No. 25-10919

# In the United States Court of Appeals for the Fifth Circuit

---

*POINT BRIDGE CAPITAL V. JOHNSON*

---

On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division, No. 4:24-CV-988, Hon. Mark T. Pitman

---

**RESPONSE TO APPELLANT CHARLES JOHNSON'S MOTION FOR BAIL PENDING APPEAL**

---

WILL THOMPSON
DLA PIPER LLP (US)
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

*Counsel for Appellees Point Bridge Capital, LLC & Hal Lambert*

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Charles Johnson** is the defendant-appellant.

2. **Michael J. Wynne, James L. Turner, and Cameron Powell of Gregor Wynne Arney, PLLC** are counsel for Johnson in the mandamus proceeding, 25-11393, but have not made an appearance in this case.

3. Petitioner's former counsel in the district court are: **Bernard Kleinman** of the **Law Office of Bernard V. Kleinman PLLC**; **Devon Judy Sanders**, **Joshua Smith Rhodes,** and **Michael A. Lehmann** of the Federal Public Defenders' Office; and **Lawrence J. Friedman** and **William Carter Boisvert** of **Friedman & Feiger, LLP**.

4. **Point Bridge Capital, LLC** and **Hal Lambert** are plaintiff-appellees.

5. **Will Thompson** of **DLA Piper, LLP** is counsel for plaintiff-appellees.

6. **Adam Douglas Farrell** and **Jeffrey J. Ansley** of **Vedder Price PC** are court-appointed receivers.

For purposes of Rule 26.1, the undersigned certifies that Point Bridge Capital, LLC has no parent corporation and no publicly held corporations owns 10% or more of its stock.

i

Dated: January 9, 2026

Respectfully submitted,

/s/ *Will Thompson*
WILL THOMPSON

*Counsel for Appellees Point Bridge*
*Capital, LLC & Hal*
*Lambert*

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ............................................. i

INTRODUCTION ........................................................................ 1

BACKGROUND ......................................................................... 4

    A.    Point Bridge and Lambert sue Johnson, who chooses to proceed pro se. ................................................................ 4

    B.    Johnson defies court orders, the district court strikes his pleadings, and plaintiffs secure a jury verdict on damages... 5

    C.    Johnson Files a Notice of Appeal ................................... 8

    D.    Johnson refuses to cooperate with post-judgment discovery and attempts to dissipate his assets. ......................... 8

    E.    At his deposition, Johnson evades questions, mocks the prospect of contempt, and steals court property. .................. 10

    F.    The district court finally holds Johnson in contempt. .......... 10

    G.    The district court recalls Johnson, who continues to evade discovery. ............................................................ 12

    H.    Johnson Files a Petition for Mandamus ............................ 13

ARGUMENT ........................................................................... 14

CONCLUSION ......................................................................... 24

CERTIFICATE OF COMPLIANCE ........................................... 25

CERTIFICATE OF SERVICE .................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armour v. Knowles,*
    512 F.3d 147 (5th Cir. 2007) ..................................................... 14

*In Re: Charles Johnson,*
    No. 25-11393, Dkt. 2 (5th Cir.) ................................................ 13

*In Re: Charles Johnson,*
    No. 25-11393, Dkt. 26 (5th Cir.), App.2130–79 ..................................... 13

*Drope v. Missouri,*
    420 U.S. 162 (1975) ............................................................ 17

*Dunn v. Johnson,*
    162 F.3d 302 (5th Cir. 1998) ....................................... 17, 19, 23

*Dusky v. United States,*
    362 U.S. 402 (per curiam) ..................................................... 17

*McNeil v. Dir., Patuxent Inst.,*
    407 U.S. 245 (1972) ......................................................17, 18

*Moore v. Harris,*
    600 Fed. App'x 201 (5th Cir. 2015) .......................................... 14

*Pate v. Robinson,*
    383 U.S. 375 (1966) ........................................................... 17

