**Will Thompson**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Tuesday, September 23, 2025 7:04 PM |
| **To:** | Thompson, Will |
| **Cc:** | Faulkner, Sherry |
| **Subject:** | Re: Point Bridge---have you attempted to sell any assets? |

⚠ EXTERNAL MESSAGE

How? My stock is locked up in the SPV he cheated me out of... of course he would know.

You should talk to your real client soon.


On Tue, Sep 23, 2025 at 20:01 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

He would not know if you are trying to sell Umbra.


**Othram**:  have you tried to sell Othram? Have you sold Othram?

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 5:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?


⚠ EXTERNAL MESSAGE

Isn't your client in control of Umbra shares? Wouldn't he know?


On Tue, Sep 23, 2025 at 19:52 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Judge Pittman's order bars you from selling until after the mandate from the 5th Circuit issues. So, he expressly takes into consideration an appeal.


Have you sold Umbra or Othram? Have you attempted to sell it? Should be an easy question to answer.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 4:49 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?

⚠ EXTERNAL MESSAGE

You seem not to understand that this is at the 5th circuit... is there a reason why?

On Tue, Sep 23, 2025 at 19:48 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles---did you try to sell any Othram or Umbra?  Have you sold it?

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 4:38 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?

⚠ EXTERNAL MESSAGE

Hey Will,

I've done what I am obliged to give you a chance to do the right thing. I've now fulfilled that obligation.

What a thing!

Anytime you want to come to DC to meet the Feds you say don't exist I'm happy to host you.

Good luck,

Appx1040

Charles


On Tue, Sep 23, 2025 at 19:32 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles:


The only way to take your statement here as a threat: "It's a challenging thing here because you are just following orders, I suppose so *I'd advise you to proceed very carefully before you get yourself or your own career into further trouble*." What are you talking about.


Also, please don't distract from my simple questions. Can you answer them? By evading the question, the only conclusion is that you have tried to sell assets, will not sit for a deposition (I think that you said that you welcomed jail), and that you won't provide any account info. Here are the questions again if you want to answer.


1. **Have you attempted to sell or dissipate any of those assets in 2025?**

2. **Have you reconsidered sitting for a deposition?**

    a. **If so, provide dates in the next two weeks?**

3. **Are you going to respond to the interrogatory asking you to identify your account information?**

And we know its baloney that the "Feds" are telling you not to talk to me.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 4:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?


⚠ EXTERNAL MESSAGE

Hey Will,

App.1012

It's before the Fifth Circuit. If you need me to get a stay I can.

I don't mean to be rude to you but I'm getting advice from the Feds not to talk to you unless it's absolutely necessary.

It's a challenging thing here because you are just following orders, I suppose so I'd advise you to proceed very carefully before you get yourself or your own career into further trouble.

All the best,

On Tue, Sep 23, 2025 at 18:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles, Judge Pittman barred you from selling any of your assets, in particular crypto, Clearview, Othram, Anduril, Umbra (among other companies and assets identified in Exhibit 64).

1. **Have you attempted to sell or dissipate any of those assets in 2025?**

2. **Have you reconsidered sitting for a deposition?**

   a. **If so, provide dates in the next two weeks?**

3. **Are you going to respond to the interrogatory asking you to identify your account information?**

In addition, it is **ORDERED** that

and anyone acting in concert with him, is

the following actions until the mandate in

Court of Appeals:

- Selling, transferring, or oth

  cryptocurrency (including bitcoin),

  other assets identified in Trial Exh

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received

App. 1043

this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Appx1044

# EXHIBIT H



# EXHIBIT I

**Thompson, Will**

---

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Thursday, September 4, 2025 3:19 PM |
| **To:** | Thompson, Will |
| **Subject:** | Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson |

⚠ EXTERNAL MESSAGE

Would you like to see a photo of me in a federal prison?

On Thu, Sep 4, 2025 at 18:12 Charles Johnson <charlescjohnson88@gmail.com> wrote:
They arrested the wrong Charles Johnson and kept me in county lockup for a long weekend. I believe it was expunged.

I have visited federal prison on several occasions, including the Super Max. Not worried about it. Frankly I could use the time to write and read and work out.

On Thu, Sep 4, 2025 at 18:10 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

What was the mistaken identity thing? That sounds different compared to spending time for contempt of court.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:07 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, it would be neither my first time in jail (mistaken identity thing) nor at the Fifth Circuit (as you know).

Alas I'm probably going to be encouraged to sue to find the litigation financing behind this whole shindig and I don't really want to do that.

You should tell Hal he should settle with me before the Feds get him. It'll look better at sentencing.

On Thu, Sep 4, 2025 at 18:04 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

I don't think that you really wanted to go to jail. I think that you were performing---Anderson County jail is not a nice place.  Would you really be ok going there? No Hurtado bbq there.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, I wanted to go to jail during this trial, and I still do.

You should probably preserve your records, though.

Champerty is an issue even in Texas!

On Thu, Sep 4, 2025 at 17:57 Charles Johnson <charlescjohnson88@gmail.com> wrote:

You can try but yeah, it's not going to happen.

I don't mean to be rude to you but you're likely going to want to chill a bit before it's overturned.

On Thu, Sep 4, 2025 at 17:56 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Just to be clear, you are going to resist any deposition absent a court order. If the court compelled your deposition, would you still not show up?  Thx for the quick response, Charles.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 2:54 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Hey Mr. Thompson,

Not going to be going to any deposition. But I love that for you.

Probably don't want to be sending me or anyone else too many harassing emails as you're conflicted... 🟠   ꞉-

I kept trying to warn you...

The fees have been paid for the 5th circuit so let's let the appeals process play out, okay?

All the best,

Charles

On Thu, Sep 4, 2025 at 17:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> Charles, In furtherance of post-judgment discovery, please provide dates when you are available for a deposition. I would like to find a time that accommodates our schedules.

therefore **ORDERED** that Defendant Charles Johnson shall pay Plaintiffs **$1,033,130.00 in attorney's fees**. The amount will be reflected in the Court's final judgment.

Next, the Court turns to Plaintiffs' Motion for Treble Damages and Asset Preservation Relief. Having considered the Motion, record, and applicable law, the Court hereby **GRANTS** the Motion.

It is therefore **ORDERED** as follows:

- The damages the jury awarded to Hal Lambert on Question 1, (ECF No. 97 at 9), are trebled from $7,500,000.00 to $22,500,000.00.

- The damages the jury awarded to Point Bridge Capital on Question 2, (ECF No. 97 at 9), are trebled from $8,000,000.00 to $24,000,000.00.

These trebled damages will be reflected in the Court's final judgment.

In addition, it is **ORDERED** that Defendant Charles Johnson, and anyone acting in concert with him, is prohibited from taking any of the following actions until the mandate in this case shall issue from the Court of Appeals:

- Selling, transferring, or otherwise disposing of any cryptocurrency (including bitcoin), stocks, private investments, or other assets identified in Trial Exhibit 64;

- Moving any such assets into a trust, LLC, or other entity in ar effort to place them beyond the reach of creditors;

- Opening or using any financial, brokerage, or digital asset account in any name other than his own for the purpose of holding assets he controls;

- Destroying, concealing, or altering any records that reflect the existence, nature, or location of his assets.

**SO ORDERED** on this **29th day of July 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Appx1032

# EXHIBIT 30

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC, ET AL.,**

     Plaintiffs,

v.                                       **No. 4:24-cv-00988-P**

**CHARLES JOHNSON,**

     Defendant.

**ORDER**

Before the Court is Plaintiffs' Motion to Compel Defendant Charles Johnson to Respond to Post-Judgment Interrogatories, Sit for Deposition, and Produce Documents. ECF No. 119.

Having considered the Motion, the applicable law, and the docket, the Court **ORDERS** the Parties to be prepared to address the Motion in person at the already-scheduled hearing on **November 10, 2025** at **12:00pm** in the fourth-floor courtroom of the Eldon B. Mahon Federal Courthouse at 501 W. 10th Street, Fort Worth, Texas 76102.

     **SO ORDERED** on this the **6th day of November 2025.**

**MARK T. PITTMAN**
**UNITED STATES DISTRICT JUDGE**

App.1024

# EXHIBIT 31

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC, ET AL.,**

    Plaintiffs,

v.                                                      **No. 4:24-cv-00988-P**

**CHARLES JOHNSON,**

    Defendant.

### ORDER

On November 10, 2025, the Court held a show cause hearing in the above-captioned case regarding Plaintiffs' Motion to Compel Defendant Charles Johnson to Respond to Post-Judgment Interrogatories, Sit for Deposition, and Produce Documents (ECF No. 119). After considering the Motion, the relevant law, this case's posture, and for the reasons stated at the hearing, the Court hereby **GRANTS** the Motion.

Accordingly, the Court **ORDERS** Defendant to serve complete, verified responses to Plaintiffs' post-judgment interrogatories within **five days** of this order. Defendant is also **ORDERED** to attend a deposition on **November 17, 2025, at 8:30 a.m.** in the fourth-floor jury room of the Eldon B. Mahon Federal Courthouse at 501 W. 10th Street, Fort Worth, Texas 76102. Defendant shall also produce all documents responsive to Plaintiffs' post-judgment requests for production at the deposition on **November 17, 2025.**

Additionally, while stated at the November 10, 2025 hearing, the Court finds it pertinent to again remind Defendant that any communication with the Court must be accomplished through filing a motion via the e-filing system, not through letters sent to the Court's proposed orders inbox.

**SO ORDERED** on this **10th day of November 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

App. 1026

# EXHIBIT 32

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC, ET AL.,**

    Plaintiffs,

v.

**CHARLES JOHNSON,**

    Defendant.

No. 4:24-cv-00988-P

## ORDER

On November 10, 2025, the Court ordered, among other things, that Defendant attend a deposition on **November 17, 2025, at 8:30 a.m.** in the fourth-floor jury room of the Eldon B. Mahon Federal Courthouse at 501 W. 10th Street, Fort Worth, Texas 76102. ECF No. 129. Due to circumstances outside of the Court's control, the fourth-floor jury room is now unavailable at that time.

Accordingly, the Court **ORDERS** Defendant to attend a deposition on **November 17, 2025, at 8:30 a.m.** in the **third-floor jury room** of the Eldon B. Mahon Federal Courthouse at 501 W. 10th Street, Fort Worth, Texas 76102.

**SO ORDERED** on this **14th day of November 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

App.1028

# EXHIBIT 33

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3                  FORT WORTH DIVISION

4   POINT BRIDGE CAPITAL, LLC    )    CASE NO. 4:24-CV-00988-P
    ET AL                        )
5                                )
                                 )    FORT WORTH, TEXAS
6   vs.                          )
                                 )    NOVEMBER 20, 2025
7   CHARLES JOHNSON              )    1:40 P.M.

8

9                              VOLUME 1
                   TRANSCRIPT OF MOTIONS HEARING
                BEFORE THE HONORABLE MARK T. PITTMAN
10              UNITED STATES DISTRICT COURT JUDGE

11

12  **A P P E A R A N C E S:**

13  FOR THE PLAINTIFF:        WILLIAM BENNETT THOMPSON
                              DLA Piper, LLP US
14                            1900 N. Pearl Street
                              Suite 2200
15                            Dallas, Texas  75201
                              Telephone:  214.743.4500
16

17

18  PRO SE DEFENDANT:         CHARLES JOHNSON
                              1624 Fieldthorn Drive
19                            Reston, Virginia 20194
                              Telephone:  617.429.4718
20

21  STAND-BY COUNSEL:         DEVON JUDY SANDERS
                              ASSISTANT FEDERAL PUBLIC DEFENDER
22                            NORTHERN DISTRICT OF TEXAS
                              819 Taylor Street, Room 9A10
23                            Fort Worth, Texas  76102
                              Telephone:  817.978.2753

24

25

```
 1

 2   RECEIVERS:              JEFFREY J. ANSLEY
                             ADAM D. FARRELL
 3                           Vedder Price
                             300 Crescent Court
 4                           Suite 400
                             Dallas, Texas  75201
 5                           Telephone:  469.895.4790

 6

 7   COURT REPORTER:         MONICA WILLENBURG GUZMAN, CSR, RPR
                             501 W. 10th Street, Room 310
 8                           Fort Worth, Texas  76102
                             Telephone:  817.850.6681
 9                           E-Mail:  mguzman.csr@yahoo.com

10

11

12   Proceedings reported by mechanical stenography, transcript
     produced by computer.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**<u>INDEX</u>**

2                                              PAGE  VOL.

3    Appearances .................................4    1

4

5    Motion to Appoint Receiver .................7    1

6

7    Motion to Show Cause – Property Taken ......14    1

8

9    Miranda Rights Given .......................17    1

10

11   Court's Ruling ............................22    1

12

13   Motion to Show Cause – Discovery ..........22    1

14

15   Questioning by the Court ..................31    1

16

17   Court's Ruling ............................52    1

18

19   Proceedings Adjourned .....................58    1

20

21   Reporter's Certificate ....................59    1

22

23   Word Index ................................60    1

24

25

**P R O C E E D I N G S**

*(November 20, 2025, 1:40 p.m.)*

    *THE COURT:*  This is Case Number 4:24-CV-988-P, Point Bridge Capital, LLC, et al vs. Charles Johnson.

    Who do I have for plaintiffs?

    *MR. THOMPSON:*  Will Thompson for the plaintiffs, Your Honor.

    *THE COURT:*  Okay.  Mr. Johnson?

    *DEFENDANT JOHNSON:*  Charles Johnson representing himself, with Ms. Sanders assisting.

    *MS. SANDERS:*  I just want to note for the record, Your Honor, I've been appointed for the limited purpose of this hearing.  I do not have Mr. Johnson's permission to speak on his behalf.

    *THE COURT:*  You do not or you do?

    *MS. SANDERS:*  I do not.

    *THE COURT:*  Okay.  Let me -- Ms. Sanders, let the record reflect that I have asked Ms. Sanders -- thank you for being here.  I know that this is the last thing you probably wanted to deal with today, especially because you were with me all morning in a criminal docket.

    But let the record reflect, I made a request that Ms. Sanders, a very competent Federal Public Defender, show up here today out of abundance of caution, due to some of the past actions that we've seen from Mr. Johnson.

1          One of the things that we're going to take up later

2   is going to be contempt.  And I want you here as standby

3   counsel for now.  The first matter I'm going to take up is a

4   purely civil -- it's a receivership motion.  And when I get to

5   the portion that might possibly involve him needing advice on

6   his Constitutional rights, then we'll take that up, okay?

7          *MS. SANDERS:*  Understood.  Thank you, Your Honor.

8          *THE COURT:*  But, again, thank you for being here

9   today.  Again, this is done simply as an abundance of caution.

10          And Mr. Johnson, thank you for being here today.

11          *DEFENDANT JOHNSON:*  You're welcome, Your Honor.

12          *THE COURT:*  All right.  We have several matters to

13  take up today.  And you've heard me express this the last

14  couple of times you've been here, Mr. Johnson, there isn't a

15  lot of time for shenanigans.

16          We do have a very busy docket, I've had a very busy

17  morning.  You have an outstanding $71 million judgment, as I

18  said at the previous hearing, that has not been stayed, has

19  not been superseded.

20          You were involved in every type of avoidance when it

21  came to the underlying case, you would not answer questions,

22  you would not cooperate.  You went through, at least, two

23  attorneys I can think of.  I've admonished you several times

24  that you need to think about trying to find an attorney.  I've

25  threatened you with contempt at various times.

1          I ordered you to appear at the courthouse and answer

2     post-judgment discovery and to give your deposition.  I am at

3     the end of my rope.  I don't have any more patience, and I do

4     not think it would be in your best interest to do what you've

5     done previously with me; and that is, to not answer questions,

6     not cooperate.  It's just not going to end well.

7          I've done everything that I can possibly do to

8     ensure that, not only do you have all the due process that

9     you're entitled under our Constitution and our common law

10    system, but also even more so.  Indeed, I've even asked a

11    public defender to be here today.

12         So, it's probably not going to be in your best

13    interest to do anything other than answer my questions and

14    participate.  We don't have time to listen to stories.  I'm

15    trying to get to the bottom of this.

16         I cannot make it any clearer than I made at the last

17    hearing, that you have a $71 million judgment, the plaintiffs

18    are entitled to collect on that judgment, and they're entitled

19    to post-judgment discovery to determine what assets you have.

20         Thus far, you have been absolutely, 100%

21    uncooperative.  As a result of that, the plaintiffs have filed

22    a motion for a receivership.  Now, a receiver is appointed by

23    the Court to, basically, take control of your assets and your

24    estate, and determine what's out there and what is subject to

25    the judgment that the plaintiffs have.

1          The motion that has been filed by the plaintiffs

2     appears very meritorious to the Court.  Indeed, you said at

3     the last hearing that we had about, I believe it was a little

4     over a week ago, that you would not object to the appointment

5     of a receiver.  And I have done my best to try and identify

6     some attorneys and some law firms that I know have the ability

7     to serve as receiver in this case that I believe are best

8     suited to do so.

9          If we would like to hear argument on the receiver,

10    I'd be happy to hear it.  But I think it might be best for me

11    to ask you, Mr. Johnson, Are you going to object?  Because you

12    did not file a response to the motion to appoint a receiver

13    filed by the plaintiffs.  Are you objecting to the appointment

14    of a receiver of your estate?

15              *DEFENDANT JOHNSON:*  No objections, Your Honor.

16              *THE COURT:*  Okay.  You need to be sure you stand

17    when you address the Court.

18              *DEFENDANT JOHNSON:*  Oh, sorry, yes.

19              No objections, Your Honor.  I don't think it will be

20    totally necessary, but they're *(sic)* happy to comb through all

21    of my assets.

22              *THE COURT:*  Okay.  No need to engage in a colloquy

23    with the Court.

24              *DEFENDANT JOHNSON:*  No objection.

25              *THE COURT:*  No objection.

1          Mr. Thompson, before I make my ruling on the

2   unopposed motion, is there anything you'd like to say with

3   regards to the appointment of the receiver?

4          *MR. THOMPSON:*  No, Your Honor.  We'll just stand

5   on -- on our motion for receiver and the supplement that we

6   filed.  We think a receiver is necessary, even more so

7   following the deposition.  We have no objection to the

8   tentative recommendations that Your Honor cited for the

9   receiver, and we're happy to go forward.

10         *THE COURT:*  Okay.  Well, I'd like to take this like

11  the old Johnny Cash song, One Piece at a Time; let's do it one

12  piece at a time, and we'll gradually get to the end, okay?

13         So, hearing no objection, and having reviewed the

14  carefully filed and constructed motion for receiver filed by

15  the plaintiffs, the Court's determined that it is appropriate

16  in this case, that all of the legal requirements for the

17  appointment of a receiver have been met in this case, it's not

18  been objected to by Mr. Johnson.

19         Now, Mr. Johnson, the Court, after much study and

20  consideration, has determined the appropriate folks to appoint

21  as a receivership in this case, both to protect you and to

22  protect the plaintiffs -- and again, you should take comfort

23  in the fact that I have a lot of respect and admiration for

24  Mr. Robert Webster, who was suggested by the plaintiffs.  But

25  out of abundance of caution, quite frankly, given your

1  proclivity to engage in conspiracies and to feed conspiracy

2  theories, I went an entire different direction and decided not

3  to appoint Mr. Webster.  Although, I've known Attorney Webster

4  for almost 20 years, and I can assure you no one is better

5  suited to serve as a receiver, and certainly look out for your

6  interests, as well as the Court's and the plaintiffs'.

7         But partially, at least, in consideration from some

8  of your concerns, I've decided that the receiver that I will

9  appoint in this case is the law firm of Vedder Price.  I've

10 asked the two attorneys over there that will be conducting and

11 be appointed as receiver in this case to please appear at the

12 hearing today.  I see that they're out there.

13        Mr. Ansley, would you please step forward, along

14 with Mr. Farrell.

15            *(Attorneys approach the bench)*

16        *THE COURT:*  Why don't both of you two make an

17 appearance on the record, just so it's clear.

18        *MR. ANSLEY:*  Yes, Your Honor.

19        *THE COURT:*  I don't believe I'll need to hear

20 anything else from you.  But make your appearance, and if I

21 need anything, or we need you later, it's good that you're

22 here.

23        Thank you, Mr. Ansley.

24        *MR. ANSLEY:*  Jeff Ansley with Vedder Price.

25        *MR. FARRELL:*  Good afternoon, Judge.  Adam Farrell

1    with Vedder Price.

2           *THE COURT:*  All right.  Thank you, gentlemen.  If

3    you'll have a seat at counsel table.

4           So, in choosing the law firm of Vedder Price, and

5    Mr. Ansley and Mr. Farrell, to serve as your receiver, again,

6    I did this trying to find the most capable folks to serve as

7    receiver while still maintaining your interest.

8           Mr. Ansley is a longtime prosecutor, criminal

9    defense attorney, as well as commercial litigation attorney

10   here in the Dallas/Fort Worth area.  He's not only served at a

11   large law firm here in Fort Worth for a number of years, but

12   he also has experience both at the Security and Exchange

13   Commission, the U.S. Attorney's Office, and he is a longtime,

14   well-respected criminal defense attorney in the white-collar

15   space.  So, I thought he would be perfect for this.  Unlike,

16   perhaps, maybe Mr. Webster, he also has a staff that can look

17   into the assets in this case and pursue correct claims.

18          I believe, Mr. Ansley, that I saw a release

19   recently, I believe you-all have hired an additional former

20   Assistant U.S. Attorney that dealt with questions involving

21   the affirmative civil enforcement division; is that correct?

22          *MR. ANSLEY:*  That's correct, Your Honor.  We hired

23   Andrew Robbins from the U.S. Attorney's Office in Dallas.

24          *THE COURT:*  I'm obviously not going to direct the

25   receiver as how to staff your cases.  But having been at the

1    U.S. Attorney's Office several years ago, I can tell you, as

2    you well know, too, Mr. Ansley, that attorney would certainly

3    have the ability to be able to look at assets and determine

4    what's recoverable from a judgment and what's not.

5            *MR. ANSLEY:*  *(Nods head)*

6            *THE COURT:*  So, I was glad -- that was another thing

7    that played into my reason to appoint you-all.  Thank you.

8            Mr. Farrell is well-known here in Fort Worth.  He

9    was a law clerk for the Honorable Reed O'Connor, the Honorable

10   Terry Means, and he also did some work for me.  I know him to

11   be honest and forthright.

12           He's also a retired Air Force captain, where he was

13   a prosecutor, and has experience in both prosecution and

14   defense work, as well as advising the highest levels of

15   command in the Pacific Ocean Command for the Air Force on

16   various strategic decisions.

17           Is that a good way to put it, Mr. Farrell?

18           *MR. FARRELL:*  Yes, Your Honor.

19           *THE COURT:*  And he's, I believe, been at Vedder

20   Price for several months.  So I thought that he would be a

21   good person to deal with this, too.  Like Mr. Ansley, I

22   personally know him to be honest and forthright.

23           And I can assure you, Mr. Johnson, that both of

24   these individuals are there not only to determine what assets

25   you have and what is appropriate, but they're also not going

1   to be conceding that any assets that would not be subject to

2   the judgment; if they are exempt, they won't be going after

3   them.  So they are very well versed in this kind of thing.

4           But, unfortunately, when you have a judgment -- I

5   warned you about this several months ago, when you represented

6   yourself in trial.  When you have a judgment against you and

7   you don't stay the judgment or supersede the judgment, it is

8   collectible; and that's where we are.  And you have not been

9   cooperative, and I am left with no other choice but to do

10  this.  And again, I'll note that you haven't objected to it.

11          So, effective here on out, after this hearing today,

12  I will be signing the proposed order for a receiver that

13  Mr. Thompson submitted, giving all those powers listed therein

14  to the two receivers.  It might be a good idea for you to

15  visit with them at some point today.

16          Mr. Thompson, do you have any questions for me?

17          *MR. THOMPSON:*  No, Your Honor.

18          *THE COURT:*  Okay.

19          *MR. THOMPSON:*  On the receiver aspect of it.

20          *THE COURT:*  And probably a good idea for you to

21  visit with the receivers as well.

22          But these two gentlemen and their law firm stand

23  effectively into the shoes of the Court.  They are effectively

24  appointed as my officers to go out and determine what assets

25  you have and what is recoverable, because you've refused to

1  cooperate.  And to the extent that you don't cooperate with

2  them, I'm sure that they will let me know.

3          Do my receivers have any questions for me?

4          *MR. ANSLEY:*  No, Your Honor.

5          *THE COURT:*  All right.  Thank you, gentlemen.

6          *DEFENDANT JOHNSON:*  May I ask a question, Your

7  Honor?

8          *THE COURT:*  Yes, sir.

9          *DEFENDANT JOHNSON:*  So, I have a fiancee that is

10 pregnant that has like difficulties, and if it's possible with

11 the receivers, I'd prefer not to be coming down to Fort Worth

12 and Dallas, if we can do it over the phone.  Is that possible?

13         I'm happy to send them all my assets.  I have no

14 objection to them, and, frankly, kind of happy that you chose

15 them.

16         *THE COURT:*  I'll let you visit with them.

17         *DEFENDANT JOHNSON:*  Okay.  Thank you.

18         *THE COURT:*  As I said, they effectively stand in my

19 shoes.  I've known both of these individuals over here for --

20 at least Mr. Ansley, for probably almost 30 years.  I can

21 assure you, if you cooperate with him, he'll cooperate with

22 you, okay?

23         *DEFENDANT JOHNSON:*  Okay.

24         *THE COURT:*  All right.  Now let's take up our

25 remaining issues.

1          In addition to having a hearing today with regards
2    to plaintiffs' motion for a receiver, the Court has also
3    ordered defendant to appear today and show cause why he
4    apparently failed to comply in good faith with the order that
5    I entered that he had to comply with post-judgment discovery.

6          And that not only deals with the failure to answer
7    interrogatories, written discovery information regarding his
8    assets, but also his failure to answer questions at the
9    deposition that was noticed to take place at the courthouse on
10   Monday.

11         Counsel for plaintiff has submitted a rough draft of
12   the deposition, and I've had a chance to review it.  And the
13   only thing that I can say to describe your behavior in the
14   deposition, Mr. Johnson, is that you were either unresponsive,
15   or obstructive throughout the deposition, and it was largely a
16   complete waste of time.  And the transcript speaks for itself.

17         It was also brought to my attention, and this is
18   part of the order causing you to appear today, that certain
19   items showed up missing from Judge O'Connor's jury room; and
20   that would be all of the water the taxpayers had paid for for
21   our jurors, and then also there was mug that was taken.

22         Why don't we do, as I said, the Johnny Cash method,
23   and take up the alleged theft of Government property first.
24   And before I do that, as I said, out of abundance of caution,
25   before I consider your response to the allegation that you

1  stole Government property from the jury room, I think it might

2  be ideal for me to formally appoint Ms. Devon Sanders, one of

3  our best Federal Public Defenders here in Fort Worth.  And I

4  will appoint her as standby counsel in this case.  And she is

5  there if you have any questions about your Constitutional

6  rights.

7      *DEFENDANT JOHNSON:*  No, Your Honor.  I can clear it

8  up, rather quickly, if you'd like.

9      *THE COURT:*  Would you like to visit with her?

10      *DEFENDANT JOHNSON:*  No, I don't.

11      *THE COURT:*  So you don't choose to use her services?

12      *DEFENDANT JOHNSON:*  Correct.  I'm happy to have her

13  present next to me, but I don't need her services.

14      *THE COURT:*  Okay.

15      *DEFENDANT JOHNSON:*  If I may very quickly?

16      *THE COURT:*  No, you may not.

17      *DEFENDANT JOHNSON:*  Okay.

18      *THE COURT:*  I'm still talking to you.

19      Ms. Sanders, have you had a chance to at least maybe

20  visit with him about his rights under the Fifth Amendment, or

21  should I give him his Miranda warnings at this time?  It

22  sounds like he's declined to have you represent him, so I hate

23  to put you in a spot.  I would like for you to remain as just

24  standby counsel.

25      *MS. SANDERS:*  Absolutely, Your Honor.

1          I have communicated with Mr. Johnson.  But I agree,

2   out of an abundance of caution, if you could give him those

3   warnings, I think that might be best for everyone involved.

4          *THE COURT:*  I think so, too.

5          *DEFENDANT JOHNSON:*  Just to be clear, I checked my

6   Miranda rights this morning, and I'm happy to waive them.  I'm

7   happy to speak on my own behalf.

8          *(Discussion between defendant and counsel)*

9          *DEFENDANT JOHNSON:*  Yes, Your Honor.

10         So --

11         *THE COURT:*  Wait.  Be careful.  I'm really, really

12   -- this is it for you, buddy.  I'm trying to be patient, but

13   I've been dealing with this for at least nine months, okay?

14         *DEFENDANT JOHNSON:*  Yes, Your Honor.

15         *THE COURT:*  I want to make sure -- Ms. Sanders,

16   thank you for, again, being here and trying to admonish

17   Mr. Johnson, although he's not your client.  Sounds like he

18   doesn't want your advice.  It's one thing to say that to the

19   Court-appointed attorney, its another to me.

20         I am going, at this time, to read you your rights

21   under the famous *United States vs. Miranda* case regarding your

22   rights -- I'm sorry, *Miranda vs. Arizona* case, regarding your

23   rights under the Constitution when it comes to

24   self-incrimination.

25         I would ask that you please listen carefully.  You

1  said that you understand these rights?

2       *DEFENDANT JOHNSON:*  I do, Your Honor.

3       *THE COURT:*  Okay.  Well, let me read them to you,

4  and I'll ask you a follow-up question.

5       Mr. Johnson, you have the right to remain silent.

6  Anything you say can and will be used against you in a court

7  of law.

8       You have the right to speak to an attorney, and have

9  an attorney present during questioning.  If you cannot afford

10  a lawyer, one will be provided for you at Government expense.

11       Do you understand those rights as I've read them to

12  you?

13       *DEFENDANT JOHNSON:*  I do and I waive them.

14       *THE COURT:*  And you understand that if you so

15  desire, I will take a break and let you visit with Ms. Sanders

16  and we'll appoint her to act as your attorney?

17       *DEFENDANT JOHNSON:*  I do, Your Honor.  And she's not

18  necessary at this time.

19       *THE COURT:*  Okay.  Please answer questions yes or no

20  and that goes for the remainder of the hearing.

21       *DEFENDANT JOHNSON:*  Yes.

22       *THE COURT:*  I want you to go over to the podium.

23       *DEFENDANT JOHNSON:*  Okay.

24       *THE COURT:*  Why don't you grab the mug there.

25       As I said, let's take up the issue of the property

1  that was allegedly removed from the jury room.

2           Did you remove the items as I've described them?

3           *DEFENDANT JOHNSON:*  I did, Your Honor.

4           *THE COURT:*  Okay.  It's your opportunity to show

5  cause.  Why did you do that?

6           *DEFENDANT JOHNSON:*  Several reasons.

7           One, I asked previously if anything that was in the

8  kitchenette was mine to take; and I was informed that, yes, I

9  could.  I then asked about the mug, but there is no sink in

10  the kitchen.  And so I went back and took the mug back to my

11  hotel room, bought some dish soap -- and gave four water

12  bottles that I had taken previous -- or that I had taken, and

13  gave two of them to some homeless people outside of my

14  courtroom -- or outside of the Courtyard Marriott, where I was

15  staying.  I then gave two more to other homeless people in the

16  area.

17           Since this trial has begun --

18           *THE COURT:*  So you removed Government property, and

19  you took the water bottles and gave them to homeless folks.

20  And you took a mug and took it back and washed it?

21           *DEFENDANT JOHNSON:*  Correct.

22           And I brought some tea with me, because there's no

23  tea options -- not a lot of healthy options in the courthouse.

24           So, I was there for six hours.  I think I --

25           *THE COURT:*  This was not meant as a spa trip.  This

1   was meant for you to actually answer truthfully the questions.

2   　　　　　*DEFENDANT JOHNSON:*  Yes.

3   　　　　　*THE COURT:*  And you're saying somebody in the Court

4   staff told you that you could use Government property, and you

5   could take the water bottles and give them away and you could

6   take the mug back to your hotel?

7   　　　　　*DEFENDANT JOHNSON:*  They never said that I could

8   take it back to my hotel.  But they did say -- I did ask if

9   everything that was in that room was mine to use.

10   　　　　　*THE COURT:*  Okay.

11   　　　　　*DEFENDANT JOHNSON:*  I'm perfectly willing to go down

12   to county lockup over a mug, which has been returned.

13   　　　　　*THE COURT:*  Let me --

14   　　　　　*DEFENDANT JOHNSON:*  The same with the water bottles,

15   I'm perfectly willing to sit before a jury --

16   　　　　　*THE COURT:*  You have a tendency not to know when to

17   be quiet, okay?

18   　　　　　*DEFENDANT JOHNSON:*  Yes.

19   　　　　　*THE COURT:*  I'm trying to be as polite as possible.

20   　　　　　*DEFENDANT JOHNSON:*  Actually, I didn't steal a

21   Bible, it was returned to me by one of the --

22   　　　　　*THE COURT:*  Again --

23   　　　　　*DEFENDANT JOHNSON:*  -- homeless people I gave it to.

24   　　　　　*THE COURT:*  -- please be quiet unless there's a

25   question outstanding.  You can have a seat.

1      *DEFENDANT JOHNSON:*  Thank you.

2      *THE COURT:*  Mr. Thompson, do you care to respond to

3   this?  You would have been there.

4      *MR. THOMPSON:*  Yes, I do.

5      I disagree with Mr. Johnson's statements.  As to the

6   water bottles, I don't recall anyone saying anything.

7      I did have a recollection about the mug, because I

8   was in the discussions.  It was four people there, myself, the

9   court reporter, the videographer, and Mr. Johnson.  The

10  deposition had concluded, or at least I called time on it when

11  he, it was clear, wasn't going to answer the questions.

12      He said, I'd like a souvenir for my time here.  And

13  he brought the mug that he had with him, he says -- I said --

14  he says, Can I take it?  I said, I don't think so, it's not

15  yours.  I specifically said, It's not your mug.  And I said,

16  why would you want it?  I said, I don't know why you want to

17  take it because it's a Tarrant County Bar Association mug.

18      And I distinctly recall, and I wrote this down,

19  Mr. Johnson saying, Well, I suppose it is better to ask for

20  forgiveness than to ask for permission, or maybe it's easier

21  to ask for forgiveness than it is permission, and then walked

22  out.  And then made another quip, because Mr. Johnson at the

23  deposition had said, repeatedly, that he might be called in

24  for a show cause hearing, but he wouldn't -- there would be no

25  -- he could always leave.  He mentioned having -- the worst

1   thing that would come about it is he'd have to eat some food

2   he shouldn't have to.  But he says, I guess this will be my

3   mug shot; and he kind of held that up.

4           *THE COURT:*  It's a pretty clever pun.

5           *MR. THOMPSON:*  And, Your Honor, I didn't print it

6   out, but I read Mr. Johnson's social media Substack, and he

7   posted a picture with the mug, and said, This is my mug shot,

8   and just, you know -- but that's all I have to say.

9           I disagree with Mr. Johnson's characterization.

10  Neither myself, nor the court reporter, nor the Court staff,

11  ever granted him any type of permission; and instead we said

12  it was not his mug.

13          *THE COURT:*  Thank you.

14          I hate to do this to the Court Security Officer.

15  But does Mr. Johnson's story about a court staff person

16  telling him that he could make use of the kitchenette sound

17  credible to you, given that either you or one of your officers

18  down there you supervise are the one that led him up to the

19  kitchenette and the jury room?

20          *SECURITY OFFICER:*  No, sir.  It is not.

21          I, myself, escorted Mr. Johnson to Judge O'Connor's

22  jury room on the third floor.  I advised Mr. Johnson where the

23  men's room was, adjacent to the jury room, and indicated rooms

24  where he would be deposed, and advised him to remain in that

25  area until the conclusion of the deposition.

1          *THE COURT:*  Thank you, Officer.

2          Mr. Johnson, having heard the response to the show

3     cause order, having heard from Mr. Thompson and the Court

4     Security Officer as to their version of what happened, and,

5     quite frankly, having worked in this building for the past six

6     and a half years, and knowing that even the Judge can't take

7     water from the jury room, I am deeply disturbed by the fact

8     that you undertook these actions.

9          This was not meant for you to come up here and make

10    a joke of this.  And it seems like that's all you have been

11    able to do.  I think that the least severe sanction that I can

12    think of to correct the behavior, and that would be, frankly,

13    I can't think of another word for it, but stealing Government

14    property, would be a $1,000 fine, due and payable immediately

15    at the conclusion of this hearing down in the Clerk's Office,

16    for removing those items without permission.

17         So that's Johnny Cash's first piece of the Cadillac.

18    Let's go to the second piece.  You've also been ordered to

19    show cause, and this is the second time, as to why you did not

20    make a good-faith effort to comply with the post-judgment

21    written discovery.

22         Based on the current filings before the Court, you

23    still have not answered, for example, the interrogatories.

24    We're not taking the deposition up at this time, as I said,

25    this is the second piece of the Cadillac that we're trying to

1   put together here.  I only care about the -- what is it,

2   Mr. Thompson, do we have two outstanding orders or one at this

3   point that he comply with post-judgment discovery?  I have the

4   original order, and then the second one from the last hearing;

5   is that correct?

6          *MR. THOMPSON:*  That's my understanding, Your Honor.

7          *THE COURT:*  Okay.  So why don't you frame it for us,

8   and then we'll allow Mr. Johnson to respond.  But is the

9   Court's statement correct, that there has been absolutely no

10  compliance with the Court's two orders and admonishments, and

11  we do not have answers to that written discovery?

12         *MR. THOMPSON:*  Yes, Your Honor.

13         A little color on that.  As to the order,

14  plaintiffs, last week -- or the week before, had moved to

15  compel Johnson to enter -- excuse me, answer two

16  interrogatories as to his assets and also his cryptocurrency

17  holdings.  Your Honor granted that after the November 10th

18  hearing.  Those were never answered.

19         Mr. Johnson, at the deposition, didn't bring those

20  interrogatory answers.  Those were due on the previous

21  Saturday.  Your Honor ordered them five days from November

22  10th.  We didn't receive anything, he did not bring them to

23  the deposition.

24         What he said was, he gave that -- he gave them to

25  his dad to mail.  And I just checked, five minutes before our

1    hearing, at 2:00 today, and my office had not received any

2    mail related to these interrogatories.  Mr. Johnson also

3    provided no proof that he had mailed them.  So that's the

4    answer on the interrogatories.

5           I guess the only corollary to that is --

6           *THE COURT:*  And he swore under oath -- I'm assuming

7    you swore him in at the deposition -- to this story?  Was this

8    story on the record?

9           *MR. THOMPSON:*  This story was under oath.  He was

10   sworn in by the court reporter.

11          *THE COURT:*  And that's evidenced by the rough

12   transcript that you filed with the Court; is that correct?

13          *MR. THOMPSON:*  Correct, Your Honor.  We requested

14   the rush transcript on that, it was long.

15          But multiple times I noted to Mr. Johnson that -- at

16   the very beginning, outset of the deposition, I said that the

17   oath that he swore in that deposition was the same as if he

18   was before Judge Pittman in the courtroom; and Mr. Johnson

19   said that he understood that.

20          Mr. Johnson has like -- said that he would answer

21   minimal questions about his assets.  The word that he

22   repeatedly used was, I think, "Minimal compliance."  And I

23   discuss that more in Docket Entry 131, our supplement -- or

24   excuse me, Docket Entry 136, plaintiffs' supplement to support

25   a motion to appoint a receiver.

1      I asked Mr. Johnson what minimum compliance was; he

2  said, Well, it's the absolute minimum.  So I said, You're not

3  going to tell me about all your assets; and he said something

4  along the lines of that's correct.

5      THE COURT:  And again, so our record is clear, we're

6  just talking about the written discovery.  I'll get to the

7  deposition.

8      MR. THOMPSON:  Sure.  Absolutely.  So, that's the

9  answer on the interrogatories.

10      Your Honor's order on plaintiffs' motion to compel

11  post-judgment discovery also compelled Mr. Johnson to bring

12  certain documents to the deposition, to show up to the

13  deposition with those documents.  Included within the

14  plaintiffs' request Mr. Johnson was ordered to produce were

15  tax returns; he produced nothing.  Again, citing to some

16  unnamed government authority that he was operating under.

17      That is the best summary of Mr. Johnson's compliance

18  with Your Honor's orders on the production of interrogatories

19  and outstanding document requests.

20      THE COURT:  Okay.

21      All right.  Mr. Johnson, it's been laid out by both

22  the Court and Mr. Thompson.  Please approach the stand, and

23  let's have your opportunity to show cause.  And again --

24      DEFENDANT JOHNSON:  Sure.

25      THE COURT:  -- I don't need a long colloquy.

1    *DEFENDANT JOHNSON:* Very -- very quickly.

2    *THE COURT:* Stop.

3    *DEFENDANT JOHNSON:* Sorry.

4    *THE COURT:* We're only dealing with the written

5    discovery, and that includes the documents you were supposed

6    to bring to your deposition, that includes the orders that you

7    were subject to to answer the post-judgment discovery.

8         I've read the deposition transcript. As I said, you

9    were unresponsive and obstructive to each and every question

10   dealing with the written discovery. Mr. Thompson has said you

11   didn't bring any requested documents, the ordered documents,

12   rather, to the deposition. And this is part of the reason

13   necessitating the appointment of a receiver.

14        So, it's your chance, tell me why you should not be

15   sanctioned and/or held in contempt.

16   *DEFENDANT JOHNSON:* Very simply, Your Honor. You

17   said at the last hearing that we came together that you would

18   stop the abuse and harassment that would take place in the

19   discovery where there were questions that were asked that had

20   nothing to do with my post-judgment assets. And there were,

21   quite a number of questions. My relationship with the FBI, my

22   relationship with somebody who's currently facing criminal

23   charges, there were quite a number of questions. It went on

24   for six hours, which is probably why I wanted the water.

25        And so, yes, there is an abuse of process that's

1  been going on, the abuse of process started when I --

2            THE COURT:  Did you bring any documents with you?

3            DEFENDANT JOHNSON:  I did not, Your Honor.

4            THE COURT:  Did you answer interrogatories?

5            DEFENDANT JOHNSON:  I did answer the interrogatories

6  when he asked them in the room, yes.  And I did answer them,

7  and I did --

8            THE COURT:  We'll get to the deposition in a moment.

9            DEFENDANT JOHNSON:  Yeah.

10            THE COURT:  Okay.  That is absolutely noncompliant.

11  So you've violated two of my orders.  And I'm left with no

12  other choice but to hold you in contempt for failure to comply

13  with the ordered post-judgment discovery and providing those

14  documents, you were ordered to do so.

15            So we're going to put that aside.  You can have

16  another seat.

17            DEFENDANT JOHNSON:  Okay.  Thank you.

18            THE COURT:  Johnny Cash is going to try to put the

19  bumper on his Cadillac.  We're going to talk about the

20  deposition and what went on at the court-ordered deposition.

21            And Mr. Thompson, I don't think I need you for this,

22  but I am going to need Mr. Johnson.  Out of abundance of

23  caution, you were specifically ordered to comply with the

24  written discovery and bringing the various documents; you've

25  told me today you didn't do it.  The best thing I can get out

1   of you as an excuse, is that you have some sort of FBI/CIA

2   handlers or something that's forbidding you to do that.

3            Here in the United States, even if that's true, the

4   judiciary is a coequal branch of government with the executive

5   branch or the legislative branch, and I have authority to

6   order you to do this and to produce this.  You haven't done

7   it.

8            I have taken several hours out of my day.  As you

9   know when you were here last time, I just got out of a

10  week-and-a-half-long trial.  This morning was spent sentencing

11  various criminal defendants.  But I have managed to take home

12  your deposition transcript and exhaustively read it; taking

13  time away from my family.

14           I cannot say anything else, other than regarding

15  matters that you were ordered to respond to, you were

16  consistently unresponsive, obstructive during that deposition.

17  So at this time, I am asking you to come take a seat on our

18  witness stand.  Out of abundance of caution, before I announce

19  my final decision and what will happen to you for being held

20  in contempt, I would like to give you one last opportunity to

21  comply with the Court's orders concerning the disclosure of

22  your assets.

23           So come up to the witness stand.

24                (Defendant approaches the stand)

25                THE COURT:  Before you take a seat, sir, raise your

1    right hand.

2              (Witness sworn)

3              THE COURT:  Have a seat.

4              All right.  Be sure you speak into the microphone,

5    so Monica can hear.

6              Now, as I said, I've spent several hours reviewing

7    the deposition transcript, as well as the matters before the

8    Court today.  I have taken a very close look at the deposition

9    transcript.

10             I want to note for the record at this time that your

11   answers to several of the financial questions were evasive, at

12   best.  You repeatedly refused to provide information on the

13   basis of your alleged government contracts -- contacts, and

14   you frequently interrupted Mr. Thompson and diverted to

15   unrelated narratives and nonsense.

16             Today, you're asking questions that I am -- I am

17   asking you questions and I am not the attorney.  I'm telling

18   you, you had better give me clear, direct and complete

19   responses to my questions.

20             So what I have done, Mr. Thompson, I went and

21   reviewed your deposition transcript, I don't know how any

22   counsel of any experience could have gotten through this.

23   What a difficult task for you.  I can't imagine being any more

24   frustrated, so I commend you for your patience.

25             I have picked out what I think are the most

1    pertinent questions that were unanswered at the deposition,

2    and I'm about to go through those.  But I want to let you

3    know, because Mr. Johnson was so obstructive, that I did my

4    best to try to draft the questions in the same way that you

5    stated them, but just, quite honestly, it was hard for you to

6    get any questions out.  So I have drafted the questions as

7    best I can with an eye towards that.

8        *MS. SANDERS:*  Your Honor, may I briefly approach the

9    witness?

10        *THE COURT:*  The witness has said he doesn't want to

11   consult you.

12        *MS. SANDERS:*  Just for a brief minute.

13        *THE COURT:*  Out of abundance of caution, I'll let

14   you.  But I'll note, that so far Mr. Johnson has refused to

15   take your advice or allow you to represent him.  So I'll do it

16   one time, okay?

17        *MS. SANDERS:*  Thank you.

18            *(Discussion between defendant and counsel)*

19        *THE COURT:*  Ms. Sanders, I don't want to ask you

20   what you advised Mr. Johnson, but, again, my understanding is

21   he's refusing to allow you to act as his attorney; is that

22   correct?

23        *MS. SANDERS:*  Yes your Honor.

24        *THE COURT:*  Okay.  All right.  Thank you, though,

25   again, for being here.

1          Let me ask you a few questions, answer them fully

2     and responsively.  And I'll preface this again by saying, if

3     you don't know the answer, or you're not allowed to disclose

4     pursuant to your alleged government contacts, that's not going

5     to cut it.  Do you understand that?

6          *DEFENDANT JOHNSON:*  I do, Your Honor.

7          *THE COURT:*  Okay.  Listen very closely.

8          In your deposition you stated multiple times that

9     you intended to be only, "Minimally compliant," and would not

10    -- and would provide, "not complete information" -- again, I'm

11    quoting directly from your deposition transcript "in response

12    to the Court's discovery orders."

13         The Court requires full compliance and complete

14    responses regarding your financial information.  Are you now

15    prepared to provide a complete, detailed and accurate account

16    and information about your finances?

17         *DEFENDANT JOHNSON:*  I am to the -- to those

18    gentlemen there.  Is that who I'm supposed to interact with?

19         *THE COURT:*  You're here today to answer this.

20         *DEFENDANT JOHNSON:*  Yes.  I am prepared.

21         *THE COURT:*  Okay.  All right.  Thank you.

22         Have you transferred, moved, or otherwise disposed

23    of any assets for the purpose of placing them beyond the reach

24    of Point Bridge Capital or Mr. Hal Lambert, the plaintiffs in

25    this case?

1        *DEFENDANT JOHNSON:* No.  I have not, Your Honor.

2        *THE COURT:* Okay.

3        Have many -- how many government trusts do you own

4   and how many are you a beneficiary of?  So how many trusts do

5   you currently own and how many are you the beneficiary of?

6        *DEFENDANT JOHNSON:* On the government trust side, I

7   don't know the answer.

8        *THE COURT:* Well, do you have a guess for us?  More

9   than two?

10       *DEFENDANT JOHNSON:* They were set up for me by other

11  people, so I don't know the answer to that question.

12       *THE COURT:* Well, I'm asking you to tell me how many

13  you think there might be.  One, two, three, four?

14       *DEFENDANT JOHNSON:* Maybe one, maybe two.

15       *THE COURT:* Maybe one, maybe two?

16       *DEFENDANT JOHNSON:* I don't know.

17       *THE COURT:* Maybe ten?

18       *DEFENDANT JOHNSON:* I don't know.

19       *THE COURT:* Less than ten?

20       *DEFENDANT JOHNSON:* Well, every time something is

21  done, typically there's a -- there's a asset -- or there's an

22  account that's set up for them.  So I wouldn't know the answer

23  to that question.  I'm not -- I'm not in charge of that.

24       *THE COURT:* And these are trusts that are held in

25  your benefit?

1          *DEFENDANT JOHNSON:*  I don't think so, Your Honor.  I

2     think they're held for the benefit of things that are done for

3     the government.

4          *THE COURT:*  Explain that.

5          *DEFENDANT JOHNSON:*  So my understanding is that when

6     there's work that's done on behalf of the U.S. Government,

7     there are trusts that are oftentimes created for individuals

8     who act as custodians, or they use that money for the

9     operation or for what's going on.  So I don't think that that

10    money is mine per se.

11         *THE COURT:*  Are you talking about for clandestine

12    activities?

13         *DEFENDANT JOHNSON:*  Not necessarily clandestine, but

14    for all kinds of manners.  Yeah, I don't know the answer to

15    the question, that's why I couldn't answer it the other day.

16         *THE COURT:*  Can you identify those trusts for us?

17         *DEFENDANT JOHNSON:*  I cannot, Your Honor.  I don't

18    know them.

19         *THE COURT:*  But you do know that you have them?

20         *DEFENDANT JOHNSON:*  I do know that somebody who

21    worked -- that I worked with told me that he had set them up

22    on my behalf and on behalf of my ex-wife and daughter.

23         *THE COURT:*  Who told you this?

24         *DEFENDANT JOHNSON:*  I will not say.

25         *THE COURT:*  You're refusing to answer the question;

1    is that correct?

2            *DEFENDANT JOHNSON:*  I am, Your Honor.

3            *THE COURT:*  Okay.  Moving on.

4            How many trusts do you know of that you are the

5    beneficiary of?  And that might include something that maybe

6    your parents, or grandparents, or other family members might

7    have set up for you.

8            *DEFENDANT JOHNSON:*  I think I'm the beneficiary of

9    one that my father set up, but I don't know.

10           *THE COURT:*  How do you not know whether you're the

11   beneficiary of a trust?

12           *DEFENDANT JOHNSON:*  Typically, we are WASPs, we

13   don't really talk about that sort of thing.  We usually find

14   out when people die.

15           *THE COURT:*  That's not been my experience in 50

16   years, but -- so you don't know whether you have -- you're a

17   beneficiary of a trust or not?

18           *DEFENDANT JOHNSON:*  Correct.  I have my own trust.

19           *THE COURT:*  Okay.  Tell us --

20           *DEFENDANT JOHNSON:*  Which is --

21           *THE COURT:*  -- tell us about your own trust.

22           *DEFENDANT JOHNSON:*  Which is Xavier Capital Trust,

23   and it has two assets in it.

24           *THE COURT:*  Tell us the assets.

25           *DEFENDANT JOHNSON:*  They are the Clearview AI stock

1 and they're the Othram stock.

2       *THE COURT:*  And were these trusts -- you set these

3 trusts up?

4       *DEFENDANT JOHNSON:*  They were set up by an attorney

5 in California that was introduced to me.

6       *THE COURT:*  Well, you understand what I mean.

7       *DEFENDANT JOHNSON:*  What do you mean?

8       *THE COURT:*  You went to the attorney and asked the

9 attorney, Please set up a trust for my benefit and these are

10 the assets I want placed in the trust?

11       *DEFENDANT JOHNSON:*  Correct, Your Honor.  And that

12 was in 2019, which is beyond the scope -- or beyond the

13 questions -- time limit that Mr. Thompson asked about.

14       *THE COURT:*  You understand with the appointment of a

15 receiver all of this has to be disclosed, and whether it's

16 subject to the $70 million judgment or not, is not a question

17 for you to determine, rather it's a question for me to

18 determine?

19       *DEFENDANT JOHNSON:*  I agree, Your Honor.  I'm happy

20 to comply with the two gentlemen that you just put in charge

21 of the receivership.

22       *THE COURT:*  Let me continue.  Any other trust that

23 you can think of?

24       *DEFENDANT JOHNSON:*  No, Your Honor.

25       And Mr. Thompson asked me about a trust that was

1  called the Task Force Trust, and that involved the assets that

2  are in question here, which is --

3        THE COURT:  I'm asking big questions, because I want

4  you to give detailed answers.

5        DEFENDANT JOHNSON:  Yes.  I'm giving you as detailed

6  an answer as I can.

7        THE COURT:  All right.  The Task Force Trust, what

8  is that?

9        DEFENDANT JOHNSON:  The Task Force Trust was set up

10  by myself and brother and father.  And it was set up with the

11  intent of putting half of my interest in this special purpose

12  vehicle in a company called Umbra, which is a synthetic

13  aperture radar technology system.  And so, Mr. Lambert cheated

14  me out of that interest, so ultimately I didn't end up putting

15  it into --

16        THE COURT:  I don't care whether --

17        DEFENDANT JOHNSON:  -- the Task Force Trust.

18        THE COURT:  -- it was cheated or whatever --

19        DEFENDANT JOHNSON:  So there's no assets in the

20  trust.

21        THE COURT:  -- I need to know what you own --

22        DEFENDANT JOHNSON:  Yes.

23        THE COURT:  -- and you haven't been telling us.

24        DEFENDANT JOHNSON:  Just so you know --

25        THE COURT:  You're even refusing to ask *(sic)*

1  questions.

2       *DEFENDANT JOHNSON:*  Okay.  And then -- so, yeah,

3  those are it for me.

4       And then my ex-wife and daughter have a trust, but

5  those assets haven't been touched since 2019.  And again,

6  those -- I think this would be the Clearview and Othram stock,

7  or they could also include some of the Umbra stock as well.

8       *THE COURT:*  Okay.  Let me continue.

9       What's your best estimate of the total amount of

10  money you have received from the United States Government or

11  any foreign government?

12       *DEFENDANT JOHNSON:*  I don't know.  Maybe somewhere

13  around a few million.

14       *THE COURT:*  You've received $3 million from the

15  United States Government?

16       *DEFENDANT JOHNSON:*  Not totally sure, Your Honor.

17       *THE COURT:*  That's just a ballpark or was that a --

18       *DEFENDANT JOHNSON:*  I don't know.  Because typically

19  the way it's done is sometimes you're given a contract through

20  an intermediary.  So I just don't know the answer to that

21  question, I couldn't answer it truthfully.

22       *THE COURT:*  Do you want to discuss any of the work

23  you've done for the United States Government?

24       *DEFENDANT JOHNSON:*  No, Your Honor.  I like doing

25  the work.  I intend to continue doing it, if I can.

1          *THE COURT:*  So you're refusing to answer the
2     question, The type of work you've made $3 million, allegedly,
3     from the United States; is that correct?
4          *DEFENDANT JOHNSON:*  Correct, Your Honor.
5          *THE COURT:*  Have you ever received any money from
6     any foreign governments?
7          *DEFENDANT JOHNSON:*  Not to my knowledge, Your Honor.
8          *THE COURT:*  What does that mean, not to my
9     knowledge?
10         *DEFENDANT JOHNSON:*  There have been times in which
11    I've been asked to take money from individuals that have
12    connections with foreign governments, but the U.S. Government
13    has been okay with it.  I've gotten a form, called an OIA,
14    when that was done, which is an otherwise illegal activity
15    form.  And that was some work I did when I was a confidential
16    informant for the FBI.
17         And, again, I would prefer not to discuss any of
18    those things, because it affects my ability to work and --
19         *THE COURT:*  Well, I don't care what you prefer and
20    not prefer, you're under oath, answer the questions.  And if
21    you don't want to answer them, that's fine; there are
22    consequences for that.  But I'm just -- I don't have time for
23    the stories.
24         So the answer is, I'm not going to disclose or I am
25    going to --

1          *DEFENDANT JOHNSON:*  Not going to disclose.

2          *THE COURT:*  Okay.  Has any United States Government

3    or -- let's keep this as broad as possible.  Has any

4    government anywhere, or any government agency, ever

5    established a bank account for you or provided you prepaid

6    cards in connection with any alleged informant work?

7          *DEFENDANT JOHNSON:*  Yes.

8          *THE COURT:*  Okay.  Describe those to us at this

9    time.

10          *DEFENDANT JOHNSON:*  Well, they're no longer

11    operational.  But I have been provided with credit card -- or

12    with credit cards with access to bank accounts, yes.

13          *THE COURT:*  By who?

14          *DEFENDANT JOHNSON:*  By -- one was my handler in the

15    FBI, and the other is a handler in a government -- another

16    government agency.

17          *THE COURT:*  Who is your handler at the FBI?

18          *DEFENDANT JOHNSON:*  He was Johnathan Boomer.  He's

19    since out, so I can talk about it.  But some of those cases we

20    worked on are still ongoing.

21              *(Court Reporter interrupts)*

22          *DEFENDANT JOHNSON:*  Yes.  J-O-H-N-A-T-H-A-N.

23          *THE COURT:*  What other government agencies are you

24    working with.

25          *DEFENDANT JOHNSON:*  I decline to answer the

1    question.

2            THE COURT:  Okay.  That's all I want to know.

3            Have you provided, with Mr. Thompson, a

4    comprehensive list of all the portfolio companies or

5    entities in which you hold any financial interest whatsoever?

6    Yes or no?

7            DEFENDANT JOHNSON:  No.

8            THE COURT:  Okay.  You were provided -- you were

9    required by Court order to produce monthly statements from

10   your Woodforest bank account, among other financial

11   statements, pursuant to the request for production number

12   three, which you were ordered to answer.

13           At your deposition, per the transcript, you stated

14   that you would not comply with that request.

15           Are you prepared to comply with that request now?

16           DEFENDANT JOHNSON:  I am, Your Honor.

17           THE COURT:  Do you have those documents with you?

18           DEFENDANT JOHNSON:  I do not, Your Honor.

19           THE COURT:  Okay.

20           DEFENDANT JOHNSON:  I don't handle any of my

21   banking.  I'd have to go call somebody to handle it for me,

22   but I don't have a phone.

23           THE COURT:  So you were supposed to bring those, you

24   didn't bring them --

25           DEFENDANT JOHNSON:  I didn't bring them.

1    THE COURT:  -- and you don't have them?

2    DEFENDANT JOHNSON:  That's right.

3    THE COURT:  Okay.  This is the last question that I

4    have; and, then, Mr. Thompson, if you'd like to do some

5    follow-up, I'll turn it over to you.  But I did the best I

6    could from the questions that you were allowed to get, okay?

7    During your deposition you were asked to identify

8    all of your bank accounts in your name; and you stated you did

9    not know.  I find that to be absolutely uncredible, zero

10   credibility.  I just do not believe that you don't know your

11   bank accounts.

12   Are you prepared today to identify and disclose

13   all -- disclose bank accounts in your name?

14   DEFENDANT JOHNSON:  I am, Your Honor.

15   THE COURT:  All right.  List them off.

16   DEFENDANT JOHNSON:  I have three bank accounts at

17   Woodforest bank, combined total assets of them are under --

18   maybe 3,000 to $4,000 currently, and that's it.  That's all

19   I've got.

20   THE COURT:  You don't have any other bank accounts?

21   DEFENDANT JOHNSON:  No, Your Honor.

22   THE COURT:  What about investment accounts?

23   DEFENDANT JOHNSON:  I don't have any of those

24   either.

25   THE COURT:  Any other that might not be in the name

1  of a -- not your name individually, but maybe an LLC, or

2  another entity that you have an interest in that you can write

3  checks or have access to cash out of the accounts?

4          *DEFENDANT JOHNSON:*  No, Your Honor.

5          *THE COURT:*  And no others, other than this one?

6          *DEFENDANT JOHNSON:*  No others.

7          *THE COURT:*  And that's a checking account?

8          *DEFENDANT JOHNSON:*  That's a checking account, yeah.

9  From Woodforest bank, which is in The Woodlands, Texas.

10         *THE COURT:*  Do you have any safe deposit boxes down

11  there?

12         *DEFENDANT JOHNSON:*  No, Your Honor.

13         *THE COURT:*  Do you have any cryptocurrency?

14         *DEFENDANT JOHNSON:*  No, Your Honor.

15         *THE COURT:*  You understand you're under oath?

16         *DEFENDANT JOHNSON:*  I do understand I'm --

17         *THE COURT:*  Lying under oath is a crime.

18         *DEFENDANT JOHNSON:*  I have no cryptocurrency.

19         *THE COURT:*  If I find that you've perjured yourself,

20  I'm referring you to the U.S. Attorney's Office for charges.

21         *DEFENDANT JOHNSON:*  By all means.

22         *THE COURT:*  Be careful what you ask for.

23         Mr. Thompson, do you have any further questions for

24  Mr. Johnson that he previously failed to answer that you'd

25  like to place on the record at this time?

1          MR. THOMPSON:  I do, Your Honor.  I'll keep it very
2    short and very brief.
3          Mr. Johnson, the Wyoming, LLC, JXC, LLC; do you know
4    what I'm talking about?
5          DEFENDANT JOHNSON:  I do.  I don't think that's the
6    exact account, but yes.
7          MR. THOMPSON:  The Wyoming, LLC, that was set to
8    take the proceeds of the sale of the Othram stock --
9          DEFENDANT JOHNSON:  Correct.
10         MR. THOMPSON:  -- are you aware of that?
11         DEFENDANT JOHNSON:  I am aware of that, yes.
12         MR. THOMPSON:  Did you set that up?
13         DEFENDANT JOHNSON:  I did not.
14         MR. THOMPSON:  Did a government handler set that up?
15         DEFENDANT JOHNSON:  Yes.
16         MR. THOMPSON:  What is the name of that government
17   handler?
18         DEFENDANT JOHNSON:  I refuse to answer the question.
19         MR. THOMPSON:  Do you know the person's name?
20         DEFENDANT JOHNSON:  Yes.
21         MR. THOMPSON:  You had no role in setting up that
22   government --
23         DEFENDANT JOHNSON:  Zero role whatsoever.
24         MR. THOMPSON:  Do you realize that you previously
25   testified that the reason that there's a Wyoming, LLC, set up

1    to take the proceeds of the Othram sale, was because your

2    family or your grandmother had a connection with Wyoming?

3             *DEFENDANT JOHNSON:*  Yes.  My handler is well aware

4    of my Wyoming connections.

5             *THE COURT:*  In fact, I believe you testified at the

6    last hearing that the reason why you were in Wyoming was due

7    to a family connection, and some assets up there that had

8    nothing to do with this case.

9             Am I misstating what you said at the last --

10            *DEFENDANT JOHNSON:*  You are, Your Honor.

11            *THE COURT:*  I am not?

12            *DEFENDANT JOHNSON:*  You are misstating it.

13            *THE COURT:*  Okay.

14            *DEFENDANT JOHNSON:*  So, I have a Wyoming connection.

15   My grandmother is from there.  She helped -- dealt with

16   accounts for Navy intelligence.  And so Wyoming is a very --

17   it's a state that intersects with a lot of U.S. interests,

18   shall we say.

19            And so, I've never been to Sheridan, I've never been

20   to that bank account.  I don't have any accounts that are in

21   -- I think it was like a -- what was the name of the bank

22   that's in there?  There was like a list or something of the

23   bank.

24            *MR. THOMPSON:*  Wells Fargo.

25            *DEFENDANT JOHNSON:*  Yeah, Wells Fargo.  I don't have

1    a Wells Fargo account.  I think I was banned from Wells Fargo

2    in 2019.

3              THE COURT:  Why were you banned from Wells Fargo in

4    2019?

5              DEFENDANT JOHNSON:  At the time I owned lots of

6    cryptocurrency, Your Honor.

7              THE COURT:  What happened to all the crypto?

8              DEFENDANT JOHNSON:  I was -- I just got rid of all

9    of it, because then-President Donald Trump gave a Tweet where

10   he said that he didn't like cryptocurrency.  And I was under

11   the impression that there were people who were looking at me

12   in the U.S. Government around various things, and they asked

13   me to get -- just -- just disabuse myself of a lot of my

14   assets, get rid of a lot of those assets.

15             THE COURT:  Go ahead, Mr. Thompson.  I have a

16   follow-up.

17             MR. THOMPSON:  I was just going to keep this just

18   for the record.

19             Mr. Johnson, identify all of the exchanges, hard

20   wallets, or at places where your cryptocurrency was ever

21   stored since you possessed it.

22             DEFENDANT JOHNSON:  I don't know those.  But I don't

23   have any cryptocurrency.  I haven't had any since at least

24   2018/2019 time frame.

25             MR. THOMPSON:  Not my question, sir.

1      *DEFENDANT JOHNSON:*  I don't have any -- I don't have

2  any hard wallets, I don't have any paper wallets.  I don't

3  touch the stuff.  I don't like the stuff.  I think its used by

4  a lot of criminals to do a lot of dangerous --

5      *THE COURT:*  Rather than giving us a colloquy, if you

6  don't have any, say no.

7      *DEFENDANT JOHNSON:*  I have none, zero, zilch.

8      *THE COURT:*  Mr. Thompson, go ahead.

9      *MR. THOMPSON:*  My question, Mr. Johnson, is,

10  Identify the exchanges, how many hard wallets you had, where

11  you stored your cryptocurrency when you did possess it.

12      *DEFENDANT JOHNSON:*  I don't know.

13      *THE COURT:*  You have no idea where you stored your

14  cryptocurrency?

15      *DEFENDANT JOHNSON:*  I think I had a Coinbase account

16  maybe at one point, but I haven't used it.

17      *THE COURT:*  Did you ever have any hard

18  cryptocurrency that you had placed in -- underneath your bed

19  in a shoebox, or safe deposit box?

20      *DEFENDANT JOHNSON:*  No.  No, I did not.  I do not.

21      *THE COURT:*  You never had any hard cryptocurrency?

22      *DEFENDANT JOHNSON:*  I don't know.  Maybe, I could

23  have, but I don't recall it off the top of my head.  I had a

24  lot of money at the time, but I don't anymore.

25      *THE COURT:*  Do you understand that if you're in my

1    spot and you're listening to this, that it is very hard for me

2    to believe -- and I preface this by saying, I've been doing

3    this for 12 years on three different courts, I've seen a lot

4    of people testify, I've heard a lot of testimony.  I found

5    that -- find it to be completely not believable that you don't

6    know whether you had any hard cryptocurrency.

7            *DEFENDANT JOHNSON:*  I don't understand the question

8    your Honor is asking me.  I don't have any, didn't have any.

9            *THE COURT:*  You never had any hard cryptocurrency?

10           *DEFENDANT JOHNSON:*  I had some on a laptop, but that

11   was a long time ago.

12           *THE COURT:*  Would you like to do any follow-up?  I'm

13   just concerned you're never going to get any answers.

14           *MR. THOMPSON:*  I have one more question.

15           *THE COURT:*  Yeah.

16           *MR. THOMPSON:*  Because I just want to make it clear

17   for follow-up.

18           Mr. Johnson, the sale of the Othram stock, the

19   purpose of that sale was to prevent Hal Lambert and the

20   plaintiffs in this action for executing on it, correct?

21           *DEFENDANT JOHNSON:*  No.  It was not.

22           *THE COURT:*  It wasn't to prevent -- well, go ahead.

23           *MR. THOMPSON:*  That's not what you said in your

24   deposition, Mr. Johnson.

25           Mr. Johnson, in your deposition you said the purpose

1   of the transaction was, in part, to keep the sale proceeds of

2   the Othram stock from, in part, Mr. Hal Lambert and

3   plaintiffs, prevent them --

4         *DEFENDANT JOHNSON:*  I never said that.  And there's

5   video evidence that I didn't say it.

6         *THE COURT:*  I'm reading the portion of your

7   transcript, let's just -- let me ask you about that.

8         You were asked a question:  Your position is that

9   Hill *(sic)* and the plaintiffs are not entitled to the proceeds

10  of the Othram stock, or the stock itself?

11        Answer:  That's correct.

12        Question, by the attorney, Mr. Thompson:  And the

13  purpose of this transaction using the JXC Wyoming, LLC, and

14  the Wells Fargo bank account was to prevent Hill *(sic)* and the

15  plaintiffs from executing on that stock and those proceeds

16  before the matter -- before the matter in the Court case

17  concluded or before the operation concluded?

18        Answer, by Mr. Johnson:  That's a fair way of

19  putting it.  But it was -- it's about asset preservation.

20        Sounds like you admitted you were moving items

21  around and hiding them --

22        *DEFENDANT JOHNSON:*  No, Your Honor.

23        *THE COURT:*  -- and transferring them to avoid the

24  judgment.  I was using your words, not mine.

25        *DEFENDANT JOHNSON:*  Yeah.  So, asset preservation

1    means -- my understanding is that that Wyoming, LLC bank

2    account belongs, and has connections, to the U.S. Government.

3    So, putting it into an account where it can be preserved by a

4    U.S. Government trustee, that's effectively what Your Honor

5    has done by appointing those receivers.  So, I have no

6    objection in giving those gentlemen that -- that stock.

7              I do object to giving my ex-wife and daughter's

8    stock.  And I was hoping to take out the whole chunk of the

9    Othram stock because that -- those belong to my --

10             *THE COURT:*  Well, I asked you in my second question,

11   Have you transferred, moved, or otherwise disposed of any

12   asset for the purpose of placing them beyond the reach of the

13   plaintiffs?

14             You admitted to that in your deposition, it sounds

15   like you're admitting it to me here in the courtroom.

16             *DEFENDANT JOHNSON:*  I haven't moved any of it, the

17   sale never went through.

18             *THE COURT:*  Shh, be quiet.

19             *MR. THOMPSON:*  Your Honor, just to clarify, the

20   transaction has not gone through, because the buyer was --

21   became aware of the asset preservation order.  The more

22   precise, probably, question is, Has he attempted to transfer

23   any of those assets?

24             *THE COURT:*  Well, what's the answer to that?

25             Because attempting is also in violation of the

1    order.

2    *DEFENDANT JOHNSON:* That's correct, Your Honor.

3    *THE COURT:* Okay. Any more questions?

4    *MR. THOMPSON:* Just one, Your Honor.

5         Mr. Johnson, what is the operation that must

6    conclude -- before you said that -- why the assets need to be

7    preserved, you said they need to be preserved before an

8    operation is completed?

9    *DEFENDANT JOHNSON:* Right. That's correct. I did

10   say that.

11   *MR. THOMPSON:* What is the operation?

12   *DEFENDANT JOHNSON:* I won't discuss that.

13   *MR. THOMPSON:* What government agency is conducting

14   the operation?

15   *DEFENDANT JOHNSON:* I won't discuss that.

16   *MR. THOMPSON:* Do you have any communications

17   concerning this operation?

18   *DEFENDANT JOHNSON:* I won't discuss that.

19   *MR. THOMPSON:* Nothing further, Your Honor.

20   *THE COURT:* Before you step down, I want to say this

21   with all -- and I'm not being facetious, I'm not making

22   accusations. This is just really -- Mr. Johnson, I'm

23   concerned about you. Because I'm, frankly, left with no other

24   choice, other than to hold you in contempt. So when I ask you

25   this, please don't think I'm being accusatory.

1          Have you ever been diagnosed with a mental illness?

2          *DEFENDANT JOHNSON:*  No, Your Honor.  I have not.

3          *THE COURT:*  Are you currently seeing any mental

4    healthcare professionals?

5          *DEFENDANT JOHNSON:*  No.  Not that I know of.

6          *THE COURT:*  Are you on any type of psychiatric --

7          *DEFENDANT JOHNSON:*  No.

8          *THE COURT:*  -- type medications at the moment?

9          *DEFENDANT JOHNSON:*  No.  In fact, I sat for a

10   psychological evaluation maybe three months ago, and was found

11   to be doing pretty well.

12         *THE COURT:*  And was that voluntary?

13         *DEFENDANT JOHNSON:*  It was voluntary, yes.  It was

14   to start another company.

15         *THE COURT:*  Do you -- do you feel like that you're

16   mentally competent, in the sense you understand why you're

17   here and the consequences?

18         *DEFENDANT JOHNSON:*  I'm very happy to be here.

19         *THE COURT:*  And you understand that I'm about to

20   hold you in contempt?

21         *DEFENDANT JOHNSON:*  I do understand that.  I wish

22   Your Honor would not do that, because he's appointed some

23   receivers that I could work with very comfortably.

24         *THE COURT:*  Well, the problem is you're still not

25   answering questions like you're supposed to.

1          So, let me ask you to please step down.  And I'm

2   going to ask you to go over to the podium, okay?

3          *DEFENDANT JOHNSON:*  Okay.

4          *THE COURT:*  At this time, the Court, having covered

5   all the three bases that I pointed out for Mr. Johnson to show

6   cause, has failed -- has made a determination, after reviewing

7   the record, hearing Mr. Johnson's testimony, hearing

8   Mr. Thompson, listening to these responses, that I'm left with

9   no choice, when I consider the least severe sanction to

10  correct the unlawful conduct, other than to order the

11  following.

12         So as I said, Johnny Cash's Cadillac had three

13  different pieces in this case.  The first thing we took up was

14  whether Mr. Johnson should be held in contempt for effectively

15  stealing government property.  That would be the mug that you

16  took, as well as the waters, from our jury room.

17         In order to correct that behavior, I am imposing the

18  least severe sanction that I believe can correct this conduct,

19  and that is to impose a $1,000 fine to be due and payable

20  immediately after this hearing.  The U.S. Marshal is going to

21  take you down to the third floor Clerk's Office, and you're

22  going to pay that today.

23         The other two pieces involve your failure to comply

24  with the Court's orders with regards to, number one, the

25  post-judgment discovery, and that includes the written

1   discovery you were required to respond to and the items that

2   you were required to bring on Monday, which you didn't do.

3          Again, taking my oath seriously, and considering the

4   least severe sanction to correct the property *(sic)*, I am

5   going to be holding you in contempt.

6          Also, the third part was the failure of you to

7   answer the questions that were asked of you at the deposition.

8   Out of abundance of caution, I have not only asked the

9   competent public defender to be here to provide you with legal

10  advice, I've read your Miranda rights, and I've even put you

11  on the stand to try to get you to answer these questions one

12  more time, and you have not done so.  Indeed, you continue to

13  be obstructive and try to avoid answering them.

14         Therefore, having no other choice, and considering

15  the least severe sanction necessary to correct the unlawful

16  conduct, I am going to make some rulings.  But I am going to

17  order the United States Marshal to arrest you and place you

18  into custody for being in contempt of court, until such time

19  as you purge yourself of the contempt by complying with the

20  Court's orders.

21         Mr. Johnson, throughout this case, has shown a

22  repeated history of failing to comply in good faith with

23  post-judgment discovery, despite numerous opportunities given

24  him to cure his unlawful conduct, including at today's

25  hearing, he has shown no willingness to comply with the

1    Court's orders.

2           Defendant's unlawful conduct is well-documented.

3    Indeed, on October the 28th of 2025, plaintiffs filed a motion

4    asking the Court to make Mr. Johnson appear and show cause to

5    hold him in civil contempt for violating the Court's asset

6    protection order and personally threatening plaintiff and

7    plaintiffs' counsel, among other allegations.  That same day,

8    the Court denied Mr. Johnson's motion to stay enforcement of

9    the judgment, and I granted plaintiffs' motion to hold a show

10   cause hearing.

11          On November the 6th, plaintiffs filed a motion to

12   compel defendant, Charles Johnson, to respond to post-judgment

13   interrogatories and sit for his deposition and produce

14   documents.  And I, accordingly, scheduled a hearing on that

15   motion.

16          After holding a hearing on November the 10th, when I

17   was in the middle of a trial, I granted plaintiffs' motion to

18   compel, and ordered defendant to answer plaintiffs'

19   post-judgment interrogatories within five days, produce the

20   documents that he was required and asked to produce, and sit

21   for his deposition here at the courthouse on Monday, November

22   17th of 2020.

23          Subsequent to that hearing, plaintiffs then filed a

24   motion for appointment of receiver; which I have considered

25   today and granted.  I also allowed Mr. Johnson to respond to

1   that motion, no written response was filed, in disobedience of

2   the Court's order.

3           Thus, I conducted the hearing today.  At the hearing

4   today, Mr. Johnson has said he did not object to the

5   appointment of a receiver.  But I'll also note, that before

6   today's hearing, plaintiff did file a supplement to its

7   original motion to appoint a receiver, further documenting

8   Mr. Johnson's noncompliance with my orders; that is at ECF

9   Number 136.

10          The Court finds that while Mr. Johnson was

11  physically present for his deposition here in the courthouse,

12  the defendant failed to respond to the questions asked in good

13  faith, and repeatedly gave evasive answers while asserting

14  that his plan was to give minimal information as possible.

15          The Court staff additionally reported that defendant

16  stole mugs and water bottles belonging to the Court, resulting

17  in the $1,000 sanction.

18          In response to defendant's noncompliance, I again

19  ordered the defendant to show cause for his failure to respond

20  in good faith to the questions asked in the deposition, and

21  his failure to produce documents and serve his interrogatory

22  responses, and his theft of Court property.

23          I then gave, yet again, Mr. Johnson another chance

24  to comply with those orders at the hearing held today, and

25  I've asked him several questions, and I've also allowed

1  Mr. Thompson to ask him several questions to those asked

2  during the deposition.  And again, he's failed to respond in

3  good faith.

4          Therefore, I find Mr. Johnson to be in contempt of

5  court.  And considering the least severe sanction possible to

6  correct the unlawful conduct, the Court orders the United

7  States Marshal to arrest defendant at this time and place him

8  into custody in the Johnson County Jail as to such time as he

9  purges himself of his contempt.

10         I would ask, gentlemen, on your way down, if you

11  please drop by the Clerk's Office so he can pay his $1,000

12  fine.

13         My receivers, I don't know how long the Marshals

14  need to process him in, but I know you'll want to visit with

15  him about his assets.  Whether you want to do that today,

16  given the late hour, or whether you want to go down to Johnson

17  County, I leave it up to you.  Thank you for your service,

18  both of you.  And also, Mr. Thompson, I appreciate your

19  patience.  Ms. Sanders, thank you.

20         Anything else for the Court before Mr. Johnson is

21  taken in?

22         *MS. SANDERS:*  Briefly, Your Honor.

23         When it comes to the issue of answering questions at

24  the deposition, how would Mr. Johnson purge -- I mean, is

25  there going to be another deposition scheduled?  Should he

1  provide notice that he's ready to sit for a deposition?

2       *THE COURT:*  I think that Mr. Johnson will contact

3  someone and tell them when he's ready to answer the questions,

4  both at the deposition and the interrogatory and produce the

5  documents.  If he's ready to do that, and he purges himself,

6  he can get out of jail.

7       *MS. SANDERS:*  So providing notice?

8       *THE COURT:*  Yeah.

9       *DEFENDANT JOHNSON:*  Your Honor, if I may?

10      *THE COURT:*  But again -- please stop.

11      He's refused your services, Ms. Sanders.  So as far

12 as I'm concerned, there's no obligation for you ethically to

13 continue.  It's up to him.

14      All right.  We'll stand off the record.

15      *THE MARSHAL:*  Your Honor, Deputy Sanford.  Can we

16 determine if he can pay that fee now or just take him to the

17 third floor, because that changes our risk assessment.

18      *THE COURT:*  Okay.  Thank you, Deputy.

19      Do you have a credit card?

20      *DEFENDANT JOHNSON:*  I don't with the -- not money

21 for $1,000, I don't have it.

22      *THE COURT:*  Okay.  We'll take you in immediately,

23 and you'll also be held in contempt until you can purge

24 yourself of the $1,000 fine.

25      *DEFENDANT JOHNSON:*  I can do both of that, if I can

1    access a computer.

2             THE COURT:  You're going to be taken in at this

3    time, and we'll see what you can do.  It might be a good idea

4    to -- I know you're entitled to a phone call, you'll be told

5    what that process is, but you need to take efforts to purge

6    yourself of this contempt.

7             DEFENDANT JOHNSON:  And do I purge myself when I

8    send the material to the receivers, or do I send it -- when I

9    send it to Mr. Thompson?

10            THE COURT:  I'm not here to give you legal advice.

11            DEFENDANT JOHNSON:  Okay.

12            THE COURT:  You should have complied with my orders.

13   It's been nine months of this.

14            Thank you, deputies.

15            Okay.  Thank you all.  Stand in recess.

16                 (Proceedings Adjourned)

17

18

19

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2

3          I, Monica Willenburg Guzman, CSR, RPR, certify

4    that the foregoing is a true and correct transcript from

5    the record of proceedings in the foregoing entitled matter.

6          I further certify that the transcript fees format

7    comply with those prescribed by the Court and the Judicial

8    Conference of the United States.

9          Signed this 12th day of December, 2025.

10

11                          /s/Monica Willenburg Guzman
                            Monica Willenburg Guzman, CSR, RPR
12                          Texas CSR No. 3386
                            NCRA No. 32278
13                          Official Court Reporter
                            The Northern District of Texas
14                          Fort Worth Division

15

16   CSR Expires:          7/31/2027

17   Business Address:     501 W. 10th Street, Room 310
                           Fort Worth, Texas  76102
18
     Telephone:            817.850.6681
19
     E-Mail Address:       mguzman.csr@yahoo.com
20

21

22

23

24

25

**DEFENDANT JOHNSON: [155]**
**MR. ANSLEY: [5]** 9/18 9/24 10/22 11/5 13/4
**MR. FARRELL: [2]** 9/25 11/18
**MR. THOMPSON: [33]** 4/6 8/4 12/17 12/19 20/4 21/5 23/6 23/12 24/9 24/13 25/8 43/1 43/7 43/10 43/12 43/14 43/16 43/19 43/21 43/24 44/24 45/17 45/25 46/9 47/14 47/16 47/23 49/19 50/4 50/11 50/13 50/16 50/19
**MS. SANDERS: [10]** 4/11 4/16 5/7 15/25 30/8 30/12 30/17 30/23 56/22 57/7
**SECURITY OFFICER: [1]** 21/20
**THE COURT: [174]**
**THE MARSHAL: [1]** 57/15

**$**

**$1,000 [6]** 22/14 52/19 55/17 56/11 57/21 57/24
**$3 [2]** 37/14 38/2
**$4,000 [1]** 41/18
**$70 [1]** 35/16
**$71 [2]** 5/17 6/17

**/**

**/s/Monica [1]** 59/11

**1**

**100 [1]** 6/20
**10th [5]** 2/7 23/17 23/22 54/16 59/17
**12 [1]** 47/3
**12th [1]** 59/9
**131 [1]** 24/23
**136 [2]** 24/24 55/9
**1624 [1]** 1/18
**17th [1]** 54/22
**1900 [1]** 1/14
**1:40 [2]** 1/7 4/2

**2**

**20 [3]** 1/6 4/2 9/4
**2018/2019 [1]** 45/24
**2019 [5]** 35/12 37/5 45/2 45/4 45/24
**20194 [1]** 1/19
**2020 [1]** 54/22
**2025 [4]** 1/6 4/2 54/3 59/9
**2027 [1]** 59/16
**214.743.4500 [1]** 1/15
**2200 [1]** 1/14
**28th [1]** 54/3
**2:00 [1]** 24/1

**3**

**3,000 [1]** 41/18
**30 [1]** 13/20
**300 [1]** 2/3
**310 [2]** 2/7 59/17
**32278 [1]** 59/12
**3386 [1]** 59/12

**4**

**400 [1]** 2/4
**469.895.4790 [1]** 2/5
**4:24-CV-00988-P [1]** 1/4
**4:24-CV-988-P [1]** 4/3

**5**

**50 [1]** 34/15
**501 [2]** 2/7 59/17

**6**

**617.429.4718 [1]** 1/19
**6th [1]** 54/11

**7**

**7/31/2027 [1]** 59/16
**75201 [2]** 1/15 2/4
**76102 [3]** 1/23 2/8 59/17

**8**

**817.850.6681 [2]** 2/8 59/18
**817.978.2753 [1]** 1/23
**819 [1]** 1/22

**9**

**9A10 [1]** 1/22

**A**

**ability [3]** 7/6 11/3 38/18
**able [2]** 11/3 22/11
**about [29]** 5/24 7/3 12/5 15/5 15/20 18/9 20/7 21/1 21/15 23/1 24/21 25/3 25/6 27/19 30/2 31/16 33/11 34/13 34/21 35/13 35/25 39/19 41/22 43/4 48/7 48/19 50/23 51/19 56/15
**absolute [1]** 25/2
**absolutely [6]** 6/20 15/25 23/9 25/8 27/10 41/9
**abundance [9]** 4/24 5/9 8/25 14/24 16/2 27/22 28/18 30/13 53/8
**abuse [3]** 26/18 26/25 27/1
**access [3]** 39/12 42/3 58/1
**accordingly [1]** 54/14
**account [13]** 31/15 32/22 39/5 40/10 42/7 42/8 43/6 44/20 45/1 46/15 48/14 49/2 49/3
**accounts [10]** 39/12 41/8 41/11 41/13 41/16 41/20 41/22 42/3 44/16 44/20
**accurate [1]** 31/15
**accusations [1]** 50/22
**accusatory [1]** 50/25
**act [3]** 17/16 30/21 33/8
**action [1]** 47/20
**actions [2]** 4/25 22/8
**activities [1]** 33/12
**activity [1]** 38/14
**actually [2]** 19/1 19/20
**ADAM [2]** 2/2 9/25
**addition [1]** 14/1
**additional [1]** 10/19
**additionally [1]** 55/15
**address [3]** 7/17 59/17 59/19
**adjacent [1]** 21/23
**Adjourned [1]** 58/16
**admiration [1]** 8/23
**admitted [2]** 48/20 49/14
**admitting [1]** 49/15
**admonish [1]** 16/16
**admonished [1]** 5/23
**admonishments [1]** 23/10
**advice [5]** 5/5 16/18 30/15 53/10 58/10
**advised [3]** 21/22 21/24 30/20

**advising [1]** 1/11
**affects [1]** 38/18
**affirmative [1]** 10/21
**afford [1]** 17/9
**after [7]** 8/19 12/2 12/11 23/17 52/6 52/20 54/16
**afternoon [1]** 9/25
**again [21]** 5/8 5/9 8/22 10/5 12/10 16/16 19/22 25/5 25/15 25/23 30/20 30/25 31/2 31/10 37/5 38/17 53/3 55/18 55/23 56/2 57/10
**against [2]** 12/6 17/6
**agencies [1]** 39/23
**agency [3]** 39/4 39/16 50/13
**ago [5]** 7/4 11/1 12/5 47/11 51/10
**agree [2]** 16/1 35/19
**ahead [3]** 45/15 46/8 47/22
**AI [1]** 34/25
**Air [2]** 11/12 11/15
**al [2]** 1/4 4/4
**all [37]** 4/21 5/12 6/8 7/20 8/16 10/2 10/19 11/7 12/13 13/5 13/13 13/24 14/20 21/8 22/10 25/3 25/21 29/4 30/24 31/21 33/14 35/15 36/7 40/2 40/4 41/8 41/13 41/15 41/18 42/21 45/7 45/8 45/19 50/21 52/5 57/14 58/15
**allegation [1]** 14/25
**allegations [1]** 54/7
**alleged [4]** 14/23 29/13 31/4 39/6
**allegedly [2]** 18/1 38/2
**allow [3]** 23/8 30/15 30/21
**allowed [4]** 31/3 41/6 54/25 55/25
**almost [2]** 9/4 13/20
**along [2]** 9/13 25/4
**also [22]** 6/10 10/12 10/16 11/10 11/12 11/25 14/2 14/8 14/17 14/21 22/18 23/16 24/2 25/11 37/7 49/25 53/6 54/25 55/5 55/25 56/18 57/23
**although [2]** 9/3 16/17
**always [1]** 20/25
**am [22]** 6/2 12/9 16/20 22/7 27/22 28/17 29/16 29/16 29/17 31/17 31/20 34/2 38/24 40/16 41/14 43/11 44/9 44/11 52/17 53/4 53/16 53/16
**Amendment [1]** 15/20
**among [2]** 40/10 54/7
**amount [1]** 37/9
**Andrew [1]** 10/23
**announce [1]** 28/18
**another [10]** 11/6 16/19 20/22 22/13 27/16 39/15 42/2 51/14 55/23 56/25
**ANSLEY [10]** 2/2 9/13 9/23 9/24 10/5 10/8 10/18 11/2 11/21 13/20
**answer [44]** 5/21 6/1 6/5 6/13 14/6 14/8 17/19 19/1 20/11 23/15 24/4 24/20 25/9 26/7 27/4 27/5 27/6 31/1 31/3 31/19 32/7 32/11 32/22 33/14 33/15 33/25 36/6 37/20 37/21 38/1 38/20 38/21 38/24 39/25 40/12 42/24 43/18 48/11 48/18 49/24 53/7 53/11 54/18 57/3
**answered [2]** 22/23 23/18
**answering [3]** 51/25 53/13 56/23
**answers [6]** 23/11 23/20 29/11 36/4 47/13 55/13
**any [55]** 6/3 6/16 12/1 12/16 13/3 15/5

## A

**any...** [49] 21/11 24/1 26/11 27/2 29/21 29/22 29/23 30/6 31/23 35/22 37/11 37/22 38/5 38/6 38/17 39/2 39/3 39/4 39/6 40/5 40/20 41/20 41/23 41/25 42/10 42/12 42/23 44/20 45/23 45/23 46/1 46/2 46/2 46/6 46/17 46/21 47/6 47/8 47/8 47/9 47/12 47/13 49/11 49/16 49/23 50/3 50/16 51/3 51/6
**anymore** [1] 46/24
**anyone** [1] 20/6
**anything** [10] 6/13 8/2 9/20 9/21 17/6 18/7 20/6 23/22 28/14 56/20
**anywhere** [1] 39/4
**aperture** [1] 36/13
**apparently** [1] 14/4
**appear** [5] 6/1 9/11 14/3 14/18 54/4
**appearance** [2] 9/17 9/20
**appears** [1] 7/2
**appoint** [10] 7/12 8/20 9/3 9/9 11/7 15/2 15/4 17/16 24/25 55/7
**appointed** [6] 4/12 6/22 9/11 12/24 16/19 51/22
**appointing** [1] 49/5
**appointment** [8] 7/4 7/13 8/3 8/17 26/13 35/14 54/24 55/5
**appreciate** [1] 56/18
**approach** [3] 9/15 25/22 30/8
**approaches** [1] 28/24
**appropriate** [3] 8/15 8/20 11/25
**are** [39] 6/18 7/7 7/11 7/13 11/24 12/2 12/3 12/8 12/23 21/18 29/25 31/14 32/4 32/5 32/24 32/24 33/2 33/7 33/7 33/11 34/4 34/12 34/25 35/9 36/2 37/3 38/21 39/20 39/23 40/15 41/12 41/17 43/10 44/10 44/12 44/20 48/9 51/3 51/6
**area** [3] 10/10 18/16 21/25
**argument** [1] 7/9
**Arizona** [1] 16/22
**around** [3] 37/13 45/12 48/21
**arrest** [2] 53/17 56/7
**aside** [1] 27/15
**ask** [18] 7/11 13/6 16/25 17/4 19/8 20/19 20/20 20/21 30/19 31/1 36/25 42/22 48/7 50/24 52/1 52/2 56/1 56/10
**asked** [23] 4/18 6/10 9/10 18/7 18/9 25/1 26/19 27/6 35/8 35/13 35/25 38/11 41/7 45/12 48/8 49/10 53/7 53/8 54/20 55/12 55/20 55/25 56/1
**asking** [7] 28/17 29/16 29/17 32/12 36/3 47/8 54/4
**aspect** [1] 12/19
**asserting** [1] 55/13
**assessment** [1] 57/17
**asset** [6] 32/21 48/19 48/25 49/12 49/21 54/5
**assets** [29] 6/19 6/23 7/21 10/17 11/3 11/24 12/1 12/24 13/13 14/8 23/16 24/21 25/3 26/20 28/22 31/23 34/23 34/24 35/10 36/1 36/19 37/5 41/17 44/7 45/14 45/14 49/23 50/6 56/15
**ASSISTANT** [2] 1/21 10/20
**assisting** [1] 4/10
**Association** [1] 20/17
**assuming** [1] 24/6
**assure** [1] 9/4 11/23 13/21

## B

**back** [5] 18/10 18/10 18/20 19/6 19/8
**ballpark** [1] 37/17
**bank** [15] 39/5 39/12 40/10 41/8 41/11 41/13 41/16 41/17 41/20 42/9 44/20 44/21 44/23 48/14 49/1
**banking** [1] 40/21
**banned** [2] 45/1 45/3
**Bar** [1] 20/17
**Based** [1] 22/22
**bases** [1] 52/5
**basically** [1] 6/23
**basis** [1] 29/13
**be** [66]
**became** [1] 49/21
**because** [20] 4/20 7/11 12/25 18/22 20/7 20/17 20/22 30/3 36/3 37/18 38/18 44/1 45/9 47/16 49/9 49/20 49/25 50/23 51/22 57/17
**bed** [1] 46/18
**been** [31] 4/12 5/14 5/18 5/19 6/20 7/1 8/17 8/18 10/25 11/19 12/8 16/13 19/12 20/3 22/10 22/18 23/9 25/21 27/1 34/15 36/23 37/5 38/10 38/11 38/13 39/11 44/19 44/19 47/2 51/1 58/13
**before** [20] 1/9 8/1 14/24 14/25 19/15 22/22 23/14 23/25 24/18 28/18 28/25 29/7 48/16 48/16 48/17 50/6 50/7 50/20 55/5 56/20
**beginning** [1] 24/16
**begun** [1] 18/17
**behalf** [5] 4/14 16/7 33/6 33/22 33/22
**behavior** [3] 14/13 22/12 52/17
**being** [10] 4/19 5/8 5/10 16/16 28/19 29/23 30/25 50/21 50/25 53/18
**believable** [1] 47/5
**believe** [10] 7/3 7/7 9/19 10/18 10/19 11/19 41/10 44/5 47/2 52/18
**belong** [1] 49/9
**belonging** [1] 55/16
**belongs** [1] 49/2
**bench** [1] 9/15
**beneficiary** [6] 32/4 32/5 34/5 34/8 34/11 34/17
**benefit** [3] 32/25 33/2 35/9
**BENNETT** [1] 1/13
**best** [14] 6/4 6/12 7/5 7/7 7/10 15/3 16/3 25/17 27/25 29/12 30/4 30/7 37/9 41/5
**better** [3] 9/4 20/19 29/18
**between** [2] 16/8 30/18
**beyond** [4] 31/23 35/12 35/12 49/12

## Bible

**Bible** [1] 19/21
**big** [1] 36/3
**Boomer** [1] 39/18
**both** [10] 8/21 9/16 10/12 11/13 11/23 13/19 25/21 56/18 57/4 57/25
**bottles** [6] 18/12 18/19 19/5 19/14 20/6 55/16
**bottom** [1] 6/15
**bought** [1] 18/11
**box** [1] 46/19
**boxes** [1] 42/10
**branch** [3] 28/4 28/5 28/5
**break** [1] 17/15
**BRIDGE** [3] 1/4 4/4 31/24
**brief** [2] 30/12 43/2
**briefly** [2] 30/8 56/22
**bring** [10] 23/19 23/22 25/11 26/6 26/11 27/2 40/23 40/24 40/25 53/2
**bringing** [1] 27/24
**broad** [1] 39/3
**brother** [1] 36/10
**brought** [3] 14/17 18/22 20/13
**buddy** [1] 16/12
**building** [1] 22/5
**bumper** [1] 27/19
**Business** [1] 59/17
**busy** [2] 5/16 5/16
**buyer** [1] 49/20

## C

**Cadillac** [4] 22/17 22/25 27/19 52/12
**California** [1] 35/5
**call** [2] 40/21 58/4
**called** [5] 20/10 20/23 36/1 36/12 38/13
**came** [2] 5/21 26/17
**can** [34] 5/23 6/7 9/4 10/16 11/1 11/23 13/12 13/20 14/13 15/7 17/6 19/25 20/14 22/11 27/15 27/25 29/5 30/7 33/16 35/23 36/6 37/25 39/19 42/2 49/3 52/18 56/11 57/6 57/15 57/16 57/23 57/25 57/25 58/3
**can't** [3] 22/6 22/13 29/23
**cannot** [4] 6/16 17/9 28/14 33/17
**capable** [1] 10/6
**CAPITAL** [4] 1/4 4/4 31/24 34/22
**captain** [1] 11/12
**card** [2] 39/11 57/19
**cards** [2] 39/6 39/12
**care** [4] 20/2 23/1 36/16 38/19
**careful** [2] 16/11 42/22
**carefully** [2] 8/14 16/25
**case** [18] 1/4 4/3 5/21 7/7 8/16 8/17 8/21 9/9 9/11 10/17 15/4 16/21 16/22 31/25 44/8 48/16 52/13 53/21
**cases** [2] 10/25 39/19
**cash** [4] 8/11 14/22 27/18 42/3
**Cash's** [2] 22/17 52/12
**cause** [10] 14/3 18/5 20/24 22/3 22/19 25/23 52/6 54/4 54/10 55/19
**causing** [1] 14/18
**caution** [9] 4/24 5/9 8/25 14/24 16/2 27/23 28/18 30/13 53/8
**certain** [2] 14/18 25/12
**certainly** [2] 9/5 11/2
**CERTIFICATE** [1] 59/1
**certify** [2] 59/3 59/6

**chance [4]** 14/12 15/19 26/14 55/23
**changes [1]** 57/17
**characterization [1]** 21/9
**charge [2]** 33/22 35/20
**charges [2]** 26/23 42/20
**CHARLES [5]** 1/7 1/18 4/4 4/9 54/12
**cheated [2]** 36/13 36/18
**checked [2]** 16/5 23/25
**checking [2]** 42/7 42/8
**checks [1]** 42/3
**choice [5]** 12/9 27/12 50/24 52/9 53/14
**choose [1]** 15/11
**choosing [1]** 10/4
**chose [1]** 13/14
**chunk [1]** 49/8
**CIA [1]** 28/1
**cited [1]** 8/8
**citing [1]** 25/15
**civil [3]** 5/4 10/21 54/5
**claims [1]** 10/17
**clandestine [2]** 33/11 33/13
**clarify [1]** 49/19
**clear [7]** 9/17 15/7 16/5 20/11 25/5 29/18 47/16
**clearer [1]** 6/16
**Clearview [2]** 34/25 37/6
**clerk [1]** 11/9
**Clerk's [3]** 22/15 52/21 56/11
**clever [1]** 21/4
**client [1]** 16/17
**close [1]** 29/8
**closely [1]** 31/7
**coequal [1]** 28/4
**Coinbase [1]** 46/15
**collar [1]** 10/14
**collect [1]** 6/18
**collectible [1]** 12/8
**colloquy [3]** 7/22 25/25 46/5
**color [1]** 23/13
**comb [1]** 7/20
**combined [1]** 41/17
**come [4]** 21/1 22/9 28/17 28/23
**comes [2]** 16/23 56/23
**comfort [1]** 8/22
**comfortably [1]** 51/23
**coming [1]** 13/11
**command [2]** 11/15 11/15
**commend [1]** 29/24
**commercial [1]** 10/9
**Commission [1]** 10/13
**common [1]** 6/9
**communicated [1]** 16/1
**communications [1]** 50/16
**companies [1]** 40/4
**company [2]** 36/12 51/14
**compel [4]** 23/15 25/10 54/12 54/18
**compelled [1]** 25/11
**competent [3]** 4/23 51/16 53/9
**complete [5]** 14/16 29/18 31/10 31/13 31/15
**completed [1]** 50/8
**completely [1]** 47/5
**compliance [5]** 23/10 24/22 25/1 25/17 31/13
**compliant [1]** 31/9

**complied [1]** 58/12
**comply [15]** 14/4 14/5 22/20 23/3 27/12 27/23 28/21 35/20 40/14 40/15 52/23 53/22 53/25 55/24 59/7
**complying [1]** 53/19
**comprehensive [1]** 40/4
**computer [2]** 2/12 58/1
**conceding [1]** 12/1
**concerned [3]** 47/13 50/23 57/12
**concerning [2]** 28/21 50/17
**concerns [1]** 9/8
**conclude [1]** 50/6
**concluded [3]** 20/10 48/17 48/17
**conclusion [2]** 21/25 22/15
**conduct [6]** 52/10 52/18 53/16 53/24 54/2 56/6
**conducted [1]** 55/3
**conducting [2]** 9/10 50/13
**Conference [1]** 59/8
**confidential [1]** 38/15
**connection [4]** 39/6 44/2 44/7 44/14
**connections [3]** 38/12 44/4 49/2
**consequences [2]** 38/22 51/17
**consider [2]** 14/25 52/9
**consideration [2]** 8/20 9/7
**considered [1]** 54/24
**considering [3]** 53/3 53/14 56/5
**consistently [1]** 28/16
**conspiracies [1]** 9/1
**conspiracy [1]** 9/1
**Constitution [2]** 6/9 16/23
**Constitutional [2]** 5/6 15/5
**constructed [1]** 8/14
**consult [1]** 30/11
**contact [1]** 57/2
**contacts [2]** 29/13 31/4
**contempt [16]** 5/2 5/25 26/15 27/12 28/20 50/24 51/20 52/14 53/5 53/18 53/19 54/5 56/4 56/9 57/23 58/6
**continue [3]** 35/22 37/8 37/25 53/12 57/13
**contract [1]** 37/19
**contracts [2]** 29/13
**control [1]** 6/23
**cooperate [6]** 5/22 6/6 13/1 13/1 13/21 13/21
**cooperative [1]** 12/9
**corollary [1]** 24/5
**correct [29]** 10/17 10/21 10/22 15/12 18/21 22/12 23/5 23/9 24/12 24/13 25/4 30/22 34/1 34/18 35/11 38/3 38/4 43/9 47/20 48/11 50/2 50/9 52/10 52/17 52/18 53/4 53/15 56/6 59/4
**could [13]** 16/2 18/9 19/4 19/5 19/5 19/7 20/25 21/16 29/22 37/7 41/6 46/22 51/23
**couldn't [2]** 33/15 37/21
**counsel [10]** 1/21 5/3 10/3 14/11 15/4 15/24 16/8 29/22 30/18 54/7
**county [4]** 19/12 20/17 56/8 56/17
**couple [1]** 5/14
**court [43]** 1/1 1/10 2/3 2/7 6/23 7/2 7/17 7/23 8/19 12/23 14/2 16/19 17/6 19/3 20/9 21/10 21/10 21/14 21/15 22/3 22/22 24/10 24/12 25/22 27/20 29/8 31/13 39/21 40/9 48/16 52/4 53/18 54/4 54/8 55/10 55/15 55/16

**55/22 56/5 56/6 56/20 59/7 59/13**
**Court's [11]** 8/15 9/6 23/9 23/10 28/21 31/12 52/24 53/20 54/1 54/5 55/2
**Court-appointed [1]** 16/19
**court-ordered [1]** 27/20
**courthouse [5]** 6/1 14/9 18/23 54/21 55/11
**courtroom [3]** 18/14 24/18 49/15
**courts [1]** 47/3
**Courtyard [1]** 18/14
**covered [1]** 52/4
**created [1]** 33/7
**credibility [1]** 41/10
**credible [1]** 21/17
**credit [3]** 39/11 39/12 57/19
**Crescent [1]** 2/3
**crime [1]** 42/17
**criminal [4]** 4/21 10/8 10/14 26/22 28/11
**criminals [1]** 46/4
**crypto [1]** 45/7
**cryptocurrency [13]** 23/16 42/13 42/18 45/6 45/10 45/20 45/23 46/1 46/14 46/18 46/21 47/6 47/9
**CSR [5]** 2/7 59/3 59/11 59/12 59/16
**cure [1]** 53/24
**current [1]** 22/22
**currently [4]** 26/22 32/5 41/18 51/3
**custodians [1]** 33/8
**custody [2]** 53/18 56/8
**cut [1]** 31/5
**CV [1]** 1/4 4/3

**D**

**dad [1]** 23/25
**Dallas [5]** 1/15 2/4 10/10 10/23 13/12
**Dallas/Fort [1]** 10/10
**dangerous [1]** 46/4
**daughter [2]** 33/22 37/4
**daughter's [1]** 49/7
**day [4]** 28/8 33/15 54/7 59/9
**days [2]** 23/21 54/19
**deal [2]** 4/20 11/21
**dealing [3]** 16/13 26/4 26/10
**deals [1]** 14/6
**dealt [2]** 10/20 44/15
**December [1]** 59/9
**decided [2]** 9/2 9/8
**decision [1]** 28/19
**decisions [1]** 11/16
**decline [1]** 39/25
**declined [1]** 15/22
**deeply [1]** 22/7
**defendant [11]** 1/18 14/3 16/8 28/24 30/18 54/12 54/18 55/12 55/15 55/19 56/7
**defendant's [2]** 54/2 55/18
**defendants [1]** 28/11
**defender [4]** 1/21 4/23 6/11 53/9
**Defenders [1]** 15/3
**defense [2]** 10/9 10/14 11/14
**denied [1]** 54/8
**deposed [1]** 21/24
**deposit [2]** 42/10 46/19
**deposition [47]** 6/2 8/7 14/9 14/12 14/14 14/15 20/10 20/23 21/25 22/24 23/19 23/23 24/7 24/16 24/17 25/7

**deposition... [31]** 25/12 25/13 26/6 26/8 26/12 27/8 27/20 27/20 28/12 28/16 29/7 29/8 29/21 30/1 31/8 31/11 40/13 41/7 47/24 47/25 49/14 53/7 54/13 54/21 55/11 55/20 56/2 56/24 56/25 57/1 57/4
**deputies [1]** 58/14
**Deputy [2]** 57/15 57/18
**describe [2]** 14/13 39/8
**described [1]** 18/2
**desire [1]** 17/15
**despite [1]** 53/23
**detailed [3]** 31/15 36/4 36/5
**determination [1]** 52/6
**determine [8]** 6/19 6/24 11/3 11/24 12/24 35/17 35/18 57/16
**determined [2]** 8/15 8/20
**DEVON [2]** 1/21 15/2
**diagnosed [1]** 51/1
**did [30]** 7/12 10/6 11/10 18/2 18/3 18/5 19/8 19/8 20/7 22/19 23/22 27/2 27/3 27/4 27/5 27/6 27/7 30/3 38/15 41/5 41/8 43/12 43/13 43/14 46/11 46/17 46/20 50/9 55/4 55/6
**didn't [13]** 19/20 21/5 23/19 23/22 26/11 27/25 36/14 40/24 40/25 45/10 47/8 48/5 53/2
**die [1]** 34/14
**different [3]** 9/2 47/3 52/13
**difficult [1]** 29/23
**difficulties [1]** 13/10
**direct [2]** 10/24 29/18
**direction [1]** 9/2
**directly [1]** 31/11
**disabuse [1]** 45/13
**disagree [2]** 20/5 21/9
**disclose [5]** 31/3 38/24 39/1 41/12 41/13
**disclosed [1]** 35/15
**disclosure [1]** 28/21
**discovery [19]** 6/2 6/19 14/5 14/7 22/21 23/3 23/11 25/6 25/11 26/5 26/7 26/10 26/19 27/13 27/24 31/12 52/25 53/1 53/23
**discuss [6]** 24/23 37/22 38/17 50/12 50/15 50/18
**Discussion [2]** 16/8 30/18
**discussions [1]** 20/8
**dish [1]** 18/11
**disobedience [1]** 55/1
**disposed [2]** 31/22 49/11
**distinctly [1]** 20/18
**DISTRICT [5]** 1/1 1/2 1/10 1/22 59/13
**disturbed [1]** 22/7
**diverted [1]** 29/14
**division [3]** 1/3 10/21 59/14
**DLA [1]** 1/13
**do [79]**
**docket [4]** 4/21 5/16 24/23 24/24
**document [1]** 25/19
**documented [1]** 54/2
**documenting [1]** 55/7
**documents [13]** 25/12 25/13 26/5 26/11 26/11 27/2 27/14 27/24 40/17 54/14 54/20 55/21 57/5
**does [2]** 21/15 38/8

**doesn't [2]** 16/18 30/10
**doing [4]** 37/24 37/25 47/2 51/1
**don't [67]**
**Donald [1]** 45/9
**done [14]** 5/9 6/5 6/7 7/5 28/6 29/20 32/21 33/2 33/6 37/19 37/23 38/14 49/5 53/12
**down [11]** 13/11 19/11 20/18 21/18 22/15 42/10 50/20 52/1 52/21 56/10 56/16
**draft [2]** 14/11 30/4
**drafted [1]** 30/6
**Drive [1]** 1/18
**drop [1]** 56/11
**due [6]** 4/24 6/8 22/14 23/20 44/6 52/19
**during [4]** 17/9 28/16 41/7 56/2

**E**

**E-Mail [2]** 2/9 59/19
**each [1]** 26/9
**easier [1]** 20/20
**eat [1]** 21/1
**ECF [1]** 55/8
**effective [1]** 12/11
**effectively [5]** 12/23 12/23 13/18 49/4 52/14
**effort [1]** 22/20
**efforts [1]** 58/5
**either [3]** 14/14 21/17 41/24
**else [3]** 9/20 28/14 56/20
**end [4]** 6/3 6/6 8/12 36/14
**enforcement [2]** 10/21 54/8
**engage [2]** 7/22 9/1
**ensure [1]** 6/8
**enter [1]** 23/15
**entered [1]** 14/5
**entire [1]** 9/2
**entities [1]** 40/5
**entitled [6]** 6/9 6/18 6/18 48/9 58/4 59/5
**entity [1]** 42/2
**Entry [2]** 24/23 24/24
**escorted [1]** 21/21
**especially [1]** 4/20
**established [1]** 39/5
**estate [2]** 6/24 7/14
**estimate [1]** 37/9
**et [2]** 1/4 4/4
**ethically [1]** 57/12
**evaluation [1]** 51/10
**evasive [2]** 29/11 55/13
**even [7]** 6/10 6/10 8/6 22/6 28/3 36/25 53/10
**ever [6]** 21/11 38/5 39/4 45/20 46/17 51/1
**every [3]** 5/20 26/9 32/20
**everyone [1]** 16/3
**everything [2]** 6/7 19/9
**evidence [1]** 48/5
**evidenced [1]** 24/11
**ex [3]** 33/22 37/4 49/7
**ex-wife [3]** 33/22 37/4 49/7
**exact [1]** 43/6
**example [1]** 22/23
**Exchange [1]** 10/12
**exchanges [2]** 45/19 46/10

**excuse [3]** 23/15 24/24 28/1
**executing [2]** 47/20 48/15
**executive [1]** 28/4
**exempt [1]** 12/2
**exhaustively [1]** 28/12
**expense [1]** 17/10
**experience [4]** 10/12 11/13 29/22 34/15
**Expires [1]** 59/16
**Explain [1]** 33/4
**express [1]** 5/13
**extent [1]** 13/1
**eye [1]** 30/7

**F**

**facetious [1]** 50/21
**facing [1]** 26/22
**fact [4]** 8/23 22/7 44/5 51/9
**failed [5]** 14/4 42/24 52/6 55/12 56/2
**failing [1]** 53/22
**failure [7]** 14/6 14/8 27/12 52/23 53/6 55/19 55/21
**fair [1]** 48/18
**faith [6]** 14/4 22/20 53/22 55/13 55/20 56/3
**family [4]** 28/13 34/6 44/2 44/7
**famous [1]** 16/21
**far [3]** 6/20 30/14 57/11
**Fargo [6]** 44/24 44/25 45/1 45/1 45/3 48/14
**FARRELL [6]** 2/2 9/14 9/25 10/5 11/8 11/17
**father [2]** 34/9 36/10
**FBI [5]** 26/21 28/1 38/16 39/15 39/17
**FBI/CIA [1]** 28/1
**FEDERAL [3]** 1/21 4/23 15/3
**fee [1]** 57/16
**feed [1]** 9/1
**feel [1]** 51/15
**fees [1]** 59/6
**few [2]** 31/1 37/13
**fiancee [1]** 13/9
**Fieldthorn [1]** 1/18
**Fifth [1]** 15/20
**file [2]** 7/12 55/6
**filed [11]** 6/21 7/1 7/13 8/6 8/14 8/14 24/12 54/3 54/11 54/23 55/1
**filings [1]** 22/22
**final [1]** 28/19
**finances [1]** 37/16
**financial [4]** 29/11 31/14 40/5 40/10
**find [7]** 5/24 10/6 34/13 41/9 42/19 47/5 56/4
**finds [1]** 55/10
**fine [5]** 22/14 38/21 52/19 56/12 57/24
**firm [4]** 9/9 10/4 10/11 12/22
**firms [1]** 7/6
**first [4]** 5/3 14/23 22/17 52/13
**five [3]** 23/21 23/25 54/19
**floor [3]** 21/22 52/21 57/17
**folks [3]** 8/20 10/6 18/19
**follow [5]** 17/4 41/5 45/16 47/12 47/17
**follow-up [5]** 17/4 41/5 45/16 47/12 47/17
**following [2]** 8/7 52/11
**food [1]** 21/1
**forbidding [1]** 28/2

**F**

**Force [6]** 11/12 11/15 36/1 36/7 36/9 36/17
**foregoing [2]** 59/4 59/5
**foreign [3]** 37/11 38/6 38/12
**forgiveness [2]** 20/20 20/21
**form [2]** 38/13 38/15
**formally [1]** 15/2
**format [1]** 59/6
**former [1]** 10/19
**FORT [11]** 1/3 1/5 1/23 2/8 10/10 10/11 11/8 13/11 15/3 59/14 59/17
**forthright [2]** 11/11 11/22
**forward [2]** 8/9 9/13
**found [2]** 47/4 51/10
**four [3]** 18/11 20/8 32/13
**frame [2]** 23/7 45/24
**frankly [5]** 8/25 13/14 22/5 22/12 50/23
**frequently [1]** 29/14
**frustrated [1]** 29/24
**full [1]** 31/13
**fully [1]** 31/1
**further [4]** 42/23 50/19 55/7 59/6

**G**

**gave [10]** 18/11 18/13 18/15 18/19 19/23 23/24 23/24 45/9 55/13 55/23
**gentlemen [7]** 10/2 12/22 13/5 31/18 35/20 49/6 56/10
**gentlemen that [1]** 49/6
**get [13]** 5/4 6/15 8/12 25/6 27/8 27/25 30/6 41/6 45/13 45/14 47/13 53/11 57/6
**give [9]** 6/2 15/21 16/2 19/5 28/20 29/18 36/4 55/14 58/10
**given [5]** 8/25 21/17 37/19 53/23 56/16
**giving [5]** 12/13 36/5 46/5 49/6 49/7
**glad [1]** 11/6
**go [12]** 8/9 12/24 17/22 19/11 22/18 30/2 40/21 45/15 46/8 47/22 52/2 56/16
**goes [1]** 17/20
**going [32]** 5/1 5/2 5/3 6/6 6/12 7/11 10/24 11/25 12/2 16/20 20/11 25/3 27/1 27/15 27/18 27/19 27/22 31/4 33/9 38/24 38/25 39/1 45/17 47/13 52/2 52/20 52/22 53/5 53/16 53/16 56/25 58/2
**gone [1]** 49/20
**good [13]** 9/21 9/25 11/17 11/21 12/14 12/20 14/4 22/20 53/22 55/12 55/20 56/3 58/3
**good-faith [1]** 22/20
**got [3]** 28/9 41/19 45/8
**gotten [2]** 29/22 38/13
**government [33]** 14/23 15/1 17/10 18/18 19/4 22/13 25/16 28/4 29/13 31/4 32/3 32/6 33/3 33/6 37/10 37/11 37/15 37/23 38/12 39/2 39/4 39/4 39/15 39/16 39/23 43/14 43/16 43/22 45/12 49/2 49/4 50/13 52/15
**governments [2]** 38/6 38/12
**grab [1]** 17/24
**gradually [1]** 8/12
**grandmother [2]** 44/2 44/15

**grandparents [1]** 34/6
**granted [5]** 21/11 23/17 54/9 54/17 54/25
**guess [3]** 21/2 24/5 32/8
**GUZMAN [4]** 2/7 59/3 59/11 59/11

**H**

**had [30]** 5/16 7/3 14/5 14/12 14/20 15/19 18/12 18/12 20/10 20/13 20/23 23/14 24/1 24/3 26/19 29/18 33/21 43/21 44/2 44/7 45/23 46/10 46/15 46/18 46/21 46/23 47/6 47/9 47/10 52/12
**Hal [3]** 31/24 47/19 48/2
**half [3]** 22/6 28/10 36/11
**hand [1]** 29/1
**handle [2]** 40/20 40/21
**handler [6]** 39/14 39/15 39/17 43/14 43/17 44/3
**handlers [1]** 28/2
**happen [1]** 28/19
**happened [2]** 22/4 45/7
**happy [10]** 7/10 7/20 8/9 13/13 13/14 15/12 16/6 16/7 35/19 51/18
**harassment [1]** 26/18
**hard [9]** 30/5 45/19 46/2 46/10 46/17 46/21 47/1 47/6 47/9
**has [31]** 5/18 5/18 7/1 8/20 10/12 10/16 11/13 13/10 14/2 14/11 18/17 19/12 23/9 24/20 26/10 30/10 30/14 34/23 35/15 38/13 39/2 39/3 49/2 49/5 49/20 49/22 52/6 52/6 53/21 53/25 55/4
**hate [2]** 15/22 21/14
**have [120]**
**haven't [7]** 12/10 28/6 36/23 37/5 45/23 46/16 49/16
**having [9]** 8/13 10/25 14/1 20/25 22/2 22/3 22/5 52/4 53/14
**he [61]**
**he'd [1]** 21/1
**he'll [1]** 13/21
**he's [13]** 10/10 11/12 11/19 15/22 16/17 30/21 39/18 51/22 56/2 57/1 57/3 57/5 57/11
**head [2]** 11/5 46/23
**healthcare [1]** 51/4
**healthy [1]** 18/23
**hear [4]** 7/9 7/10 9/19 29/5
**heard [4]** 5/13 22/2 22/3 47/4
**hearing [29]** 1/9 4/13 5/18 6/17 7/3 8/13 9/12 12/11 14/1 17/20 20/24 22/15 23/4 23/18 24/1 26/17 44/6 52/7 52/7 52/20 53/25 54/10 54/14 54/16 54/23 55/3 55/3 55/6 55/24
**held [8]** 21/3 26/15 28/19 32/24 33/2 52/14 55/24 57/23
**helped [1]** 44/15
**her [6]** 15/4 15/9 15/11 15/12 15/13 17/16
**here [30]** 4/19 4/24 5/2 5/8 5/10 5/14 6/11 9/22 10/10 10/11 11/8 12/11 13/19 15/3 16/16 20/12 22/9 23/1 28/3 28/9 30/25 31/19 36/2 49/15 51/17 51/18 53/9 54/21 55/11 58/10
**hiding [1]** 48/21
**highest [1]** 11/14

**Hill [2]** 48/9 48/14
**him [24]** 5/5 1/7/10 11/22 13/21 15/20 15/21 15/22 16/2 20/13 21/11 21/16 21/18 21/24 24/7 30/15 53/24 54/5 55/25 56/1 56/7 56/14 56/15 57/17 57/16
**himself [3]** 4/10 56/9 57/5
**hired [2]** 10/19 10/22
**his [25]** 4/14 5/6 14/7 14/8 15/20 15/21 21/12 23/16 23/16 23/25 24/21 27/19 30/21 53/24 54/13 54/21 55/11 55/14 55/19 55/21 55/21 55/22 56/9 56/11 56/15
**history [1]** 53/22
**hold [6]** 27/12 40/5 50/24 51/20 54/5 54/9
**holding [2]** 53/5 54/16
**holdings [1]** 23/17
**home [1]** 28/11
**homeless [4]** 18/13 18/15 18/19 19/23
**honest [2]** 11/11 11/22
**honestly [1]** 30/5
**Honor [65]**
**Honor's [2]** 25/10 25/18
**HONORABLE [3]** 1/9 11/9 11/9
**hoping [1]** 49/8
**hotel [3]** 18/11 19/6 19/8
**hour [1]** 56/16
**hours [4]** 18/24 26/24 28/8 29/6
**how [12]** 10/25 29/21 32/3 32/4 32/4 32/5 32/12 34/4 34/10 46/10 56/13 56/24

**I**

**I'd [5]** 7/10 8/10 13/11 20/12 40/21
**I'll [12]** 9/19 12/10 13/16 17/4 25/6 30/13 30/14 30/15 31/2 41/5 43/1 55/5
**I'm [46]** 5/3 6/14 10/24 13/2 13/13 15/12 15/18 16/6 16/6 16/11 16/12 16/22 19/11 19/15 19/19 24/8 27/11 29/17 30/2 31/10 31/18 32/12 32/23 32/23 34/8 35/19 36/3 36/5 38/22 38/24 42/16 42/20 43/4 47/12 48/6 50/21 50/21 50/22 50/23 50/25 51/18 51/19 52/1 52/8 57/5 57/11
**I've [28]** 4/12 5/16 5/23 5/24 6/7 6/10 9/3 9/8 9/9 13/19 14/12 16/13 17/11 18/2 26/8 29/6 38/11 38/13 41/19 44/19 44/19 47/2 47/3 47/4 53/10 53/10 55/25 55/25
**idea [4]** 12/14 12/20 46/13 58/3
**ideal [1]** 15/2
**identify [6]** 7/5 33/16 41/7 41/12 45/19 46/10
**illegal [1]** 38/14
**illness [1]** 51/1
**imagine [1]** 29/23
**immediately [3]** 22/14 52/20 57/22
**impose [1]** 52/19
**imposing [1]** 52/17
**impression [1]** 45/11
**include [2]** 34/5 37/7
**Included [1]** 25/13
**includes [3]** 26/5 26/6 52/25
**including [1]** 53/24
**incrimination [1]** 16/24
**Indeed [4]** 6/10 7/2 53/12 54/3

**I**

**INDEX [1]** 2/13
**indicated [1]** 21/23
**individually [1]** 42/1
**individuals [4]** 11/24 13/19 33/7 38/11
**informant [2]** 38/16 39/6
**information [6]** 14/7 29/12 31/10 31/14 31/16 55/14
**informed [1]** 18/8
**instead [1]** 21/11
**intelligence [1]** 44/16
**intend [1]** 37/25
**intended [1]** 31/9
**intent [1]** 36/11
**interact [1]** 31/18
**interest [7]** 6/4 6/13 10/7 36/11 36/14 40/5 42/2
**interests [2]** 9/6 44/17
**intermediary [1]** 37/20
**interrogatories [11]** 14/7 22/23 23/16 24/2 24/4 25/9 25/18 27/4 27/5 54/13 54/19
**interrogatory [3]** 23/20 55/21 57/4
**interrupted [1]** 29/14
**interrupts [1]** 39/21
**intersects [1]** 44/17
**introduced [1]** 35/5
**investment [1]** 41/22
**involve [2]** 5/5 52/23
**involved [3]** 5/20 16/3 36/1
**involving [1]** 10/20
**is [97]**
**isn't [1]** 5/14
**issue [2]** 17/25 56/23
**issues [1]** 13/25
**it [97]**
**it's [24]** 5/4 6/6 6/12 8/17 9/17 9/21 13/10 16/18 18/4 20/14 20/15 20/17 20/20 21/4 25/2 25/21 26/14 35/15 35/17 37/19 44/17 48/19 57/13 58/13
**items [5]** 14/19 18/2 22/16 48/20 53/1
**its [3]** 16/19 46/3 55/6
**itself [2]** 14/16 48/10

**J**

**jail [2]** 56/8 57/6
**Jeff [1]** 9/24
**JEFFREY [1]** 2/2
**Johnathan [1]** 39/18
**Johnny [5]** 8/11 14/22 22/17 27/18 52/12
**JOHNSON [62]**
**Johnson's [9]** 4/13 20/5 21/6 21/9 21/15 25/17 52/7 54/8 55/8
**joke [1]** 22/10
**JUDGE [6]** 1/10 9/25 14/19 21/21 22/6 24/18
**judgment [26]** 5/17 6/2 6/17 6/18 6/19 6/25 11/4 12/2 12/4 12/6 12/7 12/7 14/5 22/20 23/3 25/11 26/7 26/20 27/13 35/16 48/24 52/25 53/23 54/9 54/12 54/19
**Judicial [1]** 59/7
**judiciary [1]** 28/4
**JUDY [1]** 1/21
**jurors [1]** 14/21
**jury [9]** 14/19 15/1 18/1 19/15 21/19

21/23 21/23 22/7 52/16
**just [30]** 4/11 6/6 8/9 9/17 15/23 16/5 21/8 23/25 25/6 28/9 30/5 30/12 35/20 36/24 37/17 37/20 38/22 41/10 45/8 45/13 45/13 45/17 45/17 47/13 47/16 48/7 49/19 50/4 50/22 57/16
**JXC [2]** 43/3 48/13

**K**

**keep [4]** 39/3 43/1 45/17 48/1
**kind [3]** 12/3 13/14 21/3
**kinds [1]** 33/14
**kitchen [1]** 18/10
**kitchenette [3]** 18/8 21/16 21/19
**know [44]** 4/19 7/6 11/2 11/10 11/22 13/2 19/16 20/16 21/8 28/9 29/21 30/3 31/3 32/7 32/11 32/16 32/18 32/22 33/14 33/18 33/19 33/20 34/4 34/9 34/10 34/16 36/21 36/24 37/12 37/18 37/20 40/2 41/9 41/10 43/3 43/19 45/22 46/12 46/22 47/6 51/5 56/13 56/14 58/4
**knowing [1]** 22/6
**knowledge [2]** 38/7 38/9
**known [3]** 9/3 11/8 13/19

**L**

**laid [1]** 25/21
**Lambert [4]** 31/24 36/13 47/19 48/2
**laptop [1]** 47/10
**large [1]** 10/11
**largely [1]** 14/15
**last [12]** 4/19 5/13 6/16 7/3 23/4 23/14 26/17 28/9 28/20 41/3 44/6 44/9
**late [1]** 56/16
**later [2]** 5/1 9/21
**law [8]** 6/9 7/6 9/9 10/4 10/11 11/9 12/22 17/7
**lawyer [1]** 17/10
**least [13]** 4/22 9/7 13/20 15/19 16/13 20/10 22/11 45/23 52/9 52/18 53/4 53/15 56/5
**leave [2]** 20/25 56/17
**led [1]** 21/18
**left [4]** 12/9 27/11 50/23 52/8
**legal [3]** 8/16 53/9 58/10
**legislative [1]** 28/5
**Less [1]** 32/19
**let [15]** 4/17 4/17 4/22 13/2 13/16 17/3 17/15 19/13 30/2 30/13 31/1 35/22 37/8 48/7 52/1
**let's [7]** 8/11 13/24 17/25 22/18 25/23 39/3 48/7
**levels [1]** 11/14
**like [27]** 7/9 8/2 8/10 8/10 11/21 13/10 15/8 15/9 15/22 15/23 16/17 20/12 22/10 24/20 28/20 37/24 41/4 42/25 44/21 44/22 45/10 46/3 47/12 48/20 49/15 51/15 51/25
**limit [1]** 35/13
**limited [1]** 4/12
**lines [1]** 25/4
**list [3]** 40/4 41/15 44/22
**listed [1]** 12/13
**listen [3]** 6/14 16/25 31/7
**listening [2]** 47/1 52/8
**litigation [1]** 10/19

**little [2]** 7/3 23/13
**LLC [9]** 1/4 4/4 42/11 43/3 43/3 43/7 43/25 48/13 49/1
**LLP [1]** 1/13
**lockup [1]** 19/12
**long [5]** 24/14 25/25 28/10 47/11 56/13
**longer [1]** 39/10
**longtime [2]** 10/8 10/13
**look [4]** 9/5 10/16 11/3 29/8
**looking [1]** 45/11
**lot [11]** 5/15 8/23 18/23 44/17 45/13 45/14 46/4 46/4 46/24 47/3 47/4
**lots [1]** 45/5
**Lying [1]** 42/17

**M**

**made [5]** 4/22 6/16 20/22 38/2 52/6
**mail [4]** 2/9 23/25 24/2 59/19
**mailed [1]** 24/3
**maintaining [1]** 10/7
**make [11]** 6/16 8/1 9/16 9/20 16/15 21/16 22/9 22/20 47/16 53/16 54/4
**making [1]** 50/21
**managed [1]** 28/11
**manners [1]** 33/14
**many [8]** 32/3 32/3 32/4 32/4 32/5 32/12 34/4 46/10
**MARK [1]** 1/9
**Marriott [1]** 18/14
**Marshal [3]** 52/20 53/17 56/7
**Marshals [1]** 56/13
**material [1]** 58/8
**matter [4]** 5/3 48/16 48/16 59/5
**matters [3]** 5/12 28/15 29/7
**may [5]** 13/6 15/15 15/16 30/8 57/9
**maybe [15]** 10/16 15/19 20/20 32/14 32/14 32/15 32/15 32/17 34/5 37/12 41/18 42/1 46/16 46/22 51/10
**me [41]** 4/17 4/20 5/13 6/5 7/10 11/10 12/16 13/2 13/3 15/2 15/13 16/19 17/3 18/22 19/13 19/21 23/15 24/24 25/3 26/14 27/25 29/18 31/1 32/10 32/12 33/21 35/5 35/17 35/22 35/25 36/14 37/3 37/8 40/21 45/11 45/13 47/1 47/8 48/7 49/15 52/1
**mean [4]** 35/6 35/7 38/8 56/24
**means [3]** 11/10 42/21 49/1
**meant [3]** 18/25 19/1 22/9
**mechanical [1]** 2/12
**media [1]** 21/6
**medications [1]** 51/8
**members [1]** 34/6
**men's [1]** 21/23
**mental [2]** 51/1 51/3
**mentally [1]** 51/16
**mentioned [1]** 20/25
**meritorious [1]** 7/2
**met [1]** 8/17
**method [1]** 14/22
**mguzman.csr [2]** 2/9 59/19
**microphone [1]** 29/4
**middle [1]** 54/17
**might [11]** 5/5 7/10 12/14 15/1 16/3 20/23 32/13 34/5 34/6 41/25 58/3
**million [6]** 5/17 6/17 35/16 37/13 37/14 38/2

**M**

**mine [4]** 18/8 19/9 33/10 48/24
**minimal [3]** 24/21 24/22 55/14
**Minimally [1]** 31/9
**minimum [2]** 21/1 25/2
**minute [1]** 30/12
**minutes [1]** 23/25
**Miranda [5]** 15/21 16/6 16/21 16/22 53/10
**missing [1]** 14/19
**misstating [2]** 44/9 44/12
**moment [2]** 27/8 51/8
**Monday [3]** 14/10 53/2 54/21
**money [7]** 33/8 33/10 37/10 38/5 38/11 46/24 57/20
**MONICA [5]** 2/7 29/5 59/3 59/11 59/11
**monthly [1]** 40/9
**months [5]** 11/20 12/5 16/13 51/10 58/13
**more [11]** 6/3 6/10 8/6 18/15 24/23 29/23 32/8 47/14 49/21 50/3 53/12
**morning [4]** 4/21 5/17 16/6 28/10
**most [2]** 10/6 29/25
**motion [19]** 5/4 6/22 7/1 7/12 8/2 8/5 8/14 14/2 24/25 25/10 54/3 54/8 54/9 54/11 54/15 54/17 54/24 55/1 55/7
**MOTIONS [1]** 1/9
**moved [4]** 23/14 31/22 49/11 49/16
**moving [2]** 34/3 48/20
**Mr [104]**
**Ms [11]** 4/10 4/17 4/18 4/23 15/2 15/19 16/15 17/15 30/19 56/19 57/11
**much [1]** 8/19
**mug [16]** 14/21 17/24 18/9 18/10 18/20 19/6 19/12 20/7 20/13 20/15 20/17 21/3 21/7 21/7 21/12 52/15
**mugs [1]** 55/16
**multiple [2]** 24/15 31/8
**must [1]** 50/5
**my [61]**
**myself [6]** 20/8 21/10 21/21 36/10 45/13 58/7

**N**

**name [7]** 41/8 41/13 41/25 42/1 43/16 43/19 44/21
**narratives [1]** 29/15
**Navy [1]** 44/16
**NCRA [1]** 59/12
**necessarily [1]** 33/13
**necessary [4]** 7/20 8/6 17/18 53/15
**necessitating [1]** 26/13
**need [15]** 5/24 7/16 7/22 9/19 9/21 9/21 15/13 25/25 27/21 27/22 36/21 50/6 50/7 56/14 58/5
**needing [1]** 5/5
**Neither [1]** 21/10
**never [9]** 19/7 23/18 44/19 44/19 46/21 47/9 47/13 48/4 49/17
**next [1]** 15/13
**nine [2]** 16/13 58/13
**no [59]** 1/4 7/15 7/19 7/22 7/24 7/25 8/4 8/7 8/13 9/4 12/9 12/17 13/4 13/13 15/7 15/10 15/16 17/18 18/9 18/22 20/24 21/20 23/9 24/3 27/11 32/1 35/24 36/19 37/24 39/10 40/6 40/7 41/21 42/4 42/5 42/6 42/12 42/14

42/18 43/21 46/6 46/13 46/20 46/20 47/21 48/22 49/5 50/25 51/2 51/5 51/7 51/9 52/9 53/14 53/25 55/1 57/12 59/12 59/12
**Nods [1]** 11/5
**noncompliance [2]** 55/8 55/18
**noncompliant [1]** 27/10
**none [1]** 46/7
**nonsense [1]** 29/15
**NORTHERN [3]** 1/2 1/22 59/13
**not [96]**
**note [5]** 4/11 12/10 29/10 30/14 55/5
**noted [1]** 24/15
**nothing [4]** 25/15 26/20 44/8 50/19
**notice [2]** 57/1 57/7
**noticed [1]** 14/9
**NOVEMBER [7]** 1/6 4/2 23/17 23/21 54/11 54/16 54/21
**now [8]** 5/3 6/22 8/19 13/24 29/6 31/14 40/15 57/16
**number [7]** 4/3 10/11 26/21 26/23 40/11 52/24 55/9
**numerous [1]** 53/23

**O**

**O'Connor [1]** 11/9
**O'Connor's [2]** 14/19 21/21
**oath [7]** 24/6 24/9 24/17 38/20 42/15 42/17 53/3
**object [4]** 7/4 7/11 49/7 55/4
**objected [2]** 8/18 12/10
**objecting [1]** 7/13
**objection [5]** 7/24 7/25 8/7 8/13 13/14 49/6
**objections [2]** 7/15 7/19
**obligation [1]** 57/12
**obstructive [5]** 14/15 26/9 28/16 30/3 53/13
**obviously [1]** 10/24
**Ocean [1]** 11/15
**October [1]** 54/3
**off [3]** 41/15 46/23 57/14
**office [8]** 10/13 10/23 11/1 22/15 24/1 42/20 52/21 56/11
**Officer [3]** 21/14 22/1 22/4
**officers [2]** 12/24 21/17
**Official [1]** 59/13
**oftentimes [1]** 33/7
**Oh [1]** 7/18
**OIA [1]** 38/13
**okay [49]** 4/8 4/17 5/6 7/16 7/22 8/10 8/12 12/18 13/17 13/22 13/23 15/14 15/17 16/13 17/3 17/19 17/23 18/4 19/10 19/17 23/7 25/20 27/10 27/17 30/16 30/24 31/7 31/21 32/2 34/3 34/19 37/2 37/8 38/13 39/2 39/8 40/2 40/8 40/19 41/3 41/6 44/13 50/3 52/2 52/3 57/18 57/22 58/11 58/15
**old [1]** 8/11
**one [26]** 5/1 8/11 8/11 9/4 15/2 16/18 17/10 18/7 19/21 21/17 21/18 23/2 23/4 28/20 30/16 32/13 32/14 32/15 34/9 39/14 42/5 46/16 47/14 50/4 52/24 53/11
**ongoing [1]** 39/20
**only [10]** 6/8 10/10 11/24 14/6 14/13 23/1 24/5 26/4 31/9 53/8

**operating [1]** 25/16
**operation [7]** 33/9 48/17 50/5 50/8 50/11 50/14 50/17
**operational [1]** 39/11
**opportunities [1]** 53/23
**opportunity [3]** 18/4 25/23 28/20
**options [2]** 18/23 18/23
**order [16]** 12/12 14/4 14/18 22/3 23/4 23/13 25/10 28/6 40/9 49/21 50/1 52/10 52/17 53/17 54/6 55/2
**ordered [14]** 6/1 14/3 22/18 23/21 25/14 26/11 27/13 27/19 27/20 27/23 28/15 40/12 54/18 55/19
**orders [14]** 23/2 23/10 25/18 26/6 27/11 28/21 31/12 52/24 53/20 54/1 55/8 55/24 56/6 58/12
**original [2]** 5/11 57/6
**other [21]** 6/13 12/9 18/15 27/12 28/14 32/10 33/15 34/6 35/22 39/15 39/23 40/10 41/20 41/25 42/5 50/23 50/24 52/10 52/23 53/14 54/7
**others [2]** 42/5 42/6
**otherwise [3]** 31/22 38/14 49/11
**Othram [8]** 35/1 37/6 43/8 44/1 47/18 48/2 48/10 49/9
**our [12]** 6/9 6/9 8/5 13/24 14/21 15/3 23/25 24/23 25/5 28/17 52/16 57/17
**out [28]** 4/24 6/24 8/25 9/5 9/12 12/11 12/24 14/24 16/2 20/22 21/6 25/21 27/22 27/25 28/8 28/9 28/18 29/25 30/6 30/13 34/14 36/14 39/19 42/3 49/8 52/5 53/8 57/6
**outset [1]** 24/16
**outside [2]** 18/13 18/14
**outstanding [4]** 5/17 19/25 23/2 25/19
**own [6]** 16/7 32/3 32/5 34/18 34/21 36/21
**owned [1]** 45/5

**P**

**p.m [2]** 1/7 4/2
**Pacific [1]** 11/15
**PAGE [1]** 3/2
**paid [1]** 14/20
**paper [1]** 46/2
**parents [1]** 34/6
**part [5]** 14/18 26/12 48/1 48/2 53/6
**partially [1]** 9/7
**participate [1]** 6/14
**past [2]** 4/25 22/5
**patience [2]** 6/3 29/24 56/19
**patient [1]** 16/12
**pay [3]** 52/22 56/11 57/16
**payable [2]** 22/14 52/19
**Pearl [1]** 1/14
**people [8]** 18/13 18/15 19/23 20/8 32/11 34/14 45/11 47/4
**per [2]** 33/10 40/13
**perfect [1]** 10/15
**perfectly [2]** 19/11 19/15
**perhaps [1]** 10/16
**perjured [1]** 42/19
**permission [4]** 4/13 20/20 20/21 21/11 22/16
**person [2]** 11/21 21/15
**person's [1]** 43/19
**personally [1]** 11/22 54/6

**P**

**pertinent [1]** 30/1
**phone [3]** 13/12 40/22 58/4
**physically [1]** 55/11
**picked [1]** 29/25
**picture [1]** 21/7
**piece [5]** 8/11 8/12 22/17 22/18 22/25
**pieces [2]** 52/13 52/23
**Piper [1]** 1/13
**PITTMAN [2]** 1/9 24/18
**place [5]** 14/9 26/18 42/25 53/17 56/7
**placed [2]** 35/10 46/18
**places [1]** 45/20
**placing [2]** 31/23 49/12
**plaintiff [4]** 1/13 14/11 54/6 55/6
**plaintiffs [20]** 4/5 4/6 6/17 6/21 6/25
  7/1 7/13 8/15 8/22 8/24 23/14 31/24
  47/20 48/3 48/9 48/15 49/13 54/3
  54/11 54/23
**plaintiffs' [9]** 9/6 14/2 24/24 25/10
  25/14 54/7 54/9 54/17 54/18
**plan [1]** 55/14
**played [1]** 11/7
**please [11]** 9/11 9/13 16/25 17/19
  19/24 25/22 35/9 50/25 52/1 56/11
  57/10
**podium [2]** 17/22 52/2
**point [6]** 1/4 4/3 12/15 23/3 31/24
  46/16
**pointed [1]** 52/5
**polite [1]** 19/19
**portfolio [1]** 40/4
**portion [2]** 5/5 48/6
**position [1]** 48/8
**possess [1]** 46/11
**possessed [1]** 45/21
**possible [6]** 13/10 13/12 19/19 39/3
  55/14 56/5
**possibly [2]** 5/5 6/7
**post [13]** 6/2 6/19 14/5 22/20 23/3
  25/11 26/7 26/20 27/13 52/25 53/23
  54/12 54/19
**post-judgment [13]** 6/2 6/19 14/5
  22/20 23/3 25/11 26/7 26/20 27/13
  52/25 53/23 54/12 54/19
**posted [1]** 21/7
**powers [1]** 12/13
**precise [1]** 49/22
**preface [2]** 31/2 47/2
**prefer [4]** 13/11 38/17 38/19 38/20
**pregnant [1]** 13/10
**prepaid [1]** 39/5
**prepared [4]** 31/15 31/20 40/15 41/12
**prescribed [1]** 59/7
**present [3]** 15/13 17/9 55/11
**preservation [3]** 48/19 48/25 49/21
**preserved [3]** 49/3 50/7 50/7
**President [1]** 45/9
**pretty [2]** 21/4 51/11
**prevent [4]** 47/19 47/22 48/3 48/14
**previous [3]** 5/18 18/12 23/20
**previously [4]** 6/5 18/7 42/24 43/24
**Price [6]** 2/3 9/9 9/24 10/1 10/4 11/20
**print [1]** 21/5
**PRO [1]** 1/18
**probably [6]** 4/19 6/12 12/20 13/20
  26/24 49/22

**problem [1]** 51/23
**proceedings [3]** 2/12 58/18 59/5
**proceeds [5]** 43/8 44/1 48/1 48/9
  48/15
**process [5]** 6/8 26/25 27/1 56/14 58/5
**proclivity [1]** 9/1
**produce [8]** 25/14 28/6 40/9 54/13
  54/19 54/20 55/21 57/4
**produced [2]** 2/12 25/15
**production [2]** 25/18 40/11
**professionals [1]** 51/4
**proof [1]** 24/3
**property [9]** 14/23 15/1 17/25 18/18
  19/4 22/14 52/15 53/4 55/22
**proposed [1]** 12/12
**prosecution [1]** 11/13
**prosecutor [2]** 10/8 11/13
**protect [2]** 8/21 8/22
**protection [1]** 54/6
**provide [5]** 29/12 31/10 31/15 53/9
  57/1
**provided [6]** 17/10 24/3 39/5 39/11
  40/3 40/8
**providing [2]** 27/13 57/7
**psychiatric [1]** 51/6
**psychological [1]** 51/10
**public [5]** 1/21 4/23 6/11 15/3 53/9
**pun [1]** 21/4
**purely [1]** 5/4
**purge [5]** 53/19 56/24 57/23 58/5 58/7
**purges [2]** 56/9 57/5
**purpose [7]** 4/12 31/23 36/11 47/19
  47/25 48/13 49/12
**pursuant [2]** 31/4 40/11
**pursue [1]** 10/17
**put [7]** 11/17 15/23 23/1 27/15 27/18
  35/20 53/10
**putting [4]** 36/11 36/14 48/19 49/3

**Q**

**question [24]** 13/6 17/4 19/25 26/9
  32/11 32/23 33/15 33/25 35/16 35/17
  36/2 37/21 38/2 40/1 41/3 43/18 45/25
  46/9 47/7 47/14 48/8 48/12 49/10
  49/22
**questioning [1]** 17/9
**questions [40]** 5/21 6/5 6/13 10/20
  12/16 13/3 14/8 15/5 17/19 19/1 20/11
  24/21 26/19 26/21 26/23 29/11 29/16
  29/17 29/19 30/1 30/4 30/6 30/6 31/1
  35/13 36/3 37/1 38/20 41/6 42/23 50/3
  51/25 53/7 53/11 55/12 55/20 55/25
  56/1 56/23 57/3
**quickly [3]** 15/8 15/15 26/1
**quiet [3]** 19/17 19/24 49/18
**quip [1]** 20/22
**quite [5]** 8/25 22/5 26/21 26/23 30/5
**quoting [1]** 31/11

**R**

**radar [1]** 36/13
**raise [1]** 28/25
**rather [4]** 15/8 26/12 35/17 46/5
**reach [2]** 31/23 49/12
**read [7]** 16/20 17/3 17/11 21/6 26/8
  28/12 53/10
**reading [1]** 48/6

**ready [2]** 57/1 57/3 57/5
**realize [1]** 43/24
**really [4]** 16/11 16/11 34/13 50/22
**reason [4]** 11/7 26/12 43/25 44/6
**reasons [1]** 18/6
**recall [3]** 20/6 20/18 46/23
**receive [1]** 23/22
**received [4]** 24/1 37/10 37/14 38/5
**receiver [27]** 6/22 7/5 7/7 7/9 7/12
  7/14 8/3 8/5 8/6 8/9 8/14 8/17 9/5 9/8
  9/11 10/5 10/7 10/25 12/12 12/19 14/2
  24/25 26/13 55/15 54/24 55/5 55/7
**receivers [9]** 2/2 12/14 12/21 13/3
  13/11 49/5 51/23 56/13 58/8
**receivership [4]** 5/4 6/22 8/21 35/21
**recently [1]** 10/19
**recess [1]** 58/15
**recollection [1]** 20/7
**recommendations [1]** 8/8
**record [12]** 4/11 4/18 4/22 9/17 24/8
  25/5 29/10 42/25 45/18 52/7 57/14
  59/5
**recoverable [2]** 11/4 12/25
**Reed [1]** 11/9
**referring [1]** 42/20
**reflect [2]** 4/18 4/22
**refuse [1]** 43/18
**refused [4]** 12/25 29/12 30/14 57/11
**refusing [4]** 30/21 33/25 36/25 38/1
**regarding [5]** 14/7 16/21 16/22 28/14
  31/14
**regards [1]** 8/3 14/1 52/24
**related [1]** 24/2
**relationship [2]** 26/21 26/22
**release [1]** 10/18
**remain [3]** 15/23 17/5 21/24
**remainder [1]** 17/20
**remaining [1]** 13/25
**remove [1]** 18/2
**removed [2]** 18/1 18/18
**removing [1]** 22/16
**repeated [1]** 53/22
**repeatedly [4]** 20/23 24/22 29/12
  55/13
**reported [2]** 2/12 55/15
**reporter [6]** 2/7 20/9 21/10 24/10
  39/21 59/13
**REPORTER'S [1]** 58/17
**represent [2]** 15/22 30/15
**represented [1]** 12/5
**representing [1]** 4/9
**request [5]** 4/22 25/14 40/11 40/14
  40/15
**requested [2]** 24/13 26/11
**requests [1]** 25/19
**required [4]** 40/9 53/1 53/2 54/20
**requirements [1]** 8/16
**requires [1]** 31/13
**respect [1]** 8/23
**respected [1]** 10/14
**respond [9]** 20/2 23/8 28/15 53/1
  54/12 54/25 55/12 55/19 56/2
**response [6]** 7/12 14/25 22/2 31/11
  55/1 55/18
**responses [4]** 29/19 31/14 52/8 55/22
**responsively [1]** 31/2
**Reston [1]** 1/19

**R**

result [1]  6/21
resulting [1]  55/16
retired [1]  11/12
returned [2]  19/12 19/21
returns [1]  25/15
review [1]  14/12
reviewed [2]  8/13 29/21
reviewing [2]  29/6 52/6
rid [2]  45/8 45/14
right [16]  5/12 10/2 13/5 13/24 17/5
 17/8 25/21 29/1 29/4 30/24 31/21 36/7
 41/2 41/15 50/9 57/14
rights [10]  5/6 15/6 15/20 16/6 16/20
 16/22 16/23 17/1 17/11 53/10
risk [1]  57/17
Robbins [1]  10/23
Robert [1]  8/24
role [2]  43/21 43/23
room [15]  1/22 2/7 14/19 15/1 18/1
 18/11 19/9 21/19 21/22 21/23 21/23
 22/7 27/6 52/16 59/17
rooms [1]  21/23
rope [1]  6/3
rough [2]  14/11 24/11
RPR [3]  2/7 59/3 59/11
ruling [1]  8/1
rulings [1]  53/16
rush [1]  24/14

**S**

safe [2]  42/10 46/19
said [39]  5/18 7/2 13/18 14/22 14/24
 17/1 17/25 19/7 20/12 20/13 20/14
 20/15 20/15 20/16 20/23 21/7 21/11
 22/24 23/24 24/16 24/19 24/20 25/2
 25/2 25/3 26/8 26/10 26/17 29/6 30/10
 44/9 45/10 47/23 47/25 48/4 50/6 50/7
 52/12 55/4
sale [6]  43/8 44/1 47/18 47/19 48/1
 49/17
same [4]  19/14 24/17 30/4 54/7
sanction [4]  22/11 52/9 52/18 53/4
 53/15 55/17 56/5
sanctioned [1]  26/15
SANDERS [12]  1/21 4/10 4/17 4/18
 4/23 15/2 15/19 16/15 17/15 30/19
 56/19 57/11
Sanford [1]  57/15
sat [1]  51/9
Saturday [1]  23/21
saw [1]  10/18
say [13]  8/2 14/13 16/18 17/6 19/8
 21/8 28/14 33/24 44/18 46/6 48/5
 50/10 50/20
saying [5]  19/3 20/6 20/19 31/2 47/2
says [3]  20/13 20/14 21/2
scheduled [2]  54/14 56/25
scope [1]  35/12
se [2]  1/18 33/10
seat [6]  10/3 19/25 27/16 28/17 28/25
 29/3
second [5]  22/18 22/19 22/25 23/4
 49/10
Security [3]  10/12 21/14 22/4
see [2]  9/12 58/3
seeing [1]  51/3

seems [3]  22/10
seen [2]  4/25 47/3
self [1]  16/24
self-incrimination [1]  16/24
send [4]  13/13 58/8 58/8 58/9
sense [1]  51/16
sentencing [1]  28/10
seriously [1]  53/3
serve [5]  7/7 9/5 10/5 10/6 55/21
served [1]  10/10
service [1]  56/17
services [3]  15/11 15/13 57/11
set [14]  32/10 32/22 33/21 34/7 34/9
 35/2 35/4 35/9 36/9 36/10 43/7 43/12
 43/14 43/25
setting [1]  43/21
several [11]  5/12 5/23 11/1 11/20 12/5
 18/6 28/8 29/6 29/11 55/25 56/1
severe [6]  22/11 52/9 52/18 53/4
 53/15 56/5
shall [1]  44/18
she [2]  15/4 44/15
she's [1]  17/17
shenanigans [1]  5/15
Sheridan [1]  44/19
Shh [1]  49/18
shoebox [1]  46/19
shoes [2]  12/23 13/19
short [1]  43/2
shot [2]  21/3 21/7
should [6]  8/22 15/21 26/14 52/14
 56/25 58/12
shouldn't [1]  21/2
show [12]  4/23 14/3 18/4 20/24 22/2
 22/19 25/12 25/23 52/5 54/4 54/9
 55/19
showed [1]  14/19
shown [2]  53/21 53/25
sic [5]  7/20 36/25 48/9 48/14 53/4
side [1]  32/6
Signed [1]  59/9
signing [1]  12/12
silent [1]  17/5
simply [2]  5/9 26/16
since [5]  18/17 37/5 39/19 45/21
 45/23
sink [1]  18/9
sir [4]  13/8 21/20 28/25 45/25
sit [4]  19/15 54/13 54/20 57/1
six [3]  18/24 22/5 26/24
soap [1]  18/11
social [1]  21/6
some [20]  4/24 7/6 7/6 9/7 11/10
 12/15 18/11 18/13 18/22 21/1 25/15
 28/1 37/7 38/15 39/19 41/4 44/7 47/10
 51/22 53/16
somebody [4]  19/3 26/22 33/20 40/21
someone [1]  57/3
something [5]  25/3 28/2 32/20 34/5
 44/22
sometimes [1]  37/19
somewhere [1]  37/12
song [1]  8/11
sorry [3]  7/18 16/22 26/3
sort [2]  28/1 34/13
sound [1]  21/16
sounds [3]  15/22 16/17 48/20 49/14

souvenir [1]  30/12
spa [1]  18/25
space [1]  10/15
speak [4]  4/13 16/7 17/8 29/4
speaks [1]  14/16
special [1]  36/11
specifically [2]  20/15 27/23
spent [2]  28/10 29/6
spot [2]  15/23 47/1
staff [6]  10/16 10/25 19/4 21/10 21/15
 55/15
stand [1]  1/21 7/16 8/4 12/22 13/18
 25/22 28/18 28/23 28/24 53/11 57/14
 58/15
STAND-BY [1]  1/21
standby [3]  5/2 15/4 15/24
start [1]  51/14
started [1]  27/1
state [1]  44/17
stated [4]  30/5 31/8 40/13 41/8
statement [1]  23/9
statements [2]  20/5 40/9 40/11
STATES [12]  1/1 1/10 16/21 28/3
 37/10 37/15 37/23 38/3 39/2 53/17
 56/7 59/8
stay [2]  12/7 54/8
stayed [1]  5/18
staying [1]  18/15
steal [1]  19/20
stealing [2]  22/13 52/15
stenography [1]  2/12
step [3]  9/13 50/20 52/1
still [5]  10/7 15/18 22/23 39/20 51/24
stock [13]  34/25 35/1 37/6 37/7 43/8
 47/18 48/2 48/10 48/10 48/15 49/6
 49/8 49/9
stole [2]  15/1 55/16
stop [3]  26/2 26/18 57/10
stored [3]  45/21 46/11 46/13
stories [2]  6/14 38/23
story [4]  21/15 24/7 24/8 24/9
strategic [1]  11/16
Street [4]  1/14 1/22 2/7 59/17
study [1]  8/19
stuff [2]  46/3 46/3
subject [4]  6/24 12/1 26/7 35/16
submitted [2]  12/13 14/11
Subsequent [1]  54/23
Substack [1]  21/6
such [2]  53/18 56/8
suggested [1]  8/24
Suite [2]  1/14 2/4
suited [2]  7/8 9/5
summary [1]  25/17
supersede [1]  12/7
superseded [1]  5/19
supervise [1]  21/18
supplement [4]  8/5 24/23 24/24 55/6
support [1]  24/24
suppose [1]  20/19
supposed [4]  26/5 31/18 40/23 51/25
sure [7]  7/16 13/2 16/15 25/8 25/24
 29/4 37/16
swore [3]  24/6 24/7 24/17
sworn [2]  24/10 29/2
synthetic [1]  36/12
system [2]  6/10 36/13

**T**

**table [1]** 10/3
**take [32]** 5/1 5/3 5/6 5/13 6/23 8/10 8/22 13/24 14/9 14/23 17/15 17/25 18/8 19/5 19/6 19/8 20/14 20/17 22/6 26/18 28/11 28/17 28/25 30/15 38/11 43/8 44/1 49/8 52/21 57/16 57/22 58/5
**taken [7]** 14/21 18/12 18/12 28/8 29/8 56/21 58/2
**taking [3]** 22/24 28/12 53/3
**talk [3]** 27/19 34/13 39/19
**talking [4]** 15/18 25/6 33/11 43/4
**Tarrant [1]** 20/17
**task [5]** 29/23 36/1 36/7 36/9 36/17
**tax [1]** 25/15
**taxpayers [1]** 14/20
**Taylor [1]** 1/22
**tea [2]** 18/22 18/23
**technology [1]** 36/13
**Telephone [6]** 1/15 1/19 1/23 2/5 2/8 59/18
**tell [8]** 11/1 25/3 26/14 32/12 34/19 34/21 34/24 57/3
**telling [3]** 21/16 29/17 36/23
**ten [2]** 32/17 32/19
**tendency [1]** 19/16
**tentative [1]** 8/8
**Terry [1]** 11/10
**testified [2]** 43/25 44/5
**testify [1]** 47/4
**testimony [2]** 47/4 52/7
**TEXAS [11]** 1/2 1/5 1/15 1/22 1/23 2/4 2/8 42/9 59/12 59/13 59/17
**than [11]** 6/13 6/16 20/20 20/21 28/14 32/9 32/19 42/5 46/5 50/24 52/10
**thank [22]** 4/18 5/7 5/8 5/10 9/23 10/2 11/7 13/5 13/17 16/16 20/1 21/13 22/1 27/17 30/17 30/24 31/21 56/17 56/19 57/18 58/14 58/15
**that [273]**
**that's [34]** 10/22 12/8 21/8 22/10 22/17 23/6 24/3 24/11 25/4 25/8 26/25 28/2 28/3 31/4 32/22 33/6 33/15 34/15 37/17 38/21 40/2 41/2 41/18 41/18 42/7 42/8 43/5 44/22 47/23 48/11 48/18 49/4 50/2 50/9
**theft [2]** 14/23 55/22
**their [2]** 12/22 22/4
**them [40]** 12/3 12/15 13/2 13/13 13/14 13/15 13/16 16/6 17/3 17/11 17/13 18/2 18/13 18/19 19/5 23/21 23/22 23/24 24/3 27/6 27/6 30/5 31/1 31/23 32/22 33/18 33/19 33/21 38/21 40/24 40/25 41/1 41/15 41/17 48/3 48/21 48/23 49/12 53/13 57/3
**then [14]** 5/6 14/21 18/9 18/15 20/21 20/22 23/4 23/8 37/2 37/4 41/4 45/9 54/23 55/23
**then-President [1]** 45/9
**theories [1]** 9/2
**there [33]** 5/14 6/24 8/2 9/10 9/12 11/24 14/21 15/5 17/24 18/9 18/24 20/3 20/8 20/24 21/18 23/9 26/19 26/20 26/23 26/25 31/18 32/13 33/7 38/10 38/21 42/11 44/7 44/15 44/22 44/22 45/11 56/25
**there's [10]** 18/22 19/24 32/21 32/21 32/21 33/6 36/19 43/25 48/4 57/13

**T** (second column)

**Therefore [2]** 53/14 56/4
**therein [1]** 12/13
**these [12]** 11/24 12/22 13/19 17/1 22/8 24/2 32/24 35/2 35/2 35/9 52/8 53/11
**they [15]** 12/2 12/2 12/3 13/8 13/22 13/18 19/7 19/8 32/10 33/8 34/25 35/4 37/7 45/12 50/7
**they're [7]** 6/18 7/20 9/12 11/25 33/2 35/1 39/10
**thing [9]** 4/19 11/6 12/3 14/13 16/18 21/1 27/25 34/13 52/13
**things [4]** 5/1 33/2 38/18 45/12
**think [34]** 5/23 5/24 6/4 7/10 7/19 8/6 15/1 16/3 16/4 18/24 20/14 22/11 22/12 22/13 24/22 27/21 29/25 32/12 33/1 33/2 33/9 34/8 35/23 37/6 43/5 44/21 45/1 46/3 46/15 50/25 57/2
**third [4]** 21/22 52/21 53/6 57/17
**this [89]**
**THOMPSON [25]** 1/13 4/6 8/1 12/13 12/16 20/22 22/3 23/2 25/22 26/10 27/21 29/14 29/20 35/13 35/25 40/3 41/4 42/23 45/15 46/8 48/12 52/8 56/1 56/18 58/9
**those [31]** 12/13 16/2 17/11 22/16 23/18 23/19 23/20 25/13 27/13 30/2 31/17 33/16 37/3 37/5 37/6 38/18 39/8 39/19 40/17 40/23 41/23 45/14 45/22 48/15 49/5 49/6 49/9 49/23 55/24 56/1 59/7
**though [1]** 30/24
**thought [2]** 10/15 11/20
**threatened [1]** 5/25
**threatening [1]** 54/6
**three [7]** 32/13 40/12 41/16 47/3 51/10 52/5 52/12
**through [7]** 5/22 7/20 29/22 30/2 37/19 49/17 49/20
**throughout [2]** 14/15 53/21
**Thus [2]** 6/20 55/3
**time [32]** 5/15 6/14 8/11 8/12 14/16 15/21 16/20 17/18 20/10 20/12 22/19 22/24 28/9 28/13 28/17 29/10 30/16 32/20 35/13 38/22 39/9 42/25 45/5 45/24 46/24 47/11 52/4 53/12 53/18 56/7 56/8 58/3
**times [6]** 5/14 5/23 5/25 24/15 31/8 38/10
**today [24]** 4/20 4/24 5/9 5/10 5/13 6/11 9/12 12/11 12/15 14/1 14/3 14/18 24/1 27/25 29/8 29/16 31/19 41/12 52/22 54/25 55/3 55/4 55/24 56/15
**today's [2]** 53/24 55/6
**together [2]** 23/1 26/17
**told [5]** 19/4 27/25 33/21 33/23 58/4
**too [3]** 11/2 11/21 16/4
**took [6]** 18/10 18/19 18/20 18/20 52/13 52/16
**top [1]** 46/23
**total [2]** 37/9 41/17
**totally [2]** 7/20 37/16
**touch [1]** 46/3
**touched [1]** 37/5
**towards [1]** 30/7
**transaction [3]** 48/1 48/13 49/20

**T** (continued) / **U**

**transcript [15]** 1/9 2/12 14/16 24/12 24/14 26/8 28/12 29/7 29/9 29/21 31/11 40/13 48/7 59/4 59/6
**transfer [1]** 49/22
**transferred [2]** 31/22 49/11
**transferring [1]** 48/23
**trial [4]** 12/6 18/17 28/10 54/17
**trip [1]** 18/25
**true [2]** 28/3 59/4
**Trump [1]** 45/9
**trust [16]** 32/6 34/11 34/17 34/18 34/21 34/22 35/9 35/10 35/22 35/25 36/1 36/7 36/9 36/17 36/20 37/4
**trustee [1]** 49/4
**trusts [8]** 32/3 32/4 32/24 33/7 33/16 34/4 35/2 35/3
**truthfully [2]** 19/1 37/21
**try [5]** 7/5 27/18 30/4 53/11 53/13
**trying [7]** 5/24 6/15 10/6 16/12 16/16 19/19 22/25
**turn [1]** 41/5
**Tweet [1]** 45/9
**two [18]** 5/22 9/10 9/16 12/14 12/22 18/13 18/15 23/2 23/10 23/15 27/11 32/9 32/13 32/14 32/15 34/23 35/20 52/23
**type [5]** 5/20 21/11 38/2 51/6 51/8
**typically [3]** 32/21 34/12 37/18

**U**

**U.S [12]** 10/13 10/20 10/23 11/1 33/6 38/12 42/20 44/17 45/12 49/2 49/4 52/20
**ultimately [1]** 36/14
**Umbra [2]** 36/12 37/7
**unanswered [1]** 30/1
**uncooperative [1]** 6/21
**uncredible [1]** 41/9
**under [12]** 6/9 15/20 16/21 16/23 24/6 24/9 25/16 38/20 41/17 42/15 42/17 45/10
**underlying [1]** 5/21
**underneath [1]** 46/18
**understand [13]** 17/1 17/11 17/14 31/5 35/6 35/14 42/15 42/16 46/25 47/7 51/16 51/19 51/21
**understanding [4]** 23/6 30/20 33/5 49/1
**understood [2]** 5/7 24/19
**undertook [1]** 22/8
**unfortunately [1]** 12/4
**UNITED [12]** 1/1 1/10 16/21 28/3 37/10 37/15 37/23 38/3 39/2 53/17 56/6 59/8
**unlawful [5]** 52/10 53/15 53/24 54/2 56/6
**unless [1]** 19/24
**Unlike [1]** 10/15
**unnamed [1]** 25/16
**unopposed [1]** 8/2
**unrelated [1]** 29/15
**unresponsive [3]** 14/14 26/9 28/16
**until [1]** 21/25 53/18 57/23
**up [40]** 4/23 5/1 5/3 5/6 5/13 13/24 14/19 14/23 15/8 17/4 17/25 21/3 21/18 22/9 22/24 24/7 26/23 32/10 32/22 33/21 34/7 34/9 35/3 35/4 35/9

App.1098

**U**

**up... [15]**  36/9 36/10 36/14 41/5 43/12 43/14 43/21 43/25 44/7 45/16 47/12 47/17 52/13 56/17 57/13

**us [10]**  1/13 23/7 33/16 34/19 34/21 34/24 36/23 39/8 46/5

**use [5]**  15/11 19/4 19/9 21/16 33/8

**used [4]**  17/6 24/22 46/3 46/16

**using [2]**  48/13 48/24

**usually [1]**  34/13

**V**

**various [5]**  5/25 11/16 27/24 28/11 45/12

**Vedder [6]**  2/3 9/9 9/24 10/1 10/4 11/19

**vehicle [1]**  36/12

**versed [1]**  12/3

**version [1]**  22/4

**very [18]**  4/23 5/16 5/16 7/2 12/3 15/15 24/16 26/1 26/1 26/16 29/8 31/7 43/1 43/2 44/16 47/1 51/18 51/23

**video [1]**  48/5

**videographer [1]**  20/9

**violated [1]**  27/11

**violating [1]**  54/5

**violation [1]**  49/25

**Virginia [1]**  1/19

**visit [7]**  12/15 12/21 13/16 15/9 15/20 17/15 56/14

**VOL [1]**  3/2

**VOLUME [1]**  1/8

**voluntary [2]**  51/12 51/13

**vs [4]**  1/6 4/4 16/21 16/22

**W**

**Wait [1]**  16/11

**waive [2]**  16/6 17/13

**walked [1]**  20/21

**wallets [4]**  45/20 46/2 46/2 46/10

**want [21]**  4/11 5/2 16/15 16/18 17/22 20/16 20/16 29/10 30/2 30/10 30/19 35/10 36/3 37/22 38/21 40/2 47/16 50/20 56/14 56/15 56/16

**wanted [2]**  4/20 26/24

**warned [1]**  12/5

**warnings [2]**  15/21 16/3

**was [85]**

**washed [1]**  18/20

**wasn't [2]**  20/11 47/22

**WASPs [1]**  34/12

**waste [1]**  14/16

**water [9]**  14/20 18/11 18/19 19/5 19/14 20/6 22/7 26/24 55/16

**waters [1]**  52/16

**way [5]**  11/17 30/4 37/19 48/18 56/10

**we [26]**  5/12 5/16 6/14 7/3 7/9 8/5 8/6 8/7 9/21 10/22 12/8 13/12 14/22 21/11 23/2 23/11 23/24 24/13 26/17 34/12 34/12 34/13 39/19 44/18 52/13 57/15

**we'll [9]**  5/6 8/4 8/12 17/16 23/8 27/8 57/14 57/22 58/3

**we're [8]**  5/1 8/9 22/24 22/25 25/5 26/4 27/15 27/19

**we've [1]**  4/25

**Webster [4]**  8/24 9/3 9/3 10/16

**week [4]**  7/4 23/14 23/14 28/10

**Welcome [1]**  5/11

**well [29]**  6/6 8/10 9/6 10/9 10/14 11/2 11/8 11/14 12/3 12/21 17/3 20/19 25/2 29/7 32/8 32/12 32/20 35/6 37/7 38/19 39/10 44/3 47/22 49/10 49/24 51/11 51/24 52/16 54/2

**well-documented [1]**  54/2

**well-known [1]**  11/8

**well-respected [1]**  10/14

**Wells [6]**  44/24 44/25 45/1 45/1 45/3 48/14

**went [8]**  5/22 9/2 18/10 26/23 27/20 29/20 35/8 49/17

**were [38]**  4/20 5/20 14/14 23/18 23/20 25/14 26/5 26/7 26/9 26/19 26/19 26/20 26/23 27/14 27/23 28/9 28/15 28/15 29/11 30/1 32/10 35/2 35/4 40/8 40/8 40/12 40/23 41/6 41/7 44/6 45/3 45/11 45/11 48/8 48/20 53/1 53/2 53/7

**what [38]**  6/4 6/19 6/24 11/24 11/25 12/24 12/25 22/4 23/1 23/24 25/1 27/20 28/19 29/20 29/23 29/25 30/20 35/6 35/7 36/7 36/21 38/8 38/19 39/23 41/22 42/22 43/4 43/16 44/9 44/21 45/7 47/23 49/4 50/5 50/11 50/13 58/3 58/5

**what's [6]**  6/24 11/4 11/4 33/9 37/9 49/24

**whatever [1]**  36/18

**whatsoever [2]**  40/5 43/23

**when [24]**  5/4 5/20 7/17 12/4 12/5 12/6 16/23 19/16 20/10 27/1 27/6 28/9 33/5 34/14 38/14 38/15 46/11 50/24 52/9 54/16 56/23 57/3 58/7 58/8

**where [11]**  11/12 12/8 18/14 21/22 21/24 26/19 45/9 45/20 46/10 46/13 49/3

**whether [8]**  34/10 34/16 35/15 36/16 47/6 52/14 56/15 56/16

**which [14]**  19/12 26/24 34/20 34/22 35/12 36/2 36/12 38/10 38/14 40/5 40/12 42/9 53/2 54/24

**while [3]**  10/7 55/10 55/13

**white [1]**  10/14

**white-collar [1]**  10/14

**who [9]**  4/5 8/24 31/18 33/8 33/20 33/23 39/13 39/17 45/11

**who's [1]**  26/22

**whole [1]**  49/8

**why [16]**  9/16 14/3 14/22 17/24 18/5 20/16 20/16 22/19 23/7 26/14 26/24 33/15 44/6 45/3 50/6 51/16

**wife [3]**  33/22 37/4 49/7

**will [14]**  4/6 7/19 9/8 9/10 12/12 13/2 15/4 17/6 17/10 17/15 21/2 28/19 33/24 57/2

**WILLENBURG [4]**  2/7 59/3 59/11 59/11

**WILLIAM [1]**  1/13

**willing [2]**  19/11 19/15

**willingness [1]**  53/25

**wish [1]**  51/21

**within [2]**  25/13 54/19

**without [1]**  22/16

**witness [5]**  28/18 28/23 29/2 30/9 30/10

**won't [4]**  12/3 50/12 50/15 50/18

**Woodforest [3]**  40/10 41/17 42/9

**Woodlands [1]**  42/9

**word [2]**  22/13 24/21

**words [1]**  48/24

**work [10]**  11/10 11/14 33/6 37/22 37/25 38/2 38/15 38/18 39/6 51/23

**worked [4]**  22/5 33/21 33/21 39/20

**working [1]**  39/24

**worst [1]**  20/25

**WORTH [11]**  1/3 1/5 1/23 2/8 10/10 10/11 11/8 13/11 15/3 59/14 59/17

**would [35]**  5/21 5/22 6/4 7/4 7/9 9/13 10/15 11/2 11/20 12/1 14/20 15/9 15/23 16/25 20/3 20/16 20/24 21/1 21/24 22/12 22/14 24/20 26/17 26/18 28/20 31/9 31/10 37/6 38/17 40/14 47/12 51/22 52/15 56/10 56/24

**wouldn't [2]**  20/24 32/22

**write [1]**  42/2

**written [9]**  14/7 22/21 23/11 25/6 26/4 26/10 27/24 52/25 55/1

**wrote [1]**  20/18

**Wyoming [10]**  43/3 43/7 43/25 44/2 44/4 44/6 44/14 44/16 48/13 49/1

**X**

**Xavier [1]**  34/22

**Y**

**yahoo.com [2]**  2/9 59/19

**yeah [8]**  27/9 33/14 37/2 42/8 44/25 47/15 48/25 57/8

**years [7]**  9/4 10/11 11/1 13/20 22/6 34/16 47/3

**yes [29]**  7/18 9/18 11/18 13/8 16/9 16/14 17/19 17/21 18/8 19/2 19/18 20/4 23/12 26/25 27/6 30/23 31/20 36/5 36/22 39/7 39/12 39/22 40/6 43/6 43/11 43/15 43/20 44/3 51/13

**yet [1]**  55/23

**you [345]**

**you'd [4]**  8/2 15/8 41/4 42/24

**you'll [4]**  10/3 56/14 57/23 58/4

**you're [27]**  5/11 6/9 9/21 19/3 25/2 29/16 31/3 31/19 33/25 34/10 34/16 36/25 37/19 38/1 38/20 42/15 46/25 47/1 47/13 49/15 51/15 51/16 51/24 51/25 52/21 58/2 58/4

**you've [11]**  5/13 5/14 6/14 5/25 22/18 27/11 27/24 37/14 37/23 38/2 42/19

**you-all [2]**  10/19 11/7

**your [141]**

**yours [1]**  20/15

**yourself [5]**  12/6 42/19 53/19 57/24 58/6

**Z**

**zero [3]**  41/9 43/23 46/7

**zilch [1]**  46/7

# EXHIBIT 34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |

**PLAINTIFFS' SUPPLEMENT IN SUPPORT OF MOTION TO APPOINT RECEIVER
<u>AND NOTICE OF JOHNSON'S NON-COMPLIANCE</u>**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this supplement to their motion for the appointment of a receiver and to notify the Court of Defendant Charles Johnson's testimony at the November 17, 2025 post-judgment deposition.

**INTRODUCTION**

A receiver with very broad authority is now essential to enforce this Court's judgment. Johnson's November 17 deposition confirmed that he will not comply with post-judgment discovery about his assets even when directly ordered to do so, and he has taken deliberate steps— conduct consistent with wire fraud —to place assets beyond Plaintiffs' reach. Over roughly five hours of testimony, Johnson refused to identify his financial accounts, claiming that unnamed "government" handlers had not given him "permission," and repeatedly stated that he sat for the deposition only to provide "minimal consent" and "not complete information."

Johnson trivialized the prospect of contempt, testifying that jail "would be great" because he would "get the mug shot." Yet, he predicted that jail was unlikely because "[m]ore likely than not what will happen is Judge Pittman will push it into the future and then I'll have to come back to Fort Worth and eat a bunch of food I shouldn't and then fly back." (Ex. A, Rough Transcript of

1

Johnson Deposition ("Johnson Dep."). at 135:21–24, Appx. 150 (cleaned up)). He also failed to serve the interrogatory responses the Court compelled him to produce and arrived at the deposition without a single document, including the tax returns and financial records the Court expressly ordered him to bring. His noncompliance was part of his stated plan to provide "the least amount of information possible."

The testimony that Johnson raises serious concerns of perjury, wire-fraud-type conduct, and tax evasion. Johnson gave sworn statements that cannot be reconciled with what he told the Court one week earlier, including two incompatible accounts about the secret Wyoming LLC and the bank account designed to receive $1 million in Othram proceeds. Before the Court, he suggested the Wyoming LLC was benign and tied to his grandmother's connection to Wyoming. At his deposition, he denied any involvement at all, attributed the LLC and bank account to an unnamed government handler communicating over an encrypted app, and admitted that routing the proceeds through this structure was intended to keep the assets beyond Plaintiffs' reach. Given this record, only a receiver with very broad powers can compel compliance, secure the documents Johnson refuses to produce, obtain the formation and banking records he has concealed, trace the funds at issue, and protect the integrity of this Court's judgment.

## ARGUMENT

I.   **Johnson offered only "minimal consent," refused to identify his assets, and treated a potential contempt hearing as a travel inconvenience where he would "eat a bunch of food I shouldn't."**

Johnson appeared—*or at least was physically present*—for the Court-ordered post-judgment deposition. Throughout the deposition, he made clear that he did not intend to comply with the Court's orders. Johnson announced that he was there to give only what he called

App.1102

"minimal consent" and "not complete information." He repeatedly said that he would provide "the least amount of information possible." (Johnson Dep. at 25:13-14, Appx. 031).

The following exchange captures Johnson's approach to the deposition—his refusal to identify any accounts based on supposed instructions from unnamed government "handlers," his refusal to participate even after being reminded that no federal agency had contacted the Court or the U.S. Attorney's Office to limit his testimony, and his casual dismissal of contempt or incarceration as nothing more than an inconvenient return trip to Fort Worth.

> **Q.** Testifying here today under oath will you identify all those accounts?
> **A.** *No I will not.*
>
> **Q.** You refuse to?
> **A.** *I refuse to because I've not been given permission to do so.*
>
> **Q.** Will you identify who would be the person that would give you permission to identify that information?
> **A.** *I will not.*
>
> **Q.** You're aware that Judge Pittman previously disagreed that you can refuse to answer these kind of questions?
> **A.** *The judge can do whatever he sees fit I will not participate in that.*
>
> **Q.** Will you go to jail rather than identify those people?
> **A.** *No, I won't end up going to jail but that's funny.*
>
> **Q.** Would you rather?
> **A.** *It would be great if I went to jail because I would get the mug shot and that's what I want but unfortunately I will not end up going to jail. Regrettably I should say. More likely than not what will happen is Judge Pittman will push it into the future and then I'll have to come back to Fort Worth and eat a bunch of food I shouldn't and then fly back.*

(Johnson Dep. 134:23–135:24, Appx. 149-50 (cleaned up)).

Moments later, when asked what he hoped to accomplish by stonewalling, Johnson explained that his goal was not compliance at all, but to provoke a "confrontation" that would yield a mug shot—something he viewed as desirable—and result in only a "night or two in jail . . . that's not a big deal":

App.1103

**Q.** What type of confrontation do you mean?

**A.** *Well I want to provoke getting a mug shot that would be great because then that would highlight what's going on here and that would also be useful it would elevate me in what was going on but probably it won't happen like that [he'll] probably just put me a night or two in jail or whatever that's fine. That's not a big deal that's why I didn't wear my contacts but yeah that's fine.*

(Johnson Dep. at 136:15-23, Appx. 151 (cleaned up)

## II.     Johnson failed to produce documents or serve interrogatory responses as ordered.

Following the November 10 show-cause hearing, the Court granted Plaintiffs' motion to compel and ordered Johnson to serve answers to straightforward post-judgment interrogatories and to bring documents—including his tax returns—to the November 17 deposition. He did neither.

At the deposition, Johnson at times suggested that he had already complied. When asked why Plaintiffs had not received any interrogatory responses, he claimed—without any corroboration—that he "gave them to my father to mail them" but provided no proof that anything was mailed. (Johnson Dep. at 33:16-17, Appx. 040).

He also arrived without a single document. When asked why he had not provided his tax returns, for example, Johnson said that Plaintiffs should contact his CPA. In addition to defying the Court's order to produce the documents himself, Johnson offered only that the CPA's contact information was "Americancpa.com, I think his name is Dan something." (Johnson Dep. at 52:18-19, Appx. 060  (cleaned up)).

In short, Johnson made no effort to comply with the Court's order compelling him to produce interrogatories and documents, further demonstrating his disregard for the Court's orders and need for a receiver with broad authority.

App.1104

### III.     Johnson's two stories about the secret Wyoming LLC and the $1 million Othram proceeds suggest both perjury and wire-fraud-type conduct.

At the November 10 show-cause hearing, Johnson represented that he knew about—and had benign reasons for—the secret Wyoming LLC and the bank account set to take in $1 million in Othram proceeds. But at his November 17 deposition, he reversed course completely, insisting he had no involvement in creating either structure and that the information reached him only through an encrypted app from a supposed government handler.

When appearing before the Court, Johnson did not distance himself from the Wyoming LLC—JXCLLC—registered through a "storefront" registered agent involving "secretive company formations, fraud indictments and questionable fortunes from around the world."[1] He attempted to normalize it by suggesting there was nothing unusual about using this Wyoming LLC because his grandmother had lived in Wyoming and he liked the state.

At his deposition, however, he provided an entirely different account. He testified that JXCLLC "is an entity that was created for the purpose of receiving proceeds . . . but I do not know who owns it and I do not know who controls it," that he had "nothing to do with it getting set up," and that he had "zero involvement in the creation of the . . . LLC." (Johnson Dep. at 196:8-13; 197:10-11, Appx. 215-16). He further claimed the LLC "was set up by one of the many people that helped me in the federal government. It is not me," and similarly disclaimed any role or access with respect to the bank account, stating he had "no involvement whatsoever" in opening it. (Johnson Dep. 197:15-17; 198:11-16, Appx. 216-17). These two sworn explanations cannot both be true. One or both must be false, and that inconsistency squarely raises the prospect that Johnson

---

[1] Debbie Cenziper et al., Millions in COVID Relief Funds Went to Shadowy Companies at a Wyoming Storefront That Hundreds of Thousands of Firms Used as an Address, *Int'l Consortium of Investigative Journalists* (Oct. 4, 2021), https://www.icij.org/investigations/pandora-papers/millions-in-covid-relief-funds-went-to-shadowy-companies-at-a-wyoming-storefront-that-hundreds-of-thousands-of-firms-used-as-an-address/.

committed perjury at his deposition. Empowering the receiver with broad subpoena authority will allow the Court to determine the full extent of Johnson's perjury by obtaining the underlying formation records, banking records, and communications that Johnson has refused to disclose.

Johnson's own admission heightens the concern that he engaged in perjury and wire-fraud type conduct, because he testified that he routed the Othram proceeds through the Wyoming LLC and bank account, at least in part, to place the funds beyond Plaintiffs' reach. When asked directly whether one purpose of the transaction was to prevent Plaintiffs from accessing the proceeds before this case or his claimed operation concluded, Johnson agreed that was "a fair way of putting it," and confirmed that "purpose . . . behind the sale of the Othram stock is so that the proceeds . . . would be placed beyond the reach of Hal Lambert and the plaintiffs."(Johnson Dep. at 209:25-211:17, Appx. 229-32). This was not an aside or an offhand remark. It is Johnson's own explanation for why the Othram proceeds were to be directed into the secret Wyoming LLC and its associated bank account. Demanding that Othram transmit money to an account he now claims he did not create and cannot access because it was purportedly set up by unnamed federal government associates describes conduct consistent with wire fraud by channeling assets through a third-party vehicle to conceal them and frustrate creditors such as Plaintiffs.

Johnson's contradictory sworn statements, coupled with his admission about the transaction's purpose, raise serious questions of perjury and fraudulent asset movement and reinforce the need for a receiver with broad authority.

**CONCLUSION**

Johnson's refusal to comply with post-judgment discovery and his shifting, contradictory testimony make clear that enforcement through ordinary means is impossible. The Court should

App.1106

appoint a receiver with very broad authority to locate and preserve the assets needed to satisfy the judgment.

Dated: November 18, 2025                    Respectfully submitted,

                                            /s/ *Will Thompson*
                                            Will Thompson
                                            DLA PIPER LLP (US)
                                            Will Thompson
                                            State Bar No. 24094981
                                            will.thompson1@us.dlapiper.com
                                            1900 N. Pearl Street
                                            Dallas, Texas 75201
                                            Telephone: (406) 546-5587

                                            COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 18, 2025, a true and correct copy was served via the Court's electronic filing system.

                                            /s/ *Will Thompson*
                                            Will Thompson

App.1107

# EXHIBIT 35

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,**<br>**Hal Lambert**<br><br>　　　*Plaintiffs,*<br>**v.**<br><br>**Charles Johnson,**<br>　　　*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 4:24-cv-00988-P** |

**APPENDIX IN SUPPORT OF PLAINTIFFS' SUPPLEMENT IN SUPPORT OF
MOTION TO APPOINT RECEIVER <u>AND NOTICE OF JOHNSON'S NON-
COMPLIANCE</u>**

　　　Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Appendix

in Support of their Supplement in Support of Motion to Appoint Receiver and Notice of Johnson's

Non-Compliance.

| Exhibit No. | Description | Appendix Page Range |
|:---:|:---|:---:|
| **1** | Declaration of Will Thompson, dated November 18, 2025. | Appx. 001 – Appx. 003 |
| **A** | Rough Transcript of Deposition of Charles Johnson taken on November 17, 2025. | Appx. 004 – Appx. 295 |

Dated: November 18, 2025                    Respectfully submitted,

                                            /s/ *Will Thompson*
                                            Will Thompson
                                            DLA PIPER LLP (US)
                                            Will Thompson
                                            State Bar No. 24094981
                                            will.thompson1@us.dlapiper.com
                                            1900 N. Pearl Street
                                            Dallas, Texas 75201
                                            Telephone: (406) 546-5587

                                            COUNSEL FOR PLAINTIFFS


### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on

this day November 18, 2025 via the Court's CM/ECF system to all counsel of record.


                                            /s/ *Will Thompson*
                                            Will Thompson

App.1110

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| _**Plaintiffs**_, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| _**Defendant.**_ | § | |
| | § | |
| | § | |

## <u>DECLARATION OF WILL THOMPSON</u>

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of DLA Piper LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. I declare under penalty of perjury that the facts stated in this document are true and correct.

1.      I appeared at the deposition of Charles Johnson on November 17, 2025. Attached hereto as exhibit A is a rough transcript of the deposition. Plaintiffs have requested a rush transcript from the court reporter.

My name is Will Thompson, my date of birth is November 20, 1982, and my business address is 1900 N. Pearl Street Dallas, Texas 75201, and USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on November 18, 2025.


_____/s/ Will Thompson_____
Will Thompson

1

2

# EXHIBIT A

1

1    Rough Draft of Deposition

2    Of Charles Johnson

3    November 17, 2025

4    Commencing at approximately 8:43 a.m.

5

6    ROUGH DRAFT DISCLAIMER:

7
     This UNEDITED ROUGH DRAFT of the proceedings is not
8    certified.  This ROUGH DRAFT may not be cited or used
     in any way nor at any time to rebut or contradict the
9    CERTIFIED FINAL TRANSCRIPT.  This ROUGH DRAFT may
     contain untranslates, RPTR'S NOTES, misspellings,
10   and/or nonsensical English because this ROUGH DRAFT has
     not been edited, proofread, corrected, finalized,
11   indexed, bound or certified.  All of these
     discrepancies will be corrected on the FINAL CERTIFIED
12   TRANSCRIPT.  There may also be a discrepancy in page
     numbers when comparing the UNEDITED ROUGH DRAFT and the
13   edited, proofread, corrected CERTIFIED FINAL.

14

15                          - - -

16              P R O C E E D I N G S

17              Monday, November 17, 2025

18         Commencing at approximately 8:43 a.m.

19                          - - -

20

21           THE VIDEOGRAPHER:  We are on the record.

22   Today's date is November 17th, 2025.  The time is 8:43.

23   This is the video deposition of Charles Johnson

24 relative to a case styled Point Bridge Capital LLC, et

25 al, versus Charles Johnson.

                 2

1    This case is filed in the United States

2 District Court for the Northern District of Texas, Fort

3 Worth Division.

4    Counsel at this time would you state your

5 appearance for the record and the reporter can then

6 place our witness under oath.

7    MR. THOMPSON:  Will Thompson for the

8 plaintiffs.

9    THE REPORTER:  Would you raise your right

10 hand, please.

11    THE WITNESS:  (Complied)

12    THE REPORTER:  Do you swear or affirm that

13 the testimony you are about to give in this case will

14 be the truth, the whole truth, and nothing but the

15 truth, so help you God?

16    THE WITNESS:  I do.

17    MR. THOMPSON:  Ready to proceed?

18    THE VIDEOGRAPHER:  Counsel, you may

19 proceed.

20    CHARLES JOHNSON

21  having been duly sworn, testified as follows:

22                    EXAMINATION

23   BY MR. THOMPSON:

24        Q.    Okay.  Mr. Johnson are you ready to

25   proceed?

                                                  3

1         A.    I am.

2         Q.    All right.  Mr. Johnson, please state your

3    full legal name for the record.

4         A.    Charles Carlisle Johnson.

5         Q.    Have you used any other aliases names or --

6         A.    No.

7         Q.    -- in business, investment, or financial

8    dealings?

9         A.    No, I have not.

10        Q.    Have you ever given a deposition before?

11        A.    Yes.

12        Q.    How many times?

13        A.    This will be my ninth time.

14        Q.    Ninth time.  When was the last time you

15   gave one?

16        A.    I'm not sure.

17        Q.    Ballpark do you know?

18        A.    Four years ago.

19        Q.    What case was that?

20    A.    Somewhere in San Francisco.

21    Q.    Were you a --

22    A.    Maybe it was six years ago.

23    Q.    Were you a defendant?

24    A.    I was a fact witness.

25    Q.    Okay.  What was the case about?

4

1    A.    It was about First Amendment.

2    Q.    All right.  Well, it's been a couple of

3    years so I'm going to go over the ground rules.

4    A.    That's okay.  I'm familiar with them.  Go

5    ahead.

6    Q.    Do you understand that you are under oath

7    today?

8    A.    I do.

9    Q.    Do you understand that your testimony today

10    and the oath that you swore --

11    A.    Yes, go ahead, I'm familiar with taking the

12    deposition.

13    Q.    That the oath that you swore today has the

14    a same force and effect as the testimony as if you were

15    giving testimony before a Judge Pittman in open court?

16    A.    Yes, I am.  Go ahead.

17    Q.    Is there any medication, medical --

18      A.      No, I'm not on any drugs or medication.

19      Q.      Mr. Johnson, for the court reporter's

20  benefit, I'm going to ask my question.  Please let me

21  finish and then you can answer.  Is there any

22  medication, medical condition or other issue that

23  affects your ability to understand my questions --

24      A.      No.

25      Q.      -- or answer truthfully today?

                                                        5

1       A.      No.

2       Q.      Have you ever been diagnosed as a

3   pathological liar?

4       A.      No.

5       Q.      Have you ever been diagnosed as someone who

6   is incapable of telling the truth?

7       A.      No.  Relevance.

8       Q.      What is your current residential address?

9       A.      No fixed address.

10      Q.      What do you mean by no fixed address?

11      A.      No fixed address.  I'm -- I have no

12  physical address currently.

13      Q.      Where do you live then and sleep?

14      A.      I travel around.

15      Q.      Where does your mail get sent?

16    A.    It gets to 1624 filled ton drive but

17    there's a forwarding address there and I'm not sure

18    what the forwarding address is.

19    Q.    So how do you get mail, then?  Someone

20    sends you something?

21    A.    It's usually scanned and sent to me.

22    Q.    To your email?

23    A.    No.

24    Q.    Where does it get sent to how do you

25    actually receive your mail?

                                                          6

1    A.    I usually get, usually get a picture of it

2    sent to me.  Text message typically.

3    Q.    Who sends a text message to you?

4    A.    Relevance.

5    Q.    You have to answer my question.

6    A.    Well, relevance.  Objection, relevance.

7    Q.    Okay.  Who sends you your mail?

8    A.    Depends on who I ask to do it.

9    Q.    Okay.  Can you name some people?

10    A.    No.

11    Q.    Could you --

12    A.    Next question.

13    Q.    Who sends text messages or images of your

14    mail your text message?

15         A.    Next question.

16         Q.    Mr. Johnson, I'm going to object as

17    non-responsive.  You need to answer --

18         A.    Go ahead.

19         Q.    -- these questions.  Relevance is not basis

20    to not answer.

21         A.    It depends on who I instruct to do it but

22    typically the t -- ypically depends.  But I usually

23    have a young man do it for me.

24         Q.    Who is that young man as you refer to?

25         A.    Aaron Chin.

                                                          7

1         Q.    Who?

2         A.    Aaron Chin.

3         Q.    And how do you know Mr. Chin?

4         A.    Objection.  Relevance.

5         Q.    How do you know Mr. Chin?

6         A.    Socially.

7         Q.    Okay.  Where does he live?

8         A.    I'm not sure where he lives currently.  He

9    lives somewhere in Arlington, Virginia.

10         Q.    Okay.  What's his phone number so we can

11    contact him and potentially --

12      A.      Don't have his phone number right on me

13  now.

14      Q.      Do you currently have a lease or anything?

15      A.      No.

16      Q.      When was the last time you lived at that or

17  spent the night at that --

18      A.      October 31st, two thousand twenty -- 2025.

19      Q.      Okay.  So in the last 17 days where have

20  you lived or slept?

21      A.      I've traveled all over.  I was in in Los

22  Angeles, was in Boston, New York.  DC proper.

23      Q.      Did you stay in hotels or houses or other

24  people's residences?

25      A.      Depended.

                                                    8

1       Q.      Okay.  Give me the list where you stayed.

2       A.      Relevance.  It's a privacy violation.  Next

3  question.

4       Q.      Well, it's relevant because I'm going to

5  ask how you paid for it if you stayed in a hotel.  So

6  I'll ask that did you stay in any hotels during that

7  time?

8       A.      I did, once.

9       Q.      Where?

10    A.    Or twice maybe.

11    Q.    How many nights in a hotel?

12    A.    Relevance.

13    Q.    How many nights in a hotel?

14    A.    Maybe two or three, I don't know.

15    Q.    Okay.  So that is it field thorn is that

16    the address that you mentioned?

17    A.    Correct.

18    Q.    So your mail can you remember gets sent

19    there?

20    A.    I'm not sure where my mail currently gets

21    sent I haven't checked it in a while.

22    Q.    When is the last time you lived in Texas?

23    A.    Not sure.

24    Q.    Well you list in your political

25    contributions living in Montgomery County.  Do you --

                                                                9

1    when did you stop living there?

2    A.    I'm not sure.

3    Q.    Okay.  All right Mr. Johnson I'm going to

4    have the court reporter not put this in the transcript

5    but what is your Social Security Number?

6    A.    I don't know it.

7    Q.    Could you find that out?

8      A.    I could.

9      Q.    How would you do that?

10     A.    I would call my mother.

11     Q.    You have no idea what your Social Security

12  Number is?

13     A.    I don't.

14     Q.    What's your phone number?

15     A.    Area code 716, 429-4718.

16     Q.    Any other phone numbers that you have?

17     A.    I don't know (617).

18     Q.    So you may or may not have other phone

19  numbers that you use?

20     A.    Correct.

21     Q.    Okay.  So how do you not know that?

22     A.    The phones were given to me.

23     Q.    How many phones do you use?

24     A.    Currently I think maybe two or three but

25  I'm not sure.

                                                        10

1      Q.    Okay.  Do you have those on you?

2      A.    No.

3      Q.    Did you bring your phones today?

4      A.    No.

5      Q.    Where are they?

```
 6      A.    They're in a hotel.

 7      Q.    What hotel?

 8      A.    Relevance.

 9      Q.    What hotel?

10      A.    Courtyard.

11      Q.    How did you pay for that?

12      A.    A credit card.

13      Q.    What credit card?

14      A.    American Express credit card.

15      Q.    What's your spending limit on that credit

16   card?

17      A.    Don't know.

18      Q.    Do you have debt on that credit card

19   currently?

20      A.    I think so.

21      Q.    How much?

22      A.    I don't know.

23      Q.    What's your signal handle?

24      A.    Don't know my signal handle.

25      Q.    How often do you communicate via signal?
```

                                                        11

```
 1      A.    Exclusively.

 2      Q.    Exclusively?

 3      A.    Yeah.
```

4      Q.    So you don't text with people?

5      A.    Rarely do I text with people.

6      Q.    How many email addresses do you have?

7      A.    Probably a few hundred.

8      Q.    A few hundred?

9      A.    Yeah.

10     Q.    How many do you regularly use to

11  communicate?

12     A.    Don't know.

13     Q.    No idea?

14     A.    Maybe two or three.  Maybe four.  I don't

15  know.

16     Q.    Which ones are those?

17     A.    Well I guess the question is what do you

18  mean by regularly?

19     Q.    Just tell me the four ones that you, that

20  you recall when you just answered?

21     A.    Well I haven't used some of them in a few

22  years so I think the most relevant one is probably the

23  one the court has on file.

24     Q.    Okay well just give me the four that you

25  recall when you answered that question?

                                                    12

1      A.    That's okay I think it's Charles C Johnson

2    88 at Gmail.  Might be loopy Tuesday 6 at proton mail.

3    But there's a -- I don't recall.

4         Q.    Okay.  Are you planning to invoke the Fifth

5    Amendment today?

6         A.    Depending on the question.

7         Q.    So just some more ground rules here.  So

8    you understand if I answer "I don't recall," you are

9    swearing that you genuine do not remember the

10   information I'm asking.

11        A.    That's right.

12        Q.    Okay.  And you understand you're not

13   allowed to say "I don't recall" if you don't really

14   remember the answer.

15        A.    I am aware, yeah.

16        Q.    Okay.  And you also understand you may

17   invoke the Fifth Amendment if a truthful answer may

18   tend to incriminate you?

19        A.    Yeah I'm aware.

20        Q.    Okay.  And if you invoke the Fifth

21   Amendment you need to say so explicitly so the record's

22   clear --

23        A.    I'm aware.

24        Q.    Can you do that?  And you're not going to

25   use I don't recall as a substitute for the Fifth

1    Amendment, are you?

2        A.    No.

3        Q.    Okay.  And you understand that giving a

4    knowingly false "I don't recall" answer is percentage

5    Russ?

6        A.    No.

7        Q.    You don't.  Okay.  Are you a truthful

8    person?

9        A.    I am.

10        Q.    Okay.  When you post online, do you state

11    what you personally believe is true?

12        A.    Not always.

13        Q.    Okay.  When do you post truthfully and when

14    do you post falsely?

15        A.    Vague.  Over-generalized.

16        Q.    Tell me situations when you don't tell the

17    truth.

18        A.    Some things are jokes.  Some things are --

19    but generally I try to tell the truth.

20        Q.    So when you post online about your assets

21    and investments, are you lying?

22        A.    It depends on the situation.

23        Q.    Okay.  When do you lie about your

24    investments?

25        A.    A joke or a misstatement is not necessarily

14

1    a lie.

2        Q.    Okay.  So when do you not tell the truth

3    about your assets or investments when you post online?

4        A.    It depends on the context.

5        Q.    I asked you what context that is.

6        A.    Sometimes they're jokes.  Sometimes there

7    may be things that I don't necessarily know that I own.

8    Sometimes there may be things that I don't necessarily

9    recall but just generally speaking I have no objection

10   to your line of questioning.  Go on.

11       Q.    So when do you decide to not tell the truth

12   about your assets and --

13       A.    Well, generally I tell the truth when I'm

14   under oath, but generally -- but otherwise I don't

15   really spend that much time trying to be talmudic about

16   it.

17       Q.    And you understand that there's been a

18   70-plus million dollar judgment entered against you in

19   this case?

20       A.    I do, but it's under appeal.

21       Q.    Have you read the final judgment?

22       A.    The final judgment hasn't been posted yet.

23    It's before the Fifth Circuit, which you still have to

24    reply to a brief in December.

25        Q.    You are read the final judgment, Mr.

15

1    Johnson?

2        A.    There hasn't been a final judgment in this

3    case.

4        Q.    I'll represent that Judge Pittman did enter

5    a judgment against you this?

6        A.    Oh, yes in terms of that, no I have not

7    read that.

8        Q.    Okay.  You haven't read it?

9        A.    No.

10        Q.    Do you know how much money it os?

11        A.    Yes, I think it's 70 -- 70 million.

12        Q.    Have you paid any money towards it?

13        A.    I have not.  I have no intention to.

14        Q.    What you do mean no intention to?

15        A.    As in I have no intention of paying it.

16        Q.    Is it because you think you're going to

17    prevail before the Fifth Circuit, or you're --

18        A.    I do.

19        Q.    -- just not going to pay?

20        A.    I think I'm going to prevail before the

21    Fifth Circuit, and I think there will be a follow-up

22    lawsuit against DLA Piper and against Mr. Musk and I

23    think most of this will be settled out by December,

24    probably late December.

25        Q.    Because you think the Fifth Circuit's going

16

1    to rule in your favor?

2        A.    Correct.

3        Q.    Okay.  So if the Fifth Circuit throws your

4    case out and thinks your appeal wasn't persuasive or

5    compelling, are you going to pay the money?

6        A.    No, I'm going to appeal it to the Supreme

7    Court.

8        Q.    Okay.  Do you think the Supreme Court would

9    take it?

10       A.    Yes.

11       Q.    What's your lawsuit against Mr. Musk going

12   to be about?

13       A.    About how he uses shell entities like

14   Mr. Lambert to sue people it's a champerty violation.

15       Q.    You understand that you've applied for

16   stays in this case?

17       A.    I do.

18       Q.    Those both got rejected?

19      A.      That's typical, but yeah.  Go on.

20      Q.      Didn't you tell lawyers for Atron that

21   there was a stay in effect?

22      A.      Well, typically historically there's

23   usually a stay after a judgment is rendered when it's

24   appealed.

25      Q.      I'm going to object as non-responsive.  Did

17

1    you tell lawyers for --

2       A.      I did.  Actually I didn't -- I don't think

3    I told the lawyers.  I think I told David Mittelman who

4    is the CEO.  But go on.  It's six of one, half dozen of

5    the other.

6       Q.      How did you tell David Mittelman that?

7       A.      I told him that over Signal.

8       Q.      Okay.  Do you have a Signal messages?

9       A.      No I don't.

10      Q.      Do you recall Judge Pittman saying last

11   week that the judgments were enforceable?

12      A.      I do.

13      Q.      Do you understand you are here to answer

14   questions about your assets and other post judgment

15   discovery?

16      A.      I do.

17      Q.     Why don't you comply or respond to any of

18   the discovery in this case?

19      A.     I think it's a violation of my privacy and

20   I think it's likely intended to leak, I think the whole

21   process itself is a punishment, and it's designed to

22   intimidate me and other people from being federal

23   witnesses against Mr. Musk.

24      Q.     But why don't you file a motion, or appeal

25   that to the Fifth Circuit?  Do you know you could do

                                                        18

 1   that?

 2      A.     I think I'm happy to do -- happy to pursue

 3   the cases I've as I've been pursuing it.

 4      Q.     How do you think it's been going for you?

 5      A.     I think it's annoying but it's exposed to

 6   be annoying because it's designed to punishment me for

 7   helping law enforcement goodness Mr. Musk.

 8      Q.     How do you think you're doing in this case?

 9      A.     I'm doing well.

10      Q.     You said a couple of times that you've been

11   win nothing this case?

12      A.     Correct.

13      Q.     What do you mean by that?

14      A.     I mean that I've been ex-posing the network

15   of people who are financing of what I think is a

16   frivolous lawsuit against me designed to zim date me

17   and restrict my speech typically in a rico case there's

18   more than one plaintiff or more than one defendant I

19   should say.

20        Q.    Okay.  Are you taking any of your

21   directioner orders in this case from any federal agent

22   or federal entity?

23        A.    I don't know what direction means.

24        Q.    Did they tell uh-oh you to whether to

25   comply with discovery or not?

                                                      19


1        A.    I'm not going to answer questions about my

2    relationship with the federal government.

3        Q.    I'm asking you the reason you don't comply

4    with discovery is that your sole decision or did

5    someone tell you not to do that?

6        A.    I'm not going to answer questions involving

7    my relationship with the federal government.  Next

8    question.

9        Q.    Answer the question again you refuse to

10   party in discovery do you agree with me on that sir?

11       A.    No I don't I think you're asking a question

12   that is a violation of my relationship with the federal

13    government so I'm not going to answer it next question

14    counsel.

15         Q.

16              MR. THOMPSON:  Exhibit 1 please thank you.

17              THE WITNESS:  Thank you.

18    BY MR. THOMPSON:

19         Q.    So before I ask, those are some

20    interrogatories post judgment?

21         A.    Sure.

22         Q.    So I've got tow -- before question get into

23    those I've got a couple of more questions.  Do you

24    remember Judge Pittman when you said race your supposed

25    federal connections as the reason why you did not

                                                    20

1    participate in discovery?

2         A.    I don't recall him saying that.

3         Q.    You don't?

4         A.    No.

5         Q.    Do you remember saying that ever?

6         A.    To who?  To which, to judge Pittman or to

7    who.

8         Q.    To Judge Pittman?

9         A.    I don't recall saying that.

10         Q.    Okay.  What was the reason do you remember

11    when Judge Pittman was in the courtroom and he

12    explained to you that if you believe you have

13    information that is classified top secret or higher,

14    you should contact the agency or someone from the U.S.

15    attorney's office that can appear and assert that

16    position?

17         A.    I do recall him saying that but what I have

18    the information I have is neither classified nor -- but

19    you know again I'm not going to talk about a

20    relationship with the federal governmental so if you

21    want to go with and tell Judge Pittman that I have no

22    objection to you doing that.

23         Q.    What is your relationship with the federal

24    government?

25         A.    Well which which part of it.

                                                            21


1          Q.    Well, I'm just going to ask about your --

2          A.    I mean I was a code named FBI informant for

3     a number of years and I was involved in federal

4     investigation of Mr. Elon Musk.  Mr. Lambert knows this

5     because Mr. Lambert talks to my then FBI handler.

6          Q.    So if none of the information that you have

7     is classified or top secret why can't you --

8          A.    Because I said I wouldn't.

9      Q.      It's because you don't want to not because

10   it's a secret --

11      A.      No it's because I said I wouldn't next

12   question.

13      Q.      It's your sole decision not to provide that

14   information?

15      A.      I don't know what that means.

16      Q.      Well, again, I asked you did anyone

17   instruct you not to provide information in this case?

18      A.      I don't know what a sole decision means.

19   Next question.

20      Q.      What do you understand about sole decision?

21      A.      As in is it my decision to make or not I

22   don't know what that means.

23      Q.      You don't?

24      A.      I -- I've said and have said many times now

25   that I will not talk about my relationship with the

                                                                22

1   federal government to an attorney that is has a

2   thriving law practice in the form of DLA Piper with the

3   Chinese government I will not do that.

4      Q.      It's because of your connections with the

5   federal government are just blon any right?

6      A.      No are next question.

7       Q.      What part of its not blon any?

8       A.      I just told you I was a code named

9   informant with the FBI that's not a blon any.

10      Q.      That is in the past right you are kicked

11  out of the program?

12      A.      And the cases that were involved and have

13  been using to prosecute people are ongoing.

14      Q.      So are you a current witness in any ongoing

15  federal progression?

16      A.      I am not supposed to answer that question.

17  Next question.

18      Q.      It's a yes or no.

19      A.      Yes I am a witness.

20      Q.      You were kicked out of the FBI or you were?

21      A.      No, I was not I have /*F I was not /STEUBGD

22  cut of the.

23      Q.      Request you stopped being a source in 2021

24  right?

25      A.      No.

                                                    23


1       Q.      Are you can you remember a source?

2       A.      I'm not supposed to answer that question.

3       Q.      Your answer was I'm not supposed to answer

4   that question.  Is that right?

5      A.    Correct.

6      Q.    Why are you not supposed to answer it?

7      A.    You're not supposed to discussion ongoing

8  matters.

9      Q.    According to who?

10      A.    According to the relationship you /TKPRAED

11  to with the federal government agency.

12      Q.    Well we're going to get into that a little

13  later probably after lunch.  What agency?

14      A.    I'm not going to be discussing a

15  relationship I have with a federal government agency.

16      Q.    Is that ongoing case involving former FBI

17  agent Johnathan Buma?

18      A.    I'm not involved with that case as far as I

19  know.

20      Q.    So the case you said you were witness in

21  that's not the Buma case?

22      A.    Correct.

23      Q.    Do you know why no federal agency

24  representative of the federal government's ever made an

25  appearance and said that you can't or should not

                                                    24


1  provide information in this case?

2      A.    I have not asked them to.

3      Q.      Is the case you are referring to is it

4    involve David leer man?

5      A.      No.

6      Q.      Do you know who that is?

7      A.      No I do not.

8      Q.      You don't know who David leader man is?

9      A.      I do not.

10     Q.      Is that your answer under oath?

11     A.      It is my answer under oath I don't know who

12   it is.

13     Q.      All right so I handed you Exhibit 1.

14     A.      Mm-hmm.

15     Q.      All right.  What is Exhibit 1 to the best

16   of your understanding?

17     A.      This these are the interrogatories.  I

18   believe I sent this back to counsel but I'm happy to do

19   it again.

20     Q.      Whether when did you send these?

21     A.      Probably two days ago via mail but I'm

22   happy to do it again so the only accounts that I have

23   number one is with Forest bank.

24     Q.      Hold on I'm not --

25     A.      I have a checking account there.

25

1      Q.    I'll get specific questions.

2      A.    Okay.

3      Q.    For you.

4      A.    Go ahead.

5      Q.    Why didn't you respond to these last when

6  these were served over a month ago?

7      A.    There was no need to.

8      Q.    Why was there no need?

9      A.    Mostly because I -- I believe that what's

10 going on in this case is designed to intimidate a bit

11 so I'll provide as minimal information as possible.

12     Q.    What do you mean by minimal information?

13     A.    As in the least amount of information

14 possible.

15     Q.    So not complete information?

16     A.    Correct.

17     Q.    And you're still not providing complete

18 hundred percent information?

19     A.    Correct.

20     Q.    And you won't?

21     A.    I will not, no because the person who's if

22 you could this lawsuit is under federal investigation

23 so I'll wait until that plays out.

24     Q.    Who's funding this lawsuit?

25     A.    That would be Mr. Musk.

↟

26

 1      Q.      Why do you think that?

 2      A.      How do I know it or why do I think it or

 3   what do you mean?

 4      Q.      Either.

 5      A.      I was told as much.

 6      Q.      Who told you?

 7      A.      Somebody who would know.

 8      Q.      Well, who told you?

 9      A.      Well the main person was gator green wall

10   but there were others as well.

11      Q.      Okay when did he tell you this?

12      A.      About two years ago.

13      Q.      When was the last time you spoke to greater

14   green well?

15      A.      Probably at the funeral of the wife of

16   David what's his last name.  I forget his last name.  I

17   spoke to him at a funeral maybe 4 months ago 5 months

18   ago.

19      Q.

20      A.      In New York.

21      Q.      What did you -- yeah go ahead.  In New

22   York?

23      Q.      What did you and gator discuss about this

24    case?

25        A.    We discussed how it was a form of

27

1    litigation finance designed to discover things about my

2    relationship with the federal government.

3        Q.    Does gator green well work for the federal

4    government?

5        A.    I don't know.

6        Q.    You previously represented that he was part

7    of the government?

8        A.    No that comes from a lie told by your

9    client from Winslow spar he was there for gay -- I was

10    there for a total of 15 minutes while your client was

11    so drunk that I had to carry him to his car which was

12    hill layer yus in the retrospect of course as the

13    record will reflect he was reflected for DUI that day

14    so I does have that history but no Mr. Lambert is

15    mistaken if he says that Mr. /TKPWRAOEPBL said that he

16    was working for the federal government as far as I know

17    he has a relationship with the federal government but

18    I'm not sure what that is fully.

19        Q.    You don't look like you're strong enough to

20    carry someone an adult to the car.  Are you?

21        A.    It was more of a drag than a carry, but I'm

22    sure if we were to subpoena the records from the wine

23    bar we could we could find that there was camera

24    footage.

25        Q.    Did you ever do that?

⬆

                                                           28


1        A.    I never did, no.

2        Q.    And just a little bit so I have seven hours

3    on the record with you?

4        A.    Mm-hmm.

5        Q.    So that's /SUFPB?

6        A.    You're going to get another 45 minutes.

7        Q.    Seven hours that I'm asking you questions

8    I'm going to take a break about every hour, hour and a

9    half?

10       A.    That's not necessary.

11       Q.    Well, I'm just going to tell you and then

12   for lunch we can take I sent this in an email we can

13   take a short lunch I was thinking 30, 45 minutes?

14       A.    Mm-hmm.

15       Q.    You the ever need a break the bathroom's

16   right outside and just let me know.  Okay?

17       A.    I'm going to be leaving in 45 minutes so

18   you have to keep going.

19       Q.    I think you'll stay here the whole time?

20      A.    I don't think so.

21      Q.    I think you will.  Okay.  So you said you

22  wouldn't put provide complete 100 percent information

23  in response to these interrogatories.  So what

24  information are you willing to provide?

25      A.    Well so number 1 name of financial

29

1  institution wood Forest bank the name in which the

2  accounts are held Charles Johnson it's a checking

3  account.

4      Q.    Let me stop you there.  What information

5  are you not going to provide that's relevant?

6      A.    Well I don't have anything that's

7  responsive to number 2 so I can't provide it.

8      Q.    Yeah, but you said you're not giving us a

9  complete 100 percent picture of everything?

10      A.    No, I never said I would give a complete

11  picture I said that I would not give full answers on

12  every question that you asked this is an interrogatory

13  I can certainly comply with that.  Number 1 I have --

14      Q.    Hold on.  I'm not -- do you know what

15  interrogatories need to be written?

16      A.    Yes which is why I did send it to you.

17      Q.    Where did you mail that from?

18      A.      It should have been from Boston.

19      Q.      Okay.  So I'm going to and I'm just going

20   to ask a question so the record's clear.

21      A.      Okay umm.

22      A.      Mm-hmm.

23      Q.      So the interrogatory says identify all bank

24   accounts in which you have or have had any legal --

25      A.      Yeah I don't know all the bank accounts

                                                        30


1   I've had access to.

2      Q.      Since 2023?

3      A.      Since yeah so I don't really know.

4      Q.      Okay.

5      A.      But I assume that you are asking for my

6   personal information.

7      Q.      Well, I'm not --

8      A.      My personal banking information or business

9   or whatever but there may be other bank accounts that I

10   don't necessarily know if I have access to them or not.

11      Q.      O I'm actually the question's broader so if

12   you go back to page 2 and there's a definition heading

13   do you see that?

14      A.      Yeah I saw that already.

15      Q.      Okay.  So I can read it out loud or you can

16    read it to yourself but when we're talking about you

17    and the /PWAEUPGTS, it's a little bit broader it's not

18    just Charles Johnson personally but it's --

19        A.    Sure I understand.

20        Q.    The trust accounts too do you see that?

21        A.    None of the trust accounts have sold

22    anything so it's not rely really vant.

23        Q.    So do the trust accounts have bank

24    accounts?

25        A.    No as far as I know.

                                                          31


1        Q.    To the trust accounts file tax returns?

2        A.    As far as I know, no.

3        Q.    Who would know that?

4        A.    It's a good question but my understanding

5    is that all of the so you know you're not allowed to

6    ask any questions about my wife and daughters' accounts

7    that was made clear with the judge on Monday but in

8    terms of my account my sort of stocks we have the clear

9    view matter /TKH is a lawsuit that's going on in New

10    York so I'm not sure if I even have those and then the

11    other would be the o /THRAPL stocks which are currently

12    currently being held by the off ram people.

13        Q.    What's the status of your case against

14    clear view in New York?

15        A.    I'm not sure sometime in December they're

16    supposed to come back with the judge I'm not sure.

17        Q.    You were defaulted in that or you dismissed

18    /*R missed all your claims right?

19        A.    I think I dismissed the claims yeah, but I

20    wasn't defaulted no.

21        Q.    Why did you dismiss all your claims?

22        A.    I was instructed to.

23        Q.    By who?

24        A.    By somebody with an -- somebody who asked

25    me to.

                                                        32


1        Q.    Who is that?

2        A.    I said I wasn't going to talk about my

3    relationship with the federal government.

4        Q.    Who told you to dismiss your claims against

5    clear view?

6        A.    You asked me to be precise.

7        Q.    Who asked you?

8        A.    Somebody who was in a relationship with the

9    federal government.

10        Q.    Okay.  Well who is that person?

11        A.    /TPHOUT going to answer that question.

12      Q.      Why is that -- well you hold on you're

13   choosing not to /TRAOEBGT?

14      A.      Correct.

15      A.      I'm choosing not to direct.

16      Q.      You could, you could provide the name?

17      A.      Correct.

18      Q.      Okay.

19      A.      I could.  I'm electing not to.

20      Q.      Do you remember when the judge in that case

21   tried to call the --

22      A.      That -- well so she claimed.  I didn't know

23   if she actually did that or not.

24      Q.      It was a maid up person right that's what

25   she concluded?

                                                        33


1       A.      No that's what she said publicly I don't

2    know if that's necessarily true.

3       Q.      Sorry by she the federal judge --

4       A.      There's two federal judges in the case both

5    women one is judge pal Lee a poke and the other is it's

6    a name that escapes me right now.  There's two judges

7    in that case.

8       Q.      All right?

9       A.      I think it's poke or you know judge poke or

10    justice poke I'm not really sure judge poke.

11        Q.    Maybe judge fee arrest are or however you'd

12    say?

13        A.    Well folk is her full name yeah.

14        Q.    Let's go back to this interrogatory you

15    said you mailed responses?

16        A.    I did, yeah I gave them to my father to

17    mail them.

18        Q.    Okay.  Let's just go through this.  So I'm

19    going to ask about you first personally.

20        A.    Mm-hmm.

21        Q.    Okay.  So sell me the names of all the

22    financial institutions?

23        A.    I have --

24        Q.    Be it a bank account or any type of --

25        A.    As far as I know I have only one financial

                                                        34


1    institution currently and it's called wood Forest bank.

2        Q.    Okay what about --

3        A.    And I have a checking account account

4    there.

5        Q.    What about previously?

6        A.    I don't have anything Mr. He was to January

7    112, 2023 as far as I know I have maybe a Bank of

 8    America or Chase Bank but I'm not sure when those

 9    accounts were shut down.

10         Q.    When was the last time you visited wood

11    Forest bank?

12         A.    Maybe a week ago ten days ago.

13         Q.    Where was that?

14         A.    In Fort Worth.

15         Q.    What were you doing there?

16         A.    I was getting some locally pops and taking

17    out -- oh, no.  Putting in $1400 into an intrapersonal

18    checking account.

19         Q.    Any other?

20         A.    No.

21         Q.    Anything else you did there?

22         A.    I went to Walmart so I bought a candy bar.

23         Q.    Do you have a safety deposit box?

24         A.    No.

25         Q.    What bank so what financial institutions

                                                          35


 1    does the EB white trust have a bank account account?

 2         A.    I don't know my brother handles my

 3    daughter's accounts but again you're not supposed to

 4    does about those so let's just be really clear about

 5    that.

6     Q.     Well I get to ask about it and you can

7   answer it.  So.  You could answer --

8     A.     Sure I was those were trusts set up in

9   20182019 so they'd be beyond the scope of what you're

10  talking about anyway.

11    Q.     So is EB white trust have a bank account?

12    A.     As far as I know, no.

13    Q.     Okay and just to be clear, Mr. Johnson

14  Judge Pittman asked you to identify to answer these

15  interrogatories fully and completely?

16    A.     Mm-hmm.

17    Q.     He didn't limit the scope of their answer

18  of your answers in this or the scope of the question?

19    A.     No but he was he was quite clear that

20  asking questions about accounts that I don't have

21  access to or don't control is privacy violation and

22  it's obviously involving minor children so we're

23  obviously not going to go there.

24    Q.     So my question I'll ask it a different way.

25  Are you going to provide -- is there information you're

                                                        36


1   not providing me based on something you think junk

2   Pittman said about trust accounts for your kids orchid?

3     A.     I mean, Judge Pittman was clear that and I

4      said very emphatically that I didn't have access to

5      those accounts which I don't the trust belonged to my

6      ex-wife and to my daughter so it's not really relevant

7      and beside it's beyond it's outside the window in

8      question anyway as for the task force trust, I mean, I

9      own half of an equity or half of a position in the

10     special purpose vehicle that Mr. Lambert and I did in

11     2020 and Mr. Lambert obviously disputes that and that

12     was never that trust account was never funded fully.

13         Q.    So I'm going to object as non-responsive to

14     that Mr. Johnson.  My question I'll ask it differently

15     are you withholding information about the EB white rust

16     /T-S a potential trust?

17         A.    No, I just don't I don't I'm not involved

18     with it.

19         Q.    Okay so who has the information about that?

20         A.    I don't know.

21         Q.    So the EB white trust, its tax records its

22     bank accounts --

23         A.    I have not -- I'm not involved with that

24     that's part of the reason you set up a trust is to

25     limit your own exposure to it so no I have no access to

37

1      it.

2       Q.      Who --

3       A.      Could be my brother could be my ex-wife I'm

4    not sure but the none of the stocks have moved as far

5    as I know since they were set up.

6       Q.      What is your ex-wife's name?

7       A.      Bernadette hop sorry.

8       Q.      Okay what's her phone number?

9       A.      I don't know it.

10      Q.      How do you contact her?

11      A.      Typically she contacts me and usually it's

12   over Signal.

13      Q.      Okay when's the last time you interacted

14   with her?

15      A.      It would have been four or five days ago in

16   Los Angeles.

17      Q.      What was that about?

18      A.      It was about what was going on in ino knees

19   I can't.

20      Q.      When was the last time you communicated

21   with her before that?

22      A.      Might have been like a week before that.

23      Q.      What was the substance of that

24   conversation?

25      A.      My daughter got a per score open her

38

```
 1    Chinese test.
 2         Q.    Okay when was the last time before that?
 3         A.    Maybe like a week and change before that.
 4         Q.    So how often do you speak with your
 5    ex-wife?
 6         A.    Maybe once or twice a week.
 7         Q.    Okay.  Pretty exciting things like about
 8    your daughter's schoolwork that kind of stuff?
 9         A.    We don't really discuss anything about
10    that.
11         Q.    Have you guys have you and your ex-wife
12    discussed anything putting aside you know schoolwork
13    about your daughter?
14         A.    Health matters about her mother or old dog
15    got sick yeah.
16         Q.    When's the last time you discussed
17    financial matters with her?
18         A.    I haven't discussed financial matters since
19    twenty -- well, let's see won tong fat called her and
20    said that he wanted to give her $400,000 if I would
21    tell her if she would tell me to drop this suit against
22    clear view AI and that was in that would have been at
23    the end of /TPO* or twenty -- yeah it would have been
24    2023 that we discussed that and I said this seems very
```

25    suspicious do what you think is right yeah that was in

↟

39

1    the kitchen her of her home.

2        Q.      So other than that conversation in 2023

3    about a conversation about that $400,000 no other

4    financial discussions with --

5        A.      No.

6        Q.      -- your ex-wife?

7        A.      Let's see no I owed her $400 and I gave it

8    to her in cash and I owed her on a few occasions I've

9    owed her like hundreds of dollars on occasion for like

10    a child and for like various incidents /*R incidentals

11    and I've given those to her typically or I've given her

12    gift cards or I've given her and those are typically

13    that's typically like ways for maintenance for our

14    daughter.

15        Q.      Any other financial conversations?

16        A.      No as far as I know, no.

17        Q.      Nothing else?

18        A.      Not that she would listen to me anyway but

19    no.

20        Q.      Okay.

21        A.      She -- we don't -- we don't really discuss

22    any financial stuff.

23        Q.      Did you ever ever did you ever discuss the

24    ol /THRAPL stock we are?

25        A.      Which one oh, no that's not so she wanted

                                                            40


1    to cash out of the o /THRAPL position and and I said

2    well, let me go find out what they're all worth and so

3    I contacted Mittelman to contact about selling the

4    entire position and our contention is that we own more

5    of the stock but if I could get a million bucks from

6    David Mittelman I'd be happy to get that mostly because

7    it's no an illiquid stock and we have some you know the

8    larger family they have some health concerns going on

9    her parents are aging and so there was a question there

10    about whether or not her trust could be used my

11    ex-wife's trust could be used for the for elder care

12    and I said I didn't know the answer to that but I said

13    that I would be happy to sell to liquidate the o

14    /THRAPL stock and that she could she could have her

15    portion of it and if she need more she'd be happy to --

16    she'd be happy -- I'd be happy to give her mine as

17    well.

18        Q.      So she independently asked to liquidate the

19    on the ram stock?

20        A.      She did she did and she also asked to

21    liquidate the our daughter's position as well.

22        Q.    When did she make that request?

23        A.    That would have been let's see when I last

24    saw her was in four like an extended period that would

25    have been maybe August or July because I didn't see

                                                          41

1    them in September yeah so that would have been then.

2        Q.    Was that in person request?

3        A.    It was in person that was an in person

4    request yeah so typically I will see my ex-wife and

5    daughter at least once a quarter sometimes twice

6    depending.

7        Q.    For each quarter how much money do you

8    contribute to them?

9        A.    It depends on the situation depends what

10    they need.

11        Q.    On say in the last in 2025 how much money

12    have you provided to them?

13        A.    I don't know company find out but I don't

14    know.

15        Q.    How would you find out?

16        A.    I could check the records of my AmEx and I

17    could check the records of cash that I've withdrawn.

18        Q.    Did you do you send them like envelopes of

19    cash or how do you make the transfers?

20         A.    Sometimes envelopes of cash sometimes in

21    person I physically give them cash yeah.

22         Q.    Do you send them you know ven month?

23         A.    No.

24         Q.    Zelle?

25         A.    Don't do any of that.

                                                           42


1          Q.    You know what those platforms are?

2          A.    Yes I don't have any of them I don't use

3     them.

4          Q.    So you've traveled a lot you've post about

5     traveling a lot I see on your sub stack and Twitter?

6          A.    Yeah I've /TRAUFLD quite extensively yeah.

7          Q.    I'm a big reader of your sub stack by a

8     way.  Well you should buy subscription I'm sure /TKHRA*

9     piper can afford it?

10         Q.    Whether do you get the money to fly so

11    much?

12         A.    Usually it's paid for by others.

13         Q.    Okay.  Well I saw the last one you were at

14    I think in first class having an /ORPG use?

15         A.    Oh, yeah I went to go see Courtney love in,

16    in that would have been was it last year yeah I guess

17    it was right before or right after the election but

18    yeah Courtney love flew me to London and I stayed at

19    her home in Chelsea for I guess it would have been like

20    ten days or so.

21        Q.    Who paid for that?

22        A.    Courtney did.

23        Q.    She paid for your flight.  She did and all

24    my meals when I was there, yeah.  Very generous?

25        Q.    Who paid for your flight to you said you're

43

1    back in LA who paid for your flights there?

2        A.    That probably would have been done by carry

3    cue equal.

4        Q.    I've never heard that name can you

5    /SPHRAOES?

6        A.    K-E-R- I space KRKUKRAL yeah KERI and space

7    KUKRAL.

8        Q.    Who is that?

9        A.    She's a woman that was in a romantic

10    relationship with Steve jer bit son who is a board

11    member of I believe of space ex-who was wrongly treated

12    by him and was also involved in the investigation into

13    m Musk's relationship with I gore Kirk a November.

14        Q.    She worked for the federal government?

15      A.      I don't know I don't know what she really

16  does for work.

17      Q.      Okay.  So I'm going to ask a little more

18  specific question about your travel in the last six

19  months?

20      A.      Okay.

21      Q.      Okay so let's just take us back to, say,

22  may 2025.

23      A.      Okay.

24      Q.      How many flights have you taken?

25      A.      Since May?

                                                    44


1       Q.      Yeah.

2       A.      Maybe two or three yeah I haven't left the

3   country and --

4       Q.      You come down here at least three times?

5       A.      Oh, yeah I've been here I guess to Texas

6   yeah.

7       Q.      So let's just think hard and catalog them?

8       A.      So any time I've been to Texas that counts

9   I guess but other than that I went to visit my daughter

10  in August but I think I tacked that on to a Fort Worth

11  trip but I'm not totally sure I can't really remember.

12  And trying to think what are the other big ones.  I

13    didn't fly to Boston I took a train.  I flew to Houston

14    in July but that was other brief trip that was like a

15    24 hour kind of thing.  I'm trying to think are there

16    any others.  No I don't think so.

17        Q.

18        A.    I was.

19        Q.    Who paid for that or how do you pay for

20    that?

21        A.    In those cases I had like airline points or

22    I had like from the case of going to Texas my parents

23    paid for that my -- I believe my father paid for that

24    Houston trip yeah in fact I think he he paid for me and

25    the person who traveled with me.

                                                        45


1        Q.    Who was that person?

2        A.    Her name is gabby doll chay I forget her

3    last name she has two last a hyphen named Dell chay

4    done son.

5        Q.    So you do a fair amount of traveling right?

6        A.    I mean, it's sometimes more sometimes less

7    I try to do less travel these days.

8        Q.    I ask because early on in this case Judge

9    Pittman ordered you to appear and you said I think you

10    had a doctors not?

11          A.      I did.

12          Q.      I don't know how legitimate it was saying

13   that you had a debilitating condition that prevented

14   from you traveling?

15          A.      So my eyes in general are affected by

16   what's /KOULD moisture moisture in the anterior so when

17   it's extremely moist in the air my eyes tend to tutor

18   fortunately Fort Worth is not a very moist place it's a

19   more desert climate a more western climate so when I

20   first came down here my general practitioner advised

21   that I wear sunglasses and that I sort of do my best to

22   kind of take care of my eyes.  He was of the view that

23   it was more like the Houston environment but it's sort

24   of not so it's not as bad obviously I don't as you can

25   see from my travel itinerary I don't tend to go to

                                                          46

1    places the exception of being Houston in July which I

2    don't recommend doing if you have that condition and

3    probably the reason I end up leaving Houston sooner was

4    because it was quite a lot of pressure on my eyes (part

5    of the reason).

6           Q.      Who was the /TKOERGT?

7           A.      I have two of them.  But in that particular

8    case well there's one's his name is ger bet any -- her

9    last name be call her Dr. /PWEPLGT.  It's doctor I'll

10    pull it up I'll remember it in a second but she's a

11    friend of who -- of a woman I know and then the other

12    is was somebody who is Houston based so he assumed I

13    was spending more time in Houston and he was somebody

14    that was recommended to me by Dr. -- by Robert Marchly.

15    Q.    Where does Dr. Beth live?

16    A.    In Alex Andrea Virginia as far as I.

17    Q.    All right let's go back to the

18    interrogatories.

19    A.    Mm-hmm.

20    Q.    So can you provide us the account number

21    and routing number for your wood --

22    A.    I don't know them, but I can find them out.

23    Q.    Well that's the point of this

24    interrogatory?

25    A.    I think they were sent and they are in the

47

1    interrogatory.

2    Q.    Are you there?

3    A.    I'm happy to send that again.

4    Q.    Okay.  As a checking account?

5    A.    As far as I know it's a checking account

6    yes but I don't have any savings or money market

7  accounts so I assume that's what that is.

8     Q.    Okay how many people are authorized to use.

9     A.    I think that one is just me and my ex-wife

10 but I don't know I think that's it.

11    Q.    Is that a Walmart?

12    A.    Yeah all wood Forest banks are at Walmart

13 or at their most of them are a lot some of them are not

14 but most of them are.

15    Q.    So no U.S. Bank /WROEFRG /SWERPBT banks?

16    A.    None of that no.

17    Q.    When did you open that wood Forest bank?

18    A.    That would have been 20 I want to say 2017

19 or 2018 but I'm not sure I can find out.

20    Q.    So where did you bank before that?

21    A.    I banked at first foundation bank I think

22 and I think I banked Atwood -- was it Wells Fargo?  No.

23 CitiBank I banked at CitiBank.

24    Q.    And it might have been Bank of America too

25 but I'm not sure I didn't handle that side of it?

                                                      48


1     Q.    Where did you mail those interrogatories

2  responses to?

3     A.    To the same add -- same address on file

4  that is at the bottom of this.

5      Q.      Okay.  I I didn't mail them my father did.

6      (/PHARGD mark 2)?

7      BY MR. THOMPSON:

8      Q.      Handing what's been marked as Exhibit do

9      you also recall that last week Judge Pittman older you

10     to bring?

11     A.      I did yeah.

12     Q.      Do you recall that?

13     A.      I do recall him saying that.

14     Q.      And you were forwarded the orders by me,

15     correct?

16     A.      Yep.  That's right.

17     Q.      So you have them?

18     A.      Yep.  No I don't have them with me now.

19     Q.      No but you were aware of them?

20     A.      Yes I was aware of them yes.

21     Q.      So Exhibit 2 are the positive judgment

22     requests for production that the plaintiff sent to you

23     there's nine of them.

24     A.      Mm-hmm.

25     Q.      And my question is easy do you have

49

1      documents with you today?

2      A.      No I don't.

3      Q.    Why not?

4      A.    My understanding is I mailed them through

5   my father but I don't have them.

6      Q.    Do you realize that Judge Pittman ordered

7   you to bring them to the deposition?

8      A.    Yeah.  Yep.  Slipped my mind though I was

9   staying at place without a printer.

10      Q.    What place was that?

11      A.    I was staying in a factory in El Monte,

12   California, before I came here.

13      Q.    How does one stay at a factor is ate an AB

14   and B or is it --

15      A.    No it's a factor are I it's like a it's a

16   uniform manufacturing facility in he will /PHOPBL tea

17   /STKPWHRA*L where did you stay with a factory or stay

18   in a tack factory.

19      A.    It it is sufficiently close to my daughter

20   and it's owned by a by our family by liker hemi it has

21   a shower it has accommodations.

22      Q.    But you agree you didn't pring any

23   documents?

24      A.    Correct.

25      Q.    With you?

50

```
 1        A.    Did not.

 2        Q.    Okay.  Did they have a printer at the

 3   factory?

 4        A.    They did, but I wasn't like allowed to use

 5   it.

 6        Q.    Did you ask to use it?

 7        A.    I did.

 8        Q.    You did who told you no?

 9        A.    That would be the woman who was in charge

10   there and she said the /AOEPG wasn't working properly.

11        Q.    It wasn't like they did they said you can't

12   print anything?

13        A.    It wasn't like they said I couldn't print

14   it no.

15        Q.    How hard do you think you actually tried to

16   bring documents would you say --

17        A.    Didn't tried that hard, I mean, I does

18   them.  About they did say yeah, but I think the ribbon

19   wasn't working or some issue with the ink and it would

20   have been like run we or whatever and I was like I

21   don't want to go that has disrespectful and this he.

22        Q.    You kind of blue this off right?

23        A.    Yeah, I mean, I don't respect this process

24   no.

25        Q.    Okay so you could have gone to like a
```

51

1    Kinko's or --

2        A.    Yeah generally speaking I go to FedEx but

3    when I'm in a California it's a bit more challenging

4    because I'm not I'm not around FedExes as readily as I

5    am when I'm on the east coast but yeah next time tile.

6        Q.    Fair you didn't try really hard to comply?

7        A.    No wien go that far I would just say that.

8        Q.    You said you blue them off?

9        A.    I was busy no, I mean, I don't I'm happy to

10   answer them now but remember you have 30 more

11   /TPHRAEUPBTS actually like 20 but go on.

12       Q.    No we've got a little bit longer than 20

13   minutes.  I've got this whole see all these right here

14   I've go /-T a lot of paper to go through?

15       A.    Okay.  Lieutenants go with 20.

16       Q.    All right so have you mailed the tax

17   returns?

18       A.    I have not.

19       Q.    Okay.

20       A.    I don't have access to them so I can give

21   you the name of my I think his name is American CPA you

22   can pull them up you'll find them.

23       Q.    That's not really kind of how this works

24    the thing is you need to collect the documents so --

25         A.    Yeah I'm going to spend as minimal amount

52

1    of time on this as possible until the Fifth Circuit

2    rules so.

3         Q.    Do you think you've got good arguments

4    there?

5         A.    Yeah I think I'm gonna win the whole thing

6    to be honest.

7         Q.    Are you going to show up and argue /-FRLGT

8    I may if they ask me to I mean you haven't /SKPHEUTD a

9    raf /*FR brief you asked for the delay on timing?

10         Q.    Need the plaintiffs didn't ask for any

11    /STEPGS on the briefs but we might would you grant it

12    if we request it chuck or Mr. Johnson sorry?

13         A.    I, I mean, I have no objection to it, I

14    mean, you're goo 'lose either way so it's fine.

15         Q.    Okay all right so do you have the

16    information on your CPA?

17         A.    I think it's if I had my phone company pull

18    it up and tell you but a mayor -- it's American CPA dot

19    com I think his name is Dan something I'll find it and

20    send it to you.

21         Q.    Well, let me ask it let me maybe start a

22    little more basic do you object to producing your tax

23    returns?

24        A.    Yeah inextricably vay sieve so yeah I do

25    object to it.

↑
                                                        53


1        Q.    So are you going to produce them or?

2        A.    No, sir I don't know yet I have to think

3    about it I can give you the name of the Kuhn and you

4    can write him and ask him and then he'll ask me if you

5    should good et it and then I'll make a decision.

6        Q.    On Judge Pittman ordered to you produce and

7    so are you going to produce them or not?

8        A.    We'll see.

9        Q.    So right now will you commit to producing

10    them?

11        A.    Well we'll see how the line of questions

12    go.

13        Q.    No, no, no I said right now speaking here

14    at --

15        A.    No, I won't I won't agree to anything until

16    until the end of the day.

17        Q.    Okay.

18        A.    You require my consent to abuse me in this

19    process and I'm giving you the minimal amount of that

20    consent which is what I was asked to do.

21         Q.    Mr. Johnson I'm not asking I'm not drying

22    to abuse you?

23         A.    Yes you are you are participating in a

24    lawsuit that is backed by a billion fair who is didn't

25    want to be investigated by the feds I can appreciate

↑

54

1    that by the way it's kind of an invasive process being

2    investigated by the feds but that's what you're doing

3    and this is why you're '82 requesting to ultimately

4    loose your law license we can continue if you want.

5         Q.    Okay my question is I /THAO*EPBG and it's

6    yes or no testifying right now do you commit to --

7         A.    No.

8         Q.    -- producing the --

9         A.    The answer is no I do not contend so to be

10   pre very vice about this I do not intend to provide any

11   information until the end of the day when I make a

12   judgment call about how I feel about your line ever

13   questions and whether or not and if the judge want to

14   order me /H her oar a me or whatever I'm happy to go

15   through has whole process I have no objection to that.

16        Q.    Okay?

17        A.    In fact I rather welcome that next question

18    counselor.

19    Q.    But right now you will not --

20    A.    The answer is no.

21    Q.    Okay that's what I wanted to /TPHO*R?

22    A.    Yes.

23    Q.    Okay will you give me the CPA's if ulna

24    /EUFRLT I don't know his full name I don't handle that

25    side of?

56                                                              55

1    Q.    You just said --

2    A.    Hits name is Dan something it's American

3    CPA I'm not I have the information.

4    Q.    Dan something at American CPA can you

5    provide me any more information?

6    A.    No because my main accounts have died years

7    ago or I think he retired and then died you should

8    never retire that's dive lesson to that his name is

9    George lipper LI /P-FLT PE RT and he dealt with most of

10    my tax matters until maybe a year or two ago.

11    Q.    If he's dead I can't really ask him for

12    them?

13    A.    I think his wife still runs the firm or sh

14    she has the records of all the stuff but they been

15    moved to American CPA.

16          Q.      All right so we're going to go through all

17    these requests for production.  Did you produce did you

18    today did you bring any documents in response to

19    request for production number 2?

20          A.      No asked and answered.

21          Q.      Okay so --

22          A.      But no in terms of requests for production

23    so number 2 we have none of those things are applicable

24    and we have the o /THRAPLS stock and the clear view

25    stock and Xavier capital EB '80 or Kyle /PRAOT trust to

                                                                    56


1    s tent I have any task force trust I am email

2    correspondence where I instruct Mr. Lambert to take my

3    interest in the umm bra SPV and put it in various

4    places but Mr. Lambert decided to steel that steel that

5    and so obviously the task force /TRUFRT isn't funded I

6    checked with my father and brother on that so they told

7    me that was not never actually done in terms of request

8    for production number 3.

9          Q.      Hold on I've got can you ask you another

10    question on number the?

11          A.      Yeah go on.

12          Q.      What about the monthly statements from wood

13    Forest bank?

14      A.      We don't have any monthly for that none of

15  the trusts have bank accounts as far as I know.

16      Q.      No this is not limited to the trusts

17  Mr. Johnson.

18      A.      Oh in he remembers the of my personal

19  banking?  I don't use online banking so you know to the

20  extent that there would be any information there it

21  would be you know debit cards taking cash taking cash

22  out or transferring it to pay an AmEx bill.

23      Q.      So your position that wood Forest bank does

24  not provide monthly statements?

25      A.      I think they do but if they do I don't know

                                                      57


1  where they go because I don't get them.

2      Q.      Did you request them?

3      A.      I did not request them no.

4      Q.      And so you produced no documents in

5  response to request for production number 3 right?

6      A.      Correct.

7      Q.      Number 4 you didn't produce anything?

8      A.      That's right no nothing.

9      Q.      And the same five 6789?

10      A.      Nothing nothing's applicable in any of

11  those things so it's like you're asking me do you have

12    any you know you're asking my in crypto currency or

13    digital Walt so by you I don't op any crip to currency

14    nor could any of my trusts nor do any of the trusts

15    that /TPWHROPGD my wife and.

16        Q.    I'm just asking full brought anything

17    today?

18        A.    I brought /S-LGTS nothing I made it very

19    clear that I asked about using the printer and I did

20    not did not use the printer at the factory.

21        Q.    Okay let's just go maybe take some low

22    /HAEPBGing fruit number 8 do you own any vehicles?

23        A.    I own a 2017 Jaguar F type which I bought

24    in mostly cash in 2017 or excuse me 2020 and that is

25    currently staying at a lot somewhere in Chantilly

                                                      58

1    Virginia but other than that I own no vehicles I don't

2    typically drive myself I typically take public

3    transportation or am driven.

4        Q.    So the documents that reflect your

5    ownership in that car did you send them did you mail

6    them?

7        A.    I don't know where those are but I'm

8    supposed to at some point get the title and everything

9    because I was planning to sell that car but I have not

10    as of yet done that.

11        Q.    When is the last time you transacted any

12    any crip to bitcoin any type of financial?

13        A.    Probably 2018 that would have been maybe

14    2017.

15        Q.    Okay.

16        A.    I haven't touched it since.

17        Q.    To go back too your car do you realize that

18    You sell that or the proceeds of it need to go to

19    satisfy this judgment?

20        A.    Yeah that's probably why I haven't actually

21    found the title yet for it.

22        Q.    I don't understand.

23        A.    But if Mr. Lambert wants to go take the car

24    and get it I think it has a flat tire and battery issue

25    so he's happy to have it.

                                                        59


1        Q.    I don't get what you mean I think your

2    answer was that's probably --

3        A.    I haven't told et as yet.

4        Q.    But I said that's probably why I didn't go

5    get the title?

6        A.    Yeah debris go they are of sort of do I

7    think the working to get the /TAOEULGT /PHAO* car was

8    listed as stolen for a period that was because it was

9    moved from one place to another because they were doing

10   asphalt in the place that I was /HRAOEUFG opened to

11   move the car /KWREUB where the car was I don't

12   typically drive because pro forma eye issues my I don't

13   have a driver's license I haven't driven a car probably

14   I think last time I drove a car was like 4 months ago

15   know that would have been three months ago maybe.

16        Q.    I did post that picture of driving when you

17   said that you had a debilitating eye condition?

18        A.    Why he why he.

19        Q.    Top down do you remember that yes, that's

20   true I haven't driven my Jaguar though since 2024?

21        Q.    Okay so tell me about all the places or

22   exchanges where you did enter ingauge in crypto

23   transactions?

24        A.    I guess the question is I'm probably not

25   supposed to talk to you about this because it is a

                                                          60

1    federal issue, but I haven't used crypto currency in a

2    number of years basically sips 20172018 no actually

3    hold on is that right yeah that's right yeah the last

4    time I used any Walt associated with bitcoin was in

5    twenty it would have been 2018 yeah, but it wasn't my

6    account it was somebody else's account.

7         Q.    Let's just make the record clear so your

8    testimony --

9         A.    My testimony is ironclad and clear.

10        Q.    What -- what --

11        A.    I haven't touched anything involving

12   /KHOEUPT currency since probably probably at the latest

13   most recent period would have been maybe maybe may 2018

14   and it's probably more likely 2017.

15        Q.    And you said that's ironclad?

16        A.    As far as I know yeah.

17        Q.    Okay was that on an exchange a wallet cold

18   storage?

19        A.    That was a person-to-person transaction and

20   it was involved I think it was with Josh Jones, but I

21   could be wrong about this and Josh Jones is a owns

22   dream host and he agreed to buy some crypto from my

23   then mother-in-law.

24        Q.    So we're going to go into your different

25   investment and everything in a lot more detail later

                                                        61


1    but just give me an overview of your engagement and

2    work with the crypto mining?

3         A.    I haven't done any crypto mining at all

4    month.

5       Q.      What about bitcoin mining?

6       A.      I have not done any bingo mining.

7       Q.      Do you know what that is?

8       A.      I do.

9       Q.      Okay.  Do you remember news articles where

10   you're quoted about it?

11      A.      Possibly but many of those news articles

12   are me are not always the most accurate.

13      Q.      What's your understanding of what bitcoin

14   mining is?

15      A.      It's running a computer program to equity

16   extract basically it's like a puzzle that the machines

17   are running usually done on an a sick or GPU, but I

18   haven't done it in a number of years.  There's some

19   case to be made I haven't done it in at least ten

20   years.

21      Q.      So have you so my first question's going to

22   be have you ever done it and the next one's going to be

23   when okay Mr. Johnson?

24      A.      Mm-hmm.

25      Q.      Have you personally anyone at your

                                                              62

1    direction any company you invest in any company you're

2    involved with done crypto --

3        A.    There's a compound question there so maybe

4    you want to take them one at a time.

5        Q.    Okay have you ever been /PORPBL lip done

6    any bitcoin mining, crypto --

7        A.    Yes.

8        Q.    When was the last time?

9        A.    It would have been 2015.

10        Q.    Okay what about any one acting at your

11    direction?

12        A.    No.

13        Q.    What about a company you are involved with?

14        A.    No, I'm not involved with any others

15    involved with it.

16        Q.    Okay?

17        A.    I was looking into doing it at one point

18    but ultimately I elected not to do it.  Mostly when

19    President Trump treated that he was not a fan of

20    bitcoin in the first administration that's when I

21    severed all of my relationships with anything bitcoin

22    related which I believe was in 2017.

23        Q.    What is the what's the most money you ever

24    had in that wood Forest bank account?

25        A.    Maybe 30 grand 40 grand but I'm not sure.

1       Q.      And that was the only coincident you've had

2    since 2017 I think you said did it?

3       A.      As far as I know I might have other

4    accounts but I'm not sure.

5       Q.      Well go on then because that's one of the

6    reasons we're asking that you say you might have other

7    accounts but --

8       A.      Might have other accounts Atwood Forest but

9    I'm not sure if I had a company called Traitwell which

10   banked there but that company is sort of moribund at

11   the current moment maybe resuscitated later after all

12   of this is sort of done with but on the whole no I

13   don't have any other accounts there.

14      A.      And haven't for a while.  Yeah.

15      Q.      I'm handing you Exhibit 3.  Okay?

16      A.      This is and if he C disclosure.

17      A.      Yeah all of that is true I donated all that

18   of money.

19      Q.      This is all yours?

20      A.      That's correct.

21      Q.      All right where did you pay the money out

22   of?

23      A.      These would have been out of all my

24   personal account but typically I did it out of an AmEx.

25      Q.      Are you producing any of your AmEx accounts

64

1    with the requests for production?

2        A.      I did not.

3        Q.      Do you have any other credit cards other

4    than AmEx?

5        A.      I don't think so.  If I do, they're long

6    they're long moribund.

7        Q.      So you -- are you looking at Exhibit 3?

8        A.      I am.

9        Q.      Okay.  And it said Traitwell?

10       A.      That's right.

11       Q.      And it also says self start up what is

12   stealth sart up?

13       A.      That would have been Traitwell what became

14   Traitwell I should say.

15       Q.      These 5,000 is not an insignificant amount

16   of money that's true understand a I was a lot richer at

17   one point?

18       Q.      How rich were you back then in 2020 when

19   you had 35,000 you made that $5,000 donation?

20       A.      Yeah it's in /TWOEPBT I was pretty rich

21   probably /*RT part Longview because of the /PA*RPBD

22   partly because of other things going on.

23        Q.      You said you were pretty rich.  Can you

24    give a number to that or more detail?

25        A.      At one point I had maybe like I was maybe

65

1    liquid like 150 grand to 250 grand but I'm not sure

2    it's been a while.

3        Q.      So is that the most you say you've ever

4    been liquid in is 150 grand.  I don't know maybe more

5    but it's been a long time since I since I recall it.

6        Q.      Then you say that you are the CEO of

7    Traitwell?

8        A.      That's right.

9        Q.      You said that's I'm thinking what yourser

10    would more.  Morery bud yeah it's more or less

11    /TKWEPLGT at present, but I still own I want to say I

12    own like /# o 80 percent of it I'm not totally sure /PU

13    but yeah the company has done pretty well for itself

14    all told but in he remembers the of the technology that

15    it's built it's pretty interesting but we'll see what

16    ends up happening with it.

17        Q.      So who is the other owner of Traitwell?

18        A.      Dorothy Morgan is another owner of it.

19    There's a number of investors behind the company maybe

20    like 10 or so other ones.

21      Q.      And it says are you scrolling through it

22   was docket entry 28APPX040 it's a Texas Secretary of

23   State do you see that?

24      A.      Yeah that's for the State of Texas yeah.

25      Q.      Yeah and it says our per score Inc. what is

66

1   that?

2      A.      That's the company that became Traitwell.

3      Q.      Okay.  Does Traitwell have any bank

4   accounts?

5      A.      Currently it has one bank account.

6      Q.      Okay.  How much is in it?

7      A.      Atwood Forest bank I think maybe like 400,

8   500 bucks.

9      Q.      Does Traitwell take in any money?

10      A.      Currently no.

11      Q.      Is Traitwell worth anything?

12      A.      Well there's some intellectual property

13   behind it so it depends whether people buy it or not.

14      Q.      What's the IP?

15      A.      The IP has to do with taking it has to do

16   with taking gentlemen no milk data and basically

17   converting it into software.

18      Q.      Okay.

19        A.        So in essence what you would do is you

20    take, you take publicly available what are called Geno

21    lied associate studies and you convert those two

22    software so the 23 and me and ancestry and other things

23    can basically tell you if you're say allergic to

24    certain types of foods or certain types of drugs I a

25    think called farm a month ge no /SKWREUBGS to be

67

1    precise.

2        Q.        O sorry than?

3        A.        I spent most of the money that I, that I

4    had at one point actually hold on so I had I had about

5    a million dollars in the wood Forest account and then

6    about 700 to 800,000 that I invested personally in

7    Traitwell so it might have been even more than that

8    well it ultimately ended up being more than that

9    because I put more money into the company to bail it

10    out at one point.  Yeah so that that's what the company

11    does is it worth anything?  Well --

12        Q.        I'm going to sop you there so hold on so

13    how did you make those transactions when you said you

14    bailed out Traitwell for hundreds of thousands of

15    dollars?

16        A.        That was from money that I had -- I had

17    sold some stock in this case it was from a company

18    called on der roll which I sold my stock for and I

19    owe -- I think I -- I put in about $200,000 and I think

20    my position was worth like $4 million and I sold it for

21    about, about a million the rest of it I came back to

22    the CEO of the company or one of the founders of the

23    company because it was his company and then I took the

24    million that I had used some of it on personal expenses

25    and then and political do /TPHAEUGZ as you see and then

68

1    some of it I put into the company into what became

2    Traitwell.  I also invested inform /*F some of that

3    money in small ticket items in things like repeat which

4    is a startup based out of trial finder Belt Line and

5    then I also /STKWEFTD in another thing called pay a la

6    but I don't typically like when I made these

7    investments in the past they've been sort of small

8    ticket kind of items and I don't really pay attention

9    to them until the CEO or whoever tells me that they're

10    doing well or poorly generally speaking I don't really

11    pay that much attention to themsd.

12        Q.    Okay so you had Debbie Morgan?

13        A.    Dorothy more Dan.

14        Q.    The?

15    A.    The other invests /WUFP them would be

16    Robert /PHARLG one of them would be the Mohammad Al har

17    thee who is out of o man Steve orb wee, a squee who is

18    Mr. Musk Peter teal was an /STWEFRPLT I'm trying to

19    think if there are others those are the big ones there

20    might have been oh Jonathan Barrett he did like a

21    hundred grand, maybe 200.  Yeah it's been a while.  I

22    don'ten.

23    Q.    All right so let's go back to you're an

24    control investment.  How much money did you invest?

25    A.    I I invested $200,000.

69

1    Q.    When was that?

2    A.    2017.  2017-2018 I think something like

3    that.

4    Q.    How did you do the invest was it yourself

5    were you on the cap table?  SPV?

6    A.    I don't know, I mean, so I went to Palmer

7    Palmer and I had dinner Palmer asked me for my help.

8    Q.    Highs Palmer?

9    A.    Palmer lucky is the one who started on tril

10    I by the way for what it's worth I oppose totally what

11    on drill is doing these days and have for a number of

12    years but Palmer came to me and asked me to help him

13   raise money for his second act which was what

14   ultimately became on troll and I said if I help you

15   raise this money am I you know can I have equity in the

16   venture and he said well you've done left foot work for

17   me company pay you know wages or I can pay you or I can

18   give you inequity this venture and I said I'll take the

19   equity we wrote a handwritten note to each other and on

20   I think it was -- it would have been April 2nd, 2019,

21   that memorialized it and I have a copy of that like

22   floating around somewhere.

23       Q.    How would you locate that document?

24       A.    It's probably at my /PHOERPBLS house but I

25   have a photo of it somewhere too.

                                                    70

1        Q.    You have a photo of that?

2        A.    I do.

3        Q.    Okay.  Would you produce that photo?

4        A.    Sure.

5        Q.    Okay.  Can you email that over after we get

6    done today?

7        A.    Sure.

8        Q.    This was we don't immediate to make this

9    this is plaintiff's exhibit 46 do you remember it's one

10   of my favorite emails?

11        A.    I do, yes.  I think it's privileged though

12   technically to be precise about it.

13        Q.    Well I got it so how about we ask questions

14   about it.

15        A.    No I think we should actually mark it ace

16   privileged and actually say that not only is it

17   privileged it's also likely hacked so no we're not

18   going to be answering any questions about it.

19        Q.    So I'm going to ask questions because this

20   is an important document and I'll just tell you?

21        A.    Yeah.

22        Q.    Hold on I'll just tell you for the record

23   you know you had a lawyer named Carter --

24        A.    I do.

25        Q.    -- bore driveway?

                                                    71


1         A.    Yeah something like that sure.

2         Q.    He produced this document to us that's why

3    it says Johnson?

4         A.    Okay.

5         Q.    Maybe he sad do you remember you said it

6    was hacked at the trial do you remember?

7         A.    I did.  It's also privileged so there's

8    that.

9      Q.    So question I'm going to ask you about the

10   signature, the two and from up at the top. .  Mm-hmm?

11      Q.    It says Charles Johnson.  It doesn't say

12   who it's to.  Who are you writing this email to?

13      A.    Don't know.

14      Q.    Don't know?

15      A.    No.

16      Q.    You did write this though right?

17      A.    I don't know if I wrote it or not.

18      Q.    Okay.  So let's go down here an control do

19   you see that at the bottom?

20      A.    Mm-hmm.

21      A.    Mm-hmm.

22      Q.    It says I invested about 200K?

23      A.    Yeah.

24      Q.    Up to C around 80 million the current value

25   of the company is north of 2 billion so what would that

                                                            72

1    have made your?

2       A.    I think it's technically at 3 bill unnow or

3    30 pill bun use me yeah I don't know what it ended up

4    being, but I sold my position a long time ago.

5       Q.    Okay.

6       A.    So.

7       Q.      And what document show that sale?

8       A.      Palmer wired me the money so that probably

9    would count for account.

10      Q.      Into what account?

11      A.      Boo my wood Forest bank account that would

12   have been that would have been yeah I'm not actually

13   sure when he did that.  Anyway it doesn't matter I see

14   you're not asking about the umm bra synthetic ap a tur

15   ray ter company I think that position is probably my

16   largest position.

17      Q.      We're going to go through it.  All right.

18   So let let's just take these so we have on the ram do

19   you see that?

20      A.      We have on the ram, yeah.

21      Q.      Okay.  Is that sentence correct?

22      A.      I don't know -- is the sentence correct.

23      Q.      Yeah under a throm can you?

24      A.      I co founded o tham about David little man

25   sheave shoe it's worth 25 million at last funding round

                                                          73

1    it's got /SKEUBGS offers over a hundred million.

2       Q.      Okay.  Is that accurate?

3       A.      I don't know if it accurate or not.

4       Q.      Is it accurate based on your understanding?

5      A.    I don't think so.

6      Q.    You said you were the second ever investor

7    in an dra?

8      A.    I was after his mother I think technically.

9      Q.    So were these advisory shares special

10   equity or what?

11     A.    Don't know.

12     Q.    How did you pay the money for the 200,000

13   where did it come from?

14     A.    Palmer owed me the money.

15     Q.    Did you Charles Johnson have or any account

16   under your control send any money to an dro north.  Nor

17   would I have.

18     Q.    It says I invested about 200,000?

19     A.    Mm-hmm.

20     Q.    So you didn't actually invest 200,000 is

21   that --

22     A.    No he owed me the money so in lieu of

23   paying me the money he had me he converted it into

24   equity in what became on drill.

25     Q.    So were you ever on a cap table or have --

                                                        74


1      A.    As far as I know, no but I don't know he

2    was -- he told me that he was going to put me on the

3    cap table but to be honest but I didn't really care so

4    I don't really support what on drill's doing and so

5    when I got my million dollars for on control when they

6    finally gave me my cash for that I was happy to get

7    that money and to move on.

8        Q.    Do you --

9        A.    And I also believe that, da it's Palmer's

10   company Palmer should be allowed to have more control

11   and more equity and politically Palmer and I were

12   deviating from one another we were disagreeing about a

13   lot of political matters the biggest one of course is

14   when he starred the company it was supposed to be for

15   non-violent deterrence purposes and ultimately was used

16   was building munitions to kill people and I'm opposed

17   to that.

18       Q.    Did you report this pay out or payment from

19   an control on your taxes?

20       A.    I think I did yeah, but I'm not a hundred

21   percent on that it wouldn't matter anyway because the

22   lion's share of the cash that I made from it I just

23   rolled over into the Traitwell investment so it would

24   have been a minimal tax he /SRAEURBS da tax you know

25   tax incident.

75

1      Q.     Tax evasion?

2      A.     I was going to say tax -- you know, tax

3   evasive maneuver but yeah, but no just to be blunt

4   about it no I did not as far as I know the million

5   dollars that I got from that almost all of it went into

6   other investments and then I was paid a salary at

7   Traitwell, but it was below a salary of any of the

8   employees.

9      Q.     What was that?

10      A.     Maybe like 60 grand.  Yeah.

11      Q.     All right so let's --

12      A.     Could have been could have been no I think

13   it was like 64,000.  Because it was a joke at the time.

14      Q.     All right so this Exhibit 64 do you admit

15   that you wrote this email or do you have a reason to

16   think you didn't write it?

17      A.     Yes, I have reason tong that it's not

18   totally accurate, yes.

19      Q.     Who hacked it do you think?

20      A.     Well Mr. Musicst use hackers so I think

21   it's possible that he did it, but I think actually one

22   of the reasons that he wanted to go and do a basically

23   an invasive request for anything involving Mr. Musk in

24   my emails was because you'd already hacked these things

25   and so what you wanted to do was kind of build a

⌃

76

1    plausible chain that would protect you legally yeah,

2    but I think what this was if I recall this correctly I

3    could be wrong about this but I think the attorney who

4    was representing me wanted to know I think this was

5    these were emails that I might have sent concerning

6    Mr. Lambert or maybe it's possible there was something

7    else but I don't really recall writing the email but I

8    don't think /PHAOEFT of /PHOEFPT of it is accurate I

9    think a lot of it might be mistaken in different ways

10   and there are elements of it that are inaccurate so you

11   know turns out you can't patent pay with my face

12   already controls the patent on the on the Traitwell

13   stuff this probably if the email if I wrote the email

14   it would have been written in 2020 but no I don't

15   recall writing it and then in terms of the last thing

16   on it on the bitcoin mining operation there was

17   something that I invested in that I backed for $600,000

18   with a friend of mine, but I as I said when President

19   Trump came out against bitcoin in a serious way I

20   severed all ties with that person haven't talked to him

21   in many years and that would be arrest /REUPBLGT ding

22   link.

23        Q.    How did you make that investment for

24    600,000?

25    A.    I owned a lot of bitcoin early on in the

77

1    process.

2    Q.    Where was that bitcoin held?

3    A.    It was held in a coin base account and it

4    was held what was the name of that, I don't know I

5    haven't had opinion in many many years.

6    Q.    What's the most bitcoin you've ever held at

7    one time?

8    A.    I don't know.  That's a good request.

9    Q.    Can you approximate it?

10    A.    No I well, I mean, the probably with it is

11    I was using it as a currency circa like 2012, 2014, I

12    mean, I bought a Honda fit with bitcoin in 2012 so

13    yeah.

14    Q.    When did you sell or liquidate your bitcoin

15    position?

16    A.    Most of it I just gave up or you know in

17    one case you know if you're not careful with how you

18    deploy it so for example I owned a website where I was

19    miscoded and somebody transferred like 40 bitcoin to

20    the account but we /STORBD it incorrectly so we ended

21    up losing those 40 bitcoin and that was back when bit

22   counsel was like 600 bucks a opinion or something like

23   that so I couldn't actually access that and then there

24   was, you know, an incident with one of my servers fried

25   that I had at one point but no so I have no bitcoin

78

1   currently and would not own it even if it were given to

2   me I would not I would liquidate it immediately because

3   it attracts a dangerous element.

4       Q.    When did you liquidate the position what

5   year?

6       A.    That would have been 2018, I mean, whenever

7   President Trump treated that he was not a fan of

8   bitcoin in the first administration that was when I

9   walked away from all bitcoin investments.

10      Q.    Have you ever had an account on gemini?

11      A.    No as far as I know.

12      Q.    Do you know what Jim nigh is?

13      A.    I think it's started by the wing will vos

14   twins but I'm not a fan of theirs so no I would not

15   work with them or associate with them or be around

16   them.

17      Q.    So you can say with certainty you have not

18   had a gemini /K-BGT?

19      A.    I can say with certain I that in fact not

20   only can I say I never had one if suspect /OPLD and I

21   turned it down.

22       Q.     The hard drives that you said you got fried

23   do you remember talking about that just a second ago?

24       A.     Yes.

25       Q.     Do you have those hard drives?

79

1       A.     I do not.

2       Q.     Where did though go?

3       A.     Into tell Monte dump.

4       Q.     Do you have any or did you ever store any

5   bitcoin crypto currency in cold /STORPBL do you know

6   what cold storage is?

7       A.     I do and I own them and I have thun /*R

8   done anytime the past, but I own none currently.

9       Q.     Okay what happened to the bit counsel that

10  was stored in cold /STORPBL?

11      A.     Some of it was water damaged and some of it

12  uploaded and I sold.

13      Q.     How did you up load it?

14      A.     There was a software at the time where you

15  could take an image of it and you could upload it to a

16  phone and so I had a phone that just had Wi-Fi enabled

17  on it and but now I no longer have the phone no longer

18    have the coins.

19         MR. THOMPSON:  I think we've been going for

20    about 1:20.

21    A.    No, I can keep going, I mean, I have no

22    desire.

23    BY MR. THOMPSON:

24    Q.    This is for the court reporter?

25    A.    Oh, okay.

                                                              80

1     Q.    So we'll take a break now.

2     A.    Okay.

3          THE VIDEOGRAPHER:  We're going off the

4     record now at 10:05.  We're off the record.

5          (Break from 10:05 until 10:15 a.m.)

6          THE VIDEOGRAPHER:  We are back on the

7     record at 10:18.

8     BY MR. THOMPSON:

9     Q.    Thank you.

10         THE REPORTER:  Back on the record yes

11    proceed.

12         MR. THOMPSON:

13    BY MR. THOMPSON:

14    Q.    All right Mr. Johnson we're back from what

15    I you /TKOEPBG /THAO about a 10 minute break or

16    something?

17         A.    Sure whatever.

18         Q.    And okay and during that break you sank you

19    said I was going to?

20         A.    I was just to be precise about it and just

21    so we're on the record I intend to sue /TKHRA piper

22    when this conclusion because first of all counsel here

23    did not do a thorough job of looking up the conflicts

24    of interest my family retained /TKHRA pipe while he was

25    moving from Quinn he man yul which is the personal firm

                                                              81


1    of Elon Musk to /TKHRA piper which is a law firm in

2    effect controlled by Elon Musk which is the tesla law

3    firm and yes, I do intend to sue Mr. Thompson

4    personally as well as /TKHRA piper when this matter

5    conclusion when it's when the judgment is ultimately

6    overturned at the Fifth Circuit.

7         Q.    All right and you realize I earlier said

8    that the federal rules allow for 7 hours on the record?

9         A.    That's right and I intend to break those

10    federal rules just to be precise about it.

11         Q.    Why are is that?

12         A.    Because I think you're not /STK-G relevant

13    questions and I think you're here to harass me and

14    produce video clips and other things that can be leaked

15    out to the media.

16         Q.    Okay.  So I think we've been on a little

17    bit more than an hour?

18         A.    Am hum.

19              THE VIDEOGRAPHER:  Excuse me.

20              THE VIDEOGRAPHER:  _____.

21    BY MR. THOMPSON:

22         Q.    I'm asking these questions to figure out

23    our planning Mr. Johnson so you said that you're going

24    to --

25         A.    I'm gooding to leave this courtroom at noon

                                                    82


1    so you have an hour and change to keep asking your

2    questions.

3         Q.    Okay.  So I'm gonna go for is there a

4    chance you're going to stay longer originally you said

5    you were going to say?

6         A.    Zero chance than I'm going to stay more

7    than after.

8         A.    Maybe an hour five.

9         A.    That's right I'm going to leave at noon you

10   have basically /TPHAOL noon to ask all the questions

11   you want to ask and then once noon happens, if it

12    strikes noon I'm going to get out of this chair and I'm

13    going to walk down the street and I'm not going to come

14    back here.

15        Q.    Okay.  So I'm going to go for about to

16    11:30, 11:40 I'm going to see if that's still your

17    position?

18        A.    No it's going to be my position so ask your

19    questions remember I agreed to consent minimal consent

20    to participate here I have no objection to a receiver

21    being in this case in fact I would welcome it and in

22    fact had you done your homework you would have realized

23    that the account the Wyoming account that I wanted to

24    put the off ram shares in was connected in a certain

25    way with key people and so you would have realize that

                                                                83

1    had a that money was actually preserving assets I do

2    not trust Mr. Lambert having access to any of my

3    resources given his drunken misbehavior and illegal

4    conduct so I have no objection to having all of my

5    resources put into a federal trust.

6        Q.    Okay let's talk about that for a /HREUBLT?

7        A.    O I can.

8        Q.    So do you realize that the plaintiffs have

9    moved for a receiver?

10      A.      Yeah I have no objection to that though you

11  are instructed to come up with a list of three names

12  and you came one a list of one names so we should have

13  a list of three names that's what the judge said.

14      Q.      The agenda to did?

15      A.      I do object to it because I want you to

16  produce a list of three names which is what the judge

17  asked for.

18      Q.      So besides the names, number of names do

19  you object to a receiver getting appointed?

20      A.      No I have no objection to that.

21      Q.      Okay.  Do you object to the putting aside

22  how many receivers were offered do you object to the

23  relief that was sought?

24      A.      I'm not going to pay for it.

25      Q.      I don't think anyone's asked you to like?

                                                          84

1       A.      What relief are you talking about.

2       Q.      Sorry the powers that the receiver has over

3   your assets and in this case do you have any objection

4   to the relief that the plaintiff sought?

5       A.      What did he -- what was the relief he

6   sought having a receiver or what.

7       Q.      Having a receiver and we submitted a

8       proposed order you were copied on it I think it was

9       Friday noit?

10          A.      No I'm going to I trust July Pittman to

11      make the right call in this case.

12          Q.      Do you have?

13          A.      So no I object to that I object to relief

14      you were instructed by the /KWRUPBLG on Monday to come

15      up with a list of three names of receivers you did not

16      do that you came one a list of one name.  When you do

17      three names then we'll talk about the subsequent

18      matter.  It's not complicated.

19          Q.      But over all you have no objection to a

20      receiver?

21          A.      In principal I have no objection to a

22      receiver in fact I would prefer all of my assets be in

23      a federal trust dedicated federal trust to be precise.

24          Q.      Do you understand the powers that a

25      receiver has?

                                                            85


1       A.      I do and I welcome it.

2       Q.      What's your understanding actually you

3       don't have to answer that you welcome it you said?

4       A.      I do.

5       Q.      Why is that?

6      A.    It will become more obvious as the case

7    proceeds.

8      Q.    What's going to be more obvious?

9      A.    The why I welcome that.

10      Q.    All right let's go through Exhibit 64

11    again.  Trial Exhibit 64?

12      A.    Mm-hmm.

13      Q.    That's your em?

14      A.    It's what you say it's my email yeah go

15    ahead.

16      Q.    Okay all right so the o /THRAPL stock

17    right?

18      A.    Umm /H umm.

19      Q.    Talking about that.  The shares that you

20    tried to sell?

21      A.    Yep no I didn't try to sale them I tried to

22    preserve them in trust but yeah go on.

23      Q.    The shares that were part of that stock

24    purchase agreement do you know what we're talking

25    about?

86

1      A.    Yes, I so I contacted dividend middle man

2    to sell to liquidate the full position that my ex-wife

3    daughter and I have of on the ram shares and I believe

4    David went to the board of on the ram on the ram has a

5    lot of conflict of interest you know there's the issue

6    one of the board members is a gig a fund by Steve orbly

7    so a Musk business partner and there's a lot of people

8    /HAOBL that /PHEFBG is also an investor in on the ram I

9    don't know I couldn't take a position on it one way or

10   the other but then he went to the council and basically

11   we communicated back and forth they said that they

12   didn't want to sell the shares because of the order in

13   this case and I respected that I said though that they

14   could still sell the shares of my ex-wife and daughter

15   and I haven't heard back about that as yet so they're

16   going to take a position of basically waiting and

17   seeing and that's fine I don't have any objections to

18   that because I expect the entire thing to be overturned

19   at the Fifth Circuit.

20       Q.    I'm going to object as non-responsive that

21   wasn't my question.  All I was saying was all of the

22   off ram stock that you or trusts that you are

23   associated with or any of your family members have been

24   associated with that was -- you true issues -- that was

25   the entirety 100 percent you were trying to sell or

87

1    cash out that, that off ram stock?

2        A.     No I wasn't trying to sell it or cash it I

3    was trying to put it into a dedicated /KWRAOEU ohm.

4        Q.     You remember /TWAOEUG electro either tote

5    money?

6        A.     No, I /TWAEUS.

7        Q.     What's it going to be off ram shares or was

8    it gonna be turned into cash?

9        A.     The purpose.

10       Q.     Right it was cash?  70 million dollars?

11       A.     No it was put into a dedicated trust so it

12   probably would have been a basket of stocks to be

13   precise about it because there's no desire to actually

14   cause a taxable event in this case.

15       Q.     So what was the $1 million for?

16       A.     The one million /THARS was to be put into a

17   dedicated Wyoming trust and I believe you actually

18   reference it to be something like a cyber crime or

19   something like that which is very strange behavior on

20   your part but but no it was designed to /TPWAEUFL

21   preserve the asset not to sell it November desire

22   whatsoever to sell the stock I have no need of cash I

23   am not broke life is in general pretty good.

24       Q.     You said you're not broke?

25       A.     Correct.

88

1      Q.      How much money do you currently have let

2   just take your net worth right now?

3      A.      I don't know what it is it kind of depends

4   on whether or not I actually win this lawsuit right

5   doesn't it.

6      Q.      Let just start today let's take all of the

7   assets maybe that's an easier way to go at this.  Give

8   me off the /TPOP of your-to-ash cash stock clothes all

9   that stuff?

10      A.      Cash cave I minimal three grand clothes

11   maybe a few grand worth of clothes.  I own a 2017

12   Jaguar with a flat tire and a bad dart /*R battery and

13   personal loan of about $25,000 another low --

14   another -- the AmEx bill is probably like 32, 35,

15   $31,000.  I have no current let's see I have no job

16   currently probably because they're waiting to see the

17   outcome of this lawsuit and when they do I'll very

18   liable start another company which will transfer some

19   of the assets to some of my other work that I've done

20   and then what else yeah, I mean, I'm waiting I'm

21   basically waiting on the Fifth Circuit and when that's

22   over and done with I will proceed with a lawsuit

23   against you and /TKHRAP.

24      Q.      So who's the they in that other company

25    you're gonna start?

89

1        A.      Who's the they what do you mean.

2        Q.      You said you're waiting to start another

3    company is that correct?

4        A.      Yes I will start likely start a company

5    doing genetic analysis.

6        Q.      With who?

7        A.      When the time is right that will be

8    disclosed okay so it's a private matter now and I am

9    limited by /TPHA*ED.

10       Q.      And you /TPHEPBG /*R mentioned that there

11   were /S*ERTS that would go into that company?

12       A.      That's right the IP from the Traitwell

13   company would likely go into the though they may elect

14   not to take it it may /ULTS be a valueless proposition.

15       Q.      Who was that person?

16       A.      That would be people connected with I will

17   loom in a.

18       Q.      Can you spell that for the court reporter?

19       A.      I-L-L-U-M-I-N-A.

20       Q.      And who is your point of contact with that?

21       A.      That would be Jay flatly the former CEO I

22   will loom in a.

23    Q.    Do you need to get another water?

24    A.    No I'm good.

25    Q.    So what are your sources of income?

90

1    A.    I have no sources of income currently.

2    Q.    How are you to pay your $32,000 credit card

3    bill?

4    A.    I'm gonna wait until this case is

5    overturned and then I'm going to pay it the

6    old-fashioned way.

7    Q.    Which is what?

8    Q.

9    A.    Liquidating assets and paying it.

10    Q.    What assets?

11    A.    Part of the reason I part of the reason I

12    wanted to move the off ram shares is I wanted to avoid

13    a conflict of interest with a new haven't which you are

14    I wanted to start which conflicts are interest are

15    important counsel that's why you should always check on

16    them before you take a case.

17    Q.    You said you're going to liquidates to pay

18    for the credit card bill what assets are you going to

19    liquidate?

20    A.    I mean, it would depend on what how big the

21    credit card bill at that time I think I have like a

22    40,000 /TKHREUPLT on it but I'm not totally /SHR what

23    assets could you liquidate to pay that.

24        A.    I could sell an interest in my family trust

25    to my brother I could I could collect on money that

                                                              91


1    various people I have lent money to over the years

2    would pay me, there's lots of ways I could pay it if

3    you wanted to but I have no real desire to pay it

4    currently.

5        Q.    What interest in the in a trust could you

6    sell?

7        A.    I could sell my interest in my family home

8    to my brother if I wanted to.

9        Q.    When you listed your assets how come you

10    didn't mention that?

11        A.    Because I didn't know I had it until

12    recently.

13        Q.    I just asked that you question?

14        A.    But if you do pursue it I will be violating

15    like /TKHRAP does represent that family trust so you

16    will have another obvious conflict of interest conflict

17    of interest.

18        Q.    Who have you lend money or to or what

19    people owe you money an how much?

20         A.    I've lent money to friends of different

21    forms one of the biggest ones is a friend in named o

22    mayor gur rely I've lent him maybe a hundred grand I've

23    lent some money to which he can check gon Fagan.  A few

24    people over the years.

25         Q.    How much money do they owe you?

92

1         A.    Maybe like 300 grand something like that.

2         Q.    When did you loan this money?

3         A.    Over the last five six years.

4         Q.    How did you loan that much money what bank

5    accounts did it come from how did you do that how did

6    you do the transactions?

7         A.    I don't recall.  I don't know.

8         Q.    You don't recall who you transferred --

9         A.    I think it might have been through the

10    first foundation bank but I'm not sure it's been a few

11    years.

12         Q.    Was it a wire transfer?

13         A.    It would have been a wire transfer most

14    liable although yeah most likely /WAOEUFRS.

15         Q.    So first foundation bank?

16         A.    Mm-hmm.

17      Q.      Where was that located was it a branch or

18    was it nationwide?

19      A.      That one's Pasadena, but I might be

20    misremembering it exactly.

21      Q.      And that's information I guess the receiver

22    could look at?

23      A.      Yeah no problem at all I have no objection

24    to a federal receiver you're the one who's obliged to

25    come up with three names.

                                                        93


1      Q.      Okay.  When did you first contact David

2    Mittelman to try to --

3      A.      Oh Mittelman and I have talked about

4    selling my shares three dozen times in the last like

5    three or four years so he and I are constantly talking

6    about it I'm never quite doing it because I'm never

7    quite pulling the trigger on starting another company

8    we talked about it in the context of Traitwell when I

9    started that in 2019, 2018, yeah, I mean, I like David

10   I think he's a Fort Worth guy mostly though, you know,

11   they do owe me more shares of the company that I did co

12   found so that's a little annoying but partly I'm not

13   really keen on the venture model of investing these

14   days I think it's aha a lot of problems and so I'd

15   rather just to do my -- do my work another way so in

16   general I'm interested in you know basically

17   liquidating whatever asset I have that are illiquid and

18   putting them into the markets.

19      Q.    Which assets are those can you identify

20   them?

21      A.    I mean, I mentioned that I have the clear

22   labs stocky mentioned the umm bra SPV that I have an

23   interest in I mentioned gentlemen no milk prediction

24   which I'm also interested in liquidating all of the

25   assets that I have I would prefer be in the public

94

1   market not any lick with wid startups and that has a

2   lot to do with what I think is a looming recession.

3   And I would prefer all of them being /*R be in

4   dedicated trusts which are easily monitored by the

5   federal government.

6      Q.    Do you have an investment in a company

7   called land mow tow?

8      A.    I do not have an investment in it no I

9   ultimately did not invest.

10      Q.    Do you have an investment in a company

11   called accept sus tech?

12      A.    I do.  I have I own some options in it.

13       Q.      If a receiver want to identify your

14    interests in census tech highway would he go about

15    that?

16       A.      He he would tact Trevor parrot who is the

17    /KRO*ER of it and presumably Trevor would talk to him

18    about it.

19       Q.      So whatter your interests in census tech?

20       A.      I own options in it.

21       Q.      How much are they valued at?

22       A.      I don't know.

23       Q.      One dollar?  $10?  A hundred million?

24       A.      Maybe a few hundred thousand maybe a

25    million I don't know I don't typically like I I think

95

1    of it being a squirrel I put an investment in if it

2    gross great if it doesn't whatever I only really count

3    it until it's harvested until it actually is a

4    productive asset that I sell and liquidate typically by

5    putting it into the public market or by buying things

6    like a house or a car or whatever so I don't typically

7    I don't typically thing about my investments in terms

8    of like what their liquid value is it doesn't really

9    interest me.

10       Q.      Okay because when before I asked you about

11    your assets or interests you never mentioned census

12    tech so I'm trying to get an answer here?

13        A.    I didn't know that I owned census tech

14    options until maybe three weeks ago four weeks ago when

15    I talked to one of David middle man's employees who

16    reminded me of it o excuse me when I talked to Trevor

17    parrot's employee I think it was Dan sole or something.

18        Q.    I'm going to mark this as Exhibit I believe

19    it's 4.

20            (Marked Deposition Ex. 4) is that

21    BY MR. THOMPSON:

22        Q.    It's one of your sub stacks?

23        A.    Mm-hmm.   /KWR*EPL.

24        Q.    Go to the second page, Mr. Johnson.

25        A.    Yep.

                                                    96

1        Q.    Read the last paragraph above the bolded

2    lathe --

3        A.    Yes land motor and census tech I never

4    ultimately did the land mow tow deal.

5        Q.    It says in the professional world I have

6    three investments I'm doing trade well.com?

7        A.    Correct.

8        Q.    Land month so and census?

App. 1217

9      A.      Ultimately didn't dough the land mow tow

10     deal I did do the census tech one which is I have the

11     /OPBGSZ but I don't have any investments in land mow

12     tow I do think I may turn arn and invest in land month

13     to after this lawsuit is over, but I haven't as yet.

14     Q.      Well, here you don't say I'm think becoming

15     investing you say I have three investments I'm doing.

16     A.      Yes I'm doing as in like I planning ongoing

17     on doing yeah and I ultimately met with this is

18     September 2024 so in the centimeter of 2025 I went to

19     go meet Scott a Lee see month who is the CEO of land

20     month to I ultimately elected not to do the investment

21     at this time that may change I suspect it will change

22     and a lot of that has to do with what goes on in

23     endoknees I can't.  If he ultimately decide to go

24     forward with building endo knees I can't or the

25     Philippines I will likely help him an invest if he

                                                              97


1      decides to go in China or he decides to go in other

2      places like Thailand I will not support him.  Just to

3      be blunt about it I like I like Scott I think Scott I

4      think highly of Scott but I could have long-term

5      questions about the viability of what he's doing at the

6      price point he's doing it in and I am not a believer in

7   his in the way that in the way that he ask hard tech

8   investing and I also think that the market has changed

9   which means September 2024 and November 2025 the world

10   is a very different place.  You'll recall that the

11   person the democrats were in power in 2024 in September

12   of 2024 and obviously when the democrats are in pour

13   electric vehicles are more enticing than when reps are

14   in pour.

15        Q.    So something I'm having you said earlier

16   you just found out three weeks ago that you had

17   interest or options in census tech?

18        A.    Yes.

19        Q.    What's the date of Exhibit 4 the sub stack

20   post?

21        A.    It's September 9, 2024.

22        Q.    Okay.

23        A.    So I hadn't yet made any invest and so

24   you'll notice that the language I'm doing is indicative

25   that I haven't completed so I haven't done the

                                                            98


1   investment so when I finish investing in something when

2   I harvest it as I mentioned previously that's when I

3   can consider the investment done when the wire goes out

4   when the money transfers.

5      Q.      That wasn't my question before you just

6   said you just had learned about the options --

7      A.      Yeah I didn't know that I had had the

8   options in it.

9      Q.      Until three weeks ago?

10      A.      That's right yeah I didn't know the value

11   of it I knew that Trevor had said that he would put

12   something together for me ultimately I will probably be

13   investigating in a rifle drone company, but I haven't

14   yet made that decision yet either and that's something

15   that's being looked at through a friend of mine right

16   now.

17      Q.      In September 2024 you say that you mention

18   census tech so I'm trying to scare how you write about

19   it in your sub stack and then you just testified --

20      A.      Well typically when I vest.

21      Q.      Hold on hold on?

22      A.      Yeah.

23      Q.      Let me finish you just /SPHAEUD it seem oh

24   I just found out about census tech three weeks ago but

25   you've been /PROEUGT how?

                                                    99


1      A.      Well I've been writing about it over two

2   years I think over three years now I've been writing

3    about it thinking about it.

4    Q.    So do you just remember do you have a bad

5    memory or were you just not being honest earlier?

6    A.    No it's not about being honest it's a

7    question of I didn't know how familiar /OPLGZ I had

8    that it and now I have a somewhat rough ballpark of it

9    but again options are only worth when you actually

10   court you execute an option /THRAOER worth nothing

11   beforehand so in the case of in the case of census tech

12   know I have a lot of respect for Trevor I think he's

13   doing things the right way his company is doing really

14   well from what I understand but I'm not involved in the

15   day-to-day at census tech and partly that or most

16   /PAOEFT am do I business are waiting to see the

17   outcomes by what goes on here because they look at me

18   as an investor or me a a back of what this then Hal

19   Lambert they regard at a did you thinker dryer /*R liar

20   and fraud.

21   Q.

22       MR. THOMPSON:  I'll object as

23   non-responsive to that.  How much money did you pay for

24   these options in census tech.

25   A.    I didn't pay any money for them they were

100

1    given to me.

2    BY MR. THOMPSON:

3        Q.    What's the documentation that will show how

4    many options you have?

5        A.    There's probably some emails floating

6    around but I don't know that I'm ultimately going to

7    exercise the options anyway I may just do nature them

8    to charity or give them up entirely because I may be

9    conflicted because I may have another drone company I'm

10   investing in.

11       Q.    Will you produce those emails?

12       A.    It depends.

13       Q.    Well, I'm asking in responsive to get to

14   your /S*ERTS will you plows them?

15       A.    Well I don't I have not executed the option

16   so I don't -- likely what I will tell Trevor is that

17   I'm not interested in doing business with him until he

18   wants to do something serious and I'm not interested in

19   like a hundred grand or 200 grand worth of /OPBGSZ I'm

20   interested in like building a pre imminent drone

21   company that's more interesting to me.

22       Q.    Well --

23       A.    And I don't think I'd be legally allowed to

24   take those options if I ultimately invest in in a

25   competitor company which I may well end up doing I

101

1    think very likely I will end up investing in a

2    competitor.

3        Q.    The receiver wanted to identify how many

4    options?

5        A.    By all means.

6        Q.    Hold just --

7        A.    As I said before I have no objection to any

8    officer of the federal government combing through my

9    assets in fact I welcome it.

10       Q.    So how is a receiver or officer of the

11   federal government going to identify how many options

12   in sen Tuesday --

13       A.    I can give him the phone number of Trevor

14   parrot or any of the people working there and they

15   could tell him how many I own and I assume he would go

16   from there but I don't know.

17       Q.    Do you have your own records so like an

18   email where this is communicated?

19       A.    No I don't have an email eye got a phone

20   call over Signal three weeks ago where we had a

21   conversation light /SHRAOFRGS that /HRAGSD maybe 10 or

22   15 minutes Trevor was very grateful to me but /TRAEFR

23   /*R /#134*R78 ever /*R Trevor you know they wanted to

24    do things their way and that's fine but I don't agree

25    with the way they're doing them so I would prefer doing

102

1    other drone companies besides drone technology is

2    getting could mod tied right now we live in a world

3    lieu likes 400 dollars pro taking on it reduction tanks

4    huge /SKPHEF testimony's have not /TERPBLly Trevor's

5    company is interesting insofar as it applies the John

6    McCain national security ator 2019 but even there's

7    it's got chosen.  Heavy /HA*EFLly Chinese penetrated

8    it's kind of a problem so would he be able to get a

9    government contract which is really what I'm interested

10    with respect to Trevor I don't know, I mean, it depends

11    on whether or not the contracting officers likes heim

12    and likes what he's /TOEUPBG and generally speaking

13    he's liked but you know I don't know so no I use the a

14    receiver is welcome to talk to the same people I talk

15    to I'm happy to tell them the same thing I'm telling

16    I'm sure you are going to send them a copy of this

17    that's fine I have no objection to that I look forward

18    to them, you know, chatting and, you know, I helped

19    raise some money for census tech among friends of mine

20    many of them liked the company a lot of them didn't it

21    is what it is it's an okay company I did like the fact

22    that they were helping map the Colorado river that was

23    cool and the new the new design of the plane this is an

24    older make this is not the sen ter o six these are sen

25    ter o fives but yeah so I do like what they're doing

                                                                    103

1    and I, but I have been been to the facility I'm not

2    really terribly interested in it long run.

3        Q.    I've got a question about another sub stack

4    article.  And first off is that sub stack article or

5    anything about it look not accurate or anything?

6        A.    This one or which one?

7        Q.    Yeah Exhibit 4?

8        A.    It looks fine I can't tell any difference

9    though.

10        Q.    Okay.

11        A.    Yeah.  These are about the /RUGSZ.

12        Q.    So hold on I'm handing you Exhibit 5?

13        A.    Yeah.

14        Q.    And it's an October 23rd, 2024 sub stack?

15        A.    Yeah all of this looks correct, yep.

16        Q.    Okay so I'm if you go to the it's going to

17    be the fourth page?

18        A.    Mm-hmm.

19        Q.    And do you see the sentence that says all

20    of this violence?

21        A.    Yes all of this violence seems a tremendous

22    also of waste to me a rugs is cut off I don't know why

23    your thing is cut off maybe you too are having printer

24    problems.  Yeah so I can't really respond to it so.

25        Q.    To the question's I too am in drone

⬆

                                                                104

1    business I think the was cut off but what drone

2    business are you referring to?

3        A.    That would be like looking at certain

4    basically certainly looking at certain drone /TKOEUS

5    can you I don't think that that's accurate so and then

6    this piece was written let's see this piece was written

7    October 23rd, 2024 so yeah so this would have been I

8    don't know if this was before or after I agreed to help

9    a in a to country with its drone policies this is

10    insulting that would have been a little later I think

11    so I think I was probably just about getting into it.

12        Q.    Did you get paid for that help?

13        A.    I did not as yet.

14        Q.    Did they say to you you would be

15    compensated?

16        A.    They did.

17        Q.    Okay what country is that?

18    A.    That that's probably something I would have

19    to ask the feds to weigh in on whether or not I'm

20    allowed to talk about that.

21    Q.    To you do -- again how much money were they

22    going to pay you this country?

23    A.    I don't know I don't know what it

24    ultimately would have worked out to.

25    Q.    What was the compensation structure?

                                                            105


1    A.    It was contingent on me doing them some

2    doing them a favor and I did them the favor I have not

3    asked for the money as yet and I have no intention of

4    asking them for the money at present.

5    Q.    What was the how much money was it?

6    A.    It was put, it was a percentage much sales

7    of a system, but I /ULTS never sold it and in the drone

8    business business can be implied in different ways I am

9    familiar in particular the system I'm most familiar

10    with is the rock gar system so that was something that

11    I studied quite extensively and my friend yo hasn't

12    necessary Rudolph that's really his name who is a

13    German who is a German military attach? at the patent

14    gon so he and I were looking alt bringing re-love tors

15    into the United States so it's possible also that's

16    what that to so I don't hasn't NASA good to blow tup

17    S400s in cry me a.

18        Q.    So you said it was a in a to country?

19        A.    It was a in a to country.

20        Q.    Was it turkey?

21        A.    No.

22        Q.    It was not turkey?

23        A.    It was not turkey.

24        Q.    Will you identify the country?

25        A.    I will not.

                                                        106


1        Q.    Will you identify or provide the emails

2    where the compensation was discussed?

3        A.    There were no emails.

4        Q.    So what how much money were you expected to

5    get paid or how much upside could you have gotten paid?

6        A.    /STP really work that way.

7        Q.    Okay well tell me how it works?

8        A.    Well it depends on how structure it but

9    likely I would have structured it in a government trust

10   likely would have been able to draw down against that

11   trust.

12       Q.    You said you've already done the work to

13   receive the consideration?

14      A.      Mm-hmm.

15      A.      Yes.

16      Q.      So government that's?

17      A.      Government trust is a way of protecting

18  assets who work foreclosure if elder government so they

19  don't get sued by weird olly /TKPWARBGS.

20      Q.      Do you have any government trusts just

21  /KWR-RPB I'm not asking?

22      A.      Yes, I think I do.

23      Q.      Would you tell the receiver what they are?

24      A.      The receiver would already know them if

25  he's an officer of the court.

                                            107


1       Q.      Well, if the receiver needed help

2  identifying them would you tell him?

3       A.      I mean I wouldn't even have to he would

4  just know it like that's not how it works.

5       Q.      I'm just asking if he asks darns?

6       A.      Yeah of course I mean like would I tell him

7  that yeah of course they wouldn't even be a hard thing

8  for hem this do he could just do it immediately.

9       Q.      How many government trusts do you have own

10  or are a beneficiary?

11      A.      I don't know I don't know if I knew I would

12    tell you but I don't know.

13    Q.    With you tell me how I don't want to I'm

14    not going to probe I just are you tell me specifics

15    about these government trusts?

16    A.    The U.S. federal government for people who

17    do work for or favors for it construct trusts I happen

18    to have them I don't know how many there are I don't

19    know how much monies are in the accounts I don't really

20    care that's not why I got into the work I got into.

21    Q.    Is there money in those trusts?

22    A.    I don't know.

23    Q.    Okay.  How would you go about finding out?

24    A.    Typically I would draw down on those

25    government /TRUFPTS if I had some sort of you know some

108

1    sort of emergency so if I needed to pay for like a

2    medical procedure or like a child going to private

3    school or to buying a house or whatever all of that I

4    don't really have any interest in currently my

5    grandparents had government trusts my Wyoming

6    grandparents have a government trust it's a very common

7    way of doing things.

8    Q.    So I'm going to ask you a series of just

9    yes or no questions to try to lock this down.  Okay?

10    Are you do you own or are you the beneficiary of any

11    government trusts that you --

12          A.     I don't know.  The answer is yes most

13    likely but I'm not a hundred percent sure.

14          Q.     Is that the best most honest answer you can

15    give?

16          A.     That's the best mows honest answer I can

17    give.

18          Q.     Okay do you know how many or approximately

19    how many?

20    A.     I do not.

21    Q.     Do you know how much assets or --

22    A.     No.

23          Q.     What /THAOEUF /S*EFTS are in these

24    government /TRUFS it's it's just currency money?

25          A.     I'm not sure I have only had them used on

                                                      109

1    my behalf over the years so when my parents bought

2    their home that was a government that was paid for with

3    a government trust.

4          Q.     Based on work that you did?

5          A.     Based on work that I did so I know that

6    there are government trusts that are set up but part of

7    the reason yeah so I know that they exist and they have

8    been manufactured for me.

9        Q.    So if you knew he had to draw on those

10   trusts draw down get money from those trusts, how would

11   you go about doing it?

12       A.    I would call a series of people and I would

13   ask them to do it and we would see whether or not they

14   would do it it's up to their discretion.

15       Q.    Who are those people?

16       A.    I don't want to talk about my relationship

17   are the federal government.

18       Q.    Okay sew I'm going to ask you who are the

19   people you could call to draw on your government

20   trusts?

21       A.    And I'm going to answer very directly I'm

22   not going to talk about my relationship with

23   individuals in /-T federal government.

24       Q.    Okay.  Could you if you wanted to identify

25   the names of those people?

                                                    110

1        A.    I could if I wanted to but I will not.

2        Q.    So you know their names you're just not

3    telling me?

4        A.    Correct and I have no intention of doing it

5    I would rather go to jail than talk about their names.

6      Q.    It's it Alex Rodriguez?

7      A.    I would rather go to jail than talk about

8    their names.

9      Q.    Is that a yes or no?

10      A.    Even I'm.

11      Q.    Or are you refusing to answer?

12      A.    I'll realm fees to ago.

13      Q.    Is it electioner?

14      A.    I'm going as far as I know Alex fletch har

15    no relationship officially or inofficially with the

16    federal government but I don't know.

17      Q.    Is it the herry done mire?

18      A.    Again I would not talk about any

19    relationship I have with anyone who has any

20    relationship with the federal government.

21      Q.    Does Alex Rodriguez have a relationship

22    with the federal government?

23      A.    I don't know.

24      Q.    Do you have his phone number?

25      A.    No.

                                                    111


1      Q.    Do you have his Signal handle?

2      A.    I typically contacts me.

3      Q.    How does he contact you?

```
 4       A.     Through Signal or through other means.

 5       Q.     What are the other means?

 6       A.     He will send a car for me.

 7       Q.     A what?

 8       A.     A car.  He will send a car for me.

 9       Q.     Explain.

10       A.     He will send a car and I will get in the

11   car and I go to where he is.

12       Q.     A random car shows up?

13       A.     Correct.  Typically yeah.  Typically yeah.

14       Q.     Okay.  What's his Signal handle?

15       A.     Don't know his Signal handle.  He typically

16   initiates the conversations.

17       Q.     What's your /STPHRAL handle?

18       A.     Mine's my phone number.  It's pretty

19   simple.  But /KPW luck getting access to that.

20       Q.     Okay so you're just you're flatly going to

21   refuse to identify any of the individuals?

22       A.     Correct yeah I'm not gon answer that.

23       Q.     If you give Alex Rodriguez's phone number

24   to judge fail I can't in now /KWRAORBG?

25       A.     Well he has many phone numbers and and da.
```

                                                    112


```
 1       Q.     It's a yes or a no?
```

**App.1234**

2      A.     I did give her what I thought was the phone

3   number, but I may have been incorrect about the known

4   number.

5      Q.     Was it a bogus number?

6      A.     It -- I don't know if it was a bogus number

7   or not.

8      Q.     Did you think it was a bogus number?

9      A.     I did not think it was a bogus number.

10      Q.     All right so to summarize tell me if any of

11   this is inaccurate you may or may annuity have

12   government trusts set up on your behalf but you think

13   so because your parents house was in part funded by a

14   government trust right?

15      A.     No.  There are government trusts that are

16   set up for people who do work for the federal

17   government all the time.

18      Q.     That's not nigh question it's for you?

19      A.     Oh for me yes, I believe there are

20   government trusts in my name and dedicated to me.

21      Q.     You said in your name and dedicated to you?

22      A.     Correct.

23      Q.     That would be dedicated to Charles Johnson?

24      A.     Or to my well-being or what have you I'm

25   not totally sure how it works but yes, I believe there

113

```
 1    are government trusts where it's set aside for me.

 2        Q.      And one of the /TH-PBS you think that is

 3    because a government trust set up onnor behalf or

 4    dedicated to you was used to purchase or fund your

 5    participants house?

 6        A.      Correct and conversations I've had and work

 7    I've done.

 8        Q.      And you know the people who are in charge

 9    or have control of the trusts but you won't tell me?

10        A.      I don't know them, but I know that there

11    are people out there who have created trusts for me and

12    I don't know what the whole the whole set up is there,

13    but I I couldn't access it even if I wanted to and I

14    don't want to.

15        Q.      You won't identify those people?

16        A.      Correct.

17        Q.      But you would tell the receiver?

18        A.      The receiver would already know it

19    presumably.

20        Q.      If the receiver asks you would you tell

21    them names?

22        A.      I mean if the re -- if the receiver is one

23    of the three that you elect to predict yeah I have no

24    objection to that I have no objection to working with
```

25    any officer of the federal system on any matter so long

114

1    as they've got a badge I'm happy to talk to them.

2        Q.        I've got some questions about your sub

3    stack?

4        A.        Mm-hmm.

5        Q.        When did you form it?

6        A.        I think in 2020, but I don't remember.

7        Q.        And I think you've publicly described

8    yourself in that as a self made deck a millionaire?

9        A.        Mm-hmm.

10        Q.        What's a self made deck a millionaire?

11        A.        A self made tech a millionaire would be

12    somebody who's worth at least 10 mill /KWRUPBL bucks

13    sufficiently male would I don't really necessarily

14    believe that anymore like in terms of somebody people

15    that people are self made and I don't really think that

16    having millions of dollars is necessarily the best way

17    of looking at living ones life.

18        Q.        Were you ever a deck a millionaire?

19        A.        I think so at one point I may be still if

20    you look at my assets in total hand what their et al.

21    sold for but valuations change and shift over time

22    based upon macro economics factors so if people got

23    super interested ine no mix very possible my assets

24    could be worth more they could be worth less I don't

25    really care either way that's not really how I think

115

1    about it.

2         Q.     So sitting here today are you a deck a mill

3    air?

4         A.     I don't know.  I have not sat down and done

5    an assessment of my net worth in a long time nor do I

6    really care to figure out the number.

7         Q.     Well that's kind of the point of this

8    deposition?

9         A.     It is but I'm not terribly interested in

10    complying with it.

11        Q.     So you understand that the point of this

12    deposition is to find out your assets and worth?

13        A.     No the point of this deposition is to

14    harass me and try to get me on camera so it my

15    testimony can be leaked to the press as a way of

16    embarrassing me for talking to the federal government

17    about Elon Musk's criminality that's the purpose of it.

18        Q.     Do you understand that the plaintiffs have

19    at least presented or taken the position that this

20    deposition is necessary to determine your assets and

21    worth and to determine --

22        A.      I understand that's what they claim their

23    position is but Lambert.

24        Q.      Let me stop threw.  Okay.  So the answer to

25    that yes?

116

1        A.      Know the answer is that's what they claim

2    that's what they.

3        Q.      A /EUGSD?

4        A.      That's the I am that's not what's actually

5    true.

6        Q.      Okay and you are going to give minimal or

7    less than complete --

8        A.      That's right.  Yeah I have no intention of

9    doing anything other than minimal consent in being

10   here.

11       Q.      So what do you mean by mip mal consent

12   versus like --

13       A.      With will.

14       Q.      Hold on let me just ask the question.  Okay

15   and I'll let you go okay?

16       A.      Mm-hmm.

17       Q.      Explain to me the difference between

18   minimal consent which I guess you're giving?

19      A.      Mm-hmm.

20      Q.      And a hundred percent maximum consent.

21      A.      Well minimal consent is that the federal

22  government of the United States has asked me to be

23  present here so I have arranged my affairs to be

24  present here.  And so they have asked me to participate

25  in what is I believe an illegal act which is to

↟

117

1   participate in this whole sham of whatever of a trial

2   and so I participated in that and I have ton the

3   requisite stuff of filing the appeals and filing all

4   that stuff which is annoying and come burr some and

5   minimal consent is the idea that you acknowledge that

6   the proceeding has some sort of bearing insofar as you

7   want to respect the court it's like why we wear a tie

8   it's why we wear a suit all that sort of thing that's

9   /WHA*S meant by minimal consent.  Maximal consent is

10  that I would participate with you in my own harassment

11  by basically giving you a list of everything that I own

12  or am involved with and that I will not do mostly

13  because I don't know it because I just do work and then

14  like I just you know go to work like on projects that

15  are important when they're important and then yeah, I

16  mean, you know, it's I guess what I would say about it

17    is that I don't respect the abusive process that's

18    taking place here where a foreign born olly /TKPWARBG

19    will use a proxy in the form of Hal Lambert to sue me I

20    don't respect that I think it's an abuse of process and

21    probably illegal I guess we'll see when this judgment's

22    overturned and I et al. end up suing /TKHRARP and you

23    personally so we'll see how that actually holdings

24    ultimately faceses out but I'm not really terribly word

25    about it no that's also why I'm not afraid of going to

118

1    jail or whatever or being in /SRAEULGS because like

2    first of all I don't think it will happen but even if

3    it did happen that would be great because it would

4    highlight all the abuses here and I would have sweet

5    muck not and I wouldn't look as drunk as Hal Lambert

6    does in his.

7        Q.    Anything else to add?

8        A.    No I think that pretty much sums it.

9        Q.    Just trying -- just trying to understand

10    the dinners between if you'd plain so me what minimal

11    consent is I guess it's showing up?

12        A.    That's right that's minimal consent.

13        Q.    Understand a want to knew what a Munn

14    percent Max?

15    A.    That would be being super responsive to all

16  of your emails reading all the ridiculous stuff you

17  send me to waste my time that would be what that is.

18    Q.    Answering the questions that are possessed?

19    A.    No, I mean I can answer your questions I've

20  shown you the respect by telling you the names of some

21  of the acts that I might have access to and I've showed

22  you tally by actually sitting and pre trending that

23  this is actually a will he ji mat and I've Miking up by

24  wearing a tie which courtesy you haven't extended to

25  me by the way but whatever that's /TKPWRAOR prerogative

                                                119

1   and so yeah that's what that's what I mean by that.

2     Q.    Do you you've refused toness a lot of

3   questions today?

4     A.    Well a lot of the questions you're asking

5   I'm not allowed toness a and I made very clear that I

6   wasn't going to talk about my relationship with the

7   federal government because that's really what this is

8   about it's about you harassing me to discover what I've

9   told the federal government but so why all your

10  deposition questions about that relationship and I get

11  it like you know you work /TKHRAP /TKHRAP is /WAEL /*R

12  I if not their.  Is tesla so you kind of interest an in

13    that so I get it but it's ultimately why I can't really

14    help you.

15        Q.    Your sub stack by og are /*R rasy says

16    something along the total portfolio is exceeds 15 pill

17    bun?

18        A.    Yeah I think it's like 30 billion now but

19    typically the way people do this is they include they

20    include all of the companies they've invested in or

21    associated with and then they like sum them all up and

22    say the value of my portfolio is 30 billion I probably

23    wouldn't say that now I would few years ago but month

24    illustrates in/-LT.  And mostly because I don't really

25    believe in the veb which you are model of investing

↑                                                          120


1    anymore I think it's kind of fake in a way so getting a

2    sense of like it doesn't really get to the underlying

3    the way in which these things actually work and also

4    fake in the sense that like I don't think being super

5    rich is actually worthwhile.

6        Q.    So you I'm going to ask you tell me if

7    you'll do this you've got a notepad in front?

8        A.    Mm-hmm.

9        Q.    Would you take out a blank piece of paper

10   and just write down all the portfolio companies that

11    you've either you know invested in done work for or

12    where you would receive compensation --

13          A.     I wouldn't know them all, but I can give

14    you a.

15          Q.     Hold /OPLD where you have special purpose

16    vehicles and all that stuff?

17          A.     Sure.

18          Q.     And just for the court reporter's benefit

19    if you could?

20          A.     Sure I'll just list them.  So umm bra I own

21    half of for the special purpose vehicle with Hal lam

22    pertain he disputes that, but I do own it.  Clear view

23    AI I own some portion of stock they said they were

24    buying back my stock in the company.  They've never

25    actually paid me that.

                                                          121


1           Q.     If you could could just go down the list

2     and make /TKARPBLTS /UFRPLGTS yeah so off ram I own you

3     know I think my ex-wife and daughter and trusts and all

4     we own like a million dollars worth of stock we Macon

5     test that now we may say we own some more and we'll see

6     where that goes to the PDR.  Pa o although I think I

7     own like 300 grand of stock there but I'm not totally

8     sure clear labs I think I own 200K but I'm not totally

 9    sure.  But again like I don't really spend all this

10    time focused on it I think I own part of an ap ter a

11    SPV but I'm not totally sure because I I don't hold

12    that currently.  I'm trying to think of any other big

13    ones nope that's kind of it off the top of my head?

14        Q.    Okay so let's look at ap ter a.

15        A.    Mm-hmm.

16        Q.    Okay?  I think that's an electric car

17    powered by solar panels?

18        A.    That's right.

19        Q.    And you have a lot of experience I think

20    you've written about visiting the company --

21        A.    Visited the company I know the company

22    quite well I have very good friends who work there I'm

23    a big believer in the technology and believe generally

24    that the company will continue to do well and I wish

25    them well.

                                                    122

 1        Q.    Okay and how did you /STPWEFT in ap ter a?

 2        A.    I believe gator green well and I own a

 3    special purpose vehicle there but whoa know more about

 4    those details than I would.

 5        Q.    Okay do you know the name of the special

 6    purpose vehicle?

```
 7        A.      I have do not.

 8        Q.      Do you have any idea?

 9        A.      No I do not.

10        Q.      How would you find out the name of it would

11   it be har?

12        A.      I would call gator green well.

13        Q.      Would he pick up your call?

14        A.      I don't know.  I haven't called him so.

15        Q.      What is the value of the special purpose

16   vehicle?

17        A.      I don't know.  I don't -- as I said before

18   I don't pay attention to the fluctuations in the thing

19   I only care about when it matures and I can collect it.

20        Q.      Do you really -- go ahead?

21        A.      So like for example you know I own a huge

22   you know position in umm bra obviously Mr. Lambert you

23   know jumping drunken fraud that he is disputes that and

24   so is that do I have a hundred million dollar position

25   in umm bra or do I not it's unclear.  Off ram do I own
```

                                                           123


```
 1   the position or do I own it only when it actually gets

 2   liquidated these are kind of open questions so that's

 3   what I spend most of my time thinking about is when

 4   something is actually materially realized really what
```

5    matters most is cash on hand.  Everything else is kind

6    of a it's kind of annoying and kind of useless.

7        Q.    Let's take that at like let's take a

8    special purpose vehicle in ap ter a for example.  When

9    is that value or investment realized as you say?

10       A.    Well in this case there's a lock up with

11   all investor shares in ap ter a and I think it's goes

12   for another one or two years and then you have a

13   decision I think it may even be three years and you

14   have a decision then about whether or not you are going

15   to allow your interest to convert into shares or into

16   the company long run or whether you're going to whether

17   you're going to continue to basically hold it as a

18   separate distinct entity now I personally I don't know

19   what I will do in two to three years we'll see, but I

20   wish them well and if I had the cash I would invest

21   more money in them and I have -- I have directed family

22   and friends to invest in it as well.

23       Q.    Here's a sub stack from April 5th.

24       A.    Yeah notes on the ap ter a solar mobility

25   revolution yeah I don't know when this was yeah this is

                                                        124


1    when I went to visit with my family yeah yeah with my

2    ex-wife and daughter and child yeah, oh and sister.

3      Q.      Exhibit 5 is a sub stack that you wrote?

4      A.      Yep.

5      Q.      If you go to the and said my family and I

6   visited the am ter a factory in Carlsbad right?

7      A.      Mm-hmm.

8      Q.      Okay.  Who is your contact at ap ter a?

9      A.      I have several.  The main one there is

10   gator /TKPWRAOEPBL so gator /TKPWRAOEPBL would probably

11   be about T- best one to get in touch with the company

12   through he would be the best kind of source in general.

13   And then I talked to Steve familiar bro who is the CEO

14   there but he and I you know are supposed to meet but we

15   haven't met in a while mostly he had some like family

16   matter and so he and I personally ultimately didn't

17   meet up he had some situation with his daughter

18   unfortunately or rather unfortunate.

19      Q.      Anyone else in aptary?

20      A.      I think I met the other CEO and I met

21   somebody in their investment office and I met some of

22   their engineers but I'm trying to remember exactly I

23   think I know one of their board members but I'm not

24   totally sure that I would say that it's a close enough

25   relationship yeah.

125

1 Q. Can you provide names of those people?

2 A. No, I don't typically remember names I'm no

3 too terribly good at that that's why I have a that's

4 probably why I write so much but it's probably I have a

5 girlfriend on again off again girlfriend and

6 ex-/WAOEUFR and other people to remember names I'm very

7 bad at remembering names I meet too many people.

8 Q. So if you go he to the third page?

9 A. Yep.

10 Q. Just read that into the --

11 A. Yeah.

12 Q. Court and court reporter.

13 A. Which part?

14 Q. To be honest?

15 A. To be honest I didn't quote know what to

16 think this by I can an investor in ap ter a through a

17 special purpose vehicle earlier last year.

18 Q. Okay.

19 A. To my mind the real innovation of the

20 company is it's solar paneled portfolio of patents.

21 Q. Okay I'll stop you there?

22 A. Umm /STKPWHRUPL so that special purpose

23 that's with greater /TKPWRAOEPBL.

24 A. That's right.

25 Q. And you think you invested in sait early

↑

126

1    last year so sometime in /TPO* since this was --

2         A.    Yeah it might have been 2022 but he would

3    know.  I don't know off the top of my head.

4         Q.    Do you know how much money was invested?

5         A.    I don't.

6         Q.    Ballpark?

7         A.    Maybe like 10 million maybe less yeah maybe

8    four million five million I'm not totally sure.

9         Q.    So multi millions?

10        A.    Mm-hmm.

11        Q.    Okay.

12        A.    Yeah.  That's right multi millions.

13        Q.    Did you contact Mr. /TKPWRAOEPBL or speak

14   to anyone after ap ter a had an.  PO?

15        A.    Well, they didn't have an IPO they had

16   what's called a direct listing.

17        Q.    Reverse split right?

18        A.    What they had was a direct listing and a

19   direct listing is somewhat different and there's a lock

20   up period for people's shares who were inside /T-Rs and

21   I think that qualifies insiders so I made it very clear

22   to gator when I made the investment that I wasn't

23   intending to liquidate the position for another ten

24    years we talked a lot about children in the

25    conversation he has a son I have a daughter we talked a

127

1    lot about the future of solar technology coming out of

2    China and out of the United States and, you know, we

3    /KPHEUD then and there that we would not sell our

4    position until at least five years after we did our

5    investment so whenever he whenever he makes the

6    decision and I. .  He'll make the decision when we

7    liquidate the position and you know I said I I don't

8    really want to I want to set it and forget it so and in

9    my life I've found that the best investments are the

10    are not the ones you follow O'Day today they're the

11    wonder you follow when you just make a decision and

12    then you move on to the next thing and the next thing

13    and the next thing and the next thing it's much easier

14    that way so gator made most of the decisions on that.

15        Q.    So if the receiver wanted to I guess your

16    understanding it was between four and $10 million this

17    investment in aptary?

18        A.    Mm-hmm yeah if the receiver wants to look

19    into it again the receiver has all the authorities to

20    do that I have no objection to a receiver coming

21    through on all these things that's fine doesn't bo

22    /THERT /PHAO* at Al.

23        Q.    So if you give your consent to the receiver

24    to I guess investigate your interest --

25        A.    Well it wouldn't be an investigation to be

                                                        128

1    precise about.

2        Q.    What's the word like what word shouldry

3    use?

4        A.    When you are dealing with the receiver he's

5    deputized by the court so it's not an investigate he

6    has my extent under the Rules to go through all the

7    /*ETS but I don't think a receiver's probably warranted

8    in this case but maybe the judge would disagree or

9    whatever he's free to make that decision and I have no

10   objection to a receiver coming and visiting me and

11   going through and having conversations about my assets

12   much the same way I'm having a conversation now, but I

13   expect all this will be overturned at the Fifth Circuit

14   anyway so it's kind of like whistling past the

15   graveyard as it were or willfuling past the prairie or

16   something so yeah it doesn't really phase me.

17       Q.    So if the receiver --

18       A.    The receiver's probably /PAEP I'm here pi

19   happy to have the receiver call greater ga and have a

20    conversation with him about how much of the ap ter a

21    SPV I own.

22        Q.    So if the receiver wanted to quantify the

23    investment --

24        A.    Well that's his responsibility that's not

25    my responsibility.

                                                        129


1        Q.    Hold on.  Hold on.

2        A.    Mm-hmm.

3        Q.    If receiver wanted to quantify your

4    investment in ap ter a how would he go about doing

5    that?

6        A.    He would presumably call greater

7    /TKPWRAOEPBL and ask him for the documentation for work

8    we did so.

9        Q.    And what's gator /TKPWRAOEPBL's number?

10        A.    I don't know off the top of my head I

11    obviously don't have my cell phone with me and I am not

12    inclined to.  Gator agree.  If you want to contact him

13    pretty really lid he's object LinkedIn.

14        Q.    Where does gator /TKPWRAOEPBL live?

15        A.    Last I heard he's somewhere in the try

16    state area but I don't know I haven't talked to him

17    since the funeral and we were talking about we were

18    talking about his ex-girlfriend we were talking about

19    David hallow well's deceased wife we were talking about

20    France we were talking about how he liked be being a

21    father that was the extent of it.

22        Q.    It's kind of rude to talk about investments

23    at funerals don't you think?

24        Q.    How many special purpose vehicles have you

25    invested with Mr. /TKPWRAOEPBL in?

                                                    130

1        A.    I don't know he would know he would know

2    the answer to that and in fact he would know that and

3    one of his one of our kind of mutual handlers would

4    know that answer but I don't know.

5        Q.    What do you mean by mutual handlers?

6        A.    He has somebody who super intends and

7    watches him much as I have somebody who is my adult

8    supervision and he has somebody has handles a lot of

9    that for him I believe he also has a dedicated

10    government trust from what I understand as does his

11    wife.

12        Q.    So when you talk about your adult

13    supervision you're talking about spun /*R someone

14    involved in the federal government?

15        A.    Correct.

16      Q.      For the best of your understanding is the

17  aptary investment is between four and $10 million?

18      A.      Something like that but I don't know.

19      Q.      What was the source of that money?

20      A.      For which?  For the investment generally

21  lots of different investors contributed to it.

22      Q.      The special purpose vehicle?

23      A.      Yeah lots of different investors /KREUBD to

24  it.

25      Q.      Come aptary my question is what is the

131

1  source of that four to $10 million?

2      A.      Oh different investors of people that gator

3  and I know.

4      Q.      Did you put in any of the money?

5      A.      I don't recall.  I may have S very possible

6  that I did but I don't recall because he asked me for

7  it at one opinion, but I don't remember if I sent a

8  wire or not he also owed me some money so I think we

9  might have done some write off of officer of the

10  federal of that but I don't recall.

11      Q.      What is met us capital?

12      A.      Made us capital is a LLC that gator

13  /TKPWRAOEPBL gave to me as a as a gift to to basically

14    park money that I was getting to pay for various

15    entities and various events but I believe there's like

16    negative 300 bucks in there now.

17        Q.    You never mentioned met us when I asked

18    about your assets.  Why?

19        A.    Because it's not an asset that I control.

20    It's an asset that I am told to do things out of that

21    account and there's no money in it now so I don't do

22    anything out of it.

23        Q.    What do you mean?

24        A.    Typically people will call me and tell me

25    to do something with the money that was put into that

                                                      132


1    account for me and then I will typically go and do

2    those things.

3        Q.    Please explain.

4        A.    File a lawsuit, give money to a person or

5    entity yeah it's not an account that I control it's an

6    account that's I get a phone call get told to do

7    something with that account.

8        Q.    Okay where is how do you access the money

9    there in the met us capital account?

10        A.    Well there's no money in it currently but

11    typically what I do is I would go into the bank and I

12  would wire money out of it usually in person the met us

13  account was hacked a number of years ago as a lot of my

14  financial affairs were hacked and that resulted in me

15  getting what's called a controller account and all of

16  my financial properties I have so physically go into a

17  wood Forest then they call headquarters to recall

18  determine that I'm me I give a voice print someone

19  takes a photo and so there's that whole process as well

20  but yeah the m met us account I think it's like

21  negative a thousand bucks in there now.

22      Q.    What bank account was that or what bank?

23      A.    That was with wood Forest yeah, but I don't

24  have any relationship with it now.

25      Q.    Is ate separate account from approximate

                                                    133


1  erm.  You mentioned earlier?

2      A.    It is but it's not one that's controlled by

3  me it's one where I was encouraged to do that her vus

4  things but, but I haven't used that account maybe in

5  two years three years maybe.

6      Q.    Does /TKPWRAOEPBL have any affiliation with

7  the met us account?

8      A.    Well it was his LLC or it was his, you

9  know, thing that enabled me to to open it and he good

10    give that to me as far as I know he still does but I

11    don't know I don't know what his relationship is with

12    it.

13        Q.    Where are the documents for, you know, you

14    said is an where was it incorporated?

15        A.    I don't know any of that.

16        Q.    How did you get the information on how to

17    that you could take money out how did you good et the

18    access info?

19        A.    He made a series of phone calls and told

20    mow that the money was in the account and that I had

21    various things I hassed to do and I should go do them

22    and I complied.

23        Q.    How did /WOEFRT bank know that you were

24    authorized to use the met us capital account?

25        A.    I don't know but they did gator also knows

134

1    Robert March link who owns /WOEFRT bank so it's

2    possible they had a conversation about it I don't know.

3        Q.    And you think for your /*R or your

4    testimony is that met us capital is even though you had

5    access to it it's not really an asset because it's for

6    to do off the books government black work?

7        A.    We can call it off the books but usually it

8    was involved with like lawsuits or you know if they

9    needed me to something I would just do it it wasn't

10   like a complicated kind of arrangement it was actually

11   quite simple most of the money that was in there was

12   for like pairing lawyers and things, I mean, it was not

13   it was whatever.

14        Q.    What lawyers did you pay from the met us

15   account?

16        A.    I paid been any Kline man at one point.

17   Who else did I pay out of it?  I don't remember it all

18   now it's been a while but yeah there are times in which

19   I have had access to accounts that were set up for me

20   by others in which I have done what they've asked me to

21   do, you know, usually after I've gotten permission to

22   do it so.

23        Q.    Testifying here today under oath will you

24   identify all those accounts?

25        A.    No I will not.

                                                      135

1    Q.    You refuse to?

2    A.    I refuse to because I've not been given

3    permission to do so.

4    Q.    Will you identify who would be the person

5    that would give you permission to identify that

6    information?

7         A.    I will not.

8         Q.    You're aware that Judge Pittman previously

9    disagreed that you can refuse to answer these kind of

10   /*F type of questions?

11        A.    The judge can do whatever he sees fit I

12   will not participate in that.

13        Q.    Will you go to jail rather than identify

14   those people?

15        A.    No, I won't end up going to jail but that's

16   funny.

17        Q.    Would you rather?

18        A.    It would be great if I went to jail because

19   I would get the mug shot and that's what I want but

20   unfortunately I will not end up going to jail.

21   Regrettably I should say.  More likely than not what

22   will happen is Judge Pittman will push it into the

23   future and they'll I'll have to come back to Fort Worth

24   and eat a bunch of food I shouldn't and then fly back.

25        Q.    You said your flight today is at what time?

                                                          136


1         A.    It's at noon but I'm not -- or excuse me

2    it's at 2 /PU I'm not in charge of that I when I get

3    out of here I will make a phone call to one of my one

4   of my associates and they will tell me when when and

5   which airlines and all of that that will be taken care

6   of for me and then I will get in the Uber which will be

7   taken care of for me and then I will go to the fly back

8   to wherever they send me most likely they'll send me to

9   California would be my guess that's what I've asked

10   them to do but let's see it could be DC.

11       Q.    So you could stay here the rest of the day

12   and an answer all the questions?

13       A.    I would, but I want to provoke a

14   confrontation that would be cool.

15       Q.    What type of confrontation do you mean?

16       A.    Well I want to provoke getting a getting a

17   mug shot that would be great because then that would

18   highlight what's going on here and that would also be

19   useful it would elevate me in what was going on but

20   probably it won't happen like that you'll probably just

21   put me a night or two in jail or whatever that's fine

22   that's not a big deal that's why I didn't wear my

23   contacts but yeah that's fine.

24       Q.    I'm going to mark this as Exhibit 7.  So

25   you used to have a Twitter account right?

                                                    137

1       A.    I did and then I was kicked off of it and

2      then I got a new Twitter account.

3          Q.     O okay I'm talking about the old one?

4          A.     Yes.

5          Q.     Johnson thought?

6          A.     That's right Johnson thought 1 to be

7      precise.

8          Q.     And did you close it or did you get kicked

9      off of Twitter?

10         A.     I got kicked off of Twitter.

11         Q.     Wasn't to try to --

12         A.     No I'm under oath, I mean, I was kicked off

13     a hundred percent and I remember it quite vividly at

14     the time and yeah this thing that was posted was is not

15     accurate so the prim a record yeah so yeah I was kicked

16     off.

17         Q.     All right this is a think a the it's a

18     tweet by you from Johnson just tell us what Exhibit 7s

19     is?

20         A.     This is number 7 this is a tweet from the

21     Johnson thought so I have a deer /TPROEPBD who is the

22     most.  Delightly.  My bile all she should have given up

23     but he is too.  Of course I invested in him when

24     there's nothing left but the will you find a wy that.

25     A reference to o mayor gu ral of the gu ral farmer in

```
 1    turkey.

 2        Q.    So who is the dear friend?

 3        A.    That's on mayor yeah.  Very lovely man.

 4        Q.    You say or you wrote of course I invested

 5    in him?

 6        A.    Mm-hmm.

 7        Q.    What was the investment?

 8        A.    That was in a company called repeat which

 9    is more or less moribund and /TKPWUPBGT but that wasn't

10    why I was instructed to invest in him.

11        Q.    What do you mean?

12        A.    Well he is the sigh on of one of the most

13    powerful agricultural countries.  In you turkey a

14    understand have hely if '82 you had more fum numb

15    strum.

16        A.    The spices regular a notice and all that

17    has his family so very lovely guy I miss him.

18        Q.    Have you told me about all the companies

19    that you have investments in or have pre /KHROEUPLD?

20        A.    I think so yeah more or less.

21        Q.    /KWRAOEUF /AOF got another one for you.

22    Actually go back to sub stack how much money do you get

23    paid how many subscribers do you have?

24        A.    I think I have like 3,000, 4,000 I'm not
```

25    totally sure how many of them pay I don't know like 7

139

1    o, 80, 90, I don't really pay attention to it.

2        Q.      How does sub stack pay you each month?

3        A.      They pay me they send mean to a /WOEFRT

4    account but I think it's like not even a thousand bucks

5    maybe 2,000 bucks something somewhere in that I don't

6    really know.  I don't pay attention to it.

7        Q.      And did you fly in here last night?

8        A.      What.

9        Q.      Did you fly in here last night?

10       A.      I did.

11       Q.      And did the government book that?

12       A.      No.

13       Q.      Was it through your federal?

14       A.      No that was paid for by kerry crew call and

15   she used southwest which is awful but she paid for that

16   as far as I know she used her points and then I have a

17   bunch of mayor on the points so I use a lot of my mayor

18   on the points to pay foremost things and I think

19   eventually I will use /H-FLT G points in the future to

20   pay foremost hotels that I stay at.

21       Q.      You said I have infinite I have effectively

22   infinite money to litigate these matters that /H-PS

23    when the and allied governments wanting to fund your

24    legal defenses I can basically go forever?

25        A.    Correct.

                                                    140

1        Q.    Is that an /KR accurate statement of

2    something tid?

3        A.    That is something I said close to it yeah.

4        Q.    Okay.  Which allied governments?

5        A.    That would be France typically.

6        Q.    Any other /TPWOFTS paid money towards your

7    legal fees in this case or another case?

8        A.    No and I'm not totally sure about the

9    French thing they were sort ever from endly to France

10   but I think they're CIA people who send sent me from

11   money for that I'm not.

12       Q.    Through what chas wire?

13       A.    That was sent through met us but that was a

14   long time ago I don't really know what the situation

15   was there.

16       Q.    So it went into your met us act Toyota

17   /WOEFRT bank?

18       A.    Yeah and it was designed to pay been any

19   Kline man and the clear view AI suit which I did until

20   the money was exhausted and then Mr. Kline man and I

21      went our separate ways.

22          Q.    Didn't you tell Mr. Kline man there's a

23      $20,000 check nor?

24          A.    Yeah that was something we were being if a

25      /STAOERBS with fun another so we because we knew.

                                                    141


1           Q.    So you were lying from?

2           A.    Wasn't lying it was a it was a bit of sub

3       ter /TAOUPBLG I think was the government would slay.

4           Q.    It wasn't?

5           A.    I don't know where his money and frankly I

6       don't think he really cares.

7           Q.    Does the government pay your rent?

8           A.    Depends on the property.

9           Q.    Okay what property does the government pay

10      your rent?

11          A.    Well, they don't pay rent they let you stay

12      places that's how it works.

13          Q.    What /STKAEUSZ?

14          A.    Depends on what they want you to.

15          Q.    Okay in the last year where have you stayed

16      with the government's permitted to you stay?

17          A.    A number of places but again I'm not going

18      to talk about my relationship with federal government.

19      Q.      So you could so you refusing to testify and

20  answer where you have stayed at the I guess the --

21      A.      Yaws about if I tell where I stayed that

22  would compromise the things that I government asked me

23  to do so I'm not going to do that so.

24      Q.      You could though?

25      A.      I could give a full account of where I've

142

1   been for the last ten years if I wanted to yeah in fact

2   I could give an hourly account of it.  Which is crazy,

3   but I could.

4       Q.      You said you have a terrible memory and

5   can't identify names?

6       A.      I can't remember names typically no but I

7   don't have to.

8       Q.      Are you refusing to answer the question

9   about where you stayed and where the government --

10      A.      Mm-hmm yeah bras I don't want to

11  necessarily violate the trust that's plen based in me

12  in those /TKHRAEUSZ.

13      Q.      /STPWHROUF any business dealings with

14  cutter oar turkey directly indirectly?

15      A.      You mean with the government or with

16  individuals in country or what?

17    Q.    Let's start with the government.  Okay so

18  I'll ask it again do you have any business dealings --

19    A.    No.

20    Q.    Any money --

21    A.    I have no -- I have no business dealings

22  with them as far as I know I am friendly with numerous

23  member I am friendly with the Qatarian impasse tore

24  he's a dear friend of mine I was I was a guest of at of

25  his at several of his events and I have in terms of

143

1  turkey I have medical wet my you think /-PBL walking

2  did station chief there so I'm very familiar with

3  turkey but no I have no relationship with the

4  government of turkey as far as I know many of actually

5  that's not true one of the fies may ten sal a knee who

6  was /PH-FLT IT but he died he's dead now so I guess I

7  have no relationship.

8    Q.    Do you do any work paid or up paid for the

9  Qatar regovernment?

10    A.    No.

11    Q.    The turkeys occur Turkish government?

12    A.    No.

13    Q.    I hand you what's been marked as Exhibit 8?

14    A.    I do not work nor the governments of in I

15    countries or the than the United States.

16        Q.    You are familiar with this?

17        A.    I've stolen mim yuns how.  How dare you

18    could be.  That's obviously a joke that's the aub if I

19    in joke I've got to say because it's now in a court

20    record but it's a joke I have not stolen money.

21        Q.    Who /R-RP if sign?

22        A.    That was the joke it's a reference the 7K

23    thing is a reference to the fact that sigh onnists pay

24    people money to promote certain ideology talking points

25    in social media and so no.

♠

144

1        Q.    I'm going to hand you another exhibit?

2        A.    Mm-hmm.

3        Q.    This is a tweet from 2024?

4        A.    Let's see what this is.

5        Q.    You mentioned investment in metgation tech?

6        A.    Mm-hmm.

7        Q.    Explain --

8        A.    Yeah that would be the Joan company at

9    census tech and you know invested in this context means

10    paying attention the solar poured batteries solar plus

11    Carters /TKAOEPS the lead so this is a reference to the

12    ap ter a stuff so yeah that's what that is irrigation

13    litigation tech that would be mostly like the census

14    stuff but ultimately I just have the options in that

15    so.  Yeah.  Well yeah hurricane mitigation technology

16    is a very interesting subject I should spend more time

17    on that especially in the West Coast because that's

18    where /*R we're more likely to have containers /*R

19    hurricanes unfortunate /*R unfortunately in /-T future.

20        Q.    Can you briefly explain how drones mitigate

21    or hurricane mitigation technology?

22        A.    No not without getting in trouble so no

23    there's a technical well /TKHRAP is represented the

24    Chinese government in suing over drone /S-PBLG to I

25    wouldn't be talking about that no.

♠

                                                    145


1        Q.    You could answer it but you refuse to?

2        A.    I refuse to correct.

3        Q.    Okay any other investments?

4        A.    Not that I know of.

5        Q.    Okay and when I talk about investments I

6    just want you to know it's indirect direct SPVs trusts

7    government money wife daughter?

8        A.    No the you were barred from by Judge

9    Pittman you should try to.

10       Q.    Well, I'm going to ask if you?

11    A.    Remember counselor you didn't check with

12   /TKHRAP whether or not they already represented my

13   family which they did and then you moved over but you

14   didn't do the conflicts check on and now you're asking

15   about the family that's not good but you can continue

16   if you want.

17    Q.    Did you invest in any companies with Navy

18   seals?

19    A.    I did there's actually a company called dar

20   a.

21    Q.    Why didn't you mention that before?

22    A.    Didn't recall it.

23    Q.    You didn't recall it?

24    A.    That was no I didn't and I think I have

25   omissions in that one too but I'm not totally sure

146

1   gator would know more on that gator was in control of

2   that investment to the OI5.

3    Q.    How many companies I've got to bring up for

4   you to say oh gator knows about that now I remember

5   feels like you're not being complete and honest in your

6   answers?

7    A.    Well a lot of them it's not my

8   responsibility but you know I pay attention to my lane

9    and I do things that the government asks me to do and

10   people does me to do in my lane so that's why we have

11   business partners and associates.  Yeah tar gap is a

12   very interesting company though I think I don't really

13   know what's going to happen with that one, but I

14   haven't talked to Joe yo /SKWRO* Joe would full is the

15   main shot caller there and I haven't talked to him in

16   maybe a year two years no that's not true we talked

17   about it will we talked about the I tannian coast good

18   guy.

19        Q.    I'm /HAPLGD you Exhibit 10.

20              (Marked Deposition Ex. 10,

21        A.    There we go.  Yes.

22   BY MR. THOMPSON:

23        Q.    Third page?

24        A.    Third page.

25        Q.    Toward the bottom?

147

1         A.    Third page third page yep.

2         Q.    One of the companies can you read that

3    please?

4         A.    No I don't see that where is that page 3?

5    Are you sure page 3?  No I don't have it here.  Maybe

6    you want to just read it out and I'll frye and find

7    that.

8        Q.    Take mine why don't you just give me that

9    one back.  I highlighted it.

10       A.    Okay.  /UFPL hum.

11       Q.    So who are those two /WREURB friends and

12    what is the company?

13       A.    Let's see here.  What is the company that's

14    a great question I don't recall this one yeah gator

15    would definitely know this one though because he

16    handles the British side of our.

17       Q.    See if that jogs your memory Exhibit 11?

18       A.    I handle the French once.

19       Q.    If you could just please keep all the

20    exhibits --

21       A.    Yep yep so tear a dies yep I'm an investor

22    in that one, yep.  If I wrote it then I'm an investor

23    in it.  Probably.

24       Q.    Okay so again if the receiver cares to try

25    to quantify --

                                              148


1        A.    Exactly I have no objection to a federal

2    receiver you are obliged to come up with three names

3    you came unwith one come up with three.

4        Q.    Mr. Johnson, if the receiver whoever it is

5   seeks to quantify your investment or the value of your

6   investments in ter a depth how would he do it?

7       A.    He would call the company presumably he

8   could call Joe he could call he could call John Burbank

9   he could call gator /TKPWRAOEPBL he could call any

10   anybody /*R number of people.

11      Q.    So give me the full names of everyone?

12      A.    John Burbank.  So he's somebody that people

13   could call.  I don't have his contact I haven't talked

14   to him in a number of years but I think it was John at

15   passport capital when I talked to him last he has a

16   woman who worked for him named Julie Kim high typically

17   associated with O- though I think she was fired I'm not

18   totally sure what that deal is.  Yeah.  But I haven't

19   really paid attention to that in a number of years.

20      Q.    How are they going to know the name of

21   these SPVs how could they know that they're associated

22   with Mr. Chuck Johnson Charles Johnson?

23      A.    The home that Mr. Burbank lived in in

24   London was provided to him because of his help to

25   various countries in the U.S. and he will know what I'm

                                                    149

1   talking about objection, nonresponsive so this

2   investment in ter a depth was it an SPV, direct or what

3      do you know?

4          A.    I don't know.

5          Q.    Okay.

6          A.    I know that I have an interest in it I know

7      that it is sizable I don't know I don't know.

8          Q.    Okay by sizable what do you think what's

9      sizable mean to you when you sigh saysable?

10         A.    Few million bucks maybe 10 total I don't

11     know if it's all mine some of it might be gators some

12     of it might be a beginnings unclear.  I --

13         Q.    Was it in -- go ahead.

14         A.    Yeah I believe yeah I don't know what its

15     valuation is either Ien haven't really paid attention

16     to it in a you be inform years I know that it's doing

17     well and I know that it continues to get contracts from

18     the may gee but I don't know the full story with the

19     Navy nor do I really want to know because some of the

20     stuff that they do is classified from what I understand

21     and I'm not read into it.

22         Q.    Was the investment in ter a depth through

23     /TKPWRAOEPBL or did he handle it?

24         A.    He handled the paperwork around it yeah.

25         Q.    Okay was it a special purpose vehicle?

                                                      150

1      A.    I don't know.

2      Q.    You don't know?

3      A.    Chro I don't know.  /TPHO*EU that my job

4   was to source the /TWEFPLT and his was to ride the

5   capital for it so he did.  To provide the capital for

6   it so he did and I believe that there's a lot of

7   British connections there but I don't the /PWREUTS

8   don't trust me the /TPRUPBD are the ones who like me so

9   he handles the British.

10      Q.    Why don't the /PWREUTS trust?

11      A.    The whole American revolution thing yeah

12   that's a thing they're big on lineage and the French

13   like me a lot like a lot a lot so.  My family was very

14   involved in Lexington and Concord they know that

15   everybody who does business at the level in Brit an

16   you're only allowed in certain places he's allowed in

17   those places I am not.

18      Q.    Okay.  So it's 11:40?

19      A.    Yep.

20      Q.    How long have we been going I want to be

21   cognizant of the court reporter on this /#1EGS.

22         THE VIDEOGRAPHER:  Has knee.

23         MR. THOMPSON:  We'll go about five more

24   five more tints are you going to stick around.

25      A.    I don't know I have to wait I have to go

151

1    see I have go make a phone call.

2    BY MR. THOMPSON:

3        Q.    You said you were leaving at noon?

4        A.    I'm going to be leaving the building at

5    noon yes, and I may actually get into a cab and leave

6    I'm going to go file a report and say how it's going

7    and then I'm going to get instructions.

8        Q.    A report?

9        A.    Yeah.  A report.  I have to go and say what

10   happened here I'm obliged to do that the kind of

11   questions you're asking all of that I'm going to take

12   that and I'm going to go tell them.

13       Q.    Are you tell me your handlers name?

14       A.    No.  Never.

15       Q.

16           THE VIDEOGRAPHER:  I've got an hour 23

17   minutes on the record.

18           MR. THOMPSON:  That's kind of long for you

19   guys let's go off the record then.

20           THE VIDEOGRAPHER:  We are going off the

21   record at 11:42.

22           MR. THOMPSON:  Can we go back on real

23   /PWRAOEUFL.

24      A.    We're on we're on.

25   BY MR. THOMPSON:

152

1       Q.    All right.  We're going to bra I can for

2    take a real quick lunch break I just want to for

3    because we've been going an for the court reporter's

4    sake to give him a break and I still have a lotter

5    month questions for Mr. Johnson and I intend to use my

6    full seven hours Mr. Johnson has stated that he's going

7    to leave and I just want to make it very clear that I'm

8    not done with my examination here and it's 11:45 and I

9    intend to resume the deposition around 12:15, 12:30.

10            THE VIDEOGRAPHER:  Okay we're going off the

11   record at --

12            MR. THOMPSON:  Mr. Johnson are you going to

13   be back here at 12:15.

14      A.    I don't know I'm foreclosing to have to

15   make a phone call and when I find out I'll let you know

16   or presumably you'll know whether or not I'm here or

17   not.

18            MR. THOMPSON:  Okay.

19            THE VIDEOGRAPHER:  We're going off the

20   record at 11:43.

21            (Break from 11:43 a.m. until 12:41 p.m.)

22          THE VIDEOGRAPHER:  We're back on the record

23     at 12:41.

24     BY MR. THOMPSON:

25          Q.     All right.  We're back on the record.

153

1     12:41.  We were supposed to get started at 12:30 but

2     Mr. Johnson is present.  Raw today continue,

3     Mr. Johnson?

4          A.     I am.

5          Q.     Did you make any calls?

6          A.     I did.

7          Q.     Who did you speak to during the break?

8          A.     I won't say who I spoke to.

9          Q.     Why?

10         A.     Because I'm not allowed to.

11         Q.     Did you talk about this deposition and your

12     answers?

13         A.     I did.  I did.

14         Q.     What did you say?

15         A.     I said that it's it's a lot of its an an

16     now answer but it's manageable.  Something to that

17     effect.

18         Q.     Who were you speaking with?

19         A.     I won't say.

20      Q.      Over the telephone or Signal?

21      A.      Signal message.

22      Q.      Do you delete your Signal messages?

23      A.      They're auto deleted.

24      Q.      Why do you have them set like that because

25      do you understand that you are under a duty to preserve

↑

                                                        154


1       your messages in this case and your communications?

2       A.      I guess they'll have to arrest me.

3       Q.      What?

4       A.      I guess they'll have to arrest me.  They

5       were set long ago that way and I just continued with

6       the status quo of it.

7       Q.      You know you could change it so they don't

8       delete?

9       A.      I won't change it.

10      Q.      That wasn't my question.  You know you

11      could?

12      A.      I could, but I won't.

13      Q.      Typically they last for about a day or two.

14      Sometimes less.  Depending.

15      Q.      Why don't you want to preserve your

16      communications that relate to this case?

17      Q.

18      A.    Well, all my communications are preserved

19   through Signal.  Signal controls all of that.  I would

20   prefer to do everything on on install if I had my dra

21   thers.

22      Q.    You mean you can retrieve all your mention

23   that you sent on Signal?

24      A.    No.  Others can.  I can't.  But others can.

25      Q.    Are the others?

                                                        155


1      A.    Well it's not a secret who the are

2   furnished behind Signal.

3      Q.    I'm asking like could you personally --

4      A.    I personally couldn't but others can do it

5   for me.

6      Q.    And you choose to not change your message

7   retention settings --

8      A.    That's right I won't yeah, I mean, I don't

9   I won't and won't change anything that I've done

10   with -- regarding that.

11      Q.    Can you explain why?

12      A.    It's about the minimal compliance issue.

13      Q.    Same thing you're going to minimally

14   comply, but not a hundred percent maximum compliance?

15      A.    That's right and also Signal controls all

16    of it anyway everything I do on Signal I would prefer

17    to do everything on Signal as I said and Signal has a

18    back end so I'm happy if there's anything like super

19    bad or whatever that Signal, that Signal messages could

20    be reactivated at some point by somebody if necessary,

21    totally necessary.  In general I'm a fan of Signal and

22    prefer for all communications I use it with family with

23    friends girlfriends you know nannies.

24        Q.    So I went through some of your answers were

25    muddled so I'm not repeating this intentionally.  Okay.

                                                        156


1     So when was the first time you purchased or obtained

2     /KHOEUPT currency?

3         A.    I don't know what the first time was.

4     2021, 2012.

5         Q.    So list every crypto exchange or platform

6     where you have had an account?

7         A.    I don't know them alm.  Probably I think I

8     had one at coin base alm al.  That might be it.  I

9     don't have all the others off the top of my head.

10        Q.    By unanimous?

11        A.    No I've never used it.

12        Q.    Cracken?

13        A.    Never used it.

```
14        Q.      Are you sure?

15        A.      Yeah.

16        Q.      Gemini?

17        A.      /KWREFR understood /SKPWHREUT sure.

18        A.      Yes.

19        Q.      FTX?

20        A.      No never used it.

21        Q.      Are you positive?

22        A.      Yes.

23        Q.      Due coin?

24        A.      No even know what that is.

25        Q.      Bite finance?
```

157

```
 1        A.      By finance?  What is that.

 2        Q.      Something I heard about?

 3        A.      I've never used that.  I have no idea what

 4   that is.

 5        Q.      So you're positive coin base is the only

 6   one that you've ever used?

 7        A.      There might have been one or two others but

 8   I don't recall them off the top of my head as you said

 9   I haven't touched this stuff in a long time.

10        Q.      But it was not by unanimous crack Ken or

11   gem any FXT.  Certainly not I would have nothing to do
```

12    with -- I would have nothing to do with those

13    /PHRAFRPLTS under any circumstance unless directed that

14    I was to have something to do with this em?

15         Q.    What user name or email did you use to

16    register?

17         A.    I don't remember.  It was like 2016, 2017

18    when I did the coin base one it's been a long time.

19         Q.    Yeah so next question so what time periods

20    did you /KWRAO*S rest deaths for those accounts?

21         A.    That would have been like 2016, 2015 time

22    frame yeah, but I don't recall off the top of my head

23    as I said it's been a long time since I've had anything

24    to do with crypto.

25         Q.    And you would have completed the full N-

                                                      158


1    your customer identity verification?

2         A.    I don't know if they had that at that time

3    whatever the compliance software was at the time is

4    what I used.

5         Q.    You know what know your customer is are you

6    familiar?

7         A.    I do I'm familiar with with it.

8         Q.    What is that?

9         A.    Know your customer is something you have to

10    do if you are a money transmitter and my understanding

11    is that a lot of the laws around crypto have changed

12    since I've dealt with them but I don't quite haven't

13    really kept up with its it's not relevant for my

14    financial overall picture.

15        Q.    Are any of your crypto accounts still open?

16        A.    Not that I'm aware of.  If they are they're

17    knot not controlled or used by me in any form or

18    fashion.

19        Q.    You did close them?

20        A.    Just never used them anymore.  I X'd out of

21    all my positions I think after all of my crypto

22    examinations after trump's statement and I directed

23    family and friends to do likewise.

24        Q.    So any assets that you had in coin base or

25    any of the exchanges what did you do when you said you

                                                    159


1    lick we taited or got out of those?

2        A.    Most of them were sent to bank accounts but

3    some of it was given away, gave some away of it to this

4    guy /KAOEUPBL ka Zhan but that was not that much I

5    think that might have been like 10,000 to $15,000 worth

6    of crypto but in general no I never really I when trump

7    gave his famous tweet although I understand his

8       position has changed on bullet point but he gave this

9       famous tweet when.  And ma knew chen give a the then

10      treasury secretary was opposed to it I took that as a

11      Signal to no longer be involved with it and then when

12      the FBI contacted me and asked me about everything I

13      knew about bullet point and when other intelligence

14      agencies asked and talked to thee about bitcoin I

15      complied with what they asked me to talk to them about

16      and then went from there.

17          Q.    So at the peak the most you had at one time

18      how much bitcoin not value but just the number of

19      bitcoin?

20          A.    I don't know I didn't track it like that I

21      didn't think of it like that.

22          Q.    What year did you have your most bitcoin?

23          A.    Maybe 2017, 2018 not totally sure.  As I

24      said it's been a long time it's been like at least six

25      seven years eight years.

                                                          160

1           Q.    And currently your testimony under oath is

2       that you have no you possess no bitcoin you do not

3       access any bitcoin through --

4           A.    That's right.

5           Q.    -- yourself, trusts --

6      A.      Yeah and as far as I know, no one -- no one

7   in my family owns it either so as far as I know it's

8   we're entirely out of the thing.

9      Q.      Exhibit 11?

10             THE WITNESS:  Sir when you scan these do

11   you take pictures of them.

12             THE REPORTER:  I scan them scan them so if

13   I write on it as well.

14             THE REPORTER:  Everything on there will be

15   scanned.

16             THE WITNESS:  Cool.  Thank you.

17   BY MR. THOMPSON:

18      Q.      There's an article from 2017 it's a CNBC

19   article?

20      A.      Yeah a lot of this is incorrect I think

21   this is from CNBC.

22      Q.      So hold on.

23      A.      Yeah.  This is all disinformation from the

24   southern poverty law center which I think ultimately

25   went bankruptcy /THRAOUS the more rest thieves and

                                               161

1   other people were finder around that yeah so go on.

2      Q.      So whether you did it or not did you

3   represent to any third parties around 2017 to 2018 that

4   you were mining millions of dollars a month in crypto?

5       A.   I may have said that but it wasn't true.

6       Q.   So you think you did say that?

7       A.   It's possible yeah, but I didn't ultimately

8   do it.

9       Q.   I ask because if you go to the last page of

10  the text of the article, it says it refers to you

11  investing in the business po process the cash of

12  medical manner do you see that?

13      A.   I do.

14      Q.   And started a bit coin mining operation?

15      A.   Yes.

16      Q.   Okay.  So did you do either of those

17  things?

18      A.   I did not.  I did not yeah I was not

19  involved with the bitcoin mining operation ultimately

20  was not involved in the processing of cash from medical

21  manner.

22      Q.   Do you know anyone that did do that?

23      A.   I don't think so.  I don't know.

24      Q.   I believe on a podcast you said you were

25  very into bitcoin mining until 2018 and then you exited

162

1   the space because the us government told you to get out

2    of bitcoin did you say something like that?

3        A.    That sounds like something I might have

4    said yeah.

5        Q.    Okay.  Why would you say that you were very

6    into bitcoin mining until 2018?

7        A.    Well I was very interested in the concept

8    equal frame works around it, but I went and I /TRAFPLD

9    to Hong Kong and I met somebody who was later to will

10    moo that he that he was a /KH-PBZ /SPWELGTS officer and

11    he was very interested in bitcoin mining this was yeah

12    2017-2018 time frame and then I met with some people on

13    U.S. government and they informed me that this person

14    was likely a a CCP or some kind of Chinese spy and they

15    said well it's a good thing I didn't do business with

16    them and frankly there was so much craziness around

17    crypto and the dank around it so it's quite a dangerous

18    pining em get.  Harmed for it all the time and you know

19    my physical safety and the safety and well-being of

20    people around me is more to important to me than any

21    amount of money company ever seek to make.

22        Q.    So go back to that last exhibit do you have

23    it?

24        A.    Mm-hmm.

25        Q.    It's the CNBC article it says that you were

163

1    looking at businesses to process the cash of medical

2    marijuana is that right?

3        A.    That's right.

4        Q.    Okay.

5        A.    I think I went to a marijuana related

6    conference at one point that ultimately it won't

7    surprise anyone to know this but a lot of stoner resist

8    not the best business people and I also grew concerned

9    about the ethics of the marijuana industry as well as

10   the sort of federal legality or illegality of all of

11   that.

12       Q.    What businesses do you recall speaking with

13   about this?

14       A.    It was such a long time ago I don't really

15   remember them all I collected a lot of I collected a

16   lot of business cards at the time, but I most of the

17   people who are involved in this pace are not honest or

18   I found them to be dodgy in different ways tosy I tried

19   to minimize my involvement with them.

20       Q.    Did you ever encourage congressman Tom tan

21   contrato to run for governor?

22       A.    If I did it was in a very friendly like

23   kind of way but he was a friend of a friend and in I

24   did inconcern him to run for governor it was like that

25    would be great if you ran for governor like I had that

164

1    conversation with like a dozen people every like it's

2    not out of the unusual frankly if people want to run

3    for office or involved with higher involves /*FR office

4    I'm happy to support them if they are kind and good

5    people good natured.

6        Q.    Tim cray tow was a proponent of legalizing

7    marijuana?

8        A.    Was he?  I didn't know.

9        Q.    I'm asking you are wear of that one way or

10    nor?

11        A.    I have no idea.  Are you sure that's true.

12        Q.    I'm just asking if you know?

13        A.    No I have no idea.  In fact he was

14    introduced to me at a burger joint by Michelle mal con

15    and we discussed in particular we discussed Colorado

16    and we discussed whether or not I thought he could win

17    the governor's race there and I said he probably

18    wouldn't but if he wanted to run I wished him well, but

19    I don't recall, I mean, it's been a number of years and

20    I think I think the conversation went for like maybe an

21    hour or two maximum and then I haven't talked to him

22    since as far as I can recall.

23      Q.      Have you ever excuse me received any funds

24   of any sort that you now understand were proceeds from

25   the sale of marijuana distribution or sales?

165

1       A.      I don't know.  I suspect probably but I'm

2    not sure and I think I would love the U.S. government

3    and others to make that determines (let).

4       Q.      Why do you say probably?

5       A.      Just a strong suspicion people I was around

6    were interested in that kind of thing circa 2017-2018

7    it was sort of interesting time because it was legal at

8    the state level, but not at the federal level and so

9    there was a question about the legality of if you had a

10   business operating in cash in California could that

11   work or not and so ultimately never went through any

12   serious business operations.  I my understanding though

13   is that the number of people who were involved with

14   that have since gotten in trouble with the law in

15   different ways and of course I /SPOURS federal law

16   enforcement doing what they think is necessary there.

17      Q.      Let's talk about federal law enforcement a

18   little bit about so did you ever have any assistance or

19   input how federal law enforcement dealt with marijuana

20   dealers at the border?

21       A.       Reporter?  What did you say?  What was the

22  last word?  I didn't catch it.

23       Q.       Border security as it relates to drugs,

24  marijuana, car tells.

25       A.       No, I had no involvement with that as far

166

1   as I know:  It's possible it's possible that I spoke

2   with some people about it but I don't recall it.  In

3   general I would say that I am a big supporter of

4   federal law enforcement and things that they -- and the

5   federal government generally I think it's woefully

6   underfunded and would be supportive of any efforts that

7   they would do to stop things that were illegal.

8        Q.       Have you ever spoken with David leader man

9   in your life?

10       A.       I don't know who that is.

11       Q.       Is that your testimony under oath?

12       A.       It is.

13       Q.       Okay.  When was the last time you spoke

14  with Max leader man?

15       A.       I don't know who that is.

16       Q.       When was the last time you spoke about the

17  lawsuit that David leader man was in?

18       A.       I don't know who David leader man is so I

19   don't know what a lawsuit is that he's involved in.

20        Q.    That's your testimony?

21        A.    It is.  You asked me about the name of it

22   and I understand that he got arrested at one point but

23   I don't know who he is I've not seen a photo of him

24   couldn't identify him unless I'd seen a photo of him

25   but I don't know who he is.

167

1        Q.    That's your testimony?

2        A.    That is my testimony.

3        Q.    Have you provided federal law enforcement

4    or state law enforcement any information about David

5    leader man or anyone involved in marijuana growing

6    operations?

7        A.    I don't know if I should talk about

8    relationships I have with the federal government so I'm

9    gonna say no I don't know anything about any marijuana

10   cultivation or growing of operations the feds as far as

11   I know they they do pretty good work but I'm not I'm

12   not involved with it.

13       Q.    Have you ever been promised immunity

14   leniency or any other benefit in connection with any

15   crimes that the federal government charged or was

16   investigating relating to marijuana?

17      A.      As far as I know, no.

18      Q.      Okay.  You wrote a sub stack a couple of

19   days ago I think it was and it was about your I think

20   membership at a -- or your status as a federal law

21   in -- or informant do you remember that?

22      A.      I do.

23      Q.      And I think you pasted a letter you wanted

24   to give to Judge Pittman or something?

25      A.      Maybe something like that, yeah.

                                                        168


1       Q.      Okay.  You say, "I was threatened with

2    potential jail time for something which wasn't even a

3    crime."

4       A.      That's right.

5       Q.      What was that?

6       A.      That was having conversations with Julian a

7    sang yeah I went to go see him in August '17, 2017.

8       Q.      Let me start back.  So the line before you

9    say the process by which I became a code named

10   informant is complicated but it amounts to this."  I

11   was threatened with potential jail time for something

12   which wasn't even a crime.

13      A.      That's right.

14      Q.      Okay.  So what crime were you threatened

15    with or what was the potential jail time you were

16    threatened with?

17         A.    Well, the director pom pay o had designated

18    Julian a song and wick can I leaks as a non state

19    architect and I went to go see him with then Congress

20    nan ro back arrest at what a was then the Ecuadorian

21    embassy in London and he had and I had approximate

22    about a /THRAOR o four conversation or the three of us

23    had about a three or four hour conversation and when I

24    came back the United States the /*URS government ask

25    immediate about that meeting several entities from U.S.

169

1    government asked me about that meeting one group in

2    particular was very interested in that meeting and they

3    were the ones who for heim I was working at the time or

4    helping at the time I should say.

5         Q.    What's the group that you say that one

6    group in particular was very interested?

7         A.    They were very interested in the

8    conversation I had with Mr. A sang.

9         Q.    Who was the group?

10         A.    I won't discuss that.

11         Q.    Are you refusing to answer?

12         A.    That's right, I am.

13      Q.      Any government so so you said you were

14   threatened for it with a crime and federal?

15      A.      I was and.

16      Q.      Hold on hold on.

17      A.      Yeah.

18      Q.      And then so did that cause you to alter

19   your behavior or work with them or become an informant

20   is that what you're saying?

21      A.      Well you know there are many government

22   agencies and there's this process called deacon flick

23   shun and unfortunately sometimes you get very good for

24   things that you were doing under the auspices or

25   protection of another government agency and so that's

♠

                                                        170


1    what happened there.

2       Q.      Did you tell any friends or acquaintances

3    around 2018 that you were concerned with being arrested

4    or facing jail time?

5       A.      Possibly but I'm always kind of worried

6    about that I was particularly worried because I was

7    named in the mull ler probe though apparently the

8    sections concerning me in the muller probe are

9    classified to this day despite nigh best efforts.

10      Q.      You said probably or possibly.  Can you

11    identify or recall anyone that you told acquaintances

12    friends et cetera that you were concerned that you

13    would be arrested?

14         A.    Well there was a situation --

15         Q.    Just answer --

16         A.    Yeah.

17         Q.    Names?

18         A.    No no.  There was -- I'll tell you the

19    story and then you can decide for yourself how you're

20    going to process it.  So there was a guy named James

21    wolf who was a he was part of the senate intelligence

22    committee and Mr. Wolf was having an -- a series of

23    affairs with a number of journalists and he was giving

24    them information about things going on in the senate

25    intelligence committee and he was harassing me trying

                                                        171


1    to get me to comply with his probe and so I was

2    /KAPBGTD by a number of journalists at the time saying

3    that I think wolf is trying to come after me and that

4    he may try to put me in jail if he criminally referred

5    me and then wolf himself was arrested and reside -- I

6    think oafs put in jail for a brief time which was an

7    appropriate punishment he should have gotten more time

8    but I don't want to see anyone go to prison for a non

9    violent o sense and to that's what I was telling people

10   at the time and the challenging thing because we had

11   these different government agencies smacking into each

12   other and fighting with each other but ultimately I

13   prevailed I didn't have to go before Congress the house

14   or the senate which both requested my presence and so I

15   was talking to a number of journalists the number of

16   people about that time period.

17        Q.    You didn't raise any concerns about

18   potential jail time or fear of jail based on any

19   involvement with marijuana, the specific potential

20   business that you looked at?

21        A.    As far as I'm aware no but it's possible, I

22   mean, there's a big conflict with the feds and

23   marijuana my big kind of take away --

24        Q.    So I'm going to object as non-responsive so

25   just the answer is no?

                                                           172


1         A.    No, the answer's no, I was not concerned

2    about going to jail for that, no.

3         Q.    A couple of monther questions about your

4    can crypto holdings.  Identify all of the hardware

5    wallets that you owned or used?

6         A.    I don't own any hardware wallets no I've

7    never owned a hardware wallet as far as I can recall

8    although it's a challenging question because when you

9    mine bullet point sometimes you store it on a computer

10   and I did have self computers that had coin on them so

11   poo some people would say theory.  Generally people

12   talk about a hard wallet they're talking about a UBS

13   drive or something to that effect and I never owned one

14   of those.

15       Q.    Where did you store your recovery words

16   pass keys private keys C phrase all that?

17       A.    I made a poem with them and I would recite

18   it before I brushed my teeth before I went to bed and

19   after I woke up.

20       Q.    Do you use any privacy tools to obscure the

21   origin or destination of your crypto currency holdings

22   mixers tumblingers privacy pools?

23       A.    No I don't know what anything I don't know

24   what any of those things are.

25       Q.    Did you provide your assets crypto into a

                                                        173


1    wallet that someone else nominally controlled but was

2    used for your benefit?

3        A.    No never did that as far as I can recall.

4        Q.    Who is Terry done mire?

5      A.    He's an elderly gentleman who lives in

6   northern Virginia.

7      Q.    When was the last time you spoke with him

8   or communicated with him?

9      A.    Maybe three or four days ago.

10      Q.    How often do you speak with him?

11      A.    Whenever he calls me or whenever he texts

12   me or whenever he wants to get lunch or dinner or have

13   a cigarette.

14      Q.    In the last month how many times have you

15   spoken to him?

16      A.    Maybe two or three times.

17      Q.    The past two months?

18      A.    Maybe eight or nine.

19      Q.    Past three months is that about the

20   cadence?

21      A.    Yeah it's about that, I mean, it depends he

22   has ill health so usually when he and I speak it's

23   about medical matters or about things going on

24   politically we discuss the Epstein matter recently and

25   so we had a long conversation about that and what I

174

1   should do concerning it and we discussed the 2028

2   election and we discussed this Indian gentleman that we

3    are convinced is a spy which probably is a spy but in

4    general no, I mean, he's a good guy I like him he's a

5    nice he's a gentleman he and I are both you know we're

6    from old families and so there's that aspect of it as

7    well I always speak to him over Signal or in person and

8    he's a -- and he is a lovely man.

9        Q.    So have you invested directly, indirectly

10   through a special purpose vehicle perhaps with

11   Mr. Green well in any company or SPV or fund or trust

12   that Mr. Done mire was affiliated with over the past

13   ten years?

14       A.    It's possible, I mean, we have a policy of

15   honoring our hosts so.

16       Q.    I'm going to object as non-responsive yes

17   or no?

18       A.    No, I mean, it's possible I don't know so

19   yes maybe but probably yes but my guess would be he

20   would depend on how it was structured and so the way it

21   typically works is gator is the one who brokered the

22   introduction to Mr. Done mire so gator is the one who

23   has control of any financial intersections that occur

24   between me and Mr. Done mire.  I send Mr. Done mire

25   five grand maybe four years ago five years ago and we

175

1   had the last I saw him in physical presence was had to

2   have been April or May of this year and we went to tie

3   food near his home in Fairfax.  But he has rather bad

4   health so he's not the most he's had a series of

5   strokes for example and so he's not the most in the

6   healthist of spirits.

7       Q.    So he's on our list to depose?

8       A.    Good luck.

9       Q.    Why do you say that?

10      A.    It's very unlikely you'll have access to

11   him, but I wish you luck on that.

12      Q.    Can you explain in two sentences or less

13   why?

14      A.    No, I cannot but I think it's very unlikely

15   you'll be able to see access to him.

16      Q.    Why?

17      A.    Because he what he really does for a

18   living.

19      Q.    Oh, is this another like federal employment

20   conspiracy thing?

21      A.    I don't think he's a federal governmental

22   employee currently.

23      Q.    No but just like the whole kind of?

24      A.    The won't have access to him I wish you

25   well on that in fact there as lot of questions I'd like

Case: 25-10919    Document: 62-2    Page: 296    Date Filed: 01/09/2026
Case 4:24-cv-00988-P    Document 137-1    Filed 11/18/25    Page 194 of 295    PageID 3455

176

1   to ask him but you will not have a good time with that

2   that will be quite difficult for you.

3        Q.    So to testifying here today will you

4   identify any investment vehicles that you are --

5        A.    Oh, I don't know of any.

6        Q.    Just -- let me finish for the court

7   reporter.

8        A.    Yeah that's fine.  No I will not and no I

9   do not know of any if there is one, gator and Terry and

10  likely John Burbank would know about it but I was not

11  read into that that wasn't my responsibility Terry like

12  gator deals a lot with the British world and that is

13  not a world that I'm accustomed to nor do I

14  particularly like working in it in fact the last time

15  before I went to it be with Courtney love in London the

16  time before that I was advised if I went to the UK the

17  UK government could not guarantee my safety so it's not

18  a place that I like to visit the food isn't very good

19  the people aren't very nice.

20       Q.    So just to be clear can you identify

21  testifying here today yes or no can you identify any

22  investment SPV direct or invect /TKROFLG?

23       A.    If there is --

24        Q.      Involving Terry done mire yes or no can

25    you --

177

1         A.      No, I cannot identify one.  I cannot and

2    even if I could I would not so I cannot and even if I

3    could I would not.

4         Q.      Even you were aware /TKARBTS?

5         A.      Even if I were aware of it I would not

6    identify it correct, but I cannot because I don't know

7    of any.

8         Q.      In four sentences without a long filibuster

9    explain your relationship with Gary louder?

10        A.      It's quite simple we have loot of friends

11   in common.  I've met him once before he's a gentleman I

12   was more friendly with his uncle and his uncle has

13   unfortunately passed and his uncle ambassador louder

14   was our ambassador under Reagan to Vienna if I recall

15   correctly and was a lovely man patriotic Jewish guy

16   very good guy very good American and Gary does a lot of

17   investing on behalf of his larger family enterprises

18   though he and I have not done any business in quite

19   some time.

20        Q.      Have you spoken to Gary louder about this

21   case?

22    A.    I have he not as far as I can recall no.

23    I -- we are not -- he and I are not you know we had a

24    disagreement about the gaz a genocide and so he and I

25    have not really spoken in a serious way since that,

178

1    since October 7th, 2023.

2    Q.    Have you talked to Gary louder just to be

3    specific about Hal Lambert?

4    A.    As far as I know, no.  It's possible but I

5    think no unless if you have a text message or something

6    but no I don't recall talking to him about Hal Lambert.

7    Generally speaking most people --

8    Q.    No.  Object non-responsive.

9        Do you remember at trial when I asked you

10    about your gawker lawsuit?

11    A.    Yes gawker is no longer with us.

12    Q.    How much money you the receive from gawker

13    for direct or indirect through that litigation?

14    A.    It would have have to have been a few

15    million dollars Al told but I'm not quite sure honestly

16    because teal lent me some money around it and then teal

17    and I were sort of against each other in that in the

18    fine analyses because teal and at the /*R vehicles

19    willburg were having a active so there was that whole

20    that whole thing which I had to mitigate but the

21    operation was successful, I mean, gawker no longer

22    exists nor does huffing ton post as I recall or at

23    least not in the form it was.

24        Q.    Simply is I just want the amount of money

25    to the best of your knowledge, to the best of your

                                                    179


1    knowledge how much money did you receive from your

2    litigation against gawker?

3        A.    I don't know I think it might have been

4    like a few million it's been a few years now.

5        Q.    Did your attorney get paid in that case yes

6    or no?

7        A.    Which attorney?  I had several.

8        Q.    Any of them.

9        A.    That's a good question.  I believe that one

10    of them got paid but one of them did not one of them

11    was in trouble and had to work off that so --

12        Q.    So hold on hold on.  I'm trying to trace

13    where --

14        A.    I don't recall that one's a curious case

15    because it's again -- well gawker went down in 2016,

16    2015-2016 so it's been almost ten years.

17        Q.    Let me put it this way.  Okay.  Did you out

18    of any of your accounts pay your lawyers that

19    represented you in the gawker litigation?

20         A.    It's a good question.  I don't remember.

21         Q.    Were they paid out of were the lawyers paid

22    out of any of the proceeds from your gawker lawsuit?

23         A.    It's a good question.  I don't remember.  I

24    think what happened this has been now a few years but I

25    think what happened was when gawker went belly up when

180

1    it went when it went bankrupt there were a number of

2    claims that the lawsuits were I have encouraged a

3    number of people to sue gawker and so they have sued

4    gawker and each had a claim when the assets were bought

5    up by union investigation or universal media -- no

6    union vision media group and when they were bought up

7    there were these dedicated trust accounts that were set

8    up with the proceeds of when the assets got sold.

9    Okay?  And when that happens, my lawyer had access to

10   that and then he gave me I presume he took out his fee

11   I don't recall but he that was the whole process at the

12   time.

13        Q.    What you /*R what year did you get those

14   proceeds from gawker?

15        A.    Well Mr. Teal owed me some money because we

16    were --

17        Q.    Objection, nonresponsive.

18        A.    Yeah.

19        Q.    What year?

20        A.    Oh, that would have been 2015.  2015-2016.

21    Yeah.

22        Q.    What bank account would you have deposited

23    those funds?

24        A.    Don't recall.  I don't know.  It's been now

25    a number of years.

                                                        181


1         Q.    Let's --

2         A.    I think it could have been CitiBank it

3     could have been I believe I had a Bank of America

4     account but I'm not totally sure oh it could have been

5     first foundation but my my then wife handled all of

6     that at the time and so my recollection of this is that

7     the whole purpose of it was to destroy gawker and any

8     money that we made from it was incidental to the

9     operation and then teal was so overjoyed at me having

10    bankrupted gawker and having worked on that he owed me

11    a million dollars or so like it was like a million five

12    for various things that I had put on my own that I had

13    basically financed and then he in turn agreed to invest

14    in UAI or and a few other things for me and so that was

15    that would have been 2015-2016 time frame yeah.

16        Q.    Try to just /T-PBS answer the question I

17    ask.

18        A.    Okay.  Go ahead.

19        Q.    You said your wife isn't financially

20    sophisticated?

21        A.    She's not.

22        Q.    Now you're saying that she handles your

23    finances?

24        A.    No I'm saying.

25        Q.    Or handled them in 2015?

                                                        182


1        A.    I was saying yes, that's the major reason

2    he's not financially sophisticated and what happened

3    was da.

4        Q.    I --

5        A.    That account that money that was going on

6    there I put it into some some kind of trust or

7    something like that but it /STP really matter anyway

8    because been it's been nine ten years.

9        Q.    Did you use any of the gawker proceeds to

10    invest in clear view off ram man Dell you were fra pay

11    depth ap ter a?

12      A.      I don't remember if I did or not I think I

13   might have gotten some consulting money at the time and

14   that that made a lot of it but some of these companies

15   I started and so typically the way it works when you

16   start a company is that you know you decide like hey

17   off ram shares are worth ten bucks or whatever you

18   decide something and then you invest or sometimes you

19   just start the company de no vo so it really depends on

20   what's going on each of those is a specific case in the

21   terms of pa a la staff yeah the pa a la investment

22   comes from when Palmer gave me the million particulars

23   for selling him back my shares in on dral much of that

24   was a handshake sort of deal and so the Traitwell stuff

25   comes out of that money from Palmer.  Palmer owed me

                                                    183


1   more money, but I thought that it was wise to sart of

2   financially separate from him because of our agreements

3   around well we had a lot of disagreements on a lot of

4   things so.  Lovely guy nice guy nice family but you

5   know sometimes it's best to have people as friends not

6   as business associates.

7      Q.      So let's talk about the off ram stock a

8   little bit.

9      A.      Mm-hmm.

10      Q.      Okay.  I just a want a time period I don't

11      need commentary here.  When did you first try to sell

12      or monetize any of the off ram stock?

13      A.      Oh I've been trying to sell the off ram

14      stock for two years now three years.  Yeah.  Would have

15      been, oh dear, it would have been in 2021 when I tried

16      to sell my stock maybe 2020 late 2020.

17      Q.      Did you ever --

18      A.      Whenever you remember whenever that was

19      that big ice storm that big Texas storm whenever that

20      was that was when I wanted to be out of off ram

21      entirely but David would not allow me to sell my stock

22      there's a restrictive covenant on it.

23      Q.      David is David Mittelman?

24      A.      Mm-hmm.  I mean precisely David's wife who

25      now also works for the company Kristen Mittelman did

184

1       not want me to sell the stock because they thought

2       would it have a negative market Signal they were trying

3       to raise around or something to that effect.

4       Q.      When was the first time you actually

5       entered into a written agreement to sell the off ram

6       stock?

7       A.      Well almost all of our David and my

8    communications tapes on Signal so that would have been

9    well, we started the company in 2018 so it would have

10   been mid midpoint 2020 when we had a real conversation

11   about it I was very uncomfortable with the direction

12   the company was going in in 2020.

13        Q.    That's not my question.  When's the first

14   time you had any signed written document, contract

15   agreement?

16        A.    So I had we didn't typically do it that way

17   so most companies that I affiliate with with /KEPGS now

18   of off ram because off ram since has raised a round so

19   David went from being the largest majority shareholder.

20        Q.    Mr. Johnson?

21        A.    Yes.

22        Q.    It's just a simple question.  When was the

23   first time you had a written contract agreement some

24   type of document where there was or the agreement to

25   sell the off ram stocks?

                                                      185

1         A.    We entered into an agreement in November of

2    last -- I believe it was last year so he what he did

3    was he convened a board meeting the board agreed to buy

4    my shares and buy the totality of my wife's shares

5    ex-wife's shares everybody's shares that process

6    started in November I want to say it was November 10th

7    of 2024.

8        Q.    So right after this lawsuit was filed?

9        A.    It would have been well the conversations

10   began in the summer but it would have started in

11   November of 2024 yeah in earnest because he had to call

12   a board meeting to do it he couldn't just sell he

13   couldn't just use the stock of the -- the cash on hand

14   to buy it.

15       Q.    So again when is the first time --

16       A.    I can't you yeah it would have been

17   November a written a written thing where he con venes

18   the board would have been November 2024.  A discussion

19   about selling the stock generally which was written

20   because these are written these are written things like

21   they are if somebody kept my Signal messages was

22   probably March or April of 2020.  So we'd had a

23   discussion over the years of sell the stocky talk to

24   him quite often about sell the stock.

25       Q.    When was the first time was there ever you

                                                    186

1    know the stock purchase agreement that you were trying

2    to get to go through just recently, you know that one

3    we're talking about?

4       A.      I do I'm familiar with it, yes.

5       Q.      Was there ever a written /TKPWRA*EUPLT

6    agreement where both sides greed to the terminates and

7    signed it other than that one?

8       A.      Well when we started the company there was.

9       Q.      No, well you were selling?

10      A.      Oh when I was selling no no there was no

11   written there was nothing there was nothing that had

12   board approval I asked him to go to the board November

13   10th, 2024, to liquidate my entire position as well as

14   the position of my ex-wife and daughter.

15      Q.      Did you ever try to sell your stock just

16   electrical to Steve os quee?

17      A.      No as far as I know, no.

18      Q.      How often do you speak with him?

19      A.      I haven't spoken to him in a long time

20   maybe three or four years yeah he's under investigation

21   so I I won't be talking to him.

22      Q.      So since let's talk 2025 okay?

23      A.      Mm-hmm that's easier to remember.

24      Q.      Names just names okay?

25      A.      Mm-hmm.

                                                        187


1       Q.      Name all the people that you contacted

2    about selling the off ram stock?

3        A.    Well the main person would have been David

4    Mittelman he and later I spoke with the general counsel

5    I think his name is Robert pru sell, pru sell and that

6    would have been over email there was no phone call

7    conversation with him about that and then in terms of

8    Burbank I didn't speak to him about selling it I didn't

9    talk to Steve orbly I didn't know all of that was dealt

10   by David and David's wife presumably because she deals

11   a lot with the board but I didn't talk to her either

12   about I I just talked to David.

13       Q.    Can you produce any communications where

14   you said you wanted to sell this stock for your wife

15   and children or child?

16       A.    I can't produce any communications but he's

17   aware of them yeah.

18       Q.    So do you have any written communications,

19   email, texts, Signal, where you tell off ram or anyone

20   that the purpose of the sale is to support your wife

21   and children and that's something that you can produce?

22       A.    Yes, I think there are emails /TOPBGT

23   effect but I don't I don't recall like I don't recall

24   what exactly they say but they say something to that

25   effect what I wanted to do was --

                                                     188

```
 1      Q.     Hold --

 2      A.     Yeah.  So if you're forming a separate

 3   company.

 4      Q.     Hold.  Objection, nonresponsive?

 5   BY MR. THOMPSON:

 6      Q.     Did you produce those emails?

 7      A.     Here or where?

 8      Q.     Ever to the plaintiffs in this case?

 9      A.     No I did not.  Nor would I because it's not

10   relevant.

11      Q.     I'm just going to ask you because when this

12   case started you made bragged or you know said that you

13   love discovery because you record everything and you

14   take screenshots of everything.

15      A.     Mm-hmm that's right.

16      Q.     You haven't produced anything with

17   Mittelman related to off ram or any of this stuff?

18      A.     No no because --

19      Q.     So hold on in three sentences and 30

20   seconds how do you explain that?

21      A.     Oh very simply Mr. Musk is underwriting

22   Mr. Lambert in this lawsuit Mr. Os quee who is on the

23   board of off ram is a good personal friend of

24   Mr. Musk's and does business with him so I have no
```

25    interest in in providing any information to Mr. Os key

&#9650;

189

1    also owes me money so why would I tip off my hand there

2    no on the contrary I I don't want to engage with people

3    that I don't think are responsible architects.

4        Q.    So I'm going to objection, object as

5    non-responsive.  So communications let's take

6    communications with David Mittelman you said you

7    conducted those via Signal.

8        A.    That's right.

9        Q.    All right.  Earlier you said that you

10   record everything to screenshots of everything.

11       A.    That's right.

12       Q.    So those are in conflict?

13       A.    They're not at all.

14       Q.    That statement --

15       A.    Everything you do on Signal so Signal has

16   received a grant from the State Department anything you

17   do on Signal is recorded by the government so perfectly

18   consistent to use Signal for everything.

19       Q.    You said that you screenshot you personally

20   screenshot Signal messages?

21       A.    Yeah so I took --

22       Q.    Hold on?

23      A.      Yeah.

24      Q.      And you've posted Signal messages before?

25      A.      I have.

190

1       Q.      Right?

2       A.      Right that's true.

3       Q.      So my question is you say you've screenshot

4   all your Signal messages and you record everything you

5   said that right?

6       A.      That's correct, yeah.

7       Q.      Okay.  So I'm trying to figure out when I

8   ask fore all your communications with --

9       A.      No no to be precise.

10      Q.      Hold only this is important?

11      A.      No you asked for all my communications

12  regarding Mr. Musk I'm regarding things that were not

13  germane to this case and I made an objection at the

14  time and I said then and I say now that I would have

15  been happy to participate in any discovery that was

16  reasonable and limited in scope and you decided instead

17  to throw everything relied to Mr. Musk in there and

18  obviously we know that that's because Mr. Musk is under

19  federal investigation at the time and continues to be

20  under federal investigation if I recall correct l I.

21    Q.    Did you ever make a motion for a protective

22    order to argue that the --

23    A.    O no the da.

24    Q.    Hold on.  It's out of respect for the court

25    reporter.

191

1    A.    Of course.

2          THE REPORTER:  Thank you.

3    BY MR. THOMPSON:

4    Q.    Did you ever file a motion for a protective

5    order to say that the discovery was over-broad or too

6    burdensome?

7    A.    I didn't file a motion, but I made it clear

8    over and over again in open court and it's part of the

9    brief that's before the Fifth Circuit.

10    Q.    Did you file a motion yes or no?

11    A.    No as far as I know, no.

12    Q.    Did you screenshot your -- you said I was

13    right when you said you screenshot all of your

14    conversations that you have on Signal?

15    A.    No not all of them I would say that I

16    probably screenshot fewer than 10 percent of them but

17    most of the ones with Mr. Lambert I have screenshotted

18    as with Mr. Burbank.

19       Q.    Have you communicated with Mr. Burbank

20    about this case?

21       A.    I have not I sent him a message --

22       Q.    Yes or no?

23       A.    No well, not about this case but he could

24    interpret it that Iowa I sent him a message recently

25    telling him that all was forgiven.

                                                    192


1       Q.    Did he reply yes or no?

2       A.    He read et but he did not reply to it.

3       Q.    I'm going to hand you an excerpt of a we're

4    not going to mark this as an exhibit.  It's docket

5    entry 116.  Make sure you got the right one.  There's

6    some writing I did today, but I do want you to take

7    that?

8       A.    Okay.  Embed.

9       Q.    So hold on.  Do you see this is a email

10    chain with you and David middle man and looks like Rod

11    Purcell amongst others?

12       A.    That's right yep.

13       Q.    Okay.  Do you remember when I sent an email

14    to you asking for if you were trying to sell any of the

15    off ram stock?

16       A.    Yes and I did not reply if I recall

17    correctly.

18        Q.    Why wouldn't you answer that?

19        A.    Because it's not germane to you and because

20    the off ram company in question has a lot of interest

21    in relationships with the federal government and when

22    that's all said and done we're going tooz what happens

23    with off ram long story short off ram has a cleanup

24    process it's going to undergo.

25        Q.    All right let's go to looks like this is

                                                    193

1    going to be appendix Page 4.

2        A.    This one?  Can we enter this into the

3    record?  Is that object I don't have any control over

4    it do you have any objection to entering this into the

5    record.

6        Q.    What do you want?

7        A.    The whole thing in the record make it an

8    exhibit.  Thank you.

9            (Marked Deposition Ex. 12)

10    BY MR. THOMPSON:

11        Q.    It's already in the record in the case

12    that's why?

13        A.    Well, I mean, I'd like it as an exhibit as

14    well.

15    Q.    Tell me when you are ready to discuss?

16    A.    Go ahead.

17    Q.    Okay.  Page 4.

18    A.    Mm-hmm.

19    Q.    It says wire instructions?

20    A.    That's right.

21    Q.    Is that a screenshot from your phone north

22    that's not from my phone that's from somebody else's

23    phone but that is the account that I provided?

24    A.    You provided that screenshot in an email to

25    looks like rob Purcell who is representing off ram.

                                                        194


1    A.    I think actually that E -- that comes from

2    David Mittelman but I'm happy to claim ownership for it

3    was not -- I did not screenshot it no but I'm happy to

4    take responsibility for having sent that information

5    over to Mr. Mittelman.

6    Q.    Well, you can read through the email thread

7    and --

8    A.    Yeah so if you look at it.  Yeah I think

9    this is kind of cut but whatever it doesn't matter they

10    got it and they said that they wouldn't do it because

11    of the judgment and the order and I said no problem the

12    they still have to pay the money to my ex-wife and

13    daughter which is the last communication I had with

14    David.

15        Q.    So I am going to object as non-responsive.

16    Let's just answer my questions.  Okay?

17        A.    Yeah go ahead.

18        Q.    I want us out of here by 5 so you can catch

19    the flight that, da?

20        A.    I don't have a flight somebody has /ARPGD

21    for my hotel to be so I don't have a flight.

22        Q.    The same person you had to ask for

23    permission to stay here?

24        A.    Different person.

25        Q.    Okay.  Who provided the screenshot?

                                                        195


1        A.    In this case I think it was Mittelman but I

2    don't know.

3        Q.    What's the source, David Mittelman --

4        A.    David Mittelman took the screenshot sent me

5    the screenshot and I believe that I embedded it in the

6    email.

7        Q.    So this is David Mittelman set up JXC?

8        A.    No.

9        Q.    Okay that's my question.

10        A.    Who set up JXC is your question?

11    Q.    Yes?

12    A.    It was not me.

13    Q.    It was not you?

14    A.    It was not me.

15    Q.    Did anyone at your direction set up JXC?

16    A.    No no one at my direction set it up

17    somebody set it up for me.

18    Q.    That's my question.

19    A.    Yes.

20    Q.    What's your relationship to JXCLLC on page

21    Exhibit -- hold on hold on.

22    A.    Go ahead.

23    Q.    On in Exhibit 12 on appendix 032?

24    A.    Okay.

25    Q.    What is your relationship direct or

                                                    196

1    indirect with JXCLLC?

2    A.    It was it is a bank account number that was

3    set up for me not at my direction.

4    Q.    JXCLLC is a bank account number?

5    A.    No JX LLC that entity and that business

6    account and that address all of that was set up by

7    somebody else.

8    Q.    So my question is just simple, okay, what

 9   is JXCLLC?

10        A.    It is an entity that was created for the

11   purpose of receiving proceeds from for the off ram case

12   but I don't know who owns it and I don't know who

13   controls it.

14        Q.    So you had nothing to do with JXCLLC

15   getting set up?

16        A.    Correct that's not I had nothing to do with

17   it getting set up.

18        Q.    When did you first learn that it was set

19   up?

20        A.    When I was directed to send it to David

21   Mittelman.

22        Q.    It wasn't your decision to set up a JXC or

23   any LLC in Wyoming?

24        A.    No and I've never been to Sheridan Wyoming

25   in my life my grandmother's from Cheyenne.

                                                        197

 1        Q.    Did you direct anyone to set up JXCLLC or

 2   any LLC in Wyoming?

 3        A.    I did not, no.

 4        Q.    Did you know that anyone was setting up

 5   JXCLLC or any LLC that would take the proceeds of the

 6   off ram stock?

7      A.    I only knew of it when I was given that

8  information and told to send it to David Mittelman and

9  I did as I was told.

10      Q.    So you had zero involvement in the creation

11  of this?

12      A.    Correct I had zero involvement in the

13  creation of the doc -- of the LLC, yeah, zero

14  involvement.  I -- yeah.  I wasn't involved with it.

15      Q.    Who set it up?

16      A.    Was set up by one of the many people that

17  helped me in the federal government.  It's not me.

18      Q.    Did you tell or instruct these unnamed

19  people to set up an LLC for you?

20      A.    I did not, no.

21      Q.    You didn't ask them to set up an LLC for

22  you?

23      A.    No, I didn't.

24      Q.    Would you have access to the funds?

25      A.    I don't think so, no.  As far as I know,

                                                198

1  no.

2      Q.    So this Wells Fargo bank account ending in

3  6018 do you see that?

4      A.    I do.  Business checking account on Page 4

5      appendix 032 yes I see it.

6          Q.      Did you have any ability do you have were

7      you going to did you believe you would have any ability

8      to access either the account or any funds in the

9      account?

10         A.      I did not access it.  I -- you asked me

11     like a compound yes so I had no involvement whatsoever

12     in setting up the account I had no expectation of

13     receiving proceeds from the account I had no connection

14     with the account other her other than the minimal

15     amount that required me sending it from there to David

16     Mittelman.

17         Q.      So if the stock transaction had been

18     consummated for a million dollars are you with me

19     there --

20         A.      Mm-hmm.  I'm following yeah.

21         Q.      The proceeds would have gone to JXC and the

22     Wells Fargo bank account ending in 6018?

23         A.      That's right yep.

24         Q.      And your testimony today is that you would

25     have no ability to access that money?

                                                        199


1          A.      As far as I know, I would have no ability

2      to access it, yes, that's my testimony.

3      Q.      Would anyone that you are related to or

4    married to have any affiliation being able to access

5    that money either for you or for themselves?

6      A.      As far as I know, no.

7      Q.      Can you identify today any other bank

8    account that you wanted the off ram stock proceeds to

9    be deposited in?

10     A.      No, I mean, there is no one other hasn't

11   that.

12     Q.      I mean, you didn't give Othram or its

13   lawyers your /WOEFRT bank or the bank at Walmart?

14     A.      That's right yeah I did not do that.

15     Q.      Why didn't you give them that?

16     A.      Because I was not instructed to do that.

17     Q.      So you don't have this account access

18   information?

19     A.      No I have no -- the first time I saw it was

20   when I was instructed to send it to David Mittelman and

21   then I sent it to David Mittelman and he replied that

22   he'd received confirmation of it, he then screenshotted

23   it he then sent me the screenshot back to double-check

24   it I then said yes that looks good and then that was

25   the grand total of my interactions with that

                                                          200

1    information.

2        Q.    Who gave you the information?

3        A.    Who gave me the screenshot or what.

4        Q.    Know who -- what person --

5        A.    Somebody connected with the federal

6    government.

7        Q.    So did a person let me this is going to be

8    a yes or no so did a person, did a person give you the

9    information JXCLLC and the Wells Fargo bank account?

10       A.    Yes.

11       Q.    Okay.  Did you have any part roll in

12    setting up JXC?

13       A.    No none.

14       Q.    Okay did you have any role in setting up

15    Wells Fargo Bank account end in 0618?

16       A.    No.

17       Q.    It just sat -- how did you learn this

18    information?

19       A.    It was given to me by somebody involved

20    with the federal government and they asked me to then

21    relay it on to David Mittelman and I did.

22       Q.    How was it transmitted?

23       A.    I don't.

24       Q.    Are you going to give the name of that

25    person?

↟

201

```
 1      A.    No I am not.

 2      Q.    Do you know the name of the person that

 3   gave I to?

 4      A.    I do but no, I'm not going to.

 5      Q.    But you do know the name of the person?

 6      A.    I do know the name of the person, yeah.

 7      Q.    And just to be like ultra clear because

 8   your testimony under oath is that you had and do not

 9   have any present ability to access that /WOEFG account

10   and would not have had any ability to access --

11      A.    To answer your question I've never been

12   involved with it I have no access to it I have no plans

13   to have access to it I have no involvement with it.

14      Q.    If the Othram stock proceeds a million

15   dollars had been transferred to that Wells Fargo bank

16   account could you have accessed it for yourself or your

17   ex-wife or daughter?

18      A.    No.

19      Q.    That's your testimony under oath?

20      A.    Correct yes.

21      Q.    Are you hur sure of it?

22      A.    Yes I'm sure of it.

23      Q.    So you had no intention I guess if you
```

24    never could have accessed the account you had no

25    intention of ever spending any of that Othram money on

202

1    yourself or giving it to your ex-wife or daughter?

2         A.    I believe my ex-wife is band from Wells

3    Fargo and I am as well band from Wells Fargo so neither

4    one of us could have accessed it even if we with a with

5    aed had wanted it to.

6         Q.    So the money --

7         A.    To be precise the money that was that would

8    have been sent like I guess is probably hypothetical

9    but the money that would have been sent we would have

10   had no access to.  Zero.

11        Q.    And by we you mean yourself darns?

12        A.    My ex-wife my 8 year old daughter and me

13   none of us would have had access to it.

14        Q.    That's your testimony?

15        A.    Correct.  Under oath.

16        Q.    So I was speaking over you a little bit and

17   I /POLGDZ?

18        A.    Yes to be pre sizes to be pre cease just so

19   re-/WAOEPT ourselves over and over again to be precise

20   neither my ex-wife nor my 8 year old daughter nor I

21   would have had any access to that account.

22      Q.      Even if and it would have you, you your

23   ex-wife your daughter would have no access to that

24   Wells Fargo account ending in 6018 even if the Othram

25   transaction had been consummated and a million dollars

↑

203

1    had ended up in this Wells Fargo?

2        A.      Correct none of us would have had access to

3    it.

4        Q.      So that transaction would have benefited

5    you in no way correct?

6        A.      Correct.

7        Q.      I'll be precise.  The stock purchase

8    agreement where the Othram stock in the three trusts

9    that sale would you have had no, no benefit or interest

10   in that?

11       A.      Correct I would have that money would have

12   gone to an account I I don't know if I would have ever

13   seen that money again probably not likely not.

14       Q.      Is there do you have any reason tong or an

15   expectation or a belief that whoever controlled that

16   account would give you your ex-wife or your daughter

17   the funds from it?

18       A.      I have no expectation or belief about that

19   no.  In fact on the contrary I think they would

20    precisely have not given me the money from that so long

21    as there was a $71 million judgment against me it was a

22    measure to preserve assets not a measure to spend them

23    down.

24        Q.    By preserve assets do you mean to place the

25    $1 million beyond the reach of point breath capital and

↑

                                                              204

1     Hal Lambert to satisfy the judgment in this case?

2         A.    No, I expected fully that the receiver

3     would have access to it it's not hard for them to have

4     access to it.  And I expected to be asked about it and

5     candidly I expected rob Purcell who worked very closely

6     with Mr. Burbank and I expected the board who works

7     very closely with Mr. Musk and the form /STAOEFP orbly

8     I expected them to go to people like you and to make a

9     big deal about I or you to go to them either way and I

10    expected to be having this conversation and for you to

11    be extremely bee Willarded about what actually was

12    going on because you don't really understand how the

13    system works.

14        Q.    So this screenshot where it says wire

15    instructions, you received this screenshot from a

16    someone in the some associated with the federal

17    government via Signal?

18      A.      Correct.

19      Q.      And then you provided that screenshot

20  information to David Mittelman via Signal?

21      A.      Correct.

22      Q.      And then he somehow copied it into an

23  email?

24      A.      Correct.

25      Q.      That's the chain of custody?

↟
                                                        205


1       A.      Yeah I believe I sent it back to him we

2  double confirmed it but yes, it there that Signal that

3  Signal screenshot went back and forth between me,

4  Chris -- an individual in the federal /SROFT Chris to

5  me then me to Mittelman then me back to Mittelman than

6  me in this particular case yes something to that

7  effect.

8       Q.      So who would ultimately get the million

9  dollars the if the sale went through of the Othram

10  stock?

11      A.      Well ultimately when this case would be

12  overturned presumably I would but I don't know.

13  Candidly I don't really care that wasn't what I was

14  instructed to care about.

15      Q.      Why do you say presumably if you prevail on

16    this appeal and the judgment's overturned why do you

17    think that you would be entitled or get access to that

18    million dollars?

19         A.    That's just an educated guess on my part it

20    depends when an operation concludes /T*EURP what

21    happens is there's a disbursement of proceeds and this

22    would have been included in that disbursement most

23    likely.

24         Q.    Why would you /TKARS?

25         A.    Baugh I yeah why would I get access to it

                                                                206

1    because I'm in/TKPWAEPBLGD in the operation I'm doing

2    the work just like we all are of showing up here and

3    participating.

4         Q.    Sort of like compensation for your effort

5    in --

6         A.    No not compensation that's the wrong

7    phrase.  It's thinks about it like if you're ticking

8    down, taking down a ga sell or you're taking down a

9    willed beast or buffalo or whatever people get get to

10    divvied up after the operation is concluded but in

11    general one of the reasons that we did this was that

12    there's an expectation that I will be involved in a new

13    venture involved with gentlemen no mix and there would

14    be a conflict of interest in me continuing to have any

15    ownership interest with Othram so this was as much to

16    put it beyond my reach as it is to put it beyond

17    Mr. Lambert's reach so it's a way of preserving the

18    assets so that the assets can then go where they're

19    supposed to go where this process concludes.

20        Q.    So the underlying purpose of this

21    transaction --

22        A.    Which didn't go through.

23        Q.    Which didn't go through but the transaction

24    for the Othram stock to be deposited in an account

25    belonging to JXC LLC with the Wells Fargo bank account

                                                    207


1    of 6018 was so that that million dollars or the Othram

2    stock would be placed beyond the reach of Hal Lambert

3    and Point Bridge Capital in execution of this judgment?

4        A.    And beyond the reach of Charles Johnson no

5    no it's their -- these assets are being preserved

6    because Mr. Lambert has a number of debts, he is

7    currently facing hundreds of issues.

8        Q.    Mr. Johnson?

9        A.    Yes.

10        Q.    This is yes or no?

11        A.    No it's not a yes or no it's about

12    preserving an asset general a I'm making sure it's

13    beyond the reach until this court matter is concluded.

14       Q.    We'll qualify it with -- we'll go through

15    that.  Okay but the present intent or purpose --

16       A.    There's no present intent right now there

17    was at the time I received a -- a Signal message

18    instructing me to send this message to Dr. David

19    Mittelman I sent the message Mr. Mittelman then told me

20    to go talk to the attorneys there, I had a series of

21    emails with those attorneys you're privy to those

22    emails they're present right in front of me we had a

23    discussion David Mittelman and I he said he was going

24    to do what his lawyers instructed him to do I said I

25    will likely retain lawyers to help me on this the

                                                    208


1    person I looked at re-/TAEUPBGT was tore he can land.

2    Tore he can land or there was a big dispute within

3    clear view about tore he can land being represented

4    with me they said there was a conflict of interest

5    Mr. He can land said that he could not represent me and

6    I said no problem that it looks to me like the clear

7    view lawyers and the plane best of my knowledge capital

8    lawyers are colluding and that's fine you've given me

9    information that's sufficient here wish you well Mr. He

10    can land.  I theen communicated back and forth and said

11    you know 1346 this money is actually my daughter's and

12    ex-wife's maybe you could just portion that out and

13    leave my stuff beyond you know basically exposed and

14    Mr. Mittelman said he would look into that and I have

15    not heard back from him since so his position his

16    posture is to basically do nothing until the court

17    matter ends.

18         Q.    So yes or no Mr. Johnson one purpose or

19    within intent behind the sale of the Othram stock was

20    to place it beyond the reach of Hal Lambert and point

21    bridge capital until after the Fifth Circuit rules on

22    your appeal?

23         A.    No.  Until the court matter is concluded

24    until the operation is finished.

25         Q.    Okay.  So one purpose or one of the intents

                                                        209

1    behind the sale of the Othram stock is so that the

2    proceeds of it would be placed beyond the reach of Hal

3    Lambert and the plaintiffs until --

4         A.    And the defendant.  Yes.

5         Q.    Until after the matter has concluded both

6    this case and some operation that you're referring to.

7         A.    Correct.

8      Q.      And your expectation was that after the

9  court case is resolved after the operation is resolved

10  you had an expectation that you would get the proceeds

11  of that of the sale of the Othram stock?

12      A.      No I did not have that expectation.

13      Q.      I thought you said when the operation

14  conclusion?

15      A.      Whoever is running the operation decides

16  how it's /TKAEFD up the resources that are finished so

17  maybe it would go to me maybe it would go to somebody

18  else maybe it would go to another operation it's sort

19  of I am.

20      Q.      Can I say that you had an expectation that

21  after the operation was closed after the Court case was

22  resolved that there was a possibility that you would

23  get some or all of the proceeds?

24      A.      No because that's not how it works.  So

25  when operations are concluded, you're then told what

                                                      210

1  your next assignment is or what you're working on so no

2  I had no expectation of that.  I was going to do

3  precisely what I was instructed to do no more and no

4  less.

5      Q.      But we do agree that at least one purpose

6   not necessarily entire purpose of the transaction was

7   to prevent Hal Lambert and point bridge capital from

8   executing on any asset or money?

9        A.    The purpose of putting this into a Wyoming

10   trust was to make it so that the asset would be per --

11   preserved as in Mr. Lambert couldn't take it and then

12   spend it to deal with his other complications like his

13   legal bills or whatever and the purpose was to place it

14   beyond reach of either Mr. Lambert or me to literally

15   make it so that I was deacon /TPHREUBGTD and so could

16   not act in any way around that asset.

17        Q.    So your position or the position of your

18   people running this government operation is that Hill

19   and the plaintiffs are not entitled to any of the

20   Othram stock or any of the proceeds of the sale of that

21   Othram stock?

22        A.    That's not my position.  My position is

23   that when the court matters are concluded the assets

24   will be /TKAEFD up to everyone that they're supposed to

25   go to and it's not concluded yet or -- or when the

                                                        211


1   operation generally is concluded.

2        Q.    That's exactly -- okay.  So I'm foreclosing

3   to try to make that clear.

4           So, before the operation is concluded or

5    before the --

6       A.    Yes.

7       Q.    -- court matter is resolved, your position

8    is that Hill and the plaintiffs are not entitled to the

9    proceeds of that Othram stock or the stock itself?

10      A.    That's correct.

11      Q.    And the purpose of this transaction using

12   JXC the Wyoming LLC and the Wells Fargo bank account

13   was to prevent Hill and the plaintiffs from executing

14   on that stock or those proceeds before the matter the

15   court case concluded or before the operation concluded?

16      A.    That's a fair way of putting it but it

17   was -- it's about assess preservation.

18      Q.    I'm going to object to everything after --

19      A.    Yeah.

20      Q.    Afternoon?

21      A.    That's a fair way.

22      A.    I mean I think it's asked and answered but

23   we can do it again if you want we can go through it

24   again if you want.

25           MR. THOMPSON:  Let's take a break.

                                                        212

1            THE VIDEOGRAPHER:  We are going off the

2    record at 1:55.

3            (Break from 1:55 p.m. until 2:08 p.m.)

4            THE VIDEOGRAPHER:  We are back on the

5    record at 2:09.

6    BY MR. THOMPSON:

7        Q.    Mr. Johnson are you ready to continue?

8        A.    Sure.

9        Q.    During the break I think you said you

10   mentioned you got upgraded into a better hotel?

11       A.    I did.  Did.

12       Q.    Are you having to pay for it out of your

13   own funds directly or indirectly?

14       A.    Nope.

15       Q.    It's a government contract paying for it?

16       A.    I don't know.  I guess on some measure or

17   it's with points they upgraded me through the points

18   system.

19       Q.    You but won't identify who is paying for

20   your hotel room?

21       A.    I don't know who is paying for it.

22       Q.    You don't know?

23       A.    No.

24       Q.    Okay.  Would you go to Exhibit 12 which is

25   /KOBGT entry 116 we've been talking about it.  You've

213

1   got anytime front of?

2       A.      I've got anytime front of me yes.

3       Q.      Question if you can just go through the

4   whole document and where it says like the email

5   address --

6       A.      Have we not asked and answered this one

7   counsel do with he need to do it again.

8       Q.      I'm just going through parse?

9       A.      All right what are you curious about do you

10  want to go from the end the beginning or where would

11  you like to go.

12      Q.      First review it and where it says Charles C

13  Johnson 88 at Gmail.com?

14      A.      Which one is that it's at the top.

15      Q.      Why /TKWAO you start at the back in

16  chronological order?

17      A.      Which page is it on?

18      Q.      Probably starts since this is a snippet

19  APPX035 so it's actually pages 1 through 7 I'd start on

20  page I think 6 is maybe the first email exchange?

21      A.      Yes I said please pay the money by the end

22  of the day is that the one you're looking at or.

23      Q.      I just want you to go through and just if

24  you can confirm that where it says from Charles Johnson

25    that's in fact your email address and you wrote that?

♠

214

1    A.    Oh, yeah that's all my stuff yeah on Friday

2    this is at 12:06 on the 26th of sent is that what we're

3    looking at.

4    Q.    I just want you to go through all of the

5    Exhibit 12?

6    A.    Yes, the entirety of what's in here are

7    things that I wrote to Dr. David Mittelman and to his

8    counsel.

9    Q.    Yes, I just wanted to crumb it's

10    accurate --

11    A.    On here is accurate and everything looks to

12    be in good working order and looks like the printer

13    even worked so we got everything in good working order.

14    Q.    All right so if we go to page 8 which is

15    appendix 036?

16    A.    That's right.

17    Q.    September 23rd at 3:59 p.m. do you see

18    that?

19    A.    Mm-hmm.

20    Q.    It says hey Heather can we please transfer

21    funds this week I need this transaction completed a sap

22    so I can go to work did I read that correctly?

23    A.    Yes that's right.

24    Q.    You did write that?

25    A.    I did write that although it's I think it's

215

1    underlined by you not by me is that right.

2    Q.    Yes?

3    A.    Okay yeah.

4    Q.    This is submitted to the court?

5    A.    I didn't want it to look like I was overly

6    emphatic about it.  Frankly I've kind of enjoyed the

7    vacation but go on.

8    Q.    Those are the words you did write?

9    A.    I did write those, yes.

10    Q.    Okay.  And then you wrote on a /STUBGT

11    about some letter that you wanted to give to Judge

12    Pittman at the conference on November --

13    A.    Oh yes well I didn't give it to him but

14    yes, I did write about it yep.

15    Q.    Do you have that letter with you?

16    A.    No I don't have any printed documents with

17    me for the reasons we aforementioned.

18    Q.    You provided an excerpt of that letter on

19    your sub stack I believe?

20    A.    I believe I took the entirety of it.

21      Q.      That's my question?

22      A.      Yeah it's in entirety yes.

23      Q.      So is the question that my question is what

24   you posted on your sub stack is a complete and verbatim

25   copy of what you were going to give to Judge Pittman in

216

1   open court?

2       A.      It may be slightly edited but the gist of

3   it is correct yes, I think I might have edited it

4   because I think I node you a if.  But stylistic and

5   link business particularly the gist of it assist.

6       Q.      Other than typos the substance everything

7   is /TKAFRPLGTS?

8       A.      The substance is more or less accurate

9   yeah.

10      Q.      Okay.  So you were going to tell excuse me.

11   So you were going to tell are judge Pittman this is yes

12   or no my ex-wife and daughter were in need of cash as

13   they're home had been burgled and I wanted to move them

14   to safer /KPHAO indications?

15      A.      That's right.

16      Q.      And then you said I myself want to get

17   remarried and to move in with my partner and the money

18   offered here will give me an opportunity to marry her.

19      A.      Thaws, yes.

20      Q.      Those are two statements you intended to

21      tell judge judge Pittman and be under oath?

22      A.      That's right yep.

23      Q.      Okay.  You stand by everything in that

24      letter?

25      A.      No.

217

1       Q.      Actually?

2       A.      -- I don't actually there are a few things

3       in it that I've since learned were mistakes.

4       Q.      The things I just read to you you stand by

5       them?

6       A.      The things you just read to me I stand by

7       but they were not selling me Othram stock would not

8       have guaranteed that those things would have happened

9       if that's the question you are asking.

10      Q.      That was my question.  Those were the

11      statements that you wanted to give to judge Pittman --

12      A.      Correct.

13      Q.      -- and --

14      A.      But did not give him just put it up on my

15      sub stack.

16      Q.      And you wouldn't have been trying to

17    mislead or deceive judge Pittman?

18        A.        No on the contrary I think there's one

19    thing in there that I was mistaken on and so special

20    agent Johnathan Buma contacted me the other night and

21    said that he wasn't trying to go to work for Mr. Musk

22    and so he wanted that on record or Mr. Teal I want that

23    or /*R on record as well he said he wasn't doing that I

24    have no reason to doubt him but somebody told me that

25    he was an I /RAEP will so you know we're going to give

218

1    him the benefit of the doubt on that I think I think

2    that's fire and I should /PEURBL affix something saying

3    that I said this under oath in my sub stack tonight as

4    an update or something to that effect as nor the

5    burgled thing I did talk to my ex-wife after I'd

6    published that and she has informed me that they've

7    upgraded the security on the home so she's happy living

8    in her childhood home and as for the girlfriend matter,

9    I believe my girlfriend is quite happy with the way

10    things are going and we're not in any hurry on any of

11    the other stuff we have some other concerns at the

12    present.

13        Q.        Are you serious with your /TKPWEURPBLD?

14        A.        Serious enough.

15    Q.    Are you guys going to get a police

16    together?

17    A.    No not immediately.

18    Q.    When was your ex-wife's house burgled?

19    A.    Oh, it would have been three or four years

20    ago now no it would have been maybe two years ago the

21    house was broken into quite often unfortunately it's

22    and there was some police reports filed about it I

23    think it's been broken into like three or four times in

24    the last 20 years.

25    Q.    20 years?

219

1    A.    Yeah.

2    Q.    Okay.  But the -- the incident you were

3    referencing in that letter was --

4    A.    Yeah that took place about a -- two years

5    ago I think that.

6    Q.    Okay.

7    A.    Yeah so these all right everything is okay.

8    Q.    When was the last time you had a Signal

9    asset sent a Signal chat or received a Signal chat from

10    David Mittelman?

11    A.    Must have been ten days week or a week ago

12    maybe /SHRAOEUBLGTS more than that he told me is he was

13    just going to wait on what the outcome here was is

14    that's fair enough wish you well David's wife and he

15    are trying to get a big government contract so they are

16    more focused on that and candidly were they successful

17    at getting that contract the value of my stock would go

18    up so I'm noth not in in I hurry for hem toish can just

19    take their time as far as I'm concerned in fact I hope

20    they get there I hope they get it so that I collect

21    this check fatter check /SRAEUFD is very precise he's a

22    molecular gentlemen yetst by trade and they tend to be

23    re-precise so I knew anything I send date would end up

24    here so I'm pretty happy with the outcome of all that

25    and I'm happy to have it all on the record it's fine by

     ⬆                                                    220


1    me I don't need the million bucks or whatever that's

2    not it won't break the bank.

3         Q.      And that the transaction the stock purchase

4    agreement of the Othram stock to the Wyoming LLC was

5    that for all of the stock in the three trusts evening

6    it's darns?

7         A.      Yeah we were taking the matter one full

8    swoop.

9         Q.      So there would have been no Othram stock

10   left over?

11      A.      None of my family would have any shares

12    whatsoever in Othram but now that I'm not able to sell

13    that stock this is a key detail because this it affects

14    my position and probably affects the position of your

15    client so or your alleged client so if they're

16    successful at getting a very big government contract

17    that million dollars this they offered me I can go back

18    to the board and say well you offered it to me at this

19    when you guys didn't have this much revenue now you

20    have this revenue this stock is worth more so I can go

21    and get a bigger chunk of the equity later but /TPHOUTS

22    it's all or rond that they're on record saying they're

23    going to pay me it we're having a conversation about it

24    under the circumstances under oath I'm on camera

25    everything cool everything's gravy and so you're happy

                                                        221


1    because it wasn't transferred toen a LLC that you don't

2    control and I'm happy because it wasn't transferred the

3    you guys and spent on Mr. Lambert's other legal bills

4    or other issues everything is cool so I'm quite happy

5    with the outcome.

6      Q.      So yes or no 100 percent of the stock that

7    was in the EB white trust the /STKAEUFyer /KPAEP trust

8    the Cal rue trust or any other vehicle that that owned

 9    or possessed the Othram stock a hundred percent of that

10    was at the time intended to go through in that stock

11    purchase agreement that would have gotten where the

12    funds would have been transferred to that Wyoming LLC

13    that we've been talking about?

14         A.    So all of the stock I don't your question's

15    confused me so let me make sure that I understand it.

16    All of the interest that my family and I have had in

17    Othram would have been over the moments in which I sold

18    and took all of the stock there and sent it to the

19    Wyoming trust I would have no more relationship with

20    Othram other than like the job David high five whatever

21    would have no financial relationship whatever with the

22    Othram or the Mittelman's or any of the other players

23    there as far as I know maybe something with orb wee

24    because orb wee owes me some money and Burbank owes me

25    some money but as far as I can no the board members owe

                                                          222


 1    me money.

 2         Q.    This is Exhibit 13.

 3         A.    Okay.

 4         Q.    These are emails that you sent to judge

 5    Pittman?

 6         A.    That's right.

7        Q.     Do you recall those not that --

8        Q.     What is this executed in March cope a

9   county I didn't send this -- oh this is you this is you

10  declaration declaration I got it.  Yeah that's fine I

11  have no objection to this?

12       Q.     All right so Mr. Johnson I want you to

13  focus on it's going to be the email that you sent and

14  it's going to start on and 004?

15       A.     I see it entirely.

16       Q.     And then go through the are rest of the

17  dock here when you have reviewed it tell me appendix.

18

19       A.     Yes, I reviewed it and I recall writing all

20  this.

21       Q.     Okay that was my question those are all

22  your words they're not changed or anything except for

23  maybe some highlighting?

24       A.     That's right yep.

25       Q.     Okay.

                                                        223


1        A.     The highlighting is all yours I presume or

2   the underlining I haven't seen the highlighting

3   underlining is all you Wright okay.

4        Q.     But the words that were written are all

5    yours?

6       A.    Mm-hmm.

7       Q.    And this was sent to judge Pittman?

8       A.    That's right.

9       Q.    And you intended to be truthful and

10   accurate to him?

11      A.    That's right yep.

12      Q.    Then if you can go to page 004 appendix 004

13   I think it's the first page?

14      A.    Yes.

15      Q.    It's an email sent from you to me and also

16   CC'g Pittman orders?

17      A.    That's right yep.

18      Q.    And can you read just the first two lines

19   dear judge Pittman and then the next line?

20      A.    Dear judge Pittman also it's offensive to

21   be compared to criminals when I use a Wyoming LLC and a

22   bank account.  Mr. Thompson --

23      Q.    Wait.  Just the first two lines?

24      A.    Okay.

25      Q.    Those are the words that you wrote?

                                                    224

1       A.    That's right.

2       Q.    You're trying to be honest with the judge

3    there?

4         A.    That's right.

5         Q.    Accurate?

6         A.    Mm-hmm.

7         Q.    Not misleading him?

8         A.    Not misleading him at all.

9         Q.    Can you read the next, the paragraph

10   beginning I have worked diligently?

11        A.    Yes.

12        Q.    Thanks.

13        A.    I have worked diligently to keep my

14   finances private.  Wyoming where I spent many happy

15   summers is a great place for protecting my privacy from

16   the kind of over-broad object true stiff searches that

17   are at issue here."

18        Q.    Were you being honest with judge Pittman

19   there?

20        A.    I wouldn't say that every summer I spent in

21   Wyoming was happy but in the main I think that that's

22   correct.

23        Q.    Were you -- let me put this were you trying

24   to mislead judge Pittman in this statement?

25        A.    No.

1    Q.    Were you trying to mislead him about your

2    connections to Wyoming?

3    A.    No.

4    Q.    In any part of this email to judge Pittman

5    were you trying to mislead him?

6    A.    No on the contrary I was trying to inform

7    him but elected not to put it into the record anyway,

8    but I suppose we're putting it into the record now and

9    that's fine by me anyway.

10    Q.    And that's Exhibit 13?

11    A.    Yeah.

12    Q.    Going back to the Othram stock did they

13    give you any control over the company?

14    A.    Othram the company or Othram who which

15    shares.

16    Q.    The shares that were in the trust and were

17    getting transferred?

18    A.    No on the contrary I didn't want any

19    control.

20    Q.    That was my question?

21    A.    No I didn't want any control of Othram no,

22    no, no on the contrary.  No.  Absolutely not I'm not a

23    board member I'm not an executive there I am to the

24    extent my trusts my trusts is a shareholder there but I

25    have no involvement with the company other than to wish

226

1    them well and pat them on the back when they do a good

2    job which is often.

3        Q.    You mentioned a conflict is that because of

4    a potential future company you're thinking about or a

5    current company you have?

6        A.    I have no current company that would

7    conflict with Othram we decided David and I that

8    Traitwell was not in competition or implicate with

9    Othram there was some discussion as to whether or not

10   that would be in conflict because they're both

11   gentlemen no milk startups but they're both David is

12   interested in solving forensic cases and Traitwell is

13   not interested in that and any new company I form there

14   may well be a conflict with David's company which is

15   why I elected to execute and remove these remove

16   basically my involvement from the company.  And by the

17   way I have I want to be re-clear on the record I have

18   nothing but respect for David but there are other

19   things that need to be done in the gentlemen no milk

20   space that nobody's doing and so unfortunately I think

21   I think that that's rather unfortunate that no one's

22   coining that and so I think things should -- somebody

23   should do them and I was informed by people who are

24    engaged in the gentlemen no mix space that I would

25    'expected that I would have no other gentlemen no milk

227

1    investments were I to work on this project that they

2    would like my help on so I said all right I'm happy to

3    finally sell all my shares with Othram.

4        Q.    Is that different than Traitwell?

5        A.    It's different than Traitwell.

6        Q.    But some of the Traitwell IP might go

7    through this new venture?

8        A.    Unclear.

9        Q.    Possible?

10        A.    It's unclear because what probably not

11    because the puzzle that they've asked me the work on

12    wouldn't necessarily require that.

13        Q.    So I'm going to ask just yes or nos here.

14    Okay?

15        A.    Mm-hmm.

16        Q.    St the IP that you reference at Traitwell

17    owns is it a patent?

18        A.    It has not been patented it is a process of

19    software writing.

20        Q.    Is it a tennis shoe or did you --

21        A.    I think you could call it a tennis shoe.

22      Q.      Do you consider it confidential or

23  proprietary or unique?

24      A.      Yes, it was hard to do yes.  Yes but it

25  could well be case that with the lawsuits around 23 and

                                                    228


1   me and ancestry and my DNA it could well be that the

2   entire personal gentlemen nomics industry is illegal

3   and that it relies on personally protected information

4   and so if that's the case we're sort of waiting on

5   those court decisions then the value of the shares of

6   Traitwell would be approximating zero.  If it's not the

7   case, then the value of them and I've had conversation

8   with ancestry or whatever and whatevers answer trisity

9   or 23 and me or whatever is going to pay and I'm quite

10  happy to take that on that's fine do bother me neither

11  way.  The puzzle I've been asked to work on involving

12  jen mix the bigger puzzle is more interesting to me and

13  probably much more remunerative anyway so I would I can

14  lieu just I would like to probably sell everything I

15  own and put it all in a protected trust a /PWRAOEUPBD

16  trust or whatever and then just work on the task at

17  hand.

18      Q.      You mentioned gentlemen mix?

19      A.      Yes.

20      Q.      Does clear labs is it involved with jen mix

21   or?

22      A.      Sort of its involved with food food

23   analysis.

24      Q.      Quiv /*F give me a quick answer here.  Why

25   do you -- you talked about conflicts.  Why do you not

↑

229

1   think you needed to sell clear labs or your interest in

2   clear labs?

3      A.      Candidly I don't even know how much stocky

4   actually own in clear labs but candidly I'm happy to go

5   to sue son tomorrow and sell it if sue son would buy it

6   I think sue son is broke they have no interest in I

7   think it's like 200 grand something like that it's not

8   that much money so it's not risible to the level I'm

9   not a co-founder of clear labs I don't write about

10   things that clear labs does I have no real involvement

11   with clear labs I saw clear labs like I literally went

12   to their offices the first time like a year ago so I

13   have no involvement with them like they don't call me I

14   don't call them you know had you know Persian tea with

15   them and smoked a cigarette that was the extent of it

16   so I have no involvement with them.

17      Q.      So a little different than Othram where you

18    wrote that you co founded Othram so --

19         A.    Correct and it's larger amounts of money

20    larger direction I helped come up with the name Othram

21    I was very involved m the making of Othram hiring of

22    David Mittelman to be its CEO it's just a it's a

23    totally different order of things and also my skill set

24    is not it's not complementary to what Dr. Mittelman is

25    doing or his wife is doing with the company, I don't --

                                                          230


1     there's nothing I can offer, you know, I have nothing

2     to offer to them nor to -- nor to clear labs around

3     that.

4          Q.    Just to clarify something?

5          A.    Yeah.

6          Q.    You said that previously I asked you if you

7     had any control or role in the operations of Othram and

8     you said no but now you said sounds like you do believe

9     you had a -- is that just previously or today just

10    simply?

11         A.    Today I have no involvement with the

12    company when the company started I was very involved

13    now I am not involved and I have not visited them I

14    have not seen them when they've been in TC I had been

15    invited to their events but I have chosen not to go and

16    I wish them well in what they're doing but it's not

17    it's not interesting to me like what they're doing is

18    has it's a solved problem it's not interesting.

19         Q.    Some cleanup go back to or Exhibit 12 was

20    that where we have the screenshot of the Wyoming --

21         A.    That's right yeah.

22         Q.    Okay I'm not talking about that account,

23    all right?  Do you, any trusts you are a beneficiary

24    of, do you have any relation to any bank or brokerage

25    account open in the name of a Wyoming LLC any Wyoming

                                                    231


1    LLC?

2         A.    Now no, I do not.

3         Q.    I've got the ask the question and that is

4    well when did you?

5         A.    Maybe about six years ago seven years ago

6    and that was a family thing so I don't know I was not

7    involved in that my grandmother was well, we

8    increasingly find her assets strewn about so my

9    grandmother was a very successful stock picker oddly

10   enough and she had assets all over Wyoming and all over

11   California and so I routinely get checks in the mail

12   from those assets it is what it is.

13        Q.    How big are those checks?

14      A.      $500, 10,000 bucks all the time I get money

15   from her even though she's been dead since 1994.

16      Q.      How do they know where to send the check?

17      A.      Most of it goes to my mother and father but

18   candidly most of the money that I've /TPWOEPBT for that

19   has gone into money for subsequent generations like

20   what am I going to do with a 500 -- I get a lot of my

21   namesake who also lives in Wyoming he invented the

22   swinging poly pump and TxDOT a number of /PAEFPBTS so

23   when oil prices get.  I get a bunchful mailbox money

24   for the purpose that too but I don't I have no

25   involvement with that my father and my mother have most

                                                                232


1   involvement with that as does my brother I'm not really

2   engaged with that.  The last time I was in Wyoming so

3   that might be another question you might ask me was in

4   2024 -- no.  2023.  And I looked at buying a property

5   in Cody which I did not buy thank God to be very clear

6   Alaska and Wyoming are the best states in the Union.

7      Q.      Let's switch gears and talk a little bit

8   about your devices, okay?  You said you have multiple

9   phones how many?

10      A.      I don't know.  Probably around 10 or 11.

11      Q.      You use 10 phones actively?

12        A.      Depends on what the thing is but yeah

13   people give me phones I use the phones I get rid of the

14   phones I have them stored various places I give them to

15   other people I buy them for other people yeah I have a

16   lot of phones I have a lot of computers and I have a

17   lot of phones.

18        Q.      Where are those currently located?

19        A.      I think they're in a storage box in

20   Chantilly but I'm not sure.

21        Q.      Same question about computers.

22        A.      Yeah I don't know how many computers I

23   have.

24        Q.      Let's --

25        A.      Yeah.

                                                    233


1        Q.      Let's go back to, say, '20, last five

2   years.  How many computers have you owned?

3        A.      Somewhere between 30 and 50.

4        Q.      You wrote about your computer committing

5   accept a cue?

6        A.      Yes.  The main computer that I used

7   foreclosure most of my work basically fried itself and

8   shut off one day and was not usable again and I got rid

9   of it.

10    Q.    Did you have any did you try to wipe it or

11  do anything?

12    A.    No.  No.  And this has happened to me in

13  the past where I've worked on a computer and worked on

14  something and I wasn't -- the entire battery the whole

15  thing died and by the way by the way this is -- if you

16  if you run in the circles I run in this is not an

17  uncommon thing it has been known to happen once or

18  twice.  The accept a cue is obviously a joke obviously

19  the computer did not commit suicide but yeah I have

20  owned devices that have been remotely advertise

21  ruptured destroyed shut off, you know, wiped remotely

22  so yeah I have had that happen to me many times

23  actually and yeah.

24    Q.    A tech safe guy like yourself must back

25  everything up though?

234

1    A.    Depends on what I'm instructed to do around

2  that but typically the way it works is when I buy a

3  computer what I do is I usually pay cash for the

4  computer and then I instruct one of my handlers they

5  ask me for the device code and they ask me for the like

6  the Wi-Fi code that I'll be using the most and then I

7  write that down on a piece of paper and usually I will

8    mail that to them or give it to them.  Typically I buy

9    most of my computers used and I buy them in cash

10   through Craigslist or I instruct somebody who works for

11   me to go and buy the computer for me and then we do a

12   hard reset of the computer and then I give again the

13   device code and the Wi-Fi code to whoever is in charge

14   of paying for that whole thing.

15        Q.    Yes or no do you about I the computers used

16   for operational security reasons or just because

17   they're cheaper?

18        A.    Depends on what we're doing.  I've never

19   gone into an am store and bought a computer as an

20   example.

21        Q.    Go back to the jom mix.  You either posted

22   saying that you'd sent an email offering to buy 23 and

23   me and you had the funds to do that were you just

24   joking?

25        A.    No I had the cash to do it at the time I

                                                         235

1    had a guaranty from a /SOFPB law firm to do that.

2         Q.    Okay let's talk about that then. ?  Wealth

3    firm) when was that?

4         A.    Well depends on when we're talking so 23

5    and me went bankrupt and when it went bankruptcy there

6    was this question about bids around that.  And so

7    ultimately the company went back to an with a chick key

8    and/or ra cull was involved with acquiring them so that

9    was by /*F kind of a moot tail but I was talking.

10        A.    Of the o mon any sovereign wealth fund

11    about buying it in total out of time I think the

12    valuation was somewhere between a hundred million and

13    150 million but the /SOFPB wealth fund of o man is you

14    know quite large and so they had the cash to underwrite

15    it and /THERB I looked at or people joining in on that

16    and when I knew that Oracle was going to bid on that it

17    was kind of a moot point.

18        Q.    Could you produce a single document showing

19    that you were /SPHAOEG with the o mon anies?

20        A.    Certainly the man in question is a man by

21    the name of month has /PH-PL Al har they and yes, I

22    have probably communications with them that can prove

23    that he too spoke the with me largely over /STPHRAL but

24    I'm heavy happy to provide his contact information and

25    the receiver but.  But we ultimately didn't do the

236

1    transaction so it sort of is a moot point again great

2    respect to the o mon anies o mon any sovereign wealth

3    funds and very big support terse of them general and I

4    wish them base I think they're one of the more.  And I

5    was supposed go visit them in April of this year

6    ultimately did not go to visit them because of the

7    court matter that was instructed not to leave the

8    country and until this court matter was concluded.

9        Q.    Who instructed you to to?

10       A.    Some people in the federal government of

11   the United States.

12       Q.    Judge Pittman?

13       A.    No.

14       Q.    Okay.

15       A.    But it's no great loss I didn't really want

16   to go to owe o man it's kind of a long trip.  But it's

17   quite beautiful from what I understand.

18       Q.    In the past three years okay and that's

19   what I'm cabining my time frame on?

20       A.    The past 30 years?

21       Q.    Three.

22       A.    Three.  Okay.

23       Q.    How many government handlers have you

24   worked with?

25       A.    I wouldn't know.  Somewhere between five

                                                    237

1    and 20.

2      Q.      Okay.

3      A.      Yeah.  Are we talking U.S. or are we

4    talking foreign?

5      Q.      Altogether.

6      A.      Between five and 20.

7      Q.      U.S.?

8      A.      Between five and ten.

9      Q.      So a couple of questions about your secret

10   agent status.  Okay?  Back to that sub stack you talked

11   about you know you were threatened with /TORBL /*R

12   potential jail time and my understanding that was about

13   Julian a song?

14     A.      That's right yep.

15     Q.      Was it about marijuana or any money lan

16   during?

17     A.      No as far as I know no.

18     Q.      Okay.

19     A.      If it was they didn't tell me.

20     Q.      Which agency threatened you with jail time?

21     A.      Well to be precise about it the FBI at the

22   time -- well there were two FBI agents that contacted

23   me first about Steve ban non and that would have been

24   in -- no no this is important I'm getting to it.

25     Q.      I just want the dance?

                                                    238

1      A.     No, no, no this is important so during the

2   pandemic I was contacted by two FBI agents and those

3   two FBI agents then in turn introduced me to Johnathan

4   Buma and so Jonathan Buma was joking that I was under

5   all these visions and I said well, my understanding is

6   that another agency shut all those investigations down

7   and he started laughing and he said yes, that's true

8   and he said we were gonna get you and put you in jail

9   for this and I said well it's a good thing didn't you

10  do that and that was the conversation that he and I had

11  had in his hot tub at his home in San Juan Capistrano

12  which in fact is not his home.

13     Q.     Did you sign any immunity --

14     A.     No.

15     Q.     -- cooperation or non process prosecution

16  agreement?

17     A.     No.

18     Q.     Have you been paid anything for serving as

19  an informant or a confidential human source?

20     A.     No I have never asked for it in fact I've

21  rejected offers if any.

22     Q.     Did any agency or government affiliate set

23  up bank accounts give you prepaid cards in connection

24  with your informant work?

25        A.     As far as I know, well that's a difficult

239

1     question I'm not sure I should answer so I'm

2     foreclosing to say that I'm not going to talk about

3     things that the U.S. government has asked me to do.

4        Q.     Are you refusing to answer?

5        A.     I am.

6        Q.     You've already testified about government

7     trusts do you have anything to answer on that point?

8        A.     No.

9        Q.     I believe you publicly claim that the FBI

10    said that you were an excellent source?

11       A.     That's right yep.

12       Q.     Johnathan Buma was your handler?

13       A.     One of them yes.  I had several at the

14    time.

15       Q.     In our questions about the government

16    trusts, do you consider a Wyoming LLC discussed in

17    Exhibit 12 that was going to be the subject or the

18    recipient of the Othram proceeds as a government trust

19    in --

20       A.     It's not for me to say I don't know could

21    have been one very likely could have been one but I

22    don't know it's not my it wasn't my duty to do that my

23    instructions were to do as I was told and I did as I

24    was told.

25         Q.    I guess tell me if you can answer this yes

240

1    or no you considerably believe that it's probable that

2    the Wyoming LLC that was going to be the recipient of

3    the Othram proceeds is a government trust set up in

4    your benefit?

5         A.    I don't know if it was for my benefit or

6    and I do believe it was a government trust but I have

7    no way of knowing that fully I know that I was

8    encouraged to set it up and excuse me I was encouraged

9    to send it the screenshot to Dr. David Mittelman and he

10    in turn sent the money to me but he did not do any of

11    those things and so I don't really know what that whole

12    thing was about there's a lot of things like that in my

13    life why I get instructed to do something and then

14    never really figure out what it's about.  And yes it's

15    enormously frustrating but that's how it goes.

16         Q.    So the government told to you set that up

17    that account?

18         A.    No no they asked they never I never set up

19    any of those bank accounts I never was involved with I

20    in of that all I did was a take screenshot of that

21    thing and then send /TOEUTD Dr. David Mittelman an the

22    /SKAOERBT was not actually taken by me it was taken by

23    somebody else who sent it to me so I didn't even

24    screenshot it it was a screenshot provided to me.

25         Q.    Copied it over?

241

1         A.    Correct.  And then deleted it as I was

2    instructed to.  Actually no to be precise I forwarded

3    it because you can do that within Signal I did not

4    delete it.

5         Q.    Do you know the gator /TKPWRAOEPBL set up

6    that account?

7         A.    I have no idea but that was not him as far

8    as I know he was not involved as far as I know the sum

9    total of the conversations I've add had with greater

10    /TKPWRAOEPBL since this well since he was smeared in

11    summer fort the total conversations I've had with him

12    were about his children about his child David Hal la

13    well's wife's funeral and that was it we haven't

14    discussed this court case and his wife who is on again

15    off again friendly with my girlfriend she said that we

16    would wait until the matter was concluded and we'd have

17    a dinner party when it was concluded, but I rather this

18    matter has been rather complicated because I was

19    supposed to invest in another company with gator

20    /TKPWRAOEPBL and this whole court proceeding thing

21    blocked me from being able to do that which is

22    unfortunate.

23        Q.    Were you identified N- will you identify

24    the name of that company?

25        A.    Sure.  It's /KAOULD sky dweller.

242

1        Q.    Sky dweller arrow?

2        A.    Yeah.

3        Q.    Were you going to provide any funds?

4        A.    A group around me would have, yeah.  Very

5    likely but ultimately it was for naught.  And wy the

6    way there are other more sophisticated drones I think

7    /TWRAE probably for the best that we if end up doing it

8    I don't really like the CEO I don't really trust him he

9    seems kind of shady to me good if you're not please

10    answer this shortly if you're not providing any money

11    yourself, you would bring to the table why would they

12    give you any type of equity interest.

13        A.    Has.  La France.  It's the may relationship

14    with the French world would have been my relationship

15    with the French world would have been essential for

16    that operation.

17        Q.        Why?

18        A.        Well I grew up speaking /SPREPBLG I speak

19    it true eventually I'm friendly with all of them I'm

20    part of the French American foundation I've known

21    president Mac Ron since 2012 before /H he was

22    preponderate and yeah, if you have a solar poured drone

23    it's extremely valuable for the western part of Africa

24    which is where the French have a lot of territory so I

25    would have gone to Allen chay pin I would have gone to

↑

243

1    my home network and we would have gone to chay pin

2    C-H-A-P-P-I-N.

3        Q.        Slow down?

4        A.        Yeah so he would have fund it the one of

5    the Americans in the United States that likes France.

6        Q.        When was if last time you spoke with he man

7    yul ma crone?

8        A.        I haven't toke with him but the last time I

9    saw him was /TPWH 2019.

10        Q.        The Wyoming LLC and that bank account did

11    Terry done mire set that up?

12        A.        He did not.

13        Q.        How do you know with certainty just brief

14    answer?

15      A.      He doesn't typically deal with Wyoming as a

16   rule he deals more with the Turk issuing world the

17   Indian world and the democratic rep of con go, but not

18   so much with domestic matters that's not his purview.

19      Q.      What is the best estimate of the total

20   amount of money you've received from the U.S. or

21   foreign governments and I'm including government

22   trusts, any operational funds --

23      A.      Doesn't work like that.  I don't know, I

24   mean, in the millions I don't know how much yeah.

25      Q.      Has any agency or government entity or

                                                        244

1    agent instructed you not to disclose any trusts,

2    account, asset, special purpose vehicle that was set up

3    or that you have control or a relationship with?

4       A.      Well I don't have control over any of this

5    em.

6       Q.      Wait I said or a relationship with.

7       A.      I don't know it's a good question.  They

8    asked me well two of them asked me to come here and to

9    basically do the minimal consent thing which I have now

10   done and directed that's an interesting question I

11   don't know no, I mean, in general like when the

12   receiver which I assume is what you want to do when the

13    receiver starts knocking on doors he, he or she as the

14    case may be has, you know, has my full cooperation

15    provided I'm instructed to give it.

16        Q.    So you remember me asking an iteration of

17    the following question a bunch please identify all of

18    your assets whether it's accounts special purpose

19    vehicles et cetera et cetera?

20        A.    Mm-hmm.  Mm-hmm.  Mm-hmm.

21        Q.    You've identified some, right?

22        A.    Mm-hmm.

23        Q.    My question is have you withheld the names

24    of any or omitted the names or not provided a complete

25    picture based on any instructions from your government

                                                        245


1    handlers or --

2        A.    Not knowingly there may be one or two that

3    I'm missing but I have done a lot of them so I don't

4    always remember them.

5        Q.    Have you asked any government agency,

6    government agents, agent to contact judge Pittman or

7    the U.S. attorney's office to give the basis or say

8    that you should be excused or not need to provide full

9    compliance with the federal rules in this court's

10    orders?

11      A.      I instructed one of my handlers to do

12  whatever he thought was the just thing to do and that I

13  would follow it as he wished so they said if you want

14  to talk to judge Pittman and the U.S. attorney or talk

15  to whoever and I'm happy to have you do that but notify

16  desire for to you do that on my behalf that's what I

17  told him.

18      Q.      My question is are you aware so you --

19  so --

20      A.      As far as I know no.

21      Q.      The?

22      A.      But I'm not aware I wouldn't want to be

23  aware that's not take /STPHRAO /STKPHREUTS a little bit

24  did you request darts.

25      A.      No, I wouldn't request it that's not how it

                                                                246


1  works.

2      Q.      I need the question out there?

3      A.      Yeah.  Go ahead.

4      Q.      Did you request any of your government

5  contacts to speak with email communicate with judge

6  Pittman or the U.S. attorney's office to excuse any of

7  your compliance with the federal rules, your discovery

8  obligations or judge Pittman's orders?

9       A.      No on the contrary I in -- I -- when I

10   would ask --

11      Q.      Objection.  Objection?

12      A.      Yeah.

13      Q.      Non-responsive?

14      A.      No.  The answer is no.

15      Q.      Okay.  Are you aware of any of your

16   government contacts nevertheless contacting judge

17   Pittman or the U.S. attorney's office?

18      A.      I don't know.

19      Q.      Are you aware?

20      A.      Am I aware?

21      Q.      Can you identify a time --

22      A.      No.

23      Q.      -- a date?

24      A.      I did not.  And in fact but you're asking

25   like kind of a silly question it doesn't work like that

                                                    247

1    so I wouldn't instruct them like they don't they

2    instruct me like that's not how that works.

3       Q.      Did they indicate that they would speak

4    with judge Pittman or the U.S. attorney's office?

5       A.      As far as I know, no, but I never asked so

6    it's -- it's kind of immaterial.  I would never ask a

7    law enforcement official to intervene with a U.S.

8    attorney or a federal judge on my behalf.  That's just

9    not how it works.

10        Q.    So if it's immaterial, what's the -- what's

11    the point about not just providing full and complete

12    transparent answers about your relationship with the

13    government and say that's the reason you can't answer

14    all of this like the discovery in this case and

15    disclose all your assets?

16        A.    Well typically it would be tipping off the

17    people who are under investigation so you don't

18    typically do that kind of thing you wait until an

19    operation is concluded.

20        Q.    And what's the operation?

21        A.    I mean, I work in a small piece of it but

22    it has a lot to do with compromised law firms and

23    compromised technology.

24        Q.    For secret operations is it common for a

25    source to publicly brag about their importance and talk

                                                          248


1    about operational details or reference operational

2    details?

3        A.    Well it depends on what they're actually

4    what the actual target is so for an FBI the FBI thing

5   when I was closed out as a code named informant I was

6   free to talk about that to even write a book about it

7   typically the way it works is they approve the book I

8   don't support that I think that's a first amendment

9   violation because the FBI is supposed to pay you when

10   you are a confidential informant if you do dangerous

11   things for them.  I elected not to get paid that way I

12   elected to write books and novels and whatever about it

13   and so we had a -- we you know, but there are other

14   government agencies that I have conversations with and

15   happens all the time and in fact the FBI itself is

16   routinely under investigation by other government

17   agencies that's very common that's like you can't there

18   are only 50,000 agents in the FBI it's like a baby

19   agency there's like nobody there.

20   Q.    Are you writing a novel?

21   A.    I am.  I am writing a novel it's a lot of

22   fun.

23   Q.    Is it done?

24   A.    It's almost finished, yeah.  It requires

25   some edits but it's almost finished.

249

1   Q.    Is it an auto biography?

2   A.    No it's a novel.

3      Q.    Is it historical, fix based?

4      A.    It's about my relationship with Jeffrey

5  Epstein TV ban no and Steve peel but it's Roman that

6  clay about so no.

7      Q.    Not fansy?

8      A.    Not a fantasy though I am writing a second

9  book about science fix in the Mormon church so.

10     Q.    Have you shared in of any of this novel

11  with anyone?

12     A.    Maybe some of it yeah.

13     Q.    With who?

14     A.    With my father read a version of it.  A

15  friend of mine at the French embassy read some of it.

16  Maybe a few others.

17     Q.    Well, let's be specific.  Who?

18     A.    I don't know them all maybe like five or

19  six -- no that's no true.  Did George /SEUBL read it no

20  he read an earlier version, I mean, it's gone through

21  many iterations it's about 300 pages and counting I

22  have a little bit to do to tighten up the ending but

23  yeah I'm very happy I wrote it, it's -- it was a lot of

24  fun.  There's more to go on it.

25     Q.    You invited your sub stack and transiter

250

1    physicalers to request /-T right?

2        A.    Yes.

3        Q.    Have you sent it out to them?

4        A.    No no as far as I know I have not sent it

5    to anyone on there.

6        Q.    Typically the way it works when you request

7    that is you see who's interested a understand then you

8    add them to a list so when there's when there's a book

9    that has a publisher and all of that when that's good

10   and that's tight I will send them galley copies those

11   who asked?

12       Q.    Did you write reports when you were a

13   confidential auto human course?

14       A.    I the dozens of them.

15       Q.    Did you share your novel or a draft of this

16   novel with Johnathan Buma?

17       A.    No I did not.

18       Q.    You say that with certainty?

19       A.    Mm-hmm I do.  He shared a copy of his novel

20   his auto /PWROEUFG with me but I have not sent him a

21   copy of mew stiff.

22       Q.    Did you write reports for Johnathan Buma?

23       A.    I did.  And for others in the FBI doesn't

24   quite work like that the way it works is you write a

25   report and then they in Your Honor the put it into the

251

1    system so Buma would take what I would write and put it

2    into the system that's the way of protecting it from

3    the sovereign immunity kind of perspective.

4         Q.    Did Buma allow you to access information in

5    FBI databases separate from your own reporting?

6         A.    No nor would I have had -- nor would I have

7    wand it even if it had been provided.

8         Q.    Did you write reports for other FBI agents?

9         A.    I did.  Many others.

10        Q.    Did any other FBI agents allow you to

11   access FBI databases?

12        A.    No.

13        Q.    Did Buma or any other FBI agents or agents

14   from other agencies allow you to read confidential

15   human source reporting provided by other confidential

16   sources?

17        A.    No, I don't think so.

18        Q.    Did Johnathan Buma provide FBI documents to

19   you for review?

20        A.    Documents for review?  Ion what that means.

21        Q.    To look at.  To?

22        A.    To look at?  Yes.

23        Q.    FBI documents.

24        A.      Correct.  On several occasions.

25        Q.      Did Johnathan Buma provide you with

252

1    confidential human source reports other than your own?

2        A.      I don't recall but it may have happened I

3    I'm not totally certain.

4        Q.      How would --

5        A.      Typically the way it would work is he would

6    call me about a report that he had read and he would

7    try to summarize it but no he did not as far as I --

8    nothing that was classified nothing that I didn't have

9    clearance for.

10        Q.      John than Buma has been indicted for

11    illegally downloading FBI documents, right?

12        A.      That's right, yep after by the way I was

13    confidential informant for him but yes.

14        Q.      The classified information procedures act

15    has been invoked by the government are you aware of

16    that?

17        A.      As far as I know, but I haven't followed

18    the case in any detail.

19        Q.      Did Buma ever transmit any of those

20    documents to you?

21        A.      No and if he had I would have reported him.

22      Q.      Did he transmit confidential human source

23  reporting to you?

24      A.      If it was confidential or classified there

25  was no way I was going to touch it or be involved with

                                                        253

1   it.

2       Q.      Did Buma ever transmit FBI or confidential

3   human source documents to another person who then gave

4   them to you?

5       A.      As far as I know, no.  No.

6       Q.      What agencies do you report to?

7       A.      Decline to answer.

8       Q.      Is it more than one agency?

9       A.      Yes.

10      Q.      When's your confidential human source or

11  confidential source relationship begin with agencies

12  other than the FBI?

13      A.      Decline to answer.

14      Q.      You refuse to answer?

15      A.      Yes.

16      Q.      Could you answer it?

17      A.      Yes.

18      Q.      Do you have any documentation of your

19  relationship with those agencies?

20      A.      I do.

21      Q.      Could you provide it?

22      A.      No.  I would not provide it unless

23   instructed to by those handler in those cases.

24      Q.      What topics were you reporting on to those

25   agencies?

254

1      A.      Compromised law firms and compromised

2   technologies.

3      Q.      Do those agencies threaten or have leverage

4   over you?

5      A.      No.

6      Q.      Who are your handlers?

7      A.      Decline to answer.

8      Q.      Couple of other OI5 or is it 015?

9      A.      I don't know.  Probably both.

10     Q.      What?

11     A.      We called it both.  Probably (we called

12   it).

13     Q.      What is 015 or 0I5 just summarize and

14   explain it to me?

15     A.      Well it's part of the anglo American

16   Alliance and it deals with technology and it was a way

17   of inviting John Burbank to be helpful to the country

18    as his father had been helpful to the country.

19        Q.    What is the correct name of it?

20        A.    I don't know.

21        Q.    Who is your contact with it?

22        A.    You might ask Heather green well about it

23    you might ask, God, Bob or Peter yeah Peter vanish had

24    quite a fall so I don't know and then Bob, Bob hangs

25    Gus ma is sort of out of commission now so they're the

                                                        255


1    older six at work.

2        Q.    Can you spell those last names?

3        A.    Heavens no.

4        Q.    For the court reporter?

5        A.    Varnish I think is spelled like

6    V-A-R-N-I-S-H.  Guns ma Bob hangs gis ma I could never

7    spell ^ it ^ it'd cell correctly but I think it's

8    HANKES-/TKPW*FPLT DREI Zed -- no was it Zed or was it S

9    I think it might be S.  MA.

10        Q.    Is it an investment vehicle OI5 or 015?

11        A.    If it is I never received proceeds from it

12    so I have no idea I was actually when it was being set

13    up I made very clear that well it was made clear to me

14    that I was too American to participate that was the

15    phrase at the time and I said okay guilty as charged

16    but I was not involved with it.  And the last I heard

17    of it was maybe in 2021, 2020, but I wasn't involved

18    with it.  The person you really want on that one is

19    John Burbank would be my guess but I don't know I

20    wasn't involved with it.

21        Q.    The judge Pittman issued an order for you

22    to respond to the motion for a receiver by Wednesday.

23    Are you going to respond or oppose it?

24        A.    Is it by Wednesday or is it on Wednesday or

25    what is the -- does it actually say?

                                                         256


1        Q.    Have you signed up for ECF notifications?

2        A.    No, I'm not allowed on it.

3        Q.    By the government handlers?

4        A.    I'm not allowed on it I've tried to sign up

5    for it like six or severance times and every time I try

6    to fill it out it rejects me.

7        Q.    It says accord orders a response to the

8    motion by Wednesday at 12 p.m. ?

9        A.    Okay.

10        Q.    So are you going to file an open position

11    or anything to it?

12        A.    No, I think you're instructed to do three

13    of them but you are what you are saying you just have

14    the one so if there's just the one I will have a

15    conversation with somebody and ask about just the one

16    and then I will make a decision on Wednesday about

17    replying to it.

18        Q.    But you've been clear you fundamentally are

19    okay with the receiver?

20        A.    I have no objection to a receiver in

21    principal T particular receiver I ma I have an

22    objection to but I don't know if I don't know this

23    person nor have I had it looked into nor has it been

24    looked into on my behalf nor has it et cetera et cetera

25    et cetera.  I am not involved with that part of it.  I

                                                        257


1     take these things day by day and do as I'm told.

2         Q.    Told by who?

3         A.    People who are involved with me. It's so

4     much simpler existence when you just do as you're told?

5             MR. THOMPSON:  All right let's take a

6     little break where are we at on the record now.

7             THE VIDEOGRAPHER:  We are going off the

8     record at 3:05.

9             (Break from 3:05 p.m.s (OSKOUI) (OSKOUI) os

10            quee until 3:13 p.m.)

11            THE VIDEOGRAPHER:  We're back on the record

12    at 3:14.

13    BY MR. THOMPSON:

14         Q.    All right Mr. Johnson a couple of questions

15    about Steve os quee.  Do you know who I'm referring to?

16         A.    I do.

17         Q.    Okay.  Just in one or two sentences, who is

18    your understanding who is Steve os quee is?

19         A.    I believe he's a managing partner at gig a

20    fund which is he says it's a venture capital firm but

21    I'm not convinced that that's true.  And he's well he's

22    got to be in his mid 40's now I lives in Austin, Texas,

23    and he's from New York originally and from the

24    Rochester area I believe and previously worked for

25    Peter teal and currently is in business with Luke no

                                                    258


1    Zik and with Mr. He hon Musk.

2         Q.    Okay.  In the past five years have you had

3    any disputes business disputes with Mr. Os quee about

4    money, stock, anything?

5         A.    Yes.  I have had one dispute with him.  He

6    and Mr. No Zik said that they would pay me a commission

7    after I introduced them to David Mittelman at Othram

8    and they elected not to pay that and that wasn't Mr. Os

9    quee's doing that was Mr. No Zik's doing so I have no I

10      will well towards Mr. Os quee I wish him well you know

11      I think he's a nice guy but I don't really have any

12      dispute about that they owe me a fee on the money that

13      they invested from gig a fund and gig a fund a lot of

14      people think that figure a fund is a front for Musk and

15      certainly there's some money in there that comes from

16      shall we call it a Persian die a important ra and so

17      yeah I wish him well I have no objections to him

18      frankly as soon as I'm done with the Othram stuff I'm

19      happy to move on to other matters.  I stayed at orb

20      quee's home actually on several occasions and he's a

21      great host too though he doesn't cook he usually orders

22      in.

23          Q.      Has he ever given money to any of the

24      companies you are affiliated with?

25          A.      Given money he has invested in Othram.

                                                259

1           Q.      How about Traitwell?

2           A.      Oh he did invest he he invested $500,000 in

3       Traitwell and he asked for his money back when I

4       started writing critical things about Elon Musk and I

5       said no it doesn't work like that I'm afraid we won't

6       be giving you your money back and then he of course

7       elected not to pay the fee he owed me so-and-so we had

8    a big dispute there.

9        Q.    So Mr. Os quee invested according to your

10    500 FRAND m Traitwell?

11        A.    Mm-hmm.

12        Q.    Why did he ask for it back?

13        A.    Because I was writing critical things about

14    Elon must can.

15        Q.    What did he say the reason was for?

16        A.    He said because I was writing critical

17    things about Elon /PH*UFRBG and he September it in an

18    email which was stiff upped the of him.

19        Q.    That was it?

20        A.    That was it and he never followed up and I

21    said no, I'm not going to do that that's not how it

22    works and Luke no Zik his business partner said that

23    the money had to be done by os quee personally not quig

24    a /PWAUPBD because I quote had the wrong lineage end

25    quote that's literally what he said verbatim and I'm

♠

                                                    260


1    happy to have that open the record because it was wild.

2        Q.    So for Traitwell?  It's like was a $500,000

3    investment from os quee himself or?

4        A.    Os quee himself gig a fund was diligencing

5    it but gig a fund elected not to do it and gig a fund

     6    is only two guys os quee and no sick actually only two

     7    of them and they had what os quee said it was the

     8    biggest /TPAOEULT he's /*FR had with like no Zik about

     9    whether or not not to invest in me what I had been told

    10    is that Mr. Os quee is the face of the operation and

    11    that Mr. No stick is the real player /P-PBD everything.

    12    Mr. No Zik when he /STOFRD I was a federal informant

    13    freaked out and went a bit you know went a bit crazy

    14    refused to contact me he was he went really crazy

    15    Mr. Os squee asked me if I would be happy to host him

    16    at the FBI headquarters in DC and I said no, no

    17    objection I wished him well and that was the last -- he

    18    and I haven't spoken in a number of years I have

    19    nothing against him I wish him well Mr. No Zik is he's

    20    a different matter he's you know likes to do /TRUGS he

    21    likes to do all these parties Mr. Lambert has gone

    22    though those parties I'm not going to go to a party

    23    where people are doing drugs it's not really my thing

    24    oh by the way both of them have a very close

    25    relationship with the Mormon church interestingly

                                                                    261


     1    enough which is something else you might want to

     2    include they are the money behind angel studios gig a

     3    fund was and angel studios is the one that did the

4    sound of freedom thing that movie a few years ago with

5    Tim ka veas us Jesus from passion of the Christ I

6    haven't seen it.

7        Q.    In the past when the os quee invest that

8    500,000 what year?

9        A.    That would have been in 2020.

10       Q.    Okay.  So since less say and when was

11   Traitwell formed?

12       A.    That would have been 2018-2019.

13       Q.    Okay.  So let's say from 2018 onward who

14   are the biggest investors in Traitwell?

15       A.    I am.  I'm the biggest investor in

16   Traitwell.  Robert March link is also an investor.

17       Q.    How much?

18       A.    I don't know off the top of my head maybe

19   400,000, 300,000.  Don't know.  Maybe 7 but I don't

20   know and then yeah I have an accountant that handles

21   this so I'm not sure what the best person would be to

22   for you to talk to about that but yeah.

23       Q.    And you said there's only how much money is

24   in Traitwell's /PWAEUPGT?

25       A.    I think total there's like 2.1 million,

                                                    262


1    2.4 million something like that something like that

2    it's very undercapitalized relative to what I was

3    trying to do.

4        Q.    So there's 2.1 million currently in

5    Traitwell's bank account?

6        A.    No no, now there's no money in Traitwell's

7    bank account yeah.

8        Q.    What happened to it all?

9        A.    It was spent on salaries for staff yeah

10   Dorothy and Gavin and Prem and others.

11       Q.    Did Traitwell ever deliver a product or

12   anything?

13       A.    Mm-hmm it delivered a product where you can

14   take your 23 and me data and you could spit out various

15   it would tell you things about yar health that were

16   kind of controversial so yeah there was a lot of things

17   that it was the idea of the company was ultimately to

18   force 23 and me or ancestry to acquire it and

19   ultimately that didn't happen but a new company that

20   I'm planning on forming will probably avail itself of

21   some of the some of the things I learned during the

22   process of making that company.

23       Q.    Did Traitwell return any money to

24   investors?

25       A.    I it did not, no.

263

1     Q.     And now it essentially has month money?

2     A.     It has no money, but I could recapitalize

3  it and I'm likely to recap lies it after this.

4     Q.     After what?

5     A.     After the lawsuit's concluded.

6     Q.     Why wait?

7     A.     Why spend money on an asset that could be

8  seized by a $70 million judgment?

9     Q.     Well, if you were confident that you were

10  going to win and had the judgment --

11     A.     Well it could go bankrupt and then I could

12  scoop up all the assets quite cheaply which would be

13  pretty great to be honest.  I have no objection to it

14  going bankrupt and in fact it going bankrupt would be

15  beneficial to me.  It would be annoying to lose money I

16  invested but these things happen.

17     Q.     All right so this is a yes or a no I think:

18            Has anyone specifically told you that Elon

19  Musk is funding this lawsuit?

20     A.     Yes several people.

21     Q.     Did they tell you that in person or in

22  written communications?

23     A.     I don't know about the written

24  communications.  Possibly on Signal I guess that's

25  written communication I don't know but yes the I have

264

1  been informed repeatedly that Mr. Musk is and

2  associates of Mr. Musk I should say are behind this

3  lawsuit and that Mr. Lambert is their front man.

4      Q.    Were those people your government contacts?

5      A.    Some of them were.  Some of them were also

6  journalists that were investigating it and some of them

7  were also members of a foreign government.

8      Q.    So your non government agency

9  handler/contacts --

10     A.    Yes.

11     Q.    -- who told that you Elon Musk is funding

12 this lawsuit?

13     A.    A number of journalists have been somebody

14 from the Wall Street Journal asked me about it directly

15 I forget which one because they move around a bunch but

16 somebody asked me about it.

17     Q.    Was the --

18     A.    I was asked -- it was a woman I forget her

19 name now, but I get asked by journeymansts a lot about

20 things and I true I to make myself available to them

21 there was a woman who asked me about it and there's

22 also a man who asked me about it and there was also a

23    French woman has asked me about it and she I think the

24    French woman was at righters.

25         Q.    What journalist do you serve as a source

265

1    to?

2         A.    Any journalist that would call me and I'm

3    in a position to answer them.  I mean I routinely have

4    journalists from all over the world reach out to me and

5    ask me things that I know things about and I guess

6    yesterday was Michael wolf is who I was talking to of

7    Epstein fame but I can't I like journalists they're

8    interesting.

9         Q.    So who what -- need the names what is the

10    name of the reporter?

11         A.    I'm not going to be identifying reporters

12    who I talk with.

13         Q.    Kind of like your government sources it's

14    a --

15         A.    You got it.  And also it's kind of a

16    violation of a certain jurnst source protection so I'm

17    happy to go to the mat on that and litigate that at the

18    federal level that would be kind of fun to be honest.

19         Q.    Okay so putting aside stuff from your

20    supposed --

21      A.      I mean obviously if I tell you the

22   /STPHAEUPLS of journalsts that are investigating Musk

23   and Musk is funding be the lawsuit and Musk is the

24   largest customer or largest client of /TKHRAP that

25   would be a real problem wouldn't it and so I'm not

266

1   going to be doing that because then they could be

2   harassed and sued with frivolous lawsuits like I've

3   been.

4      Q.      So besides communications from the supposed

5   government sources that you have and putting aside

6   communications from reporters who you won't identify

7   can you identify any communication?

8      A.      I can butly elected no on the.

9      Q.      Bait or a earn?

10      A.      No I will not talk about any of the

11   journalists that I talked to about Mr. Musk.

12      Q.      So my question just to be clear I'll ask it

13   again Mr. Johnson.  It doesn't involve jurnsts.  It

14   doesn't involve any supposed government sources.  Are

15   you with me?

16      A.      I'm following everything you're saying.

17      Q.      Okay.  So who has told you that Elon

18   Musk --

19      A.      The individuals in question who have asked

20   me about Musk funding this suit have been either

21   government affiliated foreign governments affiliated or

22   connected to the journal list tick core of the United

23   States so I have no desire to name any of those people

24   at present.

25      Q.      So you can't identify --

267

1      A.      No no I can identify them I choose not to

2   I'm declining to answer the question.

3      Q.      You said you were listening to my question

4   you actually weren't because I'm -- I'm excluding your

5   supposed government sources and your supposed

6   journeymanst contacts so I'm asking what non

7   journalists non government contacts have told you that

8   Elon Musk is funding this lawsuit?

9      A.      Gator /TKPWRAOEPBL told me that.

10      Q.      Did he show you any documents?

11      A.      No he told me about it from another

12   associate of ours who works for the nervous system SA.

13      Q.      Didn't you initially blame John Burbank and

14   the Chinese for this lawsuit?

15      A.      /W-FPL Burbank --

16      Q.      It's a yes or no?

17    A.    No it's a no it's -- it's -- partly that

18    was done to sort of Russell John so I've known for

19    quite some time that it was Musk behind it and I have

20    no objection to that I actually kind of welcome it and

21    by the way he does this with other people as well so

22    it's not be a surprise to me and by the way he's

23    funding several lawsuits in this court if I believe I

24    believe there's one with the open AR lawsuit as well

25    that's here he's elected that Texas will be his home

268

1    and this is where he /STKEPBDZ to conduct his law fair.

2    I personally prefer he would do it in Washington, D.C.

3    or Los Angeles but you know everyone's got to do what

4    they've got to do.

5    Q.    Well Mr. Johnson I think at this time I'm

6    going to conclude the deposition I don't think that and

7    I appreciate your time showing up but I don't think you

8    answered the questions as the federal rules require I

9    think you refused to answer questions that are fair

10   game and everything but that's an issue to take up with

11   judge Pittman but as a matter of courtesy if you could

12   just stick around the court reporter has any questions?

13   A.    Sure.

14   Q.    To clarify.  How long do you think it will

15    take?

16              THE REPORTER:  Not long.

17              THE WITNESS:  Okay.

18              THE VIDEOGRAPHER:  We're going off the

19    record at 3:28 (.

20              MR. THOMPSON:  Oh actually hold an yeah

21    okay we're back on the record at 3:28.

22    BY MR. THOMPSON:

23         Q.    Just to be clear Mr. Johnson refused to

24    answer multiple questions about his finances relying on

25    supposed government contacts and I believe that's fair

                                                      269


1    game and you know for that for that and all the

2    questions that he refused to answer the plaintiffs will

3    keep open this deposition subject to bringing it up

4    with with judge Pittman but nothing more for the

5    witness today given that he's refusing to answer and

6    made clear he's going to refuse to answer questions on

7    a host of relevance subjects?

8              THE VIDEOGRAPHER:  Okay we are going off

9    the record at 3:29.

10              (Time noted: 3:29 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 36

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC, ET AL.,**

    Plaintiffs,

v.                                                     **No. 4:24-cv-00988-P**

**CHARLES JOHNSON,**

    Defendant.

## ORDER

The Court is scheduled to hold a hearing on the Motion for Appointment of a Receiver, Thursday, November 20, 2025, at 2:00 p.m. In addition, the Court **ORDERS** Defendant to **SHOW CAUSE** at the hearing for failure to comply in good faith with post-judgment discovery. At the Defendant's deposition on Monday, November 17, 2025, Defendant informed Plaintiff repeatedly that he was there to provide "minimal consent" and incomplete information. ECF No. 136. He also failed to serve the interrogatory responses previously ordered by the Court. ECF No. 136. This behavior is wholly unacceptable.

The Court also has been informed by Court staff that at the deposition, Defendant stole items belonging to the Court, such as mugs and water bottles. Accordingly, the Court also **ORDERS** Defendant to **SHOW CAUSE** at the scheduled hearing for stealing court property.

As a result of these actions, Defendant should be prepared to **SHOW CAUSE** why the Court should not impose additional sanctions up to and including holding him in civil contempt and placing him in the custody of the United States Marshal until he purges himself of his contempt.

**SO ORDERED** on this **19th day of November 2025.**

_Mark T. Pittman_

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

App.1407

# EXHIBIT 37

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC, ET AL.,

Plaintiffs,

v.                                              No. 4:24-cv-00988-P

CHARLES JOHNSON,

Defendant.

## ORDER

The Court held a hearing on Plaintiffs' Motion for Appointment of a Receiver on Thursday, November 20, 2025, at 2:00 p.m. ECF No. 135. The Court also ordered Defendant to show cause at the hearing for failure to comply in good faith with post-judgment discovery and for stealing court property.

As also stated for reasons explained on the record at the hearing, the Court finds Defendant to be in civil contempt of court for failing to comply with post-judgment discovery and for stealing court property. Therefore, having considered the least severe sanction necessary to correct the misconduct, the Court **ORDERS** the United States Marshal to arrest Defendant and place him in custody until such a time that he purges himself of his contempt. Defendant has shown a repeated history of failing to comply in good faith with post-judgment discovery. Despite the numerous opportunities given for him to cure his misconduct— including at the most recent hearing—Defendant has shown no willingness to comply with the Court orders. In fact, Defendant has expressed a desire to defy the Court's orders.

Defendant's misconduct is well-documented. On October 28, 2025, Plaintiffs filed a Motion asking for a "Show Cause" hearing to hold Defendant in civil contempt for "violat[ing] the Court's asset-protection order" and "personally threaten[ing]" Plaintiff and Plaintiffs' counsel" among other allegations. ECF No. 115 at 3, 6. That same day, the Court

denied Defendant's motion to stay enforcement of the district court's judgment. ECF No. 117. The Court subsequently granted the Plaintiffs' Motion to hold a "Show Cause" hearing to address Defendant's conduct. ECF No. 118.

On November 6, 2025, Plaintiffs filed a Motion to Compel Defendant Charles Johnson to Respond to Post-Judgment Interrogatories, Sit for Deposition, and Produce Documents. ECF No. 119. The Court accordingly scheduled a hearing on the Motion. ECF No. 121. After holding the hearing on November 10, 2025, the Court granted Plaintiffs' Motion to Compel and ordered Defendant to answer Plaintiffs' post-judgment interrogatories within five days, produce requested documents, and sit for a deposition on Monday, November 17, 2025. ECF Nos. 129, 130.

Plaintiffs then filed the Motion for Appointment of Receiver. ECF No. 131. The Court ordered a response to the Motion by Wednesday, November 19, 2025. ECF No. 134. That response was never filed in defiance of the Court's order. The Court thus ordered the most recent hearing to be held on November 20, 2025. ECF No. 135. In the interim, Plaintiffs filed a Supplement to its Motion to Appoint Receiver documenting the Defendant's noncompliance with the Court's orders. ECF No. 136. While Defendant was physically present for the deposition, the Defendant failed to respond to the questions asked in good faith and repeatedly gave evasive answers while asserting that his plan was to give as minimal information as possible. ECF No. 136. Court staff additionally reported that Defendant stole a mug and water bottles belonging to the Court that same day. ECF No. 138.

In response to Defendant's noncompliance, the Court ordered Defendant to Show Cause for his failure to respond in good faith to the questions asked in the deposition, his failure to serve his interrogatory responses, his failure to produce requested documents, and his theft of court property. ECF No. 138.

The Court then gave Defendant—yet again—another chance to comply with the Court's orders at the hearing held on November 20, 2025. There, the Court and Plaintiffs' counsel asked Defendant similar

2

App.1410

questions to those asked at the deposition. And again, the Defendant failed to respond in good faith to those questions.

Therefore, the Court finds the Defendant to be in civil contempt of court. Accordingly, considering the least severe sanction possible to correct the misconduct, the Court **ORDERS** Defendant to pay a $1000 fine to the Clerk of the Court due immediately to purge himself of his theft of government property. The Court also **ORDERS** the United States Marshal to arrest Defendant and place him in the custody of the Johnson County Jail until such a time as he purges himself of his contempt for his repeated failure to engage in post-judgment discovery in good faith.

**SO ORDERED** on this **20th day of November 2025.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

3

App.1411

# EXHIBIT 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
|     *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
|     *Defendant.* | § | |

## PLAINTIFFS' RESPONSE TO JOHNSON'S LETTERS (ECF NOS. 147 & 148)

### INTRODUCTION

Plaintiffs Point Bridge Capital and Hal Lambert ("Plaintiffs") respectfully submit this filing in response to the two letters filed by Charles Johnson's father on December 2 and December 4, 2025. *See* ECF Nos. 147, 148. Although Plaintiffs do not wish to burden the Court, the letters purport to describe Johnson's assets and could be interpreted as addressing his post-judgment obligations. Plaintiffs therefore believe it necessary to correct several objectively false statements and to make clear that the letters add no meaningful information beyond the evasive and incomplete testimony Johnson provided before his confinement.

Plaintiffs do not seek to substitute their judgment for that of the Court or the receivers regarding whether Johnson has purged his contempt. Plaintiffs simply note that the letters contain demonstrable inaccuracies, offer almost none of the detail needed to evaluate Johnson's financial position, and do not materially advance the effort to identify assets to satisfy the judgment.

App.1413

## ARGUMENT

### I.     Demonstrably False Statements in the Letters

#### A.     <u>Othram</u>: The claimed $3 million valuation contradicts Johnson's own attempted sale in September 2025.

The December 2, 2025 Letter asserts that Johnson's interest in Othram is worth $3 million. *See* ECF No. 147 at 1. In reality, as reflected in prior filings, Johnson attempted to sell all of his Othram shares—including shares he claimed belonged to family members—for approximately $1 million total and for his personal benefit. *See, e.g.*, ECF No. 115 at 4 (detailing Johnson's efforts to sell the Othram stock). That attempted sale was the subject of the Court's review in connection with Johnson's violation of the asset-preservation order. Thus, the attempted sale that Johnson orchestrated contradicts the valuation in the letter by a factor of three, rendering the figure in the letter unreliable.

#### B.     <u>Clearview AI</u>: The claimed $30 million ownership is false because Johnson has owned *zero* Clearview shares since May 2021.

The letter further asserts that Johnson owns $30 million in Clearview AI stock. He does not. Clearview exercised a buyback of all of Johnson's shares on May 21, 2021. *See* ECF No. 44 at p.12, ¶29,  *Johnson v. Clearview AI*, No. 1:23-cv-02441 (S.D.N.Y). Johnson challenged the buyback in that litigation, alleging that he remained the rightful owner. However, he later dismissed all claims with prejudice. Accordingly, Johnson lacks any legal basis to assert ownership of Clearview shares, contrary to the representation in the letter.

#### C.     <u>Cryptocurrency</u>: Johnson's recorded statements are irreconcilable with his claim that he owns no cryptocurrency or digital assets.

The December 2 Letter states, "I own no crypto currency and have not since 2017." ECF No. 147 at 1. But Johnson's own recorded statements contradict this. In a publicly accessible video—posted on Twitter/X while Johnson was in custody, though filmed shortly before his

App.1414

November 17, 2025 deposition—Johnson was questioned about earlier statements in which he acknowledged possessing cryptocurrency. He unequivocally stated that he possessed bitcoin, stating in pertinent part as follows:

- "I have a safety deposit box somewhere that has a hard drive on it that has a lot of Bitcoin on it."

- "They [*i.e.* his bitcoin] have never touched the internet . . . they were mined" and thus "impossible to . . . forensically trace."

(Video Timestamp ~23:42-24:40; available at: https://video.twimg.com/amplify_video/1992401160246898688/vid/avc1/1280x720/vLVwjz3W h6zm4Gm1.mp4, hereinafter "Pre-Deposition Video")).

Johnson also stated in the video that he maintains "banking relationships in many different countries," contradicting the letter's assertion that he holds only two accounts at Woodforest Bank. *Id.* He concluded this portion of the discussion by responding "Good luck" when asked whether Plaintiffs could locate his cryptocurrency or other bank accounts without his cooperation. *Id.* These statements directly conflict with the December 2 letter and further indicate that Johnson continues to conceal material information regarding his digital assets.

## II.    The letters add no information beyond Johnson's deposition testimony, which was itself insufficient.

The letters repeat the same incomplete and non-responsive answers the Court has already deemed insufficient. They do not identify a single asset that was not previously addressed at Johnson's deposition or uncovered independently by Plaintiffs. Nor do they clarify Johnson's holdings, resolve existing inconsistencies, or supply any of the factual information necessary to understand his financial position. In substance, the letters merely provide a conduit for Johnson to restate the same inadequate positions he advanced before, without meaningfully advancing the process of identifying assets available to satisfy the judgment.

3

App.1415

Johnson's own recorded statements confirm that the letters do not present a full or candid accounting of his assets. In the same publicly available video discussed above, Johnson made clear that the assets he identified in his deposition—and which are repeated in the letters—are not complete:

- "They're saying they want to know all those assets. And I'm like, fuck off."

- "They're never gonna find most of my stuff."

(Pre-Deposition Video at ~16:31–17:20)

In a separate recording filmed in Fort Worth, Johnson openly stated that he did not intend to reveal all of his assets, declaring: "I believe it's a responsibility for people like me to trick . . . these people to get them to waste their resources." When asked who he meant by "these people," Johnson responded, "I mean Will Thompson, DLA Piper, Hal Lambert." (Video Timestamp, ~35:55-37:11, https://archive.is/0ZKhV)[1]

**CONCLUSION**

Overall, the letters provide no new insight into Johnson's finances and do not present a full or accurate picture of his assets.

---

[1] The link is an archived version because the original post is no longer publicly available. The video itself was posted after Johnson was taken into custody. Should the archived link fail to load, Plaintiffs can provide the Court with the relevant clips.

App.1416

Dated: December 5, 2025

Respectfully submitted,

/s/ *Will Thompson*
Will Thompson
DLA PIPER LLP (US)
Will Thompson
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 5, 2025, a true and correct copy was served via the Court's electronic filing system.

/s/ *Will Thompson*
Will Thompson

App.1417

# EXHIBIT 39

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF TEXAS

3               FORT WORTH DIVISION

4    POINT BRIDGE CAPITAL, LLC    )    CASE NO. 4:24-CV-00988-P
     ET AL                        )
5                                 )
                                  )    FORT WORTH, TEXAS
6    vs.                          )
                                  )    NOVEMBER 20, 2025
7    CHARLES JOHNSON              )    1:40 P.M.

8                           VOLUME 1
                   TRANSCRIPT OF MOTIONS HEARING
9              BEFORE THE HONORABLE MARK T. PITTMAN
               UNITED STATES DISTRICT COURT JUDGE

10

11   **A P P E A R A N C E S:**

12   FOR THE PLAINTIFF:       WILLIAM BENNETT THOMPSON
                              DLA Piper, LLP US
13                            1900 N. Pearl Street
                              Suite 2200
14                            Dallas, Texas  75201
                              Telephone:  214.743.4500
15

     PRO SE DEFENDANT:        CHARLES JOHNSON
16                            1624 Fieldthorn Drive
                              Reston, Virginia 20194
17                            Telephone:  617.429.4718

18   STAND-BY COUNSEL:        DEVON JUDY SANDERS
                              ASSISTANT FEDERAL PUBLIC DEFENDER
19                            NORTHERN DISTRICT OF TEXAS
                              819 Taylor Street, Room 9A10
20                            Fort Worth, Texas  76102
                              Telephone:  817.978.2753
21

     COURT REPORTER:          MONICA WILLENBURG GUZMAN, CSR, RPR
22                            501 W. 10th Street, Room 310
                              Fort Worth, Texas  76102
23                            Telephone:  817.850.6681
                              E-Mail:  mguzman.csr@yahoo.com
24

25   Proceedings reported by mechanical stenography, transcript
     produced by computer.

1                                   **INDEX**

2                                                   PAGE   VOL.

3      Appearances ................................3      1

4

5      Motion to Appoint Receiver .................6      1

6

7      Motion to Show Cause – Property Taken ......13     1

8

9      Miranda Rights Given .......................16     1

10

11     Court's Ruling .............................21     1

12

13     Motion to Show Cause – Discovery ...........21     1

14

15     Questioning by the Court ...................30     1

16

17     Court's Ruling .............................51     1

18

19     Proceedings Adjourned ......................57     1

20

21     Reporter's Certificate .....................58     1

22

23     Word Index .................................59     1

24

25

**P R O C E E D I N G S**

*(November 20, 2025, 1:40 p.m.)*

1
2
3      *THE COURT:*  This is Case Number 4:24-CV-988-P, Point
4  Bridge Capital, LLC, et al vs. Charles Johnson.
5          Who do I have for plaintiffs?
6      *MR. THOMPSON:*  Will Thompson for the plaintiffs,
7  Your Honor.
8      *THE COURT:*  Okay.  Mr. Johnson?
9      *DEFENDANT JOHNSON:*  Charles Johnson representing
10  himself, with Ms. Sanders assisting.
11      *MS. SANDERS:*  I just want to note for the record,
12  Your Honor, I've been appointed for the limited purpose of
13  this hearing.  I do not have Mr. Johnson's permission to speak
14  on his behalf.
15      *THE COURT:*  You do not or you do?
16      *MS. SANDERS:*  I do not.
17      *THE COURT:*  Okay.  Let me -- Ms. Sanders, let the
18  record reflect that I have asked Ms. Sanders -- thank you for
19  being here.  I know that this is the last thing you probably
20  wanted to deal with today, especially because you were with me
21  all morning in a criminal docket.
22          But let the record reflect, I made a request that
23  Ms. Sanders, a very competent Federal Public Defender, show up
24  here today out of abundance of caution, due to some of the
25  past actions that we've seen from Mr. Johnson.

1          One of the things that we're going to take up later

2    is going to be contempt.  And I want you here as standby

3    counsel for now.  The first matter I'm going to take up is a

4    purely civil -- it's a receivership motion.  And when I get to

5    the portion that might possibly involve him needing advice on

6    his Constitutional rights, then we'll take that up, okay?

7          *MS. SANDERS:*  Understood.  Thank you, Your Honor.

8          *THE COURT:*  But, again, thank you for being here

9    today.  Again, this is done simply as an abundance of caution.

10          And Mr. Johnson, thank you for being here today.

11          *DEFENDANT JOHNSON:*  You're welcome, Your Honor.

12          *THE COURT:*  All right.  We have several matters to

13    take up today.  And you've heard me express this the last

14    couple of times you've been here, Mr. Johnson, there isn't a

15    lot of time for shenanigans.

16          We do have a very busy docket, I've had a very busy

17    morning.  You have an outstanding $71 million judgment, as I

18    said at the previous hearing, that has not been stayed, has

19    not been superseded.

20          You were involved in every type of avoidance when it

21    came to the underlying case, you would not answer questions,

22    you would not cooperate.  You went through, at least, two

23    attorneys I can think of.  I've admonished you several times

24    that you need to think about trying to find an attorney.  I've

25    threatened you with contempt at various times.

1          I ordered you to appear at the courthouse and answer

2    post-judgment discovery and to give your deposition.  I am at

3    the end of my rope.  I don't have any more patience, and I do

4    not think it would be in your best interest to do what you've

5    done previously with me; and that is, to not answer questions,

6    not cooperate.  It's just not going to end well.

7          I've done everything that I can possibly do to

8    ensure that, not only do you have all the due process that

9    you're entitled under our Constitution and our common law

10   system, but also even more so.  Indeed, I've even asked a

11   public defender to be here today.

12         So, it's probably not going to be in your best

13   interest to do anything other than answer my questions and

14   participate.  We don't have time to listen to stories.  I'm

15   trying to get to the bottom of this.

16         I cannot make it any clearer than I made at the last

17   hearing, that you have a $71 million judgment, the plaintiffs

18   are entitled to collect on that judgment, and they're entitled

19   to post-judgment discovery to determine what assets you have.

20         Thus far, you have been absolutely, 100%

21   uncooperative.  As a result of that, the plaintiffs have filed

22   a motion for a receivership.  Now, a receiver is appointed by

23   the Court to, basically, take control of your assets and your

24   estate, and determine what's out there and what is subject to

25   the judgment that the plaintiffs have.

1        The motion that has been filed by the plaintiffs

2    appears very meritorious to the Court.  Indeed, you said at

3    the last hearing that we had about, I believe it was a little

4    over a week ago, that you would not object to the appointment

5    of a receiver.  And I have done my best to try and identify

6    some attorneys and some law firms that I know have the ability

7    to serve as receiver in this case that I believe are best

8    suited to do so.

9        If we would like to hear argument on the receiver,

10   I'd be happy to hear it.  But I think it might be best for me

11   to ask you, Mr. Johnson, Are you going to object?  Because you

12   did not file a response to the motion to appoint a receiver

13   filed by the plaintiffs.  Are you objecting to the appointment

14   of a receiver of your estate?

15              *DEFENDANT JOHNSON:*  No objections, Your Honor.

16              *THE COURT:*  Okay.  You need to be sure you stand

17   when you address the Court.

18              *DEFENDANT JOHNSON:*  Oh, sorry, yes.

19              No objections, Your Honor.  I don't think it will be

20   totally necessary, but they're *(sic)* happy to comb through all

21   of my assets.

22              *THE COURT:*  Okay.  No need to engage in a colloquy

23   with the Court.

24              *DEFENDANT JOHNSON:*  No objection.

25              *THE COURT:*  No objection.

1          Mr. Thompson, before I make my ruling on the

2     unopposed motion, is there anything you'd like to say with

3     regards to the appointment of the receiver?

4          *MR. THOMPSON:*  No, Your Honor.  We'll just stand

5     on -- on our motion for receiver and the supplement that we

6     filed.  We think a receiver is necessary, even more so

7     following the deposition.  We have no objection to the

8     tentative recommendations that Your Honor cited for the

9     receiver, and we're happy to go forward.

10         *THE COURT:*  Okay.  Well, I'd like to take this like

11    the old Johnny Cash song, One Piece at a Time; let's do it one

12    piece at a time, and we'll gradually get to the end, okay?

13         So, hearing no objection, and having reviewed the

14    carefully filed and constructed motion for receiver filed by

15    the plaintiffs, the Court's determined that it is appropriate

16    in this case, that all of the legal requirements for the

17    appointment of a receiver have been met in this case, it's not

18    been objected to by Mr. Johnson.

19         Now, Mr. Johnson, the Court, after much study and

20    consideration, has determined the appropriate folks to appoint

21    as a receivership in this case, both to protect you and to

22    protect the plaintiffs -- and again, you should take comfort

23    in the fact that I have a lot of respect and admiration for

24    Mr. Robert Webster, who was suggested by the plaintiffs.  But

25    out of abundance of caution, quite frankly, given your

1    proclivity to engage in conspiracies and to feed conspiracy

2    theories, I went an entire different direction and decided not

3    to appoint Mr. Webster.  Although, I've known Attorney Webster

4    for almost 20 years, and I can assure you no one is better

5    suited to serve as a receiver, and certainly look out for your

6    interests, as well as the Court's and the plaintiffs'.

7            But partially, at least, in consideration from some

8    of your concerns, I've decided that the receiver that I will

9    appoint in this case is the law firm of Vedder Price.  I've

10   asked the two attorneys over there that will be conducting and

11   be appointed as receiver in this case to please appear at the

12   hearing today.  I see that they're out there.

13           Mr. Ansley, would you please step forward, along

14   with Mr. Farrell.

15           *(Attorneys approach the bench)*

16           *THE COURT:*  Why don't both of you two make an

17   appearance on the record, just so it's clear.

18           *MR. ANSLEY:*  Yes, Your Honor.

19           *THE COURT:*  I don't believe I'll need to hear

20   anything else from you.  But make your appearance, and if I

21   need anything, or we need you later, it's good that you're

22   here.

23           Thank you, Mr. Ansley.

24           *MR. ANSLEY:*  Jeff Ansley with Vedder Price.

25           *MR. FARRELL:*  Good afternoon, Judge.  Adam Farrell

1    with Vedder Price.

2              THE COURT:  All right.  Thank you, gentlemen.  If

3    you'll have a seat at counsel table.

4              So, in choosing the law firm of Vedder Price, and

5    Mr. Ansley and Mr. Farrell, to serve as your receiver, again,

6    I did this trying to find the most capable folks to serve as

7    receiver while still maintaining your interest.

8              Mr. Ansley is a longtime prosecutor, criminal

9    defense attorney, as well as commercial litigation attorney

10   here in the Dallas/Fort Worth area.  He's not only served at a

11   large law firm here in Fort Worth for a number of years, but

12   he also has experience both at the Security and Exchange

13   Commission, the U.S. Attorney's Office, and he is a longtime,

14   well-respected criminal defense attorney in the white-collar

15   space.  So, I thought he would be perfect for this.  Unlike,

16   perhaps, maybe Mr. Webster, he also has a staff that can look

17   into the assets in this case and pursue correct claims.

18             I believe, Mr. Ansley, that I saw a release

19   recently, I believe you-all have hired an additional former

20   Assistant U.S. Attorney that dealt with questions involving

21   the affirmative civil enforcement division; is that correct?

22             MR. ANSLEY:  That's correct, Your Honor.  We hired

23   Andrew Robbins from the U.S. Attorney's Office in Dallas.

24             THE COURT:  I'm obviously not going to direct the

25   receiver as how to staff your cases.  But having been at the

1    U.S. Attorney's Office several years ago, I can tell you, as

2    you well know, too, Mr. Ansley, that attorney would certainly

3    have the ability to be able to look at assets and determine

4    what's recoverable from a judgment and what's not.

5        *MR. ANSLEY:*  *(Nods head)*

6        *THE COURT:*  So, I was glad -- that was another thing

7    that played into my reason to appoint you-all.  Thank you.

8        Mr. Farrell is well-known here in Fort Worth.  He

9    was a law clerk for the Honorable Reed O'Connor, the Honorable

10   Terry Means, and he also did some work for me.  I know him to

11   be honest and forthright.

12       He's also a retired Air Force captain, where he was

13   a prosecutor, and has experience in both prosecution and

14   defense work, as well as advising the highest levels of

15   command in the Pacific Ocean Command for the Air Force on

16   various strategic decisions.

17       Is that a good way to put it, Mr. Farrell?

18       *MR. FARRELL:*  Yes, Your Honor.

19       *THE COURT:*  And he's, I believe, been at Vedder

20   Price for several months.  So I thought that he would be a

21   good person to deal with this, too.  Like Mr. Ansley, I

22   personally know him to be honest and forthright.

23       And I can assure you, Mr. Johnson, that both of

24   these individuals are there not only to determine what assets

25   you have and what is appropriate, but they're also not going

1   to be conceding that any assets that would not be subject to

2   the judgment; if they are exempt, they won't be going after

3   them.  So they are very well versed in this kind of thing.

4           But, unfortunately, when you have a judgment -- I

5   warned you about this several months ago, when you represented

6   yourself in trial.  When you have a judgment against you and

7   you don't stay the judgment or supersede the judgment, it is

8   collectible; and that's where we are.  And you have not been

9   cooperative, and I am left with no other choice but to do

10  this.  And again, I'll note that you haven't objected to it.

11          So, effective here on out, after this hearing today,

12  I will be signing the proposed order for a receiver that

13  Mr. Thompson submitted, giving all those powers listed therein

14  to the two receivers.  It might be a good idea for you to

15  visit with them at some point today.

16          Mr. Thompson, do you have any questions for me?

17          *MR. THOMPSON:*  No, Your Honor.

18          *THE COURT:*  Okay.

19          *MR. THOMPSON:*  On the receiver aspect of it.

20          *THE COURT:*  And probably a good idea for you to

21  visit with the receivers as well.

22          But these two gentlemen and their law firm stand

23  effectively into the shoes of the Court.  They are effectively

24  appointed as my officers to go out and determine what assets

25  you have and what is recoverable, because you've refused to

1   cooperate.  And to the extent that you don't cooperate with

2   them, I'm sure that they will let me know.

3           Do my receivers have any questions for me?

4           *MR. ANSLEY:*  No, Your Honor.

5           *THE COURT:*  All right.  Thank you, gentlemen.

6           *DEFENDANT JOHNSON:*  May I ask a question, Your

7   Honor?

8           *THE COURT:*  Yes, sir.

9           *DEFENDANT JOHNSON:*  So, I have a fiancee that is

10  pregnant that has like difficulties, and if it's possible with

11  the receivers, I'd prefer not to be coming down to Fort Worth

12  and Dallas, if we can do it over the phone.  Is that possible?

13          I'm happy to send them all my assets.  I have no

14  objection to them, and, frankly, kind of happy that you chose

15  them.

16          *THE COURT:*  I'll let you visit with them.

17          *DEFENDANT JOHNSON:*  Okay.  Thank you.

18          *THE COURT:*  As I said, they effectively stand in my

19  shoes.  I've known both of these individuals over here for --

20  at least Mr. Ansley, for probably almost 30 years.  I can

21  assure you, if you cooperate with him, he'll cooperate with

22  you, okay?

23          *DEFENDANT JOHNSON:*  Okay.

24          *THE COURT:*  All right.  Now let's take up our

25  remaining issues.

1          In addition to having a hearing today with regards

2     to plaintiffs' motion for a receiver, the Court has also

3     ordered defendant to appear today and show cause why he

4     apparently failed to comply in good faith with the order that

5     I entered that he had to comply with post-judgment discovery.

6          And that not only deals with the failure to answer

7     interrogatories, written discovery information regarding his

8     assets, but also his failure to answer questions at the

9     deposition that was noticed to take place at the courthouse on

10    Monday.

11         Counsel for plaintiff has submitted a rough draft of

12    the deposition, and I've had a chance to review it.  And the

13    only thing that I can say to describe your behavior in the

14    deposition, Mr. Johnson, is that you were either unresponsive,

15    or obstructive throughout the deposition, and it was largely a

16    complete waste of time.  And the transcript speaks for itself.

17         It was also brought to my attention, and this is

18    part of the order causing you to appear today, that certain

19    items showed up missing from Judge O'Connor's jury room; and

20    that would be all of the water the taxpayers had paid for for

21    our jurors, and then also there was mug that was taken.

22         Why don't we do, as I said, the Johnny Cash method,

23    and take up the alleged theft of Government property first.

24    And before I do that, as I said, out of abundance of caution,

25    before I consider your response to the allegation that you

1    stole Government property from the jury room, I think it might

2    be ideal for me to formally appoint Ms. Devon Sanders, one of

3    our best Federal Public Defenders here in Fort Worth.  And I

4    will appoint her as standby counsel in this case.  And she is

5    there if you have any questions about your Constitutional

6    rights.

7              *DEFENDANT JOHNSON:*  No, Your Honor.  I can clear it

8    up, rather quickly, if you'd like.

9              *THE COURT:*  Would you like to visit with her?

10             *DEFENDANT JOHNSON:*  No, I don't.

11             *THE COURT:*  So you don't choose to use her services?

12             *DEFENDANT JOHNSON:*  Correct.  I'm happy to have her

13   present next to me, but I don't need her services.

14             *THE COURT:*  Okay.

15             *DEFENDANT JOHNSON:*  If I may very quickly?

16             *THE COURT:*  No, you may not.

17             *DEFENDANT JOHNSON:*  Okay.

18             *THE COURT:*  I'm still talking to you.

19             Ms. Sanders, have you had a chance to at least maybe

20   visit with him about his rights under the Fifth Amendment, or

21   should I give him his Miranda warnings at this time?  It

22   sounds like he's declined to have you represent him, so I hate

23   to put you in a spot.  I would like for you to remain as just

24   standby counsel.

25             *MS. SANDERS:*  Absolutely, Your Honor.

1          I have communicated with Mr. Johnson.  But I agree,

2  out of an abundance of caution, if you could give him those

3  warnings, I think that might be best for everyone involved.

4          *THE COURT:*  I think so, too.

5          *DEFENDANT JOHNSON:*  Just to be clear, I checked my

6  Miranda rights this morning, and I'm happy to waive them.  I'm

7  happy to speak on my own behalf.

8          *(Discussion between defendant and counsel)*

9          *DEFENDANT JOHNSON:*  Yes, Your Honor.

10          So --

11          *THE COURT:*  Wait.  Be careful.  I'm really, really

12  -- this is it for you, buddy.  I'm trying to be patient, but

13  I've been dealing with this for at least nine months, okay?

14          *DEFENDANT JOHNSON:*  Yes, Your Honor.

15          *THE COURT:*  I want to make sure -- Ms. Sanders,

16  thank you for, again, being here and trying to admonish

17  Mr. Johnson, although he's not your client.  Sounds like he

18  doesn't want your advice.  It's one thing to say that to the

19  Court-appointed attorney, its another to me.

20          I am going, at this time, to read you your rights

21  under the famous *United States vs. Miranda* case regarding your

22  rights -- I'm sorry, *Miranda vs. Arizona* case, regarding your

23  rights under the Constitution when it comes to

24  self-incrimination.

25          I would ask that you please listen carefully.  You

1    said that you understand these rights?

2         *DEFENDANT JOHNSON:* I do, Your Honor.

3         *THE COURT:* Okay. Well, let me read them to you,

4    and I'll ask you a follow-up question.

5         Mr. Johnson, you have the right to remain silent.

6    Anything you say can and will be used against you in a court

7    of law.

8         You have the right to speak to an attorney, and have

9    an attorney present during questioning. If you cannot afford

10   a lawyer, one will be provided for you at Government expense.

11        Do you understand those rights as I've read them to

12   you?

13        *DEFENDANT JOHNSON:* I do and I waive them.

14        *THE COURT:* And you understand that if you so

15   desire, I will take a break and let you visit with Ms. Sanders

16   and we'll appoint her to act as your attorney?

17        *DEFENDANT JOHNSON:* I do, Your Honor. And she's not

18   necessary at this time.

19        *THE COURT:* Okay. Please answer questions yes or no

20   and that goes for the remainder of the hearing.

21        *DEFENDANT JOHNSON:* Yes.

22        *THE COURT:* I want you to go over to the podium.

23        *DEFENDANT JOHNSON:* Okay.

24        *THE COURT:* Why don't you grab the mug there.

25        As I said, let's take up the issue of the property

1  that was allegedly removed from the jury room.

2       Did you remove the items as I've described them?

3       *DEFENDANT JOHNSON:*  I did, Your Honor.

4       *THE COURT:*  Okay.  It's your opportunity to show

5  cause.  Why did you do that?

6       *DEFENDANT JOHNSON:*  Several reasons.

7       One, I asked previously if anything that was in the

8  kitchenette was mine to take; and I was informed that, yes, I

9  could.  I then asked about the mug, but there is no sink in

10 the kitchen.  And so I went back and took the mug back to my

11 hotel room, bought some dish soap -- and gave four water

12 bottles that I had taken previous -- or that I had taken, and

13 gave two of them to some homeless people outside of my

14 courtroom -- or outside of the Courtyard Marriott, where I was

15 staying.  I then gave two more to other homeless people in the

16 area.

17       Since this trial has begun --

18       *THE COURT:*  So you removed Government property, and

19 you took the water bottles and gave them to homeless folks.

20 And you took a mug and took it back and washed it?

21       *DEFENDANT JOHNSON:*  Correct.

22       And I brought some tea with me, because there's no

23 tea options -- not a lot of healthy options in the courthouse.

24       So, I was there for six hours.  I think I --

25       *THE COURT:*  This was not meant as a spa trip.  This

1    was meant for you to actually answer truthfully the questions.

2                *DEFENDANT JOHNSON:*  Yes.

3                *THE COURT:*  And you're saying somebody in the Court

4    staff told you that you could use Government property, and you

5    could take the water bottles and give them away and you could

6    take the mug back to your hotel?

7                *DEFENDANT JOHNSON:*  They never said that I could

8    take it back to my hotel.  But they did say -- I did ask if

9    everything that was in that room was mine to use.

10               *THE COURT:*  Okay.

11               *DEFENDANT JOHNSON:*  I'm perfectly willing to go down

12   to county lockup over a mug, which has been returned.

13               *THE COURT:*  Let me --

14               *DEFENDANT JOHNSON:*  The same with the water bottles,

15   I'm perfectly willing to sit before a jury --

16               *THE COURT:*  You have a tendency not to know when to

17   be quiet, okay?

18               *DEFENDANT JOHNSON:*  Yes.

19               *THE COURT:*  I'm trying to be as polite as possible.

20               *DEFENDANT JOHNSON:*  Actually, I didn't steal a

21   Bible, it was returned to me by one of the --

22               *THE COURT:*  Again --

23               *DEFENDANT JOHNSON:*  -- homeless people I gave it to.

24               *THE COURT:*  -- please be quiet unless there's a

25   question outstanding.  You can have a seat.

App.1436

1          *DEFENDANT JOHNSON:*  Thank you.

2          *THE COURT:*  Mr. Thompson, do you care to respond to

3    this?  You would have been there.

4          *MR. THOMPSON:*  Yes, I do.

5          I disagree with Mr. Johnson's statements.  As to the

6    water bottles, I don't recall anyone saying anything.

7          I did have a recollection about the mug, because I

8    was in the discussions.  It was four people there, myself, the

9    court reporter, the videographer, and Mr. Johnson.  The

10   deposition had concluded, or at least I called time on it when

11   he, it was clear, wasn't going to answer the questions.

12         He said, I'd like a souvenir for my time here.  And

13   he brought the mug that he had with him, he says -- I said --

14   he says, Can I take it?  I said, I don't think so, it's not

15   yours.  I specifically said, It's not your mug.  And I said,

16   why would you want it?  I said, I don't know why you want to

17   take it because it's a Tarrant County Bar Association mug.

18         And I distinctly recall, and I wrote this down,

19   Mr. Johnson saying, Well, I suppose it is better to ask for

20   forgiveness than to ask for permission, or maybe it's easier

21   to ask for forgiveness than it is permission, and then walked

22   out.  And then made another quip, because Mr. Johnson at the

23   deposition had said, repeatedly, that he might be called in

24   for a show cause hearing, but he wouldn't -- there would be no

25   -- he could always leave.  He mentioned having -- the worst

1  thing that would come about it is he'd have to eat some food

2  he shouldn't have to.  But he says, I guess this will be my

3  mug shot; and he kind of held that up.

4          *THE COURT:*  It's a pretty clever pun.

5          *MR. THOMPSON:*  And, Your Honor, I didn't print it

6  out, but I read Mr. Johnson's social media Substack, and he

7  posted a picture with the mug, and said, This is my mug shot,

8  and just, you know -- but that's all I have to say.

9          I disagree with Mr. Johnson's characterization.

10  Neither myself, nor the court reporter, nor the Court staff,

11  ever granted him any type of permission; and instead we said

12  it was not his mug.

13          *THE COURT:*  Thank you.

14          I hate to do this to the Court Security Officer.

15  But does Mr. Johnson's story about a court staff person

16  telling him that he could make use of the kitchenette sound

17  credible to you, given that either you or one of your officers

18  down there you supervise are the one that led him up to the

19  kitchenette and the jury room?

20          *SECURITY OFFICER:*  No, sir.  It is not.

21          I, myself, escorted Mr. Johnson to Judge O'Connor's

22  jury room on the third floor.  I advised Mr. Johnson where the

23  men's room was, adjacent to the jury room, and indicated rooms

24  where he would be deposed, and advised him to remain in that

25  area until the conclusion of the deposition.

1        *THE COURT:*  Thank you, Officer.

2        Mr. Johnson, having heard the response to the show

3   cause order, having heard from Mr. Thompson and the Court

4   Security Officer as to their version of what happened, and,

5   quite frankly, having worked in this building for the past six

6   and a half years, and knowing that even the Judge can't take

7   water from the jury room, I am deeply disturbed by the fact

8   that you undertook these actions.

9        This was not meant for you to come up here and make

10  a joke of this.  And it seems like that's all you have been

11  able to do.  I think that the least severe sanction that I can

12  think of to correct the behavior, and that would be, frankly,

13  I can't think of another word for it, but stealing Government

14  property, would be a $1,000 fine, due and payable immediately

15  at the conclusion of this hearing down in the Clerk's Office,

16  for removing those items without permission.

17       So that's Johnny Cash's first piece of the Cadillac.

18  Let's go to the second piece.  You've also been ordered to

19  show cause, and this is the second time, as to why you did not

20  make a good-faith effort to comply with the post-judgment

21  written discovery.

22       Based on the current filings before the Court, you

23  still have not answered, for example, the interrogatories.

24  We're not taking the deposition up at this time, as I said,

25  this is the second piece of the Cadillac that we're trying to

1  put together here.  I only care about the -- what is it,

2  Mr. Thompson, do we have two outstanding orders or one at this

3  point that he comply with post-judgment discovery?  I have the

4  original order, and then the second one from the last hearing;

5  is that correct?

6         *MR. THOMPSON:*  That's my understanding, Your Honor.

7         *THE COURT:*  Okay.  So why don't you frame it for us,

8  and then we'll allow Mr. Johnson to respond.  But is the

9  Court's statement correct, that there has been absolutely no

10 compliance with the Court's two orders and admonishments, and

11 we do not have answers to that written discovery?

12        *MR. THOMPSON:*  Yes, Your Honor.

13        A little color on that.  As to the order,

14 plaintiffs, last week -- or the week before, had moved to

15 compel Johnson to enter -- excuse me, answer two

16 interrogatories as to his assets and also his cryptocurrency

17 holdings.  Your Honor granted that after the November 10th

18 hearing.  Those were never answered.

19        Mr. Johnson, at the deposition, didn't bring those

20 interrogatory answers.  Those were due on the previous

21 Saturday.  Your Honor ordered them five days from November

22 10th.  We didn't receive anything, he did not bring them to

23 the deposition.

24        What he said was, he gave that -- he gave them to

25 his dad to mail.  And I just checked, five minutes before our

1    hearing, at 2:00 today, and my office had not received any

2    mail related to these interrogatories.  Mr. Johnson also

3    provided no proof that he had mailed them.  So that's the

4    answer on the interrogatories.

5              I guess the only corollary to that is --

6         THE COURT:  And he swore under oath -- I'm assuming

7    you swore him in at the deposition -- to this story?  Was this

8    story on the record?

9         MR. THOMPSON:  This story was under oath.  He was

10   sworn in by the court reporter.

11        THE COURT:  And that's evidenced by the rough

12   transcript that you filed with the Court; is that correct?

13        MR. THOMPSON:  Correct, Your Honor.  We requested

14   the rush transcript on that, it was long.

15             But multiple times I noted to Mr. Johnson that -- at

16   the very beginning, outset of the deposition, I said that the

17   oath that he swore in that deposition was the same as if he

18   was before Judge Pittman in the courtroom; and Mr. Johnson

19   said that he understood that.

20             Mr. Johnson has like -- said that he would answer

21   minimal questions about his assets.  The word that he

22   repeatedly used was, I think, "Minimal compliance."  And I

23   discuss that more in Docket Entry 131, our supplement -- or

24   excuse me, Docket Entry 136, plaintiffs' supplement to support

25   a motion to appoint a receiver.

1          I asked Mr. Johnson what minimum compliance was; he

2    said, Well, it's the absolute minimum.  So I said, You're not

3    going to tell me about all your assets; and he said something

4    along the lines of that's correct.

5          THE COURT:  And again, so our record is clear, we're

6    just talking about the written discovery.  I'll get to the

7    deposition.

8          MR. THOMPSON:  Sure.  Absolutely.  So, that's the

9    answer on the interrogatories.

10          Your Honor's order on plaintiffs' motion to compel

11    post-judgment discovery also compelled Mr. Johnson to bring

12    certain documents to the deposition, to show up to the

13    deposition with those documents.  Included within the

14    plaintiffs' request Mr. Johnson was ordered to produce were

15    tax returns; he produced nothing.  Again, citing to some

16    unnamed government authority that he was operating under.

17          That is the best summary of Mr. Johnson's compliance

18    with Your Honor's orders on the production of interrogatories

19    and outstanding document requests.

20          THE COURT:  Okay.

21          All right.  Mr. Johnson, it's been laid out by both

22    the Court and Mr. Thompson.  Please approach the stand, and

23    let's have your opportunity to show cause.  And again --

24          DEFENDANT JOHNSON:  Sure.

25          THE COURT:  -- I don't need a long colloquy.

1      *DEFENDANT JOHNSON:*  Very -- very quickly.

2      *THE COURT:*  Stop.

3      *DEFENDANT JOHNSON:*  Sorry.

4      *THE COURT:*  We're only dealing with the written

5  discovery, and that includes the documents you were supposed

6  to bring to your deposition, that includes the orders that you

7  were subject to to answer the post-judgment discovery.

8          I've read the deposition transcript.  As I said, you

9  were unresponsive and obstructive to each and every question

10  dealing with the written discovery.  Mr. Thompson has said you

11  didn't bring any requested documents, the ordered documents,

12  rather, to the deposition.  And this is part of the reason

13  necessitating the appointment of a receiver.

14          So, it's your chance, tell me why you should not be

15  sanctioned and/or held in contempt.

16      *DEFENDANT JOHNSON:*  Very simply, Your Honor.  You

17  said at the last hearing that we came together that you would

18  stop the abuse and harassment that would take place in the

19  discovery where there were questions that were asked that had

20  nothing to do with my post-judgment assets.  And there were,

21  quite a number of questions.  My relationship with the FBI, my

22  relationship with somebody who's currently facing criminal

23  charges, there were quite a number of questions.  It went on

24  for six hours, which is probably why I wanted the water.

25          And so, yes, there is an abuse of process that's

| | |
|---|---|
| 1 | been going on, the abuse of process started when I -- |
| 2 | THE COURT:  Did you bring any documents with you? |
| 3 | DEFENDANT JOHNSON:  I did not, Your Honor. |
| 4 | THE COURT:  Did you answer interrogatories? |
| 5 | DEFENDANT JOHNSON:  I did answer the interrogatories |
| 6 | when he asked them in the room, yes.  And I did answer them, |
| 7 | and I did -- |
| 8 | THE COURT:  We'll get to the deposition in a moment. |
| 9 | DEFENDANT JOHNSON:  Yeah. |
| 10 | THE COURT:  Okay.  That is absolutely noncompliant. |
| 11 | So you've violated two of my orders.  And I'm left with no |
| 12 | other choice but to hold you in contempt for failure to comply |
| 13 | with the ordered post-judgment discovery and providing those |
| 14 | documents, you were ordered to do so. |
| 15 | So we're going to put that aside.  You can have |
| 16 | another seat. |
| 17 | DEFENDANT JOHNSON:  Okay.  Thank you. |
| 18 | THE COURT:  Johnny Cash is going to try to put the |
| 19 | bumper on his Cadillac.  We're going to talk about the |
| 20 | deposition and what went on at the court-ordered deposition. |
| 21 | And Mr. Thompson, I don't think I need you for this, |
| 22 | but I am going to need Mr. Johnson.  Out of abundance of |
| 23 | caution, you were specifically ordered to comply with the |
| 24 | written discovery and bringing the various documents; you've |
| 25 | told me today you didn't do it.  The best thing I can get out |

1    of you as an excuse, is that you have some sort of FBI/CIA

2    handlers or something that's forbidding you to do that.

3            Here in the United States, even if that's true, the

4    judiciary is a coequal branch of government with the executive

5    branch or the legislative branch, and I have authority to

6    order you to do this and to produce this.  You haven't done

7    it.

8            I have taken several hours out of my day.  As you

9    know when you were here last time, I just got out of a

10   week-and-a-half-long trial.  This morning was spent sentencing

11   various criminal defendants.  But I have managed to take home

12   your deposition transcript and exhaustively read it; taking

13   time away from my family.

14           I cannot say anything else, other than regarding

15   matters that you were ordered to respond to, you were

16   consistently unresponsive, obstructive during that deposition.

17   So at this time, I am asking you to come take a seat on our

18   witness stand.  Out of abundance of caution, before I announce

19   my final decision and what will happen to you for being held

20   in contempt, I would like to give you one last opportunity to

21   comply with the Court's orders concerning the disclosure of

22   your assets.

23           So come up to the witness stand.

24               *(Defendant approaches the stand)*

25               *THE COURT:*  Before you take a seat, sir, raise your

1  right hand.

2              *(Witness sworn)*

3              *THE COURT:*  Have a seat.

4              All right.  Be sure you speak into the microphone,

5  so Monica can hear.

6              Now, as I said, I've spent several hours reviewing

7  the deposition transcript, as well as the matters before the

8  Court today.  I have taken a very close look at the deposition

9  transcript.

10             I want to note for the record at this time that your

11 answers to several of the financial questions were evasive, at

12 best.  You repeatedly refused to provide information on the

13 basis of your alleged government contracts -- contacts, and

14 you frequently interrupted Mr. Thompson and diverted to

15 unrelated narratives and nonsense.

16             Today, you're asking questions that I am -- I am

17 asking you questions and I am not the attorney.  I'm telling

18 you, you had better give me clear, direct and complete

19 responses to my questions.

20             So what I have done, Mr. Thompson, I went and

21 reviewed your deposition transcript, I don't know how any

22 counsel of any experience could have gotten through this.

23 What a difficult task for you.  I can't imagine being any more

24 frustrated, so I commend you for your patience.

25             I have picked out what I think are the most

1  pertinent questions that were unanswered at the deposition,

2  and I'm about to go through those.  But I want to let you

3  know, because Mr. Johnson was so obstructive, that I did my

4  best to try to draft the questions in the same way that you

5  stated them, but just, quite honestly, it was hard for you to

6  get any questions out.  So I have drafted the questions as

7  best I can with an eye towards that.

8         *MS. SANDERS:*  Your Honor, may I briefly approach the

9  witness?

10        *THE COURT:*  The witness has said he doesn't want to

11  consult you.

12        *MS. SANDERS:*  Just for a brief minute.

13        *THE COURT:*  Out of abundance of caution, I'll let

14  you.  But I'll note, that so far Mr. Johnson has refused to

15  take your advice or allow you to represent him.  So I'll do it

16  one time, okay?

17        *MS. SANDERS:*  Thank you.

18              *(Discussion between defendant and counsel)*

19        *THE COURT:*  Ms. Sanders, I don't want to ask you

20  what you advised Mr. Johnson, but, again, my understanding is

21  he's refusing to allow you to act as his attorney; is that

22  correct?

23        *MS. SANDERS:*  Yes your Honor.

24        *THE COURT:*  Okay.  All right.  Thank you, though,

25  again, for being here.

1          Let me ask you a few questions, answer them fully

2     and responsively.  And I'll preface this again by saying, if

3     you don't know the answer, or you're not allowed to disclose

4     pursuant to your alleged government contacts, that's not going

5     to cut it.  Do you understand that?

6          *DEFENDANT JOHNSON:*  I do, Your Honor.

7          *THE COURT:*  Okay.  Listen very closely.

8          In your deposition you stated multiple times that

9     you intended to be only, "Minimally compliant," and would not

10    -- and would provide, "not complete information" -- again, I'm

11    quoting directly from your deposition transcript "in response

12    to the Court's discovery orders."

13         The Court requires full compliance and complete

14    responses regarding your financial information.  Are you now

15    prepared to provide a complete, detailed and accurate account

16    and information about your finances?

17         *DEFENDANT JOHNSON:*  I am to the -- to those

18    gentlemen there.  Is that who I'm supposed to interact with?

19         *THE COURT:*  You're here today to answer this.

20         *DEFENDANT JOHNSON:*  Yes.  I am prepared.

21         *THE COURT:*  Okay.  All right.  Thank you.

22         Have you transferred, moved, or otherwise disposed

23    of any assets for the purpose of placing them beyond the reach

24    of Point Bridge Capital or Mr. Hal Lambert, the plaintiffs in

25    this case?

1          *DEFENDANT JOHNSON:* No.  I have not, Your Honor.

2          *THE COURT:* Okay.

3          Have many -- how many government trusts do you own

4    and how many are you a beneficiary of?  So how many trusts do

5    you currently own and how many are you the beneficiary of?

6          *DEFENDANT JOHNSON:* On the government trust side, I

7    don't know the answer.

8          *THE COURT:* Well, do you have a guess for us?  More

9    than two?

10         *DEFENDANT JOHNSON:* They were set up for me by other

11   people, so I don't know the answer to that question.

12         *THE COURT:* Well, I'm asking you to tell me how many

13   you think there might be.  One, two, three, four?

14         *DEFENDANT JOHNSON:* Maybe one, maybe two.

15         *THE COURT:* Maybe one, maybe two?

16         *DEFENDANT JOHNSON:* I don't know.

17         *THE COURT:* Maybe ten?

18         *DEFENDANT JOHNSON:* I don't know.

19         *THE COURT:* Less than ten?

20         *DEFENDANT JOHNSON:* Well, every time something is

21   done, typically there's a -- there's a asset -- or there's an

22   account that's set up for them.  So I wouldn't know the answer

23   to that question.  I'm not -- I'm not in charge of that.

24         *THE COURT:* And these are trusts that are held in

25   your benefit?

1          *DEFENDANT JOHNSON:*  I don't think so, Your Honor.  I

2     think they're held for the benefit of things that are done for

3     the government.

4          *THE COURT:*  Explain that.

5          *DEFENDANT JOHNSON:*  So my understanding is that when

6     there's work that's done on behalf of the U.S. Government,

7     there are trusts that are oftentimes created for individuals

8     who act as custodians, or they use that money for the

9     operation or for what's going on.  So I don't think that that

10    money is mine per se.

11         *THE COURT:*  Are you talking about for clandestine

12    activities?

13         *DEFENDANT JOHNSON:*  Not necessarily clandestine, but

14    for all kinds of manners.  Yeah, I don't know the answer to

15    the question, that's why I couldn't answer it the other day.

16         *THE COURT:*  Can you identify those trusts for us?

17         *DEFENDANT JOHNSON:*  I cannot, Your Honor.  I don't

18    know them.

19         *THE COURT:*  But you do know that you have them?

20         *DEFENDANT JOHNSON:*  I do know that somebody who

21    worked -- that I worked with told me that he had set them up

22    on my behalf and on behalf of my ex-wife and daughter.

23         *THE COURT:*  Who told you this?

24         *DEFENDANT JOHNSON:*  I will not say.

25         *THE COURT:*  You're refusing to answer the question;

App.1450

1    is that correct?

2         *DEFENDANT JOHNSON:*  I am, Your Honor.

3         *THE COURT:*  Okay.  Moving on.

4         How many trusts do you know of that you are the

5    beneficiary of?  And that might include something that maybe

6    your parents, or grandparents, or other family members might

7    have set up for you.

8         *DEFENDANT JOHNSON:*  I think I'm the beneficiary of

9    one that my father set up, but I don't know.

10        *THE COURT:*  How do you not know whether you're the

11   beneficiary of a trust?

12        *DEFENDANT JOHNSON:*  Typically, we are WASPs, we

13   don't really talk about that sort of thing.  We usually find

14   out when people die.

15        *THE COURT:*  That's not been my experience in 50

16   years, but -- so you don't know whether you have -- you're a

17   beneficiary of a trust or not?

18        *DEFENDANT JOHNSON:*  Correct.  I have my own trust.

19        *THE COURT:*  Okay.  Tell us --

20        *DEFENDANT JOHNSON:*  Which is --

21        *THE COURT:*  -- tell us about your own trust.

22        *DEFENDANT JOHNSON:*  Which is Xavier Capital Trust,

23   and it has two assets in it.

24        *THE COURT:*  Tell us the assets.

25        *DEFENDANT JOHNSON:*  They are the Clearview AI stock

1    and they're the Othram stock.

2            *THE COURT:*  And were these trusts -- you set these

3    trusts up?

4            *DEFENDANT JOHNSON:*  They were set up by an attorney

5    in California that was introduced to me.

6            *THE COURT:*  Well, you understand what I mean.

7            *DEFENDANT JOHNSON:*  What do you mean?

8            *THE COURT:*  You went to the attorney and asked the

9    attorney, Please set up a trust for my benefit and these are

10   the assets I want placed in the trust?

11           *DEFENDANT JOHNSON:*  Correct, Your Honor.  And that

12   was in 2019, which is beyond the scope -- or beyond the

13   questions -- time limit that Mr. Thompson asked about.

14           *THE COURT:*  You understand with the appointment of a

15   receiver all of this has to be disclosed, and whether it's

16   subject to the $70 million judgment or not, is not a question

17   for you to determine, rather it's a question for me to

18   determine?

19           *DEFENDANT JOHNSON:*  I agree, Your Honor.  I'm happy

20   to comply with the two gentlemen that you just put in charge

21   of the receivership.

22           *THE COURT:*  Let me continue.  Any other trust that

23   you can think of?

24           *DEFENDANT JOHNSON:*  No, Your Honor.

25           And Mr. Thompson asked me about a trust that was

1    called the Task Force Trust, and that involved the assets that

2    are in question here, which is --

3            *THE COURT:*  I'm asking big questions, because I want

4    you to give detailed answers.

5            *DEFENDANT JOHNSON:*  Yes.  I'm giving you as detailed

6    an answer as I can.

7            *THE COURT:*  All right.  The Task Force Trust, what

8    is that?

9            *DEFENDANT JOHNSON:*  The Task Force Trust was set up

10   by myself and brother and father.  And it was set up with the

11   intent of putting half of my interest in this special purpose

12   vehicle in a company called Umbra, which is a synthetic

13   aperture radar technology system.  And so, Mr. Lambert cheated

14   me out of that interest, so ultimately I didn't end up putting

15   it into --

16           *THE COURT:*  I don't care whether --

17           *DEFENDANT JOHNSON:*  -- the Task Force Trust.

18           *THE COURT:*  -- it was cheated or whatever --

19           *DEFENDANT JOHNSON:*  So there's no assets in the

20   trust.

21           *THE COURT:*  -- I need to know what you own --

22           *DEFENDANT JOHNSON:*  Yes.

23           *THE COURT:*  -- and you haven't been telling us.

24           *DEFENDANT JOHNSON:*  Just so you know --

25           *THE COURT:*  You're even refusing to ask *(sic)*

1   questions.

2          *DEFENDANT JOHNSON:* Okay.  And then -- so, yeah,

3   those are it for me.

4          And then my ex-wife and daughter have a trust, but

5   those assets haven't been touched since 2019.  And again,

6   those -- I think this would be the Clearview and Othram stock,

7   or they could also include some of the Umbra stock as well.

8          *THE COURT:* Okay.  Let me continue.

9          What's your best estimate of the total amount of

10  money you have received from the United States Government or

11  any foreign government?

12         *DEFENDANT JOHNSON:* I don't know.  Maybe somewhere

13  around a few million.

14         *THE COURT:* You've received $3 million from the

15  United States Government?

16         *DEFENDANT JOHNSON:* Not totally sure, Your Honor.

17         *THE COURT:* That's just a ballpark or was that a --

18         *DEFENDANT JOHNSON:* I don't know.  Because typically

19  the way it's done is sometimes you're given a contract through

20  an intermediary.  So I just don't know the answer to that

21  question, I couldn't answer it truthfully.

22         *THE COURT:* Do you want to discuss any of the work

23  you've done for the United States Government?

24         *DEFENDANT JOHNSON:* No, Your Honor.  I like doing

25  the work.  I intend to continue doing it, if I can.

1          *THE COURT:*  So you're refusing to answer the

2     question, The type of work you've made $3 million, allegedly,

3     from the United States; is that correct?

4          *DEFENDANT JOHNSON:*  Correct, Your Honor.

5          *THE COURT:*  Have you ever received any money from

6     any foreign governments?

7          *DEFENDANT JOHNSON:*  Not to my knowledge, Your Honor.

8          *THE COURT:*  What does that mean, not to my

9     knowledge?

10          *DEFENDANT JOHNSON:*  There have been times in which

11     I've been asked to take money from individuals that have

12     connections with foreign governments, but the U.S. Government

13     has been okay with it.  I've gotten a form, called an OIA,

14     when that was done, which is an otherwise illegal activity

15     form.  And that was some work I did when I was a confidential

16     informant for the FBI.

17          And, again, I would prefer not to discuss any of

18     those things, because it affects my ability to work and --

19          *THE COURT:*  Well, I don't care what you prefer and

20     not prefer, you're under oath, answer the questions.  And if

21     you don't want to answer them, that's fine; there are

22     consequences for that.  But I'm just -- I don't have time for

23     the stories.

24          So the answer is, I'm not going to disclose or I am

25     going to --

1          *DEFENDANT JOHNSON:*  Not going to disclose.

2          *THE COURT:*  Okay.  Has any United States Government

3     or -- let's keep this as broad as possible.  Has any

4     government anywhere, or any government agency, ever

5     established a bank account for you or provided you prepaid

6     cards in connection with any alleged informant work?

7          *DEFENDANT JOHNSON:*  Yes.

8          *THE COURT:*  Okay.  Describe those to us at this

9     time.

10          *DEFENDANT JOHNSON:*  Well, they're no longer

11     operational.  But I have been provided with credit card -- or

12     with credit cards with access to bank accounts, yes.

13          *THE COURT:*  By who?

14          *DEFENDANT JOHNSON:*  By -- one was my handler in the

15     FBI, and the other is a handler in a government -- another

16     government agency.

17          *THE COURT:*  Who is your handler at the FBI?

18          *DEFENDANT JOHNSON:*  He was Johnathan Boomer.  He's

19     since out, so I can talk about it.  But some of those cases we

20     worked on are still ongoing.

21          *(Court Reporter interrupts)*

22          *DEFENDANT JOHNSON:*  Yes.  J-O-H-N-A-T-H-A-N.

23          *THE COURT:*  What other government agencies are you

24     working with.

25          *DEFENDANT JOHNSON:*  I decline to answer the

1    question.

2              *THE COURT:*  Okay.  That's all I want to know.

3              Have you provided, with Mr. Thompson, a

4    comprehensive list of all the portfolio companies or

5    entities in which you hold any financial interest whatsoever?

6    Yes or no?

7              *DEFENDANT JOHNSON:*  No.

8              *THE COURT:*  Okay.  You were provided -- you were

9    required by Court order to produce monthly statements from

10   your Woodforest bank account, among other financial

11   statements, pursuant to the request for production number

12   three, which you were ordered to answer.

13             At your deposition, per the transcript, you stated

14   that you would not comply with that request.

15             Are you prepared to comply with that request now?

16             *DEFENDANT JOHNSON:*  I am, Your Honor.

17             *THE COURT:*  Do you have those documents with you?

18             *DEFENDANT JOHNSON:*  I do not, Your Honor.

19             *THE COURT:*  Okay.

20             *DEFENDANT JOHNSON:*  I don't handle any of my

21   banking.  I'd have to go call somebody to handle it for me,

22   but I don't have a phone.

23             *THE COURT:*  So you were supposed to bring those, you

24   didn't bring them --

25             *DEFENDANT JOHNSON:*  I didn't bring them.

1          THE COURT:  -- and you don't have them?

2          DEFENDANT JOHNSON:  That's right.

3          THE COURT:  Okay.  This is the last question that I

4  have; and, then, Mr. Thompson, if you'd like to do some

5  follow-up, I'll turn it over to you.  But I did the best I

6  could from the questions that you were allowed to get, okay?

7          During your deposition you were asked to identify

8  all of your bank accounts in your name; and you stated you did

9  not know.  I find that to be absolutely uncredible, zero

10  credibility.  I just do not believe that you don't know your

11  bank accounts.

12          Are you prepared today to identify and disclose

13  all -- disclose bank accounts in your name?

14          DEFENDANT JOHNSON:  I am, Your Honor.

15          THE COURT:  All right.  List them off.

16          DEFENDANT JOHNSON:  I have three bank accounts at

17  Woodforest bank, combined total assets of them are under --

18  maybe 3,000 to $4,000 currently, and that's it.  That's all

19  I've got.

20          THE COURT:  You don't have any other bank accounts?

21          DEFENDANT JOHNSON:  No, Your Honor.

22          THE COURT:  What about investment accounts?

23          DEFENDANT JOHNSON:  I don't have any of those

24  either.

25          THE COURT:  Any other that might not be in the name

1    of a -- not your name individually, but maybe an LLC, or

2    another entity that you have an interest in that you can write

3    checks or have access to cash out of the accounts?

4              *DEFENDANT JOHNSON:*  No, Your Honor.

5              *THE COURT:*  And no others, other than this one?

6              *DEFENDANT JOHNSON:*  No others.

7              *THE COURT:*  And that's a checking account?

8              *DEFENDANT JOHNSON:*  That's a checking account, yeah.

9    From Woodforest bank, which is in The Woodlands, Texas.

10             *THE COURT:*  Do you have any safe deposit boxes down

11   there?

12             *DEFENDANT JOHNSON:*  No, Your Honor.

13             *THE COURT:*  Do you have any cryptocurrency?

14             *DEFENDANT JOHNSON:*  No, Your Honor.

15             *THE COURT:*  You understand you're under oath?

16             *DEFENDANT JOHNSON:*  I do understand I'm --

17             *THE COURT:*  Lying under oath is a crime.

18             *DEFENDANT JOHNSON:*  I have no cryptocurrency.

19             *THE COURT:*  If I find that you've perjured yourself,

20   I'm referring you to the U.S. Attorney's Office for charges.

21             *DEFENDANT JOHNSON:*  By all means.

22             *THE COURT:*  Be careful what you ask for.

23             Mr. Thompson, do you have any further questions for

24   Mr. Johnson that he previously failed to answer that you'd

25   like to place on the record at this time?

1          MR. THOMPSON:  I do, Your Honor.  I'll keep it very

2   short and very brief.

3          Mr. Johnson, the Wyoming, LLC, JXC, LLC; do you know

4   what I'm talking about?

5          DEFENDANT JOHNSON:  I do.  I don't think that's the

6   exact account, but yes.

7          MR. THOMPSON:  The Wyoming, LLC, that was set to

8   take the proceeds of the sale of the Othram stock --

9          DEFENDANT JOHNSON:  Correct.

10         MR. THOMPSON:  -- are you aware of that?

11         DEFENDANT JOHNSON:  I am aware of that, yes.

12         MR. THOMPSON:  Did you set that up?

13         DEFENDANT JOHNSON:  I did not.

14         MR. THOMPSON:  Did a government handler set that up?

15         DEFENDANT JOHNSON:  Yes.

16         MR. THOMPSON:  What is the name of that government

17  handler?

18         DEFENDANT JOHNSON:  I refuse to answer the question.

19         MR. THOMPSON:  Do you know the person's name?

20         DEFENDANT JOHNSON:  Yes.

21         MR. THOMPSON:  You had no role in setting up that

22  government --

23         DEFENDANT JOHNSON:  Zero role whatsoever.

24         MR. THOMPSON:  Do you realize that you previously

25  testified that the reason that there's a Wyoming, LLC, set up

1    to take the proceeds of the Othram sale, was because your

2    family or your grandmother had a connection with Wyoming?

3              *DEFENDANT JOHNSON:*  Yes.  My handler is well aware

4    of my Wyoming connections.

5              *THE COURT:*  In fact, I believe you testified at the

6    last hearing that the reason why you were in Wyoming was due

7    to a family connection, and some assets up there that had

8    nothing to do with this case.

9              Am I misstating what you said at the last --

10             *DEFENDANT JOHNSON:*  You are, Your Honor.

11             *THE COURT:*  I am not?

12             *DEFENDANT JOHNSON:*  You are misstating it.

13             *THE COURT:*  Okay.

14             *DEFENDANT JOHNSON:*  So, I have a Wyoming connection.

15   My grandmother is from there.  She helped -- dealt with

16   accounts for Navy intelligence.  And so Wyoming is a very --

17   it's a state that intersects with a lot of U.S. interests,

18   shall we say.

19             And so, I've never been to Sheridan, I've never been

20   to that bank account.  I don't have any accounts that are in

21   -- I think it was like a -- what was the name of the bank

22   that's in there?  There was like a list or something of the

23   bank.

24             *MR. THOMPSON:*  Wells Fargo.

25             *DEFENDANT JOHNSON:*  Yeah, Wells Fargo.  I don't have

 1    a Wells Fargo account.  I think I was banned from Wells Fargo

 2    in 2019.

 3            THE COURT:  Why were you banned from Wells Fargo in

 4    2019?

 5            DEFENDANT JOHNSON:  At the time I owned lots of

 6    cryptocurrency, Your Honor.

 7            THE COURT:  What happened to all the crypto?

 8            DEFENDANT JOHNSON:  I was -- I just got rid of all

 9    of it, because then-President Donald Trump gave a Tweet where

10    he said that he didn't like cryptocurrency.  And I was under

11    the impression that there were people who were looking at me

12    in the U.S. Government around various things, and they asked

13    me to get -- just -- just disabuse myself of a lot of my

14    assets, get rid of a lot of those assets.

15            THE COURT:  Go ahead, Mr. Thompson.  I have a

16    follow-up.

17            MR. THOMPSON:  I was just going to keep this just

18    for the record.

19            Mr. Johnson, identify all of the exchanges, hard

20    wallets, or at places where your cryptocurrency was ever

21    stored since you possessed it.

22            DEFENDANT JOHNSON:  I don't know those.  But I don't

23    have any cryptocurrency.  I haven't had any since at least

24    2018/2019 time frame.

25            MR. THOMPSON:  Not my question, sir.

1    *DEFENDANT JOHNSON:*  I don't have any -- I don't have

2  any hard wallets, I don't have any paper wallets.  I don't

3  touch the stuff.  I don't like the stuff.  I think its used by

4  a lot of criminals to do a lot of dangerous --

5    *THE COURT:*  Rather than giving us a colloquy, if you

6  don't have any, say no.

7    *DEFENDANT JOHNSON:*  I have none, zero, zilch.

8    *THE COURT:*  Mr. Thompson, go ahead.

9    *MR. THOMPSON:*  My question, Mr. Johnson, is,

10  Identify the exchanges, how many hard wallets you had, where

11  you stored your cryptocurrency when you did possess it.

12    *DEFENDANT JOHNSON:*  I don't know.

13    *THE COURT:*  You have no idea where you stored your

14  cryptocurrency?

15    *DEFENDANT JOHNSON:*  I think I had a Coinbase account

16  maybe at one point, but I haven't used it.

17    *THE COURT:*  Did you ever have any hard

18  cryptocurrency that you had placed in -- underneath your bed

19  in a shoebox, or safe deposit box?

20    *DEFENDANT JOHNSON:*  No.  No, I did not.  I do not.

21    *THE COURT:*  You never had any hard cryptocurrency?

22    *DEFENDANT JOHNSON:*  I don't know.  Maybe, I could

23  have, but I don't recall it off the top of my head.  I had a

24  lot of money at the time, but I don't anymore.

25    *THE COURT:*  Do you understand that if you're in my

1   spot and you're listening to this, that it is very hard for me

2   to believe -- and I preface this by saying, I've been doing

3   this for 12 years on three different courts, I've seen a lot

4   of people testify, I've heard a lot of testimony.  I found

5   that -- find it to be completely not believable that you don't

6   know whether you had any hard cryptocurrency.

7          *DEFENDANT JOHNSON:*  I don't understand the question

8   your Honor is asking me.  I don't have any, didn't have any.

9          *THE COURT:*  You never had any hard cryptocurrency?

10         *DEFENDANT JOHNSON:*  I had some on a laptop, but that

11  was a long time ago.

12         *THE COURT:*  Would you like to do any follow-up?  I'm

13  just concerned you're never going to get any answers.

14         *MR. THOMPSON:*  I have one more question.

15         *THE COURT:*  Yeah.

16         *MR. THOMPSON:*  Because I just want to make it clear

17  for follow-up.

18         Mr. Johnson, the sale of the Othram stock, the

19  purpose of that sale was to prevent Hal Lambert and the

20  plaintiffs in this action for executing on it, correct?

21         *DEFENDANT JOHNSON:*  No.  It was not.

22         *THE COURT:*  It wasn't to prevent -- well, go ahead.

23         *MR. THOMPSON:*  That's not what you said in your

24  deposition, Mr. Johnson.

25         Mr. Johnson, in your deposition you said the purpose

1    of the transaction was, in part, to keep the sale proceeds of

2    the Othram stock from, in part, Mr. Hal Lambert and

3    plaintiffs, prevent them --

4          *DEFENDANT JOHNSON:*  I never said that.  And there's

5    video evidence that I didn't say it.

6          *THE COURT:*  I'm reading the portion of your

7    transcript, let's just -- let me ask you about that.

8          You were asked a question:  Your position is that

9    Hill *(sic)* and the plaintiffs are not entitled to the proceeds

10   of the Othram stock, or the stock itself?

11         Answer:  That's correct.

12         Question, by the attorney, Mr. Thompson:  And the

13   purpose of this transaction using the JXC Wyoming, LLC, and

14   the Wells Fargo bank account was to prevent Hill *(sic)* and the

15   plaintiffs from executing on that stock and those proceeds

16   before the matter -- before the matter in the Court case

17   concluded or before the operation concluded?

18         Answer, by Mr. Johnson:  That's a fair way of

19   putting it.  But it was -- it's about asset preservation.

20         Sounds like you admitted you were moving items

21   around and hiding them --

22         *DEFENDANT JOHNSON:*  No, Your Honor.

23         *THE COURT:*  -- and transferring them to avoid the

24   judgment.  I was using your words, not mine.

25         *DEFENDANT JOHNSON:*  Yeah.  So, asset preservation

1    means -- my understanding is that that Wyoming, LLC bank

2    account belongs, and has connections, to the U.S. Government.

3    So, putting it into an account where it can be preserved by a

4    U.S. Government trustee, that's effectively what Your Honor

5    has done by appointing those receivers.  So, I have no

6    objection in giving those gentlemen that -- that stock.

7         I do object to giving my ex-wife and daughter's

8    stock.  And I was hoping to take out the whole chunk of the

9    Othram stock because that -- those belong to my --

10        *THE COURT:*  Well, I asked you in my second question,

11   Have you transferred, moved, or otherwise disposed of any

12   asset for the purpose of placing them beyond the reach of the

13   plaintiffs?

14        You admitted to that in your deposition, it sounds

15   like you're admitting it to me here in the courtroom.

16        *DEFENDANT JOHNSON:*  I haven't moved any of it, the

17   sale never went through.

18        *THE COURT:*  Shh, be quiet.

19        *MR. THOMPSON:*  Your Honor, just to clarify, the

20   transaction has not gone through, because the buyer was --

21   became aware of the asset preservation order.  The more

22   precise, probably, question is, Has he attempted to transfer

23   any of those assets?

24        *THE COURT:*  Well, what's the answer to that?

25        Because attempting is also in violation of the

1   order.

2           *DEFENDANT JOHNSON:*  That's correct, Your Honor.

3           *THE COURT:*  Okay.  Any more questions?

4           *MR. THOMPSON:*  Just one, Your Honor.

5           Mr. Johnson, what is the operation that must

6   conclude -- before you said that -- why the assets need to be

7   preserved, you said they need to be preserved before an

8   operation is completed?

9           *DEFENDANT JOHNSON:*  Right.  That's correct.  I did

10  say that.

11          *MR. THOMPSON:*  What is the operation?

12          *DEFENDANT JOHNSON:*  I won't discuss that.

13          *MR. THOMPSON:*  What government agency is conducting

14  the operation?

15          *DEFENDANT JOHNSON:*  I won't discuss that.

16          *MR. THOMPSON:*  Do you have any communications

17  concerning this operation?

18          *DEFENDANT JOHNSON:*  I won't discuss that.

19          *MR. THOMPSON:*  Nothing further, Your Honor.

20          *THE COURT:*  Before you step down, I want to say this

21  with all -- and I'm not being facetious, I'm not making

22  accusations.  This is just really -- Mr. Johnson, I'm

23  concerned about you.  Because I'm, frankly, left with no other

24  choice, other than to hold you in contempt.  So when I ask you

25  this, please don't think I'm being accusatory.

1      Have you ever been diagnosed with a mental illness?

2      *DEFENDANT JOHNSON:* No, Your Honor. I have not.

3      *THE COURT:* Are you currently seeing any mental

4 healthcare professionals?

5      *DEFENDANT JOHNSON:* No. Not that I know of.

6      *THE COURT:* Are you on any type of psychiatric --

7      *DEFENDANT JOHNSON:* No.

8      *THE COURT:* -- type medications at the moment?

9      *DEFENDANT JOHNSON:* No. In fact, I sat for a

10 psychological evaluation maybe three months ago, and was found

11 to be doing pretty well.

12      *THE COURT:* And was that voluntary?

13      *DEFENDANT JOHNSON:* It was voluntary, yes. It was

14 to start another company.

15      *THE COURT:* Do you -- do you feel like that you're

16 mentally competent, in the sense you understand why you're

17 here and the consequences?

18      *DEFENDANT JOHNSON:* I'm very happy to be here.

19      *THE COURT:* And you understand that I'm about to

20 hold you in contempt?

21      *DEFENDANT JOHNSON:* I do understand that. I wish

22 Your Honor would not do that, because he's appointed some

23 receivers that I could work with very comfortably.

24      *THE COURT:* Well, the problem is you're still not

25 answering questions like you're supposed to.

1      So, let me ask you to please step down.  And I'm

2  going to ask you to go over to the podium, okay?

3      *DEFENDANT JOHNSON:*  Okay.

4      *THE COURT:*  At this time, the Court, having covered

5  all the three bases that I pointed out for Mr. Johnson to show

6  cause, has failed -- has made a determination, after reviewing

7  the record, hearing Mr. Johnson's testimony, hearing

8  Mr. Thompson, listening to these responses, that I'm left with

9  no choice, when I consider the least severe sanction to

10 correct the unlawful conduct, other than to order the

11 following.

12      So as I said, Johnny Cash's Cadillac had three

13 different pieces in this case.  The first thing we took up was

14 whether Mr. Johnson should be held in contempt for effectively

15 stealing government property.  That would be the mug that you

16 took, as well as the waters, from our jury room.

17      In order to correct that behavior, I am imposing the

18 least severe sanction that I believe can correct this conduct,

19 and that is to impose a $1,000 fine to be due and payable

20 immediately after this hearing.  The U.S. Marshal is going to

21 take you down to the third floor Clerk's Office, and you're

22 going to pay that today.

23      The other two pieces involve your failure to comply

24 with the Court's orders with regards to, number one, the

25 post-judgment discovery, and that includes the written

discovery you were required to respond to and the items that
you were required to bring on Monday, which you didn't do.

Again, taking my oath seriously, and considering the
least severe sanction to correct the property *(sic)*, I am
going to be holding you in contempt.

Also, the third part was the failure of you to
answer the questions that were asked of you at the deposition.
Out of abundance of caution, I have not only asked the
competent public defender to be here to provide you with legal
advice, I've read your Miranda rights, and I've even put you
on the stand to try to get you to answer these questions one
more time, and you have not done so.  Indeed, you continue to
be obstructive and try to avoid answering them.

Therefore, having no other choice, and considering
the least severe sanction necessary to correct the unlawful
conduct, I am going to make some rulings.  But I am going to
order the United States Marshal to arrest you and place you
into custody for being in contempt of court, until such time
as you purge yourself of the contempt by complying with the
Court's orders.

Mr. Johnson, throughout this case, has shown a
repeated history of failing to comply in good faith with
post-judgment discovery, despite numerous opportunities given
him to cure his unlawful conduct, including at today's
hearing, he has shown no willingness to comply with the

```
 1    Court's orders.

 2              Defendant's unlawful conduct is well-documented.

 3    Indeed, on October the 28th of 2025, plaintiffs filed a motion

 4    asking the Court to make Mr. Johnson appear and show cause to

 5    hold him in civil contempt for violating the Court's asset

 6    protection order and personally threatening plaintiff and

 7    plaintiffs' counsel, among other allegations.  That same day,

 8    the Court denied Mr. Johnson's motion to stay enforcement of

 9    the judgment, and I granted plaintiffs' motion to hold a show

10    cause hearing.

11              On November the 6th, plaintiffs filed a motion to

12    compel defendant, Charles Johnson, to respond to post-judgment

13    interrogatories and sit for his deposition and produce

14    documents.  And I, accordingly, scheduled a hearing on that

15    motion.

16              After holding a hearing on November the 10th, when I

17    was in the middle of a trial, I granted plaintiffs' motion to

18    compel, and ordered defendant to answer plaintiffs'

19    post-judgment interrogatories within five days, produce the

20    documents that he was required and asked to produce, and sit

21    for his deposition here at the courthouse on Monday, November

22    17th of 2020.

23              Subsequent to that hearing, plaintiffs then filed a

24    motion for appointment of receiver; which I have considered

25    today and granted.  I also allowed Mr. Johnson to respond to
```

1    that motion, no written response was filed, in disobedience of

2    the Court's order.

3        Thus, I conducted the hearing today.  At the hearing

4    today, Mr. Johnson has said he did not object to the

5    appointment of a receiver.  But I'll also note, that before

6    today's hearing, plaintiff did file a supplement to its

7    original motion to appoint a receiver, further documenting

8    Mr. Johnson's noncompliance with my orders; that is at ECF

9    Number 136.

10       The Court finds that while Mr. Johnson was

11   physically present for his deposition here in the courthouse,

12   the defendant failed to respond to the questions asked in good

13   faith, and repeatedly gave evasive answers while asserting

14   that his plan was to give minimal information as possible.

15       The Court staff additionally reported that defendant

16   stole mugs and water bottles belonging to the Court, resulting

17   in the $1,000 sanction.

18       In response to defendant's noncompliance, I again

19   ordered the defendant to show cause for his failure to respond

20   in good faith to the questions asked in the deposition, and

21   his failure to produce documents and serve his interrogatory

22   responses, and his theft of Court property.

23       I then gave, yet again, Mr. Johnson another chance

24   to comply with those orders at the hearing held today, and

25   I've asked him several questions, and I've also allowed

1    Mr. Thompson to ask him several questions to those asked

2    during the deposition.  And again, he's failed to respond in

3    good faith.

4          Therefore, I find Mr. Johnson to be in contempt of

5    court.  And considering the least severe sanction possible to

6    correct the unlawful conduct, the Court orders the United

7    States Marshal to arrest defendant at this time and place him

8    into custody in the Johnson County Jail as to such time as he

9    purges himself of his contempt.

10         I would ask, gentlemen, on your way down, if you

11   please drop by the Clerk's Office so he can pay his $1,000

12   fine.

13         My receivers, I don't know how long the Marshals

14   need to process him in, but I know you'll want to visit with

15   him about his assets.  Whether you want to do that today,

16   given the late hour, or whether you want to go down to Johnson

17   County, I leave it up to you.  Thank you for your service,

18   both of you.  And also, Mr. Thompson, I appreciate your

19   patience.  Ms. Sanders, thank you.

20         Anything else for the Court before Mr. Johnson is

21   taken in?

22         *MS. SANDERS:*  Briefly, Your Honor.

23         When it comes to the issue of answering questions at

24   the deposition, how would Mr. Johnson purge -- I mean, is

25   there going to be another deposition scheduled?  Should he

1  provide notice that he's ready to sit for a deposition?

2  *THE COURT:*  I think that Mr. Johnson will contact

3  someone and tell them when he's ready to answer the questions,

4  both at the deposition and the interrogatory and produce the

5  documents.  If he's ready to do that, and he purges himself,

6  he can get out of jail.

7  *MS. SANDERS:*  So providing notice?

8  *THE COURT:*  Yeah.

9  *DEFENDANT JOHNSON:*  Your Honor, if I may?

10  *THE COURT:*  But again -- please stop.

11  He's refused your services, Ms. Sanders.  So as far

12  as I'm concerned, there's no obligation for you ethically to

13  continue.  It's up to him.

14  All right.  We'll stand off the record.

15  *THE MARSHAL:*  Your Honor, Deputy Sanford.  Can we

16  determine if he can pay that fee now or just take him to the

17  third floor, because that changes our risk assessment.

18  *THE COURT:*  Okay.  Thank you, Deputy.

19  Do you have a credit card?

20  *DEFENDANT JOHNSON:*  I don't with the -- not money

21  for $1,000, I don't have it.

22  *THE COURT:*  Okay.  We'll take you in immediately,

23  and you'll also be held in contempt until you can purge

24  yourself of the $1,000 fine.

25  *DEFENDANT JOHNSON:*  I can do both of that, if I can

1   access a computer.

2          *THE COURT:*  You're going to be taken in at this

3   time, and we'll see what you can do.  It might be a good idea

4   to -- I know you're entitled to a phone call, you'll be told

5   what that process is, but you need to take efforts to purge

6   yourself of this contempt.

7          *DEFENDANT JOHNSON:*  And do I purge myself when I

8   send the material to the receivers, or do I send it -- when I

9   send it to Mr. Thompson?

10          *THE COURT:*  I'm not here to give you legal advice.

11          *DEFENDANT JOHNSON:*  Okay.

12          *THE COURT:*  You should have complied with my orders.

13   It's been nine months of this.

14          Thank you, deputies.

15          Okay.  Thank you all.  Stand in recess.

16              *(Proceedings Adjourned)*

17

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2

3        I, Monica Willenburg Guzman, CSR, RPR, certify

4    that the foregoing is a true and correct transcript from

5    the record of proceedings in the foregoing entitled matter.

6        I further certify that the transcript fees format

7    comply with those prescribed by the Court and the Judicial

8    Conference of the United States.

9        Signed this 12th day of December, 2025.

10

11                         <u>/s/Monica Willenburg Guzman</u>
                           Monica Willenburg Guzman, CSR, RPR
12                         Texas CSR No. 3386
                           NCRA No. 32278
13                         Official Court Reporter
                           The Northern District of Texas
14                         Fort Worth Division

15

16   CSR Expires:        7/31/2027

17   Business Address:   501 W. 10th Street, Room 310
                         Fort Worth, Texas  76102
18
     Telephone:          817.850.6681
19
     E-Mail Address:     mguzman.csr@yahoo.com
20

21

22

23

24

25

**DEFENDANT JOHNSON: [155]**
**MR. ANSLEY: [5]**  8/18 8/24 9/22 10/5 12/4
**MR. FARRELL: [2]**  8/25 10/18
**MR. THOMPSON: [33]**  3/6 7/4 11/17 11/19 19/4 20/5 22/6 22/12 23/9 23/13 24/8 42/1 42/7 42/10 42/12 42/14 42/16 42/19 42/21 42/24 43/24 44/17 44/25 45/9 46/14 46/16 46/23 48/19 49/4 49/11 49/13 49/16 49/19
**MS. SANDERS: [10]**  3/11 3/16 4/7 14/25 29/8 29/12 29/17 29/23 55/22 56/7
**SECURITY OFFICER: [1]**  20/20
**THE COURT: [174]**
**THE MARSHAL: [1]**  56/15

## $

**$1,000 [6]**  21/14 51/19 54/17 55/11 56/21 56/24
**$3 [2]**  36/14 37/2
**$4,000 [1]**  40/18
**$70 [1]**  34/16
**$71 [2]**  4/17 5/17

## /

**/s/Monica [1]**  58/11

## 1

**100 [1]**  5/20
**10th [5]**  1/22 22/17 22/22 53/16 58/17
**12 [1]**  46/3
**12th [1]**  58/9
**131 [1]**  23/23
**136 [2]**  23/24 54/9
**1624 [1]**  1/16
**17th [1]**  53/22
**1900 [1]**  1/13
**1:40 [2]**  1/7 3/2

## 2

**20 [3]**  1/6 3/2 8/4
**2018/2019 [1]**  44/24
**2019 [5]**  34/12 36/5 44/2 44/4 44/24
**20194 [1]**  1/16
**2020 [1]**  53/22
**2025 [4]**  1/6 3/2 53/3 58/9
**2027 [1]**  58/16
**214.743.4500 [1]**  1/14
**2200 [1]**  1/13
**28th [1]**  53/3
**2:00 [1]**  23/1

## 3

**3,000 [1]**  40/18
**30 [1]**  12/20
**310 [2]**  1/22 58/17
**32278 [1]**  58/12
**3386 [1]**  58/12

## 4

**4:24-CV-00988-P [1]**  1/4
**4:24-CV-988-P [1]**  3/3

## 5

**50 [1]**  33/15

## 6

**501 [2]**  1/23 58/17
**6**
**617.429.4718 [1]**  1/17
**6th [1]**  53/11

## 7

**7/31/2027 [1]**  58/16
**75201 [1]**  1/14
**76102 [3]**  1/20 1/22 58/17

## 8

**817.850.6681 [2]**  1/23 58/18
**817.978.2753 [1]**  1/20
**819 [1]**  1/19

## 9

**9A10 [1]**  1/19

## A

**ability [3]**  6/6 10/3 37/18
**able [2]**  10/3 21/11
**about [29]**  4/24 6/3 11/5 14/5 14/20 17/9 19/7 20/1 20/15 22/1 23/21 24/3 24/6 26/19 29/2 30/16 32/11 33/13 33/21 34/13 34/25 38/19 40/22 42/4 47/7 47/19 49/23 50/19 55/15
**absolute [1]**  24/2
**absolutely [6]**  5/20 14/25 22/9 24/8 26/10 40/9
**abundance [9]**  3/24 4/9 7/25 13/24 15/2 26/22 27/18 29/13 52/8
**abuse [3]**  25/18 25/25 26/1
**access [3]**  38/12 41/3 57/1
**accordingly [1]**  53/14
**account [13]**  30/15 31/22 38/5 39/10 41/7 41/8 42/6 43/20 44/1 45/15 47/14 48/2 48/3
**accounts [10]**  38/12 40/8 40/11 40/13 40/16 40/20 40/22 41/3 43/16 43/20
**accurate [1]**  30/15
**accusations [1]**  49/22
**accusatory [1]**  49/25
**act [3]**  16/16 29/21 32/8
**action [1]**  46/20
**actions [2]**  3/25 21/8
**activities [1]**  32/12
**activity [1]**  37/14
**actually [2]**  18/1 18/20
**Adam [1]**  8/25
**addition [1]**  13/1
**additional [1]**  9/19
**additionally [1]**  54/15
**address [3]**  6/17 58/17 58/19
**adjacent [1]**  20/23
**Adjourned [1]**  57/16
**admiration [1]**  7/23
**admitted [2]**  47/20 48/14
**admitting [1]**  48/15
**admonish [1]**  15/16
**admonished [1]**  4/23
**admonishments [1]**  22/10
**advice [5]**  4/5 15/18 29/15 52/10 57/10
**advised [3]**  20/22 20/24 29/20
**advising [1]**  10/14
**affects [1]**  37/18
**affirmative [1]**  9/21

## A

**afford [1]**  16/8
**after [7]**  7/19 11/2 11/11 22/17 51/6 51/20 53/16
**afternoon [1]**  8/25
**again [21]**  4/8 4/9 7/22 9/5 11/10 15/16 18/22 24/5 24/15 24/23 29/20 29/25 30/2 30/10 36/5 37/17 52/3 54/18 54/23 55/2 56/10
**against [2]**  11/6 16/6
**agencies [1]**  38/23
**agency [3]**  38/4 38/16 49/13
**ago [5]**  6/4 10/1 11/5 46/11 50/10
**agree [2]**  15/1 34/19
**ahead [3]**  44/15 45/8 46/22
**AI [1]**  33/25
**Air [2]**  10/12 10/15
**al [2]**  1/4 3/4
**all [37]**  3/21 4/12 5/8 6/20 7/16 9/2 9/19 10/7 11/13 12/5 12/13 12/24 13/20 20/8 21/10 24/3 24/21 28/4 29/24 30/21 32/14 34/15 35/7 39/2 39/4 40/8 40/13 40/15 40/18 41/21 44/7 44/8 44/19 49/21 51/5 56/14 57/15
**allegation [1]**  13/25
**allegations [1]**  53/7
**alleged [4]**  13/23 28/13 30/4 38/6
**allegedly [2]**  17/1 37/2
**allow [3]**  22/8 29/15 29/21
**allowed [6]**  30/3 40/6 53/25 54/25
**almost [2]**  8/4 12/20
**along [2]**  8/13 24/4
**also [22]**  5/10 9/12 9/16 10/10 10/12 10/25 13/2 13/8 13/17 13/21 21/18 22/16 23/2 24/11 36/7 48/25 52/6 53/25 54/5 54/25 55/18 56/23
**although [2]**  8/3 15/17
**always [1]**  19/25
**am [22]**  5/2 11/9 15/20 21/7 26/22 27/17 28/16 28/16 28/17 30/17 30/20 33/2 37/24 39/16 40/14 42/11 43/9 43/11 51/17 52/4 52/16 52/16
**Amendment [1]**  14/20
**among [2]**  39/10 53/7
**amount [1]**  36/9
**Andrew [1]**  9/23
**announce [1]**  27/18
**another [10]**  10/6 15/19 19/22 21/13 26/16 38/15 41/2 50/14 54/23 55/25
**Ansley [9]**  8/13 8/23 8/24 9/5 9/8 9/18 10/2 10/21 12/20
**answer [44]**  4/21 5/1 5/5 5/13 13/6 13/8 16/19 18/1 19/11 22/15 23/4 23/20 24/9 25/7 26/4 26/5 26/6 30/1 30/3 30/19 31/7 31/11 31/22 32/14 32/15 32/25 35/6 36/20 36/21 37/1 37/20 37/21 37/24 38/25 39/12 41/24 42/18 47/11 47/18 48/24 52/7 52/11 53/18 56/3
**answered [2]**  21/23 22/18
**answering [3]**  50/25 52/13 55/23
**answers [6]**  22/11 22/20 28/11 35/4 46/13 54/13
**any [55]**  5/3 5/16 11/1 11/16 12/3 14/5 20/11 23/1 25/11 26/2 28/21 28/22 28/23 29/6 30/23 34/22 36/11 36/22 37/5 37/6 37/17 38/2 38/3 38/4 38/6

**any...** [30]  39/5 39/20 40/20 40/23 40/25 41/10 41/13 41/23 43/20 44/23 44/23 45/1 45/2 45/2 45/6 45/17 45/21 46/6 46/8 46/8 46/9 46/12 46/13 48/11 48/16 48/23 49/3 49/16 50/3 50/6
**anymore** [1]  45/24
**anyone** [1]  19/6
**anything** [10]  5/13 7/2 8/20 8/21 16/6 17/7 19/6 22/22 27/14 55/20
**anywhere** [1]  38/4
**aperture** [1]  35/13
**apparently** [1]  13/4
**appear** [5]  5/1 8/11 13/3 13/18 53/4
**appearance** [2]  8/17 8/20
**appears** [1]  6/2
**appoint** [10]  6/12 7/20 8/3 8/9 10/7 14/2 14/4 16/16 23/25 54/7
**appointed** [6]  3/12 5/22 8/11 11/24 15/19 50/22
**appointing** [1]  48/5
**appointment** [8]  6/4 6/13 7/3 7/17 25/13 34/14 53/24 54/5
**appreciate** [1]  55/18
**approach** [3]  8/15 24/22 29/8
**approaches** [1]  27/24
**appropriate** [3]  7/15 7/20 10/25
**are** [39]  5/18 6/7 6/11 6/13 10/24 11/2 11/3 11/8 11/23 20/18 28/25 30/14 31/4 31/5 31/24 31/24 32/2 32/7 32/7 32/11 33/4 33/12 33/25 34/9 35/2 36/3 37/21 38/20 38/23 39/15 40/12 40/17 42/10 43/10 43/12 43/20 47/9 50/3 50/6
**area** [3]  9/10 17/16 20/25
**argument** [1]  6/9
**Arizona** [1]  15/22
**around** [3]  36/13 44/12 47/21
**arrest** [2]  52/17 55/7
**aside** [1]  26/15
**ask** [18]  6/11 12/6 15/25 16/4 18/8 19/19 19/20 19/22 29/19 30/1 35/25 41/22 47/7 49/24 51/1 51/2 55/1 55/10
**asked** [23]  3/18 5/10 8/10 17/7 17/9 24/1 25/19 26/6 34/8 34/13 34/25 37/11 40/7 44/12 47/8 48/10 52/7 52/8 53/20 54/12 54/20 54/25 55/1
**asking** [7]  27/17 28/16 28/17 31/12 35/3 46/8 53/4
**aspect** [1]  11/19
**asserting** [1]  54/13
**assessment** [1]  56/17
**asset** [6]  31/21 47/19 47/25 48/12 48/21 53/5
**assets** [29]  5/19 5/23 6/21 9/17 10/3 10/24 11/1 11/24 12/13 13/8 22/16 23/21 24/3 25/20 27/22 30/23 33/23 33/24 34/10 35/1 35/19 36/5 40/17 43/7 44/14 44/14 48/23 49/6 55/15
**ASSISTANT** [2]  1/18 9/20
**assisting** [1]  3/10
**Association** [1]  19/17
**assuming** [1]  23/6
**assure** [3]  8/4 10/23 12/21
**attempted** [1]  48/22
**attempting** [1]  48/25
**attention** [1]  13/17

**attorney** [17]  4/24 8/3 9/9 9/9 9/14 9/20 10/2 15/19 16/9 16/9 16/9 16/9 28/17 29/21 34/4 34/8 34/9 47/12
**Attorney's** [4]  9/13 9/23 10/1 41/20
**attorneys** [4]  4/23 6/6 8/10 8/15
**authority** [2]  24/16 27/5
**avoid** [2]  47/23 52/13
**avoidance** [1]  4/20
**aware** [4]  42/10 42/11 43/3 48/21
**away** [2]  18/5 27/13

## B

**back** [5]  17/10 17/10 17/20 18/6 18/8
**ballpark** [1]  36/17
**bank** [15]  38/5 38/12 39/10 40/8 40/11 40/13 40/16 40/17 40/20 41/9 43/20 43/21 43/23 47/14 48/1
**banking** [1]  39/21
**banned** [2]  44/1 44/3
**Bar** [1]  19/17
**Based** [1]  21/22
**bases** [1]  51/5
**basically** [1]  5/23
**basis** [1]  28/13
**be** [66]
**became** [1]  48/21
**because** [20]  3/20 6/11 11/25 17/22 19/7 19/17 19/22 29/3 35/3 36/18 37/18 43/1 44/9 46/16 48/9 48/20 48/25 49/23 50/22 56/17
**bed** [1]  45/18
**been** [31]  3/12 4/14 4/18 4/19 5/20 6/1 7/17 7/18 9/25 10/19 11/8 15/13 18/12 19/3 21/10 21/18 22/9 24/21 26/1 33/15 35/23 36/5 37/10 37/11 37/13 38/11 43/19 43/19 46/2 50/1 57/13
**before** [20]  1/9 7/1 13/24 13/25 18/15 21/22 22/14 22/25 23/18 27/18 27/25 28/7 47/16 47/16 47/17 49/6 49/7 49/20 54/5 55/20
**beginning** [1]  23/16
**begun** [1]  17/17
**behalf** [5]  3/14 15/7 32/6 32/22 32/22
**behavior** [3]  13/13 21/12 51/17
**being** [8]  3/19 4/8 4/10 15/16 27/19 28/23 29/25 49/21 49/25 52/18
**believable** [1]  46/5
**believe** [10]  6/3 6/7 8/19 9/18 9/19 10/19 40/10 43/5 46/2 51/18
**belong** [1]  48/9
**belonging** [1]  54/16
**belongs** [1]  48/2
**bench** [1]  8/15
**beneficiary** [6]  31/4 31/5 33/5 33/8 33/11 33/17
**benefit** [3]  31/25 32/2 34/9
**BENNETT** [1]  1/12
**best** [14]  5/4 5/12 6/5 6/7 6/10 14/3 15/3 24/17 26/25 28/12 29/4 29/7 36/9 40/5
**better** [3]  8/4 19/19 28/18
**between** [2]  15/8 29/18
**beyond** [4]  30/23 34/12 34/12 48/12
**Bible** [1]  18/21
**big** [1]  35/3
**Boomer** [1]  38/18
**both** [10]  7/21 8/16 9/12 10/13 10/23

**bolties** [6]  17/12 17/19 18/5 18/14 19/6 54/16
**bottom** [1]  5/15
**bought** [1]  17/11
**box** [1]  45/19
**boxes** [1]  41/10
**branch** [3]  27/4 27/5 27/5
**break** [1]  16/15
**BRIDGE** [3]  1/4 3/4 30/24
**brief** [1]  29/12 42/2
**briefly** [2]  29/8 55/22
**bring** [10]  22/19 22/22 24/11 25/6 25/11 26/2 39/23 39/24 39/25 52/2
**bringing** [1]  26/24
**broad** [1]  38/3
**brother** [1]  35/10
**brought** [3]  13/17 17/22 19/13
**buddy** [1]  15/12
**building** [1]  21/5
**bumper** [1]  26/19
**Business** [1]  58/17
**busy** [2]  4/16 4/16
**buyer** [1]  48/20

## C

**Cadillac** [4]  21/17 21/25 26/19 51/12
**California** [1]  34/5
**call** [2]  39/21 57/4
**called** [5]  19/10 19/23 35/1 35/12 37/13
**came** [2]  4/21 25/17
**can** [34]  4/23 5/7 8/4 9/16 10/1 10/23 12/12 12/20 13/13 14/7 16/6 18/25 19/14 21/11 26/15 26/25 28/5 29/7 32/16 34/23 35/6 36/25 38/19 41/2 48/3 51/18 55/11 56/6 56/15 56/16 56/23 56/25 56/25 57/3
**can't** [3]  21/6 21/13 28/23
**cannot** [4]  5/16 16/9 27/14 32/17
**capable** [1]  9/6
**CAPITAL** [4]  1/4 3/4 30/24 33/22
**captain** [1]  10/12
**card** [2]  38/11 56/19
**cards** [2]  38/6 38/12
**care** [4]  19/2 22/1 35/16 37/19
**careful** [2]  15/11 41/22
**carefully** [2]  7/14 15/25
**case** [18]  1/4 3/3 4/21 6/7 7/16 7/17 7/21 8/9 8/11 9/17 14/4 15/21 15/22 30/25 43/8 47/16 51/13 52/21
**cases** [2]  9/25 38/19
**cash** [4]  7/11 13/22 26/18 41/3
**Cash's** [2]  21/17 51/12
**cause** [9]  13/3 17/5 19/24 21/3 21/19 24/23 51/6 53/4 53/10 54/19
**causing** [1]  13/18
**caution** [5]  3/24 4/9 7/25 13/24 15/2 26/23 27/18 29/13 52/8
**certain** [2]  13/18 24/12
**certainly** [2]  8/5 10/2
**CERTIFICATE** [1]  58/1
**certify** [2]  58/3 58/6
**chance** [4]  13/12 14/19 25/14 54/23
**changes** [1]  56/17
**characterization** [1]  20/9
**charge** [2]  31/23 34/20

charges [2] 25/23 41/20
CHARLES [5] 1/7 1/15 3/4 3/9 53/12
cheated [2] 35/13 35/18
checked [2] 15/5 22/25
checking [2] 41/7 41/8
checks [1] 41/3
choice [5] 11/9 26/12 49/24 51/9 52/14
choose [1] 14/11
choosing [1] 9/4
chose [1] 12/14
chunk [1] 48/8
CIA [1] 27/1
cited [1] 7/8
citing [1] 24/15
civil [3] 4/4 9/21 53/5
claims [1] 9/17
clandestine [2] 32/11 32/13
clarify [1] 48/19
clear [7] 8/17 14/7 15/5 19/11 24/5 28/18 46/16
clearer [1] 5/16
Clearview [2] 33/25 36/6
clerk [1] 10/9
Clerk's [3] 21/15 51/21 55/11
clever [1] 20/4
client [1] 15/17
close [1] 28/8
closely [1] 30/7
coequal [1] 27/4
Coinbase [1] 45/15
collar [1] 9/14
collect [1] 5/18
collectible [1] 11/8
colloquy [3] 6/22 24/25 45/5
color [1] 22/13
comb [1] 6/20
combined [1] 40/17
come [4] 20/1 21/9 27/17 27/23
comes [2] 15/23 55/23
comfort [1] 7/22
comfortably [1] 50/23
coming [1] 12/11
command [2] 10/15 10/15
commend [1] 28/24
commercial [1] 9/9
Commission [1] 9/13
common [1] 5/9
communicated [1] 15/1
communications [1] 49/16
companies [1] 39/4
company [2] 35/12 50/14
compel [4] 22/15 24/10 53/12 53/18
compelled [1] 24/11
competent [3] 3/23 50/16 52/9
complete [5] 13/16 28/18 30/10 30/13 30/15
completed [1] 49/8
completely [1] 46/5
compliance [5] 22/10 23/22 24/1 24/17 30/13
compliant [1] 30/9
complied [1] 57/12
comply [15] 13/4 13/5 21/20 22/3 26/12 26/23 27/21 34/20 39/14 39/15 51/23 52/22 52/25 54/24 58/7
complying [1] 53/18
comprehensive [1] 39/4
computer [2] 1/25 57/1
conceding [1] 11/1
concerned [3] 46/13 49/23 56/12
concerning [2] 27/21 49/17
concerns [1] 8/8
conclude [1] 49/6
concluded [3] 19/10 47/17 47/17
conclusion [2] 20/25 21/15
conduct [6] 51/10 51/18 52/16 52/24 53/2 55/6
conducted [1] 54/3
conducting [2] 8/10 49/13
Conference [1] 58/8
confidential [1] 37/15
connection [4] 38/6 43/2 43/7 43/14
connections [3] 37/12 43/4 48/2
consequences [2] 37/22 50/17
consider [2] 13/25 51/9
consideration [2] 7/20 8/7
considered [1] 53/24
considering [3] 52/3 52/14 55/5
consistently [1] 27/16
conspiracies [1] 8/1
conspiracy [1] 8/1
Constitution [2] 5/9 15/23
Constitutional [2] 4/6 14/5
constructed [1] 7/14
consult [1] 29/11
contact [1] 56/2
contacts [2] 28/13 30/4
contempt [16] 4/2 4/25 25/15 26/12 27/20 49/24 50/20 51/14 52/5 52/18 52/19 53/5 55/4 55/9 56/23 57/6
continue [5] 34/22 36/8 36/25 52/12 56/13
contract [1] 36/19
contracts [1] 28/13
control [1] 5/23
cooperate [6] 4/22 5/6 12/1 12/1 12/21 12/21
cooperative [1] 11/9
corollary [1] 23/5
correct [29] 9/17 9/21 9/22 14/12 17/21 21/12 22/5 22/9 23/12 23/13 24/4 29/22 33/1 33/18 34/11 37/3 37/4 42/9 46/20 47/11 49/2 49/9 51/10 51/17 51/18 52/4 52/15 55/6 58/4
could [13] 15/2 17/9 18/4 18/5 18/5 18/7 19/25 20/16 28/22 36/7 40/6 45/22 50/23
couldn't [2] 32/15 36/21
counsel [10] 1/18 4/3 9/3 13/11 14/4 14/24 15/8 28/22 29/18 53/7
county [4] 18/12 19/17 55/8 55/17
couple [1] 4/14
court [42] 1/1 1/9 1/21 5/23 6/2 6/17 6/23 7/19 11/23 13/2 15/19 16/6 18/3 19/9 20/10 20/10 20/14 20/15 21/3 21/22 23/10 23/12 24/22 26/20 28/8 30/13 38/21 39/9 47/16 51/4 52/18 53/4 53/8 54/10 54/15 54/16 54/22 55/5 55/6 55/20 58/7 58/13
Court's [11] 7/15 8/6 22/9 22/10 27/21 30/12 51/24 52/20 53/1 53/5 54/2
Court-appointed [1] 15/19
court-ordered [1] 26/20
courthouse [5] 5/1 13/9 17/23 53/21 54/11
courtroom [3] 17/14 23/18 48/15
courts [1] 46/3
Courtyard [1] 17/14
covered [1] 51/4
created [1] 32/7
credibility [1] 40/10
credible [1] 20/17
credit [3] 38/11 38/12 56/19
crime [1] 41/17
criminal [5] 3/21 9/8 9/14 25/22 27/11
criminals [1] 45/4
crypto [1] 44/7
cryptocurrency [13] 22/16 41/13 41/18 44/6 44/10 44/20 44/23 45/11 45/14 45/18 45/21 46/6 46/9
CSR [5] 1/21 58/3 58/11 58/12 58/16
cure [1] 52/24
current [1] 21/22
currently [4] 25/22 31/5 40/18 50/3
custodians [1] 32/8
custody [2] 52/18 55/8
cut [1] 30/5
CV [2] 1/4 3/3

D

dad [1] 22/25
Dallas [4] 1/14 9/10 9/23 12/12
Dallas/Fort [1] 9/10
dangerous [1] 45/4
daughter [2] 32/22 36/4
daughter's [1] 48/7
day [4] 27/8 32/15 53/7 58/9
days [2] 22/21 53/19
deal [2] 3/20 10/21
dealing [3] 15/13 25/4 25/10
deals [1] 13/6
dealt [2] 9/20 43/15
December [1] 58/9
decided [2] 8/2 8/8
decision [1] 27/19
decisions [1] 10/16
decline [1] 38/25
declined [1] 14/22
deeply [1] 21/7
defendant [11] 1/15 13/3 15/8 27/24 29/18 53/12 53/18 54/12 54/15 54/19 55/7
defendant's [2] 53/2 54/18
defendants [1] 27/11
defender [4] 1/18 3/23 5/11 52/9
Defenders [1] 14/3
defense [3] 9/9 9/14 10/14
denied [1] 53/8
deposed [1] 20/24
deposit [2] 41/10 45/19
deposition [47] 5/2 7/7 13/9 13/12 13/14 13/15 19/10 19/23 20/25 21/24 22/19 22/23 23/7 23/16 23/17 24/7 24/12 24/13 25/6 25/8 25/12 26/8 26/20 26/20 27/12 27/16 28/7 28/8 28/21 29/1 30/8 30/11 39/13 40/7 46/24 46/25 48/14 52/7 53/13 53/21 54/11 54/20 55/2 55/24 55/25 56/1 56/4

**deputies** [1] 57/14
**Deputy** [1] 56/15 56/18
**describe** [2] 13/13 38/8
**described** [1] 17/2
**desire** [1] 16/15
**despite** [1] 52/23
**detailed** [3] 30/4 35/4 35/5
**determination** [1] 51/6
**determine** [8] 5/19 5/24 10/3 10/24 11/24 34/17 34/18 56/16
**determined** [2] 7/15 7/20
**DEVON** [2] 1/18 14/2
**diagnosed** [1] 50/1
**did** [30] 6/12 9/6 10/10 17/2 17/3 17/5 18/8 18/8 19/7 21/19 22/22 26/2 26/3 26/4 26/5 26/6 26/7 29/3 37/15 40/5 40/8 42/12 42/13 42/14 45/11 45/17 45/20 49/9 54/4 54/6
**didn't** [13] 18/20 20/5 22/19 22/22 25/11 26/25 35/14 39/24 39/25 44/10 46/8 47/5 52/2
**die** [1] 33/14
**different** [3] 8/2 46/3 51/13
**difficult** [1] 28/23
**difficulties** [1] 12/10
**direct** [2] 9/24 28/18
**direction** [1] 8/2
**directly** [1] 30/11
**disabuse** [1] 44/13
**disagree** [2] 19/5 20/9
**disclose** [5] 30/3 37/24 38/1 40/12 40/13
**disclosed** [1] 34/15
**disclosure** [1] 27/21
**discovery** [19] 5/2 5/19 13/5 13/7 21/21 22/3 22/11 24/6 24/11 25/5 25/7 25/10 25/19 26/13 26/24 30/12 51/25 52/1 52/23
**discuss** [6] 23/23 36/22 37/17 49/12 49/15 49/18
**Discussion** [2] 15/8 29/18
**discussions** [1] 19/8
**dish** [1] 17/11
**disobedience** [1] 54/1
**disposed** [2] 30/22 48/11
**distinctly** [1] 19/18
**DISTRICT** [5] 1/1 1/2 1/9 1/19 58/13
**disturbed** [1] 21/7
**diverted** [1] 28/14
**division** [3] 1/3 9/21 58/14
**DLA** [1] 1/12
**do** [79]
**docket** [4] 3/21 4/16 23/23 23/24
**document** [1] 24/19
**documented** [1] 53/2
**documenting** [1] 54/7
**documents** [13] 24/12 24/13 25/5 25/11 25/11 26/2 26/14 26/24 39/17 53/14 53/20 54/21 56/5
**does** [2] 20/15 37/8
**doesn't** [2] 15/18 29/10
**doing** [4] 36/24 36/25 46/2 50/11
**don't** [67]
**Donald** [1] 44/9
**done** [14] 4/9 5/5 5/7 6/5 27/6 28/20 31/21 32/2 32/6 36/19 36/23 37/14

48/5 52/22
**down** [11] 12/11 19/11 19/18 20/18 21/15 41/10 49/20 51/1 51/21 55/10 55/16
**draft** [2] 13/11 29/4
**drafted** [1] 29/6
**Drive** [1] 1/16
**drop** [1] 55/11
**due** [6] 3/24 5/8 21/14 22/20 43/6 51/19
**during** [4] 16/9 27/16 40/7 55/2

**E**

**E-Mail** [2] 1/23 58/19
**each** [1] 25/9
**easier** [1] 19/20
**eat** [1] 20/1
**ECF** [1] 54/8
**effective** [1] 11/11
**effectively** [5] 11/23 11/23 12/18 48/4 51/14
**effort** [1] 21/20
**efforts** [1] 57/5
**either** [3] 13/14 20/17 40/24
**else** [3] 8/20 27/14 55/20
**end** [4] 5/3 5/6 7/12 35/14
**enforcement** [2] 9/21 53/8
**engage** [2] 6/22 8/1
**ensure** [1] 5/8
**enter** [1] 22/15
**entered** [1] 13/5
**entire** [1] 8/2
**entities** [1] 39/5
**entitled** [6] 5/9 5/18 5/18 47/9 57/4 58/5
**entity** [1] 41/2
**Entry** [2] 23/23 23/24
**escorted** [1] 20/21
**especially** [1] 3/20
**established** [1] 38/5
**estate** [2] 5/24 6/14
**estimate** [1] 36/9
**et** [2] 1/4 3/4
**ethically** [1] 56/12
**evaluation** [1] 50/10
**evasive** [2] 28/11 54/13
**even** [7] 5/10 5/10 7/6 21/6 27/3 35/25 52/10
**ever** [6] 20/11 37/5 38/4 44/20 45/17 50/1
**every** [3] 4/20 25/9 31/20
**everyone** [1] 15/3
**everything** [2] 5/7 18/9
**evidence** [1] 47/5
**evidenced** [1] 23/11
**ex** [3] 32/22 36/4 48/7
**ex-wife** [3] 32/22 36/4 48/7
**exact** [1] 42/6
**example** [1] 21/23
**Exchange** [1] 9/12
**exchanges** [2] 44/19 45/10
**excuse** [3] 22/15 23/24 27/1
**executing** [2] 46/20 47/15
**executive** [1] 27/4
**exempt** [1] 11/2
**exhaustively** [1] 27/12
**expense** [1] 16/10

experience [1] 9/12 10/13 28/22 33/15
**Expires** [1] 58/16
**Explain** [1] 32/4
**express** [1] 4/13
**extent** [1] 12/1
**eye** [1] 29/7

**F**

**facetious** [1] 49/21
**facing** [1] 25/22
**fact** [4] 7/23 21/7 43/5 50/9
**failed** [5] 13/4 41/24 51/6 54/12 55/2
**failing** [1] 52/22
**failure** [7] 13/6 13/8 26/12 51/23 52/6 54/19 54/21
**fair** [1] 47/18
**faith** [6] 13/4 21/20 52/22 54/13 54/20 55/3
**family** [4] 27/13 33/6 43/2 43/7
**famous** [1] 15/21
**far** [3] 5/20 29/14 56/11
**Fargo** [6] 43/24 43/25 44/1 44/1 44/3 47/16
**Farrell** [5] 8/14 8/25 9/5 10/8 10/17
**father** [2] 33/9 35/10
**FBI** [5] 25/21 27/1 37/16 38/15 38/17
**FBI/CIA** [1] 27/1
**FEDERAL** [3] 1/18 3/23 14/3
**fee** [1] 56/16
**feed** [1] 8/1
**feel** [1] 50/15
**fees** [1] 58/6
**few** [2] 30/1 36/13
**fiancee** [1] 12/9
**Fieldthorn** [1] 1/16
**Fifth** [1] 14/20
**file** [2] 6/12 54/6
**filed** [11] 5/21 6/1 6/13 7/6 7/14 7/14 23/12 53/3 53/11 53/23 54/1
**filings** [1] 21/22
**final** [1] 27/19
**finances** [1] 30/16
**financial** [4] 28/11 30/14 39/5 39/10
**find** [7] 4/24 9/6 33/13 40/9 41/19 46/5 55/4
**finds** [1] 54/10
**fine** [5] 21/14 37/21 51/19 55/12 56/24
**firm** [4] 8/9 9/4 9/11 11/22
**firms** [1] 6/6
**first** [4] 4/3 13/23 21/17 51/13
**five** [3] 22/21 22/25 53/19
**floor** [3] 20/22 51/21 56/17
**folks** [3] 7/20 9/6 17/19
**follow** [5] 16/4 40/5 44/16 46/12 46/17
**follow-up** [5] 16/4 40/5 44/16 46/12 46/17
**following** [2] 7/7 51/11
**food** [1] 20/1
**forbidding** [1] 27/2
**Force** [6] 10/12 10/15 35/1 35/7 35/9 35/17
**foregoing** [2] 58/4 58/5
**foreign** [3] 36/11 37/6 37/12
**forgiveness** [2] 19/20 19/21
**form** [2] 37/13 37/15
**formally** [1] 14/2
**format** [1] 58/6

**former [1]** 9/19
**FORT [11]** 1/3 1/5 1/20 1/22 9/10 9/11 10/8 12/11 14/3 58/14 58/17
**forthright [2]** 10/11 10/22
**forward [2]** 7/9 8/13
**found [2]** 46/4 50/10
**four [3]** 17/11 19/8 31/13
**frame [2]** 22/7 44/24
**frankly [5]** 7/25 12/14 21/5 21/12 49/23
**frequently [1]** 28/14
**frustrated [1]** 28/24
**full [1]** 30/13
**fully [1]** 30/1
**further [4]** 41/23 49/19 54/7 58/6

**G**

**gave [10]** 17/11 17/13 17/15 17/19 18/23 22/24 22/24 44/9 54/13 54/23
**gentlemen [7]** 9/2 11/22 12/5 30/18 34/20 48/6 55/10
**gentlemen that [1]** 48/6
**get [13]** 4/4 5/15 7/12 24/6 26/8 26/25 29/6 40/6 44/13 44/14 46/13 52/11 56/6
**give [9]** 5/2 14/21 15/2 18/5 27/20 28/18 35/4 54/14 57/10
**given [5]** 7/25 20/17 36/19 52/23 55/16
**giving [5]** 11/13 35/5 45/5 48/6 48/7
**glad [1]** 10/6
**go [12]** 7/9 11/24 16/22 18/11 21/18 29/2 39/21 44/15 45/8 46/22 51/2 55/16
**goes [1]** 16/20
**going [32]** 4/1 4/2 4/3 5/6 5/12 6/11 9/24 10/25 11/2 15/20 19/11 24/3 26/1 26/15 26/18 26/19 26/22 30/4 32/9 37/24 37/25 38/1 44/17 46/13 51/2 51/20 51/22 52/5 52/16 52/16 55/25 57/2
**gone [1]** 48/20
**good [13]** 8/21 8/25 10/17 10/21 11/14 11/20 13/4 21/20 52/22 54/12 54/20 55/3 57/3
**good-faith [1]** 21/20
**got [3]** 27/9 40/19 44/8
**gotten [2]** 28/22 37/13
**government [33]** 13/23 14/1 16/10 17/18 18/4 21/13 24/16 27/4 28/13 30/4 31/3 31/6 32/3 32/6 36/10 36/11 36/15 36/23 37/12 38/2 38/4 38/4 38/15 38/16 38/23 42/14 42/16 42/22 44/12 48/2 48/4 49/13 51/15
**governments [2]** 37/6 37/12
**grab [1]** 16/24
**gradually [1]** 7/12
**grandmother [2]** 43/2 43/15
**grandparents [1]** 33/6
**granted [5]** 20/11 22/17 53/9 53/17 53/25
**guess [3]** 20/2 23/5 31/8
**GUZMAN [4]** 1/21 58/3 58/11 58/11

**H**

**had [30]** 4/16 6/3 13/5 13/12 13/20
14/19 17/13 17/13 19/10 19/13 19/23 22/14 23/1 23/3 25/19 28/18 32/2 42/21 43/2 43/7 44/23 45/10 45/15 45/18 45/21 45/23 46/6 46/9 46/10 51/12
**Hal [3]** 30/24 46/19 47/2
**half [3]** 21/6 27/10 35/11
**hand [1]** 28/1
**handle [2]** 39/20 39/21
**handler [6]** 38/14 38/15 38/17 42/14 42/17 43/3
**handlers [1]** 27/2
**happen [1]** 27/19
**happened [2]** 21/4 44/7
**happy [10]** 6/10 6/20 7/9 12/13 12/14 14/12 15/6 15/7 34/19 50/18
**harassment [1]** 25/18
**hard [9]** 29/5 44/19 45/2 45/10 45/17 45/21 46/1 46/6 46/9
**has [31]** 4/18 4/18 6/1 7/20 9/12 9/16 10/13 12/10 13/2 13/11 17/17 18/12 22/9 23/20 25/10 29/10 29/14 33/23 34/15 37/13 38/2 38/3 48/2 48/5 48/20 48/22 51/6 51/6 52/21 52/25 54/4
**hate [2]** 14/22 20/14
**have [120]**
**haven't [7]** 11/10 27/6 35/23 36/5 44/23 45/16 48/16
**having [9]** 7/13 9/25 13/1 19/25 21/2 21/5 51/4 52/14
**he [61]**
**he'd [1]** 20/1
**he'll [1]** 12/21
**he's [13]** 9/10 10/12 10/19 14/22 15/17 29/21 38/18 50/22 55/2 56/1 56/3 56/5 56/11
**head [2]** 10/5 45/23
**healthcare [1]** 50/4
**healthy [1]** 17/23
**hear [4]** 6/9 6/10 8/19 28/5
**heard [4]** 4/13 21/2 21/3 46/4
**hearing [29]** 1/8 3/13 4/18 5/17 6/3 7/13 8/12 11/11 13/1 16/20 19/24 21/15 22/4 22/18 23/1 25/17 43/6 51/7 51/7 51/20 52/25 53/10 53/14 53/16 53/23 54/3 54/3 54/6 54/24
**held [8]** 20/3 25/15 27/19 31/24 32/2 51/14 54/24 56/23
**helped [1]** 43/15
**her [6]** 14/4 14/9 14/11 14/12 14/13 16/16
**here [30]** 3/19 3/24 4/2 4/8 4/10 4/14 5/11 8/22 9/10 9/11 10/8 11/1 12/19 14/3 15/16 19/12 21/9 22/1 27/3 27/9 29/25 30/19 35/2 48/15 50/17 50/18 52/9 53/21 54/11 57/10
**hiding [1]** 47/21
**highest [1]** 10/14
**Hill [2]** 47/9 47/14
**him [24]** 4/5 10/10 10/22 12/21 14/20 14/21 14/22 15/2 19/13 20/11 20/16 20/18 20/24 23/7 29/15 52/24 53/5 54/25 55/1 55/7 55/14 55/15 56/13 56/16
**himself [3]** 3/10 55/9 56/5
**hired [1]** 9/19 9/22
**his [25]** 3/14 4/6 13/7 13/8 14/20
14/21 20/1 23/22 23/16 22/16 22/25 23/21 26/19 29/21 52/24 53/13 53/21 54/11 54/14 54/19 54/21 54/21 54/22 55/9 55/11 55/15
**history [1]** 52/22
**hold [6]** 26/12 39/5 49/24 50/20 53/5 53/9
**holding [2]** 52/5 53/16
**holdings [1]** 22/17
**home [1]** 27/11
**homeless [4]** 17/13 17/15 17/19 18/23
**honest [2]** 10/11 10/22
**honestly [1]** 29/5
**Honor [65]**
**Honor's [2]** 24/10 24/18
**HONORABLE [3]** 1/9 10/9 10/9
**hoping [1]** 48/8
**hotel [3]** 17/11 18/6 18/8
**hour [1]** 55/16
**hours [4]** 17/24 25/24 27/8 28/6
**how [12]** 9/25 28/21 31/3 31/4 31/4 31/5 31/12 33/4 33/10 45/10 55/13 55/24

**I**

**I'd [5]** 6/10 7/10 12/11 19/12 39/21
**I'll [12]** 8/19 11/10 12/16 16/4 24/6 29/13 29/14 29/15 30/2 40/5 42/1 54/5
**I'm [46]** 4/3 5/14 9/24 12/2 12/13 14/12 14/18 15/6 15/6 15/11 15/12 15/22 18/11 18/15 18/19 23/6 26/11 28/17 29/2 30/10 30/18 31/12 31/23 31/23 33/8 34/19 35/3 35/5 37/22 37/24 41/16 41/20 42/4 46/12 47/6 49/21 49/21 49/22 49/23 49/25 50/18 50/19 51/1 51/8 56/12 57/10
**I've [28]** 3/12 4/16 4/23 4/24 5/7 5/10 8/3 8/8 8/9 12/19 13/12 15/13 16/11 17/2 25/8 28/6 37/11 37/13 40/19 43/19 43/19 46/2 46/3 46/4 52/10 52/10 54/25 54/25
**idea [4]** 11/14 11/20 45/13 57/3
**ideal [1]** 14/2
**identify [6]** 6/5 32/16 40/7 40/12 44/19 45/10
**illegal [1]** 37/14
**illness [1]** 50/1
**imagine [1]** 28/23
**immediately [3]** 21/14 51/20 56/22
**impose [1]** 51/19
**imposing [1]** 51/17
**impression [1]** 44/11
**include [2]** 33/5 36/7
**Included [1]** 24/13
**includes [3]** 25/5 25/6 51/25
**including [1]** 52/24
**incrimination [1]** 15/24
**Indeed [4]** 5/10 6/2 52/12 53/3
**INDEX [1]** 2/1
**indicated [1]** 20/23
**individually [1]** 41/1
**individuals [4]** 10/24 12/19 32/7 37/11
**informant [2]** 37/16 38/6
**information [6]** 13/7 28/12 30/10 30/14 30/16 54/14
**informed [1]** 17/8
**instead [1]** 20/11

## I

**intelligence** [1] 43/16
**intend** [1] 36/25
**intended** [1] 30/9
**intent** [1] 35/11
**interact** [1] 30/18
**interest** [7] 5/4 5/13 9/7 35/11 35/14 39/5 41/2
**interests** [2] 8/6 43/17
**intermediary** [1] 36/20
**interrogatories** [11] 13/7 21/23 22/16 23/2 23/4 24/9 24/18 26/4 26/5 53/13 53/19
**interrogatory** [3] 22/20 54/21 56/4
**interrupted** [1] 28/14
**interrupts** [1] 38/21
**intersects** [1] 43/17
**introduced** [1] 34/5
**investment** [1] 40/22
**involve** [2] 4/5 51/23
**involved** [3] 4/20 15/3 35/1
**involving** [1] 9/20
**is** [97]
**isn't** [1] 4/14
**issue** [2] 16/25 55/23
**issues** [1] 12/25
**it** [97]
**it's** [24] 4/4 5/6 5/12 7/17 8/17 8/21 12/10 15/18 17/4 19/14 19/15 19/17 19/20 20/4 24/2 24/21 25/14 34/15 34/17 36/19 43/17 47/19 56/13 57/13
**items** [5] 13/19 17/2 21/16 47/20 52/1
**its** [3] 15/19 45/3 54/6
**itself** [2] 13/16 47/10

## J

**jail** [2] 55/8 56/6
**Jeff** [1] 8/24
**Johnathan** [1] 38/18
**Johnny** [5] 7/11 13/22 21/17 26/18 51/12
**JOHNSON** [62]
**Johnson's** [9] 3/13 19/5 20/6 20/9 20/15 24/17 51/7 53/8 54/8
**joke** [1] 21/10
**JUDGE** [6] 1/9 41/22 19/25 20/21 21/6 23/18
**judgment** [26] 4/17 5/2 5/17 5/18 5/19 5/25 10/4 11/2 11/4 11/6 11/7 11/7 13/5 21/20 22/3 24/11 25/7 25/20 26/13 34/16 47/24 51/25 52/23 53/9 53/12 53/19
**Judicial** [1] 58/7
**judiciary** [1] 27/4
**JUDY** [1] 1/18
**jurors** [1] 13/21
**jury** [9] 13/19 14/1 17/1 18/15 20/19 20/22 20/23 21/7 51/16
**just** [30] 3/11 5/6 7/4 8/17 14/23 15/5 20/8 22/25 24/6 27/9 29/5 29/12 34/20 35/24 36/17 36/20 37/22 40/10 44/8 44/13 44/13 44/17 44/17 46/13 46/16 47/7 48/19 49/4 49/22 56/16
**JXC** [2] 42/3 47/13

## K

**keep** [4] 38/3 42/1 44/17 47/1

**kind** [3] 1/3 12/14 20/3
**kinds** [1] 32/14
**kitchen** [1] 17/10
**kitchenette** [3] 17/8 20/16 20/19
**know** [44] 3/19 6/6 10/2 10/10 10/22 12/2 18/16 19/16 20/8 27/9 28/21 29/3 30/3 31/7 31/11 31/16 31/18 31/22 32/14 32/18 32/19 32/20 33/4 33/9 33/10 33/16 35/21 35/24 36/12 36/18 36/20 39/2 40/9 40/10 42/3 42/19 44/22 45/12 45/22 46/6 50/5 55/13 55/14 57/4
**knowing** [1] 21/6
**knowledge** [2] 37/7 37/9
**known** [3] 8/3 10/8 12/19

## L

**laid** [1] 24/21
**Lambert** [4] 30/24 35/13 46/19 47/2
**laptop** [1] 46/10
**large** [1] 9/11
**largely** [1] 13/15
**last** [12] 3/19 4/13 5/16 6/3 22/4 22/14 25/17 27/9 27/20 40/3 43/6 43/9
**late** [1] 55/16
**later** [2] 4/1 8/21
**law** [8] 5/9 6/6 8/9 9/4 9/11 10/9 11/22 16/7
**lawyer** [1] 16/10
**least** [13] 4/22 8/7 12/20 14/19 15/13 19/10 21/11 44/23 51/9 51/18 52/4 52/15 55/5
**leave** [2] 19/25 55/17
**led** [1] 20/18
**left** [4] 11/9 26/11 49/23 51/8
**legal** [3] 7/16 52/9 57/10
**legislative** [1] 27/5
**Less** [1] 3/11
**let** [15] 3/17 3/17 3/22 12/2 12/16 16/3 16/15 18/13 29/2 29/13 30/1 34/22 36/8 47/7 51/1
**let's** [7] 7/11 12/24 16/25 21/18 24/23 33/3 47/7
**levels** [1] 10/14
**like** [27] 6/9 7/2 7/10 7/10 10/21 12/10 14/8 14/9 14/22 14/23 15/17 19/12 21/10 23/20 27/20 36/24 40/4 41/25 43/21 43/22 44/10 45/3 46/12 47/20 48/15 50/15 50/25
**limit** [1] 34/13
**limited** [1] 3/12
**lines** [1] 24/4
**list** [3] 39/4 40/15 43/22
**listed** [1] 11/13
**listen** [3] 5/14 15/25 30/7
**listening** [2] 46/1 51/8
**litigation** [1] 9/9
**little** [2] 6/3 22/13
**LLC** [9] 1/4 3/4 41/1 42/3 42/3 42/7 42/25 47/13 48/1
**LLP** [1] 1/12
**lockup** [1] 18/12
**long** [5] 23/14 24/25 27/10 46/11 55/13
**longer** [1] 38/10
**longtime** [2] 9/8 9/13
**look** [4] 8/5 9/16 10/3 28/8

**looking** [1] 49/11
**lot** [11] 4/15 7/23 17/23 43/17 44/13 44/14 45/4 45/4 45/24 46/3 46/4
**lots** [1] 44/5
**Lying** [1] 41/17

## M

**made** [5] 3/22 5/16 19/22 37/2 51/6
**mail** [4] 1/23 22/25 23/2 58/19
**mailed** [1] 23/3
**maintaining** [1] 9/7
**make** [11] 5/16 7/1 8/16 8/20 15/15 20/16 21/9 21/20 46/16 52/16 53/4
**making** [1] 49/21
**managed** [1] 27/11
**manners** [1] 32/14
**many** [8] 31/3 31/3 31/4 31/4 31/5 31/12 33/4 45/10
**MARK** [1] 1/9
**Marriott** [1] 17/14
**Marshal** [3] 51/20 52/17 55/7
**Marshals** [1] 55/13
**material** [1] 57/8
**matter** [4] 4/3 47/16 47/16 58/5
**matters** [3] 4/12 27/15 28/7
**may** [5] 12/6 14/15 14/16 29/8 56/9
**maybe** [15] 9/16 14/19 19/20 31/14 31/14 31/15 31/15 31/17 33/5 36/12 40/18 41/1 45/16 45/22 50/10
**me** [41] 3/17 3/20 4/13 5/5 6/10 10/10 11/16 12/2 12/3 14/2 14/13 15/19 16/3 17/22 18/13 18/21 22/15 23/24 24/3 25/14 26/25 28/18 30/1 31/10 31/12 32/21 34/5 34/17 34/22 34/25 35/14 36/3 36/8 39/21 44/11 44/13 46/1 46/8 47/7 48/15 51/1
**mean** [4] 34/6 34/7 37/8 55/24
**means** [3] 10/10 41/21 48/1
**meant** [3] 17/25 18/1 21/9
**mechanical** [1] 1/25
**media** [1] 20/6
**medications** [1] 50/8
**members** [1] 33/6
**men's** [1] 20/23
**mental** [2] 50/1 50/3
**mentally** [1] 50/16
**mentioned** [1] 19/25
**meritorious** [1] 6/2
**met** [1] 7/17
**method** [1] 13/22
**mguzman.csr** [2] 1/23 58/19
**microphone** [1] 28/4
**middle** [1] 53/17
**might** [11] 4/5 6/10 11/14 14/1 15/3 19/23 31/13 33/5 33/6 40/25 57/3
**million** [6] 4/17 5/17 34/16 36/13 36/14 37/2
**mine** [4] 17/8 18/9 32/10 47/24
**minimal** [3] 23/21 23/22 54/14
**Minimally** [1] 30/9
**minimum** [2] 24/1 24/2
**minute** [1] 29/12
**minutes** [1] 22/25
**Miranda** [5] 14/21 15/6 15/21 15/22 52/10
**missing** [1] 13/19
**misstating** [2] 43/9 43/12

**M**
**moment [2]** 26/8 50/8
**Monday [3]** 13/10 52/2 53/21
**money [7]** 32/8 32/10 36/10 37/5 37/11 45/24 56/20
**MONICA [5]** 1/21 28/5 58/3 58/11 58/11
**monthly [1]** 39/9
**months [5]** 10/20 11/5 15/13 50/10 57/13
**more [11]** 5/3 5/10 7/6 17/15 23/23 28/23 31/8 46/14 48/21 49/3 52/12
**morning [4]** 3/21 4/17 15/6 27/10
**most [2]** 9/6 28/25
**motion [19]** 4/4 5/22 6/1 6/12 7/2 7/5 7/14 13/2 23/25 24/10 53/3 53/8 53/9 53/11 53/15 53/17 53/24 54/1 54/7
**MOTIONS [1]** 1/8
**moved [4]** 22/14 30/22 48/11 48/16
**moving [2]** 33/3 47/20
**Mr [104]**
**Ms [11]** 3/10 3/17 3/18 3/23 14/2 14/19 15/15 16/15 29/19 55/19 56/11
**much [1]** 7/19
**mug [16]** 13/21 16/24 17/9 17/10 17/20 18/6 18/12 19/7 19/13 19/15 19/17 20/3 20/7 20/7 20/12 51/15
**mugs [1]** 54/16
**multiple [2]** 23/15 30/8
**must [1]** 49/5
**my [61]**
**myself [6]** 19/8 20/10 20/21 35/10 44/13 57/7

**N**
**name [7]** 40/8 40/13 40/25 41/1 42/16 42/19 43/21
**narratives [1]** 28/15
**Navy [1]** 43/16
**NCRA [1]** 58/12
**necessarily [1]** 32/13
**necessary [4]** 6/20 7/6 16/18 52/15
**necessitating [1]** 25/13
**need [15]** 4/24 6/16 6/22 8/19 8/21 8/21 14/13 24/25 26/21 26/22 35/21 49/6 49/7 55/14 57/5
**needing [1]** 4/5
**Neither [1]** 20/10
**never [9]** 18/7 22/18 43/19 43/19 45/21 46/9 46/13 47/4 48/17
**next [1]** 14/13
**nine [2]** 15/13 57/13
**no [59]**
**Nods [1]** 10/5
**noncompliance [2]** 54/8 54/18
**noncompliant [1]** 26/10
**none [1]** 45/7
**nonsense [1]** 28/15
**NORTHERN [3]** 1/2 1/19 58/13
**not [96]**
**note [5]** 3/11 11/10 28/10 29/14 54/5
**noted [1]** 23/15
**nothing [4]** 24/15 25/20 43/8 49/19
**notice [2]** 56/1 56/7
**noticed [1]** 13/9
**NOVEMBER [7]** 1/6 3/2 22/17 22/21 53/11 53/16 53/21

**new [8]** 2/3 5/23 7/19 12/24 28/6 30/14 39/15 56/16
**number [7]** 3/3 9/11 25/21 25/23 39/11 51/24 54/9
**numerous [1]** 52/23

**O**
**O'Connor [1]** 10/9
**O'Connor's [2]** 13/19 20/21
**oath [7]** 23/6 23/9 23/17 37/20 41/15 41/17 52/3
**object [4]** 6/4 6/11 48/7 54/4
**objected [2]** 7/18 11/10
**objecting [1]** 6/13
**objection [6]** 6/24 6/25 7/7 7/13 12/14 48/6
**objections [2]** 6/15 6/19
**obligation [1]** 56/12
**obstructive [5]** 13/15 25/9 27/16 29/3 52/13
**obviously [1]** 9/24
**Ocean [1]** 10/15
**October [1]** 53/3
**off [3]** 40/15 45/23 56/14
**office [8]** 9/13 9/23 10/1 21/15 23/1 41/20 51/21 55/11
**Officer [3]** 20/14 21/1 21/4
**officers [1]** 11/24 20/17
**Official [1]** 58/13
**oftentimes [1]** 32/7
**Oh [1]** 6/18
**OIA [1]** 37/13
**okay [49]** 3/8 3/17 4/6 6/16 6/22 7/10 7/12 11/18 12/17 12/22 12/23 14/14 14/17 15/13 16/3 16/19 16/23 17/4 18/10 18/17 22/7 24/20 26/10 26/17 29/16 29/24 30/7 30/21 31/2 33/3 33/19 36/2 36/8 37/13 38/2 38/8 39/2 39/8 39/19 40/3 40/6 43/13 49/3 51/2 51/3 56/18 56/22 57/11 57/15
**old [1]** 7/11
**one [26]** 4/1 7/11 7/11 8/4 14/2 15/16 16/10 17/7 18/21 20/17 20/18 22/2 22/4 27/20 29/16 31/13 31/14 31/15 33/9 38/14 41/5 45/16 46/14 49/4 51/24 52/11
**ongoing [1]** 38/20
**only [10]** 5/8 9/10 10/24 13/6 13/13 22/1 23/5 25/4 30/9 52/8
**operating [1]** 24/16
**operation [7]** 32/9 47/17 49/5 49/8 49/11 49/14 49/17
**operational [1]** 38/11
**opportunities [1]** 52/23
**opportunity [3]** 17/4 24/23 27/20
**options [2]** 17/23 17/23
**order [16]** 11/12 13/4 13/18 21/3 22/4 22/13 24/10 27/6 39/9 48/21 49/1 51/10 51/17 52/17 53/6 54/2
**ordered [14]** 5/1 13/3 21/18 22/21 24/14 25/11 26/13 26/14 26/20 26/23 27/15 39/12 53/18 54/19
**orders [14]** 12/10 24/18 25/6 26/11 27/21 30/12 51/24 52/20 53/1 54/8 54/24 55/6 57/12
**original [2]** 22/4 54/7
**other [21]** 5/13 11/9 17/15 26/12 27/14

**21/10 32/15 33/6 34/22** 38/15 38/23 59/10 40/20 40/25 41/5 49/23 49/24 51/10 51/23 52/14 53/7
**others [2]** 41/5 41/6
**otherwise [3]** 30/22 37/14 48/11
**Othram [8]** 34/1 36/6 42/8 43/1 46/18 47/2 47/10 48/9
**our [12]** 5/9 5/9 7/5 12/24 13/21 14/3 22/25 23/23 24/5 27/17 51/16 56/17
**out [28]** 3/24 5/24 7/25 8/5 8/12 11/11 11/24 13/24 15/2 19/22 20/6 24/21 26/22 26/25 27/8 27/9 27/18 28/25 29/6 29/13 33/14 35/14 38/19 41/3 48/8 51/5 52/8 56/6
**outset [1]** 23/16
**outside [2]** 17/13 17/14
**outstanding [4]** 4/17 18/25 22/2 24/19 52/20
**own [6]** 15/7 31/3 31/5 33/18 33/21 35/21
**owned [1]** 44/5

**P**
**p.m [2]** 1/7 3/2
**Pacific [1]** 10/15
**PAGE [1]** 2/2
**paid [1]** 13/20
**paper [1]** 45/2
**parents [1]** 33/6
**part [5]** 13/18 25/12 47/1 47/2 52/6
**partially [1]** 8/7
**participate [1]** 5/14
**past [2]** 3/25 21/5
**patience [1]** 5/3 28/24 55/19
**patient [1]** 15/12
**pay [3]** 51/22 55/11 56/16
**payable [2]** 21/14 51/19
**Pearl [1]** 1/13
**people [8]** 17/13 17/15 18/23 19/8 31/11 33/14 44/11 46/4
**per [2]** 32/10 39/13
**perfect [1]** 9/15
**perfectly [2]** 18/11 18/15
**perhaps [1]** 9/16
**perjured [1]** 41/19
**permission [5]** 3/13 19/20 19/21 20/11 21/16
**person [2]** 10/21 20/15
**person's [1]** 42/19
**personally [2]** 10/22 53/6
**pertinent [1]** 29/1
**phone [3]** 12/12 39/22 57/4
**physically [1]** 54/11
**picked [1]** 28/25
**picture [1]** 20/7
**piece [5]** 7/11 7/12 21/17 21/18 21/25
**pieces [2]** 51/13 51/23
**Piper [1]** 1/12
**PITTMAN [2]** 1/9 23/18
**place [5]** 13/9 25/18 41/25 52/17 55/7
**placed [2]** 34/10 45/18
**places [1]** 44/20
**placing [2]** 30/23 48/12
**plaintiff [4]** 1/12 13/11 53/6 54/6
**plaintiffs [20]** 3/5 3/6 5/17 5/21 5/25 6/1 6/13 7/15 7/22 7/24 22/14 30/24 46/20 47/3 47/9 47/15 48/13 53/3 53/11 53/23

## P

plaintiffs' [9]   8/6 13/2 23/24 24/10 24/14 53/7 53/9 53/17 53/18
plan [1]   54/14
played [1]   10/7
please [11]   8/11 8/13 15/25 16/9 18/24 24/22 34/9 49/25 51/1 55/11 56/10
podium [2]   16/22 51/2
point [6]   1/4 3/3 11/15 22/3 30/24 45/16
pointed [1]   51/5
polite [1]   18/19
portfolio [1]   39/4
portion [2]   4/5 47/6
position [1]   47/8
possess [1]   45/11
possessed [1]   44/21
possible [6]   12/10 12/12 18/19 38/3 54/14 55/5
possibly [2]   4/5 5/7
post [13]   5/2 5/19 13/5 21/20 22/3 24/11 25/7 25/20 26/13 51/25 52/23 53/12 53/19
post-judgment [13]   5/2 5/19 13/5 21/20 22/3 24/11 25/7 25/20 26/13 51/25 52/23 53/12 53/19
posted [1]   20/7
powers [1]   11/13
precise [1]   48/22
preface [2]   30/2 46/2
prefer [4]   12/11 37/17 37/19 37/20
pregnant [1]   12/10
prepaid [1]   38/5
prepared [4]   30/15 30/20 39/15 40/12
prescribed [1]   58/7
present [3]   14/13 16/9 54/11
preservation [3]   47/19 47/25 48/21
preserved [3]   48/3 49/7 49/7
President [1]   44/9
pretty [2]   20/4 50/11
prevent [4]   46/19 46/22 47/3 47/14
previous [3]   4/18 17/12 22/20
previously [4]   5/5 17/7 41/24 42/24
Price [5]   8/9 8/24 9/1 9/4 10/20
print [1]   20/5
PRO [1]   1/15
probably [6]   3/19 5/12 11/20 12/20 25/24 48/22
problem [1]   50/24
proceedings [3]   1/25 57/16 58/5
proceeds [5]   42/8 43/1 47/1 47/9 47/15
process [5]   5/8 25/25 26/1 55/14 57/5
proclivity [1]   8/1
produce [8]   24/14 27/6 39/9 53/13 53/19 53/20 54/21 56/4
produced [2]   1/25 24/15
production [2]   24/18 39/11
professionals [1]   50/4
proof [1]   23/3
property [3]   13/23 14/1 16/25 17/18 18/4 21/14 51/15 52/4 54/22
proposed [1]   11/12
prosecution [1]   10/13
prosecutor [2]   9/8 10/13
protect [2]   7/21 7/22
protection [1]   53/6
provide [5]   28/12 39/10 30/15 52/9 56/1
provided [6]   16/10 23/3 38/5 38/11 39/3 39/8
providing [2]   26/13 56/7
psychiatric [1]   50/6
psychological [1]   50/10
public [5]   1/18 3/23 5/11 14/3 52/9
pun [1]   20/4
purely [1]   4/4
purge [5]   52/19 55/24 56/23 57/5 57/7
purges [2]   55/9 56/5
purpose [7]   3/12 30/23 35/11 46/19 46/25 47/13 48/12
pursuant [2]   30/4 39/11
pursue [1]   9/18
put [7]   10/17 14/23 22/1 26/15 26/18 34/20 52/10
putting [4]   35/11 35/14 47/19 48/3

## Q

question [24]   12/6 16/4 18/25 25/9 31/11 31/23 32/15 32/25 34/16 34/17 35/2 36/21 37/2 39/1 40/3 42/18 44/25 45/9 46/7 46/14 47/8 47/12 48/10 48/22
questioning [1]   16/9
questions [40]   4/21 5/5 5/13 9/20 11/16 12/3 13/8 14/5 16/19 18/1 19/11 23/21 25/19 25/21 25/23 28/11 28/16 28/17 28/19 29/1 29/4 29/6 29/6 30/1 34/13 35/3 36/1 37/20 40/6 41/23 49/3 50/25 52/7 52/11 54/12 54/20 54/25 55/1 55/23 56/3
quickly [3]   14/8 14/15 25/1
quiet [3]   18/17 18/24 48/18
quip [1]   19/22
quite [5]   7/25 21/5 25/21 25/23 29/5
quoting [1]   30/11

## R

radar [1]   35/13
raise [1]   27/25
rather [4]   14/8 25/12 34/17 45/5
reach [2]   30/23 48/12
read [7]   15/20 16/3 16/11 20/6 25/8 27/12 52/10
reading [1]   47/6
ready [3]   56/1 56/3 56/5
realize [1]   42/24
really [4]   15/11 15/11 33/13 49/22
reason [4]   10/7 25/12 42/25 43/6
reasons [1]   17/6
recall [3]   19/6 19/18 45/23
receive [1]   22/22
received [4]   23/1 36/10 36/14 37/5
receiver [27]   5/22 6/5 6/7 6/9 6/12 6/14 7/3 7/5 7/6 7/9 7/14 7/17 8/5 8/8 8/11 9/5 9/7 9/25 11/12 11/19 13/2 23/25 25/13 34/15 53/24 54/5 54/7
receivers [8]   11/14 11/21 12/3 12/11 48/5 50/23 55/13 57/8
receivership [4]   4/4 5/22 7/21 34/21
recently [1]   9/19
recess [1]   57/15
recollection [1]   19/7
recommendations [1]   7/8
record [12]   3/11 3/18 3/22 8/17 23/8 24/5 28/10 41/25 44/18 51/7 56/14 58/5
recoverable [2]   10/4 11/25
Reed [1]   10/9
referring [1]   41/20
reflect [2]   3/18 3/22
refuse [1]   42/18
refused [4]   11/25 28/12 29/14 56/11
refusing [4]   29/21 32/25 35/25 37/1
regarding [5]   13/7 15/21 15/22 27/14 30/14
regards [3]   7/3 13/1 51/24
related [1]   23/2
relationship [2]   25/21 25/22
release [1]   9/18
remain [3]   14/23 16/5 20/24
remainder [1]   16/20
remaining [1]   12/25
remove [1]   17/2
removed [2]   17/1 17/18
removing [1]   21/16
repeated [1]   52/22
repeatedly [4]   19/23 23/22 28/12 54/13
reported [2]   1/25 54/15
reporter [6]   1/21 19/9 20/10 23/10 38/21 58/13
REPORTER'S [1]   57/17
represent [2]   14/22 29/15
represented [1]   11/5
representing [1]   3/9
request [5]   3/22 24/14 39/11 39/14 39/15
requested [2]   23/13 25/11
requests [1]   24/19
required [4]   39/9 52/1 52/2 53/20
requirements [1]   7/16
requires [1]   30/13
respect [1]   7/23
respected [1]   9/14
respond [9]   19/2 22/8 27/15 52/1 53/12 53/25 54/12 54/19 55/2
response [6]   6/12 13/25 21/2 30/11 54/1 54/18
responses [4]   28/19 30/14 51/8 54/22
responsively [1]   30/2
Reston [1]   1/16
result [1]   5/21
resulting [1]   54/16
retired [1]   10/12
returned [2]   18/12 18/21
returns [1]   24/15
review [1]   13/12
reviewed [2]   7/13 28/21
reviewing [2]   28/6 51/6
rid [2]   44/8 44/14
right [16]   4/12 9/2 12/5 12/24 16/5 16/8 24/21 28/1 28/4 29/24 30/21 35/7 40/2 40/15 49/9 56/14
rights [10]   4/6 14/6 14/20 15/6 15/20 15/22 15/23 16/1 16/11 52/10
risk [1]   56/17
Robbins [1]   9/23
Robert [1]   7/24
role [2]   42/21 42/23

**room** [15]  1/19 1/22 13/19 14/1 17/1
17/11 18/9 20/19 20/22 20/23 20/23
21/7 26/6 51/16 58/17
**rooms** [1]  20/23
**rope** [1]  5/3
**rough** [2]  13/11 23/11
**RPR** [3]  1/21 58/3 58/11
**ruling** [1]  7/1
**rulings** [1]  52/16
**rush** [1]  23/14

**S**

**safe** [2]  41/10 45/19
**said** [39]  4/18 6/2 12/18 13/22 13/24
16/1 16/25 18/7 19/12 19/13 19/14
19/15 19/15 19/16 19/23 20/7 20/11
21/24 22/24 23/16 23/19 23/20 24/2
24/2 24/3 25/8 25/10 25/17 28/6 29/10
43/9 44/10 46/23 46/25 47/4 49/6 49/7
51/12 54/4
**sale** [6]  42/8 43/1 46/18 46/19 47/1
48/17
**same** [4]  18/14 23/17 29/4 53/7
**sanction** [7]  21/11 51/9 51/18 52/4
52/15 54/17 55/5
**sanctioned** [1]  25/15
**SANDERS** [12]  1/18 3/10 3/17 3/18
3/23 14/2 14/19 15/15 16/15 29/19
55/19 56/11
**Sanford** [1]  56/15
**sat** [1]  50/9
**Saturday** [1]  22/21
**saw** [1]  9/18
**say** [13]  7/2 13/13 15/18 16/6 18/8
20/8 27/14 32/24 43/18 45/6 47/5
49/10 49/20
**saying** [5]  18/3 19/6 19/19 30/2 46/2
**says** [3]  19/13 19/14 20/2
**scheduled** [2]  53/14 55/25
**scope** [1]  34/12
**se** [2]  1/15 32/10
**seat** [6]  9/3 18/25 26/16 27/17 27/25
28/3
**second** [5]  21/18 21/19 21/25 22/4
48/10
**Security** [3]  9/12 20/14 21/4
**see** [2]  8/12 57/3
**seeing** [1]  50/3
**seems** [1]  21/10
**seen** [2]  3/25 46/3
**self** [1]  15/24
**self-incrimination** [1]  15/24
**send** [4]  12/13 57/8 57/8 57/9
**sense** [1]  50/16
**sentencing** [1]  27/10
**seriously** [1]  52/3
**serve** [5]  6/7 8/5 9/5 9/6 54/21
**served** [1]  9/10
**service** [1]  55/17
**services** [3]  14/11 14/13 56/11
**set** [14]  31/10 31/22 32/21 33/7 33/9
34/2 34/4 34/9 35/9 35/10 42/7 42/12
42/14 42/25
**setting** [1]  42/21
**several** [11]  4/12 4/23 10/1 10/20 11/5
16/6 27/8 28/6 28/11 54/25 55/1

**severe** [6]  21/11 51/9 51/18 52/4
52/15 55/5
**shall** [1]  43/18
**she** [2]  14/4 43/15
**she's** [1]  16/17
**shenanigans** [1]  4/15
**Sheridan** [1]  43/19
**Shh** [1]  48/18
**shoebox** [1]  45/19
**shoes** [2]  11/23 12/19
**short** [1]  42/2
**shot** [2]  20/3 20/7
**should** [6]  7/22 14/21 25/14 51/14
55/25 57/12
**shouldn't** [1]  20/2
**show** [12]  3/23 13/3 17/4 19/24 21/2
21/19 24/12 24/23 51/5 53/4 53/9
54/19
**showed** [1]  13/19
**shown** [2]  52/21 52/25
**sic** [6]  6/20 35/25 47/9 47/14 52/4
**side** [1]  31/6
**Signed** [1]  58/9
**signing** [1]  11/12
**silent** [1]  16/5
**simply** [2]  4/9 25/16
**since** [5]  17/17 36/5 38/19 44/21
44/23
**sink** [1]  17/9
**sir** [4]  12/8 20/20 27/25 44/25
**sit** [4]  18/15 53/13 53/20 56/1
**six** [3]  17/24 21/5 25/24
**soap** [1]  17/11
**social** [1]  20/6
**some** [20]  3/24 6/6 6/6 8/7 10/10
11/15 17/11 17/13 17/22 20/1 24/15
27/1 36/7 37/15 38/19 40/4 43/7 46/10
50/22 52/16
**somebody** [4]  18/3 25/22 32/20 39/21
**someone** [1]  56/3
**something** [5]  24/3 27/2 31/20 33/5
43/22
**sometimes** [1]  36/19
**somewhere** [1]  36/12
**song** [1]  7/11
**sorry** [3]  6/18 15/22 25/3
**sort** [2]  27/1 33/13
**sound** [1]  20/16
**sounds** [4]  14/22 15/17 47/20 48/14
**souvenir** [1]  19/12
**spa** [1]  17/25
**space** [1]  9/15
**speak** [4]  3/13 15/7 16/8 28/4
**speaks** [1]  13/16
**special** [1]  35/11
**specifically** [2]  19/15 26/23
**spent** [2]  27/10 28/6
**spot** [2]  14/23 46/1
**staff** [6]  9/16 9/25 18/4 20/10 20/15
54/15
**stand** [12]  1/18 6/16 7/4 11/22 12/18
24/22 27/18 27/23 27/24 52/11 56/14
57/15
**STAND-BY** [1]  1/18
**standby** [3]  4/2 14/4 14/24
**start** [1]  50/14
**started** [1]  26/1

**state** [11]  43/17
**stated** [4]  29/5 30/8 39/13 40/8
**statement** [1]  22/9
**statements** [3]  19/5 39/9 39/11
**STATES** [12]  1/1 1/9 15/21 27/3 36/10
36/15 36/23 37/3 38/2 52/17 55/7 58/8
**stay** [2]  11/7 53/8
**stayed** [1]  4/18
**staying** [1]  17/15
**steal** [1]  18/20
**stealing** [2]  21/13 51/15
**stenography** [1]  1/25
**step** [3]  8/13 49/20 51/1
**still** [5]  9/7 14/18 21/23 38/20 50/24
**stock** [13]  33/25 34/1 36/6 36/7 42/8
46/18 47/2 47/10 47/10 47/15 48/6
48/8 48/9
**stole** [2]  14/1 54/16
**stop** [3]  25/2 25/18 56/10
**stored** [3]  44/21 45/11 45/13
**stories** [1]  5/14 37/23
**story** [4]  20/15 23/7 23/8 23/9
**strategic** [1]  10/16
**Street** [4]  1/13 1/19 1/22 58/17
**study** [1]  7/19
**stuff** [2]  45/3 45/3
**subject** [4]  5/24 11/1 25/7 34/16
**submitted** [2]  11/13 13/11
**Subsequent** [1]  53/23
**Substack** [1]  20/6
**such** [2]  52/18 55/8
**suggested** [1]  7/24
**Suite** [1]  1/13
**suited** [2]  6/8 8/5
**summary** [1]  24/17
**supersede** [1]  11/7
**superseded** [1]  4/19
**supervise** [1]  20/18
**supplement** [4]  7/5 23/23 23/24 54/6
**support** [1]  23/24
**suppose** [1]  19/19
**supposed** [4]  25/5 30/18 39/23 50/25
**sure** [7]  6/16 12/2 15/15 24/8 24/24
28/4 36/16
**swore** [3]  23/6 23/7 23/17
**sworn** [2]  23/10 28/2
**synthetic** [1]  35/12
**system** [2]  5/10 35/13

**T**

**table** [1]  9/3
**take** [32]  4/1 4/3 4/6 4/13 5/23 7/10
7/22 12/24 13/9 13/23 16/15 16/25
17/8 18/5 18/6 18/8 19/14 19/17 21/6
25/18 27/11 27/17 27/25 29/15 37/11
42/8 43/1 48/8 51/21 56/16 56/22 57/5
**taken** [7]  13/21 17/12 17/12 27/8 28/8
55/21 57/2
**taking** [3]  21/24 27/12 52/3
**talk** [3]  26/19 33/13 38/19
**talking** [4]  14/18 24/6 32/11 42/4
**Tarrant** [1]  19/17
**task** [5]  28/23 35/1 35/7 35/9 35/17
**tax** [1]  24/15
**taxpayers** [1]  13/20
**Taylor** [1]  1/19
**tea** [2]  17/22 17/23

**technology** [1] 35/13
**Telephone** [5] 1/14 1/17 1/20 1/23 58/18
**tell** [8] 10/1 24/3 25/14 31/12 33/19 33/21 33/24 56/3
**telling** [3] 20/16 28/17 35/23
**ten** [2] 31/17 31/19
**tendency** [1] 18/16
**tentative** [1] 7/8
**Terry** [1] 10/10
**testified** [2] 42/25 43/5
**testify** [1] 46/4
**testimony** [2] 46/4 51/7
**TEXAS** [10] 1/2 1/5 1/14 1/19 1/20 1/22 41/9 58/12 58/13 58/17
**than** [11] 5/13 5/16 19/20 19/21 27/14 31/9 31/19 41/5 45/5 49/24 51/10
**thank** [22] 3/18 4/7 4/8 4/10 8/23 9/2 10/7 12/5 12/17 15/16 19/1 20/13 21/1 26/17 29/17 29/24 30/21 55/17 55/19 56/18 57/14 57/15
**that** [273]
**that's** [34] 9/22 11/8 20/8 21/10 21/17 22/6 22/3 23/11 24/4 24/8 25/25 27/2 27/3 30/4 31/22 32/6 32/15 33/15 36/17 37/21 39/2 40/2 40/18 40/18 41/7 41/8 42/5 43/22 46/23 47/11 47/18 48/4 49/2 49/9
**theft** [2] 13/23 54/22
**their** [2] 11/22 21/4
**them** [40] 11/3 11/15 12/2 12/13 12/14 12/15 12/16 15/6 16/3 16/11 16/13 17/2 17/13 17/19 18/5 22/21 22/22 22/24 23/3 26/6 26/6 29/5 30/1 30/23 31/22 32/18 32/19 32/21 37/21 39/24 39/25 40/1 40/15 40/17 47/3 47/21 47/23 48/12 52/13 56/3
**then** [14] 4/6 13/21 17/9 17/15 19/21 19/22 22/4 22/8 36/2 36/4 40/4 44/9 53/23 54/23
**then-President** [1] 44/9
**theories** [1] 8/2
**there** [32] 4/14 5/24 7/2 8/10 8/12 10/24 13/21 14/5 16/24 17/9 17/24 19/3 19/8 19/24 20/18 22/9 25/19 25/20 25/23 25/25 30/18 31/13 32/7 37/10 37/21 41/11 43/7 43/15 43/22 43/22 44/11 55/25
**there's** [10] 17/22 18/24 31/21 31/21 31/21 32/6 35/19 42/25 47/4 56/12
**Therefore** [2] 52/14 55/4
**therein** [1] 11/13
**these** [12] 10/24 11/22 12/19 16/1 21/8 23/2 31/24 34/2 34/2 34/9 51/8 52/11
**they** [15] 11/2 11/2 11/3 11/23 12/2 12/18 18/7 18/8 31/10 32/8 33/25 34/4 36/7 44/12 49/7
**they're** [7] 5/18 6/20 8/12 10/25 32/2 34/1 38/10
**thing** [9] 3/19 10/6 11/3 13/13 15/16 20/1 26/25 33/13 51/13
**things** [4] 4/1 32/2 37/18 44/12
**think** [31] 4/23 4/24 5/4 6/10 6/19 7/6 14/1 15/3 15/4 17/24 19/14 21/11 21/12 21/13 23/22 26/21 28/25 31/13

**third** [4] 20/22 51/21 52/6 56/17
**this** [89]
**THOMPSON** [25] 1/12 3/6 7/1 11/13 11/16 19/2 21/3 22/2 24/22 25/10 26/21 28/14 28/20 34/13 34/25 39/3 40/4 41/23 44/15 45/8 47/12 51/15 55/1 55/18 57/9
**those** [31] 11/13 15/2 16/11 21/16 22/18 22/19 22/20 24/13 26/13 29/2 30/17 32/16 36/3 36/5 36/6 37/18 38/8 38/19 39/17 39/23 40/23 44/14 44/22 47/15 48/5 48/6 48/9 48/23 54/24 55/1 58/7
**though** [1] 29/24
**thought** [2] 9/15 10/20
**threatened** [1] 4/25
**threatening** [1] 53/6
**three** [7] 31/13 39/12 40/16 46/3 50/10 51/5 51/12
**through** [7] 4/22 6/20 28/22 29/2 36/19 48/17 48/20
**throughout** [2] 13/15 52/21
**Thus** [2] 5/20 54/3
**time** [32] 4/15 5/14 7/11 7/12 13/16 14/21 15/20 16/18 19/10 19/12 21/19 21/24 27/9 27/13 27/17 28/10 29/16 31/20 34/13 37/22 38/9 41/25 44/5 44/24 45/24 46/11 51/4 52/12 52/18 55/7 55/8 57/3
**times** [6] 4/14 4/23 4/25 23/15 30/8 37/10
**today** [24] 3/20 3/24 4/9 4/10 4/13 5/11 8/12 11/11 11/15 13/1 13/3 13/18 23/1 26/25 28/8 28/16 30/19 40/12 51/22 53/25 54/3 54/4 54/24 55/15
**today's** [2] 52/24 54/6
**together** [2] 22/1 25/17
**told** [5] 18/4 26/25 32/21 32/23 57/4
**too** [3] 10/2 10/21 15/4
**took** [6] 17/10 17/19 17/20 17/20 51/13 51/16
**top** [1] 45/23
**total** [2] 36/9 40/17
**totally** [2] 6/20 36/16
**touch** [1] 45/3
**touched** [1] 36/5
**towards** [1] 29/7
**transaction** [3] 47/1 47/13 48/20
**transcript** [15] 1/8 1/25 13/16 23/12 23/14 25/8 27/12 28/7 28/9 28/21 30/11 39/13 47/7 58/4 58/6
**transfer** [1] 48/22
**transferred** [2] 30/22 48/11
**transferring** [1] 47/23
**trial** [4] 11/6 17/17 27/10 53/17
**trip** [1] 17/25
**true** [2] 27/3 58/4
**Trump** [1] 44/9
**trust** [16] 31/6 33/11 33/17 33/18 33/21 33/22 34/9 34/10 34/22 34/25 35/1 35/7 35/9 35/17 35/20 36/4
**trustee** [1] 48/4
**trusts** [8] 31/3 31/4 31/24 32/7 32/16 33/4 34/2 34/3
**truthfully** [1] 18/1 36/21

**32/1 32/3 32/9 32/8 34/23 36/6 42/5 43/21 44/1 45/3 45/5 49/25 56/2

**try** [5] 6/5 28/18 29/1 52/11 52/13
**trying** [7] 4/24 5/15 9/6 15/12 15/16 18/19 21/25
**turn** [1] 40/5
**Tweet** [1] 44/9
**two** [18] 4/22 8/10 8/16 11/14 11/22 17/13 17/15 22/22 22/10 22/15 26/11 31/9 31/13 31/14 31/15 33/23 34/20 51/23
**type** [5] 4/20 20/11 37/2 50/6 50/8
**typically** [3] 31/21 33/12 36/18

**U**

**U.S** [12] 9/13 9/20 9/23 10/1 32/6 37/12 41/20 43/17 44/12 48/2 48/4 51/20
**ultimately** [1] 35/14
**Umbra** [2] 35/12 36/7
**unanswered** [1] 29/1
**uncooperative** [1] 5/21
**uncredible** [1] 40/9
**under** [12] 5/9 14/20 15/21 15/23 23/6 23/9 24/16 37/20 40/17 41/15 41/17 44/10
**underlying** [1] 4/21
**underneath** [1] 45/18
**understand** [13] 16/1 16/11 16/14 30/5 34/6 34/14 41/15 41/16 45/25 46/7 50/16 50/19 50/21
**understanding** [4] 22/6 29/20 32/5 48/1
**understood** [2] 4/7 23/19
**undertook** [1] 21/8
**unfortunately** [1] 11/4
**UNITED** [12] 1/1 1/9 15/21 27/3 36/10 36/15 36/23 37/3 38/2 52/17 55/6 58/8
**unlawful** [5] 51/10 52/15 52/24 53/2 55/6
**unless** [1] 18/24
**Unlike** [1] 7/7
**unnamed** [1] 24/16
**unopposed** [1] 7/2
**unrelated** [1] 28/15
**unresponsive** [3] 13/14 25/9 27/16
**until** [3] 20/25 52/18 56/23
**up** [40] 3/23 4/1 4/3 4/6 4/13 12/24 13/19 13/23 14/8 16/4 16/25 20/3 20/18 21/9 21/24 24/12 27/23 31/10 31/22 32/21 33/7 33/9 34/3 34/4 34/9 35/9 35/10 35/14 40/5 42/12 42/14 42/21 42/25 43/7 44/16 46/12 46/17 51/13 55/17 56/13
**us** [10] 1/12 22/7 31/8 32/16 33/19 33/21 33/24 35/23 38/8 45/5
**use** [5] 14/11 18/4 18/9 20/16 32/8
**used** [4] 16/6 23/22 45/3 45/16
**using** [2] 47/13 47/24
**usually** [1] 33/13

**V**

**various** [5] 4/25 10/16 26/24 27/11 44/12
**Vedder** [5] 8/9 8/24 9/1 9/4 10/19
**vehicle** [1] 35/12
**versed** [1] 11/3
**version** [1] 21/4
**very** [18] 3/23 4/16 4/16 6/2 11/3

**V**

very... **[13]** 14/15 23/16 25/1 25/1 25/16 28/8 30/7 42/1 42/2 43/16 46/1 50/18 50/23
video **[1]** 47/5
videographer **[1]** 19/9
violated **[1]** 26/11
violating **[1]** 53/5
violation **[1]** 48/25
Virginia **[1]** 1/16
visit **[7]** 11/15 11/21 12/16 14/9 14/20 16/15 55/14
VOL **[1]** 2/2
VOLUME **[1]** 1/8
voluntary **[2]** 50/12 50/13
vs **[1]** 1/6 3/4 15/21 15/22

**W**

Wait **[1]** 15/11
waive **[2]** 15/6 16/13
walked **[1]** 19/21
wallets **[4]** 44/20 45/2 45/2 45/10
want **[21]** 3/11 4/2 15/15 15/18 16/22 19/16 19/16 28/10 29/2 29/10 29/19 34/10 35/3 36/22 37/21 39/2 46/16 49/20 55/14 55/15 55/16
wanted **[2]** 3/20 25/24
warned **[1]** 11/5
warnings **[2]** 14/21 15/3
was **[85]**
washed **[1]** 17/20
wasn't **[2]** 19/11 46/22
WASPs **[1]** 33/12
waste **[1]** 13/16
water **[9]** 13/20 17/11 17/19 18/5 18/14 19/6 21/7 25/24 54/16
waters **[1]** 51/16
way **[5]** 10/17 29/4 36/19 47/18 55/10
we **[26]** 4/12 4/16 5/14 6/3 6/9 7/5 7/6 7/7 8/21 9/22 11/8 12/12 13/22 20/11 22/2 22/11 22/22 23/13 25/17 33/12 33/12 33/13 38/19 43/18 51/13 56/15
we'll **[9]** 4/12 7/12 16/16 22/8 26/8 56/14 56/22 57/3
we're **[8]** 4/1 7/9 21/24 21/25 24/5 25/4 26/15 26/19
we've **[1]** 3/25
Webster **[4]** 7/24 8/3 8/3 9/16
week **[4]** 6/4 22/14 22/14 27/10
week-and-a-half-long **[1]** 27/10
welcome **[1]** 4/11
well **[29]** 5/6 7/10 8/6 9/9 9/14 10/2 10/8 10/14 11/3 11/21 16/3 19/19 24/2 28/7 31/8 31/12 31/20 34/6 36/7 37/19 38/10 43/3 46/22 48/10 48/24 50/11 50/24 51/16 53/2
well-documented **[1]** 53/2
well-known **[1]** 10/8
well-respected **[1]** 9/14
Wells **[6]** 43/24 43/25 44/1 44/1 44/3 47/14
went **[8]** 4/22 8/2 17/10 25/23 26/20 28/20 34/8 48/17
were **[38]** 3/20 4/20 13/14 22/18 22/20 24/14 25/5 25/7 25/9 25/19 25/19 25/20 25/23 26/14 26/23 27/9 27/15 27/15 28/11 29/1 31/10 34/2 34/4 39/8

39/8 39/12 39/12 39/13 40/6 40/7 43/6 44/3 44/11 44/11 47/8 47/20 52/1 52/2 52/7
what **[38]** 5/4 5/19 5/24 10/24 10/25 11/24 11/25 21/4 22/1 22/24 24/1 26/20 27/19 28/20 28/23 28/25 29/20 34/6 34/7 35/7 35/21 37/8 37/19 38/23 40/22 41/22 42/4 42/16 43/9 43/21 44/7 46/23 48/4 49/5 49/11 49/13 57/3 57/5
what's **[6]** 5/24 10/4 10/4 32/9 36/9 48/24
whatever **[1]** 35/18
whatsoever **[2]** 39/5 42/23
when **[24]** 4/4 4/20 6/17 11/4 11/5 11/6 15/23 18/16 19/10 26/1 26/6 27/9 32/5 33/14 37/14 37/15 45/11 49/24 51/9 53/16 55/23 56/3 57/7 57/8
where **[11]** 10/12 11/8 17/14 20/22 20/24 25/19 44/9 44/20 45/10 45/13 48/3
whether **[8]** 33/10 33/16 34/15 35/16 46/6 51/14 55/15 55/16
which **[14]** 18/12 25/24 33/20 33/22 34/12 35/2 35/12 37/10 37/14 39/5 39/12 41/9 52/2 53/24
while **[3]** 9/7 54/10 54/13
white **[1]** 9/14
white-collar **[1]** 9/14
who **[9]** 3/5 7/24 30/18 32/8 32/20 32/23 38/13 38/17 44/11
who's **[1]** 25/22
whole **[1]** 48/8
why **[16]** 8/16 13/3 13/22 16/24 17/5 19/16 19/16 21/19 22/7 25/14 25/24 32/15 43/6 44/3 49/6 50/16
wife **[3]** 32/22 36/4 48/7
will **[14]** 3/6 6/19 8/8 8/10 11/12 12/2 14/4 16/6 16/10 16/15 20/2 27/19 32/24 56/2
WILLENBURG **[4]** 1/21 58/3 58/11 58/11
WILLIAM **[1]** 1/12
willing **[2]** 18/11 18/15
willingness **[1]** 52/25
wish **[1]** 50/21
within **[2]** 24/13 53/19
without **[1]** 21/16
witness **[5]** 27/18 27/23 28/2 29/9 29/10
won't **[4]** 11/2 49/12 49/15 49/18
Woodforest **[3]** 39/10 40/17 41/9
Woodlands **[1]** 41/9
word **[2]** 21/13 23/21
words **[1]** 47/24
work **[10]** 10/10 10/14 32/6 36/22 36/25 37/2 37/15 37/18 38/6 50/23
worked **[4]** 21/5 32/21 32/21 38/20
working **[1]** 38/24
worst **[1]** 19/25
WORTH **[11]** 1/3 1/5 1/20 1/22 9/10 9/11 10/8 12/11 14/3 58/14 58/17
would **[35]** 4/21 4/22 5/4 6/4 6/9 8/13 9/15 10/2 10/20 11/1 13/20 14/9 14/23 15/25 19/3 19/16 19/24 20/1 20/24 21/12 21/14 23/20 25/17 25/18 27/20 30/9 30/10 36/6 37/17 39/14 46/12 50/22 51/15 55/10 55/24

wouldn't **[2]** 19/24 31/22
write **[1]** 41/2
written **[9]** 13/7 21/21 22/11 24/6 25/4 25/10 26/24 51/25 54/1
wrote **[1]** 19/18
Wyoming **[10]** 42/3 42/7 42/25 43/2 43/4 43/6 43/14 43/16 47/13 48/1

**X**

Xavier **[1]** 33/22

**Y**

yahoo.com **[2]** 1/23 58/19
yeah **[8]** 26/9 32/14 36/2 41/8 43/25 46/15 47/25 56/8
years **[7]** 8/4 9/11 10/1 12/20 21/6 33/16 46/3
yes **[29]** 6/18 8/18 10/18 12/8 15/9 15/14 16/19 16/21 17/8 18/2 18/18 19/4 22/12 25/25 26/6 29/23 30/20 30/5 35/22 38/7 38/12 38/22 39/6 42/6 42/11 42/15 42/20 43/3 50/13
yet **[1]** 54/23
you **[345]**
you'd **[4]** 7/2 14/8 40/4 41/24
you'll **[4]** 9/3 55/14 56/23 57/4
you're **[27]** 4/11 5/9 8/21 18/3 24/2 28/16 30/3 30/19 32/25 33/10 33/16 35/25 36/19 37/1 37/20 41/15 45/25 46/1 46/13 48/15 50/15 50/16 50/24 50/25 51/21 57/2 57/4
you've **[11]** 4/13 4/14 5/4 11/25 21/18 26/11 26/24 36/14 36/23 37/2 41/19
you-all **[2]** 9/19 10/7
your **[141]**
yours **[1]** 19/15
yourself **[5]** 11/6 41/19 52/19 56/24 57/6

**Z**

zero **[3]** 40/9 42/23 45/7
zilch **[1]** 45/7

# EXHIBIT 40

1      IN THE UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF TEXAS

3       FORT WORTH DIVISION

4   POINT BRIDGE CAPITAL, LLC      )    CASE NO. 4:24-CV-00988-P
    ET AL                          )
5                                  )
                                   )    FORT WORTH, TEXAS
6   vs.                            )
                                   )    DECEMBER 16, 2025
7   CHARLES JOHNSON                )    1:50 P.M.

8                       VOLUME 1
                TRANSCRIPT OF STATUS CONFERENCE
9            BEFORE THE HONORABLE MARK T. PITTMAN
              UNITED STATES DISTRICT COURT JUDGE
10
    **A P P E A R A N C E S:**
11
    FOR THE PLAINTIFF:       WILLIAM BENNETT THOMPSON
12                           DLA Piper, LLP US
                             1900 N. Pearl Street
13                           Suite 2200
                             Dallas, Texas   75201
14                           Telephone:  214.743.4500

15  PRO SE DEFENDANT:        CHARLES JOHNSON
                             1624 Fieldthorn Drive
16                           Reston, Virginia 20194
                             Telephone:  617.429.4718
17
    RECEIVERS:               JEFFREY J. ANSLEY
18                           ADAM D. FARRELL
                             ANDREW ROBBINS
19                           Vedder Price
                             300 Crescent Court
20                           Suite 400
                             Dallas, Texas   75201
21                           Telephone:  469.895.4790

22  COURT REPORTER:          MONICA WILLENBURG GUZMAN, CSR, RPR
                             501 W. 10th Street, Room 310
23                           Fort Worth, Texas   76102
                             Telephone:  817.850.6681
24                           E-Mail:  mguzman.csr@yahoo.com

25  Proceedings reported by mechanical stenography, transcript
    produced by computer.

1

<u>**INDEX**</u>

2                                          PAGE   VOL.

3   Appearances ................................4      1

4

5   Report By Mr. Farrell ......................6      1

6   Response by Mr. Thompson ...................8      1

7   Response by the Defendant ..................9      1

8

9   Miranda Rights Given ......................16      1

10

11  Questioning of the Defendant

12        By the Court .........................17      1

13        By Mr. Farrell .......................23      1

14        By Mr. Thompson ......................55      1

15

16  Receiver's Witnesses   Direct   Cross   Voir Dire

17  Hal Lambert              68                       1

18

19  Comments by the Court ....................73      1

20  Discussion with the Court ................75      1

21

22  Proceedings Adjourned ....................90      1

23  Reporter's Certificate ...................91      1

24  Word Index ...............................92      1

25

1                    **ALPHABETICAL INDEX OF WITNESSES**

2

3                          Direct   Cross   Voir Dire      Vol.

4    Lambert, Hal              68                            1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          *(December 16, 2025, 1:50 p.m.)*

3          *THE COURT:*  This is the matter of Point Bridge

4     Capital, LLC vs. Charles Johnson, Docket Number is

5     4:24-CV-988-P.

6          The parties have been ordered to make an appearance

7     here today.  Mr. Johnson, who is currently being held in

8     contempt of court down in the Johnson County Jail, in an

9     effort to see if we can get himself -- to purge himself of

10    contempt, the Court had him brought to court today.

11         And my understanding is he's been meeting with

12    receivers, as well as counsel for plaintiff in order to see if

13    we can resolve this.

14         So, let me begin by asking plaintiffs' counsel to

15    identify yourself.

16         *MR. THOMPSON:*  Good afternoon, Your Honor.  Will

17    Thompson for the plaintiffs.  Mr. Lambert is in the gallery.

18         *THE COURT:*  All right.  Thank you.

19         If you'd like, you can move a chair up, that's fine.

20         And who do I have for receiver?

21         *MR. FARRELL:*  Good afternoon, Judge.  Adam Farrell,

22    and I'm joined by Jeffrey Ansley and Andrew Robbins.

23         *THE COURT:*  Thank you, gentlemen.

24         And Mr. Johnson, would you state your name for us?

25         *DEFENDANT JOHNSON:*  Charles Johnson.

1          *THE COURT:*  Okay.  Mr. Johnson, have you decided to

2     hire an attorney yet?

3          *DEFENDANT JOHNSON:*  No, Your Honor.  I don't intend

4     to.

5          *THE COURT:*  Okay.  I want to encourage you -- I

6     encouraged you throughout your trial to do so.  And now that

7     you've been held in contempt, it makes it all the more

8     difficult.  I know that receivers are going to give me a

9     report, but it could possibly resolve itself a lot quicker if

10    you had an attorney just to make communications with the

11    Court.

12         Now, your parents have sent a couple of

13    communications, which I put on the record.  But I am not

14    taking those any longer.  You only can communicate with the

15    Court via a motion that's filed for everyone to see.  But out

16    of concern for you, I have read those and put those on the

17    record.

18         So there's no way -- maybe even your mom and dad

19    couldn't hire an attorney for you?

20         *DEFENDANT JOHNSON:*  My parents are middle class, at

21    best.

22         *THE COURT:*  Well, I'm middle class at best, too.

23    But if I were in trouble, I bet that my parents would find a

24    way to get an attorney for me.

25         Is it just that you refuse to have one?  I possibly

1    -- I've thrown out the possibility twice of a public defender

2    representing you if these actions turned into criminal

3    contempt, and you've refused that representation, too.

4         *DEFENDANT JOHNSON:* When it becomes a criminal

5    contempt matter, if it does, which I hope it doesn't, I'm

6    happy to think about it at the time.

7         *THE COURT:* All right.  Well, it's perfectly within

8    your purview if you want to have an attorney or not, I'm just

9    trying to give you some free advice.  But it's worth what you

10   pay for it.

11        *DEFENDANT JOHNSON:* I appreciate that.  Thank you,

12   Your Honor.

13        *THE COURT:* Okay.  Mr. Farrell, would you like to

14   give us a report as to what went on this morning?

15        *MR. FARRELL:* Yes, Your Honor.

16        *THE COURT:* And do I need to ask Mr. Johnson any

17   questions?

18        *MR. FARRELL:* Yes, Your Honor.

19        So, this morning was the second time the receivers

20   have had the opportunity to meet with Mr. Johnson.  The first

21   being earlier in December, myself, along with Andrew Robbins,

22   went to Johnson County Jail where we spent 2 1/2 hours with

23   Mr. Johnson, asking him questions about his assets.  This was

24   all in the preliminary report, as well as the initial report

25   that was filed with the Court.

1          As far as what happened this morning, receivers,

2     along with plaintiffs' counsel, met with Mr. Johnson for

3     roughly three hours, where we continued questioning, follow-up

4     questions regarding assets and how he could assist the

5     receivers in tracking those down.

6          While I feel Mr. Johnson was generally cooperative

7     and helpful, a lot of the challenges that you're familiar with

8     that have been throughout the course of this, remain.  At

9     times it felt as though Mr. Johnson was being evasive,

10    referencing a Government handler and his inability to answer

11    certain questions we had.

12         Specifically, we asked about the Othram shares that

13    were sold.  And Mr. Johnson was unable, and what appeared to

14    be unwilling, to provide information there, and simply

15    referred to his Government handler for more information.  And

16    so that -- that has been challenging.  So that exists still.

17         There's a number of inconsistencies with regard to

18    digital currencies, crypto currencies that the receivers are

19    having a difficult time reconciling.  His statements that he's

20    made on his X account of his crypto positions, with him saying

21    that he hasn't had any digital assets or digital currencies

22    since 2017.  And so we note, for the Court, a number of those

23    inconsistencies as well.

24         That's a brief -- brief summary of this morning.

25         *THE COURT:*  Mr. Thompson, were you present during

1    the meetings this morning.

2               Thank you, Mr. Farrell.

3               *MR. THOMPSON:*  I was, Your Honor.

4               *THE COURT:*  And is your report to the Court pretty

5    much consistent with what Mr. Farrell just described?

6               *MR. THOMPSON:*  I generally agree, Your Honor.

7               Just -- since I have a little more experience, I

8    would just kind of note the information that came out of today

9    didn't materially move the ball forward in any -- in any

10   meaningful way, sort of beyond what -- the questions I asked

11   at the deposition.  Didn't learn really about any new assets.

12   We still were stuck with this Government handler on evasion.

13              And just two points that I just think are notable

14   that stuck out, in that Mr. Johnson made some vague

15   commitments to cooperate, but it was qualified, I will

16   cooperate and tell you about the things that I can.  You know,

17   suggesting that there's something more out there or something

18   that he's holding back.

19              And then just -- just another concern, you know from

20   the plaintiffs' perspective, is that, you know, as we have

21   diligently tried, with the help of the receiver, tried to

22   uncover his assets, there's a concern that just a kind of

23   hollow commitment to participate, you know, will just be met

24   with sort of, you know, past his prologue type of stuff, where

25   he will just refuse to provide tangible real answers about his

1   assets, and just kind of go around and around about different

2   names and Government handlers, and I'll tell you this, and

3   I'll tell you that.

4            *THE COURT:*  Okay.

5            *MR. THOMPSON:*  That's the only other context that --

6            *THE COURT:*  I'd like to give you an opportunity to

7   speak, Mr. Johnson.  If possible, I would like to have you

8   home by Christmas, but you have to purge yourself of the

9   contempt.  So as best you can, I'd like you to stand and

10  please go over to the podium, and why don't you tell us your

11  --

12           *DEFENDANT JOHNSON:*  Sure.  I met with the receivers

13  here on two separate occasions.  One time was after I was

14  subject to a severe beating, where I was kicked in the head.

15           *THE COURT:*  Oh, I know that you had reported that.

16           *DEFENDANT JOHNSON:*  Yes.

17           *THE COURT:*  I did have the -- something about that

18  was in your parents' --

19           *DEFENDANT JOHNSON:*  That's right.  And just to be

20  clear --

21           *THE COURT:*  Can I stop you?

22           *DEFENDANT JOHNSON:*  Yeah.  Sorry.

23           *THE COURT:*  That was in some of the correspondence

24  your parents sent.  And I did have the Marshal check on that,

25  and they said there was no record of any type of an incident

1    down there.  They are required to record that if something

2    happens.

3            *DEFENDANT JOHNSON:*  They are.  But unfortunately,

4    Your Honor, when the person is sleeping right next to you,

5    it's quite difficult to report these things.

6            *THE COURT:*  Did you report it?

7            *DEFENDANT JOHNSON:*  I reported to one of the guards,

8    but not to the main one on file.

9            *THE COURT:*  Well --

10           *DEFENDANT JOHNSON:*  I believe the receivers saw me

11   with a black eye, so I think they can speak to that as well.

12           But the reason I mention this, is that -- I made

13   clear to the receivers, as I made clear to Your Honor, I have

14   no issue with the court receiver -- I have no issue with

15   responding to any of the questions from the court receiver.

16           The problem I'm at right now is that many of the

17   assets that I may have, I'm not able to access without

18   accessing a computer.  I haven't touched a computer in

19   26 days.

20           *THE COURT:*  The problem is, you should have thought

21   of that the various times you had to respond, and you never

22   did.

23           *DEFENDANT JOHNSON:*  Your Honor, I did -- I did

24   respond to some of these questions.  And I made it very

25   abundantly clear under oath, many times, that I have had no

1  digital assets since 2017.

2          *THE COURT:*  Are you --

3          *DEFENDANT JOHNSON:*  I'm happy to take a polygraph,

4  I'm happy to do whatever is necessary.  But I just -- I don't

5  know what to do at this stage, Your Honor.  Because I'm at a

6  stage where I've had minimal sleep, minimal food, been kicked

7  in the head a few times, and I'm going to say that I don't

8  really understand fully.  And I know that Your Honor wants me

9  to get a lawyer, but there seems like a lot of good-ole-boy

10  stuff going on in Texas.

11          Just frankly, Your Honor, if I had a computer, if I

12  were free, I could answer all the receivers' questions, we

13  could all be done with this in the --

14          *THE COURT:*  If I could just stop you.

15          Are you going to persist in saying that your handler

16  won't let you disclose certain information?

17          *DEFENDANT JOHNSON:*  That's not what happened, Your

18  Honor.  So, if I may, what I've said, consistently, is I have

19  no intention of selling the Othram stock, I have no interest

20  in the money from it.  I have not -- I would rather be free

21  and broke than have any money.  I don't -- that's not what

22  motivates me.

23          *THE COURT:*  Well, I would rather you just purge

24  yourself of the contempt, and we find out that you've got --

25          *DEFENDANT JOHNSON:*  I have --

1          *THE COURT:*  -- if you don't have any assets and

2    you're truthful, then there's no need to have a receiver, and

3    the plaintiff can pursue whatever they can to --

4          *DEFENDANT JOHNSON:*  Yes.  I've given a list of my

5    assets, as best as I can recall them.  And one of the main

6    people who handles a lot of my assets is a friend of mine,

7    I've given his name.  I don't know his number off the top of

8    my head.  The only phone number I knew was my father's, and I

9    barely knew that.  This is not --

10          *THE COURT:*  That's why I warned you several times,

11    that if you didn't comply you'd be held in contempt.  And

12    specifically, we explained to you why Johnson County Jail was

13    not a very good place to go.

14          *DEFENDANT JOHNSON:*  I certainly wouldn't recommend

15    it.

16          *THE COURT:*  It's not exactly a vacation spot.

17          *DEFENDANT JOHNSON:*  Not exactly, Your Honor.

18          But I would say that I have, as best that I can,

19    purged myself of my contempt with the resources I have.  I'm

20    limited.  I have parents that are elderly, one who has a

21    broken arm and can barely type for me.  I'm not -- I don't

22    have like this massive bitcoin fortune or something hiding --

23          *THE COURT:*  Why were you going out on the Internet

24    on your various Substacks doing interviews where you claimed

25    that you had this?

1        *DEFENDANT JOHNSON:*  I had one situation, I think in

2    the last few years.  I'm frankly afraid of bitcoin because of

3    how people have been killed over it.  And that's --

4        *THE COURT:*  I don't need conspiracy theories.

5        *DEFENDANT JOHNSON:*  No, no.  Just to be blunt about

6    it, Your Honor, I have said -- I made jokes about it in the

7    past, and there are people who believe that I have a massive

8    fortune.  Mr. Thompson has taken those jokes out of context,

9    which he's done on several occasions in Your Honor's presence.

10   I made it very clear repeatedly --

11       *THE COURT:*  Probably not a good idea when you have a

12   $70 million judgment to make jokes about assets that you have.

13       *DEFENDANT JOHNSON:*  Those jokes predate the

14   $70 million judgment.

15       *THE COURT:*  Well, there was something that was shown

16   to me as an attachment, looked like you were doing, in talking

17   to somebody in a restaurant here in Fort Worth --

18       *DEFENDANT JOHNSON:*  No, Your Honor.

19       *THE COURT:*  -- the day before the hearing.

20       *DEFENDANT JOHNSON:*  I was having a conversation with

21   Mr. Brucker, back here, in my -- in my hotel room, which was

22   paid for by a friend of mine, and we were discussing a

23   hypothetical situation.  I haven't seen the clip.  I haven't

24   been online in 26 days, I haven't touched a computer or

25   whatever.  My understanding is --

1    *THE COURT:*  It was in some of the Court's filings.

2    *DEFENDANT JOHNSON:*  Yes.  So --

3    *THE COURT:*  Why don't you take a seat and let me ask

4    you some questions.

5    *DEFENDANT JOHNSON:*  Sure.

6    *THE COURT:*  You seem to talk a lot and not listen a

7    lot, and that's what got you into trouble.

8        Let me just say this, like Mr. Ansley, we've --

9    Mr. Ansley, you've held top secret security clearances with

10   the Department of Justice, haven't you?

11   *MR. ANSLEY:*  I have.  Yes, sir.

12   *THE COURT:*  You've also participated in the

13   prosecution of all types of national security cases during

14   your time?

15   *MR. ANSLEY:*  I have.  Yes, Your Honor.

16   *THE COURT:*  Okay.  I have, too.

17       And we've dealt -- Mr. Ansley and I have dealt with

18   all types of agents from all types of intelligence agencies.

19   I haven't been visited by a handler or had any motions made by

20   anybody working for the United States Government for any

21   intelligence agencies that have paid me a visit that says

22   anything that you're saying is truthful.

23   *DEFENDANT JOHNSON:*  I have not asked them to yet,

24   Your Honor.

25   *THE COURT:*  Well, if I were in Johnson County Jail I

1  might want to reach out to them.

2          *DEFENDANT JOHNSON:*  What I have asked them to do  is

3  --

4          *THE COURT:*  I am also a separate and independent

5  branch of government.

6          *DEFENDANT JOHNSON:*  I appreciate that, Your Honor.

7  But I am limited, because I have a situation where I have a

8  Government handler who is also a Government contractor, and I

9  would like to be employable after I leave here, particularly

10  as I'd like to provide for my family.  So, I'm in a situation,

11  Your Honor --

12          *THE COURT:*  You also have a $70 million judgment

13  against you.

14          *DEFENDANT JOHNSON:*  I do, and I've made clear the

15  list of assets that I have to pay that judgment.

16          *THE COURT:*  All right.  Most of the time when people

17  are intelligence assets, they don't go around saying that they

18  are or you're not much of an asset.

19          *DEFENDANT JOHNSON:*  There are different Government

20  agencies, and each one has its own relationship with me.  And

21  I have had -- I've had a relationship with a number of

22  agencies, we've had this on the record, I've testified under

23  oath on it.

24          *THE COURT:*  Okay.  You need to stop talking and

25  listen.

1    *DEFENDANT JOHNSON:*  Yes, sir.

2    *THE COURT:*  Raise your right hand.

3    *(Witness sworn)*

4    *THE COURT:*  All right.  Yet again, I am going to

5    advise you of your Miranda rights.  I hope you take the

6    opportunity to purge yourself of the contempt, it doesn't

7    sound like that you're going to, but I want to give you this

8    opportunity.  I do not want you to stay in Johnson County Jail

9    anymore than you have to.  I really just want to move this

10   forward.

11         All right.  So let me give you some advice when it

12   comes to telling the truth when you're under oath.  You do

13   have the right to remain silent.  Anything you say can and

14   will be used against you in a court of law.  You do have a

15   right to speak to an attorney.  I can try to have someone from

16   the public defender come over and have an attorney present in

17   questioning.  If you cannot afford a lawyer, one will be

18   provided to you at Government expense.

19         Do you wish to go forward?

20   *DEFENDANT JOHNSON:*  I do, Your Honor.

21   *THE COURT:*  Okay.  And you understand your rights

22   under the Constitution?

23   *DEFENDANT JOHNSON:*  I do, Your Honor.

24   *THE COURT:*  All right.  I want to ask you some very

25   direct questions, or at least, perhaps, I can turn it over to

1    one of -- counsel and they can ask you some questions and I

2    can do some follow-up, but you need to be truthful.  And what

3    I mean by that, you need to give simple, direct responses.

4    Answer the questions as they are given to you, and if you do

5    not answer them truthfully and fully, we'll continue to hold

6    you in contempt.

7            Now, holding you in contempt is not something that I

8    can do forever.  At a certain point it becomes punitive.  But

9    the Fifth Circuit seems to suggest that I can hold you about

10   18 months.  So, think about that.

11           You've been in, what, less than a month?

12           *DEFENDANT JOHNSON:*  Twenty-six days.

13           *THE COURT:*  Yeah.  So, you need to answer

14   truthfully.  You're not helping anybody by spinning your yarns

15   and conspiracy theories, you need to be truthful.

16           Who is your handler at these agencies that you keep

17   referring to?

18           *DEFENDANT JOHNSON:*  I've had several, Your Honor.

19           *THE COURT:*  All right.  I said name them for me.

20           *DEFENDANT JOHNSON:*  Yes.

21           *THE COURT:*  I don't care how many you've had.

22           *DEFENDANT JOHNSON:*  Jonathan Buma, FBI special

23   agent.

24           *THE COURT:*  And where --

25           *DEFENDANT JOHNSON:*  Ketrin Adam.

1          *(Court Reporter interrupts)*

2          *DEFENDANT JOHNSON:*  Ketrin Adam.

3          *THE COURT:*  Where are they based out of?

4          *DEFENDANT JOHNSON:*  Los Angeles field office of the

5     FBI.

6          *THE COURT:*  Okay.  And you were an asset to them and

7     you were what?

8          *DEFENDANT JOHNSON:*  I was a confidential human

9     source for them.

10         *THE COURT:*  Okay.  And they -- were they paying you

11     to provide information?

12         *DEFENDANT JOHNSON:*  They are providing me some form

13     of compensation.  I wouldn't call it payment necessarily,

14     there was no cash or money exchanged.

15         *THE COURT:*  What does that mean, some form of

16     compensation?  Buying you dinner?

17         *DEFENDANT JOHNSON:*  Buying dinners, doing things

18     like forgiving taxes that I owed or may or may not have owed,

19     that sort of thing.

20         *THE COURT:*  Let me stop you.  I was a Federal

21     prosecutor at Main Justice, at the United States Attorney's

22     Office, I investigated economic crimes at the FDIC and SEC,

23     and I've worked with countless FBI agents.  I have never known

24     that a line FBI agent had any authority to forgive taxes.

25         Mr. Ansley, in all your time as a Federal

1   prosecutor, have you ever heard of that before?

2          *MR. ANSLEY:*  Absolutely not, Your Honor.

3          *THE COURT:*  Yeah.  I don't know what in the world a

4   law enforcement agency would have anything to do about

5   forgiving taxes.

6          *MR. ANSLEY:*  And the --

7          *THE COURT:*  That --

8          *MR. ANSLEY:*  I'm sorry, Judge.

9          *THE COURT:*  Go ahead.

10          *MR. ANSLEY:*  The idea that the FBI would come in and

11   direct the Internal Revenue Service what to do is something in

12   my experiences --

13          *THE COURT:*  Would never happen.

14          *MR. ANSLEY:*  I have never experienced that.

15          *THE COURT:*  That would never happen.

16          *DEFENDANT JOHNSON:*  Well, in the case with

17   Jonathan Buma, he met with me, he said there was a series of

18   investigations into me, one of which concerned going to

19   see Julian Assange in August 17, 2017.  I met with him for

20   19 hours over the course of two days at the --

21          *THE COURT:*  Did you go see Julian Assange?

22          *DEFENDANT JOHNSON:*  I did, Your Honor.

23          *THE COURT:*  Okay.

24          *DEFENDANT JOHNSON:*  I spent four hours with him.  I

25   was then debriefed by a CIA officer who was stationed at the

1    UN building.

2              THE COURT:  What's his name?

3              DEFENDANT JOHNSON:  His name is -- his name is Alex

4    Stamos, S-T-A-M-O-S.

5              THE COURT:  And he is --

6              DEFENDANT JOHNSON:  He was introduced to me by a man

7    named Hamlet Yousef, who is also formerly in the CIA.

8              THE COURT:  What does Mr. Yousef do now?

9              DEFENDANT JOHNSON:  I believe he's some kind of

10   investigator.  I'm not quite sure, Your Honor.

11             THE COURT:  Okay.  And none of this is really

12   relevant, other than I just need to know what your assets are.

13   And you've testified at least twice before me, and it sounds

14   like you talked to these folks today, and you're saying that

15   you're not going to disclose any assets that may have been

16   given to you by these folks?

17             DEFENDANT JOHNSON:  No, Your Honor.  Well, what I

18   said then, and I say now, is that I was asked about the Othram

19   shares --

20             THE COURT:  Yeah.

21             DEFENDANT JOHNSON:  -- and about the efforts to

22   sell those shares.  It's my contention -- so I was given, by

23   my Government handler, by Mr. Alex Rodriguez, I was given a

24   screenshot and the screenshot was of a bank -- bank

25   information where I could wire money from the sale of this

```
1    stock from Othram.

2            Mr. Rodriguez is a Government contractor,

3    additionally.  We had discussed forming a genomics venture.

4    I wanted to separate myself from a conflict of interest,

5    Mr. Rodriguez advised me to sell it.  I did not set up the

6    LLC, I did not set up the bank account, I did not -- was not

7    involved in any meaningful way.

8            When Your Honor mentioned, and when it became known

9    that there was an effort here, I moved off from selling the

10   asset.  I have no interest in the asset.  Mr. Lambert is free

11   to have the asset.  I want nothing to do with Othram, it's not

12   interesting to me.

13           The only thing that's interesting --

14           THE COURT:  How much is that -- are those shares

15   worth?

16           DEFENDANT JOHNSON:  It depends who you ask, Your

17   Honor.  I've gotten --

18           THE COURT:  Well, I'm asking you.  What do you think

19   they're worth?

20           DEFENDANT JOHNSON:  Probably between a million and

21   $3 million.  I don't --

22           THE COURT:  Okay.

23           DEFENDANT JOHNSON:  To be honest with you, it

24   doesn't phase me.  What I cared about was purging myself of

25   the conflict of interest to set up a new company.  I have no
```

1    interest in the stock, it's not interesting to me in the

2    slightest.  To the extent that my ex-wife and daughter's

3    trusts are involved, they own like 300,000 or $400,000, they

4    can get that money; but I have no interest in it.

5              *THE COURT:*  You understand that under the Court's

6    orders all of your assets are in the hands of the receiver?

7              *DEFENDANT JOHNSON:*  Yes, I understand that now.

8    And now that I have a receiver, and I'm perfectly willing to

9    cooperate and help them as they secure those assets.

10             *THE COURT:*  And if there's separate assets that are

11   in the name of your children that can't be touched by the

12   judgment, they will not turn that over --

13             *DEFENDANT JOHNSON:*  Yes.

14             *THE COURT:*  -- to satisfy the judgment.

15             *DEFENDANT JOHNSON:*  Yes.  And I appreciate that

16   Your Honor set up a receivership, so that that was a

17   possibility -- so that included that possibility.

18             *THE COURT:*  Okay.  I think it might be easiest just

19   to turn it over to one of my receiver's counsel, and let's see

20   how you answer some questions under oath, and we'll see where

21   we go from there.

22             *DEFENDANT JOHNSON:*  Sure.

23             *THE COURT:*  So, Mr. Ansley or Mr. Farrell, if

24   you-all would just ask him some very pointed questions, and

25   then Mr. Thompson if you'd like to do some follow-up and we'll

1  see.

2          But I'll be quite frank with you, this -- the

3  stories of the handlers and the FBI, even assuming all of this

4  is true, doesn't concern me.  What concerns me is what you own

5  and where it is.  That's what we need to know, okay?

6          *DEFENDANT JOHNSON:*  Yep.

7          *THE COURT:*  And we need to be 100% truthful.  And we

8  cannot give answers like, I'm not going to disclose that

9  because my handler told me not to.

10         *DEFENDANT JOHNSON:*  Yep.  I appreciate that.

11         *THE COURT:*  If that continues to be the answer, you

12 will be held in contempt until it's not the answer, or for

13 that matter, you're prosecuted for civil contempt -- I mean,

14 I'm sorry, criminal contempt.

15         Mr. Farrell, go ahead.

16         *MR. FARRELL:*  Thank you, Judge.

17         Just a follow-up question on the Othram sale, or the

18 attempted sale.  You mentioned that this occurred before the

19 receivership was established.  Did this happen after the

20 preservation orders by this Court post-judgment?

21         *DEFENDANT JOHNSON:*  I don't know.  I don't know if

22 I'm getting the timing of it correct, I haven't had much sleep

23 in Johnson County, but I have no interest in selling the

24 stock.  It's not -- it's not something I'm pursuing, not

25 something I'm encouraging being done.

1          I was told by Mr. Rodriguez at the time to see if I

2    could sell and liquidate the assets.  I tried the first time

3    to liquidate the assets in November, which would preclude all

4    of this stuff, the trial and all the rest of it.

5          *MR. FARRELL:*  November of what?

6          *DEFENDANT JOHNSON:*  November of 2024.

7          *MR. FARRELL:*  Okay.

8          *DEFENDANT JOHNSON:*  So 2024, not this year.  But,

9    no, I have no interest whatsoever in selling the Othram stock.

10   In fact, I'm happy to turn it over.  I don't know how to turn

11   it over, but I'm happy to turn it over like with a pen right

12   now.

13         *THE COURT:*  Well, they have a court order that says

14   if it belongs to you it now belongs to the receiver.

15         *DEFENDANT JOHNSON:*  No objection.

16         *THE COURT:*  Well, they need to know where to go and

17   get it, how to -- who to contact.

18         *DEFENDANT JOHNSON:*  Yeah.  I believe they can

19   contact the company itself.

20         *THE COURT:*  Go ahead.  I'm sorry.

21         *MR. FARRELL:*  Thanks, Judge.

22         A question regarding separate assets, physical

23   assets that you have said were here in Fort Worth, a bag -- a

24   messenger bag and a black roller bag that you left at the

25   Kimpton Hotel before the November 20th hearing.

1          Do you have any idea where those bags are?

2          *DEFENDANT JOHNSON:*  I don't.  I think they may be at

3    the Kimpton Hotel, I don't know.  When I last saw them I was

4    with Mr. Brucker, over there.  And the two of us, we had -- I

5    think it was a lunch or a breakfast -- it was a breakfast at

6    the Kimpton Hotel, and I checked my stuff into -- into storage

7    at the property.

8          As far as I know -- I've instructed no one about it.

9    My father is the one who knows about it, he talked to

10   Mr. Ansley, I think, and some other people about it.  But I

11   have not talked about it publicly.  If there's a surveillance

12   camera of somebody coming and taking it, I don't know.  But as

13   far as I know it's still there.

14         *MR. FARRELL:*  And to your recollection, what

15   contents were in the bags?

16         *DEFENDANT JOHNSON:*  So there is a book, a notebook,

17   I believe a computer, I had a $400 computer there.  If I have

18   access to the computer, I can tell you what's on the computer.

19   But my -- mostly it's used for novels and for like writing

20   literary things.

21         It's possible -- and I mentioned this to my father,

22   but we've had difficulty communicating in the Johnson County

23   Jail, because the phones don't always work, and their

24   reception is spotty at best -- but it's possible that there's

25   information there about my finances and other personal

1   effects.  I'm not 100% sure of that, and I don't want to

2   testify under oath that I am 100% sure of it.  But I can

3   assure you that if I had access to that computer a lot of this

4   work would be a lot simpler and we could go --

5           *THE COURT:*  Well, why don't you list -- just list

6   your assets for us, list your bank accounts.

7           *DEFENDANT JOHNSON:*  Sure.

8           *THE COURT:*  I mean, I don't need a computer to tell

9   me that I have a checking account at this bank, I --

10          *DEFENDANT JOHNSON:*  Sure.

11          *THE COURT:*  -- have a savings account at this bank,

12  I've got a loan at this bank.

13          *DEFENDANT JOHNSON:*  I can appreciate --

14          *THE COURT:*  Let's start out with our checking

15  accounts.

16          *DEFENDANT JOHNSON:*  Yes.

17          *THE COURT:*  I want you to list every single bank.

18          *DEFENDANT JOHNSON:*  So I have two checking accounts

19  at Woodforest bank.  One is for a Traitwell company, which I

20  am the 70% majority owner of, the other is for a personal

21  checking account.

22          *THE COURT:*  Okay.  Any other banks where you have a

23  checking account?

24          *DEFENDANT JOHNSON:*  I don't believe so, Your Honor.

25  But the person who would know is my ex-wife, who still does my

1    taxes.  And I put -- I'm happy to give her phone number to the

2    receiver, and she's happy to comply after she spoke to my

3    father like in the last few nights.

4         THE COURT:  So, you don't know what your assets are,

5    but your ex-wife would?

6         DEFENDANT JOHNSON:  My ex-wife and friend Gator

7    Greenwell and a couple other people would know my assets.  And

8    by the way, I'm happy to --

9         THE COURT:  That just seems like pure sophistry to

10   me, I'm sorry.

11        DEFENDANT JOHNSON:  Your Honor, I can appreciate

12   that I'm an extremely odd person, I can definitely appreciate

13   that.  However, I can tell you that the way I have dealt with

14   things historically --

15        THE COURT:  If you're not -- if you don't even -- if

16   you can't even identify your own checking accounts, other

17   than --

18        DEFENDANT JOHNSON:  Your Honor, I've never had any

19   real interest in money.  I've had interests in solving

20   problems and working on --

21        THE COURT:  Well, I don't know if anybody has any

22   real interest in money.  But money is what puts food on the

23   table --

24        DEFENDANT JOHNSON:  Yes.  I have --

25        THE COURT:  -- so you have to have money.  I don't

1    care if you have an interest in it or not, I just want you to

2    identify it.

3           *DEFENDANT JOHNSON:*  I can promise you, Your Honor,

4    that my ex-wife knows chapter and verse about all of my

5    financial transactions.  My current girlfriend knows

6    everything about my current transactions.  What I have found

7    is that it's much easier to just go and make money and give it

8    to them and have them decide where it goes.

9           *THE COURT:*  You're much more trusting than I am, I

10   guess.  I'd like to know what accounts my money is going to.

11          So, you've identified two checking accounts at --

12          *DEFENDANT JOHNSON:*  Woodforest National Bank.

13          *THE COURT:*  -- Woodforest.

14          Okay.  Do you have any savings accounts?

15          *DEFENDANT JOHNSON:*  I don't think so, Your Honor.  I

16   don't know, but --

17          *THE COURT:*  What type of an answer is that?  You

18   don't know if --

19          *DEFENDANT JOHNSON:*  My answer is that I think I

20   might have one at First Foundation Bank in California, but,

21   again, I haven't touched it, I don't use it.  Mostly I pay for

22   things with credit cards.

23          *THE COURT:*  How do you pay your credit card bill?

24          *DEFENDANT JOHNSON:*  Usually people either owe me

25   money and pay it off, or I have money that I've made from

1    consulting and other things over the years and I paid it off

2    that way.

3         *THE COURT:*  What, in gold coins?

4         *DEFENDANT JOHNSON:*  No.  Typically, I pay it off in

5    cash that comes into the Woodforest account, and then from

6    there my ex-wife sends the money to AmEx or any other credit

7    card I might have.

8         *THE COURT:*  You're telling us you don't even pay

9    your own personal credit card bill?

10        *DEFENDANT JOHNSON:*  That's correct, Your Honor.

11        *THE COURT:*  Okay.  All right.

12        So, you don't -- you might have a savings account,

13   you don't know?

14        *DEFENDANT JOHNSON:*  I can guarantee you that my

15   ex-wife, as much as she is my ex-wife, is still a dear friend

16   of mine and I like her quite a lot, and she can give you

17   chapter and verse about every penny that I've spent over the

18   last 12 years.

19        *THE COURT:*  I'm dealing with you at the moment --

20        *DEFENDANT JOHNSON:*  Yep.

21        *THE COURT:*  -- because it's up to you to purge

22   yourself.

23        All right.  Tell me, do you own any real property?

24        *DEFENDANT JOHNSON:*  No, Your Honor.  I'm opposed to

25   it.

1     *THE COURT:*  So you don't have -- you don't own your

2     own home?

3          *DEFENDANT JOHNSON:*  Correct.

4          *THE COURT:*  Do you rent?

5          *DEFENDANT JOHNSON:*  I rent.  Until recently, until

6     the 31st of October I rented, now I don't -- I guess I live in

7     the Johnson County Jail.

8          *THE COURT:*  Okay.  But do you still owe obligations

9     on your rental, I'm assuming?

10          *DEFENDANT JOHNSON:*  No.  All of that is paid off.  I

11     typically prepay my rent, Your Honor.

12          *THE COURT:*  Well, have you paid it for the upcoming

13     month?

14          *DEFENDANT JOHNSON:*  No, no.  I have no assets there.

15     I just have a -- I have a storage locker that has -- it's like

16     300 a month, and I believe my brother is paying that, but I'm

17     not totally sure.  I think he and my father were discussing

18     that.

19          *THE COURT:*  Do you own any automobiles?

20          *DEFENDANT JOHNSON:*  I own a 20- I think it's 2017,

21     F-type convertible, and it's from Texas and I got it here.  It

22     is -- it was left in Chantilly, after it was listed as stolen,

23     it was listed at the dealership there to be worked on.  And

24     the person who is working on it, my father is trying to track

25     down.

1          THE COURT:  Tell me the make and model of the

2  vehicle.

3          DEFENDANT JOHNSON:  It's an F-type Jaguar, I no

4  longer drive.

5          THE COURT:  What's the model?

6          DEFENDANT JOHNSON:  Oh, it's F-type Jaguar.

7          THE COURT:  I'm sorry.  The year model.

8          DEFENDANT JOHNSON:  I think it's 2017, Your Honor.

9  It could be 2015, but I'm not sure.

10          THE COURT:  What's the approximate value of the

11  vehicle?

12          DEFENDANT JOHNSON:  The last it was checked, I think

13  it was for 12,000 or $14,000, but I don't know.  I bought it

14  used.

15          THE COURT:  Do you own any jewelry?

16          DEFENDANT JOHNSON:  No, Your Honor.

17          THE COURT:  Do you have any trust accounts?

18          DEFENDANT JOHNSON:  I don't think so.  Probably not.

19          THE COURT:  What type of an answer is, I don't think

20  so, probably not?

21          DEFENDANT JOHNSON:  No.  Let's go with no, I don't

22  own any.

23          THE COURT:  I will remind you you're under oath and

24  you've been given your Miranda warnings.

25          DEFENDANT JOHNSON:  I appreciate that, Your Honor.

1 | I don't own --

2 |          *THE COURT:*  There are no trusts out there that are

3 | held for your benefit?

4 |          *DEFENDANT JOHNSON:*  There is a trust out there

5 | that's held for my benefit called the Xavier Capital Trust, I

6 | believe.  And I believe it has Othram and Clearview stock in

7 | it, but I don't know.  It's not --

8 |          *THE COURT:*  Who's the trustees of that account?

9 |          *DEFENDANT JOHNSON:*  I believe my brother is.

10 |          *THE COURT:*  You believe or you know?

11 |          *DEFENDANT JOHNSON:*  My understanding is that he is

12 | the trustee of it.

13 |          *THE COURT:*  You need to give definite answers.

14 |          *DEFENDANT JOHNSON:*  Yes.  I think my brother is, but

15 | it could be my father.  They could have decided amongst

16 | themselves, I don't know.  I think, if a gun were put to my

17 | head and I had to admit to everything, it's my brother.

18 |          *THE COURT:*  I'm sorry, Mr. Farrell.  I don't mean to

19 | take over the questioning, I'm just frustrated.

20 |          *MR. FARRELL:*  Understood.

21 |          *THE COURT:*  Would you like to do some follow-up?

22 |          *MR. FARRELL:*  Yeah.  Just a couple of follow-up

23 | questions.

24 |          You mentioned First Foundation.  Earlier today when

25 | we were meeting you mentioned First Foundation, you also

1   mentioned that you maintain an account at Chase Bank?

2           *DEFENDANT JOHNSON:*  I think so.  I think that

3   account, though, was closed two years ago, or maybe three

4   years ago.

5           *THE COURT:*  You think or you know?

6           *DEFENDANT JOHNSON:*  I know that it was closed for

7   some reason.  I don't know if my ex-wife closed it, or if

8   Chase itself closed it.

9           *THE COURT:*  I bet I can ask every person in this

10  courtroom, and every single one of us can identify our

11  checking account, banking account, how we pay our bills month

12  to month.

13          *DEFENDANT JOHNSON:*  I appreciate that, Your Honor.

14          *THE COURT:*  And I bet we can also list what real

15  property we own and --

16          *DEFENDANT JOHNSON:*  I listed that clearly.

17          *THE COURT:*  -- just --

18          *DEFENDANT JOHNSON:*  I don't own any real property.

19          *THE COURT:*  You don't have to be a wealthy person.

20          *DEFENDANT JOHNSON:*  I promise you, Your Honor.  My

21  task in life has been to make money and give it to the various

22  women in my life.  It started with my mother, then to my

23  ex-wife, and now to my girlfriend.

24          *THE COURT:*  Officer Farino, do you know where your

25  checking account is?

1          SECURITY OFFICER:  Yes, sir.

2          THE COURT:  Marshal Sanford, Deputy, do you know

3    where your checking account is?

4          THE MARSHAL:  Yes, sir.

5          THE COURT:  Yeah.  I'd be willing to bet both of you

6    gentlemen know how much is in your checking account right now,

7    approximately, don't you?

8          SECURITY OFFICER:  Yes, sir.

9          THE COURT:  I can tell you right now, I don't have

10   much in mine, Santa Clause has stolen it all.

11         Do you understand my point?

12         DEFENDANT JOHNSON:  I do understand your point, Your

13   Honor.  And I promise, when I get out of here, the first thing

14   I'm going to do after I look at a computer is figure out all

15   of my personal banking stuff.

16         THE COURT:  What if we had your father or your

17   ex-wife, what if they came down, knowing that their loved one

18   has been held at the Johnson County Jail, because he doesn't

19   appear to be giving truthful answers to the Court or

20   court-appointed receivers' questions?

21         DEFENDANT JOHNSON:  Well, my --

22         THE COURT:  Would they be willing to come down?

23   Don't they want their -- their son or their ex-husband at home

24   over Christmas?

25         DEFENDANT JOHNSON:  My father most certainly would.

1    But my father is a very simple, elderly man, and he doesn't

2    quite understand a lot of things.  I think if you put a gun to

3    my father's head and asked him how much money was in his

4    checking account or if he had a checking account, he, too,

5    would have a difficult time answering it.

6          *THE COURT:*  Well, I understand.  God bless him.

7    I've got a simple father, too, but if I were held in jail and

8    trying to purge myself of contempt, I bet my dad would be

9    willing to show up.

10          *DEFENDANT JOHNSON:*  He would --

11          *THE COURT:*  And I'm older than you are, so I bet my

12    father is much older than your father.

13          *DEFENDANT JOHNSON:*  Yes.  I asked my father to come

14    down to Texas, but he had a few medical appointments he had

15    this month.  And I asked him to come down, and he offered to

16    drive down here, and it was a thing, because there was

17    snowstorms where he lives.

18          *THE COURT:*  Where does he live?

19          *DEFENDANT JOHNSON:*  He lives in Boston; Middleton,

20    Massachusetts.

21          *THE COURT:*  All right.  Go ahead.

22          I'm just -- I'm at a loss, I really am.  I really

23    want to do what I can to help this individual, I'm trying to

24    ask direct questions.  Has this been the type of thing you-all

25    have been putting up with this morning?

1          *MR. FARRELL:*  Yes.

2          *THE COURT:*  Yes?  *(Heads nod)*

3          Okay.  Go ahead.

4          *MR. FARRELL:*  So we've discussed savings account,

5   checking account, trust.  At either Woodforest, First

6   Foundation, Chase, or any other financial institution, do you

7   maintain a safety deposit box?

8          *DEFENDANT JOHNSON:*  No.

9          *MR. FARRELL:*  Have you ever maintained a safety

10  deposit box?

11         *DEFENDANT JOHNSON:*  My understanding is no.

12         *THE COURT:*  That's not an answer.

13         *DEFENDANT JOHNSON:*  No.  So, no, the answer is no.

14         *THE COURT:*  Have you ever had a safe deposit box?

15         *DEFENDANT JOHNSON:*  No.

16         *THE COURT:*  Has anybody that you have agency with --

17         *DEFENDANT JOHNSON:*  No.

18         *THE COURT:*  -- in other words, a relative, somebody

19  that works for you, ever had a safety deposit box?

20         *DEFENDANT JOHNSON:*  No.

21         *THE COURT:*  Has any entity you've ever been

22  affiliated with?

23         *DEFENDANT JOHNSON:*  No.

24         *THE COURT:*  Do you understand if you lie under oath

25  you will be charged for perjury?

1    *DEFENDANT JOHNSON:*  I understand that, Your Honor.

2    I do not have a safety deposit box.  That one I feel like I

3    would know, because you go in and open it up.

4    *THE COURT:*  Well, I feel like you would know, too.

5    *DEFENDANT JOHNSON:*  Yeah.

6    *MR. FARRELL:*  I do want to circle back.  Just one

7    follow-up question on the Othram attempted sale.

8    *DEFENDANT JOHNSON:*  Yeah.

9    *MR. FARRELL:*  Today when we were talking earlier,

10   you told us that you tried to sell without seeking leave of

11   Court?

12   *DEFENDANT JOHNSON:*  Legal?

13   *MR. FARRELL:*  Without seeking leave of Court to do

14   so, since this was after the preservation order.

15   Do you maintain that testimony today?

16   *DEFENDANT JOHNSON:*  I am not sure I understand what

17   leave of Court means.

18   *THE COURT:*  You didn't ask my permission.

19   *DEFENDANT JOHNSON:*  Oh, yeah, I didn't ask his

20   permission, that's true.  And then when it was -- when there

21   was an issue with it, I backed off from it.  I think I filed

22   at the Fifth Circuit, if I recall correctly, and they rejected

23   it, and then I let sleeping dogs lie.

24   *THE COURT:*  So it sounds like you know where the

25   stock is and how much it's worth, or you know -- is it held by

1    like -- in a brokerage account somewhere, like with Vanguard

2    or Fidelity, one of those?

3            DEFENDANT JOHNSON:  No, Your Honor.  It's a

4    non-public stock.  So, the way it works, typically, is I will

5    go to the company and I'll say, Hey, I'd like to be gone from

6    the company.  And they will say, We will buy this stock at

7    this price.  And sometimes I can have a competing offer, so

8    sometimes there's a shareholder or somebody else who wants to

9    buy it for more money.  And then that money gets either sent

10   to the Woodforest account, or to my ex-wife's account, or to

11   wherever it needs to go.

12           THE COURT:  Do you have a stock certificate showing

13   your ownership or some other --

14           DEFENDANT JOHNSON:  I don't believe so.  I think I

15   have an email or some kind of -- something like that.  But

16   it's known I'm on the cap table or at least that my trust is

17   on the cap table.

18           MR. FARRELL:  What email account did you use for --

19           DEFENDANT JOHNSON:  To set that one up?  I think

20   that was the Charles Carlisle Johnson account, I think.  But

21   it could -- I can find -- if you're looking for a stock

22   certificate there, I'm sure if you write to Rob Purcell there

23   they'll send it to you.  They sent it -- when my ex-wife asked

24   for it in the past, she got it from him, from the company

25   itself.

1    THE COURT:  Well, does your wife have a copy of the
2    stock certificate or ownership of the stocks, your ex-wife?
3    DEFENDANT JOHNSON:  She may -- she probably -- she
4    definitely does.  If I know her, she will have it, yeah.  And
5    she will have it -- yes, she will have it.
6    THE COURT:  Have you reached out to your ex-wife and
7    said, Honey, I know we're not married anymore, but if you
8    could help me, I don't want to have to spend Christmas in
9    Johnson County?
10    DEFENDANT JOHNSON:  I made it clear to her, and she
11    has made it very clear to me that she will do everything she
12    can to help if she's contacted by the appropriate people.  But
13    she has not as yet been contacted.
14    THE COURT:  Okay.  Go ahead, Adam.
15    MR. FARRELL:  I have a number of questions regarding
16    digital currencies that I'd like to ask.
17    DEFENDANT JOHNSON:  Yes.
18    MR. FARRELL:  Earlier today you said that you don't
19    currently hold any positions in any crypto digital asset; is
20    that your testimony now?
21    DEFENDANT JOHNSON:  That's my testimony, and has
22    been my testimony throughout this trial -- or throughout this
23    process.
24    MR. FARRELL:  When is the last time you maintained,
25    whether bitcoin or any other crypto?

1          *DEFENDANT JOHNSON:*  2017.  Whenever Donald Trump's

2    tweet was that he was opposed to bitcoin, that day was the day

3    that I got rid of every single thing I had in crypto.  So

4    whatever date that is, that's what it was.

5          *MR. FARRELL:*  And walk us through, again, how you

6    got rid of that?

7          *DEFENDANT JOHNSON:*  I had people who were willing to

8    buy it.  There was --

9          *MR. FARRELL:*  Who bought it?

10          *DEFENDANT JOHNSON:*  There was a guy by the name of

11    Josh Jones who bought some of it.

12          *MR. FARRELL:*  And who was Josh Jones?

13          *DEFENDANT JOHNSON:*  He is a gentleman that I met

14    through Harvey Mudd College, he was the founder of a company

15    called DreamHost.  We met at a math competition, nice guy.

16    And I gave some of it to my ex-mother-in-law, who I later

17    helped sell when it was at a loss.

18          *MR. FARRELL:*  How much did you give to her?

19          *DEFENDANT JOHNSON:*  I think somewhere around like

20    70 grand, 80 grand.

21          *MR. FARRELL:*  Like how many bitcoin?

22          *DEFENDANT JOHNSON:*  I don't know how many bitcoin it

23    was.

24          *MR. FARRELL:*  Okay.  It fluctuates.

25          *DEFENDANT JOHNSON:*  Yeah.

1          *MR. FARRELL:*  And did you deal in anything other
2     than bitcoin?
3          *DEFENDANT JOHNSON:*  No.
4          *MR. FARRELL:*  Okay.  And how did you store that?
5          *DEFENDANT JOHNSON:*  Mostly it was through -- I think
6     it was a Blockchain.info account, but I -- I think that's
7     right.  I know the logo was blue, white, and black; and I
8     think that's a Blockchain.info one.
9          *MR. FARRELL:*  Have you ever had a Coinbase account?
10          *DEFENDANT JOHNSON:*  I did briefly.  I did not like
11     the people I met who worked at Coinbase, and I stopped working
12     with that -- or being around them sometime in 2015/2016.
13          *MR. FARRELL:*  Have you ever had a Gemini account?
14          *DEFENDANT JOHNSON:*  No.  I don't like the Winklevoss
15     twins.
16          *MR. FARRELL:*  So when you -- in 2017, when you
17     liquidated your crypto position to Josh Jones, what -- was
18     Josh Jones a broker, what -- what was that relationship?
19          *DEFENDANT JOHNSON:*  I believe we did it through a
20     wiring situation.  Where he wired some of the money to First
21     Foundation Bank, or could have been Chase Bank.
22          *THE COURT:*  I want you to stop prefacing by saying,
23     I believe, it might have.  I need direct responses.
24          *DEFENDANT JOHNSON:*  My recollection of this -- mind
25     you it's 20- -- I've had minimal sleep and it's a transaction

1    that took place eight years ago, eight plus years ago.  But my

2    recollection of it is that he bought the bitcoin, wired me the

3    money, that money went into a First Foundation Bank and maybe

4    also a Chase account.

5         My recollection of this further is that Chase sent a

6    letter to my then-wife saying that because we had bitcoin we

7    were no longer allowed to bank at Chase.  That's my

8    recollection of this.  That could be mistaken, it could have

9    just been clear like, Hey, you're out of this bank, kind of

10   thing.  That's my recollection of it.

11        *MR. FARRELL:*  Have you sold any bitcoin to anyone

12   other than Josh Jones?

13        *DEFENDANT JOHNSON:*  Yes.

14        *MR. FARRELL:*  Who?

15        *DEFENDANT JOHNSON:*  I did it -- used it as a

16   transaction mechanism.  I bought -- used it to take people out

17   to lunch, I gave it away as gifts.  I sold some of it to a guy

18   named Bob Berry, who's a telecommunications executive out of

19   Fresno, California.

20        *MR. FARRELL:*  How much did you sell to Bob Berry?

21        *DEFENDANT JOHNSON:*  It might have been a hundred

22   grand.

23        *MR. FARRELL:*  And when was this?

24        *DEFENDANT JOHNSON:*  What's that?

25        *MR. FARRELL:*  When did this happen?

1          *DEFENDANT JOHNSON:* This would have happened in --
2    right after Trump was elected in 2016.
3          *MR. FARRELL:* Do you know a David Leidermann?
4          *DEFENDANT JOHNSON:* I don't recall meeting that
5    person.
6          *MR. FARRELL:* Do you know a Max Leidermann?
7          *DEFENDANT JOHNSON:* I don't know. So I've looked
8    into this since, and I don't -- I don't think I know this
9    person.
10          *MR. FARRELL:* Do you have any recollection of
11    selling bitcoin to them?
12          *DEFENDANT JOHNSON:* It's possible I sold bitcoin to
13    them, but I don't recall it. If I saw a picture of them,
14    maybe that would help, or if I had documentation, that would
15    help as well.
16          *THE COURT:* These are -- these are nonresponsive
17    answers.
18          *DEFENDANT JOHNSON:* Okay. I don't -- the answer is,
19    as far as I can recall --
20          *THE COURT:* I mean, it's possible the sun won't rise
21    tomorrow. I mean, you need to give direct --
22          *DEFENDANT JOHNSON:* My recollection is --
23          *THE COURT:* -- responses or you are not going to get
24    out of jail.
25          *DEFENDANT JOHNSON:* I can appreciate that, Your

1    Honor.  But I can tell you, my recollection is, no, I did not

2    sell him that.

3        MR. FARRELL:  Describe for me what is cold storage.

4    And you understand what I mean when I say cold storage?

5        DEFENDANT JOHNSON:  I do.  Cold storage -- my

6    understanding of it, forgive me if I'm wrong on this, is you

7    have bitcoin in paper form that you put in a safety deposit

8    box, or you have it on a hard drive that's not connected with

9    the Internet.  I have neither of those things.  I've never had

10   either of those things.  I had it on a laptop at one point,

11   and I had it on the Blockchain.info exchange.

12       MR. FARRELL:  And describe that laptop.

13       DEFENDANT JOHNSON:  It was a Dell laptop, it was a

14   gift for graduating.  I think it was in 2012 or 2013 make.

15   Yeah, I think that's right.  I could be mistaken about the

16   year on the laptop.

17       MR. FARRELL:  And how -- during what years did you

18   store bitcoin on the Dell laptop?

19       DEFENDANT JOHNSON:  I think starting in 2011 time

20   frame, there was -- there was stuff on the laptop.  But, yeah

21   -- yes, I think that's right.

22       MR. FARRELL:  Until when?

23       DEFENDANT JOHNSON:  Until -- I think it would have

24   been until 2015, 2016 time frame.  I put most of it on the

25   exchanges then.  There was a thing called Cumberland Mining,

1    too, Cumberland Mining Exchange, which might also be an

2    exchange that I used at the time.  I recall that now, I didn't

3    recall that when we were talking earlier.

4            MR. FARRELL:  And on the issue of mining, what is

5    your history in mining cryptocurrencies?

6            DEFENDANT JOHNSON:  I was involved in it in some

7    sense when I was in college, but I'm not involved with it now.

8    I had a situation with an extremely strange Chinese gentleman

9    who wanted to be involved with bitcoin, a guy by the name of

10   John Yuen, who I understand now is a Chinese intelligence

11   agent.  He was very interested in having me do bitcoin mining

12   operations for him in California -- or in Washington.

13           THE COURT:  This is a waste of time.  You need to

14   direct -- I want to know exactly what you own right now.

15           DEFENDANT JOHNSON:  I own zero digital assets, zero

16   nada, zip.

17           THE COURT:  When did you sell your last digital

18   asset?

19           DEFENDANT JOHNSON:  My recollection of it is in

20   2017.

21           THE COURT:  Recollection or was?

22           DEFENDANT JOHNSON:  Under oath, 2017 time frame.

23           THE COURT:  2017.

24           DEFENDANT JOHNSON:  Could have been early 2018, I

25   don't know.

1          THE COURT:  So before this lawsuit was started --

2          DEFENDANT JOHNSON:  Correct.

3          THE COURT:  -- any bitcoin you might have had or

4     cryptocurrency was sold?

5          DEFENDANT JOHNSON:  Correct.

6          THE COURT:  And you haven't owned any since then?

7          DEFENDANT JOHNSON:  I have not owned any since then.

8          THE COURT:  So if the receivers were to discover

9     some that was out there, you understand that you --

10         DEFENDANT JOHNSON:  I understand I would be in

11    serious trouble.

12         THE COURT:  -- would be in serious trouble?

13         DEFENDANT JOHNSON:  Yes.  And I also understand that

14    this is the seventh time under oath that I've said that I do

15    not own any cryptocurrency.  If there's a lie detector --

16         THE COURT:  I'm just curious.  Like if you were to

17    get out today and you were to walk out, how would you make it

18    back?  You don't know where your bank -- you've told us you

19    think --

20         DEFENDANT JOHNSON:  I would call my father, my

21    father would call my girlfriend, my girlfriend would buy me an

22    Uber.  I would get in the Uber and I would go wherever it was

23    taking me.  Then I would get -- probably to a hotel.  I would

24    get into the hotel, it would be under my name.  I would then

25    get --

1          THE COURT:  And your girlfriend would pay for your
2     hotel?
3          DEFENDANT JOHNSON:  She would.
4          THE COURT:  What about your flight home, would she
5     pay for that?
6          DEFENDANT JOHNSON:  I have several people who have
7     already offered to pay for my flight home.
8          THE COURT:  I don't understand how you're -- you're
9     functioning out there.  You've come here every time you've
10    been called to do so.  You've showed up.  You've been wearing
11    a suit.  I'm presuming you're paying for your meals while
12    you're here.
13         DEFENDANT JOHNSON:  I am not paying for my meals,
14    Your Honor.
15         THE COURT:  Somebody else is paying for all of this
16    for you?
17         DEFENDANT JOHNSON:  Correct, Your Honor.
18         THE COURT:  So, what type of -- you won't tell us
19    anything about any --
20         MR. THOMPSON:  Your Honor --
21         THE COURT:  -- kind of monetary assets.  What
22    about --
23         MR. THOMPSON:  Your Honor, if I could just maybe
24    provide a pointed question.
25         THE COURT:  Yeah.

1          *MR. THOMPSON:*  Mr. Johnson's deposition went on at
2     length, saying that his flights, his hotels, and everything
3     were paid for by some Government handler.
4          *DEFENDANT JOHNSON:*  I did not say that.  I went on
5     in some detail saying in some cases they've been paid for by
6     friends of mine, in some cases they've been covered by the
7     Government, that is true.
8          *THE COURT:*  The Government paid for your flights to
9     come down here for this?
10         *DEFENDANT JOHNSON:*  No, Your Honor.
11         *THE COURT:*  No.  For any trips that you have made as
12    part of this lawsuit?
13         *DEFENDANT JOHNSON:*  As far -- no.  No, Your Honor.
14    Most of what's been paid for here has been done by friends,
15    family.
16         *THE COURT:*  I don't care about most.  I need you to
17    give me an answer.
18         *DEFENDANT JOHNSON:*  Yeah.  So, 95%, 100%, somewhere
19    in that range, of the travel that I've come down to the great
20    State of Texas has been by other people lending me money or
21    paying for it themselves.
22         *THE COURT:*  How -- how do you put food on the table?
23         *DEFENDANT JOHNSON:*  Well, in many cases, Your Honor,
24    over the years, I've had windfalls where I've made a million
25    dollars here, or a quarter million dollars there, and I've

1    lived off of that.

2              THE COURT:  And where is that money?

3              DEFENDANT JOHNSON:  Now I have a $71 million

4    judgment.  A lot of people are waiting for that judgment to be

5    overturned so they can go back into business with me.

6              THE COURT:  No.  Where's the money that you made in

7    the past?  You're saying you made a million dollars here --

8              DEFENDANT JOHNSON:  So some of it --

9              THE COURT:  -- quarter of a million there.

10             DEFENDANT JOHNSON:  -- I invested in the things like

11   Traitwell, which is a company that I started and ran for quite

12   some time.

13             THE COURT:  Does Traitwell have any assets

14   currently?

15             DEFENDANT JOHNSON:  It has IP, that's about it.

16             THE COURT:  Okay.  Have you disclosed that to the

17   receivers?

18             DEFENDANT JOHNSON:  I have.  I talked to the

19   receivers about it.

20             THE COURT:  What about physical assets?  And I mean,

21   where are you -- like do you have somewhere where you have

22   your trophies from high school for winning the track meet and

23   computer science meet?

24             DEFENDANT JOHNSON:  All of that stuff is at my mom's

25   house -- or my father's -- my parents' home.

1          THE COURT:  Do you have -- what about your clothing,

2    where is all that?

3          DEFENDANT JOHNSON:  Most of that I buy on Uniqlo,

4    and some of it's given to me, some of it's picked out by other

5    people.

6          THE COURT:  I mean, given to you, I don't

7    understand.  Do you benefit from any Government programs, such

8    as --

9          DEFENDANT JOHNSON:  No.

10          THE COURT:  -- Medicaid?

11          DEFENDANT JOHNSON:  Nope.  Never taken it, nope.

12    None of that is interesting to me.

13          THE COURT:  Well, you have to have a way to put food

14    on the table, bud --

15          DEFENDANT JOHNSON:  When I --

16          THE COURT:  -- or you'll be homeless --

17          DEFENDANT JOHNSON:  When I ran --

18          THE COURT:  -- in a homeless shelter.

19          DEFENDANT JOHNSON:  When I ran Traitwell, I received

20    a salary, I think I was paid $65,000 a year, something like

21    that.  That was more than enough to meet my needs.

22          THE COURT:  I'm exhausted by this.

23          DEFENDANT JOHNSON:  I don't know what to tell you,

24    Your Honor.  I've answered all of your questions truthfully.

25          THE COURT:  I just do not believe any of this is

1    truthful.  But I bet there is some person in this world that

2    can tell us.  I do not want to hold you any longer than I have

3    to.

4              *DEFENDANT JOHNSON:*  I promise you, I am telling you

5    the truth.  Like, I don't know what I'm supposed to do.  Like,

6    should we go to Woodforest bank and I show you my accounts?

7              *THE COURT:*  Well, that's what you were supposed to

8    do three or four times ago, and you didn't do that.

9              *DEFENDANT JOHNSON:*  I have a receiver now.  I have

10   no objection to going with the receivers right now to

11   Woodforest bank, or to any of these other places.  I have

12   objected to the overbroad request from Mr. Thompson in

13   discovery.  I haven't posted --

14             *THE COURT:*  I'm sorry, those are overruled.  You

15   have to turn over all this information.

16             Mr. Farrell, I don't mean to continue to interrupt

17   you.  Would you like to keep going?

18             Just to be sure the record is clear, I don't believe

19   you're going to get answers to any of this.  And maybe after

20   we're done, you-all can help think and give me a roadmap, so

21   we can finally get his assets identified and hopefully he can

22   find a way -- a roadmap to purge himself of the contempt.

23   There has to be a father, a girlfriend, somebody.  The last

24   thing that I would ever want to do is have to hold somebody

25   indefinitely, because they're refusing to answer questions.

1      *DEFENDANT JOHNSON:* Your Honor --

2      *THE COURT:* I want to ask you a few more pointed

3  questions, and I asked you this last time --

4      *DEFENDANT JOHNSON:* Ask me as many pointed questions

5  as you want, Your Honor.  I have answered them truthfully.

6      *THE COURT:* And again, I am not accusing anything.

7  I'm really asking this to help me understand.  Are you under

8  the care of any mental health professional?

9      *DEFENDANT JOHNSON:* No, Your Honor.  I'm not under

10  the care of any mental health provider.

11      *THE COURT:* Are you -- have you ever been?

12      *DEFENDANT JOHNSON:* No, Your Honor.  Never.

13      *THE COURT:* Are you taking any --

14      *DEFENDANT JOHNSON:* I've never taken any meds, I've

15  never been prescribed any meds.  I've been psychologically

16  assessed five different times, and each time I --

17      *THE COURT:* By who?  By the secret agencies?

18      *DEFENDANT JOHNSON:* No, Your Honor.  I have been

19  assessed -- well, one time was in a divorce hearing, where I

20  was assessed basically as mentally fit.

21      *THE COURT:* Did the Court order that you be

22  assessed --

23      *DEFENDANT JOHNSON:* No.

24      *THE COURT:* -- by another --

25      *DEFENDANT JOHNSON:* I did it out of an overabundance

1  of caution, because I was worried that my ex-wife would say

2  that I was crazy.

3         THE COURT:  Perhaps she had some of the same

4  concerns that I do.

5         DEFENDANT JOHNSON:  Many people have found my

6  lifestyle to be eccentric, unusual, strange, and so on, and so

7  on, and so on.

8         THE COURT:  Well, General Patton was eccentric, but

9  I bet he could tell us where his assets were.

10        DEFENDANT JOHNSON:  Your Honor, I have told them --

11 I've told the receiver everything I know about my assets.

12 I've identified individuals who I know who know more about the

13 assets --

14        THE COURT:  But you're --

15        DEFENDANT JOHNSON:  -- who handle them for me.

16        THE COURT:  -- dealing in half truths.

17        DEFENDANT JOHNSON:  No, Your Honor.  I'm not dealing

18 in --

19        THE COURT:  Tell me the two people that I can --

20        DEFENDANT JOHNSON:  You can call Gator --

21        THE COURT:  -- have these folks contact, that we can

22 bring them down here --

23        DEFENDANT JOHNSON:  Call Gator --

24        THE COURT:  -- and put them under oath, and they can

25 testify to all of your assets.

1          *(Court Reporter interrupts)*

2          *DEFENDANT JOHNSON:*  You can bring Gator Greenwell

3    here, like tomorrow.  He would testify about all of the --

4          *THE COURT:*  Well, I --

5          *DEFENDANT JOHNSON:*  -- SPEs we have done together.

6          *THE COURT:*  If you would just stop.

7          He would have to come voluntarily.  So if I had a

8    good friend that I thought could help me get out of this, I

9    might be on the phone with him.

10          *DEFENDANT JOHNSON:*  Your Honor, I do not know his

11    number.  I have not -- I use Signal to communicate with him.

12    The last time he and I spoke was at the funeral of another

13    friend of ours.  He was also named in the complaint, though

14    curiously not charged or anything.

15          Nothing -- we spoke at the funeral, I was very

16    cordial to him.  His wife said that he was concerned about

17    this lawsuit, because they thought the lawsuit was unmerited,

18    and disturbed that it had gotten --

19          *THE COURT:*  Okay.  This is --

20          *DEFENDANT JOHNSON:*  -- as far as it did.

21          *THE COURT:*  This is all nonsense.

22          *DEFENDANT JOHNSON:*  I'm just telling you, Your

23    Honor.  I gave you a list of people.  I gave you my ex-wife,

24    with all of my banking information.  I gave you Gator

25    Greenwell.  I gave you my banking information.  I gave you my

1    -- I mean, what more am I supposed to do?

2         *THE COURT:*  I would rather deal with a sovereign

3    citizen, I think.

4         Do you have any other questions?

5         *MR. FARRELL:*  Judge, I don't have any further

6    questions.  But if I may turn it over to Jeff Ansley.

7         *THE COURT:*  Sure.  Mr. Ansley or Mr. Thompson, would

8    y'all care to ask any questions?  And let's put our thinking

9    caps on and see if we can find an end road to this.

10        *MR. THOMPSON:*  Just a couple of questions, Your

11   Honor.  I promise it will be brief.

12        Mr. Johnson, I believe I heard you testify earlier

13   today that you said that you're not the beneficiary of a

14   Government trust, is that -- yes or no, are you a beneficiary?

15        *DEFENDANT JOHNSON:*  No.  I don't think that I am.

16   No.  As far as I know, no.

17        *MR. THOMPSON:*  Okay.  Page 119 of your deposition, I

18   asked you about Government trusts, and here's what you said,

19   "I would draw on those Government trusts" -- sorry, excuse me.

20        This goes to your questions, Your Honor, about how

21   he pays for medical, you know, living expenses.

22        Answer, from Mr. Johnson:  Typically I would draw

23   down on those Government trusts, if I had some sort of, you

24   know, some sort of emergency.  So if I needed to pay for like

25   a medical procedure, or like a child going to private school,

1    or to buying a house or whatever, all of that, you know, I

2    don't really have any interest in currently.

3            So, did you -- was a Government trust funded -- like

4    fund you or not?

5            *DEFENDANT JOHNSON:*  No.  So that was speaking

6    hypothetically.  As I've said many times, I've had no major

7    medical procedures.  My daughter won a scholarship to her

8    private school.  And I don't know, I haven't drawn down on any

9    Government trusts.  I have no Government trusts.

10            *THE COURT:*  All right.  Well, you're -- you're not

11    quite answering the question.

12            *DEFENDANT JOHNSON:*  I don't have any Government

13    trusts.  Is that clear?

14            *THE COURT:*  Why did you -- why did you testify under

15    oath --

16            *DEFENDANT JOHNSON:*  I said -- I said that in the

17    future I may have them.

18            *THE COURT:*  Well, tell us how you're going to get

19    them.

20            *DEFENDANT JOHNSON:*  Well, the second this whole

21    matter is behind me, I intend to apply for -- I intend to

22    receive a job as a Federal contractor.  And those involve

23    Government trusts.

24            *THE COURT:*  Not in my experience.  What do you mean

25    a Government trust?  You mean an intelligence agency sets up a

1  trust for you?

2        *DEFENDANT JOHNSON:*  Yes.

3        *THE COURT:*  Because you're providing intelligence

4  information?

5        *DEFENDANT JOHNSON:*  Or you're providing products or

6  services, yes.  And I have --

7        *THE COURT:*  In my experience, they typically just

8  pay you.

9        *DEFENDANT JOHNSON:*  No.  The FBI typically pays you,

10  there are other Government agencies that set up trusts for

11  you.  Sometimes they set them up generationally, as what

12  happened with my grandmother and grandfather who were in the

13  Navy, Navy intelligence.

14        *MR. THOMPSON:*  Mr. Johnson, yes or no, did you

15  testify that a Government trust was used to pay for your

16  parents' house?

17        *DEFENDANT JOHNSON:*  My understanding is my parents'

18  house in Middleton, Massachusetts, was paid for by my

19  grandmother's trust, which was a Government trust.

20        *MR. THOMPSON:*  Have you exchanged bitcoin or any

21  digital asset that you controlled for cash with any person

22  that was involved in marijuana sales, illegal or legal?

23        *DEFENDANT JOHNSON:*  Legal, yes.

24        *MR. THOMPSON:*  Who?

25        *DEFENDANT JOHNSON:*  Adam Palmer, based in

1    California.  And I believe one or -- maybe Jason Beck, also in

2    California.

3    　　　　MR. THOMPSON:  Have you ever interacted in any way

4    with a man named Max Leidermann?

5    　　　　DEFENDANT JOHNSON:  I don't recall meeting that

6    person or know who that person is.  I did google it, when I

7    was last confronted with it.  My understanding is he's

8    involved in some kind of organized crime situation.  I have

9    had -- as far as I know, I've had no dealings with him.

10   　　　　MR. THOMPSON:  Mr. Johnson, yes or no, did you ever

11   sell bitcoin to anyone that's been charged with Federal drug

12   trafficking.

13   　　　　DEFENDANT JOHNSON:  I don't know.

14   　　　　MR. THOMPSON:  Yes or no, Mr. Johnson --

15   　　　　DEFENDANT JOHNSON:  I don't know.

16   　　　　MR. THOMPSON:  -- have you ever interacted with

17   anyone who's been charged with Federal drug trafficking,

18   specifically in the District of Nebraska?

19   　　　　DEFENDANT JOHNSON:  I don't think so, no.

20   　　　　MR. THOMPSON:  Did you ever offer to sell bitcoin or

21   any digital asset to anyone who's ever been charged with drug

22   trafficking in exchange for cash?

23   　　　　DEFENDANT JOHNSON:  I don't know.

24   　　　　MR. THOMPSON:  Did you ever take the proceeds of any

25   drug sales, legal or illegal, in exchange for bitcoin or any

1     digital asset that you control?

2            *DEFENDANT JOHNSON:* I don't know.

3            *THE COURT:* That's not an answer. Yes, no, I don't

4     remember.

5            *DEFENDANT JOHNSON:* I think it's very possible yes,

6     Your Honor.

7            *THE COURT:* Very possible, yes.

8            *DEFENDANT JOHNSON:* And the answer --

9            *THE COURT:* Do you ever give a direct response?

10            *DEFENDANT JOHNSON:* No. I'll just say, I understand

11     that the FBI contacted me about a number of individuals trying

12     to buy bitcoin in the Los Angeles area, and I believe that

13     it's possible that I may have sold bitcoin to somebody that

14     was involved in drug trafficking.

15            What I knew about this, I told my FBI handler about

16     it, Jonathan Buma, and I understand that I was -- that he

17     intervened on my behalf with the Federal law enforcement, but

18     I don't know the magnitude of that. And he told me not to

19     worry about it, as did Ketrin Adam.

20            And later, when I was dealing with Homeland

21     Security, they asked me similar questions -- a similar line of

22     questions as to what Mr. Thompson is asking me, and one of

23     their --

24            *THE COURT:* Do you hold any kind of security

25     clearance?

1          *DEFENDANT JOHNSON:*  No, Your Honor.  I would

2     deliberately not take a security clearance.

3          *THE COURT:*  Well, you wouldn't work for the Federal

4     Government long, even as a contractor, if you wouldn't.  Just

5     FYI.  Unless you just wanted to do --

6          *DEFENDANT JOHNSON:*  It depends on the work, Your

7     Honor.

8          *THE COURT:*  Yeah.  I mean, I bet you could probably

9     change out the handle on the toilet in my restroom, but you're

10    not going to do any kind of work that you're talking about

11    without a security clearance.

12         *DEFENDANT JOHNSON:*  My understanding is that I am

13    eligible once this judgment is overturned or dispensed with.

14         *THE COURT:*  Well, whether you're eligible for a

15    security clearance or not, that's something that has to go up

16    the food chain after an intense background check.

17         *DEFENDANT JOHNSON:*  That's true, Your honor.  And my

18    understanding is, that before this case was filed against me,

19    I was going through that process and I was passing with flying

20    colors.

21         *MR. THOMPSON:*  Just two questions, Your Honor.

22         Mr. Johnson, have you ever signed a non-prosecution

23    agreement with any Government agency?

24         *DEFENDANT JOHNSON:*  No.

25         *THE COURT:*  Have you ever received a target letter

1    from any Government agency?

2              *DEFENDANT JOHNSON:*  No.

3              *THE COURT:*  Do you know what a target letter is?

4              *DEFENDANT JOHNSON:*  I do, and I have never received

5    one.  When I -- when I sat for -- when I sat for one of my

6    first major FBI interviews, they told me that there were no

7    fewer than seven FBI investigations that were around me.  And

8    I said at the time -- forgive me, Your Honor -- holy shit,

9    that's a lot.

10              *THE COURT:*  Well, it must not have been very

11   successful, if you -- out of seven you didn't even get a

12   target letter.

13              *DEFENDANT JOHNSON:*  No.  They were not successful.

14              *THE COURT:*  All right.  Go ahead, counsel.

15              *DEFENDANT JOHNSON:*  The main reason I understand, by

16   the way, that the FBI opened me as a confidential human

17   source, had to do with Julian Assange, and then later it had

18   to do with bitcoin and marijuana work.  But at the time I made

19   it very clear that I was not interested in anything involved

20   in that.

21              *THE COURT:*  To be quite frank with you, I don't care

22   if the Chairman of the Joint Chiefs of Staff, if you had

23   conversations.  But if you have had any time where you have

24   been given money, or other assets, whether it be digital,

25   whether it be actual gold bullion, silver, whatever, physical,

1  digital, if you currently have that, and you've been -- and

2  your testimony is that you've been given that by any type of

3  Government agency, you need to tell us.

4      *DEFENDANT JOHNSON:*  Your Honor, I have no -- right

5  now I believe I have $32,000 in credit card debt.  I owe

6  $24,000 to my ex-girlfriend.  I owe $3,112 to my parents.  I

7  have no assets, as far as I can tell.  I own a bicycle that

8  has a flat tire.  I have a --

9      *THE COURT:*  How old are you?

10      *DEFENDANT JOHNSON:*  Thirty-seven years old, Your

11  Honor.

12      *THE COURT:*  So you're almost 40 years old, and I

13  have a -- you-all looked at his -- the records from his

14  divorce.  Surely they would have had to do a statement of

15  finances.

16      *DEFENDANT JOHNSON:*  They did.  They --

17      *THE COURT:*  I'm sorry, I didn't ask you a question.

18      *DEFENDANT JOHNSON:*  Sorry.

19      *THE COURT:*  Have y'all looked at that?  Was he

20  represented by counsel in the divorce proceedings?

21      *MR. FARRELL:*  Your Honor, we are working to getting

22  those records.

23      *THE COURT:*  Were you represented by counsel or not?

24      *DEFENDANT JOHNSON:*  No, Your Honor.

25      *THE COURT:*  You were pro se in your divorce?

1          *DEFENDANT JOHNSON:*  My ex-wife and I both

2     represented each other or whatever.  We had a 15-minute

3     conversation, and I signed the paperwork without reading it.

4          *THE COURT:*  All right.  Sounds like that might be a

5     wild goose chase.

6          Do you have any insurance policies?

7          *DEFENDANT JOHNSON:*  No, Your Honor.

8          *THE COURT:*  You don't have -- do you have health

9     insurance?

10         *DEFENDANT JOHNSON:*  I believe I have insurance, but

11    it may have lapsed.

12         *THE COURT:*  Do you know whether you have health

13    insurance.

14         *DEFENDANT JOHNSON:*  No.  I don't think so.  I think

15    it lapsed on October 11th.

16         *THE COURT:*  You don't have any type of life

17    insurance?

18         *DEFENDANT JOHNSON:*  No, Your Honor.

19         *THE COURT:*  So if you were to die today, who would

20    pay for your funeral?

21         *DEFENDANT JOHNSON:*  I assume my brother would.

22         *THE COURT:*  Anything else, Mr. Thompson?

23         *MR. THOMPSON:*  Just to lock this down.

24         Mr. Johnson, yes or no --

25         *THE COURT:*  What type of watch do you have?

1    *DEFENDANT JOHNSON:*  I don't own a watch, Your Honor.

2    *THE COURT:*  You don't own a watch?

3    *DEFENDANT JOHNSON:*  No, Your Honor.

4    *THE COURT:*  Do you have an iPhone?

5    *DEFENDANT JOHNSON:*  I have an iPhone, an iPhone 12.

6    *THE COURT:*  An iPhone 12.  Well, I've got an

7    iPhone 11, so you're doing better than me.

8         Who -- what -- who's your service provider for your

9    iPhone?

10    *DEFENDANT JOHNSON:*  That's T-Mobile.

11    *THE COURT:*  Who pays for your T-Mobile bill?

12    *DEFENDANT JOHNSON:*  That's money that I borrowed.

13    And about $89 a month is what it costs for me to have an

14    iPhone.

15    *MR. THOMPSON:*  Mr. Johnson, have you ever had any

16    type of cryptocurrency, bitcoin, et cetera with Mr. Lambert?

17    *DEFENDANT JOHNSON:*  Any type of it with him?

18    *MR. THOMPSON:*  Yeah.

19    *DEFENDANT JOHNSON:*  What does that mean?

20    *MR. THOMPSON:*  Did he ever give you money to buy

21    cryptocurrency?

22    *DEFENDANT JOHNSON:*  I don't think so, no.

23    *MR. THOMPSON:*  That's your testimony?

24    *DEFENDANT JOHNSON:*  If you have something that shows

25    me otherwise --

1        *THE COURT:* So, is the answer no?

2        *DEFENDANT JOHNSON:* -- I'm happy to take a look at

3   it, but I have no recollection of that.

4        *THE COURT:* Well, I think you would know that.

5   You've told us you're -- you're mentally fit, in the sense you

6   know what's going on here?

7        *DEFENDANT JOHNSON:* That's true, Your Honor.  But a

8   number of these transactions, as I said, have taken place over

9   many years, and I've been up for 72 hours or so in the Johnson

10  County Jail.  I don't have any recollection of it.

11       If I had access to my computer maybe I could find

12  some things.  But I have no recollection of it.

13       Mr. Lambert was very interested in a bitcoin mining

14  stock company.

15       *THE COURT:* I think he's asked -- answered the

16  questions, he's not -- okay.  Go ahead.

17       *MR. THOMPSON:* Mr. Johnson, yes or no, you told the

18  receivers today that a man named Alex Rodriguez is your

19  Government handler, yes or no?

20       *DEFENDANT JOHNSON:* That's correct.

21       *MR. THOMPSON:* Yes?

22       *DEFENDANT JOHNSON:* Yes.

23       *MR. THOMPSON:* Okay.  What title does Mr. Rodriguez

24  have with the Department of Homeland Security?  Be specific.

25       *DEFENDANT JOHNSON:* I don't know exactly, but I know

1    that he's a director of Homeland Security.  And I know that

2    Mr. Brucker over there has met him.  And I know that there are

3    others who met him as well.  My father has met him, my

4    girlfriend has met him.  He's quite a gentleman, he's quite a

5    man, you'd remember meeting him.  He's ex-marine, I like him

6    quite a bit.  I rate him very highly.

7              *MR. THOMPSON:*  Is he an employee of DHS?

8              *DEFENDANT JOHNSON:*  I believe he is.

9              *MR. THOMPSON:*  Yes or no?

10             *DEFENDANT JOHNSON:*  Yes.

11             *MR. THOMPSON:*  Is he also a contractor at DHS?

12             *DEFENDANT JOHNSON:*  He's also a contractor at DHS.

13             *THE COURT:*  What does he do for DHS?

14             *DEFENDANT JOHNSON:*  My understanding is that he's a

15    director of DHS.

16             *THE COURT:*  Well, how do you not know if they're the

17    director of DHS or not?

18             *DEFENDANT JOHNSON:*  There are a number --

19             *THE COURT:*  Like I said, my understanding is that

20    the sun is going to rise tomorrow.  I mean, you need to give

21    an answer and you've persisted in not.

22             *DEFENDANT JOHNSON:*  Your Honor, he has brought me

23    into Government buildings, when I --

24             *THE COURT:*  Well, I brought you into a Government

25    building today with the Johnson County Sheriff's Department --

1          *DEFENDANT JOHNSON:* No.  He's brought me into a --

2          *THE COURT:* -- and the Marshals.

3          *DEFENDANT JOHNSON:* Building that was owned -- it

4   was a Government-controlled place, it was controlled by

5   Homeland Security at the time.  I have been with him on many

6   occasions now, and I take him at his word and I have --

7   he's --

8          *THE COURT:* Ask your next question.  You're not

9   going to get any answers.

10         *MR. THOMPSON:* It's a waste of time.

11         *THE COURT:* Yeah.  It's a waste of time.

12         Mr. Ansley, do you have anything?

13         *MR. ANSLEY:* Sure.

14         With Mr. Johnson, though, Your Honor, I think we'll

15  just keep shadow boxing, frankly.  But what I'd like to do is

16  call Hal Lambert for a brief testimony.

17         *THE COURT:* All right.  Mr. Johnson, thank you.

18         *MR. ANSLEY:* The receiver calls Hal Lambert.

19         *THE COURT:* Mr. Lambert, if you would approach the

20  witness stand, sir, we'll have you up here.

21             *(Witness approaches the stand)*

22         *THE COURT:* If you would raise your right hand.

23             *(Witness sworn)*

24         *THE COURT:* Mr. Ansley, go ahead.

25

1        HAL LAMBERT,

2     having been first duly sworn, testified as follows:

3        DIRECT EXAMINATION

4     *BY MR. ANSLEY:*

5     *Q.*      Mr. Lambert, good afternoon.

6     *A.*      Good afternoon.

7     *Q.*      You know the defendant; is that correct?

8     *A.*      Yes.

9     *Q.*      Describe -- identify him by describing something about

10    what he's wearing.

11    *A.*      He's wearing an Anderson -- or Johnson County Jail

12    uniform.

13    *Q.*      Okay.

14              *MR. ANSLEY:*  Can the record reflect the witness has

15    identified Mr. Johnson, the defendant?

16              *THE COURT:*  So reelect.

17    *Q.*   *(By Mr. Ansley)*  How do you -- high level, how do you

18    know Mr. Johnson?

19    *A.*      He called me one day in about 2015, late 2015 or 2016,

20    somewhere in there, and reached out to me on the phone.

21    *Q.*      And is it fair to say that you engaged in ongoing

22    conversations or discussions with Mr. Johnson after that?

23    *A.*      That's correct.

24    *Q.*      Were you in interactions with Mr. Johnson in 2018?

25    *A.*      Yes.

1    Q.    You heard Mr. -- well, you were here for his testimony

2    earlier, correct?

3    A.    Yes.

4    Q.    Did you hear Mr. Johnson that first -- a couple of

5    things.  First, he is not engaged in any crypto transactions

6    since, I think he said, under oath, 2017; do you recall that

7    testimony?

8    A.    Yes.

9    Q.    Do you recall his testimony that he has never used

10   Gemini in connection with crypto transactions?

11   A.    That's right.  Gemini, correct, he said he did not.

12   Q.    I'm not a crypto person.  Can you educate me?

13            THE COURT:  The Judge isn't either.

14            THE WITNESS:  Gemini is an exchange that traded

15   bitcoin mainly, early on.

16   Q.    (By Mr. Ansley)  And by early on, did that include in

17   2018?

18   A.    Yes.

19   Q.    Did you engage in a crypto transaction with

20   Mr. Johnson?

21   A.    Yes.

22   Q.    Roughly, when do you believe that was?

23   A.    Well, the coins -- I have a Coinbase account.  And at

24   the time you were limited on how much you could buy at

25   Coinbase on a daily basis.  And I wanted to buy more than what

1    was allowed on a daily basis with Coinbase.

2              Mr. Johnson said he had a Gemini account and he

3    could buy the crypto for me.  So I wired him $50,000, and he

4    bought crypto, and then transferred the crypto to my Coinbase

5    account.  And that crypto, I just looked at it, it's still

6    there, it shows the transaction, happened February 5th of

7    2018.

8    Q.    February 5th, 2018?

9    A.    Correct.

10   Q.    And you confirmed that just today?

11   A.    Yeah.  I went out and looked at my Coinbase account to

12   see when the coins hit my account.

13   Q.    And you confirmed as well that that transaction -- I

14   think you said Mr. Johnson, what, received your funds in that

15   Gemini account; is that correct?

16   A.    I wired him funds, I don't recall where it went back

17   then; I can find that transaction.  But I wired him $50,000,

18   and then I got those coins into my Coinbase account.

19   Q.    Okay.  And I may have asked the wrong way, but -- for

20   my ignorance.  But was Mr. Johnson using Gemini in connection

21   with that transaction with you in February of '18?

22   A.    That's what he told me.

23            MR. ANSLEY:  Thank you, sir.  Pass the witness, Your

24   Honor.

25            THE COURT:  Anybody else have any questions for

1    Mr. Lambert?  *(No response)*

2             Mr. Lambert, I'd like to ask you a few questions.

3    And again, I don't -- the lawsuit is over and done, this is

4    post-judgment.  I don't want Mr. Johnson to stay in Johnson

5    County anymore than he has to.  Now, I just really would like

6    to identify what type of assets that he has, and I keep

7    getting different answers.

8             But you had some interactions with him here in Fort

9    Worth and at other places; is that correct?

10             *THE WITNESS:*  That's correct.

11             *THE COURT:*  I'm assuming you-all went out to dinner

12    and other places?

13             *THE WITNESS:*  That's correct.

14             *THE COURT:*  Did he pay for his own meals?  Did you

15    pay for those?

16             *THE WITNESS:*  I think sometimes I paid and sometimes

17    he paid, I don't recall.

18             *THE COURT:*  Do you know -- he's based on the East

19    Coast.  Did he mention who was paying for his flights here or

20    did this ever come up?

21             *THE WITNESS:*  Well, after I met him -- originally he

22    was in LA, and then he moved to The Woodlands outside of

23    Houston.  So I was living at The Woodlands.  And then during a

24    long period of time, I don't know how many years, but

25    certainly multiple years.  And then moved to northern Virginia

1    after The Woodlands.

2         So, you know, he's moved around some.  But the bulk

3    of the time that I was interacting with him, I believe he was

4    mostly in The Woodlands.

5         THE COURT:  Do you remember what type of vehicle he

6    drove or whether he owned a vehicle or perhaps leased?

7         THE WITNESS:  I've seen photos of his vehicle

8    online.  Most of the time when I would see him, I think he had

9    flown in, or sometimes he would actually, you know, hire a

10   driver to drive him.  But he -- he, you know, drove around in

11   cars and flew on airplanes.

12        THE COURT:  Hire a driver like an Uber, or like

13   somebody just for him?

14        THE WITNESS:  No.  Somebody just for him.

15        DEFENDANT JOHNSON:  Not true.  I have never done

16   that.

17        THE COURT:  We'll let you ask questions in a moment,

18   if you'd like.  We're trying to determine assets here, so this

19   is not going to be a big circus.

20        DEFENDANT JOHNSON:  To be clear, Your Honor, I've

21   never owned a Gemini account, not once.  Now it's possible

22   it was a Cumberland Mining thing, where I bought it for

23   Mr. Lambert.

24        But as I said, whenever Donald Trump tweeted that he

25   was not a fan of bitcoin, whenever that date was, that's when

1    I was out of bitcoin.

2                    THE COURT:  Okay.

3                    DEFENDANT JOHNSON:  And to be clear, Your Honor, one

4    more thing, just to be clear about this, Jonathan Buma was in

5    the FBI, he was -- I was a code-named informant, there was a

6    CHS file about me.  I have no objection to the receiver seeing

7    that CHS file and reading it to their heart's content.

8                    THE COURT:  Well, I don't care whether your handler

9    was J. Edgar Hoover.  What I care about is what your assets

10   were, because you've got a $71 million judgment.

11                   DEFENDANT JOHNSON:  And I'm happy to turn over all

12   those assets, Your Honor.

13                   THE COURT:  Any other questions for Mr. Lambert?

14                   MR. ANSLEY:  No, Your Honor.

15                   THE COURT:  Okay.  Sir, you can step down.

16                   I think I'm going to take a brief break and go get

17   my water.  And then I would like for my receiver and -- if

18   you-all could just think about a way out of this for

19   Mr. Johnson.  Because if it keeps going down this current

20   path, I don't think I have any other choice but to continue

21   holding him in contempt indefinitely.

22                   And as I said, I've looked into this, and the Fifth

23   Circuit says that you can hold somebody -- I can't remember if

24   it's 12 or 18 months, but it's a lot longer than what we've

25   been getting here.  We encounter this every once in a while

1  with sovereign-citizen types who refuse to respond to

2  Government agencies.

3          But I am extremely busy here in Fort Worth.  I've

4  got trials set from now until March.  I have every defendant

5  in the recent Prairieland shooting case, I suspect that I'll

6  be in trial the entire month of February on that case.  So I

7  don't have the assets to continue holding him in Johnson

8  County and bringing him back every week.

9          So I would like to see if we can resolve this,

10  because it may be that he just has to stay down there until he

11  finally wakes up and will give direct answers.  But I'd like

12  for you to think about it.

13          I'm going to take a five-minute recess.  And I was

14  hoping that Mr. Johnson would help himself.  No one, if they

15  can prevent it, should be away from their family over the

16  Christmas holidays, and I was hoping that I could prevent

17  that.  I'm not sure I can.

18          Okay.  We'll be in recess for five minutes.

19              *(Short break taken)*

20      *THE COURT:*  I don't want to keep you-all any longer

21  than I have to.  I would like to hear, perhaps from you

22  Mr. Ansley, and maybe I can preface this by telling you some

23  of my thoughts.  I'll be honest with you, I don't know, given

24  what I've heard today from Mr. Johnson, whether you'll ever be

25  able to get any information that's usable when it comes to

1   what you're looking for.

2          I do -- I do have some issues with regards to his

3   mental health, and I don't know how to get him evaluated on a

4   civil case.

5          MR. ANSLEY:  And I don't know either, we'll look

6   into that, Judge.  But I think, from what I've seen and heard,

7   that something like that frankly makes sense, from my

8   perspective.  So we can explore that, if that helps the Court.

9          THE COURT:  And I am concerned about throwing good

10  money after bad here.  I suspect that there are some assets

11  that are out there, but, you know, you-all -- I would

12  encourage you to be conservative.  Because it might be a

13  rainbow that you chase, and there's no pot of gold at the end.

14         MR. ANSLEY:  Yes, Your Honor.  We recognize that,

15  too.

16         THE COURT:  Any -- you know, what -- what's saddest

17  to me, and, Mr. Ansley, I know you're a father just like me.

18  But I hate -- I would hate for a father to be away from

19  their -- their daughter on the Christmas holidays.  So I did

20  want to take this effort to see if we could get him to purge

21  himself.  I didn't hear anything today that got me any closer

22  than where we were last month.

23         MR. ANSLEY:  I didn't either, Your Honor, today --

24  well, in court today, this morning during our long meeting

25  with him as well, and in previous -- the interview that my

1    colleagues did with him several weeks ago now as well.  No

2    indication that that's been purged.

3            I do not believe at this stage -- well, the Court's

4    concern in ordering the receivership was the substantial risk

5    of further or continuing asset depletion.  My opinion from

6    what I've seen so far, is the Court is still in those waters,

7    in which, if he's released, there would be that substantial

8    risk of depletion -- further depletion of assets.

9            I am sympathetic, for the same reason as the Court,

10   to the Christmas holidays coming up and what it's like for a

11   father to be away from their family.  That's heartbreaking to

12   me.  It's equally heartbreaking that I believe there's

13   information that we could have from Mr. Johnson that we don't

14   have.  And I think, unfortunately, this process is causing

15   some of that information to break loose, reluctantly as it may

16   be.

17           *THE COURT:*  I feel like we get different bits and

18   pieces each time.

19           *MR. ANSLEY:*  Yes, sir.  And to that point, we

20   have -- I mean, asked, probably countless times, for contact

21   information for Mr. Rodriguez.  I was given his phone number

22   five minutes ago by Mr. Johnson.

23           Which I appreciate, that's not critical of him

24   whatsoever.  But what that is pointing out is that that's -- I

25   mean, he didn't make a phone call in the last ten minutes,

1    that's information that he had access to while here.  Again,

2    I'm grateful and applaud him giving that to us, but I got that

3    number just now.  I shouldn't be getting that now.  I should

4    have gotten that a week ago, two weeks ago, during the meeting

5    that they had with him in Johnson County.

6         That should not be something that we're getting at

7    3 o'clock in Court after this hearing, after hearing that he

8    is still -- or is remaining in custody, and after spending the

9    entire morning with him this morning, which was a difficult

10   process, to say the least.

11        So I do think we're getting pieces of information

12   that come out.  I wish there were a better process by which to

13   get that information.  But I -- unfortunately, my view is that

14   this is probably the best process to do that.  I regret that

15   deeply.  And we will remain in consistent contact with him if

16   he remains in custody.

17        What -- what I'd like to offer to the Court is

18   that -- I mean, I don't think that there's any realistic way

19   that we can get, short of voluntary production from him,

20   additional information.  I don't think that the compulsory

21   processes that we're undertaking, with banks, with others --

22   other subpoena recipients are going to get documents -- the

23   necessary documents to us by Christmas.  They'll probably get

24   documents to us over the next 30 to 60 days.

25        But I don't believe, absent almost a 180 from

```
 1    Mr. Johnson, I don't think that it's going to get -- that

 2    following those processes will do anything to put us in a

 3    place where the contempt has been purged.

 4              So, what -- what I'd propose -- I'm sorry, Judge.

 5              THE COURT:  Oh, go ahead, Mr. Ansley.

 6              MR. ANSLEY:  What I propose is that -- I think the

 7    Court said your -- the Court is in trials the month -- at

 8    least the month of February, I think.

 9              THE COURT:  Yeah.

10              MR. ANSLEY:  So if we looked at something that is

11    a -- a 30-day plan that we can give the Court details

12    regarding, and I think I would probably propose something

13    maybe fairly compressed, 30 days, 45 days, worst case scenario

14    60 days, kind of what that looks like for the Court to take

15    any recommendations or further instructions from Your Honor.

16    But something like that would allow us -- and if we -- we

17    would triage this, follow that plan but also seek further

18    information voluntarily from Mr. Johnson, and see if that

19    let's us short-circuit things.

20              I think something with that in mind, 30 days, 45

21    days, 60 days, that's what I would propose, if that's

22    satisfactory to the Court.

23              THE COURT:  And obviously, if at any time he decides

24    to give full answers to the questions and actually --

25              DEFENDANT JOHNSON:  Your Honor --
```

1          *THE COURT:* -- give some information.

2          *DEFENDANT JOHNSON:* -- I can give --

3          *THE COURT:* You need to be quiet.  Thank you.

4          He'll be released.

5          *MR. ANSLEY:* Yes, sir.

6          *THE COURT:* I mean, it's -- you're the master of

7   your own destiny.

8          *MR. ANSLEY:* And that's -- Your Honor, that's

9   precisely what -- that echos what we discussed with

10  Mr. Johnson this morning, is that he -- my firm belief is that

11  he has more control over this process and what happens to him

12  than the Court does, certainly more than we do.  But he holds

13  the keys himself, in my opinion --

14          *THE COURT:* Any --

15          *MR. ANSLEY:* -- when he decides what to share.

16          *THE COURT:* Any communications with the ex-wife, the

17  girlfriend, the parents?

18          I mean it's -- I would assume that no one wants

19  their loved one to be locked up.  And if it's truly what he

20  said that he's -- does not know anything about his finances,

21  that his ex-wife handles that, including even paying for basic

22  bills, paying his American Express card bill.

23          *MR. ANSLEY:* And we've had, you know, me, in

24  particular, have had a lot of conversations with his father,

25  Lawrence Johnson.  I'm very sympathetic with what he's going

1    through with his son; his wife as well.  He struck me as very

2    lucid.  I mean, I had no concerns in speaking with his father

3    that this was a man of any sort of diminished capacity.

4    That's -- you know, that diagnosis is worth what you're paying

5    for.

6          *THE COURT:*  Yeah.

7          *MR. ANSLEY:*  But I was very impressed, first, with

8    his faculties, and secondly with his -- his pain that he's

9    going through for what his son is going through.  And the

10   receivership is extraordinarily sympathetic to that.

11          I'll also point out that regarding information that

12   his father may have, as opposed to Mr. Johnson, it's telling

13   to me that Mr. Johnson can tell the Court, I've got X

14   thousands of dollars in credit card debt or whatever else it

15   is, I mean, to, you know, pretty minute dollar amounts; and

16   yet, he can't identify where he's got a bank account, where

17   he's got a checking account.  That strikes me as pretty

18   discordant.

19          *THE COURT:*  Yeah.

20          *MR. ANSLEY:*  At his command, information like that,

21   and yet material matters, like where an account is held, is

22   something that escapes him.

23          *THE COURT:*  Whether he has a trust or not, who the

24   trustee is.

25          *DEFENDANT JOHNSON:*  Your Honor, if I may?

1    *THE COURT:*  Yeah.

2    *DEFENDANT JOHNSON:*  I gave the name of the guy who

3    set up the trust, Norm Rasmussen.  I gave my ex-wife's contact

4    information or her name.  I have -- I think I know her phone

5    number.

6           I've been up for 72 hours, I've been kicked twice,

7    beaten up in Johnson County.  I'm more than happy to sit down,

8    and stay in Texas even, over Christmas holiday, and answer all

9    those questions if I have a full night's rest --

10   *THE COURT:*  I know, but you had the -- you had

11   multiple opportunities.

12   *DEFENDANT JOHNSON:*  Your Honor, I did not have that

13   until you had a receiver in place.  Now that you have a

14   receiver in place, it's a different matter than when it's

15   Mr. Thompson contorting what I'd say.

16   *THE COURT:*  I shouldn't have had to have a -- put a

17   receiver in place if you were honest, Okay?

18   *DEFENDANT JOHNSON:*  To be honest with Your Honor --

19   *THE COURT:*  You didn't answer the questions.

20   *DEFENDANT JOHNSON:*  I didn't oppose the receiver in

21   the first place.  And I've answered truthfully, and I've spent

22   as much time with them, I've encouraged my family to help

23   them.  I'm asking to be released, I'm asking to be helpful.

24   I'm not able to do that from a jail cell in Johnson County

25   where my safety, my health, and the well-being of myself and

1  my family is at risk.  So I would ask you --

2          *THE COURT:*  I need to --

3          *DEFENDANT JOHNSON:*  I would ask you, Your Honor -- I

4  gave the name, the phone number of my contact, that is the

5  last one that I have.  I have no other cards to play.  Didn't

6  even recall it.  I just looked at all the wads of paper I put

7  here, because I was expecting to be released today.  I've sat

8  with them for many hours.

9          I've been in extreme physical pain in the Johnson

10 County Jail.  The light is on constantly, I don't get sleep, I

11 get assaulted there.  I don't know what to do.

12         *THE COURT:*  I would --

13         *DEFENDANT JOHNSON:*  I've instructed my family, I've

14 instructed my friends.  I've instructed people who don't even

15 like me, who give money to my commissary -- which I can't eat

16 the food there, I throw it up, and I get beaten.  It's not a

17 good situation.

18         *THE COURT:*  It's a situation, though, of your own

19 making.

20         Now, nobody should get beaten up and that sort of

21 thing, and I'll instruct the Marshal to look into that.  You

22 have the keys to release yourself.

23         *DEFENDANT JOHNSON:*  Your Honor, what is it that you

24 would like me to do that I can't do?

25         *THE COURT:*  Be truthful, identify your assets --

1    *DEFENDANT JOHNSON:*  I have identified a list of

2  them.  And if I were released today, I can provide a complete

3  list by the morning.

4    *THE COURT:*  How many opportunities have you been

5  given to do this and you've been asked direct questions.

6    *DEFENDANT JOHNSON:*  Your Honor, I don't have access

7  -- many of the things --

8    *THE COURT:*  Okay.

9    *DEFENDANT JOHNSON:*  My brain is not like normal

10  people's brains.  That doesn't mean it's deficient.

11    *THE COURT:*  I --

12    *DEFENDANT JOHNSON:*  Just to be clear about this,

13  it's not deficient, okay?  I have had people who care about

14  me --

15    *THE COURT:*  You're --

16    *DEFENDANT JOHNSON:*  -- and love me, pay my bills

17  over the years, there's nothing wrong with that.  I have

18  helped them when I've had more money, I've helped Mr. Lambert

19  when he's had situations.  I have no objection whatsoever to

20  living in a more maybe communitarian basis.  I am not safe in

21  Johnson County Jail.

22    *THE COURT:*  If I could just stop you.  I don't have

23  any other options.  That's where --

24    *DEFENDANT JOHNSON:*  You do, Your Honor.  Your

25  Honor --

1    *THE COURT:*  That's where --

2    *DEFENDANT JOHNSON:*  -- you could release me, in

3    24 hours --

4    *THE COURT:*  I don't want to argue.

5    *DEFENDANT JOHNSON:*  -- and we could come back here

6    on Friday.

7    *THE COURT:*  I don't want to argue anymore, okay?

8    You were warned time and time again.  This case has been on

9    file forever, you have a judgment, you didn't comply with

10   post-judgment discovery, you've argued with the attorneys,

11   you're arguing with me.

12       I'm really concerned about maybe your mental

13   capacity and your mental health, and I mean that as

14   respectfully as possible.  Is there anybody that has power of

15   attorney over you?  Have you ever signed a power of attorney

16   or perhaps even a guardianship?

17   *DEFENDANT JOHNSON:*  No, Your Honor.

18   *THE COURT:*  Have we been able to find anything like

19   that, Mr. Ansley?

20   *MR. ANSLEY:*  We have not, Your Honor.

21   *DEFENDANT JOHNSON:*  Your Honor, I have been

22   psychologically assessed.

23       My issue is simply, I don't have the resources

24   within the jail.  I am not -- the law requires me, as a pro se

25   litigant, to have access to a pen.  I have not been even given

1    a pen.

2         THE COURT:  I would really encourage -- next time

3    you get a chance to talk to your parents, okay --

4         DEFENDANT JOHNSON:  My parents have said to me --

5         THE COURT:  -- I would highly encourage you to try

6    and get your own counsel.

7         DEFENDANT JOHNSON:  Your Honor, I have tried that

8    with my parents.  My parents have called the Tarrant County

9    Bar Association, I have not been able to secure that.

10        I don't know what I'm supposed to do at this stage.

11   I have complied with Your Honor's request.  People have come

12   to me, I've answered their questions as best I can with my

13   memory of things that happened seven, eight, nine years ago; I

14   can't even remember if I had breakfast or not.

15        I'm not in a position to answer anything.  And my

16   situation will not get better over 30 days.  So if you want to

17   remand me into custody of some psychiatric thing, I'm happy to

18   do that.

19        THE COURT:  I don't have the authority to do that,

20   this is a civil case.

21        DEFENDANT JOHNSON:  Well, I don't know what to do.

22        THE COURT:  I need you to be quiet, okay?

23        I'm really trying to get to the bottom of this.  And

24   I can't stress it enough, the last thing I want is a father to

25   be away from his children during the Christmas holidays.

1          The reports that I have gotten from the receiver and

2     the attorney was that you were -- you did much of the same

3     today as when they went out to visit with you.  I did this

4     just as an opportunity to see if I could get you to go home.

5          *DEFENDANT JOHNSON:*  I appreciate that, Your Honor.

6          *THE COURT:*  And you don't -- you don't answer

7     questions directly, you're not forthcoming.

8          *DEFENDANT JOHNSON:*  Your Honor --

9          *THE COURT:*  I'm left with no other choice than to

10    remand you again.

11         What I would encourage the receiver to do -- perhaps

12    if we can get in contact with his loved ones.  If it's true

13    that his ex-wife does know where his assets are, maybe we

14    could bring her down here, take her deposition.  There has to

15    be somebody that can help us out with this.  I know that this

16    is frustrating.  But I don't believe we have a choice, do you?

17    I don't believe he's purged himself.

18         *MR. ANSLEY:*  I do not, Your Honor, based on what we

19    have in front of us.  I think the Court's legitimate concerns

20    about further depletion of assets remain -- remains in place.

21         *DEFENDANT JOHNSON:*  Your Honor, I'm happy to sign

22    anything saying that I will have no control over any financial

23    instruments for 30 to 90 days, because I have enough people

24    out there --

25         *THE COURT:*  Well, you're under a court order that

1   says not to.

2           *DEFENDANT JOHNSON:* I won't even touch --

3           *THE COURT:* And you're also under a receivership,

4   okay?

5           *DEFENDANT JOHNSON:* But you have to understand, Your

6   Honor, I have no financial interest, like nothing, like

7   there's nothing for me to deplete.  I wouldn't even know how

8   to do it.  I just don't have it.  I don't have the resources

9   to do that.  I don't.

10          *THE COURT:* I don't believe you've made it to

11  38 years old and you don't own one asset, I'm sorry.

12          *DEFENDANT JOHNSON:* Your Honor --

13          *THE COURT:* I'm tired of arguing.

14          You're going to be remanded at this time to go back

15  to the Johnson County Jail.

16          And I would like to see some sort of a plan from the

17  receiver on how we can finally get to a situation.  Because

18  even if you determine that there are assets out there, he's

19  still violated the Court orders and not identified it himself,

20  so he's still in contempt.

21          *MR. ANSLEY:* I believe that's correct, Your Honor.

22          *DEFENDANT JOHNSON:* Your Honor, I don't know a lot

23  of these assets.  I have people who have handled them for me

24  in the past.  I've given the names of those people.  I don't

25  have access to their phone numbers.  If I had them, they'd

1  already have it.

2  *THE COURT:*  If any of your Government handlers would

3  like to make an appearance, they can appear at any time, okay?

4  *DEFENDANT JOHNSON:*  If you called them -- if you

5  called the number that I gave, you called the number that I

6  gave Mr. Ansley, and if it was done in a private manner, in

7  which Mr. Ansley spoke to him or you spoke to him, I'm sure I

8  could be out of here in 15 minutes.

9  *THE COURT:*  Well, we'll see if Mr. Ansley can follow

10  up.  I can assure you, one of the reasons why I chose him to

11  serve as your receiver, is because he has decades of

12  experience dealing with every type of Government intelligence

13  agencies, all different types of prosecutions.

14  *DEFENDANT JOHNSON:*  This is why I was overjoyed that

15  he was the receiver in this case.

16  *THE COURT:*  Okay.

17  *MR. ANSLEY:*  We'll call him, Judge.

18  *THE COURT:*  All right.  And they'll report back to

19  me, and if what you're saying is true, then we'll let you out,

20  okay?

21  We'll keep working at it.  Thank you, though, for

22  coming down here.  I do just -- I do question maybe, when you

23  do get out, it might be worthwhile going and maybe talking to

24  a mental health consultant, a psychiatrist, or psychologist.

25  *DEFENDANT JOHNSON:*  Your Honor, I have done that

1    many, many times over the years.  And every time I've

2    disappointed the people who have sent me.  I don't

3    understand --

4            THE COURT:  Have you ever been diagnosed with

5    Asperger's or autism?

6            DEFENDANT JOHNSON:  It's been suggested that I have

7    high-pattern recognition and low emotional intelligence.

8    That's what's been suggested, but that's very commonplace in

9    computer science.

10           THE COURT:  I just feel like you're not doing

11   yourself any favors.  Again, I'm not saying that to be

12   insulting.

13           DEFENDANT JOHNSON:  I appreciate that, Your Honor.

14   This is not a culture that I'm accustomed to.  This is not a

15   place that I have chosen to spend much time.

16           THE COURT:  That's why I tried to warn you several

17   times.

18           DEFENDANT JOHNSON:  I appreciate that, Your Honor,

19   but --

20           THE COURT:  All right.  I'll go ahead and remand you

21   at this time.

22           I will look into any of the allegations of

23   assaultive behavior or abuse, and I'll do what I can to

24   correct that, if that's true.  As I said, when I heard that

25   from your parents I looked into it, and the Marshal confirmed

```
 1   there was no evidence of that.

 2            DEFENDANT JOHNSON:  They saw me with the black eye.

 3   I did not name the person, I don't want to cause a stir in the

 4   jail.  What I would like, if possible --

 5            THE COURT:  You have to report that.

 6            DEFENDANT JOHNSON:  Your Honor, I would like to be

 7   remanded into solitary confinement, if possible.

 8            THE COURT:  I'm sorry, I -- I'll see if I can talk

 9   to a Marshal and see if we can get you there, but I'm not sure

10   I have any control over that, okay?

11            DEFENDANT JOHNSON:  I appreciate that.

12            THE COURT:  All right.  Thank you all for coming

13   down.

14                 (Proceedings Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```

1                      <u>REPORTER'S CERTIFICATE</u>

2

3      I, Monica Willenburg Guzman, CSR, RPR, certify

4 that the foregoing is a true and correct transcript from

5 the record of proceedings in the foregoing entitled matter.

6      I further certify that the transcript fees format

7 comply with those prescribed by the Court and the Judicial

8 Conference of the United States.

9      Signed this 29th day of December, 2025.

10

11                      <u>/s/Monica Willenburg Guzman</u>
                     Monica Willenburg Guzman, CSR, RPR

12                      Texas CSR No. 3386
                     NCRA No. 32278

13                      Official Court Reporter
                     The Northern District of Texas

14                      Fort Worth Division

15

16 CSR Expires:        7/31/2027

17 Business Address:    501 W. 10th Street, Room 310
                     Fort Worth, Texas  76102

18

Telephone:         817.850.6681

19

E-Mail Address:      mguzman.csr@yahoo.com

20

21

22

23

24

25

**DEFENDANT JOHNSON: [324]**
**MR. ANSLEY: [28]** 14/11 14/15 19/2 19/6 19/8 19/10 19/14 67/13 67/18 68/14 70/23 73/14 75/5 75/14 75/23 76/19 78/6 78/10 79/5 79/8 79/15 79/23 80/7 80/20 84/20 86/18 87/21 88/17
**MR. FARRELL: [46]** 4/21 6/15 6/18 23/16 24/5 24/7 24/21 25/14 32/20 32/22 36/1 36/4 36/9 37/6 37/9 37/13 38/18 39/15 39/18 39/24 40/5 40/9 40/12 40/18 40/21 40/24 41/1 41/4 41/9 41/13 41/16 42/11 42/14 42/20 42/23 42/25 43/3 43/6 43/10 44/3 44/12 44/17 44/22 45/4 55/5 62/21
**MR. THOMPSON: [31]** 4/16 8/3 8/6 9/5 47/20 47/23 48/1 55/10 55/17 57/14 57/20 57/24 58/3 58/10 58/14 58/16 58/20 58/24 60/21 63/23 64/15 64/18 64/20 64/23 65/17 65/21 65/23 66/7 66/9 66/11 67/10
**SECURITY OFFICER: [2]** 34/1 34/8
**THE COURT: [323]**
**THE MARSHAL: [1]** 34/4
**THE WITNESS: [7]** 69/14 71/10 71/13 71/16 71/21 72/7 72/14

**$**

**$14,000 [1]** 31/13
**$24,000 [1]** 62/6
**$3 [1]** 21/21
**$3,112 [1]** 62/6
**$32,000 [1]** 62/5
**$400 [1]** 25/17
**$400,000 [1]** 22/3
**$50,000 [2]** 70/3 70/17
**$65,000 [1]** 50/20
**$70 [3]** 13/12 13/14 15/12
**$71 [2]** 49/3 73/10
**$89 [1]** 64/13

**'**

**'18 [1]** 70/21

**/**

**/s/Monica [1]** 91/11

**1**

**1/2 [1]** 6/22
**100 [4]** 23/7 26/1 26/2 48/18
**10th [1]** 1/22 91/17
**11 [1]** 64/7
**119 [1]** 55/17
**11th [1]** 63/15
**12 [4]** 29/18 64/5 64/6 73/24
**12,000 [1]** 31/13
**15 [1]** 88/8
**15-minute [1]** 63/2
**16 [2]** 1/6 4/2
**1624 [1]** 1/15
**17 [1]** 19/19
**18 [2]** 17/10 73/24
**180 [1]** 77/25
**19 [1]** 19/20
**1900 [1]** 1/12
**1:50 [2]** 1/7 4/2

**2**

**20 [2]** 30/20 41/25
**2011 [1]** 44/19
**2012 [1]** 44/14
**2013 [1]** 44/14
**2015 [4]** 31/9 44/24 68/19 68/19
**2015/2016 [1]** 41/12
**2016 [4]** 41/12 43/2 44/24 68/19
**2017 [11]** 7/22 11/1 19/19 30/20 31/8 40/1 41/16 45/20 45/22 45/23 69/6
**2018 [5]** 45/24 68/24 69/17 70/7 70/8
**20194 [1]** 1/16
**2024 [2]** 24/6 24/8
**2025 [3]** 1/6 4/2 91/9
**2027 [1]** 91/16
**20th [1]** 24/25
**214.743.4500 [1]** 1/14
**2200 [1]** 1/13
**24 [1]** 84/3
**26 [2]** 10/19 13/24
**29th [1]** 91/9

**3**

**30 [5]** 77/24 78/13 78/20 85/16 86/23
**30-day [1]** 78/11
**300 [2]** 1/19 30/16
**300,000 [1]** 22/3
**310 [2]** 1/22 91/17
**31st [1]** 30/6
**32278 [1]** 91/12
**3386 [1]** 91/12
**38 [1]** 87/11

**4**

**40 [1]** 62/12
**400 [1]** 1/20
**45 [2]** 78/13 78/20
**469.895.4790 [1]** 1/21
**4:24-CV-00988-P [1]** 1/4
**4:24-CV-988-P [1]** 4/5

**5**

**501 [2]** 1/22 91/17
**5th [2]** 70/6 70/8

**6**

**60 [3]** 77/24 78/14 78/21
**617.429.4718 [1]** 1/16

**7**

**7/31/2027 [1]** 91/16
**70 [2]** 26/20 40/20
**72 [2]** 65/9 81/6
**75201 [2]** 1/13 1/20
**76102 [2]** 1/23 91/17

**8**

**80 [1]** 40/20
**817.850.6681 [2]** 1/23 91/18

**9**

**90 [1]** 86/23
**95 [1]** 48/18

**A**

**able [5]** 10/17 74/25 81/24 84/18 85/9
**about [59]** 6/6 6/23 7/12 8/11 8/16

8/25 9/1 9/17 13/5 13/6 13/12 17/9 17/10 17/14 20/18 20/21 21/24 25/8 25/9 25/10 25/11 25/25 28/4 28/6 29/17 44/15 47/4 47/19 47/22 48/16 49/15 49/19 49/20 50/1 53/11 53/12 54/3 54/16 55/18 55/20 59/11 59/5 59/15 59/19 60/10 64/13 68/9 68/19 73/4 73/6 73/9 73/18 74/12 75/9 79/20 83/12 83/13 84/12 86/20
**absent [1]** 77/25
**Absolutely [1]** 19/2
**abundantly [1]** 10/25
**abuse [1]** 89/23
**access [8]** 10/17 25/18 26/3 65/11 77/1 83/6 84/25 87/25
**accessing [1]** 10/18
**account [40]** 7/20 21/6 26/9 26/11 26/21 26/23 29/5 29/12 32/8 33/1 33/3 33/11 33/11 33/25 34/3 34/6 35/4 35/4 36/4 36/5 38/1 38/10 38/10 38/18 38/20 41/6 41/9 41/13 42/4 69/23 70/2 70/5 70/11 70/12 70/15 70/18 72/21 80/16 80/17 80/21
**accounts [9]** 26/6 26/15 26/18 27/16 28/10 28/11 28/14 31/17 51/6
**accusing [1]** 52/6
**accustomed [1]** 89/14
**actions [1]** 6/2
**actual [1]** 61/25
**actually [2]** 72/9 78/24
**ADAM [7]** 1/18 4/21 17/25 18/2 39/14 57/25 59/19
**additional [1]** 77/20
**additionally [1]** 21/3
**Address [2]** 91/17 91/19
**Adjourned [1]** 90/14
**admit [1]** 32/17
**advice [2]** 6/9 16/11
**advise [1]** 16/5
**advised [1]** 21/5
**affiliated [1]** 36/22
**afford [1]** 16/17
**afraid [1]** 13/2
**after [17]** 9/13 15/9 23/19 27/2 30/22 34/14 37/14 43/2 51/19 60/16 68/22 71/21 72/1 75/10 77/7 77/7 77/8
**afternoon [4]** 4/16 4/21 68/5 68/6
**again [9]** 16/4 28/21 40/5 52/6 71/3 77/1 84/8 86/10 89/11
**against [3]** 15/13 16/14 60/18
**agencies [9]** 14/18 14/21 15/20 15/22 17/16 52/17 57/10 74/2 88/13
**agency [6]** 19/4 36/16 56/25 60/23 61/1 62/3
**agent [3]** 17/23 18/24 45/11
**agents [2]** 14/18 18/23
**ago [10]** 33/3 33/4 42/1 42/1 51/8 76/1 76/22 77/4 77/4 85/13
**agree [1]** 8/6
**agreement [1]** 60/23
**ahead [11]** 19/9 23/15 24/20 35/21 36/3 39/14 61/14 65/16 67/24 78/5 89/20
**airplanes [1]** 72/11
**AL [1]** 1/4
**Alex [3]** 20/3 20/23 65/18
**all [56]** 4/18 5/7 6/7 6/24 11/12 11/13

**all...** **[50]** 14/13 14/18 14/18 15/16 16/4 16/11 16/24 17/19 18/25 22/6 22/24 23/3 24/3 24/4 28/4 29/11 29/23 30/10 34/10 34/14 35/21 35/24 47/15 49/24 50/2 50/24 51/15 51/20 53/25 54/3 54/21 54/24 56/1 56/10 61/14 62/13 63/4 67/17 71/11 73/11 73/18 74/20 75/11 81/8 82/6 88/13 88/18 89/20 90/12 90/12

**allegations** **[1]** 89/22

**allow** **[1]** 78/16

**allowed** **[2]** 42/7 70/1

**almost** **[2]** 62/12 77/25

**along** **[2]** 6/21 7/2

**ALPHABETICAL** **[1]** 2/25

**already** **[2]** 47/7 88/1

**also** **[17]** 14/12 15/4 15/8 15/12 20/7 32/25 33/14 42/4 45/1 46/13 54/13 58/1 66/11 66/12 78/17 80/11 87/3

**always** **[1]** 25/23

**am** **[20]** 5/13 15/4 15/7 16/4 26/2 26/20 28/9 35/22 37/16 47/13 51/4 52/6 55/1 55/15 60/12 74/3 75/9 76/9 83/20 84/24

**American** **[1]** 79/22

**AmEx** **[1]** 29/6

**amongst** **[1]** 32/15

**amounts** **[1]** 80/15

**Anderson** **[1]** 68/11

**ANDREW** **[3]** 1/18 4/22 6/21

**Angeles** **[2]** 18/4 59/12

**another** **[3]** 8/19 52/24 54/12

**ANSLEY** **[20]** 1/17 4/22 14/8 14/9 14/17 18/25 22/23 25/10 55/6 55/7 67/12 67/24 68/4 74/22 75/17 78/5 84/19 88/6 88/7 88/9

**answer** **[25]** 7/10 11/12 17/4 17/5 17/13 22/20 23/11 23/12 28/17 28/19 31/19 36/12 36/13 43/18 48/17 51/25 55/22 59/3 59/8 65/1 66/21 81/8 81/19 85/15 86/6

**answered** **[5]** 50/24 52/5 65/15 81/21 85/12

**answering** **[2]** 35/5 56/11

**answers** **[10]** 8/25 23/8 32/13 34/19 43/17 51/19 67/9 71/7 74/11 78/24

**any** **[96]**

**anybody** **[6]** 14/20 17/14 27/21 36/16 70/25 84/14

**anymore** **[4]** 16/9 39/7 71/5 84/7

**anyone** **[4]** 42/11 58/11 58/17 58/21

**anything** **[16]** 14/22 16/13 19/4 41/1 47/19 52/6 54/14 61/19 63/22 67/12 75/21 78/2 79/20 84/18 85/15 86/22

**appear** **[2]** 34/19 88/3

**appearance** **[2]** 4/6 88/3

**appeared** **[1]** 7/13

**applaud** **[1]** 77/2

**apply** **[1]** 56/21

**appointed** **[1]** 34/20

**appointments** **[1]** 35/14

**appreciate** **[15]** 6/11 15/6 22/15 23/10 26/13 27/11 27/12 31/25 33/13 43/25 76/23 86/5 89/13 89/18 90/1

**approach** **[1]** 67/19

**approaches** **[1]** 67/21

**appropriate** **[1]** 39/12

**approximate** **[1]** 31/10

**approximately** **[1]** 34/7

**are** **[46]** 5/8 5/20 7/18 8/13 10/1 10/3 11/2 11/15 12/20 13/7 15/17 15/18 15/19 17/4 18/3 18/12 20/12 21/14 22/3 22/6 22/10 25/1 27/4 32/2 32/2 35/11 43/16 43/16 43/23 49/4 49/21 51/14 52/7 52/11 52/13 55/14 57/10 62/9 62/21 66/2 66/18 75/10 75/11 77/22 86/13 87/18

**area** **[1]** 59/12

**argue** **[2]** 84/4 84/7

**argued** **[1]** 84/10

**arguing** **[2]** 84/11 87/13

**arm** **[1]** 12/21

**around** **[9]** 9/1 9/11 15/17 40/19 41/12 61/7 72/2 72/10

**ask** **[20]** 6/16 14/3 16/24 17/1 21/16 22/24 33/9 35/24 37/18 37/19 39/16 52/2 52/4 55/8 62/17 67/8 71/2 72/17 82/1 82/3

**asked** **[16]** 7/12 8/10 14/23 15/2 20/18 35/3 35/13 35/15 38/23 52/3 55/18 59/21 65/15 70/19 76/20 83/5

**asking** **[7]** 4/14 6/23 21/18 52/7 59/22 81/23 81/23

**Asperger's** **[1]** 89/5

**Assange** **[3]** 19/19 19/21 61/17

**assaulted** **[1]** 82/11

**assaultive** **[1]** 89/23

**assessed** **[5]** 52/16 52/19 52/20 52/22 84/22

**asset** **[12]** 15/18 18/6 21/10 21/10 21/11 39/19 45/18 57/21 58/21 59/1 76/5 87/11

**assets** **[50]** 6/23 7/4 7/21 8/11 8/22 9/1 10/17 11/1 12/1 12/5 12/6 13/12 15/15 15/17 20/12 20/15 22/6 22/9 22/10 24/2 24/22 24/23 26/6 27/4 27/7 30/14 45/15 47/21 49/13 49/20 51/21 53/9 53/11 53/13 53/25 61/24 62/7 71/6 72/18 73/9 73/12 74/7 75/10 76/8 82/25 86/13 86/20 87/18 87/23

**assist** **[1]** 7/4

**Association** **[1]** 85/9

**assume** **[2]** 63/21 79/18

**assuming** **[3]** 23/3 30/9 71/11

**assure** **[2]** 26/3 88/10

**attachment** **[1]** 13/16

**attempted** **[2]** 23/18 37/7

**attorney** **[10]** 5/2 5/10 5/19 5/24 6/8 16/15 16/16 84/15 84/15 86/2

**Attorney's** **[1]** 18/21

**attorneys** **[1]** 84/10

**August** **[1]** 19/19

**authority** **[2]** 18/24 85/19

**autism** **[1]** 89/5

**automobiles** **[1]** 30/19

**away** **[5]** 42/17 74/15 75/18 76/11 85/25

---

## B

**back** **[10]** 8/18 13/21 37/6 46/18 49/5 70/16 74/8 84/5 87/14 88/18

**backed** **[1]** 37/21

**background** **[1]** 60/16

**bad** **[1]** 75/10

**bag** **[3]** 24/23 24/24 24/24

**bags** **[2]** 25/1 25/15

**ball** **[1]** 8/9

**bank** **[21]** 20/24 20/24 21/6 26/6 26/9 26/11 26/12 26/17 26/19 28/12 28/20 33/1 41/21 41/21 42/3 42/7 42/9 46/18 51/6 51/11 80/16

**banking** **[4]** 33/11 34/15 54/24 54/25

**banks** **[2]** 26/22 77/21

**Bar** **[1]** 85/9

**barely** **[1]** 12/9 12/21

**based** **[4]** 18/3 57/25 71/18 86/18

**basic** **[1]** 79/21

**basically** **[1]** 52/20

**basis** **[3]** 69/25 70/1 83/20

**be** **[86]** 7/14 8/23 9/19 11/13 11/20 12/11 13/5 15/9 16/14 16/17 17/2 17/15 21/23 22/11 22/18 23/2 23/7 23/11 23/12 25/2 26/4 30/23 31/9 32/15 33/19 34/5 34/19 34/22 35/8 36/25 38/5 42/8 44/15 45/1 45/9 46/10 46/12 46/24 49/4 50/16 51/18 51/23 52/21 53/6 54/9 55/11 61/21 61/24 61/25 63/4 65/24 72/19 72/20 73/3 73/4 74/6 74/10 74/15 74/18 74/23 74/24 75/12 75/12 75/18 76/7 76/11 76/16 77/3 77/6 79/3 79/4 79/19 81/18 81/23 81/23 82/7 82/25 83/12 85/22 85/25 86/15 87/14 88/8 88/23 89/11 90/6

**beaten** **[3]** 81/7 82/16 82/20

**beating** **[1]** 9/14

**became** **[1]** 21/8

**because** **[22]** 11/5 13/2 15/7 23/9 25/23 29/21 34/18 35/16 37/3 42/6 51/25 53/1 54/17 57/3 73/10 73/19 74/10 75/12 82/7 86/23 87/17 88/11

**Beck** **[1]** 58/1

**becomes** **[2]** 6/4 17/8

**been** **[61]** 4/6 4/11 5/7 7/8 7/16 11/6 13/3 13/24 14/19 17/11 20/15 31/24 33/21 34/18 35/24 35/25 36/21 39/13 39/22 41/21 42/9 42/21 44/24 45/24 47/10 47/10 48/5 48/6 48/14 48/14 48/20 52/11 52/15 52/15 52/18 58/11 58/17 58/21 61/10 61/24 62/1 62/2 65/9 67/5 68/2 73/25 76/2 78/3 81/6 81/6 82/9 83/4 83/5 84/8 84/18 84/21 84/25 85/9 89/4 89/6 89/8

**before** **[8]** 1/9 13/19 19/1 20/13 23/18 24/25 46/1 60/18

**begin** **[1]** 4/14

**behalf** **[1]** 59/17

**behavior** **[1]** 89/23

**behind** **[1]** 56/21

**being** **[6]** 4/7 6/21 7/9 23/25 41/12 81/25

**belief** **[1]** 79/10

**believe** **[31]** 10/10 13/7 20/9 24/18 25/17 26/24 30/16 32/6 32/6 32/9 32/10 38/14 41/19 41/23 50/25 51/18 55/12 58/1 59/12 62/5 63/10 66/8 69/22 72/3 76/3 76/12 77/25 86/16 86/17 87/10 87/21

**belongs** **[2]** 24/14 24/14

**beneficiary** **[2]** 55/13 55/14

**benefit [3]** 32/3 32/5 50/7
**BENNETT [1]** 1/11
**Berry [2]** 42/18 42/20
**best [8]** 5/21 5/22 9/9 12/5 12/18 25/24 77/14 85/12
**bet [9]** 5/23 33/9 33/14 34/5 35/8 35/11 51/1 53/9 60/8
**better [3]** 64/7 77/12 85/16
**between [1]** 21/20
**beyond [1]** 8/10
**bicycle [1]** 62/7
**big [1]** 72/19
**bill [4]** 28/23 29/9 64/11 79/22
**bills [3]** 33/11 79/22 83/16
**bit [1]** 66/6
**bitcoin [29]** 12/22 13/2 39/25 40/2 40/21 40/22 41/2 42/2 42/6 42/11 43/11 43/12 44/7 44/18 45/9 45/11 46/3 57/20 58/11 58/20 58/25 59/12 59/13 61/18 64/16 65/13 69/15 72/25 73/1
**bits [1]** 76/17
**black [4]** 10/11 24/24 41/7 90/2
**bless [1]** 35/6
**Blockchain.info [3]** 41/6 41/8 44/11
**blue [1]** 41/7
**blunt [1]** 13/5
**Bob [1]** 42/18 42/20
**book [1]** 25/16
**borrowed [1]** 64/12
**Boston [1]** 35/19
**both [2]** 34/5 63/1
**bottom [1]** 85/23
**bought [7]** 31/13 40/9 40/11 42/2 42/16 70/4 72/22
**box [6]** 36/7 36/10 36/14 36/19 37/2 44/8
**boxing [1]** 67/15
**boy [1]** 11/9
**brain [1]** 83/9
**brains [1]** 83/10
**branch [1]** 15/5
**break [3]** 73/16 74/19 76/15
**breakfast [3]** 25/5 25/5 85/14
**BRIDGE [2]** 1/4 4/3
**brief [5]** 7/24 7/24 55/11 67/16 73/16
**briefly [1]** 41/10
**bring [3]** 53/22 54/2 86/14
**bringing [1]** 74/8
**broke [1]** 11/21
**broken [1]** 12/21
**broker [1]** 41/18
**brokerage [1]** 38/1
**brother [5]** 30/16 32/9 32/14 32/17 63/21
**brought [4]** 4/10 66/22 66/24 67/1
**Brucker [3]** 13/21 25/4 66/2
**bud [1]** 50/14
**building [3]** 20/1 66/25 67/3
**buildings [1]** 66/23
**bulk [1]** 72/2
**bullion [1]** 61/25
**Buma [4]** 17/22 19/17 59/16 73/4
**business [2]** 49/5 91/17
**busy [1]** 74/3
**buy [10]** 38/6 38/9 40/8 46/21 50/3 59/12 64/20 69/24 69/25 79/3
**buying [3]** 18/16 19/17 56/1

**C**

**California [5]** 28/20 42/19 45/12 58/1 58/2
**call [8]** 18/13 46/20 46/21 53/20 53/23 67/16 76/25 88/17
**called [9]** 32/5 40/15 44/25 47/10 68/19 85/8 88/4 88/5 88/5
**calls [1]** 67/18
**came [2]** 8/8 34/17
**camera [1]** 25/12
**can [79]** 4/9 4/13 4/19 5/14 8/16 9/9 9/21 10/11 12/3 12/3 12/5 12/18 12/21 16/13 16/15 16/25 17/1 17/2 17/8 17/9 22/4 24/18 25/18 25/23 26/13 27/11 27/12 27/13 28/3 29/14 29/16 33/9 33/10 33/14 34/9 35/23 38/7 38/21 39/12 43/19 43/25 44/1 49/5 51/2 51/20 51/21 51/21 53/19 53/20 53/21 53/24 54/2 55/9 62/7 68/14 69/12 70/17 73/15 73/23 74/9 74/15 74/17 74/22 75/8 77/19 78/11 79/2 80/13 83/2 85/12 86/12 86/15 87/17 88/3 88/9 88/10 89/23 90/8 90/9
**can't [8]** 22/11 27/16 73/23 80/16 82/15 82/24 85/14 85/24
**cannot [2]** 16/17 23/8
**cap [2]** 38/16 38/17
**capacity [2]** 80/3 84/13
**CAPITAL [3]** 1/4 4/4 32/5
**caps [1]** 55/9
**card [6]** 28/23 29/7 29/9 62/5 79/22 80/14
**cards [2]** 28/22 82/5
**care [10]** 17/21 28/1 48/16 52/8 52/10 55/8 61/21 73/8 73/9 83/13
**cared [1]** 21/24
**Carlisle [1]** 38/20
**cars [1]** 72/11
**case [10]** 1/4 19/16 60/18 74/5 74/6 75/4 78/13 84/8 85/20 88/15
**cases [4]** 14/13 48/5 48/6 48/23
**cash [4]** 18/14 29/5 57/21 58/22
**cause [1]** 90/3
**causing [1]** 76/14
**caution [1]** 53/1
**cell [1]** 81/24
**certain [3]** 7/11 11/16 17/8
**certainly [2]** 12/14 34/25 71/25 79/12
**certificate [4]** 38/12 38/22 39/2 91/1
**certify [2]** 91/3 91/6
**cetera [1]** 64/16
**chain [1]** 60/16
**chair [1]** 4/19
**Chairman [1]** 61/22
**challenges [1]** 7/7
**challenging [1]** 7/16
**chance [1]** 85/3
**change [1]** 60/9
**Chantilly [1]** 30/22
**chapter [2]** 28/4 29/17
**charged [5]** 36/25 54/14 58/11 58/17 58/21
**CHARLES [5]** 1/7 1/15 4/4 4/25 38/20
**chase [9]** 33/1 33/8 36/6 41/21 42/4

**check [2]** 9/24 60/16
**checked [2]** 25/6 31/12
**checking [15]** 26/9 26/14 26/18 26/21 26/23 27/16 28/11 33/11 33/25 34/3 34/6 35/4 35/4 36/5 80/17
**Chiefs [1]** 61/22
**child [1]** 55/25
**children [2]** 22/11 85/25
**Chinese [2]** 45/8 45/10
**choice [3]** 73/20 86/9 86/16
**chose [1]** 88/10
**chosen [1]** 89/15
**Christmas [9]** 9/8 34/24 39/8 74/16 75/19 76/10 77/23 81/8 85/25
**CHS [2]** 73/6 73/7
**CIA [2]** 19/25 20/7
**circle [1]** 37/6
**circuit [4]** 17/9 37/22 73/23 78/19
**circus [1]** 72/19
**citizen [2]** 55/3 74/1
**civil [3]** 23/13 75/4 85/20
**claimed [1]** 12/24
**class [2]** 5/20 5/22
**Clause [1]** 34/10
**clear [16]** 9/20 10/13 10/13 10/25 13/10 15/14 39/10 39/11 42/9 51/18 56/13 61/19 72/20 73/3 73/4 83/12
**clearance [4]** 59/25 60/2 60/11 60/15
**clearances [1]** 14/9
**clearly [1]** 33/16
**Clearview [1]** 32/6
**clip [1]** 13/23
**closed [4]** 33/3 33/6 33/7 33/8
**closer [1]** 75/21
**clothing [1]** 50/1
**Coast [1]** 71/19
**code [1]** 73/5
**code-named [1]** 73/5
**Coinbase [8]** 41/9 41/11 69/23 69/25 70/1 70/4 70/11 70/18
**coins [4]** 29/3 69/23 70/12 70/18
**cold [3]** 44/3 44/4 44/5
**colleagues [1]** 76/1
**college [2]** 40/14 45/7
**colors [1]** 60/20
**come [13]** 16/16 19/10 34/22 35/13 35/15 47/9 48/9 48/19 54/7 71/20 77/12 84/5 85/11
**comes [3]** 16/12 29/5 74/25
**coming [2]** 25/12 76/10 88/22 90/12
**command [1]** 80/20
**commissary [1]** 82/15
**commitment [1]** 8/23
**commitments [1]** 8/15
**commonplace [1]** 89/8
**communicate [2]** 5/14 54/11
**communicating [1]** 25/22
**communications [3]** 5/10 5/13 79/16
**communitarian [1]** 83/20
**company [9]** 21/25 24/19 26/19 38/5 38/6 38/24 40/14 49/11 65/14
**compensation [2]** 18/13 18/16
**competing [1]** 38/7
**competition [1]** 40/15
**complaint [1]** 54/13
**complete [1]** 83/2

**complied [1]** 85/11
**comply [4]** 12/11 27/2 84/9 91/7
**compressed [1]** 78/13
**compulsory [1]** 77/20
**computer [15]** 1/25 10/18 10/18 11/11 13/24 25/17 25/17 25/18 25/18 26/3 26/8 34/14 49/23 65/11 89/9
**concern [5]** 5/16 8/19 8/22 23/4 76/4
**concerned [4]** 19/20 54/16 75/9 84/12
**concerns [4]** 23/4 53/4 80/2 86/19
**CONFERENCE [2]** 18/8 91/8
**confidential [2]** 18/8 61/16
**confinement [1]** 90/7
**confirmed [3]** 70/10 70/13 89/25
**conflict [2]** 21/4 21/25
**confronted [1]** 58/7
**connected [1]** 44/8
**connection [2]** 69/10 70/20
**conservative [1]** 75/12
**consistent [2]** 8/5 77/15
**consistently [1]** 11/18
**conspiracy [2]** 13/4 17/15
**constantly [1]** 82/10
**Constitution [1]** 16/22
**consultant [1]** 88/24
**consulting [1]** 29/1
**contact [8]** 24/17 24/19 53/21 76/20 77/15 81/3 82/4 86/12
**contacted [3]** 39/12 39/13 59/11
**contempt [20]** 4/8 4/10 5/7 6/3 6/5 9/9 11/24 12/11 12/19 16/6 17/6 17/7 23/12 23/13 23/14 35/8 51/22 73/21 78/3 87/20
**content [1]** 73/7
**contention [1]** 20/22
**contents [1]** 25/15
**context [2]** 9/5 13/8
**continue [4]** 17/5 51/16 73/20 74/7
**continued [1]** 7/3
**continues [1]** 23/11
**continuing [1]** 76/5
**contorting [1]** 81/15
**contractor [6]** 15/8 21/2 56/22 60/4 66/11 66/12
**control [4]** 59/1 79/11 86/22 90/10
**controlled [3]** 57/21 67/4 67/4
**conversation [2]** 13/20 63/3
**conversations [3]** 61/23 68/22 79/24
**convertible [1]** 30/21
**cooperate [3]** 8/15 8/16 22/9
**cooperative [1]** 7/6
**copy [1]** 39/1
**cordial [1]** 54/16
**correct [19]** 23/22 29/10 30/3 46/2 46/5 47/17 65/20 68/7 68/23 69/2 69/11 70/9 70/15 71/9 71/10 71/13 87/21 89/24 91/4
**correctly [1]** 37/22
**correspondence [1]** 9/23
**costs [1]** 64/13
**could [35]** 5/9 7/4 11/12 11/13 11/14 20/25 24/2 26/4 31/9 32/15 32/15 38/21 39/8 41/21 42/8 42/8 44/15 45/24 47/23 53/9 54/8 60/8 65/11 69/24 70/3 73/18 74/16 75/20 76/13 83/22 84/2 84/5 86/4 86/14 88/8

**couldn't [11]** 5/19
**counsel [9]** 4/12 4/14 7/2 17/1 22/19 61/14 62/20 62/23 85/6
**countless [2]** 18/23 76/20
**County [22]** 4/8 6/22 12/12 14/25 16/8 23/23 25/22 30/7 34/18 39/9 65/10 66/25 68/11 71/5 74/8 77/5 81/7 81/24 82/10 83/21 85/8 87/15
**couple [5]** 5/12 27/7 32/22 55/10 69/4
**course [2]** 7/8 19/20
**court [42]** 1/1 1/9 1/19 1/22 4/8 4/10 4/10 5/11 5/15 6/25 7/22 8/4 10/14 10/15 16/14 18/1 23/20 24/13 34/19 34/20 37/11 37/13 37/17 52/21 54/1 75/8 75/24 76/6 76/9 77/7 77/17 78/7 78/7 78/11 78/14 78/22 79/12 80/13 86/25 87/19 91/7 91/13
**Court's [4]** 14/1 22/5 76/3 86/19
**court-appointed [1]** 34/20
**courtroom [1]** 33/10
**covered [1]** 48/6
**crazy [1]** 53/2
**credit [6]** 28/22 28/23 29/6 29/9 62/5 80/14
**Crescent [1]** 1/19
**crime [1]** 58/8
**crimes [1]** 18/22
**criminal [3]** 6/2 6/4 23/14
**critical [1]** 76/23
**Cross [1]** 3/3
**crypto [14]** 7/18 7/20 39/19 39/25 40/3 41/17 69/5 69/10 69/12 69/19 70/3 70/4 70/4 70/5
**cryptocurrencies [1]** 45/5
**cryptocurrency [4]** 46/4 46/15 64/16 64/21
**CSR [5]** 1/22 91/3 91/11 91/12 91/16
**culture [1]** 89/14
**Cumberland [3]** 44/25 45/1 72/22
**curious [1]** 46/16
**curiously [1]** 54/14
**currencies [4]** 7/18 7/18 7/21 39/16
**current [3]** 28/5 28/6 73/19
**currently [5]** 4/7 39/19 49/14 56/2 62/1
**custody [3]** 77/8 77/16 85/17
**CV [2]** 1/4 4/5

**D**

**dad [2]** 5/18 35/8
**daily [2]** 69/25 70/1
**Dallas [2]** 1/13 1/20
**date [2]** 40/4 72/25
**daughter [2]** 56/7 75/19
**daughter's [1]** 22/2
**David [1]** 43/3
**day [6]** 13/19 40/2 40/2 68/19 78/11 91/9
**days [13]** 10/19 13/24 17/12 19/20 77/24 78/13 78/13 78/14 78/20 78/21 78/21 85/16 86/23
**deal [2]** 41/1 55/2
**dealership [1]** 30/23
**dealing [5]** 29/16 53/16 53/17 59/20 88/12
**dealings [1]** 58/9
**dealt [3]** 14/17 14/17 27/13

**dear [1]** 28/15
**debriefed [1]** 19/25
**debt [2]** 62/5 80/14
**decades [1]** 88/11
**DECEMBER [1]** 1/6 4/2 6/21 91/9
**decide [1]** 28/8
**decided [2]** 5/1 32/15
**decides [2]** 78/23 79/15
**deeply [1]** 77/15
**defendant [5]** 1/15 2/11 68/7 68/15 74/4
**defender [2]** 6/1 16/16
**deficient [2]** 83/10 83/13
**definite [1]** 32/13
**definitely [2]** 27/12 39/4
**deliberately [1]** 60/2
**Dell [2]** 44/13 44/18
**Department [3]** 14/10 65/24 66/25
**depends [2]** 21/16 60/6
**deplete [1]** 87/7
**depletion [4]** 76/5 76/8 76/8 86/20
**deposit [6]** 36/7 36/10 36/14 36/19 37/2 44/7
**deposition [4]** 8/11 48/1 55/17 86/14
**Deputy [1]** 34/2
**describe [3]** 44/3 44/12 68/9
**described [1]** 8/5
**describing [1]** 68/9
**destiny [1]** 79/7
**detail [1]** 48/5
**details [1]** 78/11
**detector [1]** 46/15
**determine [2]** 72/18 87/18
**DHS [6]** 66/7 66/11 66/12 66/13 66/15 66/17
**diagnosed [1]** 89/4
**diagnosis [1]** 80/4
**did [54]** 9/17 9/24 10/6 10/22 10/23 10/23 19/21 19/22 21/5 21/6 21/6 23/19 38/18 40/18 41/1 41/4 41/10 41/10 41/19 42/15 42/20 42/25 44/1 44/17 45/17 48/4 52/21 52/25 54/20 56/3 56/14 56/14 57/14 58/6 58/10 58/20 58/24 59/19 62/16 64/20 69/4 69/11 69/16 69/19 71/14 71/14 71/19 71/20 75/19 76/1 81/12 86/2 86/3 90/3
**didn't [16]** 8/9 8/11 12/11 37/18 37/19 45/2 51/8 61/11 62/17 75/21 75/23 76/25 81/19 81/20 82/5 84/9
**die [1]** 63/19
**different [7]** 9/1 15/19 52/16 71/7 76/17 81/14 88/13
**difficult [3]** 5/8 7/19 10/5 35/5 77/9
**difficulty [1]** 25/22
**digital [13]** 7/18 7/21 7/21 11/1 39/16 39/19 45/15 45/17 57/21 58/21 59/1 61/24 62/1
**diligently [1]** 8/21
**diminished [1]** 80/3
**dinner [2]** 18/16 71/11
**dinners [1]** 18/17
**Dire [1]** 3/3
**direct [12]** 3/3 16/25 17/3 19/11 35/24 41/23 43/21 45/14 59/9 68/3 74/11 83/5
**directly [1]** 86/7
**director [3]** 66/1 66/15 66/17

**disappointed [1]** 89/2
**disclose [3]** 11/16 20/15 23/8
**disclosed [1]** 49/16
**discordant [1]** 80/18
**discover [1]** 46/8
**discovery [2]** 51/13 84/10
**discussed [3]** 21/3 36/4 79/9
**discussing [2]** 13/22 30/17
**discussions [1]** 68/22
**dispensed [1]** 60/13
**DISTRICT [5]** 1/1 1/2 1/9 58/18 91/13
**disturbed [1]** 54/18
**DIVISION [2]** 1/3 91/14
**divorce [4]** 52/19 62/14 62/20 62/25
**DLA [1]** 1/12
**do [119]**
**Docket [1]** 4/4
**documentation [1]** 43/14
**documents [3]** 77/22 77/23 77/24
**does [14]** 6/5 18/15 20/8 26/25 35/18
  39/1 39/4 49/13 64/19 65/23 66/13
  79/12 79/20 86/13
**doesn't [7]** 6/5 16/6 21/24 23/4 34/18
  35/1 83/10
**dogs [1]** 37/23
**doing [5]** 12/24 13/16 18/17 64/7
  89/10
**dollar [1]** 80/15
**dollars [4]** 48/25 48/25 49/7 80/14
**don't [136]**
**Donald [2]** 40/1 72/24
**done [10]** 11/13 13/9 23/25 48/14
  51/20 54/5 71/3 72/15 88/6 88/25
**down [22]** 4/8 7/5 10/1 30/25 34/17
  34/22 35/14 35/15 35/16 48/9 48/19
  53/22 55/23 56/8 63/23 73/15 73/19
  74/10 81/7 86/14 88/22 90/13
**draw [2]** 55/19 55/22
**drawn [1]** 56/8
**DreamHost [1]** 40/15
**drive [5]** 1/15 31/4 35/16 44/8 72/10
**driver [2]** 72/10 72/12
**drove [2]** 72/6 72/10
**drug [5]** 58/11 58/17 58/21 58/25
  59/14
**duly [1]** 68/2
**during [7]** 7/25 14/13 44/17 71/23
  75/24 77/4 85/25

# E

**E-Mail [2]** 1/24 91/19
**each [4]** 15/20 52/16 63/2 76/18
**earlier [7]** 6/21 32/24 37/9 39/18 45/3
  55/12 69/2
**early [3]** 45/24 69/15 69/16
**easier [1]** 28/7
**easiest [1]** 22/18
**East [1]** 71/18
**eat [1]** 82/15
**eccentric [2]** 53/6 53/8
**echos [1]** 79/9
**economic [1]** 18/22
**Edgar [1]** 73/9
**educate [1]** 69/12
**effects [1]** 26/1
**effort [3]** 4/9 21/9 75/20

**efforts [1]** 20/21
**eight [3]** 42/1 42/7 85/13
**either [7]** 28/24 36/5 38/9 44/10 69/13
  75/5 75/23
**elderly [2]** 12/20 35/1
**elected [1]** 43/2
**eligible [2]** 60/13 60/14
**else [5]** 38/8 47/15 63/22 70/25 80/14
**email [2]** 38/15 38/18
**emergency [1]** 55/24
**emotional [1]** 89/7
**employable [1]** 15/9
**employee [1]** 66/7
**encounter [1]** 73/25
**encourage [5]** 5/5 75/12 85/2 85/5
  86/11
**encouraged [2]** 5/6 81/22
**encouraging [1]** 23/25
**end [2]** 55/9 75/13
**enforcement [2]** 19/4 59/17
**engage [1]** 69/19
**engaged [2]** 68/21 69/5
**enough [3]** 50/21 85/24 86/23
**entire [2]** 74/6 77/9
**entitled [1]** 91/5
**entity [1]** 36/21
**equally [1]** 76/12
**escapes [1]** 80/22
**established [1]** 23/19
**et [2]** 1/4 64/16
**evaluated [1]** 75/3
**evasion [1]** 8/12
**evasive [1]** 7/9
**even [17]** 5/18 23/3 27/15 27/16 29/8
  60/4 61/11 79/21 81/8 82/6 82/14
  84/16 84/25 85/14 87/2 87/7 87/18
**ever [24]** 19/1 36/9 36/14 36/19 36/21
  41/9 41/13 51/24 52/11 58/3 58/10
  58/16 58/20 58/21 58/24 59/9 60/22
  60/25 64/15 64/20 71/20 74/24 84/15
  89/4
**every [11]** 26/17 29/17 33/9 33/10
  40/3 47/9 73/25 74/4 74/8 88/12 89/1
**everyone [1]** 5/15
**everything [5]** 28/6 32/17 39/11 48/2
  53/11
**evidence [1]** 90/1
**ex [26]** 22/2 26/25 27/5 27/6 28/4 29/6
  29/15 29/15 33/7 33/23 34/17 34/23
  38/10 38/23 39/2 39/6 40/16 53/1
  54/23 62/6 63/1 66/5 79/16 79/21 81/3
  86/13
**ex-girlfriend [1]** 62/6
**ex-husband [1]** 34/23
**ex-marine [1]** 66/5
**ex-wife [20]** 22/2 26/25 27/5 27/6 28/4
  29/6 29/15 29/15 33/7 33/23 34/17
  38/23 39/2 39/6 53/1 54/23 63/1 79/16
  79/21 86/13
**ex-wife's [2]** 38/10 81/3
**exactly [4]** 12/16 12/17 45/14 65/25
**EXAMINATION [1]** 68/3
**exchange [6]** 44/11 45/1 45/2 58/22
  58/25 69/14
**exchanged [2]** 18/14 57/20
**exchanges [1]** 44/25
**excuse [1]** 55/19

**executive [1]** 42/18
**exhausted [1]** 50/22
**exists [1]** 7/16
**expecting [1]** 82/7
**expense [1]** 16/18
**expenses [1]** 55/21
**experience [4]** 8/7 56/24 57/7 88/12
**experienced [1]** 19/14
**experiences [1]** 19/12
**Expires [1]** 91/16
**explained [1]** 12/12
**explore [1]** 75/8
**Express [1]** 79/22
**extent [1]** 22/2
**extraordinarily [1]** 80/10
**extreme [1]** 82/9
**extremely [3]** 27/12 45/8 74/3
**eye [2]** 10/11 90/2

# F

**F-type [3]** 30/21 31/3 31/6
**fact [1]** 24/10
**faculties [1]** 80/8
**fair [1]** 68/21
**fairly [1]** 78/13
**familiar [1]** 7/7
**family [7]** 15/10 48/15 74/15 76/11
  81/22 82/1 82/13
**fan [1]** 72/25
**far [10]** 7/1 25/8 25/13 43/19 48/13
  54/20 55/16 58/9 62/7 76/6
**Farino [1]** 33/24
**FARRELL [9]** 1/18 4/21 6/13 8/2 8/5
  22/23 23/15 32/18 51/16
**father [24]** 25/9 25/21 27/3 30/17
  30/24 32/15 34/16 34/25 35/1 35/7
  35/12 35/12 35/13 46/20 46/21 51/23
  66/3 75/17 75/18 76/11 79/24 80/2
  80/12 85/24
**father's [3]** 12/8 35/3 49/25
**favors [1]** 89/11
**FBI [13]** 17/22 18/5 18/23 18/24 19/10
  23/3 57/9 59/11 59/15 61/6 61/7 61/16
  73/5
**FDIC [1]** 18/22
**February [5]** 70/6 70/8 70/21 74/6
  78/8
**Federal [7]** 18/20 18/25 56/22 58/11
  58/17 59/17 60/3
**feel [5]** 7/6 37/2 37/4 76/17 89/10
**fees [1]** 91/6
**felt [1]** 7/9
**few [6]** 11/7 13/2 27/3 35/14 52/2 71/2
**fewer [1]** 61/7
**Fidelity [1]** 38/2
**field [1]** 18/4
**Fieldthorn [1]** 1/15
**Fifth [3]** 17/9 37/22 73/22
**figure [1]** 34/14
**file [4]** 10/8 73/6 73/7 84/9
**filed [4]** 5/15 6/25 37/21 60/18
**filings [1]** 14/1
**finally [3]** 51/21 74/11 87/17
**finances [3]** 25/25 62/15 79/20
**financial [4]** 28/5 36/6 86/22 87/6
**find [8]** 5/23 11/24 38/21 51/22 55/9
  65/11 70/17 84/18

**F**

fine [1] 4/19
firm [1] 79/10
first [15] 6/20 24/2 28/20 32/24 32/25 34/13 36/5 41/20 42/3 61/6 68/2 69/4 69/5 80/7 81/21
fit [2] 52/20 65/5
five [4] 52/16 74/13 74/18 76/22
five-minute [1] 74/13
flat [1] 62/8
flew [1] 72/11
flight [2] 47/4 47/7
flights [3] 48/2 48/8 71/19
flown [1] 72/9
fluctuates [1] 40/24
flying [1] 60/19
folks [3] 20/14 20/16 53/21
follow [9] 7/3 17/2 22/25 23/17 32/21 32/22 37/7 78/17 88/9
follow-up [7] 7/3 17/2 22/25 23/17 32/21 32/22 37/7
following [1] 78/2
follows [1] 68/2
food [6] 11/6 27/22 48/22 50/13 60/16 82/16
foregoing [2] 91/4 91/5
forever [2] 17/8 84/9
forgive [3] 18/24 44/6 61/8
forgiving [2] 18/18 19/5
form [3] 18/12 18/15 44/7
format [1] 91/6
formerly [1] 20/7
forming [1] 21/3
FORT [9] 1/3 1/5 1/23 13/17 24/23 71/8 74/3 91/14 91/17
forthcoming [1] 86/7
fortune [2] 12/22 13/8
forward [3] 8/9 16/10 16/19
found [2] 28/6 53/5
Foundation [6] 28/20 32/24 32/25 36/6 41/21 42/3
founder [1] 40/14
four [2] 19/24 51/8
frame [3] 44/20 44/24 45/22
frank [2] 23/2 61/21
frankly [4] 11/11 13/2 67/15 75/7
free [4] 6/9 11/12 11/20 21/10
Fresno [1] 42/19
Friday [1] 84/6
friend [6] 12/6 13/22 27/6 29/15 54/8 54/13
friends [3] 48/6 48/14 82/14
front [1] 86/19
frustrated [1] 32/19
frustrating [1] 86/16
full [2] 78/24 81/9
fully [2] 11/8 17/5
functioning [1] 47/9
fund [1] 56/4
funded [1] 56/3
funds [2] 70/14 70/16
funeral [3] 54/12 54/15 63/20
further [8] 42/5 55/5 76/5 76/8 78/15 78/17 86/20 91/6
future [1] 56/17
FYI [1] 60/5

**G**

gallery [1] 4/17
Gator [5] 27/6 53/20 53/23 54/2 54/24
gave [12] 40/16 42/17 54/23 54/23 54/24 54/25 54/25 81/2 81/3 82/4 88/5 88/6
Gemini [8] 41/13 69/10 69/11 69/14 70/2 70/15 70/20 72/21
General [1] 53/8
generally [2] 7/6 8/6
generationally [1] 57/11
genomics [1] 21/3
gentleman [3] 40/13 45/8 66/4
gentlemen [2] 4/23 34/6
get [41] 4/9 5/24 11/9 22/4 24/17 34/13 43/23 46/17 46/22 46/23 46/24 46/25 51/19 51/21 54/8 56/18 61/11 67/9 73/16 74/25 75/3 75/20 76/17 77/13 77/19 77/22 77/23 78/1 82/10 82/11 82/16 82/20 85/3 85/6 85/16 85/23 86/4 86/12 87/17 88/23 90/9
gets [1] 38/9
getting [7] 23/22 62/21 71/7 73/25 77/3 77/6 77/11
gift [1] 44/14
gifts [1] 42/17
girlfriend [9] 28/5 33/23 46/21 46/21 47/1 51/23 62/6 66/4 79/17
give [26] 5/8 6/9 6/14 9/6 16/7 16/11 17/3 23/8 27/1 28/7 29/16 32/13 33/21 40/18 43/21 48/17 51/20 59/9 64/20 66/20 74/11 78/11 78/24 79/1 79/2 82/15
given [16] 12/4 12/7 17/4 20/16 20/22 20/23 31/24 50/4 50/6 61/24 62/2 74/23 76/21 83/5 84/25 87/24
giving [2] 34/19 77/2
go [32] 9/1 9/10 12/13 15/17 16/19 19/9 19/21 22/21 23/15 24/16 24/20 26/4 28/7 31/21 35/21 36/3 37/3 38/5 38/11 39/14 46/22 49/5 51/6 60/15 61/14 65/16 67/24 73/16 78/5 86/4 87/14 89/20
God [1] 35/6
goes [2] 28/8 55/20
going [34] 5/8 11/7 11/10 11/15 12/23 16/4 16/7 19/18 20/15 23/8 28/10 34/14 43/23 51/10 51/17 51/19 55/25 56/18 60/10 60/19 65/6 66/20 67/9 72/19 73/16 73/19 74/13 77/22 78/1 79/25 80/9 80/9 87/14 88/23
gold [3] 29/3 61/25 75/13
gone [1] 38/5
good [10] 4/16 4/21 11/9 12/13 13/11 54/8 68/5 68/6 75/9 82/17
good-ole-boy [1] 11/9
google [1] 58/6
goose [1] 63/5
got [17] 11/24 14/7 26/12 30/21 35/7 38/24 40/3 40/6 64/6 70/18 73/10 74/4 75/21 77/2 80/13 80/16 80/17
gotten [4] 21/17 54/18 77/4 86/1
government [40] 7/10 7/15 8/12 9/2 14/20 15/5 15/8 15/8 15/19 16/18 20/23 21/2 48/3 48/7 48/8 50/7 55/14 55/18 55/19 55/23 56/3 56/9 56/9 56/12 56/23 56/25 57/10 57/15 57/19

**H** 69/4 69/23 61/4 62/3 65/19 66/23 66/24 67/4 74/2 88/2 88/12
Government-controlled [1] 67/4
graduating [1] 44/14
grand [3] 40/20 40/20 42/22
grandfather [1] 57/12
grandmother [1] 57/12
grandmother's [1] 57/19
grateful [1] 77/2
great [1] 48/19
Greenwell [3] 27/7 54/2 54/25
guarantee [1] 29/14
guardianship [1] 84/16
guards [1] 10/7
guess [2] 28/10 30/6
gun [2] 32/16 35/2
guy [5] 40/10 40/15 42/17 45/9 81/2
GUZMAN [4] 1/22 91/3 91/11 91/11

**H**

had [79] 4/10 5/10 6/20 7/11 7/21 9/15 10/21 10/25 11/6 11/11 12/25 13/1 14/19 15/21 15/21 15/22 17/18 17/21 18/24 21/3 23/22 25/4 25/17 25/22 26/3 27/18 27/19 32/17 34/16 35/4 35/14 35/14 36/14 36/19 40/3 40/7 41/9 41/13 41/25 42/6 43/14 44/9 44/10 44/11 45/8 46/3 48/24 53/3 54/7 54/18 55/23 56/6 58/9 58/9 61/17 61/17 61/22 61/23 62/14 63/2 64/15 65/11 70/2 71/8 72/8 77/1 77/5 79/23 79/24 80/2 81/10 81/10 81/13 81/16 83/13 83/18 83/19 85/14 87/25
Hal [3] 67/16 67/18 67/25
half [1] 53/16
Hamlet [1] 20/7
hand [2] 16/2 67/22
handle [2] 53/15 60/9
handled [1] 87/23
handler [13] 7/10 7/15 8/12 11/15 14/19 15/8 17/16 20/23 23/9 48/3 59/15 65/19 73/8
handlers [3] 9/2 23/3 88/2
handles [2] 12/6 79/21
hands [1] 22/6
happen [4] 19/13 19/15 23/19 42/25
happened [6] 7/1 11/17 43/1 57/12 70/6 85/13
happens [2] 10/2 79/11
happy [13] 6/6 11/3 11/4 24/10 24/11 27/1 27/2 27/8 65/2 73/11 81/7 85/17 86/21
hard [1] 44/8
Harvey [1] 40/14
has [38] 7/16 12/20 13/8 15/20 27/21 30/15 32/6 33/21 34/10 34/18 35/24 36/16 36/21 39/11 39/13 39/21 48/14 48/20 49/15 51/23 60/15 62/8 66/2 66/3 66/4 66/22 68/14 69/9 71/5 71/6 74/10 78/3 79/11 80/23 84/8 84/14 86/14 88/11
hasn't [1] 7/21
hate [2] 75/18 75/18
have [270]
haven't [11] 10/18 13/23 13/23 13/24 14/10 14/19 23/22 28/21 46/6 51/13 56/8

**having [4]** 7/19 13/20 45/11 68/2
**he [87]** 7/4 7/21 8/25 19/17 19/17 20/5 20/6 25/9 30/17 32/11 34/18 35/1 35/4 35/4 35/10 35/14 35/14 35/15 35/17 35/18 35/19 40/2 40/13 40/14 41/20 42/2 45/11 51/21 53/9 54/3 54/7 54/12 54/13 54/16 55/21 59/16 59/18 62/19 64/20 66/7 66/8 66/11 66/13 66/22 68/19 69/5 69/6 69/9 69/11 69/11 70/2 70/2 70/3 70/22 71/5 71/6 71/14 71/17 71/19 71/21 71/22 72/3 72/5 72/6 72/8 72/9 72/10 72/10 72/24 73/5 74/10 74/10 76/25 77/1 77/7 77/16 78/23 79/10 79/11 79/12 79/15 79/19 80/1 80/16 80/23 88/11 88/15
**He'll [1]** 79/4
**he's [30]** 4/11 7/19 8/18 13/9 20/9 58/7 65/15 65/16 66/1 66/4 66/4 66/5 66/12 66/14 67/1 67/7 68/10 68/11 71/18 72/2 76/7 79/20 79/25 80/8 80/16 80/17 83/19 86/17 87/18 87/20
**head [5]** 9/14 11/7 12/8 32/17 35/3
**Heads [1]** 36/2
**health [8]** 52/8 52/10 63/8 63/12 75/3 81/25 84/13 88/24
**hear [3]** 69/4 74/21 75/21
**heard [6]** 19/1 55/12 69/1 74/24 75/6 89/24
**hearing [5]** 13/19 24/25 52/19 77/7 77/7
**heart's [1]** 73/7
**heartbreaking [2]** 76/11 76/12
**held [11]** 4/7 5/7 12/11 14/9 23/12 32/3 32/5 34/18 35/7 37/25 80/21
**help [13]** 8/21 22/9 35/23 39/8 39/12 43/14 43/15 51/20 52/7 54/8 74/14 81/22 86/15
**helped [3]** 40/17 83/18 83/18
**helpful [2]** 7/7 81/23
**helping [1]** 17/14
**helps [1]** 75/8
**her [10]** 27/1 29/16 39/4 39/10 40/18 56/7 81/4 81/4 86/14 86/14
**here [33]** 4/7 9/13 13/17 13/21 15/9 21/9 24/23 30/21 34/13 35/16 47/9 47/12 48/9 48/14 48/25 49/7 53/22 54/3 65/6 67/20 69/1 71/8 71/19 72/18 73/25 74/3 75/10 77/1 82/7 84/5 86/14 88/8 88/22
**here's [1]** 55/18
**Hey [2]** 38/5 42/9
**hiding [1]** 12/22
**high [3]** 49/22 68/17 89/7
**high-pattern [1]** 89/7
**highly [2]** 66/6 85/5
**him [56]** 4/10 6/23 7/20 19/19 19/24 22/24 35/3 35/6 35/15 38/24 44/2 45/12 54/9 54/11 54/16 58/9 64/17 66/2 66/3 66/3 66/4 66/5 66/5 66/6 67/5 67/6 68/9 70/3 70/16 70/17 71/8 71/21 72/3 72/8 72/10 72/13 72/14 73/21 74/7 74/8 75/3 75/20 75/25 76/1 76/23 77/2 77/5 77/9 77/15 77/19 79/11 80/22 88/7 88/7 88/10 88/17
**himself [8]** 4/9 4/9 51/22 74/14 75/21 79/13 86/17 87/19

**hire [4]** 5/25 19/3 72/9 72/12
**his [49]** 6/23 7/10 7/15 7/19 7/20 7/20 8/22 8/24 8/25 12/7 12/7 20/2 20/3 20/3 35/3 37/19 48/2 48/2 51/21 53/9 54/10 54/16 62/13 62/13 67/6 69/1 69/9 71/14 71/19 72/7 75/2 76/21 79/20 79/21 79/22 79/24 80/1 80/1 80/2 80/8 80/8 80/8 80/9 80/12 80/20 85/25 86/12 86/13 86/13
**historically [1]** 27/14
**history [1]** 45/5
**hit [1]** 70/12
**hold [7]** 17/5 17/9 39/19 51/2 51/24 59/24 73/23
**holding [4]** 8/18 17/7 73/21 74/7
**holds [1]** 79/12
**holiday [1]** 81/8
**holidays [4]** 74/16 75/19 76/10 85/25
**hollow [1]** 8/23
**holy [1]** 61/8
**home [7]** 9/8 30/2 34/23 47/4 47/7 49/25 86/4
**Homeland [4]** 59/20 65/24 66/1 67/5
**homeless [2]** 50/16 50/18
**honest [4]** 21/23 74/23 81/17 81/18
**Honey [1]** 39/7
**honor [118]**
**Honor's [2]** 13/9 85/11
**HONORABLE [1]** 1/9
**Hoover [1]** 73/9
**hope [2]** 6/5 16/5
**hopefully [1]** 51/21
**hoping [2]** 74/14 74/16
**hotel [7]** 13/21 24/25 25/3 25/6 46/23 46/24 47/2
**hotels [1]** 48/2
**hours [8]** 6/22 7/3 19/20 19/24 65/9 81/6 82/8 84/3
**house [4]** 49/25 56/1 57/16 57/18
**Houston [1]** 71/23
**how [35]** 7/4 13/3 17/21 21/14 22/20 24/10 24/17 28/23 33/11 34/6 35/3 37/25 40/5 40/18 40/21 40/22 41/4 42/20 44/17 46/17 47/8 48/22 48/22 55/20 56/18 62/9 66/16 67/18 68/17 69/24 71/24 75/3 83/4 87/7 87/17
**However [1]** 27/13
**human [2]** 18/8 61/16
**hundred [1]** 42/21
**husband [1]** 34/23
**hypothetical [1]** 13/23
**hypothetically [1]** 56/6

**I**

**I'd [13]** 9/6 9/9 15/10 28/10 34/5 38/5 39/16 67/15 71/2 74/11 77/17 78/4 81/15
**I'll [12]** 9/2 9/3 23/2 38/5 59/10 74/5 74/23 80/11 82/21 89/20 89/23 90/8
**I'm [86]** 4/22 5/22 6/5 6/8 10/16 10/17 11/3 11/4 11/5 11/7 12/19 12/21 13/2 15/10 19/8 20/10 21/18 22/8 23/8 23/14 23/22 23/24 23/25 24/10 24/11 24/20 26/1 27/1 27/8 27/10 27/12 29/19 29/24 30/9 30/16 31/7 31/9 32/18 32/19 34/14 35/11 35/22 35/22 32/18 38/16 38/22 44/6 45/7 46/16

**ETNA [150]** 33/5 51/5 51/14 52/7 52/9 53/17 54/22 62/17 65/2 69/12 71/11 73/11 73/16 74/13 74/17 77/2 78/4 79/25 81/7 81/23 81/23 81/24 84/12 85/10 85/15 85/17 85/23 86/9 86/21 87/11 87/13 88/7 89/11 89/14 90/8 90/9
**I've [60]** 6/1 11/6 11/18 12/4 12/7 15/14 15/21 15/22 17/18 18/23 21/17 25/8 26/12 27/18 27/19 28/25 29/17 35/7 41/25 43/7 44/9 46/14 48/19 48/24 48/24 48/25 50/24 52/14 52/14 52/15 53/11 53/12 56/6 56/8 58/9 64/6 65/9 72/7 72/20 73/22 74/3 74/24 75/6 76/6 80/13 81/6 81/6 81/21 81/21 81/22 82/7 82/9 82/13 82/13 82/14 83/18 83/18 85/12 87/24 89/1
**idea [3]** 13/11 19/10 25/1
**identified [6]** 28/11 51/21 53/12 68/15 83/1 87/19
**identify [8]** 4/15 27/16 28/2 33/10 68/9 71/6 80/16 82/25
**ignorance [1]** 70/20
**illegal [2]** 57/22 58/25
**impressed [1]** 80/7
**inability [1]** 7/10
**incident [1]** 9/25
**include [1]** 69/16
**included [1]** 22/17
**including [1]** 79/21
**inconsistencies [2]** 7/17 7/23
**indefinitely [2]** 51/25 73/21
**independent [1]** 15/4
**INDEX [2]** 2/1 3/1
**indication [1]** 76/2
**individual [1]** 35/23
**individuals [2]** 53/12 59/11
**informant [1]** 73/5
**information [24]** 7/14 7/15 8/8 11/16 18/11 20/25 25/25 51/15 54/24 54/25 57/4 74/25 76/13 76/15 76/21 77/1 77/11 77/13 77/20 78/18 79/1 80/11 80/20 81/4
**initial [1]** 6/24
**institution [1]** 36/6
**instruct [1]** 82/21
**instructed [4]** 25/8 82/13 82/14 82/14
**instructions [1]** 78/15
**instruments [1]** 86/23
**insulting [1]** 89/12
**insurance [5]** 63/6 63/9 63/10 63/13 63/17
**intelligence [9]** 14/18 14/21 15/17 45/10 56/25 57/3 57/13 88/12 89/7
**intend [3]** 5/3 56/21 56/21
**intense [1]** 60/16
**intention [1]** 11/19
**interacted [2]** 58/3 58/16
**interacting [1]** 72/3
**interactions [2]** 68/24 71/8
**interest [13]** 11/19 21/4 21/10 21/25 22/1 22/4 23/23 24/9 27/19 27/22 28/1 56/2 87/6
**interested [3]** 45/11 61/19 65/13
**interesting [4]** 21/12 21/13 22/1 50/12
**interests [1]** 27/19
**Internal [1]** 19/11

## I

**Internet [2]** 12/23 44/9
**interrupt [1]** 51/16
**interrupts [2]** 18/1 54/1
**intervened [1]** 59/17
**interview [1]** 75/25
**interviews [2]** 12/24 61/6
**introduced [1]** 20/6
**invested [1]** 49/10
**investigated [1]** 18/22
**investigations [2]** 19/18 61/7
**investigator [1]** 20/10
**involve [1]** 56/22
**involved [9]** 21/7 22/3 45/6 45/7 45/9
57/22 58/8 59/14 61/19
**IP [1]** 49/15
**iPhone [7]** 64/4 64/5 64/5 64/6 64/7
64/9 64/14
**is [170]**
**isn't [1]** 69/13
**issue [5]** 10/14 10/14 37/21 45/4
84/23
**issues [1]** 75/2
**it [200]**
**it's [56]** 6/7 6/9 10/5 12/16 20/22
21/11 22/1 23/12 23/24 23/24 25/15
25/19 25/21 25/24 28/7 29/21 30/15
30/20 30/21 31/3 31/6 31/8 32/7 32/17
37/25 38/3 38/16 41/25 41/25 43/12
43/20 50/4 50/4 59/5 59/13 67/10
67/11 70/5 72/21 73/24 73/24 76/10
76/12 78/1 79/6 79/18 79/19 80/12
81/14 81/14 82/16 82/18 83/10 83/13
86/12 89/6
**its [1]** 15/20
**itself [4]** 5/9 24/19 33/8 38/25

## J

**Jaguar [2]** 31/3 31/6
**jail [18]** 4/8 6/22 12/12 14/25 16/8
25/23 30/7 34/18 35/7 43/24 65/10
68/11 81/24 82/10 83/21 84/24 87/15
90/4
**Jason [1]** 58/1
**Jeff [1]** 55/6
**JEFFREY [2]** 1/17 4/22
**jewelry [1]** 31/15
**job [1]** 56/22
**John [1]** 45/10
**JOHNSON [70]** 1/7 1/15 4/4 4/7 4/8
4/24 4/25 5/1 6/16 6/20 6/22 6/23 7/2
7/6 7/9 7/13 8/14 9/7 12/12 14/25 16/8
23/23 25/22 30/7 34/18 38/20 39/9
55/12 55/22 57/14 58/10 58/14 60/22
63/24 64/15 65/9 65/15 66/25 67/14
67/17 68/11 68/15 68/18 68/22 68/24
69/4 69/20 70/2 70/14 70/20 71/4 71/4
73/19 74/7 74/14 74/24 76/13 76/22
77/5 78/1 78/18 79/10 79/25 80/12
80/13 81/7 81/24 82/9 83/21 87/15
**Johnson's [1]** 48/1
**joined [1]** 4/22
**Joint [1]** 61/22
**jokes [4]** 13/6 13/8 13/12 13/13
**Jonathan [4]** 17/22 19/17 59/16 73/4
**Jones [5]** 40/11 40/12 41/17 41/18
42/12

## J (cont.)

**Josh [3]** 40/11 40/12 41/17 41/18
42/12
**JUDGE [10]** 1/9 4/21 19/8 23/16 24/21
55/5 69/13 75/6 78/4 88/17
**judgment [14]** 13/12 13/14 15/12
15/15 22/12 22/14 23/20 49/4 49/4
60/13 71/4 73/10 84/9 84/10
**Judicial [1]** 91/7
**Julian [3]** 19/19 19/21 61/17
**just [68]** 5/10 5/25 6/8 8/5 8/7 8/8 8/13
8/13 8/19 8/19 8/22 8/23 8/25 9/1 9/19
11/4 11/11 11/14 11/23 13/5 14/8 16/9
20/12 22/18 22/24 23/17 26/5 27/9
28/1 28/7 30/15 32/19 32/22 33/17
35/22 37/6 42/9 46/16 47/23 50/25
51/18 54/6 54/22 55/10 57/7 59/10
60/4 60/5 60/21 63/23 67/15 70/5
70/10 71/5 72/13 72/14 73/4 73/18
74/10 75/17 77/3 82/6 83/12 83/22
86/4 87/8 88/22 89/10
**Justice [2]** 14/10 18/21

## K

**keep [6]** 17/16 51/17 67/15 71/6 74/20
88/21
**keeps [1]** 73/19
**Ketrin [3]** 17/25 18/2 59/19
**keys [2]** 79/13 82/22
**kicked [3]** 9/14 11/6 81/6
**killed [1]** 13/3
**Kimpton [3]** 24/25 25/3 25/6
**kind [11]** 8/8 8/22 9/1 20/9 38/15 42/9
47/21 58/8 59/24 60/10 78/14
**knew [3]** 12/8 12/9 59/15
**know [107]**
**knowing [1]** 34/17
**known [3]** 18/23 21/8 38/16
**knows [3]** 25/9 28/4 28/5

## L

**LA [1]** 71/22
**Lambert [14]** 4/17 21/10 64/16 65/13
67/16 67/18 67/19 68/1 68/5 71/1 71/2
72/23 73/13 83/18
**lapsed [2]** 63/11 63/15
**laptop [6]** 44/10 44/12 44/13 44/16
44/18 44/20
**last [15]** 13/2 25/3 27/3 29/18 31/12
39/24 45/17 51/23 52/3 54/12 58/7
75/22 76/25 82/5 85/24
**late [1]** 68/19
**later [3]** 40/16 59/20 61/17
**law [5]** 16/14 19/4 40/16 59/17 84/24
**Lawrence [1]** 79/25
**lawsuit [5]** 46/1 48/12 54/17 54/17
71/3
**lawyer [2]** 11/9 16/17
**learn [1]** 8/11
**leased [1]** 72/6
**least [1]** 16/25 20/13 38/16 77/10 78/8
**leave [4]** 15/9 37/10 37/13 37/17
**left [3]** 24/24 30/22 86/9
**legal [4]** 37/12 57/22 57/23 58/25
**legitimate [1]** 86/19
**Leidermann [3]** 43/3 43/6 58/4
**lending [1]** 48/20
**length [1]** 48/2

## less (cont.)

**less [1]** d7/09
**let [9]** 4/14 11/16 14/3 14/8 16/11
18/20 37/23 72/17 88/19
**let's [5]** 22/19 26/14 31/21 55/8 78/19
**letter [4]** 42/6 60/25 61/3 61/12
**level [1]** 68/17
**lie [3]** 36/24 37/23 46/15
**life [3]** 33/21 33/22 63/16
**lifestyle [1]** 53/6
**light [1]** 82/10
**like [82]** 4/19 6/13 9/6 9/7 9/9 11/9
12/22 13/16 14/8 15/9 15/10 16/7
18/18 20/14 22/3 22/25 23/8 24/11
25/19 27/3 27/9 28/10 29/16 30/15
32/21 37/2 37/4 37/24 38/1 38/1 38/5
38/15 39/16 40/19 40/21 41/10 41/14
42/9 46/16 49/10 49/21 50/20 51/5
51/5 51/17 54/3 55/24 55/25 56/3 63/4
66/5 66/19 67/15 71/2 71/5 72/12
72/12 72/18 73/17 74/9 74/11 74/21
75/7 75/17 76/10 76/17 77/17 78/14
78/16 80/20 80/21 82/15 82/24 83/9
84/18 87/6 87/6 87/16 88/3 89/10 90/4
90/6
**limited [3]** 12/20 15/7 69/24
**line [2]** 18/24 59/21
**liquidate [2]** 24/2 24/3
**liquidated [1]** 41/17
**list [10]** 12/4 15/15 26/5 26/5 26/6
26/17 33/14 54/23 83/1 83/3
**listed [3]** 30/22 30/23 33/16
**listen [2]** 14/6 15/25
**literary [1]** 25/20
**litigant [1]** 84/25
**little [1]** 8/7
**live [2]** 30/6 35/18
**lived [1]** 49/1
**lives [2]** 35/17 35/19
**living [3]** 55/21 71/23 83/20
**LLC [3]** 1/4 4/4 21/6
**LLP [1]** 1/12
**loan [1]** 26/12
**lock [1]** 63/23
**locked [1]** 79/19
**locker [1]** 30/15
**logo [1]** 41/7
**long [3]** 60/4 71/24 75/24
**longer [6]** 5/14 31/4 42/7 51/2 73/24
74/20
**look [5]** 34/14 65/2 75/5 82/21 89/22
**looked [10]** 13/16 43/7 62/13 62/19
70/5 70/11 73/22 78/10 82/6 89/25
**looking [2]** 38/21 75/1
**looks [1]** 78/14
**loose [1]** 76/15
**Los [2]** 18/4 59/12
**loss [2]** 35/22 40/17
**lot [15]** 5/9 7/7 11/9 12/6 14/6 14/7
26/3 26/4 29/16 35/2 49/4 61/9 73/24
79/24 87/22
**love [1]** 83/16
**loved [3]** 34/17 79/19 86/12
**low [1]** 89/7
**lucid [1]** 80/2
**lunch [2]** 25/5 42/17

**magnitude [1]** 59/18
**Mail [2]** 1/24 91/19
**main [4]** 10/8 12/5 18/21 61/15
**mainly [1]** 69/15
**maintain [3]** 33/1 36/7 37/15
**maintained [2]** 36/9 39/24
**major [2]** 56/6 61/6
**majority [1]** 26/20
**make [10]** 4/6 5/10 13/12 28/7 31/1 33/21 44/14 46/17 76/25 88/3
**makes [2]** 5/7 75/7
**making [1]** 82/19
**man [6]** 20/6 35/1 58/4 65/18 66/5 80/3
**manner [1]** 88/6
**many [17]** 10/16 10/25 17/21 40/21 40/22 48/23 52/4 53/5 56/6 65/9 67/5 71/24 82/8 83/4 83/7 89/1 89/1
**March [1]** 74/4
**marijuana [2]** 57/22 61/18
**marine [1]** 66/5
**MARK [1]** 1/9
**married [1]** 39/7
**Marshal [5]** 9/24 34/2 82/21 89/25 90/9
**Marshals [1]** 67/2
**Massachusetts [2]** 35/20 57/18
**massive [2]** 12/22 13/7
**master [1]** 79/6
**material [1]** 80/21
**materially [1]** 8/9
**math [1]** 40/15
**matter [6]** 4/3 6/5 23/13 56/21 81/14 91/5
**matters [1]** 80/21
**Max [2]** 43/6 58/4
**may [16]** 10/17 11/18 18/18 18/18 20/15 25/2 39/3 55/6 56/17 59/13 63/11 70/19 74/10 76/15 80/12 80/25
**maybe [15]** 5/18 33/3 42/3 43/14 47/23 51/19 58/1 65/11 74/22 78/13 83/20 84/12 86/13 88/22 88/23
**me [96]**
**meals [3]** 47/11 47/13 71/14
**mean [26]** 17/3 18/15 23/13 26/8 32/18 43/20 43/21 44/4 49/20 50/6 51/16 55/1 56/24 56/25 60/8 64/19 66/20 76/20 76/25 77/18 79/6 79/18 80/2 80/15 83/10 84/13
**meaningful [2]** 8/10 21/7
**means [1]** 37/17
**mechanical [1]** 1/25
**mechanism [1]** 42/16
**Medicaid [1]** 50/10
**medical [4]** 35/14 55/21 55/25 56/7
**meds [2]** 52/14 52/15
**meet [4]** 6/20 49/22 49/23 50/21
**meeting [7]** 4/11 32/25 43/4 58/5 66/5 75/24 77/4
**meetings [1]** 8/1
**memory [1]** 85/13
**mental [6]** 52/8 52/10 75/3 84/12 84/13 88/24
**mentally [2]** 52/20 65/5
**mention [2]** 10/12 71/19
**mentioned [6]** 21/8 23/18 25/21 32/24

32/25 33/1
**messenger [1]** 24/24
**met [13]** 7/2 8/23 9/12 19/17 19/19 40/13 40/15 41/11 66/2 66/3 66/3 66/4 71/21
**mguzman.csr [2]** 1/24 91/19
**middle [2]** 5/20 5/22
**Middleton [2]** 35/19 57/18
**might [13]** 15/1 22/18 28/20 29/7 29/12 41/23 42/21 45/1 46/3 54/9 63/4 75/12 88/23
**million [11]** 13/12 13/14 15/12 21/20 21/21 48/24 48/25 49/3 49/7 49/9 73/10
**mind [2]** 41/24 78/20
**mine [5]** 12/6 13/22 29/16 34/10 48/6
**minimal [3]** 11/6 11/6 41/25
**mining [7]** 44/25 45/1 45/4 45/5 45/11 65/13 72/22
**minute [3]** 63/2 74/13 80/15
**minutes [4]** 74/18 76/22 76/25 88/8
**Miranda [2]** 16/5 31/24
**mistaken [2]** 42/8 44/15
**Mobile [2]** 64/10 64/11
**model [3]** 31/1 31/5 31/7
**mom [1]** 5/18
**mom's [1]** 49/24
**moment [2]** 29/19 72/17
**monetary [1]** 47/21
**money [30]** 11/20 11/21 18/14 20/25 22/4 27/19 27/22 27/22 27/25 28/7 28/10 28/25 28/25 29/6 33/21 35/3 38/9 38/9 41/20 42/3 42/3 48/20 49/2 49/6 61/24 64/12 64/20 75/10 82/15 83/18
**MONICA [4]** 1/22 91/3 91/11 91/11
**month [11]** 17/11 30/13 30/16 33/11 33/12 35/15 64/13 74/6 75/22 78/7 78/8
**months [2]** 17/10 73/24
**more [17]** 5/7 7/15 8/7 8/17 28/9 38/9 50/21 52/2 53/12 55/1 69/25 73/4 79/11 79/12 81/7 83/18 83/20
**morning [11]** 6/14 6/19 7/1 7/24 8/1 35/25 75/24 77/9 77/9 79/10 83/3
**most [7]** 15/16 34/25 44/24 48/14 48/16 50/3 72/8
**mostly [4]** 25/19 28/21 41/5 72/4
**mother [2]** 33/22 40/16
**motion [1]** 5/15
**motions [1]** 14/19
**motivates [1]** 11/22
**move [3]** 4/19 8/9 16/9
**moved [4]** 21/9 71/22 71/25 72/2
**Mr [98]**
**much [18]** 8/5 15/18 21/14 23/22 28/7 28/9 29/15 34/6 34/10 35/3 35/12 37/25 40/18 42/20 69/24 81/22 86/2 89/15
**Mudd [1]** 40/14
**multiple [2]** 71/25 81/11
**must [1]** 61/10
**my [154]**
**myself [6]** 6/21 12/19 21/4 21/24 35/8 81/25

**nada [1]** 45/16
**name [14]** 4/24 12/7 17/19 20/2 20/3 20/3 22/11 40/10 45/9 46/24 81/2 81/4 82/4 90/3
**named [6]** 20/7 42/18 54/13 58/4 65/18 73/5
**names [2]** 9/2 87/24
**national [2]** 14/13 28/12
**Navy [2]** 57/13 57/13
**NCRA [1]** 91/12
**Nebraska [1]** 58/18
**necessarily [1]** 18/13
**necessary [2]** 11/4 77/23
**need [23]** 6/16 12/2 13/4 15/24 17/2 17/3 17/13 17/15 20/12 23/5 23/7 24/16 26/8 32/13 41/23 43/21 45/13 48/16 62/3 66/20 79/3 82/2 85/22
**needed [1]** 55/24
**needs [2]** 38/11 50/21
**neither [1]** 44/9
**never [15]** 10/21 18/23 19/13 19/14 19/15 27/18 44/9 50/11 52/12 52/14 52/15 61/4 69/9 72/15 72/21
**new [2]** 8/11 21/25
**next [4]** 10/4 67/8 77/24 85/2
**nice [1]** 40/15
**night's [1]** 81/9
**nights [1]** 27/3
**nine [1]** 85/13
**no [114]**
**nobody [1]** 82/20
**nod [1]** 36/2
**non [2]** 38/4 60/22
**non-prosecution [1]** 60/22
**non-public [1]** 38/4
**none [2]** 20/11 50/12
**nonresponsive [1]** 43/16
**nonsense [1]** 54/21
**nope [2]** 50/11 50/11
**Norm [1]** 81/3
**normal [1]** 83/9
**northern [3]** 1/2 71/25 91/13
**not [123]**
**notable [1]** 8/13
**note [2]** 7/22 8/8
**notebook [1]** 25/16
**nothing [5]** 21/11 54/15 83/17 87/6 87/7
**novels [1]** 25/19
**November [4]** 24/3 24/5 24/6 24/25
**now [32]** 5/6 5/12 10/16 17/7 20/8 20/18 22/7 22/8 24/12 24/14 30/6 33/23 34/6 34/9 39/20 45/2 45/7 45/10 45/14 49/3 51/9 51/10 62/5 67/6 71/5 72/21 74/4 76/1 77/3 77/3 81/13 82/20
**number [18]** 4/4 7/17 7/22 12/7 12/8 15/21 27/1 39/15 54/11 59/11 65/8 66/18 76/21 77/3 81/5 82/4 88/5 88/5
**numbers [1]** 87/25

**O**

**o'clock [1]** 77/7
**oath [12]** 10/25 15/23 16/12 22/20 26/2 31/23 36/24 45/22 46/14 53/24 56/15 69/6
**objected [1]** 51/12

objection [4]  24/15 51/10 73/6 83/19
obligations [1]  30/8
obviously [1]  78/23
occasions [3]  9/13 13/9 67/6
occurred [1]  23/18
October [2]  30/6 63/15
odd [1]  27/12
off [8]  12/7 21/9 28/25 29/1 29/4 30/10
 37/21 49/1
offer [3]  38/7 58/20 77/17
offered [2]  35/15 47/7
office [2]  18/4 18/22
officer [2]  19/25 33/24
Official [1]  91/13
Oh [4]  9/15 31/6 37/19 78/5
okay [45]  5/1 5/5 6/13 9/4 14/16 15/24
 16/21 18/6 18/10 19/23 20/11 21/22
 22/18 23/5 24/7 26/22 28/14 29/11
 30/8 36/3 39/14 40/24 41/4 43/18
 49/16 54/19 55/17 65/16 65/23 68/13
 70/19 73/2 73/15 74/18 81/17 83/8
 83/13 84/7 85/3 85/22 87/4 88/3 88/16
 88/20 90/10
old [4]  62/9 62/10 62/12 87/11
older [2]  35/11 35/12
ole [1]  11/9
once [3]  60/13 72/21 73/25
one [37]  5/25 9/13 10/7 10/8 12/5
 12/20 13/1 15/20 16/17 17/1 19/18
 22/19 25/8 25/9 26/19 28/20 33/10
 34/17 37/2 37/6 38/2 38/19 41/8 44/10
 52/19 58/1 59/22 61/5 61/5 68/19 73/3
 74/14 79/18 79/19 82/5 87/11 88/10
ones [1]  86/12
ongoing [1]  68/21
online [2]  13/24 72/8
only [4]  5/14 9/5 12/8 21/13
open [1]  37/3
opened [1]  61/16
operations [1]  45/12
opinion [2]  76/5 79/13
opportunities [2]  81/11 83/4
opportunity [5]  6/20 9/6 16/6 16/8
 86/4
oppose [1]  81/20
opposed [3]  29/24 40/2 80/12
options [1]  83/23
order [5]  4/12 24/13 37/14 52/21
 86/25
ordered [1]  4/6
ordering [1]  76/4
orders [3]  22/6 23/20 87/19
organized [1]  58/8
originally [1]  71/21
other [31]  9/5 20/12 25/10 25/25 26/20
 26/22 27/7 27/16 29/1 29/6 36/6 36/18
 38/13 39/25 41/1 42/12 48/20 50/4
 51/11 55/4 57/10 61/24 63/2 71/9
 71/12 73/13 73/20 77/22 82/5 83/23
 86/9
others [2]  66/3 77/21
otherwise [1]  64/25
Othram [9]  7/12 11/19 20/18 21/1
 21/11 23/17 24/9 32/6 37/7
our [5]  26/14 33/10 33/11 55/8 75/24
ours [1]  54/13

out [45]  5/15 6/1 8/8 8/14 8/17 11/24
 12/23 13/8 15/1 18/9 26/14 32/2 32/4
 34/13 34/14 39/6 42/9 42/16 42/18
 43/24 46/9 46/17 46/17 47/9 50/4
 52/25 54/8 60/9 61/11 68/20 70/11
 71/11 73/1 73/18 75/11 76/24 77/12
 80/11 86/3 86/15 86/24 87/18 88/8
 88/19 88/23
out that [1]  11/24
outside [1]  71/22
overabundance [1]  52/25
overbroad [1]  51/12
overjoyed [1]  88/14
overruled [1]  51/14
overturned [2]  49/5 60/13
owe [4]  28/24 30/8 62/5 62/6
owed [2]  18/18 18/18
own [26]  15/20 22/3 23/4 27/16 29/9
 29/23 30/1 30/2 30/19 30/20 31/15
 31/22 32/1 33/15 33/18 45/14 45/15
 46/15 62/7 64/1 64/2 71/14 79/7 82/18
 85/6 87/11
owned [5]  46/6 46/7 67/3 72/6 72/21
owner [1]  26/20
ownership [2]  38/13 39/2

P
p.m [2]  1/7 4/2
PAGE [2]  2/2 55/17
paid [13]  13/22 14/21 29/1 30/10
 30/12 48/3 48/5 48/8 48/14 50/20
 57/18 71/16 71/17
pain [2]  80/8 82/9
Palmer [1]  57/25
paper [2]  44/7 82/6
paperwork [1]  63/3
parents [12]  5/12 5/20 5/23 9/24 12/20
 62/6 79/17 85/3 85/4 85/8 85/8 89/25
parents' [4]  9/18 49/25 57/16 57/17
part [1]  48/12
participate [1]  8/23
participated [1]  14/12
particular [1]  79/24
particularly [1]  15/9
parties [1]  4/6
Pass [1]  70/23
passing [1]  60/19
past [5]  8/24 13/7 38/24 49/7 87/24
path [1]  73/20
pattern [1]  89/7
Patton [1]  53/8
pay [18]  6/10 15/15 28/21 28/23 28/25
 29/4 29/8 33/11 47/1 47/5 47/7 55/24
 57/8 57/15 63/20 71/14 71/15 83/16
paying [10]  18/10 30/16 47/11 47/13
 47/15 48/21 71/19 79/21 79/22 80/4
payment [1]  18/13
pays [3]  55/21 57/9 64/11
Pearl [1]  1/12
pen [3]  24/11 84/25 85/1
penny [1]  29/17
people [25]  12/6 13/3 13/7 15/16
 25/10 27/7 28/24 39/12 40/7 41/11
 42/16 47/6 48/20 49/4 50/5 53/5 53/19
 54/23 82/14 83/13 85/11 86/23 87/23
 87/24 89/2
people's [1]  83/10

perfectly [2]  6/7 22/8
perhaps [6]  16/25 53/3 72/6 74/21
 84/16 86/11
period [1]  71/24
perjury [1]  36/25
permission [2]  37/18 37/20
persist [1]  11/15
persisted [1]  66/21
person [14]  10/4 26/25 27/12 30/24
 33/9 33/19 43/5 43/9 51/1 57/21 58/6
 58/6 69/12 90/3
personal [4]  25/25 26/20 29/9 34/15
perspective [2]  8/20 75/8
phase [1]  21/24
phone [12]  12/8 27/1 54/9 68/20 76/21
 76/25 81/4 82/4 87/25
phones [1]  25/23
photos [1]  72/7
physical [4]  24/22 49/20 61/25 82/9
picked [1]  50/4
picture [1]  43/13
pieces [2]  76/18 77/11
Piper [1]  1/12
PITTMAN [1]  1/9
place [12]  12/13 42/1 65/8 67/4 78/3
 81/13 81/14 81/17 81/21 86/20 89/15
places [3]  51/11 71/9 71/12
plaintiff [3]  1/11 4/12 12/3
plaintiffs [1]  4/17
plaintiffs' [3]  4/14 7/2 8/20
plan [3]  78/11 78/17 87/16
play [1]  82/5
please [1]  9/10
plus [1]  42/1
podium [1]  9/10
point [8]  1/4 4/3 17/8 34/11 34/12
 44/10 76/19 80/11
pointed [4]  22/24 47/24 52/2 52/4
pointing [1]  76/24
points [1]  8/13
policies [1]  63/6
polygraph [1]  11/3
position [2]  41/17 85/15
positions [2]  7/20 39/19
possibility [3]  6/1 22/17 22/17
possible [12]  9/7 25/21 25/24 43/12
 43/20 59/5 59/7 59/13 72/21 84/14
 90/4 90/7
possibly [2]  5/9 5/25
post [3]  23/20 71/4 84/10
post-judgment [3]  23/20 71/4 84/10
posted [1]  51/13
pot [1]  75/13
power [2]  84/14 84/15
Prairieland [1]  74/5
precisely [1]  79/9
preclude [1]  24/3
predate [1]  13/13
preface [1]  74/22
prefacing [1]  41/22
preliminary [1]  6/24
prepay [1]  30/11
prescribed [2]  52/15 91/7
presence [1]  13/9
present [2]  7/25 16/16
preservation [2]  23/20 37/14
presuming [1]  47/11

**P**

**pretty [3]** 8/4 80/15 80/17
**prevent [2]** 74/15 74/16
**previous [1]** 75/25
**price [2]** 1/19 38/7
**private [3]** 55/25 56/8 88/6
**pro [3]** 1/15 62/25 84/24
**probably [11]** 13/11 21/20 31/18
31/20 39/3 46/23 60/8 76/20 77/14
77/23 78/12
**problem [2]** 10/16 10/20
**problems [1]** 27/20
**procedure [1]** 55/25
**procedures [1]** 56/7
**proceedings [4]** 1/25 62/20 90/14
91/5
**proceeds [1]** 58/24
**process [7]** 39/23 60/19 76/14 77/10
77/12 77/14 79/11
**processes [2]** 77/21 78/2
**produced [1]** 1/25
**production [1]** 77/19
**products [1]** 57/5
**professional [1]** 52/8
**programs [1]** 50/7
**prologue [1]** 8/24
**promise [5]** 28/3 33/20 34/13 51/4
55/11
**property [4]** 25/7 29/23 33/15 33/18
**propose [4]** 78/4 78/6 78/12 78/21
**prosecuted [1]** 23/13
**prosecution [2]** 14/13 60/22
**prosecutions [1]** 88/13
**prosecutor [2]** 18/21 19/1
**provide [6]** 7/14 8/25 15/10 18/11
47/24 83/2
**provided [1]** 16/18
**provider [2]** 52/10 64/8
**providing [3]** 18/12 57/3 57/5
**psychiatric [1]** 85/17
**psychiatrist [1]** 88/24
**psychologically [2]** 52/15 84/22
**psychologist [1]** 88/24
**public [3]** 6/1 16/16 38/4
**publicly [1]** 25/11
**punitive [1]** 17/8
**Purcell [1]** 38/22
**pure [1]** 27/9
**purge [8]** 4/9 9/8 11/23 16/6 29/21
35/8 51/22 75/20
**purged [4]** 12/19 76/2 78/3 86/17
**purging [1]** 21/24
**pursue [1]** 12/3
**pursuing [1]** 23/24
**purview [1]** 6/8
**put [14]** 5/13 5/16 27/1 32/16 35/2
44/7 44/24 48/22 50/13 53/24 55/8
78/2 81/16 82/6
**puts [1]** 27/22
**putting [1]** 35/25

**Q**

**qualified [1]** 8/15
**quarter [2]** 48/25 49/9
**question [8]** 23/17 24/22 37/7 47/24
56/11 62/17 67/8 88/22
**questioning [4]** 2/11 7/3 16/17 32/19

**questions [41]** 6:17 6/23 7/4 7/11
8/10 10/15 10/24 11/2 11/4 16/25
17/1 17/4 22/20 22/24 32/23 34/20
35/24 39/15 50/24 51/25 52/3 52/4
55/4 55/6 55/8 55/10 55/20 59/21
59/22 60/21 65/16 70/25 71/2 72/17
73/13 78/24 81/9 81/19 83/5 85/12
86/7
**quicker [1]** 5/9
**quiet [2]** 79/3 85/22
**quite [11]** 10/5 20/10 23/2 29/16 35/2
49/11 56/11 61/21 66/4 66/4 66/6

**R**

**rainbow [1]** 75/13
**raise [2]** 16/2 67/22
**ran [3]** 49/11 50/17 50/19
**range [1]** 48/19
**Rasmussen [1]** 81/3
**rate [1]** 66/6
**rather [3]** 11/20 11/23 55/2
**reach [1]** 15/1
**reached [2]** 39/6 68/20
**read [1]** 5/16
**reading [2]** 63/3 73/7
**real [6]** 8/25 27/19 27/22 29/23 33/14
33/18
**realistic [1]** 77/18
**really [12]** 8/11 11/8 16/9 20/11 35/22
35/22 52/7 56/2 71/5 84/12 85/2 85/23
**reason [4]** 10/12 33/7 61/15 76/9
**reasons [1]** 88/10
**recall [13]** 12/5 37/22 43/4 43/13
43/19 45/2 45/3 58/5 69/6 69/9 70/16
71/17 82/6
**receive [1]** 56/22
**received [4]** 50/19 60/25 61/4 70/14
**receiver [23]** 4/20 8/21 10/14 10/15
12/2 22/6 22/8 24/14 27/2 51/9 53/11
67/18 73/6 73/17 81/13 81/14 81/17
81/20 86/1 86/11 87/17 88/11 88/15
**receiver's [1]** 22/19
**receivers [15]** 1/17 4/12 5/8 6/19 7/1
7/5 7/18 9/12 10/10 10/13 46/8 49/17
49/19 51/10 65/18
**receivers' [2]** 11/12 34/20
**receivership [5]** 22/16 23/19 76/4
80/10 87/3
**recent [1]** 74/5
**recently [1]** 30/5
**reception [1]** 25/24
**recess [2]** 74/13 74/18
**recipients [1]** 77/22
**recognition [1]** 89/7
**recognize [1]** 75/14
**recollection [14]** 25/14 41/24 42/2
42/5 42/8 42/10 43/10 43/22 44/1
45/19 45/21 65/3 65/10 65/12
**recommend [1]** 12/14
**recommendations [1]** 78/15
**reconciling [1]** 7/19
**record [8]** 5/13 5/17 9/25 10/1 15/22
51/18 68/14 91/5
**records [2]** 62/13 62/22
**reelect [1]** 68/16
**referencing [1]** 7/10
**referred [1]** 7/15

**referring [1]** 17/17
**reflect [1]** 68/14
**refuse [1]** 5/25 8/25 74/1
**refused [1]** 6/3
**refusing [1]** 51/25
**regard [1]** 7/17
**regarding [5]** 7/4 24/22 39/15 78/12
80/11
**regards [1]** 75/2
**regret [1]** 77/14
**rejected [1]** 37/22
**relationship [3]** 15/20 15/21 41/18
**relative [1]** 36/18
**release [2]** 82/22 84/2
**released [5]** 76/7 79/4 81/23 82/7 83/2
**relevant [1]** 20/12
**reluctantly [1]** 76/15
**remain [4]** 7/8 16/13 77/15 86/20
**remaining [1]** 77/8
**remains [2]** 77/16 86/20
**remand [1]** 85/17 86/10 89/20
**remanded [2]** 87/14 90/7
**remember [5]** 59/4 66/5 72/5 73/23
85/14
**remind [1]** 31/23
**rent [3]** 30/4 30/5 30/11
**rental [1]** 30/9
**rented [1]** 30/6
**repeatedly [1]** 13/10
**report [9]** 5/9 6/14 6/24 6/24 8/4 10/5
10/6 88/18 90/5
**reported [3]** 1/25 9/15 10/7
**REPORTER [4]** 1/22 18/1 54/1 91/13
**REPORTER'S [1]** 90/15
**reports [1]** 86/1
**representation [1]** 6/3
**represented [3]** 62/20 62/23 63/2
**representing [1]** 6/2
**request [2]** 51/12 85/11
**required [1]** 10/1
**requires [1]** 84/24
**resolve [3]** 4/13 5/9 74/9
**resources [3]** 12/19 84/23 87/8
**respectfully [1]** 84/14
**respond [3]** 10/21 10/24 74/1
**responding [1]** 10/15
**response [2]** 59/9 71/1
**responses [3]** 17/3 41/23 43/23
**rest [2]** 24/4 81/9
**restaurant [1]** 13/17
**Reston [1]** 1/16
**restroom [1]** 60/9
**Revenue [1]** 19/11
**rid [2]** 40/3 40/6
**right [35]** 4/18 6/7 9/19 10/4 10/16
15/16 16/2 16/4 16/11 16/13 16/15
16/24 17/19 24/11 29/11 29/23 34/6
34/9 35/21 41/7 43/2 44/15 44/21
45/14 51/10 56/10 61/14 62/4 63/4
67/17 67/22 69/11 88/18 89/20 90/12
**rights [2]** 16/5 16/21
**rise [2]** 43/20 66/20
**risk [3]** 76/4 76/8 82/1
**road [1]** 55/9
**roadmap [2]** 51/20 51/22
**Rob [1]** 38/22
**ROBBINS [3]** 1/18 4/22 6/21

**R**

**Rodriguez [7]** 20/23 21/2 21/5 24/1 65/18 65/23 76/21
**roller [1]** 24/24
**room [1]** 1/22 13/21 91/17
**roughly [2]** 7/3 69/22
**RPR [3]** 1/22 91/3 91/11

**S**

**S-T-A-M-O-S [1]** 20/4
**saddest [1]** 75/16
**safe [2]** 36/14 83/20
**safety [6]** 36/7 36/9 36/19 37/2 44/7 81/25
**said [29]** 9/25 11/18 13/6 17/19 19/17 20/18 24/23 39/7 39/18 46/14 54/16 55/13 55/18 56/6 56/16 56/16 61/8 65/8 66/19 69/6 69/11 70/2 70/14 72/24 73/22 78/7 79/20 85/4 89/24
**salary [1]** 50/20
**sale [2]** 20/25 23/17 23/18 37/7
**sales [2]** 57/22 58/25
**same [2]** 53/3 76/9 86/2
**Sanford [1]** 34/2
**Santa [1]** 34/10
**sat [3]** 61/5 61/5 82/7
**satisfactory [1]** 78/22
**satisfy [1]** 22/14
**savings [4]** 26/11 28/14 29/12 36/4
**saw [4]** 10/10 25/3 43/13 90/2
**say [14]** 11/7 12/18 14/8 16/13 20/18 38/5 38/6 44/4 48/4 53/1 59/10 68/21 77/10 81/15
**saying [13]** 7/20 11/15 14/22 15/17 20/14 41/22 42/6 48/2 48/5 49/7 86/22 88/19 89/11
**says [4]** 14/21 24/13 73/23 87/1
**scenario [1]** 78/13
**scholarship [1]** 56/7
**school [3]** 49/22 55/25 56/8
**science [2]** 49/23 89/9
**screenshot [2]** 20/24 20/24
**se [3]** 1/15 62/25 84/24
**seat [1]** 14/3
**SEC [1]** 18/22
**second [2]** 6/19 56/20
**secondly [1]** 80/8
**secret [2]** 14/9 52/17
**secure [2]** 22/9 85/9
**security [10]** 14/9 14/13 59/21 59/24 60/2 60/11 60/15 65/24 66/1 67/5
**see [20]** 4/9 4/12 5/15 19/19 19/21 22/19 22/20 23/1 24/1 55/9 70/12 72/8 74/9 75/20 78/18 86/4 87/16 88/9 90/8 90/9
**seeing [1]** 73/6
**seek [1]** 78/17
**seeking [2]** 37/10 37/13
**seem [1]** 14/6
**seems [3]** 11/9 17/9 27/9
**seen [4]** 13/23 72/7 75/6 76/6
**sell [10]** 20/22 21/5 24/2 37/10 40/17 42/20 44/2 45/17 58/11 58/20
**selling [5]** 11/19 21/9 23/23 24/9 43/11
**send [1]** 38/23
**sends [1]** 29/6

**sense [3]** 45/7 65/5 75/7
**sent [6]** 5/12 9/24 38/9 38/23 42/5 89/2
**separate [5]** 9/13 15/4 21/4 22/10 24/22
**series [1]** 19/17
**serious [2]** 46/11 46/12
**serve [1]** 88/11
**service [2]** 19/11 64/8
**services [1]** 57/6
**set [9]** 21/5 21/6 21/25 22/16 38/19 57/10 57/11 74/4 81/3
**sets [1]** 56/25
**seven [4]** 61/7 61/11 62/10 85/13
**seventh [1]** 46/14
**several [6]** 12/10 13/9 17/18 47/6 76/1 89/16
**severe [1]** 9/14
**shadow [1]** 67/15
**share [1]** 79/15
**shareholder [1]** 38/8
**shares [4]** 7/12 20/19 20/22 21/14
**she [17]** 27/2 29/15 29/16 38/24 39/3 39/3 39/3 39/4 39/5 39/5 39/10 39/11 39/11 39/13 47/3 47/4 53/3
**she's [2]** 27/2 39/12
**shelter [1]** 50/18
**Sheriff's [1]** 66/25
**shit [1]** 61/8
**shooting [1]** 74/5
**short [3]** 74/19 77/19 78/19
**short-circuit [1]** 78/19
**should [6]** 10/20 51/6 74/15 77/3 77/6 82/20
**shouldn't [2]** 77/3 81/16
**show [2]** 35/9 51/6
**showed [1]** 47/10
**showing [1]** 38/12
**shown [1]** 13/15
**shows [2]** 64/24 70/6
**sign [1]** 86/21
**Signal [1]** 54/11
**signed [4]** 60/22 63/3 84/15 91/9
**silent [1]** 16/13
**silver [1]** 61/25
**similar [2]** 59/21 59/21
**simple [3]** 17/3 35/1 35/7
**simpler [1]** 26/4
**simply [2]** 7/14 84/23
**since [8]** 7/22 8/7 11/1 37/14 43/8 46/6 46/7 69/6
**single [3]** 26/17 33/10 40/3
**sir [10]** 14/11 16/1 34/1 34/4 34/8 67/20 70/23 73/15 76/19 79/5
**sit [1]** 81/7
**situation [11]** 13/1 13/23 15/7 15/10 41/20 45/8 58/8 82/17 82/18 85/16 87/17
**situations [1]** 83/19
**six [1]** 17/12
**sleep [1]** 11/6 23/22 41/25 82/10
**sleeping [2]** 10/4 37/23
**slightest [1]** 22/2
**snowstorms [1]** 35/17
**sold [6]** 7/13 42/11 42/17 43/12 46/4 59/13
**solitary [1]** 90/7

**selving [1]** 27/19
**some [50]** 6/9 8/14 9/23 10/24 14/1 14/4 16/11 16/24 17/1 17/2 18/12 18/15 20/9 22/20 22/24 22/25 25/10 32/21 33/7 38/13 38/15 40/11 40/16 41/20 42/17 45/6 46/9 48/3 48/5 48/5 48/6 49/8 49/12 50/4 50/4 51/1 53/3 55/23 55/24 58/8 65/12 71/8 72/2 74/22 75/2 75/10 76/15 79/1 85/17 87/16
**somebody [12]** 13/17 25/12 36/18 38/8 47/15 51/23 51/24 59/13 72/13 72/14 73/23 86/15
**someone [1]** 16/15
**something [22]** 8/17 8/17 9/17 10/1 12/22 13/15 17/7 19/11 23/24 23/25 38/15 50/20 60/15 64/24 68/9 75/7 77/6 78/10 78/12 78/16 78/20 80/22
**sometime [1]** 41/12
**sometimes [6]** 38/7 38/8 57/11 71/16 71/16 72/9
**somewhere [5]** 38/1 40/19 48/18 49/21 68/20
**son [3]** 34/23 80/1 80/9
**sophistry [1]** 27/9
**sorry [14]** 9/22 19/8 23/14 24/20 27/10 31/7 32/18 51/14 55/19 62/17 62/18 78/4 87/11 90/8
**sort [8]** 8/10 8/24 18/19 55/23 55/24 80/3 82/20 87/16
**sound [1]** 16/7
**sounds [3]** 20/13 37/24 63/4
**source [2]** 18/9 61/17
**sovereign [2]** 55/2 74/1
**sovereign-citizen [1]** 74/1
**speak [3]** 9/7 10/11 16/15
**speaking [2]** 56/5 80/2
**special [1]** 17/22
**specific [1]** 65/24
**specifically [3]** 7/12 12/12 58/18
**spend [2]** 39/8 89/15
**spending [1]** 77/8
**spent [6]** 6/22 19/24 29/17 81/21
**SPEs [1]** 54/5
**spinning [1]** 17/14
**spoke [5]** 27/2 54/12 54/15 88/7 88/7
**spot [1]** 12/16
**spotty [1]** 25/24
**Staff [1]** 61/22
**stage [4]** 11/5 11/6 76/3 85/10
**Stamos [1]** 20/4
**stand [3]** 9/9 67/20 67/21
**start [1]** 26/14
**started [3]** 33/22 46/1 49/11
**starting [1]** 44/19
**state [2]** 4/24 48/20
**statement [1]** 62/14
**statements [1]** 7/19
**STATES [5]** 1/1 1/9 14/20 18/21 91/8
**stationed [1]** 19/25
**STATUS [1]** 1/8
**stay [4]** 16/8 71/4 74/10 81/8
**stenography [1]** 1/25
**step [1]** 73/15
**still [11]** 7/16 8/12 25/13 26/25 29/15 30/8 70/5 76/6 77/8 87/19 87/20
**stir [1]** 90/3

**stock [13]** 11/19 21/1 22/1 23/24 24/9 32/6 37/25 38/4 38/6 38/12 38/21 39/2 65/14
**stocks [1]** 39/2
**stolen [2]** 30/22 34/10
**stop [7]** 9/21 11/14 15/24 18/20 41/22 54/6 83/22
**stopped [1]** 41/11
**storage [5]** 25/6 30/15 44/3 44/4 44/5
**store [2]** 41/4 44/18
**stories [1]** 23/3
**strange [2]** 45/8 53/6
**Street [3]** 1/12 1/22 91/17
**stress [1]** 85/24
**strikes [1]** 80/17
**struck [1]** 80/1
**stuck [2]** 8/12 8/14
**stuff [7]** 8/24 11/10 24/4 25/6 34/15 44/20 49/24
**subject [1]** 9/14
**subpoena [1]** 77/22
**Substacks [1]** 12/24
**substantial [2]** 76/4 76/7
**successful [2]** 61/11 61/13
**such [1]** 50/7
**suggest [1]** 17/9
**suggested [2]** 89/6 89/8
**suggesting [1]** 8/17
**suit [1]** 47/11
**Suite [2]** 1/13 1/20
**summary [1]** 7/24
**sun [2]** 43/20 66/20
**supposed [4]** 51/5 51/7 55/1 85/10
**sure [18]** 9/12 14/5 20/10 22/22 26/1 26/2 26/7 26/10 30/17 31/9 37/16 38/22 51/18 55/7 67/13 74/17 88/7 90/9
**Surely [1]** 62/14
**surveillance [1]** 25/11
**suspect [2]** 74/5 75/10
**sworn [3]** 16/3 67/23 68/2
**sympathetic [3]** 76/9 79/25 80/10

**T**

**T-Mobile [2]** 64/10 64/11
**table [5]** 27/23 38/16 38/17 48/22 50/14
**take [14]** 11/3 14/3 16/5 32/19 42/16 58/24 60/2 65/2 67/6 73/16 74/13 75/20 78/14 86/14
**taken [5]** 13/8 50/11 52/14 65/8 74/19
**taking [4]** 5/14 25/12 46/23 52/13
**talk [3]** 14/6 85/3 90/8
**talked [4]** 20/14 25/9 25/11 49/18
**talking [6]** 13/16 15/24 37/9 45/3 60/10 88/23
**tangible [1]** 8/25
**target [3]** 60/25 61/3 61/12
**Tarrant [1]** 85/8
**task [1]** 33/21
**taxes [4]** 18/18 18/24 19/5 27/1
**telecommunications [1]** 42/18
**Telephone [5]** 1/14 1/16 1/21 1/23 91/18
**tell [20]** 8/16 9/2 9/3 9/10 25/18 26/8 27/13 29/23 31/1 34/9 44/1 47/18

50/23 51/2 53/9 53/19 56/16 62/3 62/7 80/13
**telling [6]** 16/12 29/8 51/4 54/22 74/22 80/12
**ten [1]** 76/25
**testified [3]** 15/22 20/13 68/2
**testify [6]** 26/2 53/25 54/3 55/12 56/14 57/15
**testimony [10]** 37/15 39/20 39/21 39/22 62/22 64/23 67/16 69/1 69/7 69/9
**TEXAS [13]** 1/2 1/5 1/13 1/20 1/23 11/10 30/21 35/14 48/20 81/8 91/12 91/13 91/17
**than [24]** 11/21 16/9 17/11 20/12 27/17 28/9 35/11 35/12 41/2 42/12 50/21 51/2 61/7 64/7 69/25 71/5 73/24 74/21 75/22 79/12 79/12 81/7 81/14 86/9
**thank [10]** 4/18 4/23 6/11 8/2 23/16 67/17 70/23 79/3 88/21 90/12
**Thanks [1]** 24/21
**that [404]**
**that's [61]** 4/19 5/15 7/24 9/5 9/19 11/17 11/21 12/10 13/3 14/7 21/13 23/5 29/10 32/5 36/12 37/20 39/21 40/4 41/6 41/8 42/7 42/10 44/8 44/15 44/21 49/15 51/7 58/11 59/3 60/15 60/17 61/9 64/10 64/12 64/23 65/7 65/20 68/23 69/11 70/22 71/10 71/13 72/25 74/25 76/2 76/11 76/13 76/24 77/1 78/21 78/21 79/8 79/8 80/4 83/23 84/1 87/21 89/8 89/8 89/16 89/24
**their [14]** 25/23 34/17 34/23 34/23 34/23 59/23 73/7 74/15 75/19 75/19 76/11 79/19 85/12 87/25
**them [32]** 12/5 14/23 15/1 15/2 17/5 17/19 18/6 18/9 22/9 25/3 28/8 28/8 41/12 43/11 43/13 43/13 52/5 53/10 53/15 53/22 53/24 56/17 56/19 57/11 81/22 81/23 82/8 83/2 83/18 87/23 87/25 88/4
**themselves [2]** 32/16 48/21
**then [25]** 8/19 12/2 19/25 20/18 22/25 29/5 33/22 37/20 37/23 38/9 42/6 44/25 46/6 46/7 46/23 46/24 61/17 70/4 70/17 70/18 71/22 71/23 71/25 73/17 88/19
**then-wife [1]** 42/6
**theories [2]** 13/4 17/15
**there [61]** 7/14 8/17 9/25 10/1 11/9 13/7 13/15 15/19 18/14 19/17 21/9 22/21 25/4 25/13 25/16 25/17 25/25 29/6 30/14 30/23 32/2 32/2 32/4 32/4 35/16 37/20 38/22 38/22 40/8 40/10 44/20 44/20 44/25 46/9 47/9 48/25 49/9 51/1 51/23 57/10 61/6 66/2 66/2 66/18 68/20 70/6 73/5 74/10 75/10 75/11 76/7 77/12 82/11 82/16 84/14 86/14 86/24 87/18 87/18 90/1 90/9
**there's [15]** 5/18 7/17 8/17 8/22 12/2 22/10 25/11 25/24 38/8 46/15 75/13 76/12 77/18 83/17 87/7
**these [12]** 6/2 10/5 10/24 17/16 20/14 20/16 43/16 43/16 51/11 53/21 65/8 87/23
**they [44]** 9/25 10/1 10/3 10/11 12/3 15/17 15/17 17/1 17/4 18/3 18/10

19/10 18/12 22/3 22/3 22/9 22/12 24/13 24/16 24/18 25/2 32/15 34/17 34/22 34/23 37/22 38/6 38/23 49/5 53/24 54/17 57/7 57/11 59/21 61/6 61/13 62/14 62/16 62/16 74/14 77/5 86/3 88/3 90/2
**they'd [1]** 87/25
**they'll [3]** 38/23 77/23 88/18
**they're [3]** 21/19 51/25 66/16
**they've [2]** 48/5 48/6
**thing [14]** 18/19 21/13 34/13 35/16 35/24 40/3 42/10 44/25 51/24 72/22 73/4 82/21 85/17 85/24
**things [16]** 8/16 10/5 18/17 25/20 27/14 28/22 29/1 35/2 44/9 44/10 49/10 65/12 69/5 78/19 83/7 85/13
**think [71]** 6/6 8/13 10/11 13/1 17/10 21/18 22/18 25/2 25/5 25/10 28/15 28/19 30/17 30/20 31/8 31/12 31/18 31/19 32/14 32/16 33/2 33/2 33/5 35/2 37/21 38/14 38/19 38/20 40/19 41/5 41/6 41/8 43/8 44/14 44/15 44/19 44/21 44/23 46/19 50/20 51/20 55/3 55/15 58/19 59/5 63/14 63/14 64/22 65/4 65/15 67/14 69/6 70/14 71/16 72/8 73/16 73/18 73/20 74/12 75/6 76/14 77/11 77/18 77/20 78/1 78/6 78/8 78/12 78/20 81/4 86/19
**thinking [1]** 55/8
**Thirty [1]** 62/10
**Thirty-seven [1]** 62/10
**this [116]**
**THOMPSON [10]** 1/11 4/17 7/25 13/8 22/25 51/12 55/7 59/22 63/22 81/15
**those [27]** 5/14 5/16 5/16 7/5 7/22 13/8 13/13 20/22 21/14 22/9 25/1 38/2 44/9 44/10 51/14 55/19 55/23 56/22 62/22 70/18 71/15 73/12 76/6 78/2 81/9 87/24 91/7
**though [6]** 7/9 33/3 54/13 67/14 82/18 88/21
**thought [3]** 10/20 54/8 54/17
**thoughts [1]** 74/23
**thousands [1]** 80/14
**three [3]** 7/3 33/3 51/8
**through [8]** 40/5 40/14 41/5 41/19 60/19 80/1 80/9 80/9
**throughout [4]** 5/6 7/8 39/22 39/22
**throw [1]** 82/16
**throwing [1]** 75/9
**thrown [1]** 6/1
**time [44]** 6/6 6/9 7/19 9/13 14/14 15/16 18/25 24/1 24/2 35/5 39/24 44/19 44/24 45/2 45/13 45/22 46/14 47/9 49/12 52/3 52/16 52/19 54/12 61/8 61/18 61/23 67/5 67/10 67/11 69/24 71/24 72/3 72/8 76/18 78/23 81/22 84/8 84/8 85/2 87/14 88/3 89/1 89/15 89/21
**times [11]** 7/9 10/21 10/25 11/7 12/10 51/8 52/16 56/6 76/20 89/1 89/17
**timing [1]** 23/22
**tire [1]** 62/8
**tired [1]** 87/13
**title [1]** 65/23
**today [21]** 4/7 4/10 8/8 20/14 32/24 37/9 37/15 39/18 46/17 55/13 63/19

**T**

today... **[10]** 65/18 66/25 70/10 74/24 75/21 75/23 75/24 82/7 83/2 86/3
together **[1]** 54/5
toilet **[1]** 60/9
told **[12]** 23/9 24/1 37/10 46/18 53/10 53/11 59/15 59/18 61/6 65/5 65/17 70/22
tomorrow **[3]** 43/21 54/3 66/20
too **[8]** 5/22 6/3 14/16 35/4 35/7 37/4 45/1 75/15
took **[1]** 42/1
top **[2]** 12/7 14/9
totally **[1]** 30/17
touch **[1]** 87/2
touched **[4]** 10/18 13/24 22/11 28/21
track **[2]** 30/24 49/22
tracking **[1]** 7/5
traded **[1]** 69/14
trafficking **[4]** 58/12 58/17 58/22 59/14
Traitwell **[4]** 26/19 49/11 49/13 50/19
transaction **[7]** 41/25 42/16 69/19 70/6 70/13 70/17 70/21
transactions **[5]** 28/5 28/6 65/8 69/5 69/10
transcript **[4]** 1/8 1/25 91/4 91/6
transferred **[1]** 70/4
travel **[1]** 48/19
triage **[1]** 78/17
trial **[4]** 5/6 24/4 39/22 74/6
trials **[2]** 74/4 78/7
tried **[6]** 8/21 8/21 24/2 37/10 85/7 89/16
trips **[1]** 48/11
trophies **[1]** 49/22
trouble **[4]** 5/23 14/7 46/11 46/12
true **[10]** 23/4 37/20 48/7 60/17 65/7 72/15 86/12 88/19 89/24 91/4
truly **[1]** 79/19
Trump **[2]** 43/2 72/24
Trump's **[1]** 40/1
trust **[14]** 31/17 32/4 32/5 36/5 38/16 55/14 56/3 56/25 57/1 57/15 57/19 57/19 80/23 81/3
trustee **[2]** 32/12 80/24
trustees **[1]** 32/8
trusting **[1]** 28/9
trusts **[9]** 22/3 32/2 55/18 55/19 55/23 56/9 56/9 56/13 56/23 57/10
truth **[2]** 16/12 51/5
truthful **[8]** 12/2 14/22 17/2 17/15 23/7 34/19 51/1 82/25
truthfully **[5]** 17/5 17/14 50/24 52/5 81/21
truths **[1]** 53/16
try **[2]** 16/15 85/5
trying **[7]** 6/9 30/24 35/8 35/23 59/11 72/18 85/23
turn **[9]** 16/25 22/12 22/19 24/10 24/10 24/11 51/15 55/6 73/11
turned **[1]** 6/2
tweet **[1]** 40/2
tweeted **[1]** 72/24
Twenty **[1]** 17/12
Twenty-six **[1]** 17/12
twice **[3]** 6/1 20/13 81/6

twins **[1]** 4/15
two **[10]** 8/13 9/13 19/20 25/4 26/18 28/11 33/3 53/19 60/21 77/4
type **[18]** 8/24 9/25 12/21 28/17 30/21 31/3 31/6 31/19 35/24 47/18 62/2 63/16 63/25 64/16 64/17 71/6 72/5 88/12
types **[5]** 14/13 14/18 14/18 74/1 88/13
typically **[6]** 29/4 30/11 38/4 55/22 57/7 57/9

**U**

Uber **[3]** 46/22 46/22 72/12
UN **[1]** 20/1
unable **[1]** 7/13
uncover **[1]** 8/22
under **[19]** 10/25 15/22 16/12 16/22 22/5 22/20 26/2 31/23 36/24 45/22 46/14 46/24 52/7 52/9 53/24 56/14 69/6 86/25 87/3
understand **[24]** 11/8 16/21 22/5 22/7 34/11 34/12 35/2 35/6 36/24 37/1 37/16 44/4 45/10 46/9 46/10 46/13 47/8 50/7 52/7 59/10 59/16 61/15 87/5 89/3
understand that you **[1]** 46/9
understanding **[11]** 4/11 13/25 32/11 36/11 44/6 57/17 58/7 60/12 60/18 66/14 66/19
Understood **[1]** 32/20
undertaking **[1]** 77/21
unfortunately **[3]** 10/3 76/14 77/13
uniform **[1]** 68/12
Uniqlo **[1]** 50/3
UNITED **[5]** 1/1 1/9 14/20 18/21 91/8
Unless **[1]** 60/5
unmerited **[1]** 54/17
until **[9]** 23/12 30/5 30/5 44/22 44/23 44/24 74/4 74/10 81/13
unusual **[1]** 53/6
unwilling **[1]** 7/14
up **[34]** 4/19 7/3 17/2 21/5 21/6 21/25 22/16 22/25 23/17 29/21 32/21 32/22 35/9 35/25 37/3 37/7 38/19 47/10 56/25 57/10 57/11 60/15 65/9 67/20 71/20 74/11 76/10 79/19 81/3 81/6 81/7 82/16 82/20 88/10
upcoming **[1]** 30/12
us **[25]** 1/12 4/24 6/14 9/10 25/4 26/6 29/8 33/10 37/10 40/5 46/18 47/18 51/2 53/9 56/18 62/3 65/5 77/2 77/23 77/24 78/2 78/16 78/19 86/15 86/19
usable **[1]** 74/25
use **[3]** 28/21 38/18 54/11
used **[8]** 16/14 25/19 31/14 42/15 42/16 45/2 57/15 69/9
using **[1]** 70/20
Usually **[1]** 28/24

**V**

vacation **[1]** 12/16
vague **[1]** 8/14
value **[1]** 31/10
Vanguard **[1]** 38/1
various **[3]** 10/21 12/24 33/21
Vedder **[1]** 1/19

vehicle **[5]** 31/2 31/11 72/5 72/6 72/7
venture **[1]** 21/3
verse **[2]** 28/4 29/17
very **[19]** 10/24 12/13 13/10 16/24 22/24 35/1 39/11 45/11 54/15 59/5 59/7 61/10 61/19 65/13 66/6 79/25 80/1 80/7 89/8
via **[1]** 5/15
view **[1]** 77/13
violated **[1]** 87/19
Virginia **[2]** 1/16 71/25
visit **[2]** 14/21 86/3
visited **[1]** 14/19
Voir **[1]** 3/3
VOL **[2]** 2/2 3/3
VOLUME **[1]** 1/8
voluntarily **[2]** 54/7 78/18
voluntary **[1]** 77/19
vs **[2]** 1/6 4/4

**W**

wads **[1]** 82/6
waiting **[1]** 49/4
wakes **[1]** 74/11
walk **[2]** 40/5 46/17
want **[29]** 5/5 6/8 15/1 16/7 16/8 16/9 16/24 21/11 26/1 26/17 28/1 34/23 35/23 37/6 39/8 41/22 45/14 51/2 51/24 52/2 52/5 71/4 74/20 75/20 84/4 84/7 85/16 85/24 90/3
wanted **[4]** 21/4 45/9 60/5 69/25
wants **[3]** 11/8 38/8 79/16
warn **[1]** 89/16
warned **[2]** 12/10 84/8
warnings **[1]** 31/24
was **[147]**
Washington **[1]** 45/12
waste **[3]** 45/13 67/10 67/11
watch **[3]** 63/25 64/1 64/2
water **[1]** 73/17
waters **[1]** 76/6
way **[15]** 5/18 5/24 8/10 21/7 27/8 27/13 29/2 38/4 50/13 51/22 58/3 61/16 70/19 73/18 77/18
we **[67]** 4/9 4/13 6/22 7/3 7/11 7/12 7/22 8/12 8/20 11/12 11/24 12/12 13/22 21/3 22/21 23/5 23/7 23/7 25/4 26/4 32/25 33/11 33/14 33/15 34/16 37/9 38/6 40/15 41/19 42/6 42/6 45/3 51/6 51/21 53/21 54/5 54/15 55/9 62/21 63/2 73/25 74/9 75/8 75/14 75/20 75/22 76/13 76/13 76/17 76/19 77/15 77/19 78/10 78/11 78/16 78/16 76/19 79/9 79/12 84/5 84/18 84/20 86/12 86/13 86/16 86/18 87/17 90/9
we'll **[12]** 17/5 22/20 22/25 67/14 67/20 72/17 74/18 75/5 88/9 88/17 88/19 88/21
we're **[6]** 39/7 51/20 72/18 77/6 77/11 77/21
we've **[7]** 14/8 14/17 15/22 25/22 36/4 73/24 79/23
wealthy **[1]** 33/19
wearing **[3]** 47/10 68/10 68/11
week **[2]** 74/8 77/4
weeks **[2]** 76/1 77/4
well **[54]** 4/12 5/22 6/7 6/24 7/23 10/9

**well... [48]** 10/11 11/23 13/15 14/25 19/16 20/17 21/18 24/13 24/16 26/5 27/21 30/12 34/21 35/6 37/4 39/1 43/15 48/23 50/13 51/7 52/19 53/8 54/4 56/10 56/18 56/20 60/3 60/14 61/10 64/6 65/4 66/3 66/16 66/24 69/1 69/23 70/13 71/21 73/8 75/24 75/25 76/1 76/3 80/1 81/25 85/21 86/25 88/9

**well-being [1]** 81/25

**went [9]** 6/14 6/22 42/3 48/1 48/4 70/11 70/16 71/11 86/3

**were [45]** 5/23 7/13 7/25 8/12 11/12 12/23 13/16 13/22 14/25 18/6 18/7 18/10 24/23 25/15 30/17 32/16 32/25 35/7 37/9 40/7 42/7 45/3 46/8 46/16 46/17 48/3 51/7 53/9 57/12 61/6 61/7 61/13 62/23 62/25 63/19 68/24 69/1 69/24 73/10 75/22 77/12 81/17 83/2 84/8 86/2

**what [113]**

**what's [9]** 20/2 25/18 31/5 31/10 42/24 48/14 65/6 75/16 89/8

**whatever [8]** 11/4 12/3 13/25 40/4 56/1 61/25 63/2 80/14

**whatsoever [3]** 24/9 76/24 83/19

**when [47]** 6/4 10/4 13/11 15/16 16/11 16/12 21/8 21/8 25/3 32/24 34/13 37/9 37/20 37/20 38/23 39/24 40/17 41/16 41/16 42/23 42/25 44/4 44/22 45/3 45/7 45/17 50/15 50/17 50/19 58/6 59/20 61/5 61/5 61/5 66/23 69/22 70/12 72/8 72/25 74/25 79/15 81/14 83/18 83/19 86/3 88/22 89/24

**whenever [3]** 40/1 72/24 72/25

**where [42]** 6/22 7/3 8/24 9/14 11/6 12/24 15/7 17/24 18/3 20/25 22/20 23/5 24/16 25/1 26/22 28/8 33/24 34/3 35/17 35/18 37/24 41/20 46/18 48/24 49/2 49/21 49/21 50/2 52/19 53/9 61/23 70/16 72/22 75/22 78/13 80/16 80/21 81/25 83/23 84/1 86/13

**Where's [1]** 49/6

**wherever [2]** 38/11 46/22

**whether [9]** 39/25 60/14 61/24 61/25 63/12 72/6 73/8 74/24 80/23

**which [16]** 5/13 6/5 13/9 13/21 19/18 24/3 26/19 45/1 49/11 57/19 76/7 76/23 77/9 77/12 82/15 88/7

**while [4]** 7/6 47/11 73/25 77/1

**white [1]** 41/7

**who [46]** 4/7 4/20 12/6 12/20 13/7 15/8 17/16 19/25 20/7 21/16 24/17 25/9 26/25 26/25 30/24 38/8 40/7 40/9 40/11 40/12 40/16 41/11 42/14 45/9 45/10 47/6 52/17 53/12 53/12 53/15 57/12 57/24 58/6 63/19 64/8 64/11 66/3 71/19 74/1 80/23 81/2 82/14 82/15 83/13 87/23 89/2

**who's [5]** 32/8 42/18 58/17 58/21 64/8

**whole [1]** 56/20

**why [11]** 9/10 12/10 12/12 12/23 14/3 26/5 56/14 56/14 88/10 88/14 89/16

**wife [24]** 22/2 26/25 27/5 27/6 28/4 29/6 29/15 29/15 33/7 33/23 34/17 38/23 39/1 39/2 39/6 42/6 53/1 54/16 54/23 63/1 79/16 79/21 80/1 86/13

**wife's [2]** 38/10 81/3

**wild [1]** 63/5

**will [24]** 4/16 8/15 8/23 8/25 16/14 16/17 22/12 23/12 31/23 36/25 38/4 38/6 38/6 39/4 39/5 39/5 39/11 55/11 74/11 77/15 78/2 85/16 86/22 89/22

**WILLENBURG [4]** 1/22 91/3 91/11 91/11

**WILLIAM [1]** 1/11

**willing [5]** 22/8 34/5 34/22 35/9 40/7

**windfalls [1]** 48/24

**Winkelvoss [1]** 41/14

**winning [1]** 49/22

**wire [1]** 20/25

**wired [5]** 41/20 42/2 70/3 70/16 70/17

**wiring [1]** 41/20

**wish [2]** 16/19 77/12

**within [2]** 6/7 84/24

**without [5]** 10/17 37/10 37/13 60/11 63/3

**witness [6]** 16/3 67/20 67/21 67/23 68/14 70/23

**WITNESSES [1]** 3/1

**women [1]** 33/22

**won [1]** 56/7

**won't [4]** 11/16 43/20 47/18 87/2

**Woodforest [8]** 26/19 28/12 28/13 29/5 36/5 38/10 51/6 51/11

**Woodlands [4]** 71/22 71/23 72/1 72/4

**word [1]** 67/6

**words [1]** 36/18

**work [6]** 25/23 26/4 60/3 60/6 60/10 61/18

**worked [3]** 18/23 30/23 41/11

**working [6]** 14/20 27/20 30/24 41/11 62/21 88/21

**works [2]** 36/19 38/4

**world [2]** 19/3 51/1

**worried [1]** 53/1

**worry [1]** 59/19

**worst [1]** 78/13

**worth [14]** 1/3 1/5 1/23 6/9 13/17 21/15 21/19 24/23 37/25 71/9 74/3 80/4 91/14 91/17

**worthwhile [1]** 88/23

**would [89]** 4/24 5/23 6/13 8/8 9/7 11/20 11/23 12/18 15/9 19/4 19/10 19/13 19/15 22/24 24/3 26/4 26/25 27/5 27/7 32/21 34/22 34/25 35/5 35/8 35/10 37/3 37/4 43/1 43/14 43/14 44/23 46/10 46/12 46/17 46/20 46/21 46/21 46/22 46/22 46/23 46/24 46/24 47/1 47/3 47/4 51/17 51/24 53/1 54/3 54/6 54/7 55/2 55/7 55/19 55/22 60/1 62/14 63/19 63/21 65/4 67/19 67/22 71/5 72/8 72/9 73/17 74/9 74/14 74/21 75/11 75/18 76/7 78/12 78/16 78/17 78/21 79/18 82/1 82/3 82/12 82/24 85/2 85/5 86/11 87/16 88/2 90/4 90/6

**wouldn't [5]** 12/14 18/13 60/3 60/4 87/7

**write [1]** 38/22

**writing [1]** 25/19

**wrong [3]** 44/6 70/19 83/17

**Xavier [1]** 32/5

**Y**

**y'all [2]** 55/8 62/19

**yahoo.com [2]** 1/24 91/19

**yarns [1]** 17/14

**yeah [24]** 9/22 17/13 19/3 20/20 24/18 32/22 34/5 37/5 37/8 37/19 39/4 40/25 44/15 44/20 47/25 48/18 60/8 64/18 67/11 70/11 78/9 80/6 80/19 81/1

**year [4]** 24/8 31/7 44/16 50/20

**years [18]** 13/2 29/1 29/18 33/3 33/4 42/1 42/1 44/17 48/24 62/10 62/12 65/9 71/24 71/25 83/17 85/13 87/11 89/1

**Yep [3]** 23/6 23/10 29/20

**yes [52]** 6/15 6/18 9/16 12/4 14/2 14/11 14/15 16/1 17/20 22/7 22/13 22/15 26/16 27/24 32/14 34/1 34/4 34/8 35/13 36/1 36/2 39/5 39/17 42/13 44/21 46/13 55/14 57/2 57/6 57/14 57/23 58/10 58/14 59/3 59/5 59/7 63/24 65/17 65/19 65/21 65/22 66/9 66/10 68/8 68/25 69/3 69/8 69/18 69/21 75/14 76/19 79/5

**yet [6]** 5/2 14/23 16/4 39/13 80/16 80/21

**you [443]**

**you'd [5]** 4/19 12/11 22/25 66/5 72/18

**you'll [2]** 50/16 74/24

**you're [49]** 7/7 12/2 14/22 15/18 16/7 16/12 17/14 20/14 20/15 23/13 27/15 28/9 29/8 31/23 38/21 42/9 47/8 47/8 47/11 47/12 49/7 51/19 53/14 55/13 56/10 56/10 56/18 57/3 57/5 60/9 60/10 60/14 62/12 64/7 65/5 65/5 67/8 75/1 75/17 79/6 80/4 83/15 84/11 86/7 86/25 87/3 87/14 88/19 89/10

**you've [24]** 5/7 6/3 11/24 14/9 14/12 17/11 17/21 20/13 28/11 31/24 36/21 46/18 47/9 47/9 47/10 47/10 62/1 62/2 65/5 66/21 73/10 83/5 84/10 87/10

**you-all [8]** 22/24 35/24 51/20 62/13 71/11 73/18 74/20 75/11

**your [205]**

**yourself [7]** 4/15 9/8 11/24 16/6 29/22 82/22 89/11

**Yousef [2]** 20/7 20/8

**Yuen [1]** 45/10

**Z**

**zero [2]** 45/15 45/15

**zip [1]** 45/16

# EXHIBIT 41

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,    §
et al.,                       §
                              §
        Plaintiffs,           §        No. 4:24-cv-00988-P
                              §
v.                            §
                              §
CHARLES JOHNSON,              §
                              §
        Defendant.            §
_____

ORAL AND VIDEOTAPED DEPOSITION OF

CHARLES JOHNSON

November 17, 2025
_____

        ORAL AND VIDEOTAPED DEPOSITION OF CHARLES

JOHNSON, produced as a witness at the instance of the

Plaintiff, and duly sworn, taken in the above-styled

and numbered cause on November 17, 2025, from 8:43 a.m.

to 3:29 p.m., before Joseph D. Hendrick, Certified

Shorthand Reporter in and for the State of Texas,

reported by machine shorthand, in the third-floor jury

room of the Eldon B. Mahon Federal Courthouse at 501 W.

10th Street, Fort Worth, Texas, pursuant to Court Order

and the Federal Rules of Civil Procedure and any

provisions stated on the record or attached hereto.


Job No. 7746143

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:
            William Thompson
 3          DLA PIPER, LLP
            1900 N. Pearl Street, Suite 2200
 4          Dallas TX 75201
            406-546-5587
 5          will.thompson1@us.dlapiper.com

 6    FOR THE DEFENDANT:
            Charles Johnson, Pro Se
 7
      ALSO PRESENT:
 8          David Crenshaw, Videographer

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2    Appearances  ...................................    2

 3    CHARLES JOHNSON

 4        EXAMINATION BY MR. THOMPSON ...............    6

 5    Signature waived  ...........................  295

 6    Reporter's Certification  ...................  297

 7                         EXHIBITS

 8    NO.          DESCRIPTION                       PAGE

 9        EXHIBIT 1 Plaintiffs' First Set of          23
                    Post-Judgment Discovery to Defendant
10                  Charles Johnson

11        EXHIBIT 2 Plaintiffs' First Set of          54
                    Post-Judgment Requests for
12                  Production to Defendant Charles
                    Johnson
13
          EXHIBIT 3 FEC discosure                     70
14
          EXHIBIT 4 Real Tech Notes from the Startup 106
15                  Life, Fake Tech Confessions from
                    Guru Graham
16
          EXHIBIT 5 For World Peace, Restore the Russian 114
17                  Aristocracy, Protect the Minorities,
                    Encourage
18                  the Nobility -- and Abolish the
                    Oligarchs
19                  Wherever They May Be article

20        EXHIBIT 6 April 5, 2024 Substack: Notes on 137
                    Aptera and The Solar Mobility
21                  Revolution

22        EXHIBIT 7 Tweet by JohnsonThought1          151

23        EXHIBIT 8 Tweet by realchuckcj              158

24        EXHIBIT 9 Tweet by JohnsonThought1          159

25
```

App.1598

1    EXHIBIT 10 When You Come Upon a Strange Op...    162
          SBF and the Crypto's Crisis article
2         by Charles Johnson, 11/30/22

3    EXHIBIT 11 [THE FIRST EXHIBIT 11]    163
          December 16, 2024 Substack: Drones
4         and Droning on about #DefenseTech

5    EXHIBIT 11 CNBC article    177

6    EXHIBIT 12 Email from David Mittelman to    214
          Charles Johnson, 10/6/25
7
     EXHIBIT 13 Document 123-1 Page ID 3154-3162;    245
8         Declaration of Will Thompson, emails

9

10                  PREVIOUSLY MARKED EXHIBITS

11   NO.                 DESCRIPTION                     PAGE

12     EXHIBIT 64 ................................. 78

13

14              REQUESTED DOCUMENTS/INFORMATION

15   NO.   DESCRIPTION                               PAGE

16     1 Produce photo of handwritten note between    78
          Johnson and Luckey
17

18

19

20

21

22

23

24

25

1

2                          - - -

3                 P R O C E E D I N G S

4              Monday, November 17, 2025

5           Commencing at approximately 8:43 a.m.

6                          - - -

7

8           THE VIDEOGRAPHER:  We are on the record.

9   Today's date is November 17th, 2025.  The time is 8:43.

10  This is the video deposition of Charles Johnson

11  relative to a case styled Point Bridge Capital LLC, et

12  al, versus Charles Johnson.

13           This case is filed in the United States

14  District Court for the Northern District of Texas, Fort

15  Worth Division.

16           Counsel, at this time, would you state your

17  appearance for the record and the reporter can then

18  place our witness under oath.

19           MR. THOMPSON:  Will Thompson for the

20  plaintiffs.

21           THE REPORTER:  Would you raise your right

22  hand, please, sir.

23           THE WITNESS:  (Complied)

24           THE REPORTER:  Do you swear or affirm that

25  the testimony you're about to give in this case will be

1  the truth, the whole truth, and nothing but the truth,

2  so help you God?

3          THE WITNESS:  I do.

4          MR. THOMPSON:  Ready to proceed?

5          THE VIDEOGRAPHER:  Counsel, you may

6  proceed.

7                  CHARLES JOHNSON

8      having been duly sworn, testified as follows:

9                  EXAMINATION

10 BY MR. THOMPSON:

11     Q.    Okay.  Mr. Johnson, you're ready to

12 proceed?

13     A.    I am.

14     Q.    All right.  Mr. Johnson, please state your

15 full legal name for the record.

16     A.    Charles Carlisle Johnson.

17     Q.    Have you used any other aliases names or --

18     A.    No.

19     Q.    -- in business, investment, or financial

20 dealings?

21     A.    No, I have not.

22     Q.    Have you ever given a deposition before?

23     A.    Yes.

24     Q.    How many times?

25     A.    This will be my ninth time.

```
 1        Q.    Ninth time.  When was the last time you
 2   gave one?
 3        A.    I'm not sure.
 4        Q.    Ballpark, do you know?
 5        A.    Four years ago.
 6        Q.    What case was that?
 7        A.    Somewhere in San Francisco.
 8        Q.    Were you a --
 9        A.    Maybe it was six years ago.
10        Q.    Were you a defendant?
11        A.    I was a fact witness.
12        Q.    Okay.  What was the case about?
13        A.    It was about the First Amendment.
14        Q.    All right.  Well, it's been a couple of
15   years so I'm going to go over the ground rules.
16        A.    That's okay.  I'm familiar with them.  Go
17   ahead.
18        Q.    Do you understand that you are under oath
19   today?
20        A.    I do.
21        Q.    Do you understand that your testimony today
22   and the oath that you swore has the same --
23        A.    Yes, I do.
24        Q.    -- force and effect --
25        A.    Yes.
```

```
 1              THE REPORTER:  I'm sorry.  Can you, please,
 2    just one at a time?
 3         A.   Go.  Just go ahead.  I'm familiar with
 4    taking the deposition.
 5    BY MR. THOMPSON:
 6         Q.   That the oath that you swore today has the
 7    same force and effect as the testimony -- as if you
 8    were giving testimony before Judge Pittman in open
 9    court?
10         A.   Yes, I am.  Go ahead.
11         Q.   Is there any medication, medical
12    condition --
13         A.   No, I'm not on any drugs or medication.
14         Q.   So, Mr. Johnson, for the court reporter's
15    benefit, I'm going to ask my question; please let me
16    finish and then you can answer.
17              Is there any medication, medical condition
18    or other issue that affects your ability to understand
19    my questions --
20         A.   No.
21         Q.   -- or answer truthfully today?
22         A.   No.
23         Q.   Have you ever been diagnosed as a
24    pathological liar?
25         A.   No.
```

1        Q.      Have you ever been diagnosed as someone who

2    is incapable of telling the truth?

3        A.      No.  Relevance.

4        Q.      What is your current residential address?

5        A.      No fixed address.

6        Q.      What do you mean by "no fixed address"?

7        A.      No fixed address.  I'm -- I have no

8    physical address currently.

9        Q.      Where do you live, then, and sleep?

10        A.      I travel around.

11        Q.      Where does your mail get sent?

12        A.      It gets to 1624 Fieldthorn Drive, but

13    there's a forwarding address there, and I'm not sure

14    what the forwarding address is.

15        Q.      So how do you get mail, then, if someone

16    sends -- sends you something?

17        A.      It's usually scanned and sent to me.

18        Q.      To your email?

19        A.      No.

20        Q.      Where does it get sent to, how do you

21    actually receive your mail?

22        A.      I usually get -- usually get a picture of

23    it sent to me.  Text message, typically.

24        Q.      Who sends the text message to you?

25        A.      Relevance.

```
1        Q.    You have to answer my question.

2        A.    Well, relevance.  Objection, relevance.

3        Q.    Okay.  Who sends you your mail?

4        A.    Depends on who I ask to do it.

5        Q.    Okay.  Can you name some people?

6        A.    No.

7        Q.    Could you --

8        A.    Next question.

9        Q.    Who -- who texts -- who sends text messages

10   or images of your mail via text message?

11       A.    Next question.

12       Q.    Mr. Johnson, I'm going to object as

13   non-responsive.  You need to answer --

14       A.    Go ahead.

15       Q.    -- these questions.  Relevance is not a

16   basis to not answer.

17       A.    It depends on who I instruct to do it.  But

18   typically the -- it typically depends.  But I usually

19   have a young man do it for me.

20       Q.    Who is that young man, as you refer him?

21       A.    Aaron Chin.

22       Q.    Who?

23       A.    Aaron Chin.

24       Q.    And how do you know Mr. Chin?

25       A.    Objection.  Relevance.
```

1      Q.    How do you know Mr. Chin?

2      A.    Socially.

3      Q.    Okay.  Where does he live?

4      A.    I'm not sure where he lives currently.  He

5 lives somewhere in Arlington, Virginia.

6      Q.    Okay.  What's his phone number so we can

7 contact him and potentially --

8      A.    Don't have his phone number right on me

9 now.

10      Q.    Do you currently have a lease or anything?

11      A.    No.

12      Q.    When was the last time you lived at that or

13 spent the night at that --

14      A.    October 31st, two thousand twenty -- 2025.

15      Q.    Okay.  So in the last 17 days, where have

16 you lived or slept?

17      A.    I've traveled all over.  I was in Los

18 Angeles, was in Boston, New York.  DC proper.

19      Q.    Did you stay in hotels or houses or other

20 people's residences?

21      A.    Depended.

22      Q.    Okay.  Give me the list where you stayed.

23      A.    Relevance.  It's a privacy violation.  Next

24 question.

25      Q.    Well, it's relevant because I'm going to

1   ask how you paid for it if you stayed in a hotel.  So

2   I'll ask that:  Did you stay in any hotels during that

3   time?

4         A.    I did, once --

5         Q.    Where?

6         A.    -- or twice maybe.

7         Q.    How many nights in a hotel?

8         A.    Relevance.

9         Q.    How many nights in a hotel?

10        A.    Maybe two or three, I don't know.

11        Q.    Okay.  So that -- is it Fieldthorn?  Is

12   that the address that you mentioned?

13        A.    Correct.

14        Q.    So your mail currently gets sent there?

15        A.    I'm not sure where my mail currently gets

16   sent.  I haven't checked it in a while.

17        Q.    When's the last time you lived in Texas?

18        A.    Not sure.

19        Q.    Well, you list in your political

20   contributions living in Montgomery County.  Do you --

21   when did you stop living there?

22        A.    I'm not sure.

23        Q.    Okay.  All right.  Mr. Johnson, I'm going

24   to have this court reporter not put this in the

25   transcript, but what is your Social Security Number?

```
 1          A.    I don't know it.
 2          Q.    Could you find that out?
 3          A.    I could.
 4          Q.    How would you do that?
 5          A.    I would call my mother.
 6          Q.    You have no idea what your Social Security
 7    Number is?
 8          A.    I don't.
 9          Q.    What's your phone number?
10          A.    Area code (617)429-4718.
11          Q.    Any other phone numbers that you have?
12          A.    I don't know.
13          Q.    So you may or may not have other phone
14    numbers that you use?
15          A.    Correct.
16          Q.    Okay.  So how do you not know that?
17          A.    The phones were given to me.
18          Q.    How many phones do you use?
19          A.    Currently, I think maybe two or three, but
20    I'm not sure.
21          Q.    Okay.  And do you have those on you?
22          A.    No.
23          Q.    Did you bring your phones today?
24          A.    No.
25          Q.    Where are they?
```

```
 1        A.    They're in a hotel.

 2        Q.    What hotel?

 3        A.    Relevance.

 4        Q.    What hotel?

 5        A.    Courtyard.

 6        Q.    Okay.  How'd you pay for that?

 7        A.    A credit card.

 8        Q.    What credit card?

 9        A.    American Express credit card.

10        Q.    What's your spending limit on that credit

11   card?

12        A.    Don't know.

13        Q.    Do you have debt on that credit card

14   currently?

15        A.    I think so.

16        Q.    How much?

17        A.    I don't know.

18        Q.    What's your Signal handle?

19        A.    Don't know my Signal handle.

20        Q.    How often do you communicate via Signal?

21        A.    Exclusively.

22        Q.    Exclusively?

23        A.    Yeah.

24        Q.    So you don't text with people?

25        A.    Rarely do I text with people.
```

1      Q.      How many email addresses do you have?

2      A.      Probably a few hundred.

3      Q.      A few hundred?

4      A.      Yeah.

5      Q.      How many do you regularly use to

6  communicate?

7      A.      Don't know.

8      Q.      No idea?

9      A.      Maybe two or three.  Maybe four.  I don't

10  know.

11      Q.      Which ones are those?

12      A.      But I guess the question is:  What do you

13  mean by "regularly"?

14      Q.      Well, just tell -- tell me the four ones

15  that you -- that you recall when you just answered.

16      A.      Well, I haven't used some of them in a few

17  years, so I think the most relevant one is probably the

18  one the court has on file.

19      Q.      Okay.  Well, just give me the four that you

20  recall when you answered that question.

21      A.      It's okay.  I think it's

22  charlescjohnson88@gmail.

23            Might be loopytuesday6@protonmail.  But

24  there's a -- I don't recall.

25      Q.      Okay.  Are you planning to invoke the Fifth

1    Amendment today?

2        A.    Depending on the question.

3        Q.    Okay.  So there's some more ground rules

4    here.  So you understand that if you answer "I don't

5    recall," you're swearing that you genuinely do not

6    remember the information I'm asking?

7        A.    That's right.

8        Q.    Okay.  And you understand you're not

9    allowed to say "I don't recall" if you don't actually

10   remember the answer?

11       A.    I'm aware, yeah.

12       Q.    Okay.  And you also understand that you may

13   invoke the Fifth Amendment if a truthful answer may

14   tend to incriminate you?

15       A.    Yeah, I'm aware.

16       Q.    Okay.  And if you invoke the Fifth

17   Amendment, you need to say so explicitly so the

18   record's clear.

19       A.    I'm aware.

20       Q.    Can you do that?

21             Okay.  And you're not going to use "I don't

22   recall" as a substitute for the Fifth Amendment, are

23   you?

24       A.    No.

25       Q.    Okay.  And you understand that giving a

1    knowingly false "I don't recall" answer is perjurous?

2         A.    No.

3         Q.    No?  Okay.

4               Are you a truthful person?

5         A.    I am.

6         Q.    Okay.  When you post online, do you state

7    what you personally believe is true?

8         A.    Not always.

9         Q.    Okay.  When do you post truthfully and when

10   do you post falsely?

11        A.    Vague.  Over-generalized.

12        Q.    Well, tell me situations when you don't

13   tell the truth.

14        A.    Some things are jokes.  Some things are --

15   but generally I try to tell the truth.

16        Q.    Okay.  So gen -- so when you post online

17   about your assets and investments, are you lying?

18        A.    It depends on the situation.

19        Q.    Okay.  When do you lie about your

20   investments?

21        A.    A joke or a misstatement is not necessarily

22   a lie.

23        Q.    Okay.  So when do you not tell the truth

24   about your inv -- assets or investments when you post

25   online?

1        A.      That depends on the context.

2        Q.      Well, I asked you what context that is.

3        A.      Sometimes they're jokes.  Sometimes there

4    may be things that I don't necessarily know that I own.

5    Sometimes there might be things that I don't

6    necessarily recall.  But yeah, generally speaking, I

7    have no objection to your line of questioning.  Go on.

8        Q.      So when do you decide to not tell the truth

9    about your assets and --

10       A.      Well, generally, I tell the truth when I'm

11   under oath, but generally -- but otherwise, I don't

12   really spend that much time trying to be talmudic about

13   it.

14       Q.      And you understand that there's been a

15   70-plus million dollar judgment entered against you in

16   this case?

17       A.      I do, but it's under appeal.

18       Q.      Have you read the final judgment?

19       A.      The final judgment hasn't been posted yet.

20   There's this thing before the Fifth Circuit which you

21   still have to reply to a brief in December.

22       Q.      Have you read the final judgment in this

23   case?

24       A.      There hasn't been a final judgment in this

25   case.

1    Q.    Okay.  Well, I'll represent that Judge

2  Pittman did enter a judgment against you and --

3    A.    Oh, yes, in terms of that, no, I have not

4  read that.

5    Q.    Okay.  You haven't read it?

6    A.    No.

7    Q.    Do you know how much money it is?

8    A.    Yes, I think it's 70 -- 70 million.

9    Q.    Okay.  Have you paid any money towards it?

10    A.    I have not.  And I have no intention to.

11    Q.    What do you mean "no intention to"?

12    A.    As in I have no intention of paying it.

13    Q.    Is it because you think you're going to

14  prevail before the Fifth Circuit, or you're --

15    A.    I do.

16    Q.    -- just not going to pay?

17    A.    I think I'm going to prevail before the

18  Fifth Circuit, and I think there will be a follow-up

19  lawsuit against DLA Piper and against Mr. Musk.  And I

20  think most of this will be settled up by December,

21  probably late December.

22    Q.    Because you think the Fifth Circuit's going

23  to rule in your favor?

24    A.    Correct.

25    Q.    Okay.  So if the Fifth Circuit throws your

1    case out and thinks your appeal wasn't persuasive or

2    compelling, are you going to pay the money?

3        A.    No, I'm going to appeal it to the Supreme

4    Court.

5        Q.    Okay.  Do you think the Supreme Court would

6    take it?

7        A.    Yes.

8        Q.    What's your lawsuit against Mr. Musk going

9    to be about?

10       A.    About how he uses shell entities, like

11   Mr. Lambert, to sue people.  It's a champerty

12   violation.

13       Q.    You understand that you've applied for

14   stays in this case?

15       A.    I do.

16       Q.    Those both got rejected?

17       A.    Yeah, that's typical.  But yeah.  Go on.

18       Q.    Didn't you tell lawyers for Othram that

19   there was a stay in effect?

20       A.    Well, typically, historically, there's

21   usually a stay after a judgment is rendered when it's

22   appealed.

23           MR. THOMPSON:  I'm going to object as

24   non-responsive.

25   BY MR. THOMPSON:

```
1          Q.    Did you tell lawyers for --

2          A.    I did.  Actually, I didn't -- I don't think

3    I told the -- the lawyers.  I think I told David

4    Mittelman, who's the CEO.  But go on.  It's six of one,

5    half dozen of the other.

6          Q.    How did you tell David Mittelman that?

7          A.    I told him that over Signal.

8          Q.    Okay.  And do you have the Signal messages?

9          A.    No, I don't.

10         Q.    Do you recall Judge Pittman saying last

11   week that the judgment's fully enforceable?

12         A.    I do.

13         Q.    Do you understand you're here to answer

14   questions about your assets and other post-judgment

15   discovery?

16         A.    I do.

17         Q.    Why don't you comply or respond to any of

18   the discovery in this case?

19         A.    I think it's a violation of my privacy, and

20   I think it's likely intended to leak.  I think the

21   whole process is, itself, is a punishment, and it's

22   designed to intimidate me and other people from being

23   federal witnesses against Mr. Musk.

24         Q.    But why don't you file a motion, or appeal

25   that to the Fifth Circuit?  Do you know you could do
```

1  that?

2      A.    I think I'm happy to do -- happy to pursue

3  the case as I've been pursuing it.

4      Q.    How do you think it's been going for you?

5      A.    I think it's annoying, but it's supposed to

6  be annoying because it's designed to punish me for

7  helping law enforcement against Mr. Musk.

8      Q.    How do you think you're doing in this case?

9      A.    I'm doing well.

10     Q.    You said a couple of times that -- that

11 you've been winning in this case?

12     A.    Correct.

13     Q.    What do you mean by that?

14     A.    I mean that I've been exposing the network

15 of people who are financing of what I think is a

16 frivolous lawsuit against me designed to intimidate me

17 and restrict my speech.  Typically, in a RICO case,

18 there's more than one plaintiff -- or more than one

19 defendant, I should say.

20     Q.    Okay.  Are you taking any of your direction

21 or orders in this case from any federal agent or

22 federal entity?

23     A.    I don't know what "direction" means.

24     Q.    Did they tell you how to -- whether to

25 comply with discovery or not?

1      A.    I'm not going to answer questions about my

2  relationship with the federal government.

3      Q.    Okay.  Well, I'm asking you:  The reason

4  you don't comply with discovery, is it your sole

5  decision, or did someone tell you not to do that?

6      A.    I'm not going to answer questions involving

7  my relationship with the federal government.  Next

8  question.

9      Q.    Well, I ask the question again:  You

10 refused to participate in discovery.  Do you agree with

11 me on that, sir?

12     A.    No, I don't.  I think you're asking a

13 question that is a violation of my relationship with

14 the federal government, so I'm not going to answer it.

15 Next question, counselor.

16          MR. THOMPSON:  Exhibit 1, please.  Thank

17 you.

18          (Marked Deposition Ex. 1)

19          THE WITNESS:  Thank you.

20 BY MR. THOMPSON:

21     Q.    So before I ask, those are some

22 interrogatories post-judgment.

23     A.    Sure.

24     Q.    So I've got to -- before we get into those,

25 I've got a couple of more questions.

1          Do you remember Judge Pittman when you

2    said -- raised your supposed federal connections as the

3    reason why you did not participate in discovery?

4          A.    I don't recall him saying that.

5          Q.    You don't?

6          A.    No.

7          Q.    Do you remember saying that ever?

8          A.    To who?  To which -- to Judge Pittman or to

9    who?

10         Q.    To Judge Pittman.

11         A.    I don't recall saying that.

12         Q.    Okay.  What was the reason -- do you

13   remember when Judge Pittman was in the courtroom and he

14   explained to you that if you believe you have

15   information that is classified, top secret or higher,

16   you should contact the agency and -- or someone from

17   the U.S. Attorney's Office that can appear and assert

18   that position?

19         A.    I do recall him saying that, but what I

20   have -- the information I have is neither classified

21   nor -- but, you know, again, I -- I'm not gonna talk

22   about a relationship with the federal government.  So

23   if you want to go and tell Judge Pittman that, I have

24   no objection to you doing that.

25         Q.    What is your relationship with the federal

1    government?

2         A.    Well, which -- which part of it?

3         Q.    Well, I'm just going to ask about your --

4         A.    I mean, I was a code -- I was a code-named

5    FBI informant for a number of years, and I was involved

6    in a federal investigation of even Mr. Elon Musk.

7    Mr. Lambert knows this because Mr. Lambert talks to my

8    then FBI handler.

9         Q.    So if none of the information that you have

10   is classified or top secret, why can't you --

11        A.    Because I said I wouldn't.

12        Q.    It's because you don't want to, not because

13   it's a secret --

14        A.    No, it's because I said I wouldn't.  Next

15   question.

16        Q.    It's your sole decision not to provide that

17   information?

18        A.    I don't know what that means.

19        Q.    Well, again, I asked you:  Did anyone

20   instruct you not to provide information in this case?

21        A.    I don't know what a "sole decision" means.

22   Next question.

23        Q.    What don't you understand about "sole

24   decision"?

25        A.    As in is it my decision to make or not.  I

1    don't know what that means.

2        Q.    You don't?

3        A.    I -- I've said, and I've have said many

4    times now, that I will not talk about my relationship

5    with the federal government to an attorney that is --

6    has a thriving law practice, in the form of DLA Piper,

7    with the Chinese government.  No, I will not do that.

8        Q.    It's because your connections with the

9    federal government are just baloney, right?

10        A.    No.  Next question.

11        Q.    What part of it's not baloney?

12        A.    I just told you I was a code-named

13    informant with the FBI.  That's not a baloney.

14        Q.    Well, that's -- that is in the past, right?

15    You were kicked out of the program?

16        A.    And the cases that involve and have been

17    used to prosecute people are ongoing.

18        Q.    So are you a current witness in any ongoing

19    federal prosecution?

20        A.    I'm not supposed to answer that question.

21    Next question.

22        Q.    It's a yes or a no.

23        A.    Yes, I am a witness.

24        Q.    You were kicked out of the FBI, or you

25    were --

```
 1          A.     I was not -- I was not kicked out of the
 2    FBI program.
 3          Q.     Well, you stopped being a source --
 4          A.     I stopped --
 5          Q.     -- in 2021, right?
 6          A.     No.
 7          Q.     Are you currently a source?
 8          A.     I'm not supposed to answer that question.
 9          Q.     Your answer was, "I'm not supposed to
10    answer that question."  Is that right?
11          A.     Correct.
12          Q.     Why are you not supposed to answer it?
13          A.     You're not supposed to discuss ongoing
14    matters.
15          Q.     According to who?
16          A.     According to the relationship you agreed to
17    with the federal government agency.
18          Q.     Well, we're going to get into that a little
19    later, probably after lunch.  What --
20          A.     If I'm here.
21          Q.     What agency?
22          A.     I'm not going to be discussing any
23    relationship I have with a federal government agency.
24          Q.     Is that ongoing case involving the former
25    FBI agent Jonathan Buma?
```

1    A.    I'm not involved with that case, as far as
2  I know.
3    Q.    So the case you said you're a witness in,
4  that's not the Buma case?
5    A.    Correct.
6    Q.    Do you know why no federal agency, a
7  representative of the federal government's ever made an
8  appearance and said that you can't or should not
9  provide information in this case?
10    A.    I have not asked them to.
11    Q.    Is the case you're referring to, does it
12  involve David Lederman?
13    A.    No.
14    Q.    Do you know who that is?
15    A.    No, I do not.
16    Q.    You don't know who David Lederman is?
17    A.    I do not.
18    Q.    Is that your answer under oath?
19    A.    It is my answer under oath.  I don't know
20  who it is.
21    Q.    Okay.  All right.  So I handed you
22  Exhibit 1.
23    A.    Mm-hmm.
24    Q.    All right.  What is Exhibit 1, to the best
25  of your understanding?

1      A.    This -- these are the interrogatories.  I

2  believe I sent this back to counsel, but I'm happy to

3  do it again.

4      Q.    Okay.  When did you send these?

5      A.    Probably two days ago via mail.  But I'm

6  happy to do it again.  So the only accounts that I

7  have, number one, is Woodforest Bank.

8      Q.    Well, hold on.  I'm -- I'm not --

9      A.    I have a checking account there.

10      Q.    I've got specific questions --

11      A.    Okay.

12      Q.    -- for you.

13      A.    Go ahead.

14      Q.    Why didn't you respond to these last --

15  like, when I serv -- when these were served over a

16  month ago?

17      A.    There was no need to.

18      Q.    Why was there no need?

19      A.    Mostly because I -- I believe that what's

20  going on in this case is designed to intimidate a

21  witness.  So I'll -- I'll provide as minimal

22  information as possible.

23      Q.    What do you mean by "minimal information"?

24      A.    As in the least amount of information

25  possible.

1    Q.    So not complete information?

2    A.    Correct.

3    Q.    And you're still not providing complete,

4    hundred percent information?

5    A.    Correct.

6    Q.    And you won't?

7    A.    I will not, no, because the person who's

8    funding this lawsuit is also under federal

9    investigation, so I'll wait until that plays out.

10    Q.    Who's funding this lawsuit?

11    A.    That would be Mr. Musk.

12    Q.    Why do you think that?

13    A.    Why do I know it, or why do I think it, or

14    what do you mean?

15    Q.    Either.

16    A.    I was told as much.

17    Q.    Who told you?

18    A.    Somebody who would know.

19    Q.    Well, who told you?

20    A.    Well, the main person was Gator Greenwill,

21    but there were others as well.

22    Q.    Okay.  When did he tell you this?

23    A.    About two years ago.

24    Q.    When was the last time you spoke to Gator

25    Greenwill?

```
 1        A.     Probably at the funeral of the wife of

 2   David -- what's his last name?  I forget his last name.

 3   I believe -- yeah, I spoke to him at a funeral maybe

 4   four months ago, five months ago in New York.

 5        Q.     What did you -- yeah, go ahead.

 6        A.     In New York.

 7        Q.     What did you and Gator discuss about this

 8   case?

 9        A.     We discussed how it was a form of

10   litigation finance designed to discover things about my

11   relationship with the federal government.

12        Q.     Does Gator Greenwill work for the federal

13   government?

14        A.     I don't know.

15        Q.     You previously represented that he was part

16   of the government.

17        A.     No, that comes from a -- a lie told by your

18   client from Winslow's bar.  He was there for a -- I was

19   there for a total of 15 minutes.  Your client was so

20   drunk that I had to carry him to his car, which was

21   hilarious in retrospect.  Of course, as -- as the

22   record will reflect, he was arrested for DUI the other

23   day.  So he does have that history.

24               But, no, Mr. Lambert is mistaken if he says

25   that Mr. Greenwill said he was working for the federal
```

1    government.  As far as I know, he -- he has a

2    relationship with the federal government, but I'm not

3    sure what that is fully.

4         Q.    You don't look like you're strong enough to

5    carry someone, an adult to the car.  Are you?

6         A.    It was more of a drag than a carry.  But

7    I'm sure if we were to subpoena the records from the --

8    from the wine bar, we could -- we could find that

9    there's camera footage.

10        Q.    Did you ever do that?

11        A.    I never did, no.

12        Q.    And just a little bit.  So I have seven

13   hours on the record with you --

14        A.    Mm-hmm.

15        Q.    -- so that's seven hours --

16        A.    You're going to get another 45 minutes.

17        Q.    That's seven hours when I'm asking you

18   questions.  I'm going to take a break about every hour,

19   hour and a half.

20        A.    That's not necessary.

21        Q.    Hour -- well, I'm just going to tell you.

22   And then for lunch, we can take -- I sent this in an

23   email, but we can take a short lunch.  I was thinking

24   30, 45 minutes.

25        A.    Mm-hmm.

```
1        Q.    If you ever need a break, the bathroom's

2    right outside, and just let me know.  Okay?

3        A.    I'm going to be leaving in 45 minutes, so

4    you have to keep going.

5        Q.    I think you'll stay here the whole time.

6        A.    I don't think so.

7        Q.    I think you will.

8              Okay.  So you said you wouldn't pro --

9    provide complete, 100 percent information in response

10   to these interrogatories.  So, what information are you

11   willing to provide?

12       A.    Well, so, number one, name of financial

13   institution, Woodforest Bank.  The name in which the

14   accounts are held, Charles Johnson.

15       Q.    Let's --

16       A.    It's a checking account.

17       Q.    Yeah, let me just, let me stop you there.

18   What information are you not going to provide that's

19   relevant?

20       A.    Well, I don't have anything that's

21   responsive to number 2, so I can't provide it.

22       Q.    Yeah, but you said you're not giving us a

23   complete 100 percent picture of everything.

24       A.    No, I never said that I would never give a

25   complete picture.  I said that I would not give full
```

1    answers on every question that you ask.  And this is an

2    interrogatory.  I can certainly comply with that.

3              Number 1, I have --

4        Q.    Hold on.  I'm not -- I don't -- I don't --

5    did you know that interrogatories need to be written?

6        A.    Yes.  Which is why I did send it to you.

7        Q.    Okay.  Where'd you mail that from?

8        A.    It should have been from Boston.

9        Q.    Okay.  So I'm going to -- and I'm just

10   going to ask a question so the record is clear.

11       A.    Mm-hmm.

12       Q.    Okay.  So the interrogatory says, "Identify

13   all bank accounts in which you have, or have had any

14   legal access to" --

15       A.    Yeah, I don't know all of the bank accounts

16   I've had access to.

17       Q.    Since 2023?

18       A.    Since, yeah, so I don't really know.

19       Q.    Okay.

20       A.    But I -- I assume that you are asking for

21   my personal information.

22       Q.    Well, I'm actually --

23       A.    My personal banking information or business

24   or whatever.  But there may be other bank accounts that

25   I don't necessarily know if I have access to them or

1  not.

2       Q.    Okay, so I'm actually -- the question's

3  broader.  So if you go back to page 2, and there's a

4  Definitions heading.

5            Do you see that?

6       A.    Yeah, I saw that already.

7       Q.    Okay.  So you -- I can read it out loud or

8  you can read it to yourself.  But when we're talking

9  about you and the bank accounts, it's a little bit

10  broader.  It's not just Charles Johnson, personally,

11  but it's --

12      A.    Sure.  I understand.

13      Q.    -- also the trust accounts, too.

14      A.    Sure.  None of --

15      Q.    Do you see that?

16      A.    None of the trust accounts have sold

17  anything so it's not really relevant.

18      Q.    So do the trust accounts have bank

19  accounts?

20      A.    No.  As far as I know.

21      Q.    Do the trust accounts file tax returns?

22      A.    As far as I know, no.

23      Q.    Who would know that?

24      A.    That's a good question.  But my

25  understanding is that all of the -- so, you know,

1    you're not allowed to ask any questions about my wife

2    and daughter's accounts.  That was made clear with the

3    judge on Monday.  But in terms of my account, my, sort

4    of, stocks, we have the Clearview matter, which is a

5    lawsuit that's going on in New York.  So I'm not sure

6    if I even have those.

7            And then the other would be the Othram

8    stocks which are currently -- currently being held by

9    the Othram people.

10    Q.    What's the status of your case against

11    Clearview in New York?

12    A.    I'm not sure.  Sometime in December they're

13    supposed to come back with the judge, but I'm not sure.

14    Q.    You were defaulted in that, or you

15    dismissed all your claims, right?

16    A.    I think I dismissed the claims, yeah, but I

17    wasn't defaulted, no.

18    Q.    Why did you dismiss all your claims?

19    A.    I was instructed to.

20    Q.    By who?

21    A.    By somebody with a -- somebody who asked me

22    to.

23    Q.    Who's that?

24    A.    I said I wasn't going to talk about my

25    relationship with the federal government.

1    Q.    Who told you to dismiss your claims against

2  Clearview?

3    A.    Well, he asked me to, to be precise.

4    Q.    Who asked you?

5    A.    Somebody who was in a relationship with the

6  federal government.

7    Q.    Okay.  Well, who is that person?

8    A.    I'm not going to answer that question.

9    Q.    Why is that?  You -- Well, hold on.  You

10  could answer, you're just choosing not to, correct?

11    A.    I'm choosing not to, correct.

12    Q.    You could -- you could provide the name,

13  correct?

14    A.    That's correct.

15    Q.    Okay.

16    A.    I could.  I'm electing not to.

17    Q.    Do you remember when the judge in that case

18  tried to call the per --

19    A.    That' correct, yeah,  well, so she claimed.

20  I don't know if she actually did that or not.

21    Q.    It was a made-up person, right; that's what

22  she concluded?

23    A.    No, that's what she said publicly.  I don't

24  know if that's necessarily true.

25    Q.    Sorry.  And by "she," I -- the federal

```
1   judge --
2        A.    There are two federal judges in the case,
3   both women.  One is Judge Failla Polk, and the other is
4   -- it's a woman that escapes me right now.  But I'm
5   looking right at her.  And so there are two judges in
6   that case.
7        Q.    All right.  So let's --
8        A.    I think it's Polk or, you know, Judge Polk
9   or Justice Polk.  I'm not really sure.
10       Q.    Maybe --
11       A.    Judge Polk.
12       Q.    Maybe Judge Failla, or however you say it.
13       A.    Well, Failla Polk is her full name.  Yeah.
14       Q.    Let's go back to this interrogatory.  So
15   you said you -- you mailed responses?
16       A.    I did, yeah.  I gave them to my father to
17   mail them.
18       Q.    Okay.  Let's just go through this.  So I'm
19   going to ask about you first personally.
20       A.    Mm-hmm.
21       Q.    Okay.  So tell me the names of all the
22   financial in -- institutions.
23       A.    I have --
24       Q.    Be it a bank account or any type of --
25       A.    As far as I know, I have only one financial
```

1    institution currently, and it's called Woodforest Bank.

2         Q.    Okay.  What about previous --

3         A.    And I have a checking account there.

4         Q.    What about previously?

5         A.    I don't have anything previous to January

6    1st, 2023, as far as I know.  I had maybe a Bank of

7    America or a Chase Bank, but I'm not sure when those

8    accounts were shut down.

9         Q.    When was the last time you visited a

10   Woodforest Bank?

11        A.    Maybe a week ago, ten days ago.

12        Q.    Where was that?

13        A.    In Fort Worth.

14        Q.    What were you doing there?

15        A.    I was getting some lollipops and taking

16   out -- or, no -- putting in $1400 into a -- into a

17   personal checking account.

18        Q.    Any other?

19        A.    No.

20        Q.    Anything else you did there?

21        A.    It's in a Walmart, so I bought a candy bar.

22        Q.    Do you have a safety deposit box?

23        A.    No.

24        Q.    And what bank -- so what financial

25   institutions does the EB White Trust have a bank

1    account with?

2       A.    I don't know.  My brother handles my

3    daughter's accounts.  But again, you're not supposed to

4    ask about those.  The judge was really clear about

5    that.

6       Q.    Well, I get to ask about it, and you can

7    answer it.  So, You could answer --

8       A.    That was -- those were trusts that were set

9    up in 2018, 2019, so they'd be beyond the scope of what

10   you're talking about anyway.

11      Q.    So does the EB White Trust have a -- have a

12   bank account?

13      A.    As far as I know, no.

14      Q.    Okay.  And just to be clear, Mr. -- Mr.

15   Johnson, Judge Pittman asked you to identify -- to

16   answer these interrogatories fully and completely.

17      A.    Mm-hmm.

18      Q.    He didn't limit the scope of their answer

19   -- of your answers in this --

20      A.    No, but he was quite --

21      Q.    -- or the scope of the question.

22      A.    He was he was quite clear that asking

23   questions about accounts that I don't have access to or

24   don't control is a privacy violation.  And it's

25   obviously involving minor children, so we're,

1  obviously, not going to go there.

2      Q.    So my question -- I'll ask it a different

3  way.

4            Are you provide -- is there information

5  you're not providing me based on something you think

6  Judge Pittman said about trust accounts for your kids

7  -- or kid?

8      A.    I mean, Judge Pittman was clear that -- and

9  I said very emphatically that I didn't have access to

10  those accounts, which I don't.  The trust belonged to

11  my ex-wife and to my daughter, so it's not really

12  relevant.  And besides, it's beyond -- it's outside the

13  window in question anyway.

14            As for the Task Force Trust, I mean, I own

15  half of an equity -- or half of a position in a -- the

16  special purpose vehicle that Mr. Lambert and I did in

17  2020.  And Mr. Lambert, obviously, disputes that.  And

18  that was never -- that -- that trust account was never

19  funded fully.

20      Q.    So I'm going to object as non-responsive to

21  that, Mr. Johnson.  My question -- I'll ask it

22  differently.

23            Are you withholding information about the

24  EB White Trust is a capital trust?

25      A.    No, I just don't -- I don't -- I'm not

1    involved with it.

2        Q.    Okay.  So who has the information about

3    that?

4        A.    I don't know.

5        Q.    So the EB White Trust, its tax records, its

6    bank accounts --

7        A.    I have no -- I am not involved with that.

8    That's part of the reason you set up a trust, is to

9    limit your own exposure to it.

10        Q.    Who --

11        A.    So I have no -- I have no access to it.

12    Could be my brother.  It could be my ex-wife.  I'm not

13    sure.  But the -- none of the stocks have moved, as far

14    as I know, since they were set up.

15        Q.    What is your ex-wife's name?

16        A.    Bernadette Hapsari.

17        Q.    Okay.  What's her phone number?

18        A.    I don't know it.

19        Q.    How do you contact her?

20        A.    Typically she contacts me and usually it's

21    over Signal.

22        Q.    Okay.  When was the last time you

23    interacted with her?

24        A.    It would have been four or five days ago in

25    Los Angeles.

```
1        Q.    What was that about?

2        A.    It was about what was going on in

3   Indonesia.

4        Q.    When was the last time you communicated

5   with her before that?

6        A.    Might have been, like, a week before that.

7        Q.    What was the substance of that

8   conversation?

9        A.    My daughter got a perfect score on her

10  Chinese test.

11       Q.    Okay.  When was the last time before that?

12       A.    Maybe like a week and change before that.

13       Q.    So how often do you speak with your

14  ex-wife?

15       A.    Maybe once or twice a week.

16       Q.    Okay.  Putting aside anything about, like,

17  about your daughter's schoolwork, that kind of stuff?

18       A.    We don't really discuss anything about

19  that.

20       Q.    In the last year, have you guys dis -- have

21  you and your ex-wife discussed anything, putting aside,

22  you know, schoolwork about your daughter?

23       A.    Health matters about her mother.  Our old

24  dog got sick.  Yeah.

25       Q.    When was the last time you discussed
```

1    financial matters with her?

2        A.    I haven't discussed financial matters since

3    2020 -- well, let's see.  Hoan Ton-That called her and

4    said that he wanted to give her $400,000 if I would

5    tell her -- if she would tell me to drop this suit

6    against Clearview AI.  And that was in -- that would

7    have been at the end of 2023 or twenty twenty -- yeah,

8    it would have been 2023 that we discussed that.

9            And I said, "This seems very suspicious.

10   Do what you think is right."  Yeah.  And that was in

11   the kitchen of her -- of her home.

12       Q.    So other than that conversation in 2023

13   about a conversation about that $400,000, no other

14   financial discussions with --

15       A.    No.

16       Q.    -- your ex-wife?

17       A.    Let's see.  You know, I owed her $400, and

18   I gave it to her in cash.  And I owed her -- on a few

19   occasions, I've owed her, like, hundreds of dollars on

20   occasion for, like, our child and for, like, various

21   incidentals, and I've given those to her, typically, or

22   I've given her gift cards or I've given her -- and

23   those are typically -- that's typically, like, ways of

24   maintenance for our daughter.

25       Q.    Any other financial compensation?

1    A.    No.  As far as I know, no.

2    Q.    Nothing else?

3    A.    Not that she would listen to me anyway, but

4    no.

5    Q.    Okay.

6    A.    She -- we -- we don't -- we don't really

7    discuss any financial stuff.

8    Q.    Did you ever discuss the Othram stock with

9    her?

10    A.    Which one?  Oh, no, that's not -- so, she

11    wanted to cash out of the Othram position, and -- and I

12    said, "Well, let me go find out what they're all

13    worth."  And so I contacted Mittelman to talk about

14    selling the entire position.  Now our contention is

15    that we own more of the stock, but if I could get a

16    million bucks from -- from David Mittelman, I'd be

17    happy to get that, mostly because it's an illiquid

18    stock and we have some -- you know, the larger family,

19    there's some sort of health concerns going on.  Her

20    parents are aging, and -- and so there was a question

21    there about whether or not her trust could be used --

22    my ex-wife's trust could be used for the -- for elder

23    care.  And I said I didn't know the answer to that.

24    But I said that I would be happy to sell, to liquidate

25    the Othram stock, and that she could -- she could have

1    her portion of it, and if she needed more, she'd be ha

2    -- she'd be happy -- I'd be happy to give her mine as

3    well.

4         Q.    So she independently asked to liquidate the

5    Othram stock?

6         A.    She did.  She did.  And she also asked to

7    liquidate, you know, our daughter's position as well.

8         Q.    When did she make that request?

9         A.    That would have been -- let's see.  When I

10   last saw her was in -- for, like, an extended period,

11   that would have been maybe August or July.  Because I

12   didn't see them in September.  Yeah.  So that would

13   have been then.

14        Q.    Was that in-person request?

15        A.    It was in person.  That was an in-person

16   request, yeah.  So typically I will see my ex-wife and

17   daughter at least once a quarter, sometimes twice.

18   Depending.

19        Q.    For each quarter, how much money do you

20   contribute to them?

21        A.    It depends on the situation.  It depends

22   what they need.

23        Q.    Well, say, in the last -- in 2025, how much

24   money have you provided to them?

25        A.    I don't know.  I can find out, but I don't

1    know.

2        Q.    How would you find out?

3        A.    I could check the records of my AmEx and I

4    could check the records of cash that I've withdrawn.

5        Q.    Do you send them, like, envelopes of cash,

6    or how do you make the transfers?

7        A.    Sometimes envelopes of cash.  Sometimes in

8    person I give -- physically give them cash, yeah.

9        Q.    Do you send them, you know, Venmo?

10       A.    No.

11       Q.    Zelle?

12       A.    Don't do any of that.

13       Q.    Do you know what those platforms are?

14       A.    Yes.  I don't have any of them and I don't

15   use them.

16       Q.    So you've traveled a lot.  You post about

17   traveling a lot I see on your Substack and Twitter?

18       A.    Yeah, I've traveled quite extensively,

19   yeah.

20       Q.    I'm a big reader of your Substack, by the a

21   way.

22       A.    Well, you should buy a subscription.  I'm

23   sure DLA Piper can afford it.

24       Q.    Where do you get the money to fly so -- so

25   much?

1   A. Usually it's paid for by others.

2   Q. Okay.  Well, I saw the last one.  You were,

3 I think, in first class having an orange juice?

4   A. Oh, yeah.  I went to go see Courtney Love

5 in -- in -- that would have been -- was it last year?

6 Yeah, I guess it was right before or right after the

7 election.  But yeah, Courtney Love flew me to London

8 and I stayed at her home in Chelsea for, I guess it

9 would have been like ten days or so.

10   Q. Who paid for that?

11   A. Courtney did.

12   Q. She paid for your flight?

13   A. She did.  And all my meals when I was

14 there, yeah.  Very generous.

15   Q. Who paid for your flight to -- you said

16 you're back in LA.  Who paid for your flights there?

17   A. That probably would have been done by Keri

18 Kukral.

19   Q. Okay.  I've never heard that name.  Can you

20 please spell it out for me?

21   A. K-E-R-I, space, K-R -- K-U-K-R-A-L.  Yeah.

22 K-E-R-I and space K-U-K-R-A-L.

23   Q. Who is that?

24   A. She's a woman that was in a romantic

25 relationship with Steve Jurvetson, who's a board member

1    of -- I believe of SpaceX, who was wrongly treated by

2    him and is -- is a -- was also involved in the

3    investigation into Mr. Musk's relationship with Igor

4    Kirkenoff.

5         Q.    Does she work for the federal government?

6         A.    I don't know.  I don't know what she really

7    does for work.

8         Q.    Okay.  So I'm going to ask a little more

9    specific question about your travel in the last six

10   months.

11        A.    Okay.

12        Q.    Okay.  So let's just take us back to, say,

13   May 2025.

14        A.    Okay.

15        Q.    How many flights have you taken?

16        A.    Since May?

17        Q.    Yeah.

18        A.    Maybe two or three.  Yeah, I haven't left

19   the country.  And --

20        Q.    You've come down here at least three times.

21        A.    Oh, yeah, I've been here, I guess, to

22   Texas, yeah.

23        Q.    So, like, let's just -- like, let's just

24   think hard and catalog them.

25        A.    So any -- anytime I've been to Texas, that

1    counts, I guess.  But other than that, I went to visit

2    my daughter in August, but I think I tacked that on to

3    a Fort Worth trip, but I'm not totally sure.  I can't

4    really remember.

5              And I'm trying to think.  What are the

6    other big ones?  I didn't fly to Boston; I took the

7    train.  I flew to Houston in July, but that was a very

8    brief trip.  That was, like, a 24-hour kind of thing.

9    I'm trying to think.  Are there any others?  Yeah, I

10   don't think so.

11        Q.    Who paid for that?  Like, how do you pay

12   for that?

13        A.    In those cases, I had, like, airline points

14   or I had, like -- in the case of going to Texas, my

15   parents paid for that.  My -- my -- I believe my father

16   paid for that on the Houston trip.  Yeah.  In fact, I

17   think he paid for me and the person who traveled with

18   me.

19        Q.    Who was that person?

20        A.    Her name is Gabi Dolce -- I forget her last

21   name.  She has two last -- a hyphenated named.

22   Dolce-Dunson.

23        Q.    So you do a fair amount of traveling,

24   right?

25        A.    I mean, it's sometimes more, sometimes

1    less.  I try to do less traveling these days.

2        Q.    I ask because early on in this case, Judge

3    Pittman ordered you to appear and you said, I think,

4    you had a doctor's note --

5        A.    I did.

6        Q.    -- I don't know how legitimate it was,

7    saying that you had a debilitating condition that

8    prevented you from traveling.  So how do I square that?

9        A.    So my eyes, in general, are affected by

10   what's -- what's called -- with moisture in the air.

11   So when it's extremely moist in the air, my eyes tend

12   to hurt.  Fortunately, Fort Worth is not a very moist

13   place.  It's a more desert climate, a more western

14   climate.  So when I first came down here, my general

15   practitioner advised that I wear sunglasses and that I

16   sort of do my best to kind of take care of my eyes.

17            He was of the view that it was more like

18   the Houston environment, but it's sort of not.  So it's

19   not as bad.  Obviously, I don't -- as you can see from

20   my travel itinerary, I don't tend to go to places - the

21   exception of being of Houston in July, which I don't

22   recommend doing if you have an eye condition.  And part

23   of the reason I ended up leaving Houston sooner was

24   because it was quite a lot of pressure on my eyes.

25        Q.    Who was the doctor?

1      A.    I have two of them.  But in that particular

2 case -- well, there's -- one whose name is Gerbetany --

3 her last name is -- so we call her Dr. Beth, but it's

4 Doctor -- I'll pull it up.  I'll -- I'll remember it in

5 a second.  But she's a friend of who -- of a woman I

6 know.

7            And then the other is -- was somebody who

8 was Houston based.  So he assumed I was spending more

9 time in Houston.  And he was somebody that was

10 recommended to me by Dr. -- by Robert Marling.

11      Q.    Where does Dr. Beth live?

12      A.    In Alexandria, Virginia, as far as I know.

13      Q.    All right.  Let's go back to the

14 interrogatories.

15      A.    Mm-hmm.

16      Q.    So can you provide us the account number

17 and routing number for your Wood --

18      A.    I don't know them, but I can find them out.

19      Q.    Okay.  Well, you're -- that's the point of

20 this interrogatory.  In the interrog --

21      A.    I think they were sent and they are in the

22 interrogatory.

23      Q.    That is not --

24      A.    I'm happy to send that again.

25      Q.    Okay.  And it's a checking account?

1       A.    As far as I know, it's a checking account,

2  yes.  But I don't have any savings or money market

3  accounts, so I assume that's what that is.

4       Q.    Okay.  How many people are authorized to

5  use it?

6       A.    I think that one is just me and my ex-wife,

7  but I don't know.  And I think that's it.

8       Q.    It's at a Walmart?

9       A.    Yeah.  All Woodforest Banks are at

10  Walmarts, or at their -- most of them are.  A lot --

11  some of them are not, but most of them are.

12       Q.    So no U.S. Bank, Wells Fargo, International

13  bank --

14       A.    None of that, no.

15       Q.    Okay.  When did you open that Woodforest

16  Bank?

17       A.    That would have been twenty -- I want to

18  say 2017 or 2018, but I'm not sure.  I can find out.

19       Q.    And so where'd you bank before that?

20       A.    I banked at First Foundation Bank, I think.

21  And I think I banked at Wood -- was it Wells Fargo?

22  No.  CitiBank.  I banked at CitiBank.  And it might

23  have been Bank of America, too, but I'm not sure.  I

24  didn't handle that side of it.

25       Q.    Where did you mail those interrogatory

```
1    responses to?
2         A.    To the same add -- same address on file
3    that is at the bottom of this.
4         Q.    Okay.  I didn't mail them; my father did.
5               (Marked Deposition Ex. 2)
6    BY MR. THOMPSON:
7         Q.    Handing you what's been marked as
8    Exhibit 2.  Do you also recall last week that Judge
9    Pittman ordered you to produce documents today and
10   bring documents here?
11        A.    He did, yeah.
12        Q.    Do you recall that?
13        A.    I do recall him saying that.
14        Q.    And you were forwarded the orders by me,
15   correct?
16        A.    Yep.  That's right.
17        Q.    So you have them?
18        A.    Yep.  No, I don't have them with me now.
19        Q.    No, but you were aware of them?
20        A.    Yes, I was aware of them.  Yeah.
21        Q.    So Exhibit 2 are the post-judgment requests
22   for production that the plaintiff sent to you.  There's
23   nine of them.
24        A.    Mm-hmm.
25        Q.    And my question is easy:  Do you have
```

1    documents with you today?

2        A.    No, I don't.

3        Q.    Why not?

4        A.    My understanding is I mailed them through

5    my father, but I don't have them.

6        Q.    Do you realize that Judge Pittman ordered

7    you to bring them to the --

8        A.    Yeah.

9        Q.    -- deposition today?

10       A.    Yep.  Slipped my mind, though, and I was

11   staying at a place without a printer.

12       Q.    What place was that?

13       A.    I was staying in a factory in El Monte,

14   California, before I came here.

15       Q.    How does one stay at a factory?  Is it a

16   Airbnb, is it --

17       A.    No, it's a factory, as in, like, it's --

18   it's a uniform manufacturing facility in El Monte,

19   California.

20       Q.    Why did you decide to stay -- live in a

21   factory, or stay in a factory?

22       A.    It's -- it is close -- it's sufficiently

23   close to my daughter and it's owned by a -- by our

24   family, by the Lauger family.  It has a shower.  It has

25   accommodations.

1      Q.     But you agree you didn't bring any
2   documents today --
3      A.     Correct.
4      Q.     -- with you?
5      A.     Did not.
6      Q.     Okay.  Did they have a printer at the
7   factory?
8      A.     They did, but I wasn't, like, allowed to
9   use it.
10     Q.     Did you ask to use it?
11     A.     I did.
12     Q.     You did?  Who told you no?
13     A.     That would be the -- the woman who was in
14  charge there, and she said the ink wasn't working
15  properly.
16     Q.     Well, this wasn't like they didn't -- they
17  said you can't print anything, right?
18     A.     It wasn't like they said I couldn't print
19  it, no.
20     Q.     How hard do you think you tried to actually
21  bring documents?  Would you say --
22     A.     Didn't try that hard.  I mean, I did ask
23  them if they had a printer.  They did say yeah, but the
24  -- I think the ribbon wasn't working or some issue with
25  the ink, and it would have been like runny or whatever,

1  and I was, like, I don't want to do that, that'll just

2  get me -- that'll be seen as being disrespectful.  And

3  if they really need it, I'll just send it to them.

4      Q.    I mean, you kind of blew this off, right?

5      A.    Yeah.  I mean, I don't respect this

6  process, no.

7      Q.    Okay.  So you could have gone to, like, a

8  Kinko's or somewhere like --

9      A.    Yeah, generally speaking, I go to FedEx.

10  But when I'm in California, it's a bit more challenging

11  because I'm not -- I'm not around FedExes as readily as

12  I am when I'm on the east coast.  But yeah, next time

13  I'll do FedEx.

14      Q.    But fair you didn't try really hard to

15  comply?

16      A.    No, I wouldn't go that far.  I would just

17  say that --

18      Q.    You said you blew them off.

19      A.    -- I was busy.  No, I mean, I don't -- I'm

20  happy to answer them now.  But remember, you have 30

21  more minutes.  Actually, I think 20.  But go on.

22      Q.    No, we've got a little bit longer than 20

23  minutes.  I've got this whole -- see all of these right

24  here?  I've got a lot of papers to go through.

25      A.    Okay.  Well, we'll see.

1    Q.    A lot more than 20.  All right.  So have

2  you mailed the tax returns?

3    A.    I have not.

4    Q.    Okay.

5    A.    I'm not -- I don't have access to them.  So

6  I can give you the name of my -- I think his name is

7  American CPA.  You can pull them up.  You'll find them.

8    Q.    That's not really kind of how this works.

9  The thing is, you need to collect the documents.

10  So you're --

11    A.    Yeah.  I'm not -- I'm going to spend as

12  minimal amount of time on this as possible until the

13  Fifth Circuit rules.  So.

14    Q.    Okay.  Do you think you've got good

15  arguments there?

16    A.    Yeah.  I think I'm gonna win the whole

17  thing, to be honest.

18    Q.    Are you going to show up and argue?

19    A.    I may, if they ask me to.

20    Q.    Okay.

21    A.    I mean, you haven't submitted the brief.  I

22  get it on time.  You asked for the delay on timing.

23    Q.    We did not -- I'll say the plaintiffs

24  didn't ask for any extension on the briefs.  But we

25  might.  Would you -- would you grant it if we requested

1    it, Chuck -- or Mr. Johnson?  Sorry.

2         A.    I -- I mean, I have no objection to it.  I

3    mean, you're gonna lose either way, so it's fine.

4         Q.    Okay.  All right.  So do you have the

5    information on your CPA?

6         A.    I think it's -- if I had my phone, I can

7    pull it up and tell you.  But Amer -- it's

8    americancpa.com.  I think his name is Dan something.

9    I'll find it and send it to you.

10        Q.    Well, let me ask it, let me maybe start a

11   little more basic.

12              Do you object to producing your tax

13   returns?

14        A.    Yeah.  It's invasive.  So yeah, I do object

15   to it.

16        Q.    So are you going to produce them or not?

17        A.    I don't know yet.  I have to think about

18   it.  I can give you the name of the accountant and you

19   can write to him and ask him, and then he'll ask me if

20   you should get it, and then I'll make a decision.

21        Q.    Okay.  Well, I'm -- Judge Pittman ordered

22   you to produce them.  And so are you going to produce

23   them or not?

24        A.    We'll see.

25        Q.    So, right now, will you commit to producing

1    them?

2        A.    Well, we'll see how the line of questions

3    go.

4        Q.    No, no, no.  I said:  Right now, speaking

5    here at --

6        A.    No, I won't.  I won't -- I won't agree to

7    anything until -- until the end of the day.

8        Q.    Okay.

9        A.    You require my consent to abuse me in this

10    process, and I'm giving you the minimal amount of that

11    consent, which is what I was asked to do in this --

12        Q.    Mr. Johnson, I'm not asking -- I'm not

13    trying to abuse you.

14        A.    Yes, you are.  You're participating in a

15    lawsuit that is backed by a -- by a billionaire who is

16    -- didn't want to be investigated by the feds.  I can

17    appreciate that, by the way.  It's kind of an invasive

18    process to be investigated by the feds.  But that's

19    what you're doing.  And this is why you're ultimately

20    gonna lose your law license.  But we can continue if

21    you want.

22        Q.    Okay.  My question is -- I think it's yes

23    or no -- testifying right now, do you commit to --

24        A.    No.

25        Q.    -- producing your tax --

1      A.    The answer is no, I do not intend.  So, to

2    be very precise about this, I do not intend to provide

3    any information until the end of the day when I make a

4    judgment call about how I feel about your line of

5    questions and whether or not -- and if the judge wants

6    to order me here or arrest me or whatever, I'm happy to

7    go through that whole process.  I have no objection to

8    that.

9      Q.    Okay.

10      A.    In fact, I rather welcome it.  Next

11    question, counselor.

12      Q.    But right now, you will not --

13      A.    The answer is no.

14      Q.    Okay.  That's what I wanted to know.

15      A.    Yes.

16      Q.    Okay.  Will you give me the CPA's full

17    name?

18      A.    I don't know his full name.  I don't handle

19    that side of it.

20      Q.    You just said at the --

21      A.    His name is Dan something.  It's American

22    CPA.  I'm not -- I have the information.

23      Q.    Dan something at American CPA.  Can you

24    provide me any more information?

25      A.    No, because my main accountant died a few

1   years ago, or I think he -- he retired, then died.  You

2   should never retire is kinda the lesson in that.  His

3   name is George Lippert, L-I-P-P-E-R-T, and he dealt

4   with most of my tax matters until maybe a year or two

5   ago.

6       Q.    Well, if he's dead, I can't really ask him

7   for them.

8       A.    I think his wife still runs the firm, or

9   she has the records of all the stuff.  But we did move

10  to American CPA.

11      Q.    All right.  So we're going to go through

12  all these requests for production.  Did you produce --

13  did you -- today, did you bring any documents in

14  response to request for production number 2?

15      A.    No.  Asked and answered.

16      Q.    Okay.  So --

17      A.    But no, in terms of requests for

18  production, so number 2, we have none of those things

19  are applicable.  And we have the Othram stock and the

20  Clearview stock, and Xavier Capital, EB White Trust or

21  KawRuh Trust.  To the extent that I have any Task Force

22  Trust related, I have email correspondence where I

23  instruct Mr. Lambert to take my interest in the Umbra

24  SPV and put it in various places.

25              But Mr. Lambert decided to steal that --

1   steal that, and so, obviously, the Task Force Trust

2   isn't funded.  I checked with my father and brother on

3   that, so they -- they told me that that was not --

4   never actually done.

5               In terms of request for production number

6   3 --

7        Q.    Hold on.  I've got -- can I ask you another

8   question on number 2?

9        A.    Yeah, go ahead.

10       Q.    What about the monthly statements from

11   Woodforest Bank?

12       A.    We don't have any monthly for the -- none

13   of the trusts have bank accounts, as far as I know.

14       Q.    No.  This is -- this is not limited to the

15   trusts, Mr. Johnson.

16       A.    Oh.  In terms of my personal banking, I

17   don't use online banking.  So, you know, to the extent

18   that there would be any information there, it would be,

19   you know, debit cards, taking cash -- taking cash out

20   or transferring it to pay an AmEx bill.  So.

21       Q.    So your position is that Woodforest Bank

22   does not provide monthly statements?

23       A.    I think they do, but if they do, I don't

24   know where they go because I don't get them.

25       Q.    Did you request them?

```
 1        A.    I did not request them, no.
 2        Q.    And so you've produced no documents in
 3   response to request for production number 3, right?
 4        A.    Correct.
 5        Q.    Number 4, you didn't produce anything?
 6        A.    That's right.  No, nothing.
 7        Q.    And the same, 5, 6, 7, 8, 9, you --
 8        A.    None -- nothing's applicable in any of
 9   those things.  So it's, like, you're asking me:  Do you
10   have any -- you know, you're asking if any
11   cryptocurrency or digital wallets held by you or -- I
12   don't own any crypto -- cryptocurrency, nor do any of
13   my trusts, as far as I know.  Nor do any of the trusts
14   that belong to my wife and daughter --
15        Q.    Hold on.  Hold on.  Like, I'm just asking
16   if you brought anything today.  It's --
17        A.    I brought -- I brought absolutely nothing.
18        Q.    Okay.
19        A.    That's correct.  I made it very clear that
20   I asked about using the printer, and I did not -- did
21   not use the printer at the factory.
22        Q.    Okay.  Let's just go maybe take some
23   low-hanging fruit.
24              Number 8.  Do you own any vehicles?
25        A.    I own a 2017 Jaguar F-type which I bought
```

1    in mostly cash in 2017 -- or excuse me -- 2020, and

2    that is currently staying at a lot somewhere in

3    Chantilly, Virginia.  But other than that, I own no

4    vehicles.  I don't typically drive myself.  I typically

5    take public transportation or I'm driven.

6         Q.    So the documents that reflect your

7    ownership in that car, did you send them?  Did you mail

8    them?

9         A.    I don't know where those are, but I'm --

10   I'm supposed to, at some point, get the title and

11   everything because I was planning to sell that car, but

12   I have not as yet done that.

13        Q.    When's the last time you transacted in any

14   crypto, Bitcoin, any type of financial --

15        A.    Probably 2018.  That would have been maybe

16   2017.

17        Q.    Okay.  To go --

18        A.    And I haven't touched it since.

19        Q.    To go back to your car, do you realize that

20   you can't sell that, or the proceeds of it need to go

21   to satisfy this judgment?

22        A.    Yeah, that's probably why I haven't

23   actually found the title yet for it.

24        Q.    I don't understand.

25        A.    But if -- but if Mr. Lambert wants to go

1    take the car and get it, I think it has a flat tire and

2    a battery issue, so he's happy to have it.

3        Q.    I don't get what you mean.  I think your

4    answer was, "That's probably" --

5        A.    I haven't sold it as yet.

6        Q.    But you said, "That's probably why I didn't

7    go get the title."

8        A.    Yeah, I didn't -- I didn't bother, sort of,

9    doing the work to get the title.  So my car was listed

10   as stolen for a period, and that was because it was

11   moved from one place to another because they were doing

12   asphalt in the place that I was living and so they

13   moved the car.  I didn't know where the car was.  I

14   don't typically drive because of the eye issues.  My --

15   I don't have a driver's license.  I haven't driven a

16   car probably -- I think the last time I drove a car

17   was, like, four months ago.  No, that would have been

18   three months ago maybe.

19       Q.    I did post that picture of you driving.

20   You know, when you said that you had a debilitating eye

21   condition.

22       A.    Yes.  Yes.

23       Q.    It had you -- it had you with the top down.

24   Do you remember that one?

25       A.    Yes.  Yes, that's true.  I haven't driven

1    my Jaguar, though, in twen -- since 2024.

2    Q.    Okay.  So let's -- tell me about all the

3    places or exchanges where you did enter -- engage in

4    crypto transactions.

5    A.    I guess the question is -- I'm probably not

6    supposed to talk to you about this because it is a

7    federal issue, but I haven't used cryptocurrency in a

8    number of years.  Basically, since 2017-2018.  No.

9    Actually, hold on.  Is that right?  Yeah, that's right.

10    Yeah, the last time I used any wallet associated with

11    Bitcoin was in twenty -- it would have been 2018, yeah.

12    But it wasn't my account; it was somebody else's

13    account.

14    Q.    Well, let's just make the record clear.  So

15    your testimony --

16    A.    My testimony is ironclad --

17    Q.    Hold --

18    A.    -- and clear.

19    Q.    Hold --

20    A.    I have not touched anything involving

21    cryptocurrency since probably -- probably, at the

22    latest, most recent period would have been maybe, maybe

23    May 2018.  And it's probably more likely 2017.

24    Q.    And you said that's ironclad?

25    A.    As far as I know, yeah.

1    Q.    Okay.  Was that on an exchange?  A wallet?

2  Cold storage?

3    A.    That was a person-to-person transaction,

4  and it was involved -- I think it was with Josh Jones,

5  but I could be wrong about this.  And Josh Jones is a

6  -- owns DreamHost and he agreed to buy some crypto from

7  my then-mother-in-law.

8    Q.    So we're going to go into your different

9  investments and everything in a lot more detail later,

10  but just give me an overview of your engagement and

11  work with crypto mining.

12    A.    I haven't done any crypto mining at all,

13  no.

14    Q.    What about Bitcoin mining?

15    A.    I have not done any Bitcoin mining.

16    Q.    Do you know what that is?

17    A.    I do.

18    Q.    Okay.  Do you remember news articles where

19  you're quoted about it?

20    A.    Possibly.  But many of those news articles

21  about me are not always the most accurate.

22    Q.    What's your understanding of what Bitcoin

23  mining is?

24    A.    It's running a computer program to extract

25  -- basically, it's like a puzzle that the machines are

1    running, usually done on an ASIC or GPU, but I haven't

2    done it in a number of years.  There's some case to be

3    made I haven't done it in at least ten years.

4         Q.    Okay.  So have you -- so my first

5    question's going to be:  Have you ever done it?  And

6    the next one's going to be:  When?  Okay, Mr. Johnson?

7         A.    Mm-hmm.

8         Q.    Have you, personally, anyone at your

9    direction, any company you invest in, any company

10   you're involved with, done crypto --

11        A.    There's sort of a compound question there,

12   so maybe you want to take them one at a time.

13        Q.    Okay.  Have you ever personally done it,

14   any Bitcoin mining --

15        A.    Yes.

16        Q.    -- or cryp -- when was the last time?

17        A.    It would have been 2015.

18        Q.    Okay.  And what about anyone acting at your

19   direction?

20        A.    No.

21        Q.    What about a company you're involved with?

22        A.    No, I'm not involved with any companies

23   involved with it.

24        Q.    Okay.

25        A.    I was looking into doing it at one point,

1    but ultimately I elected not to do it.  Mostly when

2    President Trump tweeted that he was not a fan of

3    Bitcoin in the first administration, that's when I

4    severed all of my relationships with anything Bitcoin

5    related, which I believe was in 2017.

6        Q.    What is the -- what's the most money you

7    ever had in that Woodforest Bank account?

8        A.    Maybe 30 grand, 40 grand, but I'm not sure.

9        Q.    And that was the only account you've had

10   since 2017 I think you said?

11       A.    As far as I know.  I might have other

12   accounts, but I'm not sure.

13       Q.    Well, go on that, because that's one of the

14   reasons we're asking that.  You say you "might have

15   other accounts, but I'm not" --

16       A.    I might have other accounts at Woodforest,

17   but I'm not sure if -- I had a company called Traitwell

18   which banked there, but that company is sort of

19   moribund at the current moment.  May be resuscitated

20   later after all of this is sort of done with.  But on

21   the whole, no, I don't have any other accounts there.

22   And haven't for a while.  Yeah.

23            (Marked Deposition Ex. 3)

24   BY MR. THOMPSON:

25       Q.    I'm handing you Exhibit 3.

1        A.      Okay.

2        Q.      This is an FEC disclosure.

3        A.      Yep.  All of that is true.  I donated all

4    that of money.

5        Q.      This is all yours?

6        A.      That's correct.

7        Q.      All right.  Where'd you pay the money out

8    of?

9        A.      These would have been out of all my

10   personal accounts, but typically I did it out of an

11   AmEx.

12       Q.      Are you producing any of your AmEx accounts

13   with the requests for production?

14       A.      I did not.

15       Q.      Do you have any other credit cards other

16   than AmEx?

17       A.      I don't think so.  If I do, they're long --

18   they're long moribunds.

19       Q.      Okay.  All right.  So you -- are you

20   looking at Exhibit 3?

21       A.      I am.

22       Q.      Okay.  And "Employer," it says,

23   "Traitwell"?

24       A.      That's right.

25       Q.      Okay.  And it also says, "Stealth Startup."

1   What is a self start -- "Stealth Startup"?

2       A.    That would have been Traitwell.

3       Q.    Okay.

4       A.    What became Traitwell, I should say.

5       Q.    These are -- $5,000 is not an insignificant

6   amount of money.

7       A.    That's true.  And I was a lot richer at one

8   point.

9       Q.    Okay, well, how -- how rich were you back

10  then in 2020 when you had 5,000 -- I mean, you made

11  that $5,000 donation?

12      A.    Yeah, it's -- in 2020, I was pretty rich.

13  Partly because of the pandemic, partly because of other

14  things going on.

15      Q.    All right.  You said you were "pretty

16  rich."  Can you give a number to that or more detail?

17      A.    At one point, I had maybe like -- I was

18  maybe liquid, like, 150 grand to 250 grand.  But I'm

19  not sure.  It's been a while.

20      Q.    So is that the most you'd say you've ever

21  been liquid in is 150 grand?

22      A.    I don't know.  Maybe more.  But it's been a

23  long time since I -- since I recall it.

24      Q.    Then you say that you're the CEO of

25  Traitwell?

1    A.    That's right.

2    Q.    But you said that's -- I'm thinking, what's

3  your words?  Moribund?

4    A.    Moribund, yeah.  It's -- it's more or less

5  defunct at present, though I still own -- once I owned,

6  like, 70, 80 percent of it.  I'm not totally sure.  But

7  -- but yeah, the company has done pretty well for

8  itself, all -- all told.  But in terms of the

9  technology that it's built, it's pretty interesting.

10  But we'll see what ends up happening with it.

11    Q.    So who is the other owner of Traitwell?

12    A.    Dorothy Morgan is another owner of it.

13  There's a number of investors behind the company, maybe

14  like 10 or so other ones.

15    Q.    And it says -- are you -- scrolling

16  through, it's -- it was docket entry 28, Appx 040.

17  It's a Texas Secretary of State.

18         Do you see that?

19    A.    Yeah.  That's for the State of Texas, yeah.

20    Q.    Yeah.  And it says, "Our Perfect Score,

21  Inc."  What is that?

22    A.    That's the company that became Traitwell.

23    Q.    Okay.  Does Traitwell have any bank

24  accounts?

25    A.    Currently, it has one bank account.

1          Q.      Okay.  How much is in it?

2          A.      At Woodforest bank.  I think maybe, like,

3     400, 500 bucks.

4          Q.      All right.  Does Traitwell take in any

5     money?

6          A.      Currently, no.

7          Q.      Is Traitwell worth anything?

8          A.      Well, there's some IP behind it, so it

9     depends on whether or not people will buy it or not.

10          Q.      What's the IP?

11          A.      The IP has to do with taking -- it has to

12     do with taking genomic data and basically converting it

13     into software.

14          Q.      Okay.

15          A.      So, in essence, what you would do is you

16     take -- you take publicly available what are called

17     Genome-Wide Association Studies, and you convert those

18     into software.  So the 23andMe and Ancestry and other

19     things can basically tell you if you're, say, allergic

20     to certain types of foods or certain types of drugs.  A

21     thing called pharmacogenomics, to be precise.

22          Q.      So other than --

23          A.      So I spent most of the money that I -- that

24     I had at one point -- actually, hold on.  So I had -- I

25     had about a million dollars in the Woodforest account,

1    and then about 700 to 800,000 that I invested

2    personally in Traitwell.  So -- it might have been even

3    more than that.  Well, it ultimately ended up being

4    more than that because I put more money into the

5    company to bail it out at one point.  Yeah.  So that --

6    that's what the -- the company does.  Is it worth

7    anything?  Well, it --

8        Q.    I'm going to stop you there.  So hold on.

9    So how'd you make those transactions when you said you

10   bailed out Traitwell for hundreds of thousands of

11   dollars?

12       A.    That was from money that I had -- I had

13   sold some stock.  In this case, it was from a company

14   called Anduril, which I sold my stock for, and I owe --

15   I think I -- I put in about $200,000, and I think my

16   position was worth, like, 4 million bucks.  And I sold

17   it for about -- about a million.  The rest of it, I

18   gave back to the CEO of the company, or one of the

19   founders of the company because it was his company.

20   And then I took the million that I had, used some of it

21   on personal expenses, and then -- and political

22   donations, as you see.  And then some of it I put into

23   the company to what became Traitwell.  I also invested

24   some of that money in small-ticket items, in things

25   like Repeat, which is a startup based out of -- from a

1  friend of mine.  And then I also invested some of it in

2  a thing called Payala.

3         But I don't -- typically, like, when I made

4  these dec -- these investments in the past, they've

5  been sort of small-ticket kind of items and I don't

6  really pay attention to them until the CEO, or whoever,

7  tells me that they're doing well or poorly.  Generally

8  speaking, I don't really pay that much attention to

9  them.

10  Q.    Okay.  So we had Debbie -- Debbie Morgan

11  and you.  Who are the other investors in Traitwell?

12  A.    Dorothy Morgan.  The other investors, one

13  of them would be Robert Marling.  One of them would be

14  this Mohammad Alharthy, who's out of Oman.  Steve

15  Oskoui -- Oskoui, who is the smarter Mr. Musk.  Peter

16  Thiel was an investor.  I'm trying to think if there

17  are others.

18         Those are the big ones.  There might have

19  been somebody -- oh, Jonathan Barrett, he did, like, a

20  hundred grand, or maybe 200.  Yeah, it's been a while.

21  I don't know.

22  Q.    All right.  So let's go back to your

23  Anduril investment.  How much money did you invest?

24  A.    I invested $200,000.

25  Q.    When was that?

1          A.      2017.  2017-2018, I think.  Something like

2    that.

3          Q.      How did you do the investment?  Was it

4    yourself?  Were you on the cap table?  SPV?

5          A.      I don't know.  I mean, so I went to Palmer.

6    Palmer and I had dinner.  Palmer asked me for my help.

7          Q.      Who's Palmer?

8          A.      Palmer Luckey is the one who started

9    Anduril.  I -- by the way, for what it's worth, I

10   oppose totally what Anduril's doing these days, and

11   have for a number of years.  But Palmer came to me and

12   asked me to help him raise money for his second act,

13   which is what ultimately became Anduril.  And I said,

14   "If I help you raise this money, am I able, you know,

15   can I have equity in the venture?"  And he said, "Well,

16   you've done a lot of work for me, I can pay you, you

17   know, wages or I can pay you, or I can give you equity

18   in this venture."  And I said, "I'll take the equity."

19               We wrote a handwritten note to each other

20   at -- on -- I think it was -- it would have been April

21   2nd, 2019, that memo -- memorialized it.  And I have a

22   copy of that, like, floating around somewhere.

23          Q.      How would you locate that document?

24          A.      It's probably at my mother-in-law's house.

25   But I have a photo of it somewhere, too.

1       Q.    Okay.  You have a photo of that?

2       A.    I do.

3       Q.    Okay.  Would you produce that photo?

4       A.    Sure.

5       Q.    Okay.  Can you email that over after we get

6 done today?

7       A.    Sure.

8       Q.    This was -- we don't need to mark this.

9 This was Plaintiff's Exhibit 64.  You remember?

10      A.    I do.

11      Q.    It's one of my favorite emails.

12      A.    Yes.  I think it's privileged, though,

13 technically, to be precise about it.

14      Q.    Well, I got it, so how about we ask

15 questions about it.

16      A.    No, I think we should actually mark it as

17 privileged and actually say that not only is it

18 privileged, it's also likely hacked.  So no, we're not

19 going to be answering any questions about it.

20      Q.    So I'm going to ask questions because this

21 is an important document.  And I'll just tell you for

22 the --

23      A.    Yeah.  So --

24      Q.    Hold on.  I'll just tell you for the

25 record, you remember you had a lawyer named --

```
1          A.    I do.

2          Q.    -- Carter Boisvert?

3          A.    Yeah, something like that.  Sure.

4          Q.    He produced this document to us, and that's

5    why it says "Johnson."

6          A.    Okay.

7          Q.    And remember you said it was hacked at the

8    trial?  Do you remember?

9          A.    I did.  It's also privileged, so there's

10   that.

11         Q.    Okay.  So question, I'm going to ask you

12   about the signature, the "To" and "From" up at the top.

13         A.    Mm-hmm.

14         Q.    It says "Charles Johnson."  It doesn't say

15   who it's to.  Who are you writing this email to?

16         A.    Don't know.

17         Q.    Don't know?

18         A.    No.

19         Q.    You did write this, though, right?

20         A.    I don't know if I wrote it or not.

21         Q.    Okay.  So let's go down here.  "Anduril,"

22   do you see that at the bottom?

23         A.    Mm-hmm.

24         Q.    It says, "I invested about 200K"?

25         A.    Yeah.
```

1    Q.    "At the seed round of 80 million.  The

2    current valuation of the company is north of 2

3    billion."

4         So what would that have made your $200,000

5    investment worth?

6    A.    I think it's technically at 3 billion

7    now -- or 30 billion.  Excuse me.  Yeah, I don't know

8    what it ended up being, but I sold my position a long

9    time ago.

10    Q.    Okay.

11    A.    So.

12    Q.    And what documents show that sale?

13    A.    Palmer wired me the money, so that probably

14    would account for it.

15    Q.    Into what bank account?

16    A.    Into my Woodforest Bank account.  But that

17    would have been -- that would have been -- yeah, I'm

18    not actually sure when he actually did that.  Anyway,

19    it doesn't matter.

20         I see you're not asking about the Umbra

21    Synthetic Aperture Radar company.  I think that

22    position is probably my largest position.

23    Q.    Well, we're going to go through it.  So.

24    All right.  Let's -- let's just take these.  So we have

25    Othram.  Do you see that?

1  A. We have Othram, yep.

2  Q. Okay.  So is that --

3  A. I don't know what --

4  Q. -- sentence correct?

5  A. Is the sentence correct?

6  Q. Yeah.  Under Othram, can you just read that

7 out loud?

8  A. "I cofounded Othram with David Mittelman

9 and Steve Hsu.  It's worth $25 million at last funding

10 round.  It's gotten acquisition offers over a hundred

11 million."

12  Q. Okay.  Is that accurate?

13  A. I don't know if it's accurate or not.

14  Q. Is it accurate based on your understanding?

15  A. I don't think so.

16  Q. Okay.  You said you were the second ever

17 investor in Anduril?

18  A. I was, after his mother, I think,

19 technically.

20  Q. So were these advisory shares, special

21 equity, or what?

22  A. Don't know.

23  Q. How did you pay the money for the 200,000?

24 Where did it come from?

25  A. Palmer owed me the money.

1      Q.    Did you, Charles Johnson, or any account

2  under your control send any money to Anduril?

3      A.    No.  Nor would I have.

4      Q.    Okay, why -- it says, "I invested about

5  200,000."

6      A.    Mm-hmm.

7      Q.    So you didn't actually invest 200,000; is

8  that --

9      A.    No.  He owed me the money.  So in lieu of

10  paying me the money, he had me -- he converted it into

11  equity in what became Anduril.

12      Q.    So were you ever on the cap table or

13  have --

14      A.    As far as I know, no.  But I don't know.

15  He was -- he told me that he was going to put me on the

16  cap table.  But to be honest with you, I didn't really

17  care because I don't really support what Anduril's

18  doing.  And so when I got my million dollars for

19  Anduril, when they finally gave me my cash for that, I

20  was happy to get that money and to move on.

21      Q.    Do you --

22      A.    And I also believe that it's Palmer's

23  company, Palmer should be allowed to have more control

24  and more equity.  And politically, Palmer and I were

25  deviating from one another.  We were disagreeing on a

1    lot of political matters.  The biggest one, of course,

2    is when he started the company it was supposed to be

3    for non-violent deterrence purposes, and ultimately was

4    used -- was building munitions to kill people and I'm

5    opposed to that.

6        Q.    Did you report this payout or payment from

7    Anduril on your taxes?

8        A.    I think I did, yeah, but I'm not a hundred

9    percent on that.

10       Q.    Did that --

11       A.    It wouldn't matter anyway because the

12   lion's share of the cash that I made from it, I just

13   rolled over into the Traitwell investment, so it would

14   have been a minimal tax evais -- or tax -- you know,

15   tax incident.

16       Q.    "Tax evasion"?

17       A.    Well, I was gonna say tax -- you know,

18   tax-evasive maneuver.  But yeah.  But no, just to be

19   blunt about it, no, I -- I did not.  As far as I know,

20   the million dollars that I got from that, almost all of

21   it went into other investments.  And then I was paid a

22   salary at Traitwell, but it was the lowest salary of

23   any of the employees.

24       Q.    What was that?

25       A.    Maybe like 60 grand.  Yeah.

1      Q.    All right.  So let's --

2      A.    Could have been -- could have been -- no, I

3   think it was, like, 64,000.  Because it was a joke at

4   the time.

5      Q.    All right.  So this Exhibit 64, do you

6   admit that you wrote this email, or do you have a

7   reason to think you didn't write it?

8      A.    Yes, I have reason to think that it's not

9   totally accurate, yes.

10     Q.    Who hacked it, do you think?

11     A.    Well, Mr. Musk does use hackers, so I think

12  that it's possible that he -- that he did it.  And I

13  think actually one of the reasons you wanted to go and

14  do a -- basically an invasive request for anything

15  involving Mr. Musk in my emails was because you'd

16  already hacked these things, and so what you wanted to

17  do was kind of build a -- a plausible chain that would

18  protect you legally.  Yeah.

19          But I think what this was, if I recall this

20  correctly - I could be wrong about this - but I think

21  the attorney who was representing me wanted to know --

22  I think this was -- these were emails that I might have

23  sent concerning Mr. Lambert, or maybe it's possible

24  there was something else.  But I don't really recall

25  writing the email.  And I don't think most of it is

1    accurate.  I think a lot of it might be mistaken in

2    different ways.  And there are elements of it that are

3    inaccurate.  So, you know, it turns out you can't

4    patent "pay with my face."  Apple already controls the

5    patent.

6             On the -- on the Traitwell stuff, this

7    probably -- if the email -- if I wrote the email, it

8    would have been written in 2020.  But no, I don't

9    recall writing it.

10            And then in terms of the -- the last thing

11   on it, on the Bitcoin mining operation, there was

12   something that I invested in that I backed for 600,000

13   bucks with a friend of mine, but I -- as I said, when

14   President Trump came out against Bitcoin in a serious

15   way, I severed all ties with that person.  I haven't

16   talked to him in many years.  And that would be Eric

17   Yingling.

18       Q.    How did you make that investment for

19   600,000?

20       A.    I owned a lot of Bitcoin early on in the

21   process.

22       Q.    Where was that Bitcoin held?

23       A.    It was held in a Coinbase account, and it

24   was held -- what was the name of that?  But I had -- I

25   don't -- I haven't had Bitcoin in many, many years.

1      Q.     What's the most Bitcoin you've ever held at

2  one time?

3      A.     I don't know.  That's a good question.

4      Q.     Can you approximate it?

5      A.     No, I -- well, I mean, the problem with it

6  was I was using it as a currency circa, like, 2012,

7  2014.  I mean, I bought a Honda Fit with Bitcoin in

8  2012.  So, yeah.

9      Q.     When did you sell or liquidate your Bitcoin

10 position?

11     A.     Most of it I just gave -- gave up or, you

12 know, one -- in one case -- you know, if you're not

13 careful with how you deploy it, so, for example, I

14 owned a website where it was miscoded and somebody

15 transferred, like, 40 Bitcoin to the account, but we

16 stored it incorrectly so we ended up losing those 40

17 Bitcoin and that was back when Bitcoin was, like, 600

18 bucks a coin, or something like that.  So I couldn't

19 actually access that.

20              And then there was, you know, an incident

21 where one of my servers fried that I had at one point.

22 But, no, so I don't -- I own no Bitcoin currently.  And

23 would not own it.  Even if it were given to me, I would

24 not -- I would liquidate it immediately because it

25 attracts a dangerous element.

1    Q.    When did you liquidate the position?  What
2  year?
3    A.    That would have been 2018.  I mean, bay --
4  when -- whenever President Trump tweeted that he was
5  not a fan of Bitcoin in the first administration, that
6  was when I walked away from all Bitcoin investments.
7    Q.    Have you ever had an account on Gemini?
8    A.    No, as far as I know.
9    Q.    Do you know what Gemini is?
10    A.    I think it started by the Winklevoss twins,
11  but I'm not a fan of theirs, so no, I would not
12  associate with them or work with them or be around
13  them.
14    Q.    So can you say with certainty you did not
15  have a Gemini account?
16    A.    I can say with certainty I never had a
17  Gemini account.
18    Q.    Okay.
19    A.    In fact -- in fact, not only can I say with
20  certainty I never had one, I -- somebody offered to
21  give me a Gemini account at one point and I turned it
22  down.
23    Q.    The hard drives that you said you got
24  fried, do you remember talking about that just a second
25  ago?

1    A.    Yes.

2    Q.    Do you have those hard drives?

3    A.    I do not.

4    Q.    Where did they go?

5    A.    Into the El Monte dump.

6    Q.    Do you have any -- or did you ever store

7    any Bitcoin, cryptocurrency in cold storage?  And do

8    you know what "cold storage" is?

9    A.    I do.  And I own none.  And I have done it

10   in the past, but I own none currently.

11   Q.    Okay.  What happened to the Bitcoin that

12   was stored in cold storage?

13   A.    Some of it was water damaged and some of it

14   I uploaded and I sold.

15   Q.    How did you upload it?

16   A.    There was a software, at the time, where

17   you could take an image of -- of it and you could

18   upload it to a phone.  And so I had a phone that just

19   had Wi-Fi enabled on it and -- but now I no longer have

20   the phone and no longer have the coins.

21         MR. THOMPSON:  I think we've been going for

22   about 1:20.

23         THE WITNESS:  No, I can keep going.  I

24   mean, I have no desire --

25         MR. THOMPSON:  This is for the court

1    reporter.

2              THE WITNESS:  Oh, okay.

3              MR. THOMPSON:  So we'll -- we'll take a

4    break now.  Thanks.

5              THE WITNESS:  Okay.

6              THE VIDEOGRAPHER:  We're going off the

7    record now at 10:05.

8              (Break from 10:05 a.m. until 10:18 a.m.)

9              THE VIDEOGRAPHER:  We are back on the

10   record at 10:18.

11             MR. THOMPSON:  Thank you.

12             THE REPORTER:  Back on the record, yes.

13   Proceed.

14   BY MR. THOMPSON:

15        Q.   All right, Mr. Johnson, we're back from a,

16   what do you think, about a 10-minute break or

17   something?

18        A.   Sure.  Whatever.

19        Q.   Okay.  And during that break, I think you

20   had said I was -- you're going to sue me, I was going

21   to lose my law --

22        A.   Yeah, I'm gonna sue you, correct, just to

23   be precise about it and just so we're on the record, I

24   intend to sue DLA Piper when this concludes, because,

25   first of all, counsel here did not do a thorough job of

```
 1    looking up the conflicts of interest.  My family
 2    retained DLA Piper while he was moving from Quinn
 3    Emanuel, which is the personal firm of Elon Musk, to --
 4    to DLA Piper, which is a law firm in effect controlled
 5    by Elon Musk, which is the Tesla law firm.
 6            And -- and yes, I do intend to sue
 7    Mr. Thompson personally as well as DLA Piper when this
 8    matter concludes, when it's -- when the judgment is
 9    ultimately overturned at the Fifth Circuit.
10        Q.    All right.  And you realize I earlier said
11    that the federal rules allow for seven hours on the
12    record?
13        A.    That's right.  And I intend to break those
14    federal rules, just to be precise about it.
15        Q.    Why is that?
16        A.    Because I think you're not asking relevant
17    questions, and I think you're here to harass me and
18    produce video clips and other things that can be leaked
19    out to the media.
20        Q.    Okay.  So I think we've been on a little
21    bit more than an hour.
22        A.    Mm-hmm.
23            THE VIDEOGRAPHER:  Excuse me just a second.
24    Mr. Hendrick, what time did we go off the record?  I
25    didn't write that down.
```

1          THE REPORTER:  10:05.

2          THE VIDEOGRAPHER:  Thank you, sir.

3   BY MR. THOMPSON:

4      Q.    I'm asking these questions to figure out

5   our planning, Mr. Johnson.  So you said that you're

6   going to --

7      A.    I'm going to leave this courtroom at noon,

8   so you have an hour and change to keep asking your

9   questions.

10     Q.    Okay.  So I'm gonna go for -- is there a

11  chance you're going to stay longer?

12     A.    No, there's no chance.

13     Q.    I mean, originally you said you were going

14  to stay for --

15     A.    There's zero chance that I'm gonna stay

16  more than after noon.

17     Q.    So you -- but you originally told me you

18  were going to stay here for an hour --

19     A.    That's right.

20     Q.    -- maybe an hour and fifteen?

21     A.    No, I'm gonna leave at noon.  You have --

22  you have basically until noon to ask all the questions

23  you want to ask.  And then once noon happens, it

24  strikes noon, I'm going to get out of this chair, I'm

25  going to walk down the street and I'm not going to come

1    back here.

2        Q.    Okay.  So I'm going to go for about --

3    about to 11:30, 11:40, I'm going to see if that's still

4    your position.

5        A.    No, it's going to be my position.  So ask

6    your questions.  Remember, I agreed to consent --

7    minimal consent to participate here.  I have no

8    objection to a Receiver being in this case.  In fact, I

9    would welcome it.  And, in fact, had you done your

10   homework, you would have realized that the account --

11   the Wyoming account that I wanted to put the Othram

12   shares in was connected in -- in a certain way with --

13   with -- with key people.  And so you would have

14   realized that that money was actually preserving

15   assets.

16            I do not trust Mr. Lambert having access to

17   any of my resources, given his drunken misbehavior and

18   illegal conduct.  So I have no -- no objection to

19   having all of my resources put into a federal trust.

20       Q.    Okay.  Let's talk about that for a little

21   bit.  So do you realize that the plaintiffs have moved

22   for a Receiver?

23       A.    Yeah, I have no objection to that.

24   Though -- though you were instructed to come up with a

25   list of three names and you came up with a list of one

1    names.  So we should have a list of three names.

2    That's what the judge said on --

3         Q.    Do you object to the --

4         A.    I do object to it because I -- I want you

5    to produce a list of three names, which is what the

6    judge asked for.

7         Q.    So -- so besides the names, the number of

8    names, do you object to a Receiver getting appointed?

9         A.    No.  I have no objection to that.

10        Q.    Okay.  Do you object to the -- putting

11   aside how many receivers were offered, do you object to

12   the relief that was sought?

13        A.    I'm not going to pay for it.

14        Q.    I don't think anyone's asked you to,

15   like --

16        A.    What relief are you talking about?

17        Q.    Sorry.  The -- the powers that the Receiver

18   has over your assets and in this case, do you have any

19   objection to the relief that the plaintiff sought?

20        A.    What did he -- what was the relief he

21   sought?  Having a Receiver, or what?

22        Q.    Yeah, having a Receiver, and we submitted a

23   proposed order.  You were copied on it.  I think it was

24   Friday night.

25        A.    No, I'm going to let the judge make a

1    decision about that.  I trust Judge Pittman to make the

2    right call in this case.

3        Q.    Okay.  So do you have --

4        A.    So no, I object to that.  I object to the

5    relief.  You were instructed by the judge on Monday to

6    come up with a list of three names of Receivers.  You

7    did not do that.  You came up with a list of one name.

8    When you do three names, then we will talk about the

9    subsequent matter.  It's not complicated.

10        Q.    But overall, you have no objection to a

11    Receiver?

12        A.    Over -- in principle, I have no objection

13    to a Receiver.  In fact, I would prefer all of my

14    assets be in a federal trust.  Dedicated federal trust,

15    to be precise.

16        Q.    Do you understand the powers that a

17    Receiver has?

18        A.    I do, and I welcome it.

19        Q.    What's your understanding?  Actually, you

20    don't need to answer that.

21              You welcome it, you said?

22        A.    I do.

23        Q.    Why is that?

24        A.    It'll become more obvious as the case

25    proceeds.

1      Q.      What's going to be more obvious?

2      A.      The why I welcome that.

3      Q.      All right.  Let's go through Exhibit 64

4    again.  Trial Exhibit 64.

5      A.      Mm-hmm.

6      Q.      It's your email.

7      A.      It's what you say is my email.  But yeah,

8    go ahead.

9      Q.      Okay.  All right.  So the Othram stock,

10   right?

11     A.      Mm-hmm.

12     Q.      Talking about that.  The shares that you

13   tried to sell --

14     A.      Yep.  No, I didn't try to sell them.  I

15   tried to preserve them in a trust.  But yeah, go on.

16     Q.      The shares that were part of that stock

17   purchase agreement, do you know what we're talking

18   about?

19     A.      Yes.  I -- so I contacted David Mittelman

20   to sell, to liquidate the full position that my

21   ex-wife, daughter and I have of Othram shares.  And I

22   believe Oth -- David went to the board at Othram.

23   Othram has a lot of conflicts of interest.  You know,

24   there's the issue of one of the board members is a

25   Gigafund guy, Steve Oskoui, so, a Musk business

1    partner.  And there's a lot of people who believe that

2    Musk is also an investor in Othram.  I don't know.  I

3    couldn't take a position on it one way or the other.

4           But he went to the council and basically we

5    communicated back and forth.  They said that they

6    didn't want to sell the -- the shares because of the

7    order in this case.  And I respected that.  I said,

8    though, that they could still sell the shares of my

9    ex-wife and daughter, and I haven't heard back about

10   that as yet.

11          So they're going to take a position of

12   basically waiting and seeing.  And that's fine.  I -- I

13   don't have any objections to that because I expect the

14   entire thing to be overturned at the Fifth Circuit.

15          MR. THOMPSON:  I'm going to object as

16   non-responsive because it wasn't my question.

17   BY MR. THOMPSON:

18   Q.   All I was saying was, all of the Othram

19   stock that you or trusts that you're associated with or

20   any of your family members have been associated with,

21   that was in -- and you try -- that was -- the entirety

22   100 percent you were trying to sell or cash out that,

23   that Othram stock?

24   A.   No, I wasn't trying to sell it or cash it

25   out.  I was trying to put it into a dedicated Wyoming

1    trust.

2        Q.    Well, you were trying to convert it to

3    money, right?

4        A.    No, I was trying to put it in a dedicated

5    Wyoming trust.

6        Q.    Well, was it going to be Othram shares, or

7    was it going to be turned into cash?

8        A.    The purpose --

9        Q.    Right?  It was cash?  $70 million?

10       A.    No, it was put in -- it was put into a

11   dedicated trust, so it probably would have been a

12   basket of stocks, to be precise about it, because

13   there's no desire to actually cause a taxable event in

14   this case.

15       Q.    So what was the $1 million for?

16       A.    The $1 million was to be put into a

17   dedicated Wyoming trust.  And you -- I believe you

18   actually referenced it to be something like a cyber

19   crime thing or something like that, which is very

20   strange behavior on your part.

21             But -- but yeah.  No, it's -- it was

22   designed to basically preserve the asset, not to sell

23   it.  I have no desire whatsoever to sell this stock.  I

24   have no need of cash.  I am not broke.  Life is, in

25   general, pretty good.

1      Q.      You said you're not broke?

2      A.      Correct.

3      Q.      Well, how much money do you currently have?

4  Let's just take your net worth right now.

5      A.      I don't know what it is.  It kinda depends

6  on whether or not I actually win this lawsuit, right?

7  Doesn't it?

8      Q.      Well, let's just start today.  Let's take

9  all of the assets.  That's -- maybe that's an easier

10  way to go at this.  Give me your, off the top of your

11  head, all assets, so cash, stock, cars --

12      A.      So cash --

13      Q.      -- clothes, all that stuff?

14      A.      Cash, I have minimal, three grand.

15  Clothes, maybe a few grand worth of clothes.  I own a

16  2017 Jaguar with a flat tire and a bad battery.  I have

17  a personal loan of about $25,000, another loan --

18  another -- the AmEx bill is probably like 32, thirty --

19  $31,000.  I have no current -- let's see.  I have no

20  job currently, partly because they're waiting to see

21  the outcome of this lawsuit.  And when they do, I'll

22  very likely start another company, which will transfer

23  some of the assets to some of my other work that I've

24  done.  And then what else?  Yeah, I mean, I'm waiting

25  -- I'm basically waiting on the Fifth Circuit.  And

1    when that's over and done with, I will proceed with a

2    lawsuit against you and DLA Piper.

3        Q.    So who's the "they" in that other company

4    you're going to start?

5        A.    Who's the "they"?  What do you mean?

6        Q.    Well, you said you're waiting to start

7    another company; is that correct?

8        A.    Yes.  I will start a -- likely start a

9    company doing genetic analysis.

10        Q.    With who?

11        A.    When the time is right, that will be

12    disclosed.  It's a -- it's a private matter now and I'm

13    limited by NDA.

14        Q.    And you mentioned that there were assets

15    that would go into that company?

16        A.    That's right.  The IP from the Traitwell

17    company would likely go into there, but they may elect

18    not to take it.  It may ultimately be a valueless

19    proposition.

20        Q.    Who is that person?

21        A.    That would be people connected with

22    Illumina.

23        Q.    Can you spell that for the court reporter?

24        A.    I-L-L-U-M-I-N-A.

25        Q.    And who is your point of contact with that?

1      A.    That would be Jay Flatley, the former CEO

2  of Illumina.

3      Q.    Do you need to get another water?

4      A.    No, I'm good.

5      Q.    All right.  So what are your sources of

6  income?

7      A.    I have no source of income currently.

8      Q.    How are you going to pay your $32,000

9  credit card bill?

10     A.    I'm gonna wait until this case is

11  overturned and then I'm going to pay it the

12  old-fashioned way.

13     Q.    Which is what?

14     A.    Liquidating assets and paying it.

15     Q.    What assets?

16     A.    Part of the reason I -- part of the reason

17  I wanted to move the Othram shares is I wanted to avoid

18  a conflict of interest with a new genomics venture I

19  wanted to start.  Which, you know, conflicts of

20  interests are important, counsel.  That's why you

21  should always check on them before you take a case.

22     Q.    You said you're going to liquidate assets

23  to pay for the credit card bill.  What assets are you

24  going to liquidate?

25     A.    I mean, it would depend on what -- on how

1    big the credit card bill is by that time.  I think I

2    have, like, a $40,000 limit on it, but I'm not totally

3    sure.

4        Q.    What assets could you liquidate to pay

5    that?

6        A.    I could sell an interest in my family trust

7    to my brother.  I could -- I could collect on money

8    that -- from various people I've lent money to over the

9    years would pay me.  There's lots of ways I could pay

10   it if I wanted to.  But I have no real desire to pay it

11   currently.

12       Q.    What interest in a -- in a trust could you

13   sell?

14       A.    I could sell my interest in my family home

15   to my brother if I wanted to.

16       Q.    Whenever you listed your assets, how come

17   you didn't mention that?

18       A.    Because I didn't know I had it until

19   recently.

20       Q.    I just asked you that question.

21       A.    But if you do pursue it, you will be

22   violating -- like, DLA Piper does represent that family

23   trust, so you will have another obvious conflict of

24   interest.

25       Q.    Who have you lent money to?  Or who -- what

1    people owe you money and how much?

2        A.    Well, I've lent money to friends of

3    different forms.  One of the biggest ones is a friend

4    in -- named Omayer Gurel.  I've lent him maybe a

5    hundred grand.  I've lent some money to John Fagan.  A

6    few people over the years.

7        Q.    How much money do they owe you?

8        A.    Maybe, like, 300 grand, something like

9    that.

10       Q.    When did you loan this money?

11       A.    Over the last five, six years.

12       Q.    How did you loan that much money?  What

13   bank accounts did it come from?  How did you -- how did

14   you do the transactions?

15       A.    I don't recall.  I don't know.

16       Q.    You don't recall how you transferred --

17       A.    I think it might have been through the

18   First Foundation Bank, but I'm not sure.  It's been a

19   few years.

20       Q.    Was it a wire transfer?

21       A.    It would have been a wire transfer most

22   likely.  Although -- yeah, most likely wire transfers.

23       Q.    So First Foundation Bank?

24       A.    Mm-hmm.

25       Q.    Where was that located?  Was it a branch or

1    is it nationwide?

2         A.    That was Pasadena.  But I might be

3    misremembering it exactly.

4         Q.    And that's information, I guess, the

5    Receiver could look at?

6         A.    Yeah, no problem at all.  I have no

7    objection to a federal Receiver.  You're the one who's

8    obliged to come up with three names.

9         Q.    Okay.  When did you first contact David

10   Mittelman to try to --

11        A.    Oh, Mittelman and I have talked about

12   selling my shares three dozen times in the last, like,

13   three or four years.  So he and I are constantly

14   talking about it.  I'm never quite doing it because I'm

15   never quite pulling the trigger on starting another

16   company.  We talked about it in the context of

17   Traitwell, when I started that in 2019, 2018.

18             Yeah, I mean, I like David, I think he's a

19   good guy mostly, though, you know, they do owe me more

20   shares of the company that I did co-found, so that's a

21   little annoying.  But partly, I'm not really keen on

22   the venture model of investing these days.  I think

23   it's a -- it has a lot of problems.  And so I'd rather

24   just to do my -- do my work another way.

25             So, in general, I'm interested in, you

1    know, basically liquidating whatever assets I have that

2    are illiquid and putting them into the markets.

3        Q.    Which assets are those?  Can you identify

4    them?

5        A.    I mean, I mentioned that I have the Clear

6    Labs stock.  I mentioned the Umbra SPV that I have an

7    interest in.  I mentioned Genomic Prediction which I'm

8    also interested in liquidating.  All of the assets that

9    I have, I would prefer be in the public markets and not

10    in illiquid startups, and that has a lot to do with

11    what I think is a looming recession.  And I would

12    prefer all of them be in dedicated trusts, which are

13    easily monitored by the federal government.

14        Q.    Do you have an investment in a company

15    called LAND Moto?

16        A.    I do not have an investment in it, no.  I

17    didn't -- ultimately did not invest.

18        Q.    Do you have an investment in a company

19    called Censys Tech?

20        A.    I do.  I have -- I own some options in it.

21        Q.    If a Receiver wanted to identify your

22    interest in Censys Tech, how would he go about that?

23        A.    He would contact Trevor Perrott who's the

24    CEO of it, and presumably Trevor would talk to him

25    about it.

1    Q.    So what are your interests in Censys Tech?

2    A.    I own options in it.

3    Q.    And how much are they valued at?

4    A.    I don't know.

5    Q.    One dollar?  $10?  A hundred million?

6    A.    Maybe a few hundred thousand, maybe a

7    million.  I don't know.  I don't typically -- like I --

8    I think of it like being a squirrel.  I put an

9    investment in.  If it grows, great; if it doesn't,

10   whatever.  I only really count it until it's harvested,

11   until it actually is a productive asset that I can sell

12   and liquidate, typically by putting it into the public

13   markets or by buying things like a house or a car or

14   whatever.  So I don't typically -- I don't typically

15   think about my investments in terms of, like, what

16   their liquid value is.  It doesn't really interest me.

17   Q.    Okay.  Because when -- before, when I asked

18   you about your assets or interests, you never mentioned

19   Censys Tech.  So I'm trying to get an answer here.

20   A.    I didn't know that I owned Censys Tech

21   options until maybe three weeks ago, four weeks ago

22   when I talked to one of David Mittelman's employees who

23   reminded me of it.  Excuse me.  When I talked to Trevor

24   Perrott's employee.  I think -- I forget.  It was,

25   like, Dan Saul or something.

```
1         Q.    I'm going to mark this as Exhibit -- I
2    believe it's 4.
3               (Marked Deposition Ex. 4)
4    BY MR. THOMPSON:
5         Q.    It's one of your Substacks?
6         A.    Mm-hmm.  Yep.
7         Q.    Go to the second page, Mr. Johnson.
8         A.    Yep.
9         Q.    Read the last paragraph above the bolded
10   language.
11        A.    Yes.  "LAND Moto, and Censys Tech."  I
12   never ultimately did the LAND Moto deal.
13        Q.    It says, "In the professional world I have
14   three investments I'm doing:  Traitwell.com" --
15        A.    Correct.
16        Q.    -- "LAND Moto, and Censys Tech."
17        A.    I ultimately didn't do the LAND Moto deal.
18   I did do the Censys Tech one, which is why I have the
19   options.  But I don't have any investments in LAND
20   Moto.  I do think that I may turn around and invest in
21   LAND Moto after this lawsuit is over, but I haven't as
22   yet.
23        Q.    Well, here, you don't say, "I'm thinking
24   about investing."  You say, "I have three investments
25   I'm doing."
```

1    A.    Yes.  "I'm doing" as in, like, I plan on

2    doing.  Yeah.  And I ultimately met with -- this is

3    September 2024.  So in the summertime of 2025, I went

4    to go meet Scott Colosimo, who's the CEO of LAND Moto,

5    and I ultimately elected not to do the investment at

6    this time.  That may change.  I suspect it will change.

7    And a lot of that has to do with what goes on in

8    Indonesia.

9            If he ultimately decides to go forward with

10    building in Indonesia or the Philippines, I will likely

11    help him and invest.  If he decides to go in China or

12    he decides to go in other places like Thailand, I will

13    not support him.  Just to be blunt about it, I like --

14    I like Scott.  I think Scott -- I think highly of

15    Scott, but I do have long-term questions about the

16    viability of what he's doing at the price point he's

17    doing it in.  And I am not a believer in his -- in the

18    way that -- in the way that he does hard tech

19    investing.

20            And I also think that the market has

21    changed between September 2024 and November 2025.  The

22    world is a very different place.  You'll recall that

23    the -- the person -- the -- the Democrats were in power

24    in 2024, in September of 2024.  And obviously when the

25    Democrats are in power, electric vehicles are more

1    enticing than when Republicans are in power.

2        Q.    So something I'm having -- you said earlier

3    you just found out three weeks ago that you had

4    interests or options in Censys Tech.

5        A.    Yes.

6        Q.    What's the date of Exhibit 4, the Substack

7    post?

8        A.    It's September 9, 2024.

9        Q.    Okay.

10       A.    So I hadn't yet made any investments.  And

11   so you'll notice that the language "I'm doing" is

12   indicative that I haven't completed.  So I haven't done

13   the investment.  So when I finish investing in

14   something, when I harvest it, as I mentioned

15   previously, that's when I consider the investment done.

16   When the wire goes out, when the money transfers.

17       Q.    That wasn't my question.

18             Before, you just said you just had learned

19   about the options --

20       A.    Yeah, I didn't know that I had had the

21   options in it.

22       Q.    Until three weeks ago?

23       A.    That's right.  Yeah.  I didn't know the

24   value of it.  I knew that Trevor had said that he would

25   put something together for me.  Ultimately, I will

1    probably be investing in a rival drone company, but I

2    haven't yet made that decision either, and that's

3    something that's being looked at through a friend of

4    mine right now.

5        Q.    But in September 2024, you say that -- you

6    mention Censys Tech.  So I'm just trying to square how

7    you write about it in your Substack and then you just

8    testified --

9        A.    Well, typically, when I invested --

10        Q.    Hold on.  Hold on.

11        A.    Yeah.

12        Q.    Let me finish.  You just made it seem like,

13    "Oh, I just found out about Censys Tech three weeks

14    ago," but you've been writing about it for over a year.

15    So how do I square that?

16        A.    Oh, I've been -- I've been writing about it

17    over two years.  Actually, I think over three years now

18    I've been writing about it, thinking about it.

19        Q.    So did you just --

20        A.    Well --

21        Q.    -- remember, you have a bad memory, or were

22    you just not being honest earlier?

23        A.    No, it's not about being honest or being

24    dishonest.  It's a question of I didn't know how many

25    options I had in it, and now I have a some -- somewhat

```
1    rough ballpark of it.  But again, options are only
2    worth when you actually execute an option.  They're
3    worth nothing beforehand.  And so in the case of -- in
4    the case of Censys Tech, you know, I have a lot of
5    respect for Trevor, I think he's doing things the right
6    way, his company is doing really well, from what I
7    understand, but I'm not involved in the day-to-day at
8    Censys Tech.  And partly -- well, most of the people I
9    do business with are waiting to see the outcomes of
10   what goes on here because they would prefer me as an
11   investor and me as a backer of what they're doing than
12   -- than Hal Lambert, who they regard as a drunken liar
13   and a fraud.
14            MR. THOMPSON:  I'll object as
15   non-responsive to that.
16   BY MR. THOMPSON:
17       Q.   How much money did you pay for these
18   options in Censys Tech?
19       A.   I didn't pay any money for them.  They were
20   given to me.
21       Q.   What's the documentation that will show how
22   many options you have?
23       A.   There's probably some emails floating
24   around, but I don't know that I'm ultimately going to
25   exercise the options anyway.  I may just donate them to
```

1    charity or give them up entirely because I may be

2    conflicted because I may have another drone company I'm

3    investing in.

4        Q.    Will you produce those emails?

5        A.    It depends.

6        Q.    Well, I'm asking.  If they're responsive to

7    get to your assets, will you produce them?

8        A.    Well, I don't -- I have not executed the

9    options, so no.  I will likely -- likely what I will

10    tell Trevor is that I'm not interested in doing

11    business with him until he wants to do something

12    serious.  And I'm not interested in, like, a hundred

13    grand or 200 grand worth of options.  I'm interested

14    in, like, building a preeminent drone company.  That's

15    more interesting to me.

16        Q.    Well --

17        A.    And I don't think I'd be legally allowed to

18    take those options if I ultimately invest in a

19    competitor company, which I may well end up doing.  I

20    think very likely I will end up investing in a

21    competitor.

22        Q.    If the Receiver wanted to identify how many

23    options --

24        A.    By all means.  I have a -- as I--

25        Q.    Hold on.  Just --

1      A.    As I've said before, I have no objection to

2  any officer of the federal government combing through

3  my assets.  In fact, I welcome it.

4      Q.    So how is a Receiver or officer of the

5  federal government going to identify how many options

6  in Censys Tech --

7      A.    I can give him the phone number of Trevor

8  Perrott or of any of the people working there and then

9  they could tell him how many I own, and I assume he

10  would go from there, but I don't know.

11      Q.    Do you have your own records, like an email

12  where this is communicated?

13      A.    No, I don't.  No, I don't have an email.  I

14  have an phone -- I got a phone call over Signal three

15  weeks ago where we had a convers -- slight conversation

16  that lasted maybe 10 or 15 minutes.  Trevor was very

17  grateful to me, but Trevor, you know, they want to --

18  they want to do things their way and that's fine, but I

19  don't agree with the way they're doing them, so I would

20  prefer doing other drone companies.

21          And besides, drone technology is getting

22  commodified right now.  It's -- we live in a world that

23  likes $400 drones taking out Russian tanks, so like,

24  you know, huge, expensive systems are not terribly

25  interesting.

1          Trevor's company is interesting insofar as

2    it complies with the John McCain National Security Act

3    of 2018-2019.  But even there it's, like, still got

4    some Chinese components.  I mean, it's -- the drone

5    industry in the United States is heavily Chinese

6    penetrated.  It's kind of a problem.  So would he be

7    able to get a government contract, which is really what

8    I'm interested with respect to Trevor.  I don't know.

9    I mean, it depends on whether or not the contracting

10   officer likes him and likes what he's doing.  And

11   generally speaking he's liked, but, you know, I don't

12   know.

13          So no, I -- the -- a Receiver is welcome to

14   talk to the same people I talk to.  I'm happy to tell

15   them the same thing I'm telling you.  I'm sure you are

16   going to send him a copy of this.  That's fine.  I have

17   no objection to that.  I look forward to them, you

18   know, chatting.

19          You know, I helped raise some money for

20   Censys Tech among friends of mine.  Many of them liked

21   the company.  A lot of them didn't.  It is what it is.

22   It's -- it's an okay company.  I did like the fact that

23   they were helping map the Colorado River.  That was

24   cool.  And the new Sen -- the new -- the new design of

25   the plane -- this is an older make.  This is not the

1    Sentaero 6.  It's Sentaero 5.

2                But, yeah, so I do like what they're doing,

3    and I -- but I haven't been to the facility.  I'm not

4    really terribly interested in it long run.

5        Q.    I've got a question about another Substack

6    article.  And first off, is -- does that Substack

7    article look -- anything about it look not accurate or

8    anything?

9        A.    This one, or which one?

10       Q.    Yeah, Exhibit 4.

11       A.    That looks fine.  I can't tell any

12   difference, though.  Yeah.

13                (Marked Deposition Ex. 5)

14   BY MR. THOMPSON:

15       Q.    So I'm --

16       A.    So these are about the Russians.

17       Q.    So, hold on.  Just -- so I'm handing you

18   Exhibit 5.

19       A.    Yeah.

20       Q.    And it's an October 23rd --

21       A.    Yep.

22       Q.    -- 2024, Substack.

23       A.    All of this looks correct, yep.

24       Q.    Okay.  So I'm -- if you go to the -- I

25   believe it's the -- it's going to be the fourth page.

1  A.  Mm-hmm.

2  Q.  And do you see the sentence that says, "All

3 of this violence"?  It's the --

4  A.  Yes, "All of this violence seems a

5 tremendous loss of waste to me.  A Russian" -- it's cut

6 off.  I don't know why your thing is cut off.  Maybe

7 you, too, are having printer problems.  Yeah, so I

8 can't really respond to it.  So.

9  Q.  So the question, "I, too, am in drone

10 business."  I think "the" was cut off.  But what drone

11 business are you referring to?

12  A.  That would be, like, looking at certain --

13 basically looking at certain drone companies.  But I

14 don't think that that's accurate.  So -- and then this

15 piece was written -- let's see.  This piece was written

16 October 23rd, 2024.  So, yeah.  So, this would've

17 been -- I don't know if this was before or after I

18 agreed to help a -- a NATO country with its drone

19 policies as a consultant.  That would have been a

20 little later, I think.  So I think I was probably just

21 about getting into it.

22  Q.  Did you get paid for that help?

23  A.  I did not as yet.

24  Q.  Did they say that you would be compensated?

25  A.  They did.

1    Q.    Okay.  What country is that?

2    A.    That -- that's probably something we'd have

3    to ask the feds to weigh in on whether or not I'm

4    allowed to talk about that.

5    Q.    So you do -- but -- what were they going to

6    -- how much were the -- money were they going to pay

7    you, this country?

8    A.    I don't know.  I don't know what it would

9    ultimately have worked out to.

10    Q.    Well, what was the compensation structure?

11    A.    It was contingent on me doing them some --

12    doing them a favor.  And I did them the favor.  I have

13    not asked for the money as yet, and I have no intention

14    of asking them for the money at present.

15    Q.    Well, what was the -- how much money was

16    it?

17    A.    It was put -- it was a percentage of sales

18    of a system.  But I ultimately never sold it.  And in

19    the drone business, business can be implied in

20    different ways.  I am familiar -- in particular, the

21    system I'm most familiar with is the Bayraktar system,

22    so that was something that I studied quite extensively.

23           And my friend Johannes Rudolph, that's

24    really his name, who's a German -- who's a German

25    military attaché at the Pentagon, so he and I were

1  looking at bringing Bayraktars into the United States.

2  And so that's a possible also what that refers to.  So

3  Johannes was a good guy.  He was involved in the

4  operation to blow up the S400s in Crimea.

5        Q.    So you said it was a NATO country?

6        A.    It was a NATO country.

7        Q.    Was it Turkey?

8        A.    No.

9        Q.    It was not Turkey?

10       A.    It was not Turkey.

11       Q.    And you won't -- will you identify the

12  country?

13       A.    I will not.

14       Q.    Okay, will you -- will you identify or

15  provide the emails where the compensation was

16  discussed?

17       A.    There were no emails.

18       Q.    So what -- how much money were you expected

19  to get paid, or how much upside could you have gotten

20  paid?

21       A.    It doesn't really work that way.

22       Q.    Okay, well, tell me how it works.

23       A.    Well, it depends on how you structure it,

24  but likely I would have structured it in a government

25  trust, and likely I would have been able to draw down

1    against that trust.

2        Q.    You said you've already done the work to

3    receive the consideration?

4        A.    Mm-hmm.  Yes.

5        Q.    Okay.  Government trust.  What's a

6    government trust?

7        A.    A government trust is a way of protecting

8    assets of people who do work for the federal government

9    so that they don't get sued by weird oligarchs.

10       Q.    Okay.  Do you have any government trusts?

11   Just yes or no.  I'm not asking about any --

12       A.    Yes, I think I do.

13       Q.    Would you tell the Receiver what they are?

14       A.    The Receiver would already know them if

15   he's an officer of the court.

16       Q.    Okay.  Well, if the Receiver needed help

17   identifying them, would you tell him?

18       A.    I mean, I wouldn't even have to.  He would

19   just know it.  Like, it -- that's not how it works.

20       Q.    Well, I'm just -- I'm just asking, if he

21   asks --

22       A.    Yeah, of course.  Like, I mean, would I

23   tell him that -- yeah, of course.  Like, he -- it

24   wouldn't even be a hard thing for him to do.  He could

25   just do it immediately.

1    Q.    How many government trusts do you have --

2    A.    I don't know.

3    Q.    -- or an owner or a beneficiary?

4    A.    Don't know.  If I knew, I would tell you,

5    but I don't know.

6    Q.    Can you tell me how -- I don't want to --

7    I'm not going to probe.  I guess, will you tell me the

8    specifics about these government trusts?

9    A.    The U.S. federal government, for people who

10    do work for it or favors for it, construct trusts.

11    Q.    Okay.

12    A.    I happen to have them.  I don't know how

13    many they are.  I don't know how much monies are in the

14    accounts.  I don't really care.  That's not why I got

15    into the work I got into.

16    Q.    Is there money in those trusts?

17    A.    I don't know.

18    Q.    Okay.  How would you go about finding out?

19    A.    Typically, I would draw down on those

20    government trusts if I had some sort of -- you know,

21    some sort of emergency, so if I needed to pay for,

22    like, a medical procedure or, like, a child going to

23    private school, or to buying a house or whatever.  All

24    of that, I don't really have any interest in currently.

25    My grandparents had government trusts.  My

1  Wyoming grandparents have a government trust.  It's a

2  very common way of doing things.

3       Q.    Okay, so I'm going to ask you a series of

4  just yes-or-no questions to try to lock this down.

5  Okay.

6            Are you -- do you own or are you the

7  beneficiary of any government trusts as you --

8       A.    I don't know.  The answer is yes, most

9  likely, but I'm not a hundred percent sure.

10      Q.    Is that the best, most honest answer you

11 can give?

12      A.    That's the best, most honest answer I can

13 give.

14      Q.    Do you know how many or approximately how

15 many?

16      A.    I do not.

17      Q.    Do you know how much assets or --

18      A.    No.

19      Q.    What type of assets are in these government

20 trusts?  Is it just currency, money?

21      A.    I'm not sure.  I've own -- I -- I have only

22 had them used on my behalf over the years.  So when my

23 parents bought their home, that was a government --

24 that was paid for with a government trust.

25      Q.    Based on work that you did?

1      A.    Based on work that I did, so I know that

2  there are government trusts that are set up, but part

3  of the reason -- yeah, so I know that they exist and I

4  know that they have been manufactured for me.

5      Q.    So if you need to draw on those trusts,

6  draw down, get money from those trusts, how would you

7  go about doing it?

8      A.    I would call a -- a series of people and I

9  would ask them to do it and we would see whether or not

10  they would do it.  It's up to their discretion.

11      Q.    Who are those people?

12      A.    I don't want to talk about my relationship

13  with the federal government.

14      Q.    Okay, so I'm going to ask you very

15  directly:  Who are the people you could call to draw on

16  your government trusts?

17      A.    And I'm going to answer very directly:  I'm

18  not going to talk about my relationship with

19  individuals in the federal government.

20      Q.    Okay.  Could you, if you wanted to,

21  identify the names of those people?

22      A.    I could if I wanted to, but I will not.

23      Q.    So you know their names, you're just not

24  telling me?

25      A.    Correct.  And I have no intention of doing

1    it.  I would rather go to jail than talk about their

2    names.

3         Q.    Is it Alex Rodriguez?

4         A.    I would rather go to jail than talk about

5    their names.

6         Q.    Is that a "yes" or a "no"?

7         A.    Again, I've already made my --

8         Q.    Or are you refusing to answer?

9         A.    I'm refusing to answer the question.

10        Q.    Okay.  Is it Alex Fletcher?

11        A.    Again, I'm refusing to answer the question.

12   As far as I know, Alex Fletcher has no relationship,

13   officially or unofficially, with the federal

14   government, but I don't know.

15        Q.    Is it Terry Dunmeier?

16        A.    Again, I would not talk about any

17   relationship I have with anyone who has any

18   relationship with the federal government.

19        Q.    Does Alex Rodriguez have a relationship

20   with the federal government?

21        A.    I don't know.

22        Q.    Do you have his phone number?

23        A.    No.

24        Q.    Do you have his Signal handle?

25        A.    He typically contacts me.

```
1       Q.    How does he contact you?

2       A.    Through Signal or through other means.

3       Q.    What are the other means?

4       A.    He will send a car for me.

5       Q.    A what?

6       A.    A car.  He will send a car for me.

7       Q.    Explain.

8       A.    He will send a car and I will get in the

9  car and then I go to where he is.

10      Q.    A random car shows up?

11      A.    Correct.  Typically, yeah.  Typically,

12 yeah.

13      Q.    Okay.  What's his Signal handle?

14      A.    I don't know his Signal handle.  He

15 typically initiates the conversations.

16      Q.    What's your Signal handle?

17      A.    Mine's my phone number.  It's pretty

18 simple.  But good luck getting access to that.

19      Q.    Okay.  So you're just -- you're flatly

20 going to refuse to identify any of the individuals?

21      A.    Correct, yeah, I'm not gonna answer that.

22      Q.    Didn't you give Alex Rodriguez's phone

23 number to Judge Failla in New York?

24      A.    Well, he has many phone numbers, and --

25 and --
```

1    Q.    It's a -- it's a "yes" or a "no."

2    A.    I did give her what I thought was the --

3    the phone number, but I may have been incorrect about

4    the phone number.

5    Q.    Was it a bogus number?

6    A.    It -- I don't know if it was a bogus number

7    or not.

8    Q.    Did you think it was a bogus number?

9    A.    I did not think it was a bogus number.

10    Q.    All right.  So to summarize, tell me if any

11    of this is inaccurate:  You may or may not have

12    government trusts set up on your half -- behalf, but

13    you think so because your parents' house was, in part,

14    funded by a government trust, right?

15    A.    No.  There are government trusts that are

16    set up for people who do work for the federal

17    government all the time.  And --

18    Q.    That's not my question.  It's for -- it's

19    for you.

20    A.    Oh, for me, yes, I believe that there are

21    government trusts in my name, yeah --

22    Q.    Okay.  And --

23    A.    -- and dedicated to me.

24    Q.    You said in your name and dedicated to you?

25    A.    Correct.

```
1          Q.     That would be dedicated to Charles Johnson?

2          A.     Or to my wellbeing or what have you.  I'm

3   not totally sure how it works, but yes, I believe that

4   there are government trusts where it's set aside for

5   me.

6          Q.     And one of the reasons you think that is

7   because a government trust set up on your behalf or

8   dedicated to you was used to purchase or fund your

9   parents' house?

10         A.     Correct.  And conversations I've had and

11  work I've done.

12         Q.     Okay.  And you know the people who are in

13  charge or have control of the trusts, but you won't

14  tell me?

15         A.     I don't know them, but I know that there

16  are people out there who have created government trusts

17  for me.  And I don't know what the whole -- the whole

18  setup is there, but I -- I couldn't access it even if I

19  wanted to, and I don't want to.

20         Q.     You won't identify those people?

21         A.     Correct.

22         Q.     But you would tell the Receiver?

23         A.     The Receiver would already know it,

24  presumably.

25         Q.     If the Receiver asks you, would you tell
```

1    them names?

2        A.    I mean, if the Re -- if the Receiver is one

3    of the three that you elect to predict, yeah, I have no

4    objection to that.

5        Q.    Okay.

6        A.    I have no objection to working with any

7    officer of the federal system on any matter.  So long

8    as they've got a badge, I'm happy to talk to them.

9        Q.    I've got some questions about your

10    Substack.

11        A.    Mm-hmm.

12        Q.    When did you form it?

13        A.    I think in 2020, but I don't remember.

14        Q.    And I think you've publicly described

15    yourself in that as a self-made deca-millionaire?

16        A.    Mm-hmm.  Yeah.

17        Q.    What's a self-made deca-millionaire?

18        A.    A self-made deca-millionaire would be

19    somebody who's worth at least 10 million bucks.

20    Self-made presumably would mean that I did it myself.

21    I don't really necessarily believe that anymore, like

22    in terms of, like, I don't really believe that people

23    are self-made, and I don't really think that having

24    millions of dollars is necessarily the best way of

25    living one's life.

1        Q.    Were you ever a deca-millionaire?

2        A.    I think so at one point.  And I may be

3   still if you look at my assets in total and what

4   they're ultimately sold for, but valuations change and

5   shift over time based upon mac -- based upon

6   macroeconomic factors.

7              So if people got super interested in

8   genomics, very possible my assets could be worth more,

9   they could be worth less.  I don't really care either

10  way.  That's not really how I think about it.

11       Q.    So sitting here today, are you a

12  deca-millionaire?

13       A.    I don't know.  I have not sat down and done

14  an assessment of my net worth in a long time, nor do I

15  really care to figure out the number.

16       Q.    Well, that's kind of the point of this

17  deposition.

18       A.    It is, but I'm not terribly interested in

19  complying with it.

20       Q.    So you understand that the point of this

21  deposition is to find out your assets and worth?

22       A.    No.  The point of this deposition is to

23  harass me and try to get me on camera so that my

24  testimony can be leaked to the press as a way of

25  embarrassing me for talking to the federal government

1    about Elon Musk's criminality.  That's the purpose of

2    it.

3         Q.    Do you understand that the plaintiffs have

4    at least presented or taken the position that this

5    deposition is necessary to determine your assets and

6    worth and to determine if you --

7         A.    I understand that that's -- that's what

8    they claim their position is.  But Lambert, again --

9         Q.    Okay, so I'll stop you there.

10        A.    -- he --

11        Q.    So -- okay, so the answer to that's "yes,"

12   right?

13        A.    No, the answer is that's what they claim;

14   that's not what's actually true.

15        Q.    I said that's the plaintiff's position.

16        A.    That's what they claim; that's not what's

17   actually true.

18        Q.    Okay.  And you are going to give minimal or

19   less than complete --

20        A.    That's right.  Yeah, I have no intention of

21   doing anything other than minimal consent in being

22   here.

23        Q.    So what do you mean by "minimal consent"

24   versus, like --

25        A.    Well --

1        Q.    Wait, wait.  Hold on.  Let me just ask the

2    question.  Okay?  And I'll let you go, okay?

3        A.    Mm-hmm.

4        Q.    Explain to me the difference between

5    minimal consent, which I guess you're giving, and a

6    hundred percent maximum consent.

7        A.    Well, minimal consent is that the federal

8    government of the United States has asked me to be

9    present here, so I have arranged my affairs to be

10   present here.  And so they have asked me to participate

11   in what is I believe an illegal act, which is to

12   participate in this whole sham of whatever, of a trial,

13   and so I have participated in that and I have done the

14   requisite stuff of filing the appeals and filing all

15   that stuff, which was annoying and cumbersome.

16           And minimal consent is the idea that you

17   acknowledge that the proceeding has some sort of

18   bearing insofar as you want to respect the Court.  It's

19   like why we wear a tie, it's why we wear a suit, all of

20   that sort of thing.  That's what's meant by minimal

21   consent.

22           Maximal consent is that I would participate

23   with you in my own harassment by basically giving you a

24   list of everything that I own or am involved with, and

25   that I will not do, mostly because I don't know it,

1    because I just do work, and then, like, I just, you

2    know, go to work, like, on the projects that are

3    important, when they're important.

4            And then, yeah, I mean, you know, it's -- I

5    guess what I would say about it is that I don't respect

6    the abusive process that's taking place here where a

7    foreign-born oligarch will use a proxy in the form of

8    Hal Lambert to sue me.  I don't respect that.  I think

9    it's an abuse of process and probably illegal.  I guess

10   we'll see when this judgment's overturned and I

11   ultimately end up suing DLA Piper and you personally.

12   So we'll see how that actually ultimately -- ultimately

13   phase -- phases out, but I'm not really terribly

14   worried about it, no.

15           It's also why I'm not afraid of going to

16   jail or whatever or being in violation of -- because,

17   like, first of all, I don't think it will happen, but

18   even if it did happen, that would be great because it

19   would highlight all the abuses here, and I would have a

20   sweet mugshot and I wouldn't look as drunk as Hal

21   Lambert does in his.

22       Q.    Anything else to add?

23       A.    No, I think that pretty much sums it up.

24       Q.    Just trying -- just trying to understand

25   the difference between -- if -- you've explained to me

1   what minimal consent is; I guess it's showing up here?

2       A.    That's right.   That's minimal consent.

3       Q.    And I want to know what 100 percent maximum

4   consent would be.

5       A.    That would be being super responsive to all

6   of your emails, reading all the ridiculous stuff that

7   you send me to waste my time.   That would be what that

8   is.

9       Q.    Answering the questions that are asked?

10      A.    No, I mean, I can answer your questions.

11  I've --   I've shown you respect by telling you the

12  names of some accounts that I might have access to, and

13  I've showed you respect by actually sitting and

14  pretending that this is actually a legitimate process.

15  And I've shown you respect by mic'ing up and by wearing

16  a tie, which is a courtesy you haven't extended to me,

17  by the way.   But whatever.   That's your prerogative.

18  And -- and so yeah, that -- that -- that's what --

19  that's what I mean by that.

20      Q.    You haven't -- you've refused to answer a

21  lot of questions today, too.

22      A.    Well, a lot of the questions you're asking

23  I'm not allowed to answer, and I made very clear that I

24  wasn't going to talk about my relationship with the

25  federal government.   Because that's really what this is

1    about, it's about you harassing me to discover what

2    I've told the federal government about Mr. Musk.  It's

3    why all of your deposition questions were about that

4    relationship.

5            And I get it.  Like, you know, you work for

6    DLA Piper.  DLA Piper is one of -- actually, I think

7    one of their biggest clients, if not their biggest

8    client, is Tesla, so you kinda have an interest in

9    that.  So I get it.  But it's ultimately why I can't

10    really help you.

11    Q.    Your Substack biography has said

12    something -- says something along the lines of the

13    total value of portfolio companies exceeds 15 billion?

14    A.    Yeah, I think it's like 30 billion now.

15    But typically the way people do this is they include --

16    they include all of the companies that they've invested

17    in or are associated with, and then they, like, sum

18    them all up and they say, "The value of my portfolio is

19    30 billion."  I probably wouldn't say that now.  I

20    wrote that Substack bio a few years ago.  Mostly

21    because I think it's an inelegant way of talking, and

22    mostly because I don't really believe in the venture

23    model of investing anymore.  I think it's kind of fake,

24    in a way.

25    Q.    Okay.  You --

1        A.     Fake in the sense of, like, it doesn't

2    really get to the underlying -- the way in which these

3    things actually work.  And also fake in the sense that,

4    like, I don't think being super-rich is actually

5    worthwhile.

6        Q.     Will you -- I'm going to ask you -- tell me

7    if you'll do this.  So you've got a notepad in front --

8    or --

9        A.     Mm-hmm.

10        Q.     Would you take out a blank piece of paper

11    and just write down all the portfolio companies that

12    you've either, you know, invested in, done work for,

13    where you -- where you would -- where you would receive

14    compensation, where you have --

15        A.     I wouldn't know them all, but I could give

16    you a list of the --

17        Q.     Wait, wait.  Hold on.

18              Where you have special purpose vehicles

19    and, you know, like -- and all that stuff.

20        A.     Sure.

21        Q.     And just for the court reporter's benefit,

22    if you could --

23        A.     Sure, I'll just list them.  So Umbra, I own

24    half of the -- of -- of the special purpose vehicle

25    with Hal Lambert.  He disputes that, but I do own it.

1  Clearview AI, I own some portion of stock.  They said

2  they were buying back my stock in the company.  They've

3  never actually paid me.  That was --

4      Q.    If you could just go down the -- the list

5  and make --

6      A.    Yeah, so, Othram, I own, you know, I think

7  my ex-wife and daughter in trusts and all, like we own

8  a million dollars worth of stock.  We may contest that

9  now.  We may say we own some more and then we'll see

10  where that goes to the board.

11          Payala, I think I own like 300 grand of

12  stock there, but I'm not totally sure.  Clear Labs, I

13  think I own 200k, but I'm not totally sure.  But again,

14  like, I don't really spend all this time focused on it.

15  I think I own part of an Aptera SPV, but I'm not

16  totally sure because I -- I don't hold that currently.

17          I'm trying to think of any other big ones.

18  Nope, that's kinda it off the top of my head.

19      Q.    Okay, so let's look at Aptera.

20      A.    Mm-hmm.

21      Q.    Okay?  I think that's an electric car

22  powered by solar panels?

23      A.    That's right.

24      Q.    And you have a lot of experience, I think

25  you've written about visiting the company --

1      A.    Visited the company, I know the -- the

2   company quite well.  I have very good friends who work

3   there.  I'm a big believer in the technology and I

4   believe generally that the company will continue to do

5   well, and I wish them well.

6      Q.    Okay.  And how did you invest in Aptera?

7      A.    I believe Gator Greenwill and I own a

8   special purpose vehicle there, but he would know more

9   about those details than I would.

10     Q.    Do you know the name of the special purpose

11  vehicle?

12     A.    I do not.

13     Q.    Do you have any idea?

14     A.    No, I do not.

15     Q.    How would you find out the name of it?

16  Would it be hard?

17     A.    I would call Gator Greenwill.

18     Q.    Would he pick up your call?

19     A.    I don't know.  I haven't called him, so.

20     Q.    What is the value of the special purpose

21  vehicle?

22     A.    I don't know.  I don't -- as I said before,

23  I don't pay attention to the fluctuations in the thing.

24  I only care about when it matures and I can collect it.

25     Q.    Do you really -- go ahead.

1    A.    So like, for example, you know, I own a

2    huge, you know, position in Umbra.  Obviously,

3    Mr. Lambert, you know, drunken fraud that he is,

4    disputes that.  And so is that -- do I have a hundred

5    million dollar position in Umbra, or do I not?  It's

6    unclear.

7         Othram.  Do I own the position or do I own

8    it only when it actually gets liquidated?  These are

9    kind of open questions.  So that's what I spend most of

10   my time thinking about, is when something is actually

11   materially realized.  Really what matters most is cash

12   on hand.  Everything else is kind of a -- it's kind of

13   annoying and kind of useless.

14   Q.    Let's take that at -- like, let's take a

15   special purpose vehicle in Aptera, for example.  When

16   is that value or investment realized, as you say?

17   A.    Well, in this case, there's a lockup with

18   all investors' shares in Aptera, and I think it goes

19   for another one or two years, and then you have a

20   decision -- I think it may be even three years.  And

21   you have a decision then about whether or not you are

22   going to allow your interest to convert into shares

23   or -- into the company long run, or whether you're

24   going to -- whether you're going to continue to

25   basically hold --  hold it as a separate distinct

1    entity.

2          Now, I personally, I don't know what I will

3    do in two to three years.  We'll see.  But I wish them

4    well.  And if I had the cash, I would invest more money

5    in them.  And I have -- I have directed family and

6    friends to invest in it as well.

7          (Marked Deposition Ex. 6)

8    BY MR. THOMPSON:

9          Q.    Here's a Substack from April 5th.

10         A.    Yeah, notes on the Aptera Solar Mobility

11   Revolution.  Yeah.  I don't know if this was when -- is

12   this -- yeah, this is when I went and visited with my

13   family.  Yeah.  Yeah, with my ex-wife and daughter and

14   child.  Yeah.

15         Q.    Okay.

16         A.    Oh, and sister --

17         Q.    So Exhibit --

18         A.    She also came.

19         Q.    Exhibit 5 is a Substack that you wrote?

20         A.    Yep.

21         Q.    If you go to the -- and you said, "My

22   family and I visited the Aptera factory in Carlsbad,"

23   right?

24         A.    Mm-hmm.

25         Q.    Okay.  Who is your contact at Aptera?

1    A.    I have several.  The main one there is Sir

2  Gator Greenwill.  So Gator Greenwill would probably be

3  the best one to get in touch with the company through.

4  He would be the best kind of source in general.  And

5  then I talked to Steve Fambro, who's the CEO there, but

6  he and I -- he and I were supposed to meet, but we

7  haven't met in a while.  Mostly he had some, like,

8  family matter and so he and I ultimately didn't meet

9  up.  He had some situation with his daughter,

10  unfortunately.  It's unfortunate.

11    Q.    Anyone else in Aptera?

12    A.    I think I met the other CEO, and I met

13  somebody in their investment office, and I met some of

14  their engineers.  But I'm trying to remember exactly.

15  I think I know one of their board members, but I'm not

16  totally sure that I would say that it's a close enough

17  relationship.  Yeah.

18    Q.    Can you provide names of those people?

19    A.    No, I don't typically remember names.  I'm

20  not terribly good at that.  That's why I have a --

21  that's partly why I write so much, but it's also

22  partly -- or I have a girlfriend, or an

23  on-again-off-again girlfriend and an ex-wife and other

24  people to remember names.  I'm very bad at remembering

25  names.  I meet too many people.

1        Q.    So if you go to the third page.

2        A.    Yep.

3        Q.    Just read that to the --

4        A.    Yeah.

5        Q.    -- court and court reporter.

6        A.    Which part?

7        Q.    "To be honest"?

8        A.    "To be honest, I didn't quite know what to

9    think just by being an investor in Aptera through a

10   special purpose vehicle earlier last year."

11       Q.    Okay.

12       A.    "To my mind, the real innovation of the

13   company is its solar paneled portfolio of patents."

14       Q.    Okay.  I'll stop you there.  So that

15   special purpose vehicle, that's with Gator Greenwill?

16       A.    That's right.

17       Q.    And you think you invested in -- you said

18   earlier last year, so sometime in 2023, since this

19   was written --

20       A.    Yeah, it might have been 2022, but he would

21   know.  I don't know off the top of my head.

22       Q.    Do you know how much money was invested?

23       A.    I don't.

24       Q.    Ballpark?

25       A.    Maybe like 10 million.  Maybe less.  Yeah,

1    maybe four million, five million.  I'm not totally

2    sure.

3        Q.    So multi-millions?

4        A.    Mm-hmm.

5        Q.    Okay.

6        A.    Yeah.  That's right, yeah, multi-millions.

7        Q.    Did you contact Mr. Greenwill or speak to

8    anyone after Aptera had an IPO?

9        A.    Well, they didn't have an IPO.  They had

10   what's called a direct listing.

11       Q.    Reverse split, right?

12       A.    What they had was a direct listing, and a

13   direct listing is somewhat different and there's a

14   lockup period for people's shares who were insiders.

15   And technically I think that I qualify as insiders.  So

16   I made it very clear to Gator when I made the

17   investment that I wasn't intending to liquidate the

18   position for another ten years.  We talked a lot about

19   children in the conversation.  He has a son, I have a

20   daughter.  We talked a lot about the future of solar

21   technology coming out of China and out of the United

22   States, and, you know, we committed then and there that

23   we would not sell our position until at least five

24   years after we did our investment.

25              So, whenever he -- whenever he makes the

1   decision, and I -- I deputized him with the ability to

2   make the decision of when we liquidate the position,

3   and I said, you know, I -- I don't really want to spend

4   that much time, I want to set it and forget it.  So in

5   my life, I've found that the best investments you do

6   are not the ones you follow on the day-to-day; they're

7   the one's you follow when you just make a decision and

8   then you move on to the next thing and the next thing

9   and the next thing and the next thing.  And it's much

10  easier that way.  So Gator made -- made most of the

11  decisions on that.

12        Q.    So if the Receiver wanted to -- and I guess

13  your understanding, it was between four and

14  $10 million, this investment in Aptera?

15        A.    Mm-hmm.  Yeah.  If the Receiver wants to

16  look into it, again, the Receiver has all the

17  authorities to do that.  I have no objection to a

18  Receiver coming through on all these things.  That's

19  fine.  It doesn't bother me at all.

20        Q.    So if you give your consent to the Receiver

21  to, I guess, investigate your interest --

22        A.    Well, it wouldn't be an investigation, to

23  be precise about it.

24        Q.    What's the word?  Like -- like, what word

25  should I use?

1      A.      When you're dealing with a Receiver, the

2   Receiver is an officer, he's deputized by the court, so

3   it's not an investigation.  He has my consent under the

4   Rules to go through all of the assets, but I don't

5   think a Receiver's probably warranted in this case.

6   But maybe the Judge would disagree or whatever.  He's

7   free to make that decision.  And I have no objection to

8   a Receiver coming and visiting me and going through and

9   having conversations about my assets, much the same way

10  I'm having a conversation now.  But I expect all this

11  will be overturned at the Fifth Circuit anyway, so it's

12  kind of like whistling -- whistling past the graveyard,

13  as it were, or whistling past, you know, the prairie or

14  something.  But yeah, so it doesn't really faze me.

15      Q.      So if the Receiver --

16      A.      The Receiver is perfectly happy -- I'm

17  perfectly happy to have the Receiver call Gator

18  Greenwill and have a conversation with him about how

19  much of the Aptera SPV I own.

20      Q.      So if -- if the Receiver wanted to quantify

21  the scope of your investment --

22      A.      Well, that's his -- that's his

23  responsibility.  That's not my responsibility.

24      Q.      Hold on.  Hold on.

25      A.      Mm-hmm.

1      Q.     If the Receiver wanted to quantify your

2  investment in Aptera, how would he go about doing that?

3      A.     He would presumably call Gator Greenwill

4  and ask him for the documentation for the work we did.

5  So.

6      Q.     And what's Gator Greenwill's number?

7      A.     I don't know off the top of my head.  I

8  obviously don't have my cell phone with me, and I am

9  not inclined to memorize these things.  Like, Gator

10 Greenwill's pretty reachable.  If you want, you can

11 contact him pretty -- pretty readily.  He's on

12 LinkedIn.

13     Q.     Where does Gator Greenwill live?

14     A.     Last I heard, he's somewhere in the

15 tri-state area, but I don't know.  I haven't talked to

16 him since the funeral, and we were talking about -- we

17 were talking about his ex-girlfriend, we were talking

18 about David Hallowell's deceased wife, we were talking

19 about France, we were talking about how he liked be

20 being a father.  That was the extent of it.  It's kinda

21 rude to talk about investments at funerals, don't you

22 think?

23     Q.     How many special purpose vehicles have you

24 invested with Mr. Greenwill in?

25     A.     I don't know.  He would know.  He would

1    know the answer to that.  And, in fact, he would know

2    that and one of his -- one of our kind of mutual

3    handlers would know that answer.  But I don't know.

4         Q.    What do you mean by "mutual handlers"?

5         A.    He has somebody who superintends and

6    watches him in much the same way I have somebody who's

7    my adult supervision, and he has somebody who handles a

8    lot of that for him.  I believe he also has a dedicated

9    government trust, from what I understand, as does his

10   wife.

11        Q.    So when you talk about your adult

12   supervision, you're talking about someone involved in

13   the federal government?

14        A.    Correct.

15        Q.    The best of your understanding is your Ap

16   -- the Aptera investment is between four and

17   $10 million?

18        A.    Something like that, but I don't know.

19        Q.    What was the source of that money?

20        A.    For which?  For the investment generally?

21   Lots of different investors contributed to it.

22        Q.    The -- the special purpose vehicle --

23        A.    Yeah, lots of different investors --

24        Q.    -- in Aptera --

25        A.    -- contributed to it.

1      Q.    My question is:  What is the source of that

2   four to $10 million?

3      A.    Oh, different investors, so people that

4   Gator and I know.

5      Q.    Did you put in any of the money?

6      A.    I don't recall.  I may have.  Very possible

7   that I did, but I don't recall.  Because he asked me

8   for it at one point, but I don't remember if I sent the

9   wire or not.  He also owed me some money, so I think we

10   might have done some write-off off of that, but I don't

11   recall.

12      Q.    What is Metis Capital?

13      A.    Metis Capital is a LLC that Gator Greenwill

14   gave to me as a -- as a gift to -- to basically park

15   money that I was getting to pay for various entities

16   and various events.  But I believe there's, like,

17   negative 300 bucks in there now.

18      Q.    You never mentioned Metis when I asked

19   about your assets.  Why?

20      A.    Because it's not an asset that I control.

21   It's an asset that I am told to do things out of that

22   account and there's no money in it now, so I don't do

23   anything out of it.

24      Q.    What do you mean?

25      A.    Typically, people will call me and tell me

1    to do something with the money that was put into that

2    account for me, and then I will typically go and do

3    those things.

4        Q.    Please explain.

5        A.    File a lawsuit, give money to a person

6    or -- or entity.  Yeah, it's not an account that I

7    control.  It's an account that's I get a phone call,

8    get told to do something with that account.

9        Q.    Okay, where's -- how do you access the

10   money there in the Metis Capital account?

11       A.    Well, there's no money in it currently.

12   But typically what I would do is I would go into the

13   bank and I would wire money out of it, usually in

14   person.  The Metis account was hacked a number of years

15   ago, as a lot of my financial affairs were hacked, and

16   that resulted in me getting what's called a controller

17   account on all of my financial properties, so I have to

18   physically go into a Woodforest, then they call

19   headquarters to determine that I'm me, I give a voice

20   print, they come and take a photo, and so there's that

21   whole process as well.  But, yeah, the Metis account, I

22   think it's like negative a thousand bucks in there now.

23       Q.    What bank account was that, or what banking

24   institution?

25       A.    That was with -- that was with Woodforest.

1    Yeah.  But I don't have any relationship with it now.

2        Q.    Is it a separate account from the personal

3    Charles Johnson account you mentioned earlier?

4        A.    It is, but it's not one that's controlled

5    by me.  It's one where I was encouraged to do various

6    things with it, but I -- I haven't used that account

7    maybe in two years, three years maybe.

8        Q.    Does Greenwill have any affiliation with

9    the Metis account?

10       A.    Well, it was his LLC, or it was his, you

11   know, thing that enabled me to open it, and he did give

12   that to me.  As far as I know, he still does, but I

13   don't know.  I don't know what his relationship is with

14   it.

15       Q.    Where are the documents for -- have you

16   seen -- you know, is it an LLC?  Where was it

17   incorporated?

18       A.    I don't know.  I don't know any of that.

19       Q.    How did you get the information on how to

20   -- know that you could take money out?  How'd you get

21   the access infor -- info?

22       A.    He made a series of phone calls and told me

23   that the money was in the accounts and that I had

24   various things I had to do and I would -- should go do

25   them, and I complied.

1      Q.    How did Woodforest Bank know that you were

2  authorized to use the Metis Capital account?

3      A.    I don't know, but they did.  Gator also

4  knows Robert Marling who owns Woodforest Bank, so it's

5  possible they had a conversation about it.  I don't

6  know.

7      Q.    And you think -- or your testimony is that

8  Metis Capital is -- even though you had access to it,

9  it's not really an asset because it's for -- to do

10  off-the-books government black work?

11      A.    I wouldn't call it off the books, but

12  usually it was involved with, like, lawsuits or, you

13  know, if they needed me to do something, I would just

14  do it.  I mean, it wasn't like a complicated kind of

15  arrangement.  It was actually quite simple.  Most of

16  the money that was in there was for, like, paying

17  lawyers and things.  I mean, it was not -- it was

18  whatever.

19      Q.    What lawyers did you pay from the Metis

20  account?

21      A.    I paid Bernie Kleinman at one point.  Who

22  else did I pay out of it?  I don't remember it all now,

23  it's been a while.  But, yeah, there are times in which

24  I have had access to accounts that were set up for me

25  by others in which I have done what they've asked me to

1    do, you know, usually after I've gotten permission to

2    do it.  So.

3        Q.    Testifying here today under oath, will you

4    identify all of those accounts?

5        A.    No, I will not.

6        Q.    You refuse to?

7        A.    I refuse to because I've not been given

8    permission to do so.

9        Q.    Will you identify who would be the person

10   that would give you permission to identify that

11   information?

12       A.    I will not.

13       Q.    You're aware that Judge Pittman previously

14   disagreed that you can refuse to answer these type of

15   questions?

16       A.    The judge can do whatever he sees fit.  But

17   I will not participate in that.

18       Q.    Will you go to jail rather than identify

19   those people?

20       A.    No, I won't end up going to jail.  But

21   that's funny.

22       Q.    Would you rather?

23       A.    It would be great if I went to jail because

24   I would get the mugshot and that's what I want.  But

25   unfortunately, I will not end up going to jail.  Regret

1    -- regrettably, I should say.  More likely than not

2    what will happen is Judge Pittman will push it into the

3    future and then I'll have to come back to Fort Worth

4    and eat a bunch of food I shouldn't and then fly back.

5        Q.    You said your flight today is at what time?

6        A.    It's at noon, but I'm not -- or excuse me.

7    It's at 2, but I'm not in charge of that.  I -- when I

8    get out of here, I will make a phone call to one of

9    my -- one of my associates and they will tell me

10   when -- when and which airlines and all of that.  That

11   will be taken care of for me.  And then I will get

12   in the -- get in the Uber, which will be taken care of

13   for me, and then I will go to the -- to fly back to

14   wherever they send me.  Most likely they'll send me to

15   California would be my guess.  That's what I've asked

16   them to do.  But we'll see.  It could be DC.

17       Q.    So you could stay here the rest of the day

18   and answer all the questions?

19       A.    I could, but I want to provoke a

20   confrontation.  That would be cool.

21       Q.    What type of confrontation do you mean?

22       A.    Well, I want to provoke getting a --

23   getting that mugshot.  That would be great, because

24   then it would highlight what's going on here, and that

25   would also be useful.  It would elevate me in what was

1    going on.  But probably it won't happen like that.

2    They'll probably just -- probably have to do a night or

3    two in jail and whatever.  That's fine.  It's not a big

4    deal.  That's why I didn't wear my contacts.  But yeah,

5    it's fine.

6                    (Marked Deposition Ex. 7)

7    BY MR. THOMPSON:

8        Q.    I'm going to mark this as Exhibit 7.  So

9    you used to have a Twitter account, right?

10       A.    I did.  And then I was kicked off of it and

11   then I got a new Twitter account.

12       Q.    Okay.  I'm talking about the old one.

13       A.    Yes.

14       Q.    Is that JohnsonThought?

15       A.    That's right, JohnsonThought1, to be

16   precise.

17       Q.    And did you close it, or did you get kicked

18   off of Twitter?

19       A.    I got kicked off of Twitter.

20       Q.    It wasn't to try to --

21       A.    No, I'm under oath.  I mean, I was kicked

22   off.  A hundred percent.  And I remember it quite

23   vividly at the time.  And yeah, this thing that was

24   posted was -- is not accurate, so the perma record.

25   Yeah.  So yeah, I was kicked off.

1      Q.    All right.  This is a, I think, a -- it's a
2   tweet by you from -- at least from JohnsonThought.
3   This -- would this have been -- just tell us what
4   Exhibit 7 is.
5      A.    This is number 7.  This is a tweet from the
6   JohnsonThought.  So, "I have a dear friend who is among
7   the most delightfully delusional men I know.  By all
8   rights he should have given up but he is too crazy to
9   quit.  Of course I invested in him.  When there's
10  nothing left but the Will you find the Way."
11         That's a reference to Ahmer Gurral of the
12  Gurral Family, Turkey.
13     Q.    So who is the dear friend?
14     A.    That's Ahmer.  Yeah.  A very lovely man.
15     Q.    You say -- or you wrote, "of course I
16  invested in him"?
17     A.    Mm-hmm.
18     Q.    What was the investment?
19     A.    That was in a company called Repeat, which
20  is more or less moribund and defunct, but that wasn't
21  why I was instructed to invest in him.
22     Q.    What do you mean?
23     A.    Well, he is the scion of one of the most
24  powerful agricultural coun -- agricultural families in
25  Türkiye, and a very lovely guy.  And if you've had

1    McCormick & Schmitt, you know -- you're familiar with

2    McCormick & Schmitt?  The spices, oregano and all that,

3    that's in the -- that's his family.  So, a very lovely

4    guy.  I miss him.

5        Q.    Have you told me about all the companies

6    that you have investments in or proclaim to have --

7        A.    I think so, yeah, more or less.

8        Q.    I've got another one for you.  Actually, go

9    back to Substack.  How much money do you get paid as --

10    how many subscribers do you have?

11        A.    I think I have like 3,000, 4,000.  I'm not

12    totally sure.  How many of them pay?  I don't know.

13    Like, 70?  80?  90?  I don't really pay attention --

14        Q.    How does --

15        A.    -- to it.

16        Q.    How does Substack pay you each month?

17        A.    They pay me, they send money to a

18    Woodforest account, but I think it's like not even a

19    thousand bucks, maybe 2,000 bucks, something, somewhere

20    in there.  I don't really know.  I don't really pay

21    attention to it, to be honest.

22        Q.    And did you fly in here last night?

23        A.    What?

24        Q.    Did you fly in here last night?

25        A.    I did.

1    Q.    And did the government book that?

2    A.    No.

3    Q.    Was it part of your federal --

4    A.    That was paid for by Keri Kukral.  And she

5    used -- did Southwest, which is awful, but she paid for

6    that.  As far as I know, she used her points.  And then

7    I have a bunch of Marriott points, so I use a lot of my

8    Marriott points to pay for most things.  And I think

9    eventually I will use IHG points in the future to pay

10   for most hotels that I stay at.

11   Q.    You've said, "I have infinite" -- "I have

12   effectively infinite money to litigate these matters.

13   This happens when the US government likes you" --

14   A.    Correct.

15   Q.    -- "and allied governments wanting to fund

16   your legal defenses.  I can basically go forever?"

17   A.    Correct.

18   Q.    Is that an accurate statement of something

19   you said or close to it?

20   A.    That is something I said, close to it,

21   yeah.

22   Q.    Okay.  Which allied governments?

23   A.    That would be France typically.

24   Q.    Any other governments paid money towards

25   your legal fees in this case or another case?

1      A.    No.  And I'm not totally sure about the
2  French thing.  They were sort of friendly to France,
3  but I think they are CIA, the people who sent me some
4  money for that.  But I'm not totally sure.
5      Q.    Through what channels?  Wires?  Crypto?
6      A.    That was sent through -- that was sent
7  through Metis, but that was a long time ago.  I don't
8  really know what the situation is there with that.
9      Q.    So it went into your Metis -- the Metis
10  account at Woodforest Bank?
11      A.    Yeah, and it was designed to pay Bernie
12  Kleinman in the Clearview AI suit, which I did until
13  the money was exhausted, and then Mr. Kleinman and I
14  went our separate ways.
15      Q.    Didn't you tell Mr. Kleinman there was a
16  $20,000 check for him?
17      A.    Yeah, that was something of a -- we were
18  being facetious with one another because we knew that
19  conversation would leak.
20      Q.    So you were lying there?
21      A.    Wasn't lying.  It was a -- it was a bit of
22  subterfuge, I think, as the -- as the government would
23  say.
24      Q.    It wasn't true, though, right?
25      A.    I don't know where his money is, and

1    frankly, I don't think he really cares.

2        Q.    Does the government pay your rent?

3        A.    Depends on the property.

4        Q.    Okay.  What property does the government

5    pay your rent at?

6        A.    Well, they don't pay rent.  They let you

7    stay places.  That's how it works.

8        Q.    What places does the government allow you

9    to stay?

10        A.    Depends on what they want you to do.

11        Q.    Okay.  In the last year, where have you

12    stayed that the government's permitted you to stay?

13        A.    A number of places.  But again, I'm not

14    going to talk about my relationship with the federal

15    government.

16        Q.    So you could -- so are you refusing to

17    testify and answer where you have stayed at the -- I

18    guess at the government's --

19        A.    Yeah, because if I tell you where I've

20    stayed, that would compromise the things that the

21    government asked me to do, so I'm not going to do that.

22    So.

23        Q.    You could, though?

24        A.    I could -- I could give a full accounting

25    of where I've been for the last ten years if I wanted

1    to, yeah.  In fact, I could give an hourly account of

2    it.  Which is crazy, but I could.

3         Q.    You said you have a terrible memory and you

4    can't identify names.

5         A.    I can't remember names typically, no, but I

6    don't have to.

7         Q.    But you're refusing to answer the question

8    about where you stayed and where the government --

9         A.    Mm-hmm, yeah, because I don't necessarily

10   want to violate the trust that's been placed in me in

11   those places.

12        Q.    Do you have any business dealings with

13   Qatar or Turkey directly, indirectly or --

14        A.    You mean with the government, or with

15   individuals in the country, or what?

16        Q.    Let's start with the government.  Okay, so

17   I'll just ask it again:  Do you have any business

18   dealings --

19        A.    No --

20        Q.    -- any money --

21        A.    -- I have no -- I have no business dealings

22   with them as far as I know.  I am friendly with

23   numerous member -- I am friendly with the Qatari

24   ambassador, he's a dear friend of mine.  I like him a

25   lot.  I was -- I was a guest at one of his -- at

1    several of his events.  And I have, in terms of

2    Türkiye, you know, I'm well-networked there.  My uncle

3    was the station chief there.  So I'm very familiar with

4    Türkiye.

5              But no, I have no relationship with the

6    government of Türkiye as far as I know.  Many of --

7    actually, that's not true.  One of the guys, Mehdtan

8    Sahlahme (phonetic), who was MIT, but he died, he's --

9    he's dead now, so I guess I have no relationship.

10        Q.    Do you do any work, paid or unpaid, for the

11   Qatari government?

12        A.    No.

13        Q.    The Turkey -- Turkish government?

14        A.    No.

15              (Marked Deposition Ex. 8)

16   BY MR. THOMPSON:

17        Q.    I hand you what's been marked as Exhibit 8.

18        A.    I do no gov -- work -- work for the

19   governments of any other country than the United

20   States.

21        Q.    You're familiar with this tweet?

22        A.    Yes.  "I have stolen millions from the

23   Zionists."  It's from the other night.  "How dare you

24   say I could be bought for $7k?"  That -- that's

25   obviously a joke.  That's a funny joke I've gotta say,

1    because it's now in a court record.  But it's a joke.

2    I have not stolen millions of dollars from Zionists.

3         Q.    Who were the Zionists you're referring to?

4         A.    That was the joke.  It -- it's a

5    reference -- the 7k thing is a reference to the fact

6    that the Zionists pay people money to promote certain

7    ideology and talking points in social media, and so no.

8              (Marked Deposition Ex. 9)

9    BY MR. THOMPSON:

10        Q.    I'm going to hand you another exhibit.

11        A.    Mm-hmm.

12        Q.    This is a tweet from 2024.

13        A.    Let's see what this is.

14        Q.    You mention an investment in hurricane

15    mitigation tech.

16        A.    Mm-hmm.

17        Q.    Explain what --

18        A.    Yeah, that would be -- that would be the

19    drone company at Censys Tech.  And, you know,

20    "invested" in this context means paying attention.  But

21    solar powered batteries, "Solar plus batteries keeps

22    the lights on."  So this is a reference to the Aptera

23    stuff.  So yeah, that's what that is.  Hurrigation

24    (sic) mitigation tech, that would be mostly like the

25    Censys stuff.  But ultimately, I just have the options

1    in that.  So.  Yeah.  Well, yeah, hurricane mitigation

2    technology is a very interesting subject.  I should --

3    I should spend more time on that, especially in the

4    West Coast because that's where we're likely to have --

5    we're likely to have more hurricanes, unfortunately, in

6    the future.

7        Q.    Can you briefly explain how drones

8    mitigate, are hurricane mitigation technology?

9        A.    No, not without getting in trouble.  So,

10   no.  There's a technical -- well, DLA Piper has

11   represented the Chinese government in suing over drone

12   technology, so I won't be talking about that, no.

13       Q.    You could answer it, but you refuse to?

14       A.    I refuse to, correct.

15       Q.    Okay.  Any other investments?

16       A.    Not that I know of.

17       Q.    Okay.  And when I talk about investments, I

18   just want you to know it's indirect, direct, SPVs,

19   trusts, government money, wife, daughter, government --

20       A.    Well, the wife and daughter you were barred

21   from by Judge Pittman.  You should try, though.

22       Q.    Well, I'm going to ask if you --

23       A.    Remember, counselor, you didn't check with

24   DLA Piper of whether or not they already represented my

25   family, which they did, and then you moved over, which

1   you didn't do the conflicts check -- conflicts check

2   on, and now you're asking about the family.  That's not

3   good.  But you can continue if you want.

4        Q.    Did you invest in any companies with Navy

5   SEALS?

6        A.    I did.  I backed a company called

7   Terradepth.

8        Q.    Why didn't you mention that before?

9        A.    I didn't recall it.

10       Q.    You didn't recall it?

11       A.    That was -- no, I didn't.  And I think I

12   have options in that one, too, but I'm not totally

13   sure.  Gator would know more on that.  Gator's in --

14   Gator was in control of that investment through the

15   OI5 --

16       Q.    So, how many -- how many companies do I

17   gotta bring up for you to say, "Oh, Gator knows about

18   that, now I remember."  It feels like you're not being

19   complete and honest in your answers.

20       A.    Well, a lot of them, it's not my

21   responsibility.  Like, you know, I pay attention to my

22   lane and I do the things that the government asks me to

23   do and people ask me to do in my lane.  So that's why

24   we have business partners and associates.

25            Yeah, Terradepth is a very interesting

 1    company, though.  I don't think -- I don't really know

 2    what's going to happen with that one.  But I haven't

 3    talked to Joe -- Joe Wolfel is the main shot-caller

 4    there, and I haven't talked to him in maybe a year, two

 5    years.  No, that's not true.  We talked about Italy.

 6    We talked about the Italian coast.  Good guy.

 7                   (Marked Deposition Ex. 10)

 8    BY MR. THOMPSON:

 9         Q.    I'm handing you Exhibit 10.

10         A.    Ah.  There we go.  Yes.

11         Q.    Third page.

12         A.    Third page.

13         Q.    Towards the bottom.

14         A.    Third page.  Third page.  Yep.

15         Q.    "One of the companies," can you read that,

16    please?

17         A.    No, I don't see that.  Where is that?  Page

18    3?  Are you sure it's page 3?  No, I don't have it

19    here.  Maybe you want to just read it out and I'll try

20    and find it.

21         Q.    Take mine.  Why don't you give me that one

22    back.  I highlighted it.

23         A.    Okay.

24         Q.    So who are those two British friends and

25    what is the company?

1      A.    Let's see here.  What is the company?

2  That's a great question.  I don't recall this one.

3  Yeah, Gator would definitely know this one --

4      Q.    That one.

5      A.    -- though, because he handles the British

6  side of our dock --

7              (Marked Deposition Ex. 11)

8  BY MR. THOMPSON:

9      Q.    See if that jogs your memory.

10     A.    I handle --

11     Q.    Exhibit 11.

12     A.    I handle the French ones.

13     Q.    Keep that -- Charles --

14     A.    Yep.

15     Q.    -- if you could --

16     A.    Oh.  Sorry.

17     Q.    -- please just please keep all the

18  exhibits --

19     A.    Okay.  Yep.  Yep.  So Terradepth, yep, I'm

20  an investor in that one, yep.  If I wrote it, then I'm

21  an investor in it.  Probably.

22     Q.    Okay.  So again, if the Receiver cares to

23  try to quantify --

24     A.    Again, I have no objection to a federal

25  Receiver.  You were obliged to come up with three

1    names.  You came up with one.  Come up with three.

2        Q.    Mr. Johnson, if the Receiver, whoever it

3    is, seeks to quantify your investment or the value of

4    your investments in Terradepth, how would he do it?

5        A.    He would call the company.  Presumably, he

6    could call Joe, he could call -- he could call John

7    Burbank.  He could call Gator Greenwill.  He could call

8    any number of people.

9        Q.    So give me the full names of everyone.

10       A.    John Burbank.  So he's somebody that people

11   could call.  I don't have his contact.  I haven't

12   talked to him in a number of years, but I think it was

13   John at Passport Capital when I talked to him last.  He

14   has a woman who works for him named Julie Kim who I

15   typically associated with, though I think she was

16   fired.  I'm not totally sure what that deal is.  Yeah.

17   But I haven't really paid attention to that in a number

18   of years.

19       Q.    And how are they going to know the name of

20   the -- these SPVs?  How do they know that they're

21   associated with Mr. Chuck Johns -- Charles Johnson?

22       A.    The home that Mr. Burbank lived in in

23   London was provided to him because of his help to

24   various countries, the UK and the U.S.  He will know

25   what I'm talking about.

```
1              MR. THOMPSON:  Objection, nonresponsive.
2    BY MR. THOMPSON:
3         Q.    So this investment in Terradepth, was it an
4    SPV, direct, or what?  Do you know?
5         A.    I don't know.
6         Q.    Okay.
7         A.    I know that I have an interest in it.  I
8    know that it is sizable.  I don't know -- I don't know.
9         Q.    Okay.  By "sizable," what do you think?
10   What's "sizable" mean to you when you say "sizable"?
11        A.    A few million bucks, maybe 10 total.  But I
12   don't know if it's all mine.  Some of it might be
13   Gator's, some of it might be a combination.  Unclear.
14   I --
15        Q.    Was it in -- go ahead.
16        A.    Yeah, I believe -- yeah, I don't know what
17   its valuation is either.  I haven't really paid
18   attention to it in a number of years.  I know that it's
19   doing well and I know that it continues to get
20   contracts from the Navy, but I don't know the full
21   story with the Navy, nor do I really want to know
22   because some of the stuff that they do is classified,
23   from what I understand, and I'm not read into it.
24        Q.    Was the investment in Terradepth through
25   Greenwill, or did he handle it?
```

1     A.     He handled the paperwork around it, yeah.

2     Q.     Okay.  Was it a special purpose vehicle?

3     A.     I don't know.

4     Q.     You don't know?

5     A.     I don't know.  I know that my job was to

6   source the investment and his was to provide the

7   capital for it, so he did.  Yeah.  And I believe that

8   there's a lot of British connections there, but I don't

9   know the full thing.  The Brits don't trust me.  The

10   French are the ones that like me, and so he handles the

11   British.

12     Q.     Why don't the Brits trust you?

13     A.     The whole American Revolution thing.  Yeah.

14   It's a thing.  They're big on lineage.  And the French

15   like me a lot, like "a lot" a lot.  So.  My family was

16   very involved in Lexington and Concord.  They know

17   that.  Everybody who does business at the level in

18   Britain, you're only allowed in certain places.  He's

19   allowed in those places.  I am not.

20     Q.     Okay.  So it's 11:40.

21     A.     Yep.

22            MR. THOMPSON:  How long have we been going

23   -- I want to be cognizant of the court reporter --  on

24   this session?

25            THE REPORTER:  I don't have a time for

1       that.

2                   MR. THOMPSON:  About --

3                   THE VIDEOGRAPHER:  I need to go off the

4       record and calculate that for you.

5                   MR. THOMPSON:  We'll go about five more --

6       five, ten more minutes and then will take our lunch

7       break.

8       BY MR. THOMPSON:

9           Q.    Are you -- are you going to stick around?

10          A.    I don't know.  I have to wait and I have to

11      go see.  I have go make a phone call.

12          Q.    Because you said you were leaving at noon.

13          A.    I am going to be leaving the building at

14      noon, yes.  And I may actually get into a cab and

15      leave.  I'm going to actually go and file a report and

16      say how it's going and then I'm going to get

17      instructions.

18          Q.    A "report"?

19          A.    Yeah.  It's a report.  I have to go and say

20      what happened here.  I'm obliged to do that.  The kind

21      of questions you're asking, all of that, I'm going to

22      take that and I'm going to go tell them.

23          Q.    Will you tell me your handler's name?

24          A.    No.  Never.

25                  THE VIDEOGRAPHER:  I've got an hour and 23

1    minutes as of right now on the record.

2              MR. THOMPSON:  All right.  That's -- that's

3    kind of long for you guys.  Let's go off the record

4    then.

5              THE VIDEOGRAPHER:  We are going off the

6    record at 11:42.

7              MR. THOMPSON:  Oh, can we just go back on

8    real briefly?

9              THE VIDEOGRAPHER:  Yes, we're on.  We're

10   on.

11             MR. THOMPSON:  All right.  We're going to

12   break for -- take a real quick lunch break.  I just

13   want to, for the -- because we've been going for about

14   an hour 20, for the court reporter's sake, to give him

15   a break.  And I still have a lot more questions for

16   Mr. Johnson, and I intend to use my full seven hours.

17   Mr. Johnson has stated that he's going to leave, and I

18   just want to make it very clear that --

19             THE REPORTER:  Wait.  Wait.  I need those.

20             THE WITNESS:  Oh, you need them?

21             THE REPORTER:  Yeah.

22             THE WITNESS:  Okay.

23             MR. THOMPSON:  -- I'm not done with my

24   examination here, and it's 11:45.  I intend to resume

25   the deposition around 12:15, 12:30.

```
1              THE VIDEOGRAPHER:  Okay.  We're going off
2    the record at --
3              MR. THOMPSON:  Oh --
4              THE VIDEOGRAPHER:  On.
5    BY MR. THOMPSON:
6         Q.    Mr. Johnson, are you going to be back here
7    at 12:15?
8         A.    I don't know.  I'm going to have to make a
9    phone call, and when I find out, I will let you know,
10   or you'll -- presumably you'll know whether or not I'm
11   here or not.
12             MR. THOMPSON:  Okay.
13             THE VIDEOGRAPHER:  We're going off the
14   record at 11:43.
15             (Break from 11:43 a.m. until 12:41 p.m.)
16             THE VIDEOGRAPHER:  We're back on the record
17   at 12:41.
18             MR. THOMPSON:  All right.  We're back on
19   the record.  12:41.  We were supposed to get started at
20   12:30, but Mr. Johnson is present.
21   BY MR. THOMPSON:
22        Q.    Are you ready to continue, Mr. Johnson?
23        A.    I am.
24        Q.    Did you make any calls?
25        A.    I did.
```

1    Q.    Who did you speak to during the break?

2    A.    I won't say who I spoke to.

3    Q.    Why?

4    A.    Because I'm not allowed to.

5    Q.    Did you talk about this deposition and your

6    answers?

7    A.    I did.  I did.

8    Q.    What did you say?

9    A.    I said that it's a -- it's a lot of -- it's

10   an annoyance, but it's manageable.  Something to that

11   effect.

12   Q.    Who were you speaking with?

13   A.    I won't say.

14   Q.    Over the telephone, or Signal?

15   A.    Signal message.

16   Q.    Do you delete your Signal messages?

17   A.    They're auto-deleted.

18   Q.    Why do you have them set like that?

19   Because do you understand that you are under a duty to

20   preserve your messages in this case and your

21   communications?

22   A.    I guess they'll have to arrest me.

23   Q.    What?

24   A.    I guess they'll have to arrest me.  They

25   were set long ago that way and I just continued with

1    the status quo of it.

2         Q.    You know you could change it so they don't

3    delete?

4         A.    I won't change it.

5         Q.    That wasn't my question.  You know you

6    could?

7         A.    I could, but I won't.  Typically, they last

8    for about a day or two.  Sometimes less.  Depending.

9         Q.    Why don't you want to preserve your

10    communications that relate to this case?

11         A.    Well, all my communications are preserved

12    through Signal.  Signal controls all of that.  I would

13    prefer to do everything on Signal if I had my druthers.

14         Q.    You mean you can retrieve all your messages

15    that you sent on Signal?

16         A.    No.  Others can.  I can't, but others can.

17         Q.    Who are the others?

18         A.    Well, it's not a secret who are the funders

19    behind Signal.

20         Q.    I'm asking, like, could you if you

21    personally want to retrieve --

22         A.    I personally couldn't, but others can do it

23    for me.

24         Q.    And you choose to not change your message

25    retention settings --

1    A.    That's right.  I -- I won't.  Yeah, I mean,

2  I don't -- I won't, and won't change anything that I've

3  done with -- regarding that.

4    Q.    Can you explain why?

5    A.    It's about the minimal compliance issue.

6    Q.    Same thing, you're going to minimally

7  comply, but not a hundred percent maximum compliance?

8    A.    That's right.  And also Signal controls all

9  of it anyway, everything I do on Signal.  I would

10 prefer to do everything on Signal, as I've said, and

11 Signal has a back end, so I'm happy if there's anything

12 like super-bad or whatever, that Signal -- the Signal

13 messages could be reactivated at some point by somebody

14 if necessary, if totally necessary.

15          In general, I'm a fan of Signal and prefer

16 it for all communications.  I use it with family, with

17 friends, girlfriends, you know, nannies.

18   Q.    So I went through -- some of your answers

19 were muddled, so I'm not repeating this intentionally.

20 Okay.  So when was the first time you purchased or

21 obtained cryptocurrency?

22   A.    I don't know what the first time was.

23 2011, 2012.

24   Q.    So list every crypto exchange or platform

25 where you've had an account.

```
 1          A.    I don't know them all.  Probably -- I think
 2    I had one at Coinbase.  That might be it.
 3          Q.    Bi --
 4          A.    I don't know the others off the top of my
 5    head.
 6          Q.    Binance?
 7          A.    No, I've never used it.
 8          Q.    Kraken?
 9          A.    Never used it.
10          Q.    Are you sure?
11          A.    Yeah.
12          Q.    Gemini?
13          A.    Never used it.
14          Q.    Sure?
15          A.    Yes.
16          Q.    FTX?
17          A.    No, I've never used it.
18          Q.    Are you positive?
19          A.    Yes.
20          Q.    KuCoin?
21          A.    No, I don't even know what that is.
22          Q.    Bitfinex?
23          A.    Bitfinex?  What is that?
24          Q.    Something I heard about.
25          A.    I've never -- I've never used that.
```

1    Q.    Okay.

2    A.    I have no idea what that is.

3    Q.    So you're positive Coinbase is the only one

4    that you've ever used?

5    A.    There might have been one or two others,

6    but I don't recall them off the top of my head.  As I

7    said, I haven't touched this stuff in a long time.

8    Q.    But it was not Binance, Kraken, or Gemini

9    or FTX?

10    A.    No.  Certainly not.  I would have nothing

11    to do with -- I would have nothing to do with those

12    platforms under any circumstance unless directed that I

13    was to have something to do with them.

14    Q.    What user name or email did you use to

15    register?

16    A.    I don't remember.  It was like 2016, 2017

17    when I did the Coinbase one.  It's been a long time.

18    Q.    Yeah.  So the next question:  So what time

19    periods did you register for those accounts?

20    A.    Oh, that would have been like 2016, 2015

21    time frame.  Yeah.  But I don't recall off the top of

22    my head.  As I said, it's been a long time since I've

23    had anything to do with crypto.

24    Q.    And you would have completed the full Know

25    Your Customer infor -- identity -- identity

1    verification?

2        A.    I don't know if they had that at that time.

3    Whatever the compliance software was at the time is

4    what I used.

5        Q.    You know what Know Your Customer is?  Are

6    you familiar?

7        A.    I do.  I'm familiar with it.

8        Q.    What is that?

9        A.    Know Your Customer is something you have to

10   do if you're a money transmitter, and my understanding

11   is that a lot of the laws around crypto have changed

12   since I've dealt with them, but I don't quite -- I

13   haven't really kept up with it.  It's cer -- not really

14   relevant for my overall financial picture.

15       Q.    Are any of your crypto accounts still open?

16       A.    Not that I know of.  If they are, they're

17   not controlled or used by me in any form or fashion.

18       Q.    Did you close them?

19       A.    Just never use them anymore.  I X'd out of

20   almost all my positions, I think actually out of all of

21   my crypto positions after Trump -- Trump's statement,

22   and I directed family and friends to do likewise.

23       Q.    So any assets that you had in Coinbase or

24   any of the exchanges, what did you do when you -- when

25   you said you liquidated or got out of those?

1          A.     Most of them were sent to -- to bank

2     accounts, but some of it was given away.  I gave some

3     away of it to this guy, Kyle Kazan, but that was not

4     that much.  I think that might have been like 10,000 to

5     $15,000 worth of crypto.

6               But in general, no, I never really -- I --

7     when Trump gave his famous Tweet -- although I

8     understand his position has changed on Bitcoin -- but

9     he gave his famous Tweet were he said that he wasn't a

10    fan of it, and Mnuchin give a speech, where Mnuchin,

11    the then treasury secretary, was opposed to it.  I took

12    that as a signal to -- to no longer be involved with

13    it.

14               And then when the FBI contacted me and

15    asked me about everything I knew about Bitcoin, and

16    when other intelligence agencies asked, talked to me

17    about Bitcoin, I complied with what they asked me to

18    talk to them about, and went from there.

19         Q.    So at the peak, the most you had at one

20    time, how much Bitcoin?  Not value, but just the number

21    of Bitcoin.

22         A.     I don't know.  I didn't track it like that.

23    I didn't think of it like that.

24         Q.    What year did you have your most Bitcoin?

25         A.     Maybe 2017, 2018.  Not totally sure.  As I

1    said, it's been a long time.  It's been like at least

2    six, seven years, eight years.

3         Q.    And currently your testimony under oath is

4    that you have no -- you possess no Bitcoin, you could

5    not access any Bitcoin through --

6         A.    That's right.

7         Q.    -- yourself, trusts --

8         A.    Yeah, and as far as -- and as far as I

9    know, no one -- no one in my family owns it either.  So

10   as far as I know, it's -- we're entirely out of the

11   thing.

12                 (Marked Deposition Ex. 11)

13   BY MR. THOMPSON:

14        Q.    That's Exhibit 11.

15                 THE WITNESS:  Sir, when you scan these, do

16   you take pictures of them, or do you -- how do you do

17   it?

18                 THE REPORTER:  I scan them.

19                 THE WITNESS:  You scan them?  Okay.  Great.

20   So if I write on it, it'll be scanned as well?  Okay.

21   Great.

22                 THE REPORTER:  Everything on there will be

23   scanned.

24                 THE WITNESS:  Cool.  Thank you.

25   BY MR. THOMPSON:

1    Q.    Here's an article from 2017.  It's a CNBC
2  article.
3    A.    Yeah, a lot of this is incorrect.  I think
4  this is from CNBC.
5    Q.    So hold on.
6    A.    Yeah, this is all disinformation from the
7  Southern Poverty Law Center, which I think ultimately
8  went bankrupt.  Or at least the -- Morris Dees and a
9  number of other people were fired around that.  So
10  yeah, go on.
11    Q.    So whether you did it or not, did you
12  represent to any third parties around 2017 to 2018 that
13  you were mining millions of dollars a month in crypto?
14    A.    I may have said that, but it wasn't true.
15    Q.    So you think you did say that?
16    A.    It's possible, yeah, but I didn't
17  ultimately do it.
18    Q.    I ask, because if you go to the last page
19  of the text of the article, it says -- refers to you
20  investing in the -- to pro -- "business to process the
21  cash from medical marijuana."
22          Do you see that?
23    A.    I do.
24    Q.    "And has started a Bitcoin mining
25  operation"?

1        A.    Yes.

2        Q.    Okay.  So did you do either of those

3   things?

4        A.    I did not.  I did not.  Yeah, I was not

5   involved with the Bitcoin mining operation ultimately,

6   was not involved with the processing of cash from

7   medical marijuana.

8        Q.    Do you know anyone that did do that?

9        A.    I don't think so.  So I don't know.

10       Q.    I believe on a podcast you said you were

11  very into Bitcoin mining until 2018 and then you exited

12  the space because the U.S. government told you to get

13  out of Bitcoin.  Did you say something like that?

14       A.    Some -- prob -- that sounds -- that might

15  -- that sounds like something I might have said, yeah.

16       Q.    Okay.  Why would you say that you were very

17  into Bitcoin mining until 2018?

18       A.    Well, I was very interested in the

19  conceptual frameworks around it, but I went and -- I

20  traveled to Hong Kong and I met somebody who was later

21  told to me that he was Chinese intelligence officer.

22  He was very interested in Bitcoin mining.  This was --

23  yeah, twenty -- 2017-2018 time frame.

24            And then I met with some people on U.S.

25  government and they informed me that this person was

 1 | likely a CCP or some kind of Chinese spy, and I said,
 2 | "Well, it's a good thing I didn't do business with
 3 | him."  And, frankly, there was so much craziness around
 4 | crypto and the dangers around it, that I wanted to be
 5 | sort of out of it altogether because it's quite a
 6 | dangerous thing there.  People get kidnapped for it and
 7 | get harmed for it all the time.  And, you know, my
 8 | physical safety and the safety and well-being of people
 9 | around me is more important to me than any amount of
10 | money I could ever seek to make.
11 |     Q.    So go back to that last exhibit.  Do you
12 | have it?
13 |     A.    Mm-hmm.
14 |     Q.    It's the CNBC article.  It says that you
15 | were looking at businesses to process the cash from
16 | medical marijuana.  Is that right?
17 |     A.    That's right.
18 |     Q.    Okay.
19 |     A.    I think I went to a marijuana-related
20 | conference at one point, but ultimately -- it won't
21 | surprise anyone to know this, but a lot of stoners are
22 | not the best business people.  And I also grew
23 | concerned about the ethics of the marijuana industry,
24 | as well as the sort of federal legality or illegality
25 | of all of that.

1    Q.    What businesses do you recall speaking with

2    about this?

3    A.    It was such a long time ago, I don't really

4    remember them all.  I collected a lot of -- I collected

5    a lot of business cards at the time, but I found most

6    of the people who were involved in this space to not

7    honest brokers, or I found them to be dodgy in

8    different ways, so I tried to minimize my involvement

9    with them.

10    Q.    Did you ever encourage Congressman Tom

11    Tancredo to run for governor?

12    A.    If I did, it was in a very, like, friendly

13    kind of way.  But he was a friend of a friend, and if I

14    did encourage him to run for governor, it was, like,

15    "That would be great if you ran for governor."  Like,

16    that's -- I have that conversation with, like, a dozen

17    people every -- like, it's not out of the unusual.

18            Frankly, if people want to run for office

19    or are involved with higher office, I'm happy to

20    support them if they are kind -- kind and good people,

21    good-natured.

22    Q.    Tancredo was a proponent of legalizing

23    marijuana?

24    A.    Was he?  I didn't know.

25    Q.    I'm asking.  Were you aware of that one way

1    or another?

2        A.    I had no idea.  I -- that -- are you sure

3    that's true?

4        Q.    I'm just asking if you know.

5        A.    No, I have no idea.  In fact, he was

6    introduced to me at a burger joint by Michelle Malkin,

7    and we discussed -- in particular, we discussed

8    Colorado, and we discussed whether or not I thought he

9    could win a governor's race there, and I said he

10   probably couldn't, but if he wanted to run, I wished

11   him well.

12            But I don't recall.  I mean, it's been a

13   number of years.  And I think -- I think the

14   conversation went for, like, maybe an hour or two

15   maximum, and then I haven't talked to him since, as far

16   as I can recall.

17       Q.    Have you ever -- excuse me -- received any

18   funds of any sort that you now understand were proceeds

19   from the sale of -- marijuana distribution or sales?

20       A.    I don't know.  I suspect probably, but I'm

21   not sure.  And I think I would let the U.S. government

22   and others to make that determination.

23       Q.    Why do you say "probably"?

24       A.    Just a strong suspicion.  People I was

25   around were interested in that kind of thing circa

1    2017-2018.  It was a sort of interesting time because

2    it was legal at the state level but not at the federal

3    level, and so there was a question about the legality

4    of if you had a business operating in cash in

5    California, could that work or not.

6              And so ultimately never went through any

7    serious business operations.  My understanding though

8    is is that a number of the people who were involved

9    with that have since gotten in trouble with the law in

10   different ways.  And of course I support federal law

11   enforcement doing what they think is necessary there.

12        Q.    Well, let's talk about federal law

13   enforcement, a little bit about it.  So did you ever

14   have any assist in or input on how federal law

15   enforcement dealt with marijuana dealers or the border?

16        A.    Reporter?  What did you say?  What was the

17   last word?  I didn't catch it.

18        Q.    Border security as it relates to drugs,

19   marijuana, cartels.

20        A.    No, I had no involvement with that, as far

21   as I know.  It's possible -- it's possible that I spoke

22   with some people about it, but I don't recall it.

23        Q.    Okay.

24        A.    In general, I would say that I am a big

25   supporter of the federal law enforcement and think that

1    they -- and the federal government generally, I think

2    it's woefully underfunded, and would be supportive of

3    any efforts that they would do to -- to stop things

4    that were illegal.

5         Q.    Have you ever spoken with David Lederman in

6    your life?

7         A.    I don't know who that is.

8         Q.    Is that your testimony under oath?

9         A.    It is.

10        Q.    Okay.  When was the last time you spoke

11   with Max Lederman?

12        A.    I don't know who that is.

13        Q.    When was the last time you spoke about the

14   lawsuit that David Lederman was in?

15        A.    I do what -- I don't know who David

16   Lederman is, so I don't know what a lawsuit is that

17   he's involved in.

18        Q.    That's your testimony?

19        A.    It is.  You asked me about the name of it,

20   and I understand that he -- he got arrested at one

21   point, but I don't know who he is, I've not seen a

22   photo of him.  Couldn't identify him unless I'd seen a

23   photo of him.  But I don't know who he is.

24        Q.    That's your testimony?

25        A.    That is my testimony.

1    Q.    Have you provided federal law enforcement

2    or state law enforcement any information about David

3    Lederman or anyone involved in marijuana-growing

4    operations?

5    A.    I don't know if I should talk about a

6    relationship I have with the federal government, so I'm

7    gonna say no, I don't know anything about any marijuana

8    cultivation or growing of operations.  The feds, as far

9    as I know, they -- they do pretty good work, but I'm

10   not -- I'm not involved with it.

11   Q.    Have you ever been promised immunity,

12   leniency, or any other benefit in connection with any

13   crimes that the federal government charged or was

14   investigating relating to marijuana?

15   A.    As far as I know, no.

16   Q.    Okay.  You wrote a Substack a couple of

17   days ago, I think it was, and it was about your, I

18   think, membership at a -- or your status as a federal

19   law in -- or informant.  Do you remember that?

20   A.    I do.

21   Q.    Okay.  And I think you pasted a letter you

22   wanted to give to Judge Pittman or something?

23   A.    Maybe something like that, yeah.

24   Q.    Okay.  You say, "I was threatened with

25   potential jail time for something which wasn't even a

1    crime."

2        A.    That's right.

3        Q.    What was that?

4        A.    That was having conversations with Julian

5    Assange.  Yeah.  I went to go see him in August '17,

6    2017.

7        Q.    Let me start back.  So, the line before,

8    you say, "The process by which I became a code-named

9    informant is complicated, but it amounts to this.  I

10    was threatened with potential jail time for something

11    which wasn't even a crime."

12        A.    That's right.

13        Q.    Okay.  So what crime were you threatened

14    with, or what was the potential jail time you were

15    threatened with?

16        A.    Well, Director Pompeo had designated Julian

17    Assange and Wikileaks as a non-state actor, and I went

18    to go see him with then Congressman Rohrabacher at the

19    Ecua -- what was then the Ecuadorian Embassy in London,

20    and he had and I had about a four-hour conversation, or

21    the three of us had a four-hour conversation.  And when

22    I came back to the United States, the U.S. government

23    asked -- you know, asked me about that meeting.

24    Several entities from the U.S. government asked me

25    about that meeting.  One group in particular was very

1   interested in that meeting, and they are the ones who

2   -- for whom I was working at the time, or help --

3   helping at the time, I should say.

4      Q.   What's the group that you threw that "one

5   group in particular was very interested"?

6      A.   They were very interested in the

7   conversation I had with Mr. Assange that --

8      Q.   Who was the group?

9      A.   I won't discuss that.

10     Q.   Are you refusing to answer?

11     A.   That's right, I am.

12     Q.   Any government -- so -- so you said you

13  were threatened for it with a crime and jail time and

14  federal --

15     A.   I was, but they didn't --

16     Q.   Hold on, hold on.

17     A.   Yeah.

18     Q.   Hold on, hold on.  And then so did that

19  cause you to alter your behavior or work with them or

20  become an informant; is that what you're saying?

21     A.   Well, you know, there are many government

22  agencies, and there's this process called

23  deconfliction, and unfortunately sometimes you get

24  investigated for things that you were doing under the

25  auspices or protection of another government agency,

1    and so that's what happened there.

2        Q.    Did you tell any friends or acquaintances

3    around 2018 that you were concerned with being arrested

4    or facing jail time?

5        A.    Possibly.  But I'm always kind of worried

6    about that.  I was particularly worried because I was

7    named in the Mueller probe, though apparently the

8    sections concerning me in the Mueller probe are still

9    classified to this day, despite my best efforts.

10        Q.    Testifying here today, you said "probably"

11    or "possibly."  Can you identify or recall anyone that

12    you told - acquaintances, friends, et cetera - that you

13    were concerned that you would be arrested?

14        A.    Well, there was a situation --

15        Q.    Just answer --

16        A.    Yeah.

17        Q.    I want names.

18        A.    No, no.  There was -- I'll just tell you

19    the story and then you can decide for yourself how

20    you're going to process it.

21            So there was a guy named James Wolfe who

22    was a -- he was a part of the Senate Intelligence

23    Committee, and Mr. Wolfe was having an af -- a series

24    of affairs with a number of journalists and he was

25    giving them information about things going on in the

1   Senate Intelligence Committee and he was harassing me

2   trying to get me to comply with his probe and so I was

3   contacted by a number of journalists at the time saying

4   that I think Wolfe was trying to come after me and that

5   he may try to put me in jail if he criminally referred

6   me, and then Mr. Wolfe was arrested himself and

7   ultimately resign -- or I think he was put in jail for

8   a brief time, which was an appropriate punishment.  He

9   should have gotten more time, but I don't want to see

10  anyone go to prison for a non-violent offense.  And

11  so -- and so that's what I was telling people at the

12  time.

13          It was a challenging thing because we had

14  these different government agencies smacking into each

15  other and fighting with each other.  But ultimately

16  I -- I prevailed.  I didn't have to go before Congress,

17  the House or the Senate, which both requested my

18  presence.  And so I was talking to a number of

19  journalists and a number of people, about that time

20  period.

21      Q.    You didn't raise any concerns about

22  potential jail time or fear of jail based on any

23  involvement with marijuana, the specific potential

24  business that you looked at, the --

25      A.    As far as I'm aware, no.  But it's

1    possible.  I mean, there's a big conflict with the feds

2    and marijuana.  My big kinda takeaway --

3            MR. THOMPSON:  So I'm going to object as

4    non- --

5            THE WITNESS:  Yeah.

6            MR. THOMPSON:  -- responsive.

7    BY MR. THOMPSON:

8        Q.    So just the answer is "no"?

9        A.    No, the answer is no.  I was not concerned

10   about going to jail for that, no.

11       Q.    A couple more questions about your crypto

12   holdings.  Identify all of the hardware wallets that

13   you owned or used.

14       A.    I don't own any hardware wallets.  I don't

15   have the time.

16       Q.    Do you --

17       A.    No, I haven't -- I've never owned a

18   hardware wallet as far as I can recall.  Although, it's

19   a challenging question because when you mine Bitcoin,

20   sometimes you store it on a computer, and I did own

21   several computers that had coin on them.  So some

22   people would say that those are hard wallets, but I

23   think it's probably not a fair thing.  Generally when

24   people talk about a hard wallet, they're talking about

25   a USB drive or something to that effect, and I never

1    owned one of those.

2        Q.    Where did you store your recovery words,

3    passkeys, private keys, seed phrases, all that?

4        A.    I made a poem with them and I would recite

5    it before I brushed my teeth before I went to bed and

6    after I woke up.

7        Q.    Do you use any privacy tools to obscure the

8    origin or destination of your cryptocurrency holdings,

9    mixers, tumblers, privacy pools?

10       A.    No, I don't know what any of those things

11   are.

12       Q.    Did you ever provide your assets, crypto,

13   into a wallet that someone else nominally controlled

14   but was used for your benefit?

15       A.    No, I never did that, as far as I can

16   recall.

17       Q.    Who is Terry Dunmire?

18       A.    He's an elderly gentleman who lives in

19   northern Virginia.

20       Q.    When was the last time you spoke with him

21   or communicated with him?

22       A.    Maybe three or four days ago.

23       Q.    How often do you speak with him?

24       A.    Whenever he calls me or whenever he texts

25   me or whenever he wants to get lunch or dinner or have

1    a cigarette.

2         Q.    In the last month, how many times have you

3    spoken to him?

4         A.    Maybe two or three times.

5         Q.    The past two months?

6         A.    Maybe eight or nine.

7         Q.    Past three months, is that about the

8    cadence?

9         A.    Yeah, it's about that.  I mean, it depends.

10   He has ill health, so usually when he and I speak, it's

11   about medical matters or about things going on

12   politically.  We discussed the Epstein matter recently

13   and so we had a long conversation about that and what I

14   should do concerning it.  And we discussed the 2028

15   election.  And we discussed this Indian gentleman that

16   we are convinced is a spy, which probably is a spy.

17             But in general, no, I mean, he's a good

18   guy.  I like him.  He's a nice -- he's a gentleman.  He

19   and I are both -- you know, we're from the old

20   families, and so there's sort of that aspect of it as

21   well.  I always speak to him over Signal or in person,

22   and he's a -- he's a lovely man.

23        Q.    So have you invested directly, indirectly

24   through a special purpose vehicle perhaps with

25   Mr. Greenwill in any company or SPV or fund or trust

1    that Mr. Dunlo -- Dunmire was affiliated with over the

2    past ten years?

3         A.    It's possible.  I mean, we have a policy of

4    honoring our hosts.  So.

5              MR. THOMPSON:  I'm going to object as

6    non-responsive.

7    BY MR. THOMPSON:

8         Q.    Yes or no?

9         A.    No, I mean, it's possible.  I don't know.

10   So yes maybe, but -- probably yes, but my guess would

11   be it would depend on how it was structured.  And so

12   the way it typically works is Gator is the one who

13   brokered the introduction to Mr. Dunmire, so Gator is

14   the one who has control of any financial interactions

15   that occur between mister -- me and Mr. Dunmire.

16              I sent Mr. Dunmire five grand maybe four

17   years ago, five years ago, and we had -- the last I saw

18   him in physical presence was -- it had to have been

19   April or May of this year, and we went to Thai food

20   near his home in Fairfax.  But he has rather bad

21   health, so he's not the most -- he's had a series of

22   strokes, for example, and so he's not the most -- in

23   the healthiest of spirits.

24        Q.    So, he's on our list to depose.  If --

25        A.    Good luck.

1        Q.      Why do you say that?

2        A.      It's very unlikely you'll have access to

3    him, but I wish you luck on that.

4        Q.      Can you explain in two sentences or less

5    why?

6        A.      No, I cannot, but I think it's very

7    unlikely you'll be able to get access to him.

8        Q.      Why?

9        A.      Because of what he really does for a

10   living.

11       Q.      Oh, is this another, like, federal

12   government informant conspiracy --

13       A.      I don't think he's --

14       Q.      -- thing?  Wait.

15       A.      -- a federal governmental employee

16   currently.

17       Q.      No, but just, like, the whole, like, kind

18   of --

19       A.      You will not have access to him.

20       Q.      -- baloney sandwich --

21       A.      You can try.  I mean, I wish you well on

22   that.  In fact, there's a lot of questions I'd like to

23   ask him.  But -- but you will not have -- you will not

24   have a good time with that.  That'll be quite difficult

25   for you.

1          Q.    So testifying here today, will you identify

2     any investment vehicles that you are involved --

3          A.    I will not.  I don't know of any.

4          Q.    Just let me finish for the court reporter.

5          A.    Yeah, that's fine.  No, I will not, and no,

6     I do not know of any.  If there is one, Gator and Terry

7     and likely John Burbank would know about it.  But I was

8     not read into that.  That wasn't my responsibility.

9     Terry, like Gator, deals a lot with the British world

10    and that is not a world that I'm accustomed to, nor do

11    I particularly like working in it.

12              In fact, the last time, before I went to be

13    with Courtney Love in London, the time before that, I

14    was advised if I went to the UK, the UK government

15    could not guarantee my safety.  So it's not a place

16    that I like to visit.  The food isn't very good.  The

17    people aren't very nice.

18         Q.    So just to be clear, can you identify,

19    testifying here today, yes or no, can you identify any

20    investment, SPV, direct or indirect involving --

21         A.    If there is one --

22         Q.    -- involving Terry Dunmire, yes or no, can

23    you identif --

24         A.    No, I cannot identify one.  I cannot.  And

25    even if I could, I would not.  So I cannot, and even if

1    I could, I would not.

2        Q.    Even if you were aware of an in --

3        A.    Even if I were aware of it, I would not

4    identify it, correct.  But I cannot, because I don't

5    know of any.

6        Q.    In four sentences - without a long

7    filibuster - explain your relationship with Gary

8    Lauder.

9        A.    It's quite simple.  We -- we have a lot of

10   friends in common.  I've met him once before.  He's a

11   gentleman.  I was more friendly with his uncle, and his

12   uncle has, unfortunately, passed.  And his uncle,

13   Ambassador Lauder, was our ambassador under Reagan to

14   Vienna, if I recall correctly, and was a lovely man.

15   Patriotic Jewish guy.  Very good guy.  Very good --

16   good American.  And Gary does a lot of investing on

17   behalf of his larger family enterprises, though he and

18   I have not done any business in quite some time.

19       Q.    Have you spoken to Gary Lauder about this

20   case?

21       A.    I have not, as far as I can recall, no.

22   I -- we are not -- he and I are not -- you know, we had

23   a disagreement about the Gaza genocide, and so he and I

24   have not really spoken in a serious way since that,

25   since October 7th, 2023.

1      Q.    Have you talked to Gary Lauder, just to be

2  specific, about Hal Lambert?

3      A.    As far as I know, no.  But it's possible,

4  but I think no.  Unless you have  -- if you have a text

5  message or something, but no, I have -- I don't recall

6  talking to him about Ga -- about Hal Lambert.

7  Generally speaking, most people --

8            MR. THOMPSON:  No.  No.  Object.

9  Non-responsive.

10  BY MR. THOMPSON:

11      Q.    Remember at trial when I asked you about

12  your Gawker lawsuit?

13      A.    Yes.  Gawker is no longer with us.

14      Q.    How much money did you receive from Gawker

15  for -- direct or indirect through that litigation?

16      A.    It would have to have been a few million

17  dollars all told.  But I'm not quite sure actually, to

18  be honest with you, because Thiel -- you know, Thiel

19  lent me some money around it, and then Thiel and I were

20  sort of against each other in that -- in the final

21  analysis because Thiel and Vekselberg were having a

22  tiff.  So there was that whole -- that whole thing

23  which I had to MIT -- mitigate.  But the operation was

24  successful.  I mean, Gawker no longer exists, nor does

25  Huffington Post, if I recall, or at least not in

1  anywhere what the form it was.

2      Q.    Okay, it's simply -- I just want the amount

3  of money.

4      A.    I don't know.

5      Q.    To the best of your knowledge -- to the

6  best of your knowledge, how much money did you receive

7  from your litigation against Gawker?

8      A.    I don't know.  I think it might have been

9  like a few million.  It's been a few years now.

10      Q.    Did your attorney get paid in that case,

11  yes or no?

12      A.    Which attorney?  I had several.

13      Q.    Any of them.

14      A.    That's a good question.  I believe that one

15  of them got paid, but one of them did not.  One of them

16  was in trouble and had to work off that.  So --

17      Q.    So hold on.  So hold on.  I'm -- I'm

18  trying --

19      A.    Yeah.

20      Q.    -- to trace where --

21      A.    I don't recall.  That one's a curious case

22  because it's now -- well, Gawker went -- went down in

23  2016, 2015-2016, so it's been almost ten years.

24      Q.    Let me put it this way.  Okay?  Did you,

25  out of any of your accounts, pay your lawyers that

1    represented you in the Gawker litigation?

2        A.    It's a good question.  I don't remember.

3        Q.    Were they paid out of -- were the lawyers

4    paid out of any of the proceeds from your Gawker

5    lawsuit?

6        A.    It's a good question.  I don't remember.  I

7    think what happened -- this has been now a few years,

8    but I think what happened was when Gawker went

9    belly-up, when it went -- when it went bankrupt, there

10    were a number of claims that the lawsuits were -- I had

11    encouraged a number of people to sue Gawker, and so

12    they have sued Gawker, and so each had a claim when the

13    assets were bought up by Univision -- or Universal

14    Media -- no, Univision Media Group.

15        And when they were bought up, there were

16    these dedicated trust accounts that were set up with

17    the proceeds of when the assets got sold.  Okay?  And

18    when that happens, my lawyer had access to that and

19    then he gave me -- I -- I presume he took out his fee,

20    I don't recall, but he -- that was the whole process at

21    the time.

22        Q.    What --

23        A.    Yeah.

24        Q.    What year did you get those proceeds from

25    Gawker?

1       A.      Well, Mr. Thiel owed me some money because

2   we were --

3               MR. THOMPSON:  Objection, nonresponsive.

4       A.      Yeah.

5   BY MR. THOMPSON:

6       Q.      What year did you --

7       A.      Oh, that would have been 2015.  2015-2016.

8   Yeah.

9       Q.      What bank account would you have deposited

10  those funds?

11      A.      I don't recall.  I don't know.  It's been

12  now a number of years.

13      Q.      Well, that's -- that's something --

14      A.      I think it could have been CitiBank.  It

15  could have been -- I believe I had a Bank of America

16  account, but I'm not totally sure.  Oh, it could have

17  been First Foundation.  But my -- my then wife handled

18  all of that at the time, and so my recollection of this

19  is that the whole purpose of it was to destroy Gawker,

20  and any money that we made from it was incidental to

21  the operation.

22              And then Thiel was so overjoyed at me

23  having bankrupted Gawker and having worked on that, he

24  owed me a million dollars or so, like, it was like a

25  million five for various things that I had put on my

1    own, that I had basically financed.  And then he, in

2    turn, agreed to invest in Clearview AI and a few other

3    things for me.  And so that was -- that would have been

4    2015-2016 time frame.  Yeah.

5        Q.    Try to just answer the question I ask.

6        A.    Okay.  Go ahead.

7        Q.    You said your wife isn't financially

8    sophisticated?

9        A.    She's not.

10       Q.    Now you're saying that she handles your

11   finances?

12       A.    No, I'm saying --

13       Q.    Or handled them in 2015?

14       A.    I was saying that, yes, that was a major

15   reason that she's not my wife anymore is that she's not

16   terribly financially sophisticated.  And what happened

17   was --

18       Q.    I --

19       A.    -- that account, that money that was going

20   on there, I put it into some -- some kind of trust or

21   something like that.  But it doesn't really matter

22   anyway because it's been -- it's been nine, ten years.

23       Q.    Did you use any of the Gawker proceeds to

24   invest in Clearview, Othram, Mandrel, Umbra, Payala,

25   Terradepth, Aptera?

1      A.    I don't remember if I did or not.  I think

2   I might have gotten some consulting money at the time

3   and that that made a lot of it.  But some of these

4   companies I started, and so typically the way it works

5   when you start a company is that, you know, you decide

6   like, hey, Othram shares are worth ten bucks or

7   whatever, you decide something and then you invest or

8   sometimes you just start the company de novo.  So it

9   really depends on what's going on.

10            Each of those is a specific case.  In the

11   terms of Payala stuff, yeah, the Payala investment

12   comes from when Palmer gave me the million dollars for

13   selling him back my shares in -- in Anduril.  And much

14   of that was a handshake sort of deal.  And so the

15   Traitwell stuff comes out of that money from Palmer.

16   Palmer owed me more money, but I thought that it was

17   wise to sort of financially separate from him because

18   of our disagreements around -- well, our -- we had a

19   lot of disagreements on a lot of things.  So.  Lovely

20   guy.  Nice guy.  Nice family.  But, you know, sometimes

21   it's best to have people as friends, not as business

22   associates.

23      Q.    Well, let's talk about the Othram stock a

24   little bit.

25      A.    Mm-hmm.

1        Q.    Okay.  I just a want a time period.  I

2    don't need any --

3        A.    Yeah.

4        Q.    -- commentary here.

5              When did you first try to sell or monetize

6    any of the Othram stock?

7        A.    Oh, I've been trying to sell the Othram

8    stock for two years now, three years.  Yeah.  It

9    would've been -- oh dear, it would have been in 2021

10   when I tried to sell my stock.  Maybe 2020.  Late 2020.

11       Q.    Did you ever --

12       A.    Whenever -- do you remember whenever there

13   was that big ice storm, that big Texas storm?  Whenever

14   that was, that was when I wanted to be out of Othram

15   entirely.  But David would not allow me to sell my

16   stock.  There was a restrictive covenant on it.

17       Q.    "David" is David Mittelman?

18       A.    Mm-hmm.  I mean, pre -- precisely, David's

19   wife, who now also works for the company, Kristen

20   Mittelman did not want me to sell the stock because

21   they thought it would have a negative market signal.

22   They were trying to raise a round, or something to that

23   effect.

24       Q.    When was the first time you actually

25   entered into a written agreement to sell the Othram

1  stock?

2      A.    Well, almost all of our, David and my

3  communications take place on Signal, so that would have

4  been -- well, we started the company in 2018, so it

5  would have been mid -- midpoint 2020 when we had a real

6  conversation about it.  I was very uncomfortable with

7  the direction the company was going in in 2020.

8      Q.    That's not my question.

9            When's the first time you had a signed

10  written document, contract, agreement?

11      A.    Ah.  So I had -- we didn't -- we don't

12  typically do it that way.  So, most companies that I

13  affiliate with, with the exception now of Othram

14  because Othram since has raised a round, so David went

15  from being the largest majority shareholder --

16      Q.    Mr. Johnson.

17      A.    Yes.

18      Q.    It's just a simple question.

19            When was the first time you had a written

20  contract, agreement, some type of document where there

21  was -- or the agreement to sell the Othram stock?

22      A.    We entered into an agreement in November of

23  last -- I believe it was last year.  So he -- what he

24  did was he convened a board meeting.  The board agreed

25  to buy my shares and -- buy the totality of my shares,

1    my ex-wife's shares, everybody's shares.  That start --

2    that process started in November.  I want to say it was

3    November 10th of 2024.

4         Q.    So right after this lawsuit was filed?

5         A.    It would have been -- well, the

6    conversations began in the summer, but it would have

7    started in November of 2024.  Yeah.  In earnest.

8    Because he had -- he had to call a board meeting to do

9    it.  He couldn't just sell.  He couldn't just use the

10   stock of the -- the cash on hand to buy it.

11        Q.    So, yeah, again, when is --

12        A.    Yeah yeah.  It would've been --

13        Q.    When was the first time --

14        A.    It would have been November, the written --

15   a written thing where he convenes the board would have

16   been November 2024.  A discussion about selling the

17   stock generally, which was written, because these are

18   written -- these are written things, like they are if

19   somebody could get my Signal messages, was probably

20   March or April of 2020.  So we'd had a discussion over

21   the years of selling the stock.  I talked to him quite

22   often about selling the stock.

23        Q.    When was the first time there was a -- was

24   there ever -- you know the stock purchase agreement

25   that you were trying to get to go through just

1    recently, you know that one we're talking about?

2         A.    I do, I'm familiar with it, yes.

3         Q.    Was there ever a written agreement where

4    both sides agreed to the terms and signed it bef --

5    other than that one?

6         A.    Well, when we started the company, there

7    was.

8         Q.    No.  Where you were selling.

9         A.    Oh, when I was selling?  No.  No.  There

10   was no written, there was nothing, there was nothing

11   that had had board -- board approval.  Yeah, I asked

12   him to go to the board November twe -- 10th, 2024, to

13   liquidate my entire position, as well as the position

14   of my ex-wife and daughter.

15        Q.    Did you ever try to sell your stock just

16   directly to Steve Oskoui?

17        A.    No.  As far as I know, no.

18        Q.    How often do you speak with him?

19        A.    I haven't spoken to him in a long time.

20   Maybe three or four years.  Yeah, he's under

21   investigation, so I -- I won't be talking to him.

22        Q.    So since -- let's talk 2025, okay?

23        A.    Mm-hmm.  That's easier to remember.

24        Q.    Just names.  Okay?

25        A.    Mm-hmm.

1      Q.    Name all the people that you've contacted

2   about selling the Othram stock.

3      A.    Well, the main person would have been David

4   Mittelman.  He -- and -- and later I spoke with the

5   general counsel, I think his name is Robert Prucell?

6   Prucell?  And that would have been over email.  There

7   was no phone call conversation with him about that.

8            And then in terms of Burbank, I didn't

9   speak to him about selling it.  I didn't talk to Steve

10  Oskoui.  I didn't -- no, all of that was dealt by David

11  and David's wife, presumably, because she deals with --

12  a lot with the board.  But I didn't talk to her either

13  about it.  I just talked to David.

14     Q.    Can you produce any communications where

15  you said you wanted to sell this stock for your wife

16  and children -- or child?

17     A.    I can't produce any communications, but

18  he's aware --

19     Q.    I --

20     A.    -- of them, yeah.

21     Q.    So do you have any written communications,

22  email, text, Signal, where you tell Othram or anyone

23  that the purpose of the sale is to support your wife

24  and children, and that's something that you can

25  produce?

1    A.    Yes, I think there are emails to that

2  effect, but I don't -- I don't recall.  Like, I don't

3  recall what exactly they say, but they say something to

4  that effect.  What I wanted to do was --

5    Q.    Hold --

6    A.    Yeah.  So if you're forming a separate

7  company --

8    Q.    Hold --

9          MR. THOMPSON:  Objection --

10   A.    Yeah.

11         MR. THOMPSON:  -- nonresponsive.

12  BY MR. THOMPSON:

13   Q.    Did you produce those emails?

14   A.    Here, or where?

15   Q.    Ever to the plaintiffs in this case?

16   A.    No, I did not.  Nor would I because it's

17  not relevant.

18   Q.    I'm just going to ask, because when this

19  case started, you made -- bragged, or, you know, said

20  that you love discovery because you record everything

21  and you take screenshots of everything.

22   A.    Mm-hmm.  That's right.

23   Q.    You haven't produced anything with

24  Mittelman related to Othram or any of this stuff --

25   A.    No, and nor --

1    Q.    And had a --

2    A.    Yeah.

3    Q.    So hold on.  So just in three sentences and

4  30 seconds, how do you explain that?

5    A.    Oh, very simply.  Mr. Musk is underwriting

6  Mr. Lambert in this lawsuit.  Mr. Oskoui, who's on the

7  board of Othram, is a good personal friend of

8  Mr. Musk's and does business with him.  So I have no

9  interest in -- in providing any information.

10  Mr. Oskoui also owes me money.  So why would I -- why

11  would I tip off my hand there?  No.  On the contrary,

12  I -- I don't want to engage with people that I don't

13  think are responsible actors.

14           MR. THOMPSON:  So I'm going to objection --

15  object as non-responsive.

16  BY MR. THOMPSON:

17    Q.    So communications, let's take

18  communications with David Mittelman.  All right?  So

19  you said you conducted those via Signal?

20    A.    That's right.

21    Q.    All right.  You earlier said that you

22  record everything, take screenshots of everything.

23    A.    That's right.

24    Q.    So those are --

25    A.    I --

1    Q.    -- in conflict --

2    A.    No, they're not.  They're not at all.

3    Q.    -- that state --

4    A.    In fact, everything you do on Signal -- so,

5    Signal has received a grant from the State Department.

6    Anything you do on Signal is recorded by the

7    government.  So perfectly consistent to use Signal for

8    everything.

9    Q.    You said that you screenshot, you

10   personally screenshot Signal messages --

11   A.    Yeah, so I took --

12   Q.    Hold on.

13   A.    Yeah.

14   Q.    And you've posted Signal messages --

15   A.    I have.

16   Q.    -- before, right?

17   A.    I have, that's true.

18   Q.    So my question is:  You say you've

19   screenshot all your Signal messages and you record

20   everything.  You've said that, right?

21   A.    That's correct, yeah.

22   Q.    Okay.  So I'm trying to figure out when I

23   asked for all your communications with --

24   A.    No, no --

25   Q.    Hold --

1      A.     -- to be precise --

2      Q.     Hold -- hold on.

3      A.     No, no.  This is important.

4      Q.     No, I'm going to finish my --

5      A.     You asked for all my communications

6  regarding Mr. Musk and regarding things that were

7  not -- not germane to this case.  And I made an

8  objection at the time and I said then and I say now

9  that I would have been happy to participate in any

10  discovery that was reasonable and limited in scope.

11  And you decided instead to throw everything related to

12  Mr. Musk in there.  And, obviously, we know that that's

13  because Mr. Musk was under federal investigation at the

14  time and he continues to be under federal

15  investigation, if I recall correctly.

16      Q.     Did you ever make a motion for a protective

17  order to argue that the --

18      A.     No, the --

19      Q.     Hold -- wait.  Hold on.  It's out of

20  respect for the court reporter.

21      A.     Of course.

22             THE REPORTER:  Thank you.

23  BY MR. THOMPSON:

24      Q.     Did you ever file a motion for a protective

25  order to say that the discovery was over-broad or too

1    burdensome?

2        A.    I didn't file a motion, but I made it clear

3    open -- over and over again in open court and it's part

4    of the brief that's before the Fifth Circuit.

5        Q.    Did you file a motion, yes or no?

6        A.    No.  As far as I know, no.

7        Q.    Did you screenshot your -- you said -- I

8    was right when you said you screenshot all of your

9    conversations that you have on Signal?

10        A.    No, not all of them.  I would say that I

11    probably screenshot fewer than 10 percent of them.  But

12    most of the ones with Mr. Lambert I have screenshotted,

13    and with Mr. Burbank.

14        Q.    Have you communicated with Mr. Burbank

15    about this case?

16        A.    I have not.  I sent him a message --

17        Q.    Yes or no.

18        A.    No, well, not about this case, but he could

19    interpret it that way.  I sent him a message recently

20    telling him that all was forgiven.

21        Q.    Did he reply?  Yes or no?

22        A.    He read it, but he did not reply to it.

23        Q.    I'm going to hand you an excerpt of

24    a filing.  We're not going to mark this as an exhibit.

25    It's Docket Entry 116.  Make sure you've got the right

1    one.  There's some writing I did today, but I do want

2    you to take that.

3        A.    Okay.  Go ahead.

4        Q.    So hold on.  Do you see this is a email

5    chain with you and David Mittelman and looks like Rob

6    Purcell, amongst others?

7        A.    That's right, yep.

8        Q.    Okay.  Do you remember when I sent an email

9    to you asking if you were trying to sell any of the

10   Othram stock?

11       A.    Yes, and I did not reply, if I recall

12   correctly.

13       Q.    Why wouldn't you answer that?

14       A.    Because it's not germane to you, and

15   because the Othram company in question has a lot of

16   interest in relationships with the federal government.

17   And when that's all said and done, we're going to see

18   what happens with Othram.  Long story -- long story

19   short, Othram has a -- a cleanup process it's going to

20   undergo.

21       Q.    All right.  Let's go to -- looks like this

22   is going to be Appendix Page 4.

23       A.    This one?

24             THE WITNESS:  Can we enter this into the

25   record?  Is that possible?  Can we?

1          THE REPORTER:  I don't have any control

2     over it.

3          THE WITNESS:  Do you have any objection to

4     entering this into the record?

5     BY MR. THOMPSON:

6          Q.    What do you want?

7          A.    The whole thing entered into the record.

8     Yeah.  Make it an exhibit.  Thank you.

9          (Marked Deposition Ex. 12)

10    BY MR. THOMPSON:

11         Q.    It's already in the record in the case.

12    That's why.

13         A.    Well, I mean, I'd like it in there as an

14    exhibit as well.

15         Q.    Tell me when you're ready to discuss.

16         A.    Go ahead.

17         Q.    Okay.  Page 4.

18         A.    Mm-hmm.

19         Q.    Do you see where says "Wire_Instructions"?

20         A.    That's right.

21         Q.    Is that a screenshot from your phone?

22         A.    No, that's not from my phone.  That's from

23    somebody else's phone.  But that is the account that I

24    provided.

25         Q.    You provided that screenshot in an email

1    to, it looks like Rob Purcell who was representing

2    Othram.

3        A.    I think actually that e -- that comes from

4    David Mittelman, but I'm happy to claim ownership for

5    it.  It's not -- it was not -- I did not screenshot it,

6    no, but I'm happy to take responsibility for having

7    sent that information over to Mr. Mittelman.

8        Q.    Well, you can read through the email thread

9    and --

10       A.    Yeah, so if you look at it -- yeah, I think

11   this is kind of cut, but whatever, it doesn't matter,

12   they got it.  And they said that they wouldn't do it

13   because of the judgment and the order, and I said no

14   problem.  Though they still have to pay the money to my

15   ex-wife and daughter, which is the last communication I

16   had with David.

17            MR. THOMPSON:  So I am going to object as

18   non-responsive.

19   BY MR. THOMPSON:

20       Q.    Let's just answer my questions.  Okay?

21       A.    Yeah.  Go ahead.

22       Q.    I want us out of here by 5 so you can catch

23   the flight that --

24       A.    I don't have a flight.  Somebody's arranged

25   for my hotel to be accommodated.  So I don't have a

1    flight.

2        Q.    The same person you had to ask for

3    permission to stay here?

4        A.    Different person.

5        Q.    Okay.  Who provided the screenshot?

6        A.    In this case, I think it was Mittelman, but

7    I don't know.

8        Q.    What's the source, did David Mittelman take

9    the --

10       A.    David Mittelman took the screenshot, sent

11   me the screenshot and I believe that I embedded it in

12   the email.

13       Q.    So this is David Mittelman set up JXZ?

14       A.    No.

15       Q.    Okay.  That's my question.

16       A.    Who set up JXZ is your question?

17       Q.    Yes.

18       A.    It was not me.

19       Q.    It was not you?

20       A.    It was not me.

21       Q.    Did anyone at your direction set up JXZ?

22       A.    No, no one at my direction set it up.

23   Somebody set it up for me.

24       Q.    That's my question.

25       A.    Yes.

1          Q.    What's your relationship to JXZ LLC on page

2     exhibit -- hold on.  Hold on.  Hold on.

3          A.    Go ahead.

4          Q.    On -- in Exhibit 12, on Appendix 032 --

5          A.    Okay.

6          Q.    -- what is your relationship, direct or

7     indirect, with JXZ LLC?

8          A.    It was -- it is a bank account number that

9     was set up for me not at my direction.

10         Q.    JXZ LLC is a bank account number?

11         A.    No, JX -- JX LLC, that entity and that

12     business account and that address, all of that was set

13     up by somebody else.

14         Q.    So my question is - just simple, okay? -

15     what is JXZ LLC?

16         A.    It is an entity that was created for the

17     purpose of receiving proceeds from -- for the Othram

18     case.  But I don't know who owns it and I don't know

19     who controls it.

20         Q.    So you had nothing to do with JXZ LLC

21     getting set up?

22         A.    Correct.  That's not -- I had nothing to do

23     with it getting set up.

24         Q.    When did you first learn that it was set

25     up?

```
1        A.    When I was directed to send it to David
2   Mittelman.
3        Q.    It wasn't your decision to set up a JXZ or
4   any LLC in Wyoming?
5        A.    No.  And I've never been to Sheridan,
6   Wyoming in my life.  My grandmother's from Cheyenne.
7        Q.    Did you direct anyone to set up JXZ LLC or
8   any LLC in Wyoming?
9        A.    I did not, no.
10        Q.    Did you know that anyone was setting up JXZ
11   LLC or any LLC that would take the proceeds of the
12   Othram stock?
13        A.    I only knew of it when I was given that
14   information and told to send it to David Mittelman, and
15   I did as I was told.
16        Q.    So you had zero involvement in the creation
17   of this?
18        A.    Correct.  I had zero involvement in the
19   creation of the doc -- of the LLC.  Yeah, zero
20   involvement.  I -- yeah, I wasn't involved with it.
21        Q.    Who set it up?
22        A.    It was set up by one of the many people
23   that helped me in the federal government.  It's not me.
24        Q.    Did you tell or instruct these unnamed
25   people to set up an LLC for you?
```

1        A.    I did not, no.

2        Q.    You didn't ask them to set up an LLC for

3    you?

4        A.    No, I didn't.

5        Q.    Would you have access to the funds?

6        A.    I don't think so, no.  As far as I know,

7    no.

8        Q.    So this Wells Fargo bank account ending in

9    6018, do you see that?

10        A.    I do.  Business checking account on page 4,

11    Appendix 032.  Yes, I see it.

12        Q.    Did you have any ability, do you have, were

13    you going to, did you believe you would have any

14    ability to access either the account or any funds in

15    the account?

16        A.    I did not access it.  I -- you asked me,

17    like, a compound question.  So I had no involvement

18    whatsoever in setting up the account.  I had no

19    expectation of receiving proceeds from the account.  I

20    had no connection with the account other than the

21    minimal amount that required me sending it from there

22    to David Mittelman.

23        Q.    So if the stock transaction had been

24    consummated for a million dollars -- are you with me

25    there?

1    A.    Mm-hmm.

2    Q.    Okay.

3    A.    I'm following, yeah.

4    Q.    The proceeds would have gone to JXZ and the

5    Wells Fargo bank account ending in 6018?

6    A.    That's right.  Yep.

7    Q.    And your testimony today is that you would

8    have no ability to access that money?

9    A.    As far as I know, I would have no ability

10   to access it.  Yes, that's my testimony.

11   Q.    Would anyone that you are related to or

12   married to, have any affiliation, been able to access

13   that money either for you or for themselves?

14   A.    As far as I know, no.

15   Q.    Can you identify today any other bank

16   account that you wanted the Othram stock proceeds to be

17   deposited in?

18   A.    No.  I mean, there is no other one other

19   than that.

20   Q.    I mean, you didn't give Othram or its

21   lawyers your Woodforest Bank or the bank at Walmart?

22   A.    That's right.  Yeah, I did not do that.

23   Q.    Why didn't you give them that?

24   A.    Because I was not instructed to do that.

25   Q.    So you don't have this account access

1    information?

2        A.    No, I have no -- the first time I saw it

3    was when I was instructed to send it to David

4    Mittelman.  And then I sent it to David Mittelman and

5    he reply -- replied that he'd received confirmation of

6    it.  He then screenshotted it.  He then sent me the

7    screenshot back to double-check it.  I then said, "Yes,

8    that looks good."  And then that was the grand total of

9    my interactions with that information.

10        Q.    Who gave you the information?

11        A.    Who gave me the screenshot, or what

12    information?

13        Q.    No.  Who -- sorry.  Yeah.  What person --

14        A.    Somebody get -- connected with the U.S.

15    federal government.

16        Q.    So did a person -- let me just -- this is

17    going to be a "yes" or "no."

18        A.    Yes, they did.

19        Q.    So did a person --

20        A.    Yep.

21        Q.    Did a person give you the information JXZ

22    LLC and the Wells Fargo bank account?

23        A.    Yes.

24        Q.    Okay.  Did you have any part, role in

25    setting up JXZ?

1    A.    No.   None.

2    Q.    Okay.  And did you have any role in setting

3  up Wells Fargo Bank account ending in 0618?

4    A.    No.

5    Q.    It just sat -- how did you get it -- learn

6  this information?

7    A.    It was given to me by somebody involved

8  with the federal government, and they asked me to then

9  relay it on to David Mittelman, and I did.

10    Q.    How was it transmitted?

11    A.    Signal.

12    Q.    Are you going to give the name of that

13  person?

14    A.    No, I'm not.

15    Q.    Do you know the the person that gave it to

16  you?

17    A.    I do -- I do, but no, I'm not going to.

18    Q.    But you do know the name of the person?

19    A.    I do know the name of the person, yeah.

20    Q.    And just to be, like, ultra clear, because

21  your testimony under oath is that you had and do not

22  have any present ability to access that Wells Fargo

23  account and would not have had any ability to access --

24    A.    Yes, I have -- to answer your question, I

25  have never been involved with it.  I have no access to

1    it.  I have no plans to have access to it.  I have no

2    involvement with it.

3         Q.    If the Othram stock proceeds, a million

4    dollars, had been transferred to that Wells Fargo bank

5    account, could you have accessed it for yourself or

6    your ex-wife or daughter?

7         A.    No.

8         Q.    That's your testimony under oath?

9         A.    Correct.  Yes.

10        Q.    Are you sure of it?

11        A.    Yes, I'm sure of it.

12        Q.    So you had no intention -- I guess if you

13   never could have accessed the account, you had no

14   intention of ever spending any of that Othram money on

15   yourself or giving it to your ex-wife or daughter?

16        A.    Cor -- I believe my ex-wife is banned from

17   Wells Fargo, and I am as well banned from Wells Fargo,

18   so neither one of us could have accessed it even if we

19   had wanted it -- to.

20        Q.    So the money --

21        A.    To be precise, the money that was -- that

22   would have been sent, I guess is, like, probably

23   hypothetical, but the money that would have been sent,

24   we would have had no access to.  Zero.

25        Q.    And by "we," you mean yourself --

1          A.    My ex-wife --

2          Q.    -- correct?

3          A.    -- and my 8-year-old daughter and my -- and

4     me.  None of us would have had access to it.

5          Q.    That's your testimony?

6          A.    Correct.  Under oath.

7          Q.    So I was speaking over you a little bit and

8     I --

9          A.    Yeah, to be --

10         Q.    -- apologize.

11         A.    To be to be precise --

12         Q.    Wait --

13         A.    To be precise just so we repeat ourselves

14    over and over again, to be precise, neither my ex-wife

15    nor my 8-year-old daughter nor I would have had any

16    access to that account.

17         Q.    Even if -- and it would have you -- you,

18    your ex-wife, your daughter would have no access to

19    that Wells Fargo account ending in 6018 even if the

20    Othram transaction had been consummated and a million

21    dollars had ended up in this Wells Fargo account?

22         A.    Correct.  None of us would have had access

23    to it.

24         Q.    So that transaction would have benefited

25    you in no way, correct?

1    A.    Correct.

2    Q.    I'll be precise.  The stock purchase

3 agreement where the Othram stock in the three trusts,

4 that sale, you would have had no -- no benefit or

5 interest in that?

6    A.    Correct.  I would have -- that money would

7 have gone to an account.  I -- I don't know if I would

8 ever have seen that money again.  Probably not.  Likely

9 not.

10    Q.    Is there -- do you have any reason to think

11 or an expectation or a belief that whoever controlled

12 that account would give you, your ex-wife or your

13 daughter the funds from it?

14    A.    I have no expectation or belief about that,

15 no.  In fact, on the contrary.  I think they would

16 precisely have not given me the money from that so long

17 as there was a $71 million judgment against me.  It was

18 a measure to preserve assets, not a measure to spend

19 them down.

20    Q.    By "preserve assets," do you mean to place

21 the $1 million beyond the reach of Point Bridge Capital

22 and Hal Lambert to satisfy the judgment in this case?

23    A.    No, I expected fully that the Receiver

24 would have acc -- have access to it.  It's not hard for

25 them to have access to it.  And I expected to -- to be

1    asked about it.  And candidly, I expected Rob Purcell,

2    who worked very closely with Mr. Bur -- Burbank, and I

3    expected the board, who works very closely with

4    Mr. Musk in the form of Steve Oskoui, I expected them

5    to go to people like you and to make a big deal about

6    it.  And I ex -- and -- or you to go to them, either

7    way, and I expected to be having this conversation and

8    for you to be extremely bewildered about what actually

9    was going on because you don't really understand how

10   the system works.

11        Q.    So this screenshot where it says

12   "Wire_Instructions," you received this screenshot from

13   a -- someone in the -- some -- someone associated with

14   the federal government via Signal?

15        A.    Correct.

16        Q.    And then you provided that screenshot

17   information to David Mittelman via Signal?

18        A.    Correct.

19        Q.    And then he somehow copied it into an

20   email?  You have a --

21        A.    Correct.

22        Q.    That's the chain of custody?

23        A.    Yeah.  I believe I sent it back to him.  We

24   double confirmed it.  But yes, it -- the -- that Signal

25   -- that Signal screenshot went back and forth between

1   me, Chris -- an ind -- an individual in the federal

2   government, Chris, to me, then me to Mittelman.  Then

3   Mittelman back to me, then me, in this particular case.

4   Yeah.  Something -- something to that effect.

5       Q.    So who would ultimately get the million

6   dollars if the -- if the sale went through of the

7   Othram stock?

8       A.    Well, ultimately, when this case would be

9   overturned, presumably I would.  But I don't know.

10  Candidly, I don't really care.  That -- that was --

11  wasn't what I was instructed to care about.

12      Q.    Why do you say presumably, if you prevail

13  on this appeal and the judgment's overturned, why do

14  you think that you would be entitled or get access to

15  that million dollars?

16      A.    That's just an educated guess on my part.

17  It depends -- when the op -- when an operation

18  concludes, typically what happens is there's a

19  disbursement of proceeds, and this would have been

20  included in that disbursement most likely.

21      Q.    Why would you --

22      A.    Because I'm -- I -- yeah, why would I get

23  access to it?  Because I'm engaged in the operation.

24  I'm doing the work, just like we all are of showing up

25  here and participating.

1      Q.    Sort of like compensation for your effort

2  in --

3      A.    No, not compensation.  That's the wrong

4  phrase.  It's -- think about like if you're taking

5  down -- taking down a gazelle or you're taking down a

6  wildebeest or buffalo or whatever, people get -- it

7  gets a -- gets divvied up after the operation's

8  concluded.  But in general, one of the reasons that we

9  did this was that there's an expectation that I will be

10 involved in a new venture involved with genomics and

11 there would be a conflict of interest in me continuing

12 to have any ownership interest with Othram.

13          So this was as much to put it beyond my

14 reach as it is to put -- put it beyond Mr. Lambert's

15 reach.  So it's a way of preserving the assets so that

16 the assets can then go where they're supposed to go

17 when this process concludes.

18     Q.    So the underlying purpose of this

19 transaction --

20     A.    Which didn't go through.

21     Q.    -- which didn't go through, but the

22 transaction for the Othram stock to be deposited in an

23 account belonging to JXZ LLC with the Wells Fargo bank

24 account of 6018 was so that that million dollars or the

25 Othram stock would be placed beyond the reach of Hal

1   Lambert and Point Bridge Capital in execution of this

2   judgment?

3        A.   And beyond the reach of Charles Johnson.

4   No, no, it's they're pre -- these assets are being

5   preserved because Mr. Lambert has a number of debts.

6   He is currently facing all sorts of issues.

7        Q.   Mr. Johnson.

8        A.   Yes.

9        Q.   It's -- this is "yes" or "no".

10       A.   It's -- no -- no, it's not a "yes" or "no."

11  It's -- it's about preserving an asset generally and

12  making sure it's beyond the reach until this, this

13  court matter is concluded.

14       Q.   We'll qualify it with -- when -- but --

15  we'll -- we'll go through that, okay?  But the present

16  intent or purpose --

17       A.   There's no present intent right now.  There

18  was -- at the time I received a -- a Signal message

19  instructing me to send this message to Dr. David

20  Mittelman.  I sent the message.  Mr. Mittelman then

21  told me to go talk to the attorneys there.  I had a

22  series of emails with those attorneys.  You're privy to

23  those emails.  They're present right in front of me.

24            We had a discussion, David Mittelman and I.

25  He said he was going to do what his lawyers instructed

1  him to do.  I said I will likely retain lawyers to help

2  me on this.

3          The person I looked at retaining was Tor

4  Ekeland.  Tor Ekeland's wa -- there was a big dispute

5  within Clearview about Tor Ekeland being rep -- being

6  represented with me.  They said that there was a

7  conflict of interest and Mr. Ekeland said that he could

8  not represent me, and I said, "No problem, that it

9  looks to me like the Clearview lawyers and the Point

10  Bridge Capital lawyers are colluding, and that's fine,

11  you've given me information that's sufficient here,

12  wish you well, Mr. Ekeland."

13          I then communicated back and forth and

14  said, you know, that some of this money is actually my

15  daughter's and ex-wife's, maybe you could just portion

16  that out and leave my stuff beyond, you know, basically

17  exposed, and Mr. Mittelman said he would look into

18  that, and I have not heard back from him since.  So his

19  position, his posture is to basically do nothing until

20  the court matter ends.

21          MR. THOMPSON:  I'm just talking, I'm going

22  to take a break for his sake in about 10 minutes or

23  less.

24  BY MR. THOMPSON:

25      Q.    Okay, so, yes or no, Mr. Johnson:  One

1    purpose or one intent behind the sale of the Othram

2    stock was to place it beyond the reach of Hal Lambert

3    and Point Bridge Capital until after the Fifth Circuit

4    rules on your appeal?

5         A.    No.  Until the court matter is concluded

6    until the operation is finished.

7         Q.    Okay.  So one purpose or one of the intents

8    behind the sale of the Othram stock is so that the

9    proceeds of it would be placed beyond the reach of Hal

10   Lambert and the plaintiffs until --

11        A.    And the defendant.  Yes.

12        Q.    -- until after the matter has concluded,

13   both this case and some operation that you're referring

14   to.

15        A.    Correct.

16        Q.    And your expectation was that after the

17   court case is resolved, after the operation is

18   resolved, you had an expectation that you would get the

19   proceeds of that -- of the sale of this -- of the

20   Othram stock?

21        A.    No, I did not have that expectation.

22        Q.    I thought you said you -- like, when the

23   operation concludes.

24        A.    It's whoever's running the operation

25   decides how it's divvied up, the resources that are

1    finished.  So maybe it would go to me.  Maybe it would

2    go to somebody else.  Maybe it would go to another

3    operation.  It's sort of immaterial.

4        Q.    Can I say that you had an expectation that

5    after the operation was closed, after the court case

6    was resolved, that there was a possibility that you

7    would get some or all of the proceeds?

8        A.    No, because that's not how it works.  So

9    when operations are concluded, you are then told what

10   your next assignment is or what you're working on.  So

11   no, I had no expectation of that.  I was going to do

12   precisely what I was instructed to do; no more and no

13   less.

14       Q.    But we do agree that at least one purpose -

15   not necessarily the entire purpose - of the transaction

16   was to prevent Hal Lambert and Point Bridge Capital

17   from executing on any asset or money?

18       A.    The purpose of putting this into a Wyoming

19   trust was to make it so that the asset would be per --

20   preserved, as in Mr. Lambert couldn't take it and then

21   spend it to deal with his other complications, like his

22   legal bills or whatever, and the -- the purpose was to

23   place it beyond reach of either Mr. Lambert or me to

24   literally make it so that I was de-conflicted and so

25   could not act in any way around that asset.

1      Q.     So your position or the position of your

2   people running this government operation is that Hal

3   Lambert and the plaintiffs are not entitled to any of

4   the Othram stock or any of the proceeds of the sale of

5   that Othram stock?

6      A.     That's not my position.  My position is

7   that when the court matters are concluded, the assets

8   will be divvied up to everyone that they're supposed to

9   go to.  And it's not concluded yet, or -- or when the

10   operation generally is concluded.

11      Q.     That's exactly -- okay.  So I'm gonna try

12   to make that clear.

13         So, before the operation is concluded or

14   before the --

15      A.     Yes.

16      Q.     -- court matter is resolved, your position

17   is that Hal Lambert and the plaintiffs are not entitled

18   to the proceeds of that Othram stock or the stock

19   itself?

20      A.     That's correct.

21      Q.     And the purpose of this transaction using

22   JXZ the Wyoming LLC and the Wells Fargo bank account

23   was to prevent Hal Lambert and the plaintiffs from

24   executing on that stock or those proceeds before the

25   matter -- the court case concluded or before the

1    operation concluded?

2        A.    That's a fair way of putting it.  But it

3    was a -- it's about asset preservation.

4            MR. THOMPSON:  I'm going to object to

5    everything after --

6        A.    Yeah.

7            MR. THOMPSON:  -- "fair way of putting it."

8        A.    I mean, I think it's asked and answered,

9    but I can -- I can do it again if you want.  We can go

10   through it again if you want.

11           MR. THOMPSON:  Let's take a break.

12           THE VIDEOGRAPHER:  We're going off the

13   record at 1:55.

14           (Break from 1:55 p.m. until 2:09 p.m.)

15           THE VIDEOGRAPHER:  We're back on the record

16   at 2:09.

17   BY MR. THOMPSON:

18       Q.    Mr. Johnson, are you ready to continue?

19       A.    Sure.

20       Q.    During the break, I think you said you

21   mentioned you got upgraded into --

22       A.    I did.

23       Q.    -- a better hotel?

24       A.    I did.

25       Q.    Are you having to pay for it out of your

1    own funds directly or indirectly?

2        A.    Nope.

3        Q.    Is a government contact paying for it?

4        A.    I don't know.  I guess on some measure, or

5    it's with points.  They upgraded me through the points

6    system.

7        Q.    But you won't identify who's paying for

8    your hotel room now?

9        A.    I don't know who's paying for it.

10        Q.    You don't know?

11        A.    No.

12        Q.    Okay.  Can you go to Exhibit 12, which is

13    Docket Entry 116.  We've been talking about it.  You

14    have it --

15        A.    Yep.

16        Q.    -- in front of you?

17        A.    I've got it in front of me, yep.

18        Q.    Okay.  And question, if you can just re --

19    go through the whole document and where it says like

20    the email address --

21        A.    Have we not asked and answered this one,

22    counsel?  I mean, do we need to do it again?  We

23    keep in --

24        Q.    I'm just going through some other parts.

25        A.    All right.

1       Q.      Just let me ask --

2       A.      What -- what would you -- what are you

3   curious about?  Which -- do you want to go to the --

4   from the end?  The beginning?  Or where -- where would

5   you like to go.

6       Q.      Just first review it and where it says

7   charlescjohnson88@gmail.com.

8       A.      Yeah, which one's that?  That's, oh, at the

9   top.

10      Q.      Just start -- why don't you start at the

11  back in chronological order.  It's going to be probably

12  easier.

13      A.      Which page is it on?

14      Q.      Probably starts - since this is a snippet -

15  Appx 035.  So it's actually pages 1 through 7.  I'd

16  start on page -- I think 6 is maybe the first email

17  exchange.

18      A.      Ah, yes.  I said, "Please pay the money by

19  the end of the day."  Is that the one you're looking

20  at?  Or -- yeah.

21      Q.      I just want you to go through and just if

22  you can confirm that where it says "from Charles

23  Johnson," that's, in fact, your email address and you

24  wrote that.

25      A.      Oh, yeah.  That's all my stuff.  Yeah, on

1    Friday, this is at 12:06 on the 26th of September.  Is

2    that what we're looking at?

3         Q.    I just want you to go through all of

4    Exhibit 12.

5         A.    Yes, the -- the entirety of the -- of

6    what's in here are things that I wrote to doc -- to

7    Dr. David Mittelman and to his counsel.

8         Q.    Yes, I just want you to confirm that it's

9    accurate --

10        A.    Yeah, it's all --

11        Q.    -- and what's inacc --

12        A.    Everything on here is accurate, and

13   everything looks to be in good working order.  And it

14   looks like the printer even worked, so we got

15   everything in -- in good working order.

16        Q.    All right.  So if we go to page 8, which is

17   Appendix 036.

18        A.    That's right.

19        Q.    September 23rd at looks 3:59 p.m., do you

20   see that?

21        A.    Mm-hmm.

22        Q.    It says, "Hey Heather, Can we please

23   transfer funds this week?  I need this transaction

24   completed ASAP so I can go to work."

25             Did I read that correctly?

1    A.    Yes, that's right.

2    Q.    Did you write that?

3    A.    I did write that.  Although, it's ital -- I

4  think it's underlined by you, not by me.  Is that

5  right?

6    Q.    Yes.

7    A.    Okay.  Yeah.

8    Q.    This is submitted to the court.

9    A.    I didn't want it to look like I was overly

10  emphatic about it.  Frankly, I've kind of enjoyed the

11  vacation.  But go on.

12    Q.    Those are the words you did write?

13    A.    I did write those, yep.

14    Q.    Okay.  And then you wrote on a Substack

15  about some letter that you were -- wanted to give to

16  Judge Pittman at the conference on November --

17    A.    Oh yes.  Though I didn't give it to him,

18  but yes, I did write about it.  Yep.

19    Q.    Do you have that letter with you?

20    A.    No, I don't have any printed documents with

21  me for the reasons we aforementioned.

22    Q.    You provided an excerpt of that letter on

23  your Substack, I believe?

24    A.    I believe I took the entirety of it.  Did

25  it --

1    Q.    That's my question.

2    A.    Yeah, it's in entirety, yeah.

3    Q.    So the question that -- my question is:

4    What you posted on your Substack is a complete and

5    verbatim copy of what you were going to give to Judge

6    Pittman in open court?

7    A.    It may be slightly edited, but the gist of

8    it is correct, yeah.  I think I might have edited it

9    because I think I noticed like a few typos in the one I

10    was going to give him, so I think I corrected that.

11    But the -- stylistically and linguistically, the gist

12    of it's the same.

13    Q.    Other than typos, the substance, everything

14    is --

15    A.    The substance is more or less accurate,

16    yeah.

17    Q.    Okay.  So you were going to tell -- excuse

18    me.

19    So you were going to tell Judge Pittman -

20    this is yes or no - "My ex-wife and daughter were in

21    need of cash as their home had been burgled and I

22    wanted to move them to safer accommodations."

23    A.    That's right.

24    Q.    And then you said, "I myself want to get

25    remarried and to move in with my partner and the money

1    offered here will give me an opportunity to marry her."

2    A.    That's right.  Yep.

3    Q.    Those are two statements you intended to

4    tell Judge Pittman and be under oath?

5    A.    That's right.  Yep.

6    Q.    Okay.  You stand by everything in that

7    letter?

8    A.    No --

9    Q.    Actually --

10    A.    -- I don't, actually.  There are a few

11    things in it that I've since learned were mistakes

12    or -- yeah.

13    Q.    Sloppy question.

14         The things I just read to you, you stand by

15    them?

16    A.    The things you just read to me, I stand by,

17    but they were not -- selling the Othram stock would not

18    have guaranteed that those things would have happened,

19    if that's the question you're asking.

20    Q.    That was my question.  Those were the

21    statements that you wanted to give to Judge Pittman --

22    A.    Correct.

23    Q.    -- and --

24    A.    But did not give him, just put it up on my

25    Substack.

1      Q.    And you wouldn't have been trying to

2   mislead or deceive Judge Pittman?

3      A.    No.  On the contrary.  I think there's one

4   thing in there that I was mistaken on.  And so Special

5   Agent Johnathan Buma contacted me the other night and

6   said that he wasn't trying to go work for Mr. Musk, and

7   so I want that on record.  Or Mr. Thiel.  And I want

8   that on record as well, that he says he wasn't doing

9   that.  I have no reason to doubt him, but I was --

10   somebody told me that he was and I haven't really

11   talked to him since.  So, you know, we're going to give

12   him the benefit of the doubt on that.  I think -- I

13   think that's fair.  And I should probably affix

14   something saying that that I said this under oath in my

15   Substack tonight as an update or something to that

16   effect.

17          As for the burgled thing, I did talk to my

18   ex-wife after I'd published that, and she has informed

19   me that they've upgraded the security on the home, so

20   she's happy living in her childhood home.

21          And as for the girlfriend matter, I believe

22   my girlfriend is quite happy with the way things are

23   going, and we're not in any hurry on any of the other

24   stuff.  We have sort of other -- other concerns at the

25   present.

1       Q.    Are you serious with your girlfriend?

2       A.    Serious enough.

3       Q.    Are you guys going to get a place together?

4       A.    No, not im -- not immediately.

5       Q.    When was your ex-wife's house burgled?

6       A.    Oh, it would have been three or four years

7 ago now.  No, it would have been maybe two years ago.

8 The house is broken into quite often, unfortunately.

9 It's -- and there was some police reports filed about

10 it.  I think it's been broken into like three or four

11 times in the last 20 years.

12       Q.    Twenty years?

13       A.    Yeah.

14       Q.    Okay.  But the -- the incident you were

15 referencing in that letter was --

16       A.    Yeah, that -- that took place about a --

17 two years ago, I think, now.

18       Q.    Okay.

19       A.    Yeah.  So she's all right.  Everybody is

20 okay.

21       Q.    When was the last time you had a sen -- a

22 Signal chat or received a Signal chat from David

23 Mittelman?

24       A.    Must have been ten days ago or a week ago

25 or so, maybe more -- maybe slightly more than that.

1    And he told me he was just going to wait on what his --

2    what the outcome here was.  And I said, "That's fair

3    enough.  Wish you well."  Yeah.  David's wife and he

4    are trying to get a big government contract, so they

5    are more focused on that.  And candidly, were they

6    successful at getting that contract, the value of my

7    stock would go up.  So I'm not in any hurry for them

8    to -- you know, they can just take their time as far as

9    I'm concerned.  In fact, I hope they get the -- that --

10   their -- I hope they get it so that I collect this

11   check, fatter check.

12           David is very -- he's very precise.  I

13   mean, he's a molecular geneticist by trade and they

14   tend to be very precise.  So I knew anything I would

15   send David would end up here, so I'm pretty happy with

16   the outcome of all that.  And I'm happy to have it all

17   on the record.  It's fine by me.  I don't need the

18   million bucks or whatever, that's not -- it won't break

19   the bank.

20       Q.    And that, the transaction, the stock

21   purchase agreement of the Othram stock to the Wyoming

22   LLC, was that for all of the stock in the -- in the

23   three trusts?  I think it's --

24       A.    Yeah, we were taking them out in one full

25   -- full swoop.

1        Q.    So there would have been no Othram stock

2    left over?

3        A.    None of my family would have any shares

4    whatsoever in Othram.  But now that I'm not able to

5    sell that stock -- this is a key detail because this --

6    this -- it affects my position and probably affects the

7    position of your client.  So -- or your alleged client.

8    So, if they're successful at getting a very big

9    government contract, that million dollars that they

10   offered me, I can go back to the board and say, "Well,

11   you, you offered it to me at this, when the -- when you

12   guys didn't have this much revenue.  Now you have this

13   revenue.  This stock is worth more."  So I can go and

14   get a bigger chunk of the equity later.

15            But now it's all on the record that I own

16   this stock, they're on record saying that they're going

17   to pay me it.  We're having a conversation about it,

18   it's under oath, I'm on camera, everything's cool,

19   everything's gravy.  So and you're happy because it

20   wasn't transferred to an LLC that you don't control

21   and I'm happy because it wasn't transferred to you guys

22   and spent on Mr. Lambert's other legal bills or other

23   issues.  Everything is cool.  So I'm quite happy with

24   the outcome.

25        Q.    So, yes or no, 100 percent of the stock

1    that was in the EB White Trust, the Xavier Capital

2    Trust, the KawRuh Trust or any other vehicle that --

3    that owned or possess -- possessed the Othram stock, a

4    hundred percent of that was, at the time, intended to

5    go through in that stock purchase agreement that would

6    have gotten -- where the funds would have been

7    transferred to that Wyoming LLC that we've been talking

8    about?

9        A.    So all of the stock -- I don't -- your

10   question's confusing.  So, like, let me make sure that

11   I understand it.  All of the interest that my family

12   and I have had in Othram would have been over the

13   moments in which I sold and I took all of the stock

14   there and sent it to the Wyoming trust.  I would have

15   no more relationship with Othram, other than, like,

16   "Good job, David," high-five, whatever.  I'd have nev

17   -- no financial relationship with the Othram or the

18   Mittelmans or any of the other players there, as far as

19   I know.  Maybe something with Oskoui because Oskoui

20   owes me some money, but -- and Burbank owes me some

21   money.  But -- but as far as I can tell, no.  The board

22   members owe me money.

23             (Marked Deposition Ex. 13)

24   BY MR. THOMPSON:

25        Q.    This is Exhibit 13.

```
 1        A.    Okay.
 2        Q.    These are some emails that you sent to --
 3   to Judge Pittman?
 4        A.    That's right.
 5        Q.    Do you recall those?
 6        A.    Not that -- why is this executed in
 7   Marciopa County?  I didn't send this -- no -- oh, this
 8   is you.  This is you declaration -- declaration.  I got
 9   it.  Yeah, that's fine.  I have no objection to this
10   going --
11        Q.    All right, so, Mr. Johnson, I want you to
12   focus on -- it's going to be the email that you sent
13   and it's going to start on Appx. 004.
14        A.    I see it entirely.
15        Q.    And then go through the rest of -- rest of
16   the doc here.  And when you have reviewed it, tell me.
17        A.    Yes, I reviewed it and I recall writing all
18   this.
19        Q.    Okay.  That was my question.  Those are all
20   your words, they're not changed or anything except for
21   maybe some highlighting?
22        A.    That's right.  Yep.
23        Q.    Okay.
24        A.    The highlighting is all yours, I presume,
25   or the underlining.  I haven't seen any highlighting.
```

1    The underlining is all you, right?  Okay.

2       Q.    But the words that were written are all

3    yours?

4       A.    Mm-hmm.

5       Q.    And this was sent to Judge Pittman?

6       A.    That's right.

7       Q.    And you were intending to be truthful and

8    accurate to him?

9       A.    That's right, yep.

10       Q.    Then if you can go to page 004, Appendix

11    004.  I think it's the first page.

12       A.    Yes.

13       Q.    It's an email sent from you to me, and also

14    cc'ing pittman_orders?

15       A.    That's right.  Yep.

16       Q.    And can you just read the first two lines?

17    "Dear Judge Pittman," and then the next line?

18       A.    "Dear Judge Pittman, Also it's offensive to

19    be compared to criminals when I use a Wyoming LLC and

20    bank account.  Mr. Thompson" --

21       Q.    Wait.  Just the first two lines.

22       A.    Okay.

23       Q.    Those are the words that you wrote?

24       A.    That's right.

25       Q.    Okay.  You were trying to be honest with

1    the judge there?

2        A.    That's right.

3        Q.    Accurate?

4        A.    Mm-hmm.

5        Q.    Not misleading him?

6        A.    Not misleading him at all.

7        Q.    Can you read the next -- the paragraph

8    beginning, "I have worked diligently"?

9        A.    Yes.

10        Q.    Thanks.

11        A.    I am -- "I have worked diligently to keep

12    my finances private.  Wyoming, where I spent many happy

13    summers, is a great place for protecting my privacy

14    from the kind of overbroad, obtrusive searches that are

15    at issue here."

16        Q.    Were you trying to be hon -- were you being

17    honest with Judge Pittman there?

18        A.    I wouldn't say that every summer I spent in

19    Wyoming was happy, but in the main -- I think that

20    that's correct.

21        Q.    Were you -- let me put it this way:  Were

22    you trying to mislead Judge Pittman in this statement?

23        A.    No.

24        Q.    Were you trying to mislead him about your

25    connections to Wyoming?

1          A.    No.

2          Q.    In any part of this email to Judge Pittman

3    were you trying to mislead him?

4          A.    No.  On the contrary, I was trying to

5    inform him.  But he elected not to put it into the

6    record anyway, but I suppose we're putting it into the

7    record now, so that's fine by me anyway.

8          Q.    And that's Exhibit 13?

9          A.    Yeah.

10         Q.    Going back to the Othram shares, did they

11   give you any control over the company?

12         A.    Othram the company or Othram -- who?  Which

13   shares.

14         Q.    The shares that were in the trust and were

15   getting transferred.

16         A.    No.  On the contrary, I didn't want any

17   control.

18         Q.    That was my question.

19         A.    Yeah.

20         Q.    But --

21         A.    No, I don't want any control of Othram.

22   No, no, no.  On the contrary.  No.  Absolutely not.

23   I'm not a board member.  I'm not an executive there.  I

24   am, to the extent my trusts -- my trust is a

25   shareholder there, but I have no involvement with the

1    company other than to wish them well and pat them on

2    the back when they do a good job, which is often.

3        Q.    You mentioned a conflict.  Is that because

4    of a potential future company you're thinking about, or

5    a current company you have?

6        A.    I have no current company that would

7    conflict with Othram.  We decided, David and I, that

8    Traitwell was not in competition or conflict with

9    Othram.  There was some discussion as to whether or not

10   that would be in conflict because they're both genomic

11   startups, they're both -- but David is interested in

12   solving forensics cases, and -- and Traitwell is not

13   interested in that.  In any new company I form, there

14   may well be a conflict with David's company, which is

15   why I elected to execute and remove these -- remove

16   basically my involvement from the company.

17             And by the way, I have -- I want to be very

18   clear on the record.  I have nothing but respect for

19   David, but there are other things that need to be done

20   in the genomics space that nobody's doing, and so,

21   unfortunately, I think -- I think that that's -- that's

22   rather unfortunate that no one's doing them.  And so I

23   think things should -- somebody should do them.

24             And I was informed by people who are

25   engaged in the genomics space that I -- it -- it would

1    be expected that I would have no other genomic

2    investments were I to work on this -- this project that

3    they would like my help on.  So I said, "All right.

4    I'm happy to finally sell all my shares with Othram."

5         Q.    Is that different than Traitwell?

6         A.    It's different than Traitwell.

7         Q.    But some of the Traitwell IP might go into

8    this new venture?

9         A.    Unclear.

10        Q.    Possible?

11        A.    It's unclear.  Because what -- probably

12   not, because the puzzle that they've asked me to work

13   on wouldn't necessarily require that.

14        Q.    So I'm going to ask --

15        A.    Yeah.

16        Q.    -- just yes or no's here.  Okay?

17        A.    Mm-hmm.  Mm-hmm.

18        Q.    Does the IP that you reference that

19   Traitwell owns, is it a patent?

20        A.    It has not been patented.  It is a -- it is

21   a process of software writing.

22        Q.    Is it a trade secret, or did you --

23        A.    I think you -- I think you could call it a

24   trade secret.

25        Q.    Do you consider it confidential or

1   proprietary or unique?

2       A.    Yes.  It was hard to do, yes.  Yes.  But it

3   could well be the case that with the lawsuits around

4   23andMe and Ancestry and myDNA, it could well be that

5   the entire personal genomics industry is illegal and

6   that it relies on personally protected information.

7   And so if that's the case - we're sort of waiting on

8   those court decisions - then the value of the shares of

9   Traitwell would be approximating zero.

10          If it's not the case, then the value of

11  them -- and I've had conversations with Ancestry or

12  whatever is -- whatever Ancestry or 23andMe or whatever

13  is willing to pay, and I'm quite happy to take whatever

14  on that.  That's fine.  It doesn't bother me either

15  way.

16          The puzzle I've been asked to work on

17  involving genomics, the bigger puzzle is more

18  interesting to me anyway and probably much more

19  remunerative anyway.  So I would like to just -- I

20  would like to per -- probably sell everything I own and

21  put it all in a protected trust, a blind trust, or

22  whatever, and then just work on the task at hand.

23      Q.    You mentioned genomics?

24      A.    Yes.

25      Q.    Does Clear Labs, is it involved with

1   genomics or --

2       A.    Sort of.  It's involved with food, food

3   analysis.

4       Q.    Give me a quick answer here.  Why do you --

5   you talked about conflicts.  Why do you not think you

6   needed to sell Clear Labs or your interest in Clear

7   Labs?

8       A.    Candidly I don't even know how much stock I

9   actually own in Clear Labs.  But candidly, I'm happy to

10  go to Sasan and sell it tomorrow if Sasan would buy it.

11  I think Sasan is broke.  So.  They have no interest in

12  -- I think it's, like, 200 grand or something like

13  that.  It's not that much money.  So it's not -- it's

14  not risible to the level.  I'm not a co-founder of

15  Clear Labs.  I don't write about the things that Clear

16  Labs does.  I have no real involvement with Clear Labs.

17              I saw Clear Labs, like, I literally went to

18  their offices for the first time, like, a year ago.  So

19  I have no involvement with them.  Like, they don't call

20  me, I don't call them.  You know, I had, you know,

21  Persian tea with them and smoked a cigarette.  That was

22  the extent of it.

23      Q.    Okay.

24      A.    So I have no involvement with them.

25      Q.    Okay.  So a little different than Othram

1    where you wrote that you co-founded Othram, so --

2        A.    Correct.    It's -- and it's larger amounts

3    of money, larger direction.    I helped come up with the

4    name Othram.    I was very involved in the making of

5    Othram, the hiring of David Mittelman to be its CEO,

6    it's just a -- it's a totally different order of

7    things.

8            And also my skill set is not -- it's not

9    complementary to what Dr. Mittelman is doing or his

10   wife is doing with the company.    I don't -- there's

11   nothing I can offer.    You know, I have nothing to offer

12   to them.    Nor to -- nor to Clear Labs, for that matter.

13       Q.    Just to clarify something.

14       A.    Yeah.

15       Q.    You said that -- previously I asked you if

16   you had any control or role in the operations of Othram

17   and you said no.    But now you said -- it sounds like

18   you do believe you had a -- is that just previously, or

19   today?    Just simply.

20       A.    Today, I have no involvement with the

21   company.    When the company started, I was very

22   involved.    Now I am not involved.    And I have not

23   visited them, I have not seen them when they've been in

24   DC.    I have been invited to their events, but I have

25   chosen not to go.    And I wish them well in what they're

1    doing, but it's not -- it's not interesting to me.

2    Like, what they're doing is -- has -- it's a solved

3    problem.  It's not interesting.

4        Q.    All right.  Some cleanup.  Go back to -- or

5    in Exhibit 12, was that where we have the screenshot of

6    the Wyoming, the Wells Far --

7        A.    That's right.  Yeah.

8        Q.    Okay.  Okay.  I'm not talking about that

9    account, all right?

10       A.    Mm-hmm.

11       Q.    Do you, any trusts you are a beneficiary

12   of, do you have any relation to any bank or broker --

13   brokerage account open in the name of a Wyoming LLC,

14   any Wyoming LLC?

15       A.    Now, no, I do not.

16       Q.    I've got to ask.  The next question is:

17   Well, when did you?

18       A.    Maybe about six years ago, seven years ago.

19   And that was a family thing.  So I don't know.  I was

20   not involved in that.  My grandmother was -- well, we

21   increasingly find her assets strewn about.  So my

22   grandmother was a very successful stock-picker, oddly

23   enough, and she had assets all over Wyoming and all

24   over California.  And so I routinely get checks in the

25   mail from those assets.  It is what it is.

1    Q.    How big are those checks?

2    A.    500 bucks, 10,000 bucks.  All the time I

3  get money from her even though she's been dead since

4  1994.

5    Q.    How do they know where to send the check?

6    A.    Most of it goes to my mother and father.

7  But I -- candidly, most of the money that I've gotten

8  for that has gone into money for subsequent

9  generations.  Like, what am I going to do with a

10  $500 -- I get a lot of my -- my namesake, who also

11  lives in Wyoming, he invented the swinging oil pump and

12  owned a number of patents.  So I get a number -- when

13  gas prices -- when oil prices go very high, I get a

14  bunch of mailbox money for that, too.  But I don't -- I

15  have no involvement with that.  My father and my mother

16  have most involvement with that, as does my brother.

17  I'm not really engaged with that.  The last time I was

18  in Wyoming -- so that might be another question you

19  might ask me -- was in 2024 -- twenty -- no -- 2023.

20  And I looked at buying a property in Cody, which I did

21  not buy, thank God.  To be very clear, Alaska and

22  Wyoming are the best states in the Union.

23    Q.    Let's switch gears and talk a little bit

24  about your devices.  Okay?  You said you have multiple

25  phones.  How many?

1      A.    I don't know.  Probably around 10 or 11.

2      Q.    You use 10 phones actively?

3      A.    Depends on what the -- the thing is.  But

4  yeah, people give me phones.  I use the phones.  I get

5  rid of the phones.  I have them stored various places.

6  I give them to other people.  I buy them for other

7  people.  Yeah, I have a lot of phones.  I have a lot of

8  computers and I have a lot of phones.

9      Q.    Where are those currently located?

10     A.    I think they're in a storage box in

11  Chantilly, but I'm not sure.

12     Q.    Same question about computers.

13     A.    Yeah, I don't know how many --

14     Q.    Let's just --

15     A.    -- computers I have.  Yeah.

16     Q.    Let's go back to, say, '20, the last five

17  years.  Okay?  How many computers have you owned?

18     A.    Somewhere between 30 and 50.

19     Q.    You wrote about your computer committing

20  seppuku?

21     A.    Yes.

22     Q.    Where --

23     A.    The main computer that I used for most of

24  my work basically fried itself and shut off one day and

25  was not usable again and I got rid of it.

1      Q.    Did you have any -- did you try to wipe

2   it --

3      A.    No.

4      Q.    -- or do anything?

5      A.    No.  And this has happened to me in the

6   past where I've worked on a computer and worked on

7   something and I wasn't -- I'm -- the -- the entire

8   battery -- I mean, the whole thing will die.

9      Q.    When --

10     A.    And by the way -- by the way, this is -- if

11  you -- if you run in the circles I run in, this is not

12  an uncommon thing.  It has been known to happen once or

13  twice.  The seppuku is a kind of a joke.  Obviously,

14  the computer did not commit suicide.  But -- but, yeah,

15  I have owned devices that have been remotely disrupted,

16  destroyed, shut off, you know, wiped remotely.  So

17  yeah, I have had that happen to me many times,

18  actually.  And -- yeah.

19     Q.    A tech-savvy guy like yourself must back

20  everything up, though?

21     A.    It depends on what I'm instructed to do

22  around that.  But typically the way it works is when I

23  buy a computer, what I do is I usually pay cash for the

24  computer and then I instruct one of my handlers, they

25  ask me for the device code and they ask me for the --

1    like, the -- the Wi-Fi code that I'll be using the

2    most.  And then I -- I write that down on a piece of

3    paper and usually I will mail that to them or give it

4    to them.

5              Typically, I buy most of my computers used

6    and I buy them in cash through Craigslist, or I

7    instruct somebody who works for me to go and buy the

8    computer for me.  And then we do a hard reset of the

9    computer, and then I give, again, the device code and

10   the Wi-Fi code to whoever is in charge of paying for

11   that whole thing.

12        Q.    Yes or no:  Do you buy the computers used

13   for operational security reasons, or just because

14   they're cheaper?

15        A.    Depends on what we're doing.  I've never

16   gone into an Apple store and bought a computer, as an

17   example.

18        Q.    Go back to the genomics.  You either posted

19   saying that you'd sent an email offering to buy 23andMe

20   and you had the funds to do that.  Were you just

21   joking?

22        A.    No.  I had the cash to do it at the time.

23   I had a guarantee from a sovereign wealth fund to do

24   that.

25        Q.    Okay.  Let's talk about that, then.  When

1    was that?

2        A.    Well, it depends on when we're talking.  So

3    23andMe went bankrupt.  And when it went bankrupt,

4    there was this question about the bids around that.

5    And so ultimately the company went back to Anne

6    Wojcicki, and Oracle was involved with actually

7    acquiring them.  So that was kind of a moot kind of

8    detail.

9        But I was talking with somebody who was a

10   representative of the Omani sovereign wealth fund about

11   buying it in total.  And at the time, I think the

12   valuation was somewhere between a hundred million and

13   150 million.  But the sovereign wealth fund of Oman is,

14   you know, quite large, and so they had the cash to

15   underwrite it.  And then I looked at other people

16   joining in on that.  But when I knew that Oracle was

17   going to bid on that, it was kinda -- it was kind of a

18   moot point.

19       Q.    Could you produce a single document showing

20   that you were speaking with the Omanis?

21       A.    Certainly.  The man in question is a man by

22   the name of Mohammad Alharthy.  And yes, I have --

23   probably have communications with him that could

24   prove -- prove that.  He, too, spoke with me largely

25   over Signal, but I'm happy to provide his contact

1    information to the Receiver.

2              But we ultimately didn't do the

3    transaction, so it sort of is a moot point.  Again,

4    great respect to the Omanis, Omani sovereign wealth

5    funds, I'm a very big supporters of them generally.  I

6    wish them well in what they're undertaking because I

7    think they're one of the more responsible countries in

8    the Middle East.

9              And I was supposed to go and visit them in

10   April of this year.  Ultimately did not go to visit

11   them because of this court matter.  And I was

12   instructed not to leave the country until this court

13   matter was concluded.

14        Q.    Who instructed you to?

15        A.    Some people in the federal government of

16   the United States.

17        Q.    Judge Pittman?

18        A.    No.

19        Q.    Okay.

20        A.    But it's no great loss.  I didn't really

21   want to go to Oman.  It's kind of a long trip.  Though

22   it's quite beautiful, from what I understand.

23        Q.    In the past three years, okay, and that's

24   what I'm cabining my time frame on.

25        A.    The past 30 years?

```
1        Q.    Three.

2        A.    Three.  Okay.

3        Q.    How many government handlers have you

4   worked with?

5        A.    I wouldn't know.  Somewhere between five

6   and 20.

7        Q.    Okay.

8        A.    Yeah.  Are we talking U.S., or are we

9   talking foreign?

10        Q.    Altogether.

11        A.    Between five and 20.

12        Q.    U.S.?

13        A.    Between five and ten.

14        Q.    So a couple of questions about your secret

15   agent status.  Okay?  Back to that Substack.  You

16   talked about, you know, you were threatened with

17   potential jail time.  And my understanding is that was

18   about -- that was about Julian Assange?

19        A.    That's right.  Yep.

20        Q.    Was -- was it about marijuana or any money

21   laundering?

22        A.    No.  As far as I know, no.

23        Q.    Okay.

24        A.    If it was, they didn't tell me.

25        Q.    Which agency threatened you with jail time?
```

1      A.     Well, preci -- to be precise about it, the

2   FBI at the time -- well, there were two FBI agents that

3   contacted me first about Steve Bannon, and that would

4   have been in -- no, no.  This is important.  I'm

5   getting to it.

6      Q.     I just want the names.

7      A.     That would've been -- no, no.  This is

8   important.  So in -- during the pandemic, I was

9   contacted by two FBI agents and those two FBI agents

10   then, in turn, introduced me to Johnathan Buma.  And so

11   Johnathan Buma was joking that I was under all these

12   investigations.  And I said, "Well, my understanding is

13   that another agency shut all those investigations

14   down."  And he started laughing and he said, "Yes,

15   that's true."  And he said, "We were gonna get you on,

16   put you in jail for this."  And I said, "Well it's a

17   good thing you didn't do that."  And that was the

18   conversation that he and I had had in his hot tub at

19   his home in San Juan Capistrano, which was not, in

20   fact, his home.

21      Q.     Did you sign any immunity --

22      A.     No.

23      Q.     -- cooperation, or non-prosecution

24   agreement?

25      A.     No.

1          Q.    Have you been paid anything for serving as

2    an informant or a confidential human source?

3          A.    No, I have never asked for it.  In fact,

4    I've rejected offers to pay me.

5          Q.    Did any agency or government affiliate set

6    up bank accounts, give you prepaid cards in connection

7    with your informant work?

8          A.    As far as I know -- well, that's a

9    difficult question.  I'm not sure I should answer it.

10   So I'm going to say that I'm not going to talk about

11   things that the U.S. government has asked me to do.

12         Q.    Are you refusing to answer?

13         A.    I am.

14         Q.    You've already testified about government

15   trusts.  Do you have anything to answer on that point?

16         A.    No.

17         Q.    I believe you publicly claimed that the FBI

18   said that you were an excellent source?

19         A.    That's right.  Yep.

20         Q.    Johnathan Buma was your handler?

21         A.    One of them, yes.  I had several at the

22   time.

23         Q.    In our questions about the government

24   trusts, do you consider the Wyoming LLC discussed in

25   Exhibit 12 that was going to be the subject or the

1    recipient of the Othram proceeds as a government trust

2    in --

3        A.    It's not for me to say.  I don't know.

4    Could have been one.  It -- it very likely could have

5    been one, but I don't know.  It's not my -- it wasn't

6    my duty to do that.  My instructions were to do as I

7    was told, and I did as I was told.

8        Q.    I guess, tell me if you can answer this,

9    yes or no:  You consider or believe that it's probable

10   that the Wyoming LLC that was going to be the recipient

11   of the Othram proceeds was a government trust set up in

12   your benefit?

13       A.    I don't know if it was for my benefit or --

14   and I do believe it was a government trust, but I have

15   no way of knowing that fully.  I know that I was

16   encouraged to set it up and -- or to -- excuse me -- I

17   was encouraged to send it through the screenshot to

18   Dr. David Mittelman, and he -- he, in turn, would send

19   the money to me.  But he did not do any of those

20   things.  And so I don't really know what that whole

21   thing was about.

22            There's a lot of things like that in my

23   life where I get instructed to do something and then

24   never really figure out what it's about.  And yes, it's

25   enormously frustrating, but that's how it goes.

1      Q.    So the government told you to set that up,

2   that account?

3      A.    No, they asked -- they never -- I never set

4   up any of those bank accounts.  I never was involved

5   with any of that.  All I did was a take a screenshot of

6   that thing and send it to Dr. David Mittelman.  And the

7   screenshot was actually not taken by me; it was taken

8   by somebody else who sent it to me.  So I didn't even

9   screenshot it.  It was a screenshot provided to me.

10      Q.    You copied it over?

11      A.    Correct.  And then deleted it as I was

12   instructed to.  Actually, no.  To be precise, I

13   forwarded it, because you can do that within Signal.  I

14   did not delete it.

15      Q.    Do you know if Gator Greenwill set up that

16   account?

17      A.    I have no idea.  But that was not him.  As

18   far as I know, he was not involved.  As far as I know,

19   the sum total of the conversations I've had with Gator

20   Greenwill since this -- well, since he was smeared in

21   sumafor, the total conversations I've had with him were

22   about his children, about his child at David

23   Hallowell's wife's funeral.  And that was it.  We

24   haven't discussed this court case.  And his wife, who's

25   on-again/off-again friendly with my girlfriend, she

1    said that we would wait until the matter was concluded

2    and we'd have a -- we'd have a dinner party when it was

3    concluded.

4              But I rather -- this matter has been rather

5    complicated because I was supposed to invest in another

6    company with Gator Greenwill, and this whole court

7    proceeding thing blocked me from having -- being able

8    to do that, which is unfortunate.

9         Q.    Will you identify the name of that company?

10        A.    Sure.  It's called Skydweller.

11        Q.    Skydweller Aero?

12        A.    Mm-hmm.  Yeah.

13        Q.    Were you going to provide any funds?

14        A.    A group around me would have, yeah, very

15   likely.  But would -- but ultimately it was for naught.

16   And by the way, there are other more sophisticated

17   drones.  I think it was probably for the best that we

18   didn't end up doing it.  I don't really like the CEO.

19   I don't really trust him.  He seems kind of shady to

20   me.

21        Q.    If you're not -- please answer this

22   shortly.

23              If you're not providing any money yourself,

24   what -- what do you bring to the table?  Why would they

25   give you any type of equity interest?

1        A.    Ah.  La France.  It's the -- my

2   relationship with the French world would have been --

3   my relationship with the French world would have been

4   essential for that operation.

5        Q.    Why?

6        A.    Well, I grew up speaking French.  I speak

7   it fluently.  I'm friendly with all of them.  I'm a

8   part of the French-American Foundation.  I've known

9   President Macron since 2012, before he was president.

10  And yeah.  If -- if you have a solar powered drone,

11  it's extremely valuable for the western part of Africa,

12  which is where the French have a lot of territory.

13            So I would have gone to Allen Chappin.  I

14  would have gone to my whole network and we would have

15  gone onto the -- ah.  Chappin is spelled C-H-A-P-P-I-N.

16       Q.    Slow down.

17       A.    Yeah.  So we would have funded it.  We

18  Americans in the United States that like France.

19       Q.    When was the last time you spoke with

20  Emmanuel Macron?

21       A.    I haven't spoken with him.  But the last

22  time I saw him was in 2019.

23       Q.    The Wyoming LLC and that bank account, did

24  Terry Dunmire set that up?

25       A.    He did not.

 1       Q.      How do you know with certainty?  Just brief

 2    answer.

 3       A.      He doesn't typically deal with Wyoming, as

 4    a rule.  He deals more with the Turkic world, the

 5    Indian world, and the Democratic Republic Of Congo, but

 6    not so much with domestic matters.  That's not his

 7    purview.

 8       Q.      What is the best estimate of the total

 9    amount of money you've received from the U.S. or

10    foreign governments?  And I'm including government

11    trusts, any operational funds --

12       A.      Doesn't work like that.  I don't know.  I

13    mean, in the millions.  No, I don't know how much.

14    Yeah.

15       Q.      Has any agency or government entity or

16    agent instructed you not to disclose any trust,

17    account, asset, special purpose vehicle that was set up

18    or that you have control or a relationship with?

19       A.      Well, I don't have control over any of

20    them.

21       Q.      Wait.  I said "or a relationship with."

22       A.      I don't know.  It's a good question.  They

23    asked me -- well, two of them asked me to come here and

24    to basically do the minimal consent thing, which I've

25    now done.  And directed -- that's an interesting

1   question.  I don't know.  No, I mean, in general, like

2   when the Receiver -- which I assume is what you want to

3   do -- when the Receiver starts knocking on doors, he --

4   he - or she, as the case may be - has, you know, has my

5   full cooperation provided I'm instructed to give it.

6        Q.    So you remember me asking an iteration of

7   the following question a bunch:  Please identify all of

8   your assets, whether it's accounts, special purpose

9   vehicles, et cetera, et cetera?

10       A.    Mm-hmm.  Mm-hmm.  Mm-hmm.

11       Q.    And you've identified some, right?

12       A.    Mm-hmm.

13       Q.    My question is:  Have you withheld the

14  names of any or omitted the names or not provided a

15  complete picture based on any instructions from your

16  government handlers or --

17       A.    Not knowingly.  There may be one or two

18  that I'm missing.  But I have done a lot of them, so I

19  don't always remember them.

20       Q.    Have you asked any government agency,

21  government agents/agent to contact Judge Pittman or the

22  U.S. Attorney's Office to give the basis or say that

23  you should be excused or not need to provide full

24  compliance with the Federal Rules and this Court's

25  orders?

1      A.    I instructed one of my handlers to do

2  whatever he thought was the just thing to do and that I

3  would follow it as he wished.  So I said, "If you want

4  to talk to Judge Pittman or the U.S. Attorney, or talk

5  to whoever, I'm happy to have you do that, but I have

6  no desire for you to do that on my behalf."  That's

7  what I told him.

8      Q.    My question is are you aware?  So you --

9  so --

10     A.    As far as I know, no.

11     Q.    -- the --

12     A.    But I'm not aware.  I wouldn't want to be

13 aware.  That's not -- that's not, like, how it works.

14     Q.    That's a little bit word salad.  So here.

15     A.    Yeah.

16     Q.    Did you request any --

17     A.    I didn't -- no, I wouldn't request it.  It

18 doesn't -- that's not how it works.

19     Q.    I need the question out there.

20     A.    Okay.  Yeah.  Go ahead.

21     Q.    Did you request any of your government

22 contacts to speak with, email, communicate with Judge

23 Pittman or the U.S. Attorney's Office to excuse any of

24 your compliance with the Federal Rules, your discovery

25 obligations, or Judge Pittman's orders?

1    A.    No.  On the contrary.  I instr -- I -- when

2  I would ask --

3          MR. THOMPSON:  Objection.  Objection.

4    A.    Yeah.

5          MR. THOMPSON:  Non-responsive.

6    A.    No.  The answer is no.

7  BY MR. THOMPSON:

8    Q.    Okay.  Are you aware of any of your

9  government contacts nevertheless contacting Judge

10  Pittman or the U.S. Attorney's Office?

11    A.    I don't know.

12    Q.    Are you aware?

13    A.    Am I aware?

14    Q.    Can you identify a time --

15    A.    No --

16    Q.    -- a date?

17    A.    -- I cannot.  In fact -- but you're asking

18  like a kind of a silly question.  It doesn't work like

19  that.  So I wouldn't instruct them.  Like, they

20  don't -- they instruct me.  Like, that's not how that

21  works.

22    Q.    Did they indicate that they would speak

23  with Judge Pittman or the U.S. Attorney's Office?

24    A.    As far as I know, no, but I never asked, so

25  it's -- it's kind of immaterial.  I would never ask a

1    law enforcement official to intervene with the U.S.

2    Attorney or a federal judge on my behalf.  So that's

3    just not, like, how it works.

4        Q.    So if it's immaterial, what's the -- what's

5    the point about not just providing full and complete

6    and transparent answers about your relationship with

7    the government and say that's the reason you can't

8    answer all of this, like the discovery in this case and

9    disclose all of your assets?

10        A.    Well, typically, it would be tipping off

11    the people who are under investigation, so you don't

12    typically do that kind of thing.  You wait until an

13    operation is concluded.

14        Q.    And what's the operation?

15        A.    I mean, I -- I work on a small piece of it,

16    but it has a lot to do with compromised law firms and

17    compromised technology.

18        Q.    For secret operations is it common for a

19    source to publicly brag about their importance and talk

20    about operational details or reference operational

21    details?

22        A.    Well, it depends on what they're

23    actually -- what the actual target is.  So, for an FBI,

24    for the FBI thing when I was closed out as a code-named

25    informant, I was free to talk about that, to even write

1    a book about it.  But typically the way it works is

2    they approve the book.  I don't support that.  I think

3    that's a First Amendment violation because the FBI is

4    supposed to pay you when you're a confidential

5    informant if you do dangerous things for them.  I

6    elected not to get paid that way.  I elected to write

7    books and novels and whatever about it.  And so we had

8    a -- we, you know -- but there are other government

9    agencies that I have conversations with, and it happens

10   all the time.  And, in fact, the FBI itself is

11   routinely under investigation by other government

12   agencies.  That's very common.  That's like -- you

13   can't -- there's only 50,000 agents in the FBI.  It's

14   like a baby agency.  There's, like, nobody there.

15        Q.    Are you writing a novel?

16        A.    I am.  I am writing a novel.  It's a lot of

17   fun.

18        Q.    Is it done?

19        A.    It's almost finished, yeah.  It requires

20   some edits, but it's almost finished.

21        Q.    Is it an autobiography?

22        A.    No, it's a novel.

23        Q.    Is it historical fiction based --

24        A.    It's about my relationship with Jeffrey

25   Epstein, Steve Bannon, and Peter Thiel, but it's a

1    *roman à clef*.  So, no.

2         Q.    Not fantasy?

3         A.    Not a fantasy.  Though I am writing a

4    second book about science fiction in the Mormon Church.

5    So.

6         Q.    Have you shared in of any of this novel

7    with anyone?

8         A.    Maybe some of it, yeah.

9         Q.    With who?

10        A.    With -- my father read a version of it.  A

11   friend of mine at the French Embassy read some of it.

12   Maybe a few others.

13        Q.    Well, let's be specific.  Who?

14        A.    I don't know them all.  Maybe like five or

15   six -- no, that's not true.  Did George Sibble read it?

16   No, he read an earlier version.  I mean, it's gone

17   through many iterations.  It's about 300 pages and

18   counting.  I have a little bit to do to tighten up the

19   ending.  But yeah, I'm very happy I wrote it.  It's a

20   lot -- it was a lot of fun.  There's more to go on it.

21        Q.    You invited your Substack and Twitter

22   followers to request it, right?

23        A.    Yes, I did.

24        Q.    Have you sent it out to them?

25        A.    No.  No.  As far as I know, I have not sent

1    it to anyone on there.  Typically the way it works when

2    you request that is you see who's interested and then

3    you add them to a list.  So when there's -- when

4    there's a book that has a publisher and all of that,

5    when that's good and that's tight, I will send them

6    galley copies, those who have asked.

7            Q.    Did you write reports when you were a

8    confidential human source?

9            A.    I did.  Dozens of them.

10           Q.    Did you share your novel or a draft of this

11   novel with Johnathan Buma?

12           A.    No, I did not.

13           Q.    You say that with certainty?

14           A.    Mm-hmm, I do.  He shared a copy of his

15   nov -- his autobiography with me, but I have not sent

16   him a copy of my stuff.

17           Q.    Did you write reports for Johnathan Buma?

18           A.    I did.  And for others in the FBI.  It

19   doesn't quite work like that.  The way it works is you

20   write a report and then they, in turn, put it into the

21   system.  So Buma would take what I would write and put

22   it into the system.  That's a way of protecting it from

23   the sovereign immunity kind of perspective.

24           Q.    Did Buma allow you to access information in

25   FBI databases separate from your own reporting?

1        A.    No, nor would I have had -- nor would I

2    have wanted it even if it had been provided.

3        Q.    Did you write reports for other FBI agents?

4        A.    I did.  Many others.

5        Q.    Did any other FBI agents allow you to

6    access FBI databases?

7        A.    No.

8        Q.    Did Buma or any other FBI agents or agents

9    from other agencies allow you to read confidential

10   human source reporting provided by other confidential

11   sources?

12       A.    No, I don't think so.

13       Q.    Did Johnathan Buma provide FBI documents to

14   you for review?

15       A.    Documents for review?  I don't know what

16   that means.

17       Q.    To look at.

18       A.    To look at?  Yes.

19       Q.    FBI documents.

20       A.    Correct.  On several occasions.

21       Q.    Did Johnathan Buma provide you with

22   confidential human source reports other than your own?

23       A.    I don't recall, but it may have happened.

24   I'm not totally certain.

25       Q.    How would --

1    A.    Typ -- typically the way it would work is

2  he would call me about a report that he had read and he

3  would try to summarize it.  But no, he did not, as far

4  as I -- nothing that was classified.  Nothing that I

5  didn't have clearance for.

6    Q.    Johnathan Buma has been indicted for

7  illegally downloading FBI documents, right?

8    A.    That's right, yep.  After, by the way, I

9  was confidential informant for him.  But yes.

10    Q.    The Classified Information Procedures Act

11  has been invoked by the government.  Are you aware of

12  that?

13    A.    As far as I know, but I haven't followed

14  the case in minute detail.

15    Q.    Did Buma ever transmit any of those

16  documents to you?

17    A.    No.  And if he had, I would have reported

18  him.

19    Q.    Did he transmit confidential human source

20  reporting to you?

21    A.    If it was confidential or classified, there

22  was no way I was going to touch it or -- touch it or be

23  involved with it.

24    Q.    Did Buma ever transmit FBI or confidential

25  human source documents to another person who then gave

1    them to you?

2         A.    As far as I know, no.  No.

3         Q.    What agencies do you report to?

4         A.    Decline to answer.

5         Q.    Is it more than one agency?

6         A.    Yes.

7         Q.    When did your confidential human source --

8    or confidential human source relationship begin with

9    agencies other than the FBI?

10        A.    Decline to answer.

11        Q.    You refuse to answer?

12        A.    Yes.

13        Q.    Could you answer it?

14        A.    Yes.

15        Q.    Do you have any documentation of your

16   relationship with those agencies?

17        A.    I do.

18        Q.    Could you provide it?

19        A.    No, I would not provide it unless

20   instructed to by those handlers in those cases.

21        Q.    What topics were -- were you reporting on

22   to those agencies?

23        A.    Compromised law firms and compromised

24   technologies.

25        Q.    Do those agencies have -- threaten or have

```
1   leverage over you?

2       A.    No.

3       Q.    Who are your handlers?

4       A.    I decline to answer.

5       Q.    Couple of other.  OI5, or is it OI5?

6       A.    I don't know.  Probably both.

7       Q.    What?

8       A.    We called it both.

9       Q.    What is OI5 or OI5?  Just summarize and

10  explain it to me.

11      A.    Well, it's part of the Anglo-American

12  Alliance and it deals with technology and it was a way

13  of inviting John Burbank to be helpful to the country,

14  as his father had been helpful to the country.

15      Q.    What is the correct name of it?

16      A.    I don't know.

17      Q.    Who is your contact with it?

18      A.    You might ask Gator Greenwill about it.

19  You might ask - God - Bob, or Peter.  Yeah.  Peter

20  Varnish had quite a fall, so I don't know.  And then

21  Bob, Bob Hankes-Drielsma is sort of out of commission

22  now, so they're the older sixer network.

23      Q.    Can you spell those last names for --

24      A.    Heavens no.

25      Q.    -- the court reporter?
```

1    A.    Varnish I think is spelled like

2  V-A-R-N-I-S-H.  Drielsma -- Bob Hankes-Drielsma, I

3  could never spell it correctly, but I think it's

4  H-A-N-K-E-S dash D-R-E-I-Z -- no, was it Z?  Or is it

5  S.  I think it might be S.  M-A.

6    Q.    Is it an investment vehicle, OI5 or O15?

7    A.    If it is, I've never received proceeds from

8  it, so I have no idea.  I was actually -- when it was

9  being set up, I made it very clear that -- well, it was

10  made clear to me that I was too American to

11  participate.  That was the phrase at the time.  And I

12  said, okay, guilty as charged.  But I was not involved

13  with it.  And the last I heard of it was maybe in 2021,

14  2020, but I wasn't involved with it.  The person you

15  really want on that one is John Burbank, would be my

16  guess, but I don't know.  I wasn't involved with it.

17    Q.    The -- Judge Pittman issued an order for

18  you to respond to the motion for a Receiver by

19  Wednesday.  Are you going to respond or oppose it?

20    A.    Is it by Wednesday, or is it on Wednesday,

21  or what is the -- does it actually say?

22    Q.    Have you signed up for ECF notifications?

23    A.    No, I'm not allowed on it.

24    Q.    By the government handlers?

25    A.    I'm not allowed on it.  I've tried to sign

1    up for it like six or seven times.  And every time I

2    try to fill it out, it rejects me.

3        Q.    It says, "The court orders a response to

4    the motion by Wednesday at 12 p.m."

5        A.    Okay.

6        Q.    So are you going to file an opposition or

7    anything to it?

8        A.    No, I think you're instructed to do three

9    of them, but you are -- what you are saying is you have

10   just have the one.  So if there's just the one, I will

11   have a conversation with somebody and ask about just

12   the one, and then I will make a decision on Wednesday

13   about replying to it.

14       Q.    But you've been clear you fundamentally are

15   okay with the Receiver?

16       A.    I have no objection to a Receiver in

17   principle.  The particular Receiver, I may have an

18   objection to, but I don't know if I don't know this

19   person, nor have I had it looked into, nor has it been

20   looked into on my behalf, nor has it, et cetera,

21   et cetera, et cetera.  I am not involved with that part

22   of it.  I take these things day by day and do as I'm

23   told.

24       Q.    Told by who?

25       A.    People who are involved with me.  It's a

1    much simpler existence when you just do as you're told.

2          MR. THOMPSON:  All right, let's take a

3    little break.  Where are we at on the record now?

4          THE VIDEOGRAPHER:  We're going off the

5    record at 3:05.

6          (Break from 3:05 p.m. until 3:14 p.m.)

7          THE VIDEOGRAPHER:  We're back on the record

8    at 3:14.

9    BY MR. THOMPSON:

10       Q.    All right.  Mr. Johnson, a couple of

11   questions about Steve Oskoui.  Do you know who I'm

12   referring to?

13       A.    I do.

14       Q.    Okay.  Just in one or two sentences, who is

15   your understanding who Steve Oskoui is?

16       A.    I believe he's a managing partner at

17   Gigafund, which is -- he says it's a venture capital

18   firm, but I'm not convinced that that's true.  And

19   he's -- well, he's gotta be in his mid 40's now.  He

20   lives in Austin, Texas.  And he's from New York

21   originally, and from the Rochester area, I believe, and

22   previously worked for Peter Thiel and currently is in

23   business with Luke Nosek and with Mr. Elon Musk.

24       Q.    Okay.  In the past five years, have you had

25   any disputes, business disputes with Mr. Oskoui about

1    money, stock, anything?

2         A.    Yes.  I have had one dispute with him.  He

3    and Mr. Nosek said that they would pay me a commission

4    after I introduced them to David Mittelman at Othram,

5    and they elected not to pay that.  And that wasn't

6    really Mr. Oskoui's doing, that was Mr. Nosek's doing.

7    So I have no ill will towards Mr. Oskoui.  I wish him

8    well.  You know, I think he's a nice guy.  But I -- I

9    don't really have any dispute about that.

10             They owe me a fee on the money that they

11   invested in -- from Gigafund.  And Gigafund, a lot of

12   people think that Gigafund is a front for Musk, and

13   certainly there's some money in there that comes from

14   shall we call it the Persian diaspora.  And -- and so

15   yeah, I wish him well.  I have no objections to him.

16             Frankly, as soon as I'm done with the

17   Othram stuff, I'm happy to move on to other matters.  I

18   stayed at Oskoui's home, actually, on several

19   occasions, and he's a great host, too, though he

20   doesn't cook.  He usually orders in.

21        Q.    Has he ever given money to any of the

22   companies you're affiliated with?

23        A.    Given money?  He has invested in Othram.  No.

24        Q.    How about Traitwell?

25        A.    Oh, he did invest, he invested $500,000 in

1    Traitwell, and he asked for his money back when I

2    started writing critical things about Elon Musk.  And I

3    said, "No, it doesn't work like that, I'm afraid we

4    won't be giving you your money back."  And then he, of

5    course, elected not to pay the fee that he owed me, and

6    so we had a big dispute there.

7        Q.    So Mr. Oskoui invested, according to you,

8    500 grand in Traitwell?

9        A.    Mm-hmm.

10       Q.    Why did he ask for it back?

11       A.    Because I was writing critical things about

12   Elon Musk.

13       Q.    What did he say the reason was for it?

14       A.    He said because I was writing critical

15   things about Elon Musk.  And he said it in an email,

16   which was kinda stupid of him.

17       Q.    That was it?

18       A.    That was it.  And then he never followed

19   up.  And I said, "No, I'm not going to do that, that's

20   not how it works."

21            And Luke Nosek, his business partner, said

22   that the money had to be done by Oskoui personally, not

23   by Gigafund, because I, quote, have the wrong lineage,

24   end quote.  That's literally what he said verbatim.

25   And I'm happy to have that on the record, because it

1    was wild.

2        Q.    So for Traitwell?  It looks like it was a

3    500,000 investment from Oskoui himself, or --

4        A.    Oskoui himself.  Gigafund was diligencing

5    it, but Gigafund elected not to do it.  And Gigafund is

6    only two guys, Oskoui and Nosek.  There's only two of

7    them.  And they had what Oskoui said it was the biggest

8    fight he's ever had with Luke Nosek about whether or

9    not to invest in me.

10            What I had been told is that Mr. Oskoui is

11    the face of the operation and that Mr. Nosek is the

12    real player behind everything.  Mr. Nosek, when he

13    discovered I was a federal informant, freaked out and

14    went a bit, you know, went a bit crazy, refused to

15    contact me.  He was -- he went really crazy.

16    Mr. Oskoui asked me if I -- if I would be happy to host

17    him at -- at the FBI headquarters in DC and I said, no,

18    no objection.  I wished him well, and that was the

19    last -- he and I haven't spoken in a number of years.

20    I have nothing against him.  I wish him well.

21            Mr. Nosek is -- he's a different matter.

22    He's -- you know, likes to do drugs.  He likes to do

23    all these parties.  Mr. Lambert has gone to those

24    parties.  I'm not going to go to a party where people

25    are doing drugs.  It's not really my thing.

1          Oh, by the way, both of them have a very

2    close relationship with the Mormon Church,

3    interestingly enough, which is something else you might

4    want to include.  They are the money behind Angel

5    Studios, Gigafund was.  And Angel Studios is the one

6    that did the "Sound of Freedom" thing, that movie a few

7    years ago with Jim Ca -- Jim Caviezel, Jesus from

8    "Passion of the Christ."  I haven't seen it.

9         Q.    So in the past, when did Oskoui invest that

10   500,000?  What year?

11        A.    That would've been in 2020.

12        Q.    Okay.  So since let's say -- and when was

13   Traitwell formed?

14        A.    That would have been 2018-2019.

15        Q.    Okay.  So let's say from 2018 onward, who

16   are the biggest investors in Traitwell?

17        A.    I am.  I'm the biggest investor in

18   Traitwell.  Robert Marling is also an investor.

19        Q.    How much?

20        A.    I don't know.  Off the top of my head,

21   maybe 400,000, 300,000.  Don't know.  Maybe seven.  But

22   I don't know.  And then, yeah, I have an accountant

23   that handles this, so I'm not sure what the best person

24   would be to -- for you to talk to about that.  But

25   yeah.

1      Q.    And you said there's only -- how much money

2  is in Traitwell's bank account?

3      A.    I think total there's like 2.1 million,

4  2.4 million, something like that.  It's very

5  undercapitalized relative to what I was trying to do.

6      Q.    So there's 2.1 million currently in

7  Traitwell's bank account?

8      A.    No.  Now there's no money in Traitwell's

9  bank account.  Yeah.

10     Q.    What happened to it all?

11     A.    It was spent on salaries for staff.  Yeah.

12  Dorothy and Gavin and Prem and others.

13     Q.    Did Traitwell ever deliver a product or

14  anything?

15     A.    Mm-hmm.  It delivered a product where you

16  could take your 23andMe data and you could spit out

17  various -- it would tell you things about your health

18  that were kind of controversial.  So yeah, there was a

19  lot of things that -- there was -- the idea of the

20  company was ultimately to force 23andMe or Ancestry to

21  acquire it, and ultimately that didn't happen.  But a

22  new company that I'm planning on forming will probably

23  avail itself of some of the -- some of the things I

24  learned during the process of making that company.

25     Q.    Did Traitwell return any money to

1    investors?

2        A.    I it did not, no.

3        Q.    And now it essentially has no money?

4        A.    It has no money, but I could recapitalize

5    it.  And I'm likely to recapitalize it after this.

6        Q.    After what?

7        A.    After the lawsuit's concluded.

8        Q.    Why wait?

9        A.    Why spend money on an asset that could be

10   seized by a $71 million judgment?

11       Q.    Well, if you were confident that you were

12   going to win and have the judgment --

13       A.    Well, it could go bankrupt and then I could

14   then scoop up all the assets quite cheaply, which would

15   be pretty great, to be honest.  I have no objection to

16   it going bankrupt.  And, in fact, it going bankrupt

17   would be beneficial to me.  It would be annoying to

18   lose the money I invested, but these things happen.

19       Q.    All right.  So this is a yes or a no, I

20   think:  Has anyone specifically told you that Elon Musk

21   is funding this lawsuit?

22       A.    Yes.  Several people.

23       Q.    Did they tell you that in person, or in

24   written communications?

25       A.    I don't know about the written

1    communications.  Possibly on Signal.  I guess that's

2    written communication, I don't know.  But yes, the -- I

3    have been informed repeatedly that Mr. Musk is behind

4    -- and -- associates of Mr. Musk, I should say, are

5    behind this lawsuit, and that Mr. Lambert is their

6    front -- front man.

7         Q.    Were those people your government contacts?

8         A.    Some of them were.  Some of them were also

9    journalists that were investigating it.  And some of

10   them were also members of a foreign government.

11        Q.    So your non-government agency

12   handler/contacts?

13        A.    Yes.

14        Q.    Who told you that you Elon Musk is funding

15   this lawsuit?

16        A.    A number of journalists have infor --

17   somebody from the *Wall Street Journal* asked me about it

18   directly.  I forget which one, because they move around

19   a bunch.  But somebody asked me about it.  I was --

20        Q.    Was the --

21        A.    I was asked -- it was a woman.  I forget

22   her name now.  But I get asked by journalists a lot

23   about things.  And I try to make myself available to

24   them.  But there was a woman who asked me about it, and

25   there was also a man who asked me about it.  And there

1    was also a French woman who asked me about it.  I think

2    she -- the French woman I think was at Reuters.

3         Q.    Okay.  How -- what journalists do you serve

4    as a source to?

5         A.    Any journalist that would call me and I'm

6    in a position to answer them.  I mean, I routinely have

7    journalists from all over the world reach out to me and

8    ask me things that I know things about.  And I guess

9    yesterday it was Michael Wolff is who I was talking to,

10   of Epstein fame.  But yeah, I like journalists.

11   They're interesting.

12        Q.    So who -- what -- I need the names.  What

13   is the name of the reporter?

14        A.    I'm not going to be identifying reporters

15   that I talk with.

16        Q.    Kind of like your government sources, it's

17   just --

18        A.    You got it.  And also it's kind of a

19   violation of a certain journalist source protection.  So

20   I'm happy to go to the mat on that and litigate that at

21   the federal level.  That would be kind of fun, to be

22   honest.

23        Q.    So -- okay.  So putting aside stuff from

24   your supposed --

25        A.    I mean, obviously, if I tell you the names

1    of journalists that are investigating Musk, and Musk is

2    funding the lawsuit, and Musk is the largest customer

3    or largest client of DLA Piper, that would be a real

4    problem, wouldn't it?  And so I'm not going to be doing

5    that, because then they could be harassed and sued with

6    frivolous lawsuits, like I've been.

7         Q.    Okay.  So besides communications from the

8    supposed government sources that you have, and putting

9    aside communications from reporters who you won't

10   identify, can you identify any communication --

11        A.    I can, but I would --

12        Q.    -- or a --

13        A.    I elect not to.

14        Q.    -- or a person --

15        A.    No, I will not talk about any of the

16   journalists that I talked to about Mr. Musk.

17        Q.    So my question -- just to be clear, I'll

18   ask it again, Mr. Johnson.  It doesn't involve

19   journalists.  It doesn't involve any supposed

20   government sources.  Are you with me?

21        A.    I'm following everything you're saying.

22        Q.    Okay.  So who has told you that Elon

23   Musk --

24        A.    The individuals in question who've asked me

25   about Musk funding this suit have been either

1   government affiliated, foreign governments affiliated,

2   or connected to the journalistic corps of the United

3   States.  So I have no desire to name any of those

4   people at present.

5          Q.    So you can't identify --

6          A.    No, no, I -- I can identify them.  I choose

7   not to.  I'm declining to answer the question.

8          Q.    You said you were listening to my question.

9   You actually weren't because I'm -- I'm excluding your

10  supposed government sources and your supposed

11  journalist contacts.

12              So I'm asking what non-journalists,

13  non-government contacts have told you that Elon Musk is

14  funding this lawsuit?

15         A.    Gator Greenwill told me that.

16         Q.    Did he show you any documents?

17         A.    No.  He told me about it from another

18  associate of ours who works for the NSA.

19         Q.    Didn't you initially blame John Burbank and

20  the Chinese for this lawsuit?

21         A.    Well, Burbank --

22         Q.    It's a yes or no.

23         A.    No, it's a no, it's -- it's -- partly that

24  was done to sort of rustle John.  So I've known for

25  quite some time that it was Musk that was behind it.

1   And I have no objection to that.  I actually kind of

2   welcome it.

3        Q.    Okay.

4        A.    And by the way, he does this with other

5   people as well.  So it's not really a surprise to me.

6   And by the way, he's funding several lawsuits in this

7   court, if -- I believe.  I believe there's one with the

8   Open AI lawsuit, as well, that's here.  He's elected

9   that Texas will be his home and this is where he

10  intends to conduct his lawfare.

11           I personally prefer he would do it in

12  Washington, D.C. or Los Angeles, but, you know,

13  everyone's gotta do what they've gotta do.

14       Q.    Well, Mr. Johnson, I think at this time I'm

15  going to conclude the deposition.  I don't think

16  that -- and I appreciate your time showing up, but I

17  don't think you answered the questions as the Federal

18  Rules require.  I think you refused to answer questions

19  that are fair game and everything, but that's an issue

20  to take up with Judge Pittman.

21           But as a matter of courtesy, if you could

22  just stick around, if the court reporter has any

23  questions --

24       A.    Sure.

25       Q.    -- to clarify.

1          THE WITNESS:  How long do you think it will

2    take, sir?

3          THE REPORTER:  Not long.

4          THE WITNESS:  Okay.

5          THE VIDEOGRAPHER:  We're going off the

6    record at 3:28.

7          MR. THOMPSON:  Oh, actually, hold on.  Yeah.

8          THE VIDEOGRAPHER:  Okay.  We're back on the

9    record at 3:28.

10         MR. THOMPSON:  Yeah.  And just to be clear,

11   Mr. Johnson refused to answer multiple questions about

12   his finances relying on supposed government contacts,

13   and I believe that's fair game.  And, you know, for

14   that -- for that and all the questions that he refused

15   to answer, the plaintiffs will keep open this

16   deposition, subject to bringing it up with -- with

17   Judge Pittman.

18         But nothing more for the witness today,

19   given that he's refusing to answer and made clear he's

20   going to refuse to answer questions on a host of

21   relevant subjects.

22         THE VIDEOGRAPHER:  Okay.  We're going off

23   the record at 3:29.

24         (Time noted: 3:29 p.m.)

25         (Signature waived)

1                      -o0o-

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2              DEPOSITION OF CHARLES JOHNSON

3                     November 17, 2025

4          I, Joseph D. Hendrick, Notary Public and

5   Certified Shorthand Reporter in the State of Texas,

6   hereby certify to the following:

7              That the Witness, CHARLES JOHNSON, was duly

8   sworn by the officer and that the transcript of the

9   oral deposition is a true record of the testimony given

10  by the witness;

11             I further certify that pursuant to FRCP

12  Rule 30(f)(1) the signature of the deponent:

13             _____ was requested by the deponent or

14  a party before the completion of the deposition and is

15  to be returned within 30 days from date of receipt of

16  the transcript;

17             ___X___ was not requested by the

18  deponent or a party before the completion of the

19  deposition;

20             I further certify that I am neither counsel

21  for, related to, nor employed by any of the parties or

22  attorneys in the action in which this proceeding was

23  taken;

24             Further, I am not a relative or employee of

25  any attorney of record, nor am I financially or

1    otherwise interested in the outcome of the action.

2              Subscribed and sworn to on this date:

3    December 8, 2025.

4

5

6

7

8

9

10

11                        <%Signature%>
                          Joseph D. Hendrick, CSR #947
12                        Expiration Date: 04/30/2027
                          Notary Comm. Exp. 02/13/27
13                        Veritext Legal Solutions
                          Firm Registration No. 571
14                        300 Throckmorton Street, Ste. 1600
                          Fort Worth, TX  76102
15                        Telephone (800) 336-4000

16   Attorney Times:

17        Will Thompson - 05:12:12

18

19

20

21

22

23

24

25

## $

**$10** [4] - 105:5, 141:14, 144:17, 145:2
**$1400** [1] - 39:16
**$15,000** [1] - 176:5
**$20,000** [1] - 155:16
**$200,000** [3] - 75:15, 76:24, 80:4
**$25** [1] - 81:9
**$25,000** [1] - 98:17
**$31,000** [1] - 98:19
**$32,000** [1] - 100:8
**$40,000** [1] - 101:2
**$400** [2] - 44:17, 112:23
**$400,000** [2] - 44:4, 44:13
**$5,000** [2] - 72:5, 72:11
**$500** [1] - 256:10
**$500,000** [1] - 284:25
**$70** [1] - 97:9
**$71** [2] - 225:17, 289:10
**$7k** [1] - 158:24

## '

**'17** [1] - 186:5
**'20** [1] - 257:16

## 0

**004** [3] - 246:13, 247:10, 247:11
**015** [3] - 280:5, 280:9, 281:6
**032** [2] - 217:4, 219:11
**035** [1] - 236:15
**036** [1] - 237:17
**040** [1] - 73:16
**0618** [1] - 222:3

## 1

**1** [9] - 23:16, 23:18, 28:22, 28:24, 34:3, 97:15, 97:16, 225:21, 236:15
**10** [11] - 73:14, 112:16, 126:19, 139:25, 162:7, 162:9, 165:11, 212:11, 230:22, 257:1, 257:2
**10,000** [2] - 176:4, 256:2
**10-minute** [1] - 89:16
**100** [5] - 33:9, 33:23, 96:22, 131:3, 244:25
**10:05** [3] - 89:7, 89:8, 91:1
**10:18** [2] - 89:8, 89:10
**10th** [2] - 205:3, 206:12
**11** [5] - 163:7, 163:11, 177:12, 177:14, 257:1
**116** [2] - 212:25, 235:13
**11:30** [1] - 92:3
**11:40** [2] - 92:3, 166:20
**11:42** [1] - 168:6
**11:43** [2] - 169:14, 169:15

**11:45** [1] - 168:24
**12** [7] - 214:9, 217:4, 235:12, 237:4, 255:5, 264:25, 282:4
**12:06** [1] - 237:1
**12:15** [2] - 168:25, 169:7
**12:30** [2] - 168:25, 169:20
**12:41** [3] - 169:15, 169:17, 169:19
**13** [3] - 245:23, 245:25, 249:8
**15** [3] - 31:19, 112:16, 132:13
**150** [3] - 72:18, 72:21, 260:13
**1624** [1] - 9:12
**17** [2] - 5:4, 11:15
**17th** [1] - 5:9
**1994** [1] - 256:4
**1:20** [1] - 88:22
**1:55** [2] - 234:13, 234:14
**1st** [1] - 39:6

## 2

**2** [10] - 33:21, 35:3, 54:5, 54:8, 54:21, 62:14, 62:18, 63:8, 80:2, 150:7
**2,000** [1] - 153:19
**2.1** [2] - 288:3, 288:6
**2.4** [1] - 288:4
**20** [7] - 57:21, 57:22, 58:1, 168:14, 242:11, 262:6, 262:11
**200** [3] - 76:20, 111:13, 253:12
**200,000** [3] - 81:23, 82:5, 82:7
**200K** [1] - 79:24
**200k** [1] - 134:13
**2011** [1] - 172:23
**2012** [4] - 86:6, 86:8, 172:23, 268:9
**2014** [1] - 86:7
**2015** [4] - 69:17, 174:20, 200:7, 201:13
**2015-2016** [3] - 198:23, 200:7, 201:4
**2016** [3] - 174:16, 174:20, 198:23
**2017** [14] - 53:18, 64:25, 65:1, 65:16, 67:23, 70:5, 70:10, 77:1, 98:16, 174:16, 176:25, 178:1, 178:12, 186:6
**2017-2018** [4] - 67:8, 77:1, 179:23, 183:1
**2018** [14] - 40:9, 53:18, 65:15, 67:11, 67:23, 87:3, 103:17, 176:25, 178:12, 179:11, 179:17, 188:3, 204:4, 287:15
**2018-2019** [2] - 113:3, 287:14
**2019** [4] - 40:9, 77:21, 103:17, 268:22
**2020** [14] - 41:17, 44:3, 65:1, 72:10, 72:12, 85:8, 126:13, 203:10, 204:5, 204:7, 205:20,

281:14, 287:11
**2021** [3] - 27:5, 203:9, 281:13
**2022** [1] - 139:20
**2023** [8] - 34:17, 39:6, 44:7, 44:8, 44:12, 139:18, 196:25, 256:19
**2024** [15] - 67:1, 107:3, 107:21, 107:24, 108:8, 109:5, 114:22, 115:16, 159:12, 205:3, 205:7, 205:16, 206:12, 256:19
**2025** [8] - 5:4, 5:9, 11:14, 46:23, 49:13, 107:3, 107:21, 206:22
**2028** [1] - 192:14
**23** [1] - 167:25
**23andMe** [7] - 74:18, 252:4, 252:12, 259:19, 260:3, 288:16, 288:20
**23rd** [3] - 114:20, 115:16, 237:19
**24-hour** [1] - 50:8
**250** [1] - 72:18
**26th** [1] - 237:1
**28** [1] - 73:16
**2:09** [2] - 234:14, 234:16
**2nd** [1] - 77:21

## 3

**3** [8] - 63:6, 64:3, 70:23, 70:25, 71:20, 80:6, 162:18
**3,000** [1] - 153:11
**30** [9] - 32:24, 57:20, 70:8, 80:7, 132:14, 132:19, 209:4, 257:18, 261:25
**300** [4] - 102:8, 134:11, 145:17, 275:17
**300,000** [1] - 287:21
**31st** [1] - 11:14
**32** [1] - 98:18
**3:05** [2] - 283:5, 283:6
**3:14** [2] - 283:6, 283:8
**3:28** [2] - 295:6, 295:9
**3:29** [2] - 295:23, 295:24
**3:59** [1] - 237:19

## 4

**4** [9] - 64:5, 75:16, 106:2, 106:3, 108:6, 114:10, 213:22, 214:17, 219:10
**4,000** [1] - 153:11
**40** [3] - 70:8, 86:15, 86:16
**40's** [1] - 283:19
**400** [1] - 74:3
**400,000** [1] - 287:21
**45** [3] - 32:16, 32:24, 33:3

## 5

**5** [6] - 64:7, 114:1, 114:13,

114:18, 137:19, 215:22
**5,000** [1] - 72:10
**50** [1] - 257:18
**50,000** [1] - 274:13
**500** [3] - 74:3, 256:2, 285:8
**500,000** [2] - 286:3, 287:10
**5th** [1] - 137:9

## 6

**6** [4] - 64:7, 114:1, 137:7, 236:16
**60** [1] - 83:25
**600** [1] - 86:17
**600,000** [2] - 85:12, 85:19
**6018** [4] - 219:9, 220:5, 224:19, 228:24
**617)429-4718** [1] - 13:10
**64** [4] - 78:9, 84:5, 95:3, 95:4
**64,000** [1] - 84:3

## 7

**7** [6] - 64:7, 151:6, 151:8, 152:4, 152:5, 236:15
**70** [4] - 19:8, 73:6, 153:13
**70-plus** [1] - 18:15
**700** [1] - 75:1
**7k** [1] - 159:5
**7th** [1] - 196:25

## 8

**8** [5] - 64:7, 64:24, 158:15, 158:17, 237:16
**8-year-old** [1] - 224:3, 224:19
**80** [3] - 73:6, 80:1, 153:13
**800,000** [1] - 75:1
**8:43** [2] - 5:5, 5:9

## 9

**9** [3] - 64:7, 108:8, 159:8
**90** [1] - 153:13

## A

**a.m** [4] - 5:5, 89:8, 169:15
**Aaron** [2] - 10:21, 10:23
**ability** [8] - 8:18, 141:1, 219:12, 219:14, 220:8, 220:9, 222:22, 222:23
**able** [7] - 77:14, 113:7, 117:25, 194:7, 220:12, 244:4, 267:7
**absolutely** [2] - 64:17, 249:22
**abuse** [3] - 60:9, 60:13, 130:9
**abuses** [1] - 130:19
**abusive** [1] - 130:6
**acc** [1] - 225:24
**access** [43] - 34:14, 34:16, 34:25, 40:23, 41:9, 42:11,

58:5, 86:19, 92:16, 123:18, 125:18, 131:12, 146:9, 147:21, 148:8, 148:24, 177:5, 194:2, 194:7, 194:19, 199:18, 219:5, 219:14, 219:16, 220:8, 220:10, 220:12, 220:25, 222:22, 222:23, 222:25, 223:1, 223:24, 224:4, 224:16, 224:18, 224:22, 225:24, 225:25, 227:14, 227:23, 276:24, 277:6
**accessed** [3] - 223:5, 223:13, 223:18
**accommodated** [1] - 215:25
**accommodations** [2] - 55:25, 239:22
**according** [3] - 27:15, 27:16, 285:7
**account** [92] - 29:9, 33:16, 36:3, 38:24, 39:3, 39:17, 40:1, 40:12, 41:18, 52:16, 52:25, 53:1, 67:12, 67:13, 70:7, 70:9, 73:25, 74:25, 80:14, 80:15, 80:16, 82:1, 85:23, 86:15, 87:7, 87:15, 87:17, 87:21, 92:10, 92:11, 145:22, 146:2, 146:6, 146:7, 146:8, 146:10, 146:14, 146:17, 146:21, 146:23, 147:2, 147:3, 147:6, 147:9, 148:2, 148:20, 151:9, 151:11, 153:18, 155:10, 157:1, 172:25, 200:9, 200:16, 201:19, 214:23, 217:8, 217:10, 217:12, 219:8, 219:10, 219:14, 219:15, 219:18, 219:19, 219:20, 220:5, 220:16, 220:25, 221:22, 222:3, 222:23, 223:5, 223:13, 224:16, 224:19, 224:21, 225:7, 225:12, 228:23, 228:24, 233:22, 247:20, 255:9, 255:13, 266:2, 266:16, 268:23, 269:17, 288:2, 288:7, 288:9
**accountant** [3] - 59:18, 61:25, 287:22
**accounting** [1] - 156:24
**accounts** [41] - 29:6, 33:14, 34:13, 34:15, 34:24, 35:9, 35:13, 35:16, 35:18, 35:19, 35:21, 36:2, 39:8, 40:3, 40:23, 41:6, 41:10, 42:6, 53:3, 63:13, 70:12, 70:15, 70:16, 70:21, 71:10, 71:12, 73:24, 102:13, 119:14, 131:12, 147:23, 148:24, 149:4, 174:19, 175:15, 176:2, 198:25, 199:16, 264:6, 266:4, 270:8

**accurate** [15] - 68:21, 81:12, 81:13, 81:14, 84:9, 85:1, 114:7, 115:14, 151:24, 154:18, 237:9, 237:12, 239:15, 247:8, 248:3
**accustomed** [1] - 195:10
**acknowledge** [1] - 129:17
**acquaintances** [2] - 188:2, 188:12
**acquire** [1] - 288:21
**acquiring** [1] - 260:7
**acquisition** [1] - 81:10
**Act** [2] - 113:2, 278:10
**act** [3] - 77:12, 129:11, 232:25
**acting** [1] - 69:18
**actively** [1] - 257:2
**actor** [1] - 186:17
**actors** [1] - 209:13
**actual** [1] - 273:23
**add** [3] - 54:2, 130:22, 276:3
**address** [12] - 9:4, 9:5, 9:6, 9:7, 9:8, 9:13, 9:14, 12:12, 54:2, 217:12, 235:20, 236:23
**addresses** [1] - 15:1
**administration** [2] - 70:3, 87:5
**admit** [1] - 84:6
**adult** [3] - 32:5, 144:7, 144:11
**advised** [2] - 51:15, 195:14
**advisory** [1] - 81:20
**Aero** [1] - 267:11
**af** [1] - 188:23
**affairs** [2] - 129:9, 146:15, 188:24
**affected** [1] - 51:9
**affects** [2] - 8:18, 244:6
**affiliate** [2] - 204:13, 264:5
**affiliated** [4] - 193:1, 284:22, 293:1
**affiliation** [2] - 147:8, 220:12
**affirm** [1] - 5:24
**affix** [1] - 241:13
**afford** [1] - 47:23
**aforementioned** [1] - 238:21
**afraid** [2] - 130:15, 285:3
**Africa** [1] - 268:11
**again/off** [1] - 266:25
**agencies** [11] - 176:16, 187:22, 189:14, 274:9, 274:12, 277:9, 279:3, 279:9, 279:16, 279:22, 279:25
**agency** [14] - 24:16, 27:17, 27:21, 27:23, 28:6, 187:25, 262:25, 263:13, 264:5, 269:15, 270:20, 274:14, 279:5, 290:11
**Agent** [1] - 241:5
**agent** [4] - 22:21, 27:25, 262:15, 269:16
**agents** [8] - 263:2, 263:9,

274:13, 277:3, 277:5, 277:8
**agents/agent** [1] - 270:21
**aging** [1] - 45:20
**ago** [40] - 7:5, 7:9, 29:5, 29:16, 30:23, 31:4, 39:11, 42:24, 62:1, 62:5, 66:17, 66:18, 80:9, 87:25, 105:21, 108:3, 108:22, 109:14, 112:15, 132:20, 146:15, 155:7, 170:25, 181:3, 185:17, 191:22, 193:17, 242:7, 242:17, 242:24, 253:18, 255:18, 287:7
**agree** [5] - 23:10, 56:1, 60:6, 112:19, 232:14
**agreed** [7] - 27:16, 68:6, 92:6, 115:18, 201:2, 204:24, 206:4
**agreement** [12] - 95:17, 203:25, 204:10, 204:20, 204:21, 204:22, 205:24, 206:3, 225:3, 243:21, 245:5, 263:24
**agricultural** [1] - 152:24
**ahead** [16] - 7:17, 8:3, 8:10, 10:14, 29:13, 31:5, 63:9, 95:8, 135:25, 165:15, 201:6, 213:3, 214:16, 215:21, 217:3, 271:20
**Ahmer** [2] - 152:11, 152:14
**AI** [5] - 44:6, 134:1, 155:12, 201:2, 294:8
**air** [2] - 51:10, 51:11
**Airbnb** [1] - 55:16
**airline** [1] - 50:13
**airlines** [1] - 150:10
**al** [1] - 5:12
**Alaska** [1] - 256:21
**Alex** [5] - 122:3, 122:10, 122:12, 122:19, 122:19, 123:22
**Alexandria** [1] - 52:12
**Alharthy** [2] - 76:14, 260:22
**aliases** [1] - 6:17
**alleged** [1] - 244:7
**Allen** [1] - 268:13
**allergic** [1] - 74:19
**Alliance** [1] - 280:12
**allied** [2] - 154:15, 154:22
**allow** [7] - 90:11, 136:22, 156:8, 203:15, 276:24, 277:5, 277:9
**allowed** [12] - 16:9, 36:1, 56:8, 82:23, 111:17, 116:4, 131:23, 166:18, 166:19, 170:4, 281:23, 281:25
**almost** [6] - 83:20, 175:20, 198:23, 204:2, 274:19, 274:20
**alter** [1] - 187:19
**altogether** [2] - 180:5, 262:10
**Ambassador** [1] - 196:13
**ambassador** [2] - 157:24, 196:13

**Amendment** [6] - 7:13, 16:1, 16:13, 16:17, 16:22, 274:3
**Amer** [1] - 59:7
**America** [3] - 39:7, 53:23, 200:15
**American** [10] - 14:9, 58:7, 61:21, 61:23, 62:10, 166:13, 196:16, 268:8, 280:11, 281:10
**americancpa.com** [1] - 59:8
**Americans** [1] - 268:18
**AmEx** [7] - 47:3, 63:20, 71:11, 71:12, 71:16, 98:18
**amount** [9] - 29:24, 50:23, 58:12, 60:10, 72:6, 180:9, 198:2, 219:21, 269:9
**amounts** [2] - 186:9, 254:2
**analysis** [3] - 99:9, 197:21, 253:3
**Ancestry** [5] - 74:18, 252:4, 252:11, 252:12, 288:20
**Anduril** [11] - 75:14, 76:23, 77:9, 77:13, 79:21, 81:17, 82:2, 82:11, 82:19, 83:7, 202:13
**Anduril's** [2] - 77:10, 82:17
**Angel** [2] - 287:4, 287:5
**Angeles** [3] - 11:18, 42:25, 294:12
**Anglo** [1] - 280:11
**Anglo-American** [1] - 280:11
**Anne** [1] - 260:5
**annoyance** [1] - 170:10
**annoying** [6] - 22:5, 22:6, 103:21, 129:15, 136:13, 289:17
**answer** [82] - 8:16, 8:21, 10:1, 10:13, 10:16, 16:4, 16:10, 16:13, 17:1, 21:13, 23:1, 23:6, 23:14, 26:20, 27:8, 27:9, 27:10, 27:12, 28:18, 28:19, 37:8, 37:10, 40:7, 40:16, 40:18, 45:23, 57:20, 61:1, 61:13, 66:4, 94:20, 105:19, 120:8, 120:10, 120:12, 121:17, 122:8, 122:9, 122:11, 123:21, 128:11, 128:13, 131:10, 131:20, 131:23, 144:1, 144:3, 149:14, 150:18, 156:17, 157:7, 160:13, 187:10, 188:15, 190:8, 190:9, 201:5, 213:13, 215:20, 222:24, 253:4, 264:9, 264:12, 264:15, 265:8, 267:21, 269:2, 272:6, 273:8, 279:4, 279:10, 279:11, 279:13, 280:4, 291:6, 293:7, 294:18, 295:11, 295:15, 295:19, 295:20
**answered** [6] - 15:15, 15:20,

62:15, 234:8, 235:21, 294:17
**answering** [2] - 78:19, 131:9
**answers** [6] - 34:1, 40:19, 161:19, 170:6, 172:18, 273:6
**anytime** [1] - 49:25
**anyway** [13] - 40:10, 41:13, 45:3, 80:18, 83:11, 110:25, 142:11, 172:9, 201:22, 249:6, 249:7, 252:18, 252:19
**anywhere** [1] - 198:1
**Ap** [1] - 144:15
**Aperture** [1] - 80:21
**apologize** [1] - 224:10
**apparently** [1] - 188:7
**appeal** [8] - 18:17, 20:1, 20:3, 21:24, 227:13, 231:4
**appealed** [1] - 20:22
**appeals** [1] - 129:14
**appear** [2] - 24:17, 51:3
**appearance** [2] - 5:17, 28:8
**Appendix** [5] - 213:22, 217:4, 219:11, 237:17, 247:10
**Apple** [2] - 85:4, 259:16
**applicable** [2] - 62:19, 64:8
**applied** [1] - 20:13
**appointed** [1] - 93:8
**appreciate** [2] - 60:17, 294:16
**appropriate** [1] - 189:8
**approval** [1] - 206:11
**approve** [1] - 274:2
**approximate** [1] - 86:4
**approximately** [2] - 5:5, 120:14
**approximating** [1] - 252:9
**Appx** [3] - 73:16, 236:15, 246:13
**April** [5] - 77:20, 137:9, 193:19, 205:20, 261:10
**Aptera** [18] - 134:15, 134:19, 135:6, 136:15, 136:18, 137:10, 137:22, 137:25, 138:11, 139:9, 140:8, 141:14, 142:19, 143:2, 144:16, 144:24, 159:22, 201:25
**area** [3] - 13:10, 143:15, 283:21
**argue** [2] - 58:18, 211:17
**arguments** [1] - 58:15
**Arlington** [1] - 11:5
**around** [28] - 9:10, 57:11, 77:22, 87:12, 106:20, 110:24, 166:1, 167:9, 168:25, 175:11, 178:9, 178:12, 179:19, 180:3, 180:4, 180:9, 182:25, 188:3, 197:19, 202:18, 232:25, 252:3, 257:1, 258:22, 260:4, 267:14, 290:18, 294:22
**arranged** [1] - 129:9, 215:24
**arrangement** [1] - 148:15
**arrest** [3] - 61:6, 170:22, 170:24
**arrested** [5] - 31:22, 184:20, 188:3, 188:13, 189:6

**article** [6] - 114:6, 114:7, 178:1, 178:2, 178:19, 180:14
**articles** [2] - 68:18, 68:20
**ASAP** [1] - 237:24
**ASIC** [1] - 69:1
**aside** [6] - 43:16, 43:21, 93:11, 125:4, 291:23, 292:9
**aspect** [1] - 192:20
**asphalt** [1] - 66:12
**Assange** [4] - 186:5, 186:17, 187:7, 262:18
**assert** [1] - 24:17
**assessment** [1] - 127:14
**asset** [12] - 97:22, 105:11, 145:20, 145:21, 148:9, 229:11, 232:17, 232:19, 232:25, 234:3, 269:17, 289:9
**assets** [49] - 17:17, 17:24, 18:9, 21:14, 92:15, 93:18, 94:14, 98:9, 98:11, 98:23, 99:14, 100:14, 100:15, 100:22, 100:23, 101:4, 101:16, 104:1, 104:3, 104:8, 105:18, 111:7, 112:3, 118:8, 120:17, 120:19, 127:3, 127:8, 127:21, 128:5, 142:4, 142:9, 145:19, 175:23, 191:12, 199:13, 199:17, 225:18, 225:20, 228:15, 228:16, 229:4, 233:7, 255:21, 255:23, 255:25, 270:8, 273:9, 289:14
**assignment** [1] - 232:10
**assist** [1] - 183:14
**associate** [2] - 87:12, 293:18
**associated** [7] - 67:10, 96:19, 96:20, 132:17, 164:15, 164:21, 226:13
**associates** [4] - 150:9, 161:24, 202:22, 290:4
**Association** [1] - 74:17
**assume** [4] - 34:20, 53:3, 112:9, 270:2
**assumed** [1] - 52:8
**attaché** [1] - 116:25
**attention** [9] - 76:6, 76:8, 135:23, 153:13, 153:21, 159:20, 161:21, 164:17, 165:18
**attorney** [4] - 26:5, 84:21, 198:10, 198:12
**Attorney** [2] - 271:4, 273:2
**Attorney's** [5] - 24:17, 270:22, 271:23, 272:10, 272:23
**attorneys** [2] - 229:21, 229:22
**attracts** [1] - 86:25
**August** [3] - 46:11, 50:2, 186:5
**auspices** [1] - 187:25
**Austin** [1] - 283:20
**authorities** [1] - 141:17
**authorized** [2] - 53:4, 148:2

**auto** [1] - 170:17
**auto-deleted** [1] - 170:17
**autobiography** [2] - 274:21, 276:15
**avail** [1] - 288:23
**available** [2] - 74:16, 290:23
**avoid** [1] - 100:17
**aware** [18] - 16:11, 16:15, 16:19, 54:19, 54:20, 149:13, 181:25, 189:25, 196:2, 196:3, 207:18, 271:8, 271:12, 271:13, 272:8, 272:12, 272:13, 278:11
**awful** [1] - 154:5

## B

**baby** [1] - 274:14
**backed** [3] - 60:15, 85:12, 161:6
**backer** [1] - 110:11
**bad** [6] - 51:19, 98:16, 109:21, 138:24, 172:12, 193:20
**badge** [1] - 126:8
**bail** [1] - 75:5
**bailed** [1] - 75:10
**ballpark** [3] - 7:4, 110:1, 139:24
**baloney** [4] - 26:9, 26:11, 26:13, 194:20
**bank** [41] - 34:13, 34:15, 34:24, 35:9, 35:18, 38:24, 39:24, 39:25, 40:12, 42:6, 53:13, 53:19, 63:13, 73:23, 73:25, 74:2, 80:15, 102:13, 146:13, 146:23, 176:1, 200:9, 217:8, 217:10, 219:8, 220:5, 220:15, 220:21, 221:22, 223:4, 228:23, 233:22, 243:19, 247:20, 255:12, 264:6, 266:4, 268:23, 288:2, 288:7, 288:9
**Bank** [22] - 29:7, 33:13, 39:1, 39:6, 39:7, 39:10, 53:12, 53:16, 53:20, 53:23, 63:11, 63:21, 70:7, 80:16, 102:18, 102:23, 148:1, 148:4, 155:10, 200:15, 220:21, 222:3
**banked** [4] - 53:20, 53:21, 53:22, 70:18
**banking** [4] - 34:23, 63:16, 63:17, 146:23
**bankrupt** [7] - 178:8, 199:9, 260:3, 289:13, 289:16
**bankrupted** [1] - 200:23
**Banks** [1] - 53:9
**banned** [2] - 223:16, 223:17
**Bannon** [2] - 263:3, 274:25
**bar** [3] - 31:18, 32:8, 39:21
**barred** [1] - 160:20
**Barrett** [1] - 76:19
**based** [11] - 41:5, 52:8, 75:25,

81:14, 120:25, 121:1, 127:5, 189:22, 270:15, 274:23
**basic** [1] - 59:11
**basis** [2] - 10:16, 270:22
**basket** [1] - 97:12
**bathroom's** [1] - 33:1
**batteries** [2] - 159:21
**battery** [3] - 66:2, 98:16, 258:8
**bay** [1] - 87:3
**Bayraktar** [1] - 116:21
**Bayraktars** [1] - 117:1
**bearing** [1] - 129:18
**beautiful** [1] - 261:22
**became** [6] - 72:4, 73:22, 75:23, 77:13, 82:11, 186:8
**become** [2] - 94:24, 187:20
**bed** [1] - 191:5
**bef** [1] - 206:4
**beforehand** [1] - 110:3
**began** [1] - 205:6
**begin** [1] - 279:8
**beginning** [2] - 236:4, 248:8
**behalf** [7] - 120:22, 124:12, 125:7, 196:17, 271:6, 273:2, 282:20
**behavior** [2] - 97:20, 187:19
**behind** [10] - 73:13, 74:8, 171:19, 231:1, 231:8, 286:12, 287:4, 290:3, 290:5, 293:25
**belief** [2] - 225:11, 225:14
**believer** [2] - 107:17, 135:3
**belly** [1] - 199:9
**belly-up** [1] - 199:9
**belong** [1] - 64:14
**belonged** [1] - 41:10
**belonging** [1] - 228:23
**beneficial** [1] - 289:17
**beneficiary** [3] - 119:3, 120:7, 255:11
**benefit** [8] - 8:15, 133:21, 185:12, 191:14, 225:4, 241:12, 265:12, 265:13
**benefited** [1] - 224:24
**Bernadette** [1] - 42:16
**Bernie** [2] - 148:21, 155:11
**best** [18] - 28:24, 51:16, 120:10, 120:12, 126:24, 138:3, 138:4, 141:5, 144:15, 180:22, 188:9, 198:5, 198:6, 202:21, 256:22, 267:17, 269:8, 287:23
**Beth** [2] - 52:3, 52:11
**better** [1] - 234:23
**between** [12] - 107:21, 129:4, 130:25, 141:13, 144:16, 193:15, 226:25, 257:18, 260:12, 262:5, 262:11, 262:13
**bewildered** [1] - 226:8
**beyond** [12] - 40:9, 41:12,

225:21, 228:13, 228:14, 228:25, 229:3, 229:12, 230:16, 231:2, 231:9, 232:23
**bi** [1] - 173:3
**bid** [1] - 260:17
**bids** [1] - 260:4
**big** [20] - 47:20, 50:6, 76:18, 101:1, 134:17, 135:3, 151:3, 166:14, 183:24, 190:1, 190:2, 203:13, 226:5, 230:4, 243:4, 244:8, 256:1, 261:5, 285:6
**bigger** [1] - 244:14, 252:17
**biggest** [7] - 83:1, 102:3, 132:7, 286:7, 287:16, 287:17
**bill** [5] - 63:20, 98:18, 100:9, 100:23, 101:1
**billion** [6] - 80:3, 80:6, 80:7, 132:13, 132:14, 132:19
**billionaire** [1] - 60:15
**bills** [2] - 232:22, 244:22
**Binance** [2] - 173:6, 174:8
**bio** [1] - 132:20
**biography** [1] - 132:11
**bit** [15] - 32:12, 35:9, 57:10, 57:22, 90:21, 92:21, 155:21, 183:13, 202:24, 224:7, 256:23, 271:14, 275:18, 286:14
**Bitcoin** [39] - 65:14, 67:11, 68:14, 68:15, 68:22, 69:14, 70:3, 70:4, 85:11, 85:14, 85:20, 85:22, 85:25, 86:1, 86:7, 86:9, 86:15, 86:17, 86:22, 87:5, 87:6, 88:7, 88:11, 176:8, 176:15, 176:17, 176:20, 176:21, 176:24, 177:4, 177:5, 178:24, 179:5, 179:11, 179:13, 179:17, 179:22, 190:19
**Bitfinex** [1] - 173:22
**bitfinex** [1] - 173:23
**black** [1] - 148:10
**blame** [1] - 293:19
**blank** [1] - 133:10
**blew** [2] - 57:4, 57:18
**blind** [1] - 252:21
**blocked** [1] - 267:7
**blow** [1] - 117:4
**blunt** [2] - 83:19, 107:13
**board** [18] - 48:25, 95:22, 95:24, 134:10, 138:15, 204:24, 205:8, 205:15, 206:11, 206:12, 207:12, 209:7, 226:3, 244:10, 245:21, 249:23
**Bob** [4] - 280:19, 280:21, 281:2
**bogus** [4] - 124:5, 124:6, 124:8, 124:9
**Boisvert** [1] - 79:2
**bolded** [1] - 106:9

**book** [5] - 154:1, 274:1, 274:2, 275:4, 276:4
**books** [3] - 148:10, 148:11, 274:7
**border** [2] - 183:15, 183:18
**born** [1] - 130:7
**Boston** [3] - 11:18, 34:8, 50:6
**bother** [3] - 66:8, 141:19, 252:14
**bottom** [3] - 54:3, 79:22, 162:13
**bought** [8] - 39:21, 64:25, 86:7, 120:23, 158:24, 199:13, 199:15, 259:16
**box** [2] - 39:22, 257:10
**brag** [1] - 273:19
**bragged** [1] - 208:19
**branch** [1] - 102:25
**Break** [4] - 89:8, 169:15, 234:14, 283:6
**break** [11] - 32:18, 33:1, 89:4, 89:16, 89:19, 90:13, 167:7, 168:12, 168:15, 170:1, 230:22, 234:11, 234:20, 243:18, 283:3
**Bridge** [6] - 5:11, 225:21, 229:1, 230:10, 231:3, 232:16
**brief** [6] - 18:21, 50:8, 58:21, 189:8, 212:4, 269:1
**briefly** [2] - 160:7, 168:8
**briefs** [1] - 58:24
**bring** [8] - 13:23, 54:10, 55:7, 56:1, 56:21, 62:13, 161:17, 267:24
**bringing** [2] - 117:1, 295:16
**Britain** [1] - 166:18
**British** [2] - 162:24, 163:5, 166:8, 166:11, 195:19
**Brits** [2] - 166:9, 166:12
**broad** [1] - 211:25
**broader** [2] - 35:3, 35:10
**broke** [3] - 97:24, 98:1, 253:11
**broken** [2] - 242:8, 242:10
**broker** [1] - 255:12
**brokerage** [1] - 255:13
**brokered** [1] - 193:13
**brokers** [1] - 181:7
**brother** [6] - 40:2, 42:12, 63:2, 101:7, 101:15, 256:16
**brought** [3] - 64:16, 64:17
**brushed** [1] - 191:5
**bucks** [5] - 45:16, 74:3, 75:16, 85:13, 86:18, 126:19, 145:17, 146:22, 153:19, 165:11, 202:6, 243:18, 256:2
**buffalo** [1] - 228:6
**build** [1] - 84:17
**building** [4] - 83:4, 107:10, 111:14, 167:13
**built** [1] - 73:9

**Buma** [16] - 27:25, 28:4, 241:5, 263:10, 263:11, 264:20, 276:11, 276:17, 276:21, 276:24, 277:8, 277:13, 277:21, 278:6, 278:15, 278:24
**bunch** [5] - 150:4, 154:7, 256:14, 270:7, 290:19
**bur** [1] - 226:2
**Burbank** [13] - 164:7, 164:10, 164:22, 195:7, 207:8, 212:13, 212:14, 226:2, 245:20, 280:13, 281:15, 293:19, 293:21
**burdensome** [1] - 212:1
**burger** [1] - 182:6
**burgled** [2] - 239:21, 241:17, 242:5
**business** [29] - 6:19, 34:23, 95:25, 110:9, 111:11, 115:10, 115:11, 116:19, 157:12, 157:17, 157:21, 161:24, 166:17, 178:20, 180:2, 180:22, 181:5, 183:4, 183:7, 189:24, 196:18, 202:21, 209:8, 217:12, 219:10, 283:23, 283:25, 285:21
**businesses** [2] - 180:15, 181:1
**busy** [1] - 57:19
**buy** [15] - 47:22, 68:6, 74:9, 204:25, 205:10, 253:10, 256:21, 257:6, 258:23, 259:5, 259:6, 259:7, 259:12, 259:19
**buying** [5] - 105:13, 119:23, 134:2, 256:20, 260:11
**BY** [39] - 6:10, 8:5, 20:25, 23:20, 54:6, 70:24, 89:14, 91:3, 96:17, 106:4, 110:16, 114:14, 137:8, 151:7, 158:16, 159:9, 162:8, 163:8, 165:2, 167:8, 169:5, 169:21, 177:13, 177:25, 190:7, 193:7, 197:10, 200:5, 208:12, 209:16, 211:23, 214:5, 214:10, 215:19, 230:24, 234:17, 245:24, 272:7, 283:9

**C**

**C-H-A-P-P-I-N** [1] - 268:15
**Ca** [1] - 287:7
**cab** [1] - 167:14
**cabining** [1] - 261:24
**cadence** [1] - 192:8
**calculate** [1] - 167:4
**California** [6] - 55:14, 55:19, 57:10, 150:15, 183:5, 255:24
**caller** [1] - 162:3
**camera** [3] - 32:9, 127:23, 244:18

**candidly** [6] - 226:1, 227:10, 243:5, 253:8, 253:9, 256:7
**candy** [1] - 39:21
**cannot** [6] - 194:6, 195:24, 195:25, 196:4, 272:17
**cap** [3] - 77:4, 82:12, 82:16
**Capistrano** [1] - 263:19
**Capital** [14] - 5:11, 62:20, 145:12, 145:13, 146:10, 148:2, 148:8, 164:13, 225:21, 229:1, 230:10, 231:3, 232:16, 245:1
**capital** [3] - 41:24, 166:7, 283:17
**car** [19] - 31:20, 32:5, 65:7, 65:11, 65:19, 66:1, 66:9, 66:13, 66:16, 105:13, 123:4, 123:6, 123:8, 123:9, 123:10, 134:21
**card** [8] - 14:7, 14:8, 14:9, 14:11, 14:13, 100:9, 100:23, 101:1
**cards** [5] - 44:22, 63:19, 71:15, 181:5, 264:6
**care** [11] - 45:23, 51:16, 82:17, 119:14, 127:9, 127:15, 135:24, 150:11, 150:12, 227:10, 227:11
**careful** [1] - 86:13
**cares** [2] - 156:1, 163:22
**Carlisle** [1] - 6:16
**Carlsbad** [1] - 137:22
**carry** [3] - 31:20, 32:5, 32:6
**cars** [1] - 98:11
**cartels** [1] - 183:19
**Carter** [1] - 79:2
**case** [77] - 5:11, 5:13, 5:25, 7:6, 7:12, 18:16, 18:23, 18:25, 20:1, 20:14, 21:18, 22:3, 22:8, 22:11, 22:17, 22:21, 25:20, 27:24, 28:1, 28:3, 28:4, 28:9, 28:11, 29:20, 31:8, 36:10, 37:17, 38:2, 38:6, 50:14, 51:2, 52:2, 69:2, 75:13, 86:12, 92:8, 93:18, 94:2, 94:4, 96:7, 97:14, 100:10, 100:21, 110:3, 110:4, 136:17, 142:5, 154:25, 170:20, 171:10, 196:20, 198:10, 198:21, 202:10, 208:15, 208:19, 211:7, 212:15, 212:18, 214:11, 216:6, 217:18, 225:22, 227:3, 227:8, 231:13, 231:17, 232:5, 233:25, 252:3, 252:7, 252:10, 266:24, 270:4, 273:8, 278:14
**cases** [4] - 26:16, 50:13, 250:12, 279:20
**cash** [31] - 44:18, 45:11, 47:4, 47:5, 47:7, 47:8, 63:19, 65:1,

82:19, 83:12, 96:22, 96:24, 97:7, 97:9, 97:24, 98:11, 98:12, 98:14, 136:11, 137:4, 178:21, 179:6, 180:15, 183:4, 205:10, 239:21, 258:23, 259:6, 259:22, 260:14

**catalog** [1] - 49:24

**catch** [2] - 183:17, 215:22

**Caviezel** [1] - 287:7

**cc'ing** [1] - 247:14

**CCP** [1] - 180:1

**cell** [1] - 143:8

**Censys** [18] - 104:19, 104:22, 105:1, 105:19, 105:20, 106:11, 106:16, 106:18, 108:4, 109:6, 109:13, 110:4, 110:8, 110:18, 112:6, 113:20, 159:19, 159:25

**Center** [1] - 178:7

**CEO** [11] - 21:4, 72:24, 75:18, 76:6, 100:1, 104:24, 107:4, 138:5, 138:12, 254:5, 267:18

**cer** [1] - 175:13

**certain** [9] - 74:20, 92:12, 115:12, 115:13, 159:6, 166:18, 277:24, 291:19

**certainly** [4] - 34:2, 174:10, 260:21, 284:13

**certainty** [5] - 87:14, 87:16, 87:20, 269:1, 276:13

**cetera** [6] - 188:12, 270:9, 282:20, 282:21

**chain** [3] - 84:17, 213:5, 226:22

**chair** [1] - 91:24

**challenging** [3] - 57:10, 189:13, 190:19

**champerty** [1] - 20:11

**chance** [3] - 91:11, 91:12, 91:15

**change** [9] - 43:12, 91:8, 107:6, 127:4, 171:2, 171:4, 171:24, 172:2

**changed** [4] - 107:21, 175:11, 176:8, 246:20

**channels** [1] - 155:5

**Chantilly** [2] - 65:3, 257:11

**Chappin** [2] - 268:13, 268:15

**charge** [4] - 56:14, 125:13, 150:7, 259:10

**charged** [2] - 185:13, 281:12

**charity** [1] - 111:1

**CHARLES** [1] - 6:7

**Charles** [13] - 5:10, 5:12, 6:16, 33:14, 35:10, 79:14, 82:1, 125:1, 147:3, 163:13, 164:21, 229:3, 236:22

**charlescjohnson88@gmail.c** - 15:22

**charlescjohnson88@gmail. com** [1] - 236:7

**Chase** [1] - 39:7

**chat** [2] - 242:22

**chatting** [1] - 113:18

**cheaper** [1] - 259:14

**cheaply** [1] - 289:14

**check** [11] - 47:3, 47:4, 100:21, 155:16, 160:23, 161:1, 221:7, 243:11, 256:5

**checked** [2] - 12:16, 63:2

**checking** [7] - 29:9, 33:16, 39:3, 39:17, 52:25, 53:1, 219:10

**checks** [2] - 255:24, 256:1

**Chelsea** [1] - 48:8

**Cheyenne** [1] - 218:6

**chief** [1] - 158:3

**child** [5] - 44:20, 119:22, 137:14, 207:16, 266:22

**childhood** [1] - 241:20

**children** [5] - 40:25, 140:19, 207:16, 207:24, 266:22

**Chin** [2] - 10:21, 10:23

**chin** [2] - 10:24, 11:1

**China** [2] - 107:11, 140:21

**Chinese** [8] - 26:7, 43:10, 113:4, 113:5, 160:11, 179:21, 180:1, 293:20

**choose** [2] - 171:24, 293:6

**choosing** [2] - 37:10, 37:11

**chosen** [1] - 254:25

**Chris** [2] - 227:1, 227:2

**Christ** [1] - 287:8

**chronological** [1] - 236:11

**chuck** [1] - 164:21

**Chuck** [1] - 59:1

**chunk** [1] - 244:14

**Church** [2] - 275:4, 287:2

**CIA** [1] - 155:3

**cigarette** [2] - 192:1, 253:21

**circa** [2] - 86:6, 182:25

**circles** [1] - 258:11

**Circuit** [12] - 18:20, 19:14, 19:18, 19:25, 21:25, 58:13, 90:9, 96:14, 98:25, 142:11, 212:4, 231:3

**Circuit's** [1] - 19:22

**circumstance** [1] - 174:12

**CitiBank** [3] - 53:22, 200:14

**claim** [5] - 128:8, 128:13, 128:16, 199:12, 215:4

**claimed** [2] - 37:19, 264:17

**claims** [5] - 36:15, 36:16, 36:18, 37:1, 199:10

**clarify** [2] - 254:13, 294:25

**class** [1] - 48:3

**classified** [7] - 24:15, 24:20, 25:10, 165:22, 188:9, 278:4, 278:21

**Classified** [1] - 278:10

**cleanup** [2] - 213:19, 255:4

**Clear** [11] - 104:5, 134:12, 252:25, 253:6, 253:9, 253:15, 253:16, 253:17, 254:12

**clear** [25] - 16:18, 34:10, 36:2, 40:4, 40:14, 40:22, 41:8, 64:19, 67:14, 67:18, 131:23, 140:16, 168:18, 195:18, 212:2, 222:20, 233:12, 250:18, 256:21, 281:9, 281:10, 282:14, 292:17, 295:10, 295:19

**clearance** [1] - 278:5

**Clearview** [11] - 36:4, 36:11, 37:2, 44:6, 62:20, 134:1, 155:12, 201:2, 201:24, 230:5, 230:9

**clef** [1] - 275:1

**client** [6] - 31:18, 31:19, 132:8, 244:7, 292:3

**clients** [1] - 132:7

**climate** [2] - 51:13, 51:14

**clips** [1] - 90:18

**close** [8] - 55:22, 55:23, 138:16, 151:17, 154:19, 154:20, 175:18, 287:2

**closed** [2] - 232:5, 273:24

**closely** [2] - 226:2, 226:3

**clothes** [2] - 98:13, 98:15

**CNBC** [3] - 178:1, 178:4, 180:14

**co** [3] - 103:20, 253:14, 254:1

**co-found** [1] - 103:20

**co-founded** [1] - 254:1

**co-founder** [1] - 253:14

**Coast** [1] - 160:4

**coast** [2] - 57:12, 162:6

**code** [10] - 13:10, 25:4, 26:12, 186:8, 258:25, 259:1, 259:9, 259:10, 273:24

**code-named** [4] - 25:4, 26:12, 186:8, 273:24

**Cody** [1] - 256:20

**cofounded** [1] - 81:8

**cognizant** [1] - 166:23

**coin** [2] - 86:18, 190:21

**Coinbase** [5] - 85:23, 173:2, 174:3, 174:17, 175:23

**coins** [1] - 88:20

**cold** [4] - 68:2, 88:7, 88:8, 88:12

**collect** [2] - 58:9, 101:7, 135:24, 243:10

**collected** [1] - 181:4

**colluding** [1] - 230:10

**Colorado** [2] - 113:23, 182:8

**Colosimo** [1] - 107:4

**combination** [1] - 165:13

**combing** [1] - 112:2

**coming** [3] - 140:21, 141:18,

142:8

**Commencing** [1] - 5:5

**commentary** [1] - 203:4

**commission** [2] - 280:21, 284:3

**commit** [3] - 59:25, 60:23, 258:14

**committed** [1] - 140:22

**Committee** [2] - 188:23, 189:1

**committing** [1] - 257:19

**commodified** [1] - 112:22

**common** [4] - 120:2, 196:10, 273:18, 274:12

**communicate** [3] - 14:20, 15:6, 271:22

**communicated** [6] - 43:4, 96:5, 112:12, 191:21, 212:14, 230:13

**communication** [3] - 215:15, 290:2, 292:10

**communications** [17] - 170:21, 171:10, 171:11, 172:16, 204:3, 207:14, 207:17, 207:21, 209:17, 209:18, 210:23, 211:5, 260:23, 289:24, 290:1, 292:7, 292:9

**companies** [9] - 69:22, 112:20, 115:13, 132:13, 132:16, 133:11, 153:5, 161:4, 161:16, 162:15, 202:4, 204:12, 284:22

**company** [79] - 69:9, 69:21, 70:17, 70:18, 73:7, 73:13, 73:22, 75:5, 75:6, 75:13, 75:18, 75:19, 75:23, 80:2, 80:21, 82:23, 83:2, 98:22, 99:3, 99:7, 99:9, 99:15, 99:17, 103:16, 103:20, 104:14, 104:18, 109:1, 110:6, 111:2, 111:14, 111:19, 113:1, 113:21, 113:22, 134:2, 134:25, 135:1, 135:2, 135:4, 136:23, 138:3, 139:13, 152:19, 159:19, 161:6, 162:1, 162:25, 163:1, 164:5, 192:25, 202:5, 202:8, 203:19, 204:4, 204:7, 206:6, 208:7, 213:15, 249:11, 249:12, 250:1, 250:4, 250:5, 250:6, 250:13, 250:14, 250:16, 254:10, 254:21, 260:5, 267:6, 267:9, 288:20, 288:22, 288:24

**compared** [1] - 247:19

**compelling** [1] - 20:2

**compensated** [1] - 115:24

**compensation** [6] - 44:25, 116:10, 117:15, 133:14, 228:1, 228:3

**competition** [1] - 250:8

**competitor** [2] - 111:19, 111:21

**complementary** [1] - 254:9

**complete** [10] - 30:1, 30:3, 33:9, 33:23, 33:25, 128:19, 161:19, 239:4, 270:15, 273:5
**completed** [3] - 108:12, 174:24, 237:24
**completely** [1] - 40:16
**compliance** [5] - 172:5, 172:7, 175:3, 270:24, 271:24
**complicated** [4] - 94:9, 148:14, 186:9, 267:5
**complications** [1] - 232:21
**complied** [2] - 147:25, 176:17
**Complied** [1] - 5:23
**complies** [1] - 113:2
**comply** [7] - 21:17, 22:25, 23:4, 34:2, 57:15, 172:7, 189:2
**complying** [1] - 127:19
**components** [1] - 113:4
**compound** [2] - 69:11, 219:17
**compromise** [1] - 156:20
**compromised** [4] - 273:16, 273:17, 279:23
**computer** [11] - 68:24, 190:20, 257:19, 257:23, 258:6, 258:14, 258:23, 258:24, 259:8, 259:9, 259:16
**computers** [7] - 190:21, 257:8, 257:12, 257:15, 257:17, 259:5, 259:12
**conceptual** [1] - 179:19
**concerned** [5] - 180:23, 188:3, 188:13, 190:9, 243:9
**concerning** [3] - 84:23, 188:8, 192:14
**concerns** [3] - 45:19, 189:21, 241:24
**conclude** [1] - 294:15
**concluded** [17] - 37:22, 228:8, 229:13, 231:5, 231:12, 232:9, 233:7, 233:9, 233:10, 233:13, 233:25, 234:1, 261:13, 267:1, 267:3, 273:13, 289:7
**concludes** [5] - 89:24, 90:8, 227:18, 228:17, 231:23
**Concord** [1] - 166:16
**condition** [5] - 8:12, 8:17, 51:7, 51:22, 66:21
**conduct** [2] - 92:18, 294:10
**conducted** [1] - 209:19
**conference** [2] - 180:20, 238:16
**confident** [1] - 289:11
**confidential** [13] - 251:25, 264:2, 274:4, 276:8, 277:9, 277:10, 277:22, 278:9, 278:19, 278:21, 278:24, 279:7, 279:8
**confirm** [2] - 236:22, 237:8
**confirmation** [1] - 221:5
**confirmed** [1] - 226:24
**conflict** [11] - 100:18, 101:23,

190:1, 210:1, 228:11, 230:7, 250:3, 250:7, 250:8, 250:10, 250:14
**conflicted** [2] - 111:2, 232:24
**conflicts** [6] - 90:1, 95:23, 100:19, 161:1, 253:5
**confrontation** [2] - 150:20, 150:21
**confusing** [1] - 245:10
**Congo** [1] - 269:5
**Congress** [1] - 189:16
**Congressman** [2] - 181:10, 186:18
**connected** [4] - 92:12, 99:21, 221:14, 293:2
**connection** [3] - 185:12, 219:20, 264:6
**connections** [4] - 24:2, 26:8, 166:8, 248:25
**consent** [18] - 60:9, 60:11, 92:6, 92:7, 128:21, 128:23, 129:5, 129:6, 129:7, 129:16, 129:21, 129:22, 131:1, 131:2, 131:4, 141:20, 142:3, 269:24
**consider** [4] - 108:15, 251:25, 264:24, 265:9
**consideration** [1] - 118:3
**consistent** [1] - 210:7
**conspiracy** [1] - 194:12
**constantly** [1] - 103:13
**construct** [1] - 119:10
**consultant** [1] - 115:19
**consulting** [1] - 202:2
**consummated** [2] - 219:24, 224:20
**contact** [16] - 11:7, 24:16, 42:19, 99:25, 103:9, 104:23, 123:1, 137:25, 140:7, 143:11, 164:11, 235:3, 260:25, 270:21, 280:17, 286:15
**contacted** [8] - 45:13, 95:19, 176:14, 189:3, 207:1, 241:5, 263:3, 263:9
**contacting** [1] - 272:9
**contacts** [9] - 42:20, 122:25, 151:4, 271:22, 272:9, 290:7, 293:11, 293:13, 295:12
**contention** [1] - 45:14
**contest** [1] - 134:8
**context** [4] - 18:1, 18:2, 103:16, 159:20
**contingent** [1] - 116:11
**continue** [6] - 60:20, 135:4, 136:24, 161:3, 169:22, 234:18
**continued** [1] - 170:25
**continues** [2] - 165:19, 211:14
**continuing** [1] - 293:2
**contract** [6] - 113:7, 204:10, 204:20, 243:4, 243:6, 244:9

**contracting** [1] - 113:9
**contracts** [1] - 165:20
**contrary** [7] - 209:11, 225:15, 241:3, 249:4, 249:16, 249:22, 272:1
**contribute** [1] - 46:20
**contributed** [2] - 144:21, 144:25
**contributions** [1] - 12:20
**control** [16] - 40:24, 82:2, 82:23, 125:13, 145:20, 146:7, 161:14, 193:14, 214:1, 244:20, 249:11, 249:17, 249:21, 254:16, 269:18, 269:19
**controlled** [5] - 90:4, 147:4, 175:17, 191:13, 225:11
**controller** [1] - 146:16
**controls** [4] - 85:4, 171:12, 172:8, 217:19
**controversial** [1] - 288:18
**convened** [1] - 204:24
**convenes** [1] - 205:15
**convers** [1] - 112:15
**conversation** [21] - 43:8, 44:12, 44:13, 112:15, 140:19, 142:10, 142:18, 148:5, 155:19, 181:16, 182:14, 186:20, 186:21, 187:7, 192:13, 204:6, 207:7, 226:7, 244:17, 263:18, 282:11
**conversations** [10] - 123:15, 125:10, 142:9, 186:4, 205:6, 212:9, 252:11, 266:19, 266:21, 274:9
**convert** [3] - 74:17, 97:2, 136:22
**converted** [1] - 82:10
**converting** [1] - 74:12
**convinced** [2] - 192:16, 283:18
**cook** [1] - 284:20
**cool** [5] - 113:24, 150:20, 177:24, 244:18, 244:23
**cooperation** [2] - 263:23, 270:5
**copied** [3] - 93:23, 226:19, 266:10
**copies** [1] - 276:6
**copy** [5] - 77:22, 113:16, 239:5, 276:14, 276:16
**cor** [1] - 223:16
**corps** [1] - 293:2
**correct** [58] - 12:13, 13:15, 19:24, 22:12, 27:11, 28:5, 30:2, 30:5, 37:10, 37:11, 37:13, 37:14, 37:19, 54:15, 56:3, 64:4, 64:19, 71:6, 81:4, 81:5, 89:22, 98:2, 99:7, 106:15, 114:23, 121:25, 123:11, 123:21, 124:25, 125:10, 125:21, 144:14,

154:14, 154:17, 160:14, 196:4, 210:21, 217:22, 218:18, 223:9, 224:2, 224:6, 224:22, 224:25, 225:1, 225:6, 226:15, 226:18, 226:21, 231:15, 233:20, 239:8, 240:22, 248:20, 254:2, 266:11, 277:20, 280:15
**corrected** [1] - 239:10
**correctly** [6] - 84:20, 196:14, 211:15, 213:12, 237:25, 281:3
**correspondence** [1] - 62:22
**coun** [1] - 152:24
**council** [1] - 96:4
**counsel** [7] - 5:16, 29:2, 89:25, 100:20, 207:5, 235:22, 237:7
**Counsel** [1] - 6:5
**counselor** [3] - 23:15, 61:11, 160:23
**count** [1] - 105:10
**counting** [1] - 275:18
**countries** [2] - 164:24, 261:7
**country** [12] - 49:19, 115:18, 116:1, 116:7, 117:5, 117:6, 117:12, 157:15, 158:19, 261:12, 280:13, 280:14
**counts** [1] - 50:1
**County** [2] - 12:20, 246:7
**couple** [8] - 7:14, 22:10, 23:25, 185:16, 190:11, 262:14, 280:5, 283:10
**course** [9] - 31:21, 83:1, 118:22, 118:23, 152:9, 152:15, 183:10, 211:21, 285:5
**Court** [4] - 5:14, 20:4, 20:5, 129:18
**court** [36] - 8:9, 8:14, 12:24, 15:18, 88:25, 99:23, 118:15, 133:21, 139:5, 142:2, 159:1, 166:23, 168:14, 195:4, 211:20, 212:3, 229:13, 230:20, 231:5, 231:17, 232:5, 233:7, 233:16, 233:25, 238:8, 239:6, 252:8, 261:11, 261:12, 266:24, 267:6, 280:25, 282:3, 294:7, 294:22
**Court's** [1] - 270:24
**courtesy** [2] - 131:16, 294:21
**Courtney** [4] - 48:4, 48:7, 48:11, 195:13
**courtroom** [2] - 24:13, 91:7
**courtyard** [1] - 14:5
**covenant** [1] - 203:16
**CPA** [5] - 58:7, 59:5, 61:22, 61:23, 62:10
**CPA's** [1] - 61:16
**Craigslist** [1] - 259:6
**craziness** [1] - 180:3