*Point Bridge Cap., LLC v. Johnson,*
    No. 25-10919 (5th Cir.) ........................................................ 8

*Smith v. Barry,*
    502 U.S. 244 (1992) ........................................................... 14

*Taylor v. Univ. of Phoenix/Apollo Grp.,*
    487 F. App'x 942 (5th Cir. 2012) ............................................ 14

iv

*Tennessee v. Lane,*
   541 U.S. 509 (2004) ................................................................ 17

*United States v. Boukamp,*
   105 F.4th 717 (5th Cir. 2024) .............................................. 23

*United States v. Brugnara,*
   856 F.3d 1198 (9th Cir. 2017) ...................................... 18, 19, 23

*United States v. Joseph,*
   333 F.3d 587 (5th Cir. 2003) ................................................ 18

*United States v. Lucarell,*
   2023 WL 3756191 (6th Cir. June 1, 2023) ........................... 23

*United States v. Perkins,*
   99 F.4th 804 (5th Cir. 2024) ................................................ 23

*United States v. Sterling,*
   99 F.4th 783 (5th Cir. 2024) ................................................ 18

*Warfield v. Fidelity and Deposit Co.,*
   904 F.2d 322 (5th Cir. 1990) ........................................... 14, 15

## Statutes

American Disabilities Act ........................................................ 17

RICO .................................................................................. 5, 8

## Other Authorities

Fed. R. App. P. 3(c)(1)(B) ....................................................... 14

Fed. R. Civ. P. 62(a) ............................................................... 8

Fed. R. Civ. P. 69(a)(2) ........................................................... 8

## INTRODUCTION

Charles Johnson's motion for bail pending appeal is another attempt to dodge the consequences of the district court's contempt finding, which arose from his sustained refusal to comply with lawful court orders. Johnson has treated the judicial process with open disdain—defying orders, ridiculing the court, and turning his misconduct into a spectacle to protect his assets and build his public brand. This motion recycles arguments from his unsuccessful mandamus petition, which this Court rightly rejected without comment. The same result is warranted here.

Tellingly, Johnson's motion says nothing about the conduct that led to his contempt. From the beginning, he has used this case to feed his social media following—treating the court as a prop, not a forum for justice. He has said—online and under oath—that he has no intention of complying, that jail is preferable to discovery, and that being locked up would help his brand. As he put it, he wanted "to go to jail in Texas" because it would yield a "sweet mugshot" that "would get a lot of attention."

The district court went to great lengths to avoid indulging Johnson's wish. Over months of proceedings, the district court bent over backwards to avoid jailing Johnson, repeatedly warning him that continued defiance would lead the court with no choice but contempt. Even when sanctions were plainly warranted, the court delayed employing coercive measures long after most courts would have imposed them.

Like his petition for mandamus, this Court should deny Johnson's motion for bail pending appeal.

*First*, the motion should be dismissed for want of jurisdiction. The notice of appeal in No. 25-10919 was filed before the district court issued the contempt order now at issue. That notice cannot support appellate review of a later order. If Johnson wishes to challenge the contempt finding, the proper course is to file a new notice of appeal that expressly identifies it.

*Second*, Johnson's motion largely duplicates arguments previously presented in his mandamus petition. He asserts, without explanation, that he "is unable to purge his contempt," and thus characterizes the contempt order as punitive rather than coercive. This Court has already

rejected that theory by summarily denying mandamus, and there is no basis to revisit it. As the district court explained, Johnson can purge his contempt by engaging in discovery in good faith, including by providing non-evasive answers about his financial assets. He cannot credibly claim that he is unable to give straight answers about his financial holdings for purposes of satisfying a lawful judgment against him.

*Third*, the sole new argument in Johnson's motion is his attempt to raise a claim of mental incapacity—an effort that amounts to weaponizing the district court's expressions of concern. But Johnson never actually claims he is mentally incompetent. He simply floats the issue, hoping to manufacture ambiguity where the record is clear. His own testimony defeats the suggestion. He affirmed his competency, denied any mental health diagnosis or treatment, takes no psychiatric medication, and voluntarily underwent psychological evaluations that found him "to be doing pretty well." Nothing about his conduct points to incapacity. On the contrary, Johnson has shown himself to be deliberate, defiant, and fully aware of the court's orders. His obstruction has not been confused or accidental, but a calculated effort to avoid compliance. Even setting aside the motion's jurisdictional flaws, he cannot credibly

claim that he lacks a rational or factual understanding of these proceedings.

The motion should be denied.

## BACKGROUND

### A.    Point Bridge and Lambert sue Johnson, who chooses to proceed pro se.

Plaintiff-Appellees Point Bridge Capital LLC and Hal Lambert, Point Bridge's founder and principal, sued Johnson in 2024 for his role in a fraudulent scheme under which he, and a co-conspirator, "falsely present[ed] themselves as intelligence agents or assets of U.S. government agencies," and sought to extort money from plaintiffs. App.162.

Long story short, Johnson made a relatively small investment in a special-purpose investment vehicle that Point Bridge created, then tried to coerce Lambert and others into giving him a much larger share by, among other things, claiming that he was "with the Defense Department" and so could ensure the company received no government contracts, and threatening to use his government ties to invoke an SEC investigation. *See* App.203–210. When Lambert refused to give in to this scheme, Johnson defamed him as "a front for a lot of the Russian activity,"

associated with the "Russian mob world," and a sexual predator. App.212–13.

In October 2024, Point Bridge and Lambert sued Johnson under the Racketeer Influenced and Corrupt Organizations Act, claiming that his repeated extortionary demands constituted a pattern of racketeering activity. App.223–230.

**B.    Johnson defies court orders, the district court strikes his pleadings, and plaintiffs secure a jury verdict on damages.**

In late January 2025, plaintiffs served Johnson with requests for production relating to their civil RICO claims. App.322. Johnson's response was blatantly deficient, and plaintiffs moved to compel adequate discovery responses.

The district court set a hearing on the motion. The district judge displayed commendable patience, telling Johnson that despite "what is possibly emerging as a pattern" of disobeying litigation rules, he would "give [Johnson] some time to respond" to discovery. App.535–36. But the judge ultimately reminded Johnson that he has "an obligation to comply with the rules" and that failure to do so could lead to contempt sanctions.

App.535. So, the court ordered Johnson to respond to plaintiffs' requests for production. App.521–22.

Johnson did not comply with the court's discovery order. Ignoring correspondence from plaintiffs' counsel, Johnson took to social media where he told his audience that it would be "an honor to pay sanctions for expressing my viewpoint" and that he "wanted" the district judge "to be adverse to me to create the impression that it was me against the system." App.574. Losing the case, Johnson said, would make him "an American legend." *Id.*

Around the same time, the district court learned that Johnson—despite saying he would do so at the prior show-cause hearing—had failed to pay his portion of the fee for court-ordered mediation. The district court set a show-cause hearing to address the mediation issue and Johnson's discovery-order noncompliance. App.567, 578.

At the hearing, Johnson's only excuse for not producing responsive documents was that the requests were overbroad. *See* App.568. The district court reminded him that he could object to discovery but nonetheless has "an obligation, under the rules, pro se or not, to produce documents that are responsive." App.1934. The judge admonished

Johnson that "[g]oing on your Substack or live chat and complaining doesn't really advance the ball." App.1935–36.

The district judge found Johnson to have defied his order and warned that he could jail Johnson for contempt. App.1944. The judge told Johnson that he was "trying to be very kind and patient" in light of Johnson's pro se status. App.1945. The court ordered Johnson to turn over his devices to a third-party discovery vendor to conduct a search for and produce all responsive, nonprivileged documents. App.580–81, 1946–47. That, however, would be Johnson's "last warning." App.1945.

Johnson didn't heed that warning. Johnson refused to tell plaintiffs' counsel his whereabouts, let alone cooperate with the third-party vendor. App.613–15. This resulted in another show-cause hearing—the second in just over a month. *See* App.635.

At the hearing, Johnson admitted that he had not complied with the court's order. App.640. Despite recognizing that Johnson appears to do "nothing but flaunt the Court's orders," the district judge expressed concern that jailing him for contempt would simply fulfill Johnson's wish "to be seen as a martyr." App.594, 596. That left the court "with no other

choice than to strike [Johnson's] pleadings." App.597; *see also* App.627 (order).

With Johnson's pleadings struck, the parties proceeded to a jury trial on damages. The jury's verdict, once trebled under RICO, was $71 million. App.922. Upon entering judgment, the court also ordered Johnson to refrain from dissipating or conveying his assets. App.918–19.

### C.    Johnson Files a Notice of Appeal

Johnson appealed that judgment on August 6, 2025. *See Point Bridge Cap., LLC v. Johnson*, No. 25-10919 (5th Cir.). In his Notice of Appeal, Johnson identified the district court's July 29, 2025, final judgment as the order from which he was appealing. At the time he filed his notice of appeal, the district court had not imprisoned Johnson for contempt.

### D.    Johnson refuses to cooperate with post-judgment discovery and attempts to dissipate his assets.

After the 30-day automatic stay of the judgment expired, *see* Fed. R. Civ. P. 62(a), plaintiffs initiated standard post-judgment discovery to identify Johnson's assets, *see* Fed. R. Civ. P. 69(a)(2); *see* App.1037–39. Plaintiffs, for example, asked Johnson to sit for a deposition. When Johnson refused, plaintiffs' counsel asked Johnson whether he would

attend "[i]f the court compelled your deposition," and Johnson responded: "You can try but yeah, it's not going to happen" and "Remember, Mr. Thompson, I wanted to go to jail during this trial and I still do." App.987.

At the same time Johnson was ignoring interrogatories and dodging a deposition, he was also trying to sell over $1 million in stock holdings in violation of the district court's asset-preservation order. Specifically, on September 15, 2025, Johnson executed a "Stock Transfer Agreement" to sell his shares in a genetics company back to the company, with the proceeds going to a newly formed LLC registered to a Wyoming address associated with shell companies used to obscure financial transactions. *See* App.1986–87.

The district court, upon learning from plaintiffs of Johnson's discovery evasion and efforts to hide assets, scheduled another show cause hearing. *See* App.965. At the hearing, Johnson began by affirming that he "ha[s] no intention whatsoever of sitting for discovery or harassment" and that he had "no objection to eventually going to Johnson County Jail and highlighting the abuses here. In fact, I would welcome it." App.938.

Despite Johnson openly "welcom[ing]" jail, the district court ordered Johnson to sit for a deposition in the court's jury room, to serve complete responses to plaintiffs' post-judgment interrogatories, and to produce at the deposition all documents responsive to plaintiffs' post-judgment requests for production. App.945,1026. The court twice more encouraged Johnson to obtain a lawyer. App.946,953.

### E.    At his deposition, Johnson evades questions, mocks the prospect of contempt, and steals court property.

Johnson physically appeared for his deposition but served no interrogatory responses and produced no documents. App.1101–02. At the outset, Johnson announced he would provide only "minimal consent," "not complete information," and "the least amount of information possible." App.1102–03; App.1624–25, 1723–24.

Over the course of five hours, Johnson engaged in obvious evasions and outright refusals, confirmed that his attempted stock sale was intended to place the proceeds "beyond the reach" of plaintiffs, App.1823, and mocked the prospect of being jailed for contempt, App.1744–46.

### F.    The district court finally holds Johnson in contempt.

Johnson's recalcitrance prompted plaintiffs to move for a receivership and the district court to set yet another show cause hearing.

*See* App.1407. The day before the hearing, Johnson posted on his Substack, "If I have to go to jail, well, I have to go to jail." Charles Johnson, *"Persevere and Become"* (Nov. 19, 2025), tinyurl.com/yc344akn.

The district court opened the show cause hearing by appointing a Federal Public Defender as standby counsel for Johnson at the hearing. App.1421. When it came time for Johnson to speak, the court asked if he would like to speak with the Public Defender first. Johnson declined, affirming that he "d[id]n't need her services." App.1432.

After addressing Johnson's theft of court property, the court turned to Johnson's (non)compliance with written discovery. The court asked Johnson, "Did you bring any documents with you [to the deposition]?" and Johnson responded, "I did not." App.1444. That, the court says, was "absolutely noncompliant," which left the court with "no other choice but to hold you in contempt for failure to comply with the ordered post-judgment discovery and providing those documents." *Id.*

Turning to Johnson's conduct at the deposition, the court decided, "[o]ut of an abundance of caution," to call Johnson to the witness stand to give him "one last opportunity to comply" by answering questions about his assets. App.1433. Johnson again confirmed that he was

"refusing to allow [standby counsel] to act as his attorney," App.1447,
then refused to answer the district court's questions, App. 1450–1467.

After Johnson stepped down, the court found Johnson to be in
contempt of court and remanded him to the custody of the Johnson
County Jail until "such time as her purges himself of his contempt."
App.1473.

### G.    The district court recalls Johnson, who continues to evade discovery.

After Johnson's father submitted a letter identifying some of
Johnson's assets in the vaguest of terms, the court recalled Johnson for a
hearing on December 16, 2025, to determine whether he had purged his
contempt. The morning of the hearing, the receivers conducted a multi-
hour interview of Johnson, their second such interview since he had been
detained. App.1494–95,2124.

Stating that it "would hate for a father to be away from their
daughter on the Christmas holidays" and that it "did want to take this
effort to see if we could get him to purge himself," the district court,
receivers, and plaintiffs' counsel then proceeded to ask Johnson questions
about his assets. App.1563. Johnson's answers were repeatedly evasive
and downright bizarre. For example, he claimed that instead of being

paid for his information he provided to law enforcement, the FBI "forg[ave] taxes that I owed." App.1506. On questioning about his Bitcoin holdings, he repeatedly answered, "I don't know," "I don't think so," or "it's possible," prompting the district court to intervene. After yet another qualified response, the district court asked, "Do you ever give a direct response," and Johnson answered, "No." App.1547.

Johnson's evasive answers vexed the court because Johnson previously admitted to having a safety deposit box "somewhere" containing a hard drive with "a lot of Bitcoin on it"—Bitcoin that he said "never touched the internet," had been "mined," and would be "impossible" to "forensically trace." App.1415.

## H.    Johnson Files a Petition for Mandamus

On December 30, 2025, Johnson, through counsel, filed a petition for a writ of mandamus. *See In Re: Charles Johnson*, No. 25-11393, Dkt. 2 (5th Cir.). In brief, Johnson argued that the district court's contempt order violated his due process rights by imposing "what is in substance and effect criminal punishment." *Id.* at 11. After ordering a response, this Court summarily denied Johnson's petition. *See In Re: Charles Johnson*, No. 25-11393, Dkt. 26 (5th Cir.), App.2130–79.

Johnson now files the instant motion for bail pending appeal, raising many of the same arguments he made in his mandamus petition.

## ARGUMENT

**This court lacks jurisdiction to review the civil contempt order.**

The notice of appeal must "designate the judgment—or the appealable order—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B). This requirement is "jurisdictional in nature," and adherence "is a prerequisite to appellate review." *Smith v. Barry*, 502 U.S. 244, 248 (1992). Effectively, this means that a sanctions order issued after an appellant filed a notice of appeal cannot be reviewed in that appeal. This Court has previously held as much, explaining that where the appellant filed a notice of appeal from final judgment and the district court subsequently issued a sanctions order, the appellant "could not have intended to appeal the sanctions ruling . . . because the sanctions order had not yet been made at the time the notice[ ] of appeal [was] filed." *Taylor v. Univ. of Phoenix/Apollo Grp.*, 487 F. App'x 942, 949 (5th Cir. 2012) (citing *Warfield v. Fidelity and Deposit Co.*, 904 F.2d 322, 325 (5th Cir. 1990)); *see also Moore v. Harris*, 600 Fed. App'x 201, 204 & n.11 (5th Cir. 2015) (explaining that post-judgment sanctions must be appealed within 30 days after entry) (citing *Armour v. Knowles*, 512 F.3d 147, 156

(5th Cir. 2007) ("Because the order on costs was a post-judgment order and not a prior order, it cannot be challenged without a separate notice of appeal." (citations omitted))).

The contempt order Johnson seeks relief from postdates the notice of appeal and is not properly before the Court. Johnson filed his notice of appeal on August 6, 2025, and it appeared on the trial docket four days later. App.2127. However, the district court did not order civil contempt sanctions until November 20, over three months after Johnson filed his notice of appeal. *See* App.1409–11. Because the notice of appeal did not— and in fact, could not—designate the contempt order for appeal, this Court lacks appellate jurisdiction to consider the order. Accordingly, if Johnson wants to appeal his confinement, he must do so "by filing a new notice of appeal." *Warfield*, 904 F.2d at 325.

### Johnson's mental-capacity challenge fails on the merits.[1]

The only issue Johnson raises that does not simply repeat his mandamus arguments is a last-minute suggestion that he lacks the

---

[1] Johnson reasserts the claim that the district court's contempt order amounts to criminal contempt because it is punitive in nature. Motion at 1. Johnson raised this precise issue in his mandamus petition, which this Court denied. To the extent that Johnson can raise this duplicative argument in his motion, Appellees incorporate the analysis contained in

mental capacity to comply with the court's orders. Motion at 2. The argument is new and unsupported. Nothing in the record—and nothing in Johnson's prior representations to the court—supports the notion that he is incapable of compliance.

During the November 20 show-cause hearing, the court asked whether Johnson had "ever been diagnosed with a mental illness" and "if [he] feel[s] like [he is] mentally competent, in the sense [he] understand[s] why [he's] here and the consequences" of his obstruction. Johnson responded clearly that he had "not" been diagnosed with any mental illness; was not "seeing any mental healthcare professional"; was not taking any "psychiatric medicines"; and that "*d[id] understand*" that the district court was "about to hold [him] in contempt."

Likewise, at the December 16, 2025, status hearing, when the court gave Johnson another opportunity to comply, the court asked, "You've told us you're mentally fit, in the sense you know what's going on here?" Johnson confirmed, "That's true, Your Honor."

---

their mandamus response here by reference. In short, the contempt order is civil and coercive and offers Johnson a clear path to release: comply in good faith with the discovery obligations he has long flouted.

Now, attempting to weaponize the court's expressions of concern, Johnson claims that the "lower court violated [his] rights under the American Disabilities Act" based on a "perceived mental impairment." Motion at 2 (citing *Tennessee v. Lane*, 541 U.S. 509 (2004), *Pate v. Robinson*, 383 U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975)). Johnson writes that his "mental capacity cannot be presumed . . . without a competency hearing." *Id.*

At best, Johnson hints that he either lacks the capacity to purge his contempt or that the court erred by not initiating a formal competency proceeding. His only basis for this claim is the district court's comment expressing concern about his mental capacity. Motion at 2. It is true that, in some cases, mental incapacity may excuse noncompliance and preclude civil contempt. A court must determine whether the contemnor's conduct is willful or is instead "a manifestation of mental illness, for which he cannot fairly be held responsible." *McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 251 (1972). But this is not such a case.

Johnson need only have "'a rational as well as factual understanding of the proceeding[ ] against him.'" *Dunn v. Johnson*, 162 F.3d 302, 305 (5th Cir. 1998) (quoting *Dusky v. United States*, 362 U.S.

402, 402 (per curiam)). The standard of review is highly deferential. Johnson must show that the district court's decision was "clearly arbitrary or unwarranted—a species of clear error review." *United States v. Joseph*, 333 F.3d 587, 589 (5th Cir. 2003) (internal quotation marks omitted).

And contrary to what Johnson suggests, the district court may rely on "its own observations of the defendant's demeanor and behavior." *United States v. Sterling*, 99 F.4th 783, 800 (5th Cir. 2024) (internal quotation marks omitted). In doing so, a district court may rightly find that a defendant's was a "product of strategic calculation rather than any mental defect," which "makes him a makes him a nuisance, not incompetent." *United States v. Brugnara*, 856 F.3d 1198, 1215–16 (9th Cir. 2017).

Measured against that standard, Johnson cannot begin to show that "he cannot fairly be held responsible" for his repeated defiance of the district court's orders. *McNeil*, 407 U.S. at 251; *see also* Oppo. to Johnson's Mandamus at 8-20, App.2146-58 (detailing Johnson's history of defiance). The record shows just the opposite. As one court aptly put it, the "evidence reveals that [Johnson's] obstinate and pugnacious behavior

was nothing more than a deliberate attempt to circumvent the court's rules." *Brugnara*, 856 F3d at 1215–16. He flaunted his noncompliance, mocked the court, and monetized his behavior through social media postings. Nor does Johnson actually assert he lacks capacity. Instead, he seeks to convert the district court's humane concern into a ground for reversal. As detailed in the mandamus opposition, that framing misrepresents both the tone and substance of the court's approach. *See, e.g.*, Oppo. to Johnson's Mandamus, App.2160.

Johnson's own testimony squarely refutes the suggestion that he did not have "a rational as well as factual understanding of the proceeding[] against him." *Dunn*, 162 F.3d at 305 (internal quotation marks omitted). Johnson's testimony to the district court leaves no doubt that he understood the nature and consequences of the contempt proceedings. He confirmed that he knew why he was before the court, acknowledged the potential consequences of contempt, and explained that he had recently undergone a voluntary psychological evaluation in 2025, where he "was found to be doing pretty well." The relevant testimony from the November 20, 2025 show-cause hearing follows.

> THE COURT: Before you step down, I want to say this with all -- and I'm not being facetious, I'm not

making accusations. This is just really -- Mr. Johnson, I'm concerned about you. Because I'm, frankly, left with no other choice, other than to hold you in contempt. So when I ask you this, please don't think I'm being accusatory. Have you ever been diagnosed with a mental illness?

JOHNSON: No, Your Honor. I have not.

THE COURT: Are you currently seeing any mental healthcare professionals?

JOHNSON: No. Not that I know of.

THE COURT: Are you on any type of psychiatric -

JOHNSON: No.

THE OCURT: Type medications at the moment?

JOHNSON: No. In fact, I sat for a psychological evaluation maybe three months ago, and was found to be doing pretty well.

THE COURT: And was that voluntary?

JOHNSON: It was voluntary, yes. It was to start another company.

THE COURT: Do you -- do you feel like that you're mentally competent, in the sense you understand why you're here and the consequences?

JOHNSON: I'm very happy to be here.

THE COURT: And you understand that I'm about to hold you in contempt?

> JOHNSON:  I do understand that.  I wish Your Honor would not do that, because he's appointed some receivers that I could work with very comfortably.

> THE COURT:  Well, the problem is you're still not answering questions like you're supposed to.

App.1467–68.

Johnson's December 16 testimony was no different. He told the court he had been "psychologically assessed . . . five times" and found to be "mentally fit," and again affirmed that he was "mentally fit, in the sense [he] knows what's going on":

> THE COURT:  And again, I am not accusing anything. I'm really asking this to help me understand.  Are you under the care of any mental health professional?

> JOHNSON:  No, Your Honor.  I'm not under the care of any mental health provider.

> THE COURT:  Are you -- have you ever been?

> JOHNSON:  No, Your Honor.  Never.

> THE COURT:  Are you taking any –

> JOHNSON:  I've never taken any meds, I've never been prescribed any meds.  I've been psychologically assessed five different times, and each time I –

THE COURT:  By who?  By the secret agencies?

JOHNSON:  No, Your Honor.  I have been assessed -- well, one time was in a divorce hearing, where I was assessed basically as mentally fit.

THE COURT:  Did the Court order that you be assessed –

JOHNSON: No.

THE COURT:  – by another

JOHNSON: I did it out of an overabundance of caution, because I was worried that my ex-wife would say that I was crazy.

THE COURT:  Perhaps she had some of the same concerns that I do.

JOHNSON:  Many people have found my lifestyle to be eccentric, unusual, strange, and so on, and so on, and so on.

\*       \*       \*

THE COURT: You've told us you're -- you're mentally fit, in the sense you know what's going on here?

JOHNSON:  That's true, Your Honor.

\*       \*       \*

THE COURT: Have you ever been diagnosed with Asperger's or autism?[2]

JOHNSON: It's been suggested that I have high-pattern recognition and low emotional intelligence. That's what's been suggested, but that's very commonplace in computer science.

App.1540–41,1553,1577.

Johnson's testimony, both before and after the contempt finding, confirms that he possesses "a rational as well as factual understanding of the proceeding[] against him." *Dunn*, 162 F.3d at 305 (internal quotation marks omitted). "Faced with this record," Johnson's "obstinate and pugnacious behavior was nothing more than a deliberate attempt to circumvent the court's rules," and thus "no need to hold a competency hearing *sua sponte*" existed. *Brugnara*, 856 F.3d at 1216.

---

[2] "Asperger's Syndrome is essentially a mild form of autism." *US v. Lange*, 445 F. 3d 983, 985 (7th Cir. 2006). The Fifth Circuit has emphatically rejected arguments that autism necessarily implies incompetence. *United States v. Boukamp*, 105 F.4th 717, 737 (5th Cir. 2024); *see also United States v. Perkins,* 99 F.4th 804, 812 (5th Cir. 2024) (although "autism diagnosis is relevant" to competency, it is less relevant, than illnesses such as schizophrenia, especially when "mild"); *United States v. Lucarell*, 2023 WL 3756191 (6th Cir. June 1, 2023) (approving the district court's determination that, because there is "nothing specific about autism that causes people to commit crimes," the defendant's autism did not mitigate the disturbing nature and circumstances of the child-sex-related offenses).

Johnson's mental-capacity argument is thus baseless and provides no grounds for disturbing the contempt order.

## CONCLUSION

The Court should reject Johnson's motion and allow the contempt order to stand.

Dated: January 9, 2026                    Respectfully submitted,

                                          /s/ *Will Thompson*
                                          WILL THOMPSON
                                          DLA PIPER LLP (US)
                                          State Bar No. 24094981
                                          will.thompson1@us.dlapiper.com
                                          1900 N. Pearl Street
                                          Dallas, Texas 75201
                                          Telephone: (406) 546-5587

                                          *Counsel for Appellees Point Bridge*
                                          *Capital, LLC & Hal Lambert*

## CERTIFICATE OF COMPLIANCE

This response complies with Federal Rules of Appellate Procedure 21(d) and 32(c)(2) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and contains 4416 words excluding the sections listed in Rule 32(f).

*/s/ Will Thompson*

## CERTIFICATE OF SERVICE

I certify that on January 9, 2026, I electronically filed this document with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users. A paper copy of the motion will be mailed to Johnson as well.

*/s/ Will Thompson*