No. 25-10919

# In the United States Court of Appeals for the Fifth Circuit

POINT BRIDGE CAPITAL, L.L.C.; HAL LAMBERT,
*Plaintiffs – Appellees*

v.

Charles Johnson,
*Defendant – Appellant*

*On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division, No. 4:24-CV-988, Hon. Mark Pittman*

## BRIEF OF PLAINTIFFS-APPELLEES

| | |
|---|---|
| Will Thompson<br>**DLA PIPER LLP (US)**<br>1900 N. Pearl Street<br>Dallas, Texas 75201<br>Telephone: (406) 546-5587<br>will.thompson1@us.dlapiper.com<br><br>*Counsel of Record* | Samuel Pollock-Bernard<br>**DLA PIPER LLP (US)**<br>500 Eighth Street, NW<br>Washington, DC 20004<br>samuel.pollock-bernard@us.dlapiper.com |

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Charles Johnson is the defendant-appellant.

2. Michael J. Wynne, James L. Turner, and Cameron Powell of Gregor Wynne Arney, PLLC were counsel for Johnson in the mandamus proceeding, 25-11393, but have not made an appearance in this case.

3. Johnson's former counsel in the District Court are: Bernard Kleinman of the Law Office of Bernard V. Kleinman PLLC; Devon Judy Sanders, Joshua Smith Rhodes, and Michael A. Lehmann of the Federal Public Defender's Office; and Lawrence J. Friedman and William Carter Boisvert of Friedman & Feiger, LLP.

4. Point Bridge Capital, LLC and Hal Lambert are plaintiff-appellees.

5. Will Thompson and Samuel Pollock-Bernard of DLA Piper, LLP are counsel for plaintiff-appellees.

6. Adam Douglas Farrell and Jeffrey J. Ansley of Vedder Price PC are court-appointed receivers.

For purposes of Rule 26.1, the undersigned certifies that Point Bridge Capital, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: February 25, 2026

Respectfully submitted,

/s/ *Will Thompson*
W<small>ILL</small> T<small>HOMPSON</small>

*Counsel for Plaintiffs-Appellees Point Bridge Capital, LLC & Hal Lambert*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.4, Plaintiffs-Appellees respectfully suggest that oral argument is not likely to assist this Court in adjudicating this matter. This matter involves a default judgment against a *pro se* litigant. Accordingly, the facts at issue in this case are largely undisputed. Moreover, the legal issues presented involve the application of settled law to settled facts. Most of these issues are straightforward and resolvable under the deferential abuse-of-discretion standard.

The briefs and record provide a complete basis for decision, and oral argument would not materially aid the Court's resolution of the issues. In addition, given Johnson's demonstrated tendency to inject conspiratorial and inflammatory allegations into these proceedings, oral argument would present an unnecessary risk of distraction from the merits.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... vii

INTRODUCTION ................................................................................. 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................. 1

    A.   Professional provocateur Charles Johnson runs an extortion racket. ................................................................................. 1

    B.   Point Bridge and Lambert sue Johnson, who chooses to proceed pro se after he rendered his counsel's representation "unreasonably difficult." ................................................. 3

    C.   Johnson flouts basic discovery requests. ........................ 4

    D.   Johnson defies the District Court's discovery order ..................... 5

    E.   Johnson continues violating the District Court's discovery orders, so the District Court strikes his pleadings. ....................... 7

    F.   Plaintiffs win a $72 million judgment against Johnson. ............ 11

SUMMARY OF ARGUMENT ............................................................ 21

ARGUMENT ....................................................................................... 25

    A.   The jury's exemplary damages award did not violate Johnson's due process rights. ....................................... 25

        1.  <u>Reprehensibility</u>: Johnson's shakedown scheme attempted to cause maximum harm through threats of arrest, investor intimidation, and false accusations of corruption and sexual assault. .......................................... 26

iv

2. <u>Ratio</u>: The ratio between the jury's punitive damages award and the harm suffered by Plaintiffs (1.6-to-1) is well within constitutional limits—Johnson never explains how he gets a ratio of 8.5-to-1. ........................................................ 31

3. <u>Comparable Penalties</u>: The jury's verdict is consistent with all statutory benchmarks. ........................................................ 34

4. A default judgment does not preclude a punitive damages award. ........................................................ 36

B. The District Court did not abuse its discretion in striking Johnson's pleadings and directing entry of default on liability. 37

1. Johnson willfully violated the district court's orders. .............. 39

2. Johnson had only himself to blame for his discovery violations. ................................................................... 40

3. Johnson's repeated refusal to comply with discovery orders substantially prejudiced Plaintiffs. ........................................... 41

4. Lesser sanctions could not achieve the desired deterrent effect. ........................................................................... 42

5. The sanction was proportionate and tailored. .......................... 43

C. Johnson forfeited any challenge to the District Court's discovery orders, including any "reporter's privilege." ................ 44

D. Johnson's vague conflict-of-interest allegation is forfeited and unsupported on the merits. .................................................. 49

E. The District Court did not abuse its discretion by disallowing Johnson's teleconference appearance. ......................................... 51

F.   The District Court was not required to hold a Rule 55(b)(2) hearing because the jury decided damages. ..................................53

G.   Johnson's conspiratorial allegations regarding litigation funding do not create a standing defect or any other basis for reversal. .......................................................................................56

CONCLUSION ..........................................................................................58

CERTIFICATE OF COMPLIANCE .......................................................60

CERTIFICATE OF SERVICE ................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Airlines, Inc.,*
972 F.2d 605 (5th Cir. 1992)............................................51

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996)................................................. *passim*

*Matter of Caton,*
157 F.3d 1026 (5th Cir. 1998)..........................................37

*In re Charles Johnson,*
No. 25-11393, Dkt. 2 ..................................................21

*Coughlin v. Lee,*
946 F.2d 1152 (5th Cir. 1991)..........................................45

*Crabtree v. Allstate Prop. & Cas. Ins. Co.,*
140 F.4th 623 (5th Cir. 2025) ......................................57, 58

*Crain v. City of Selma,*
952 F.3d 634 (5th Cir. 2020)...........................................38

*In re Dresser Indus., Inc.,*
972 F.2d 540 (5th Cir. 1992)...........................................51

*El Paso County v. Trump,*
982 F.3d 332 (5th Cir. 2020)...........................................57

*Eller v. Trans Union, LLC,*
739 F.3d 467 (10th Cir. 2013)..........................................52

*FDIC v. United States Fire Ins. Co.,*
50 F.3d 1304 (5th Cir. 1995)...........................................51

*Institute for Free Speech v. Johnson,*
148 F.4th 318 (5th Cir. 2025) .........................................57

*Johnson v. Clearview AI, Inc.*,
    No. 23 Civ. 2441, 2025 WL 1865220 (S.D.N.Y. Jul. 2, 2025)......... 9, 10

*JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*,
    936 F.3d 251 (5th Cir. 2019) ............................................................. 45

*Kelley v. Alpine Site Servs., Inc.*,
    110 F.4th 812 (5th Cir. 2024) ........................................................... 39

*L. Funder L.L.C. v. Munoz*,
    924 F.3d 753 (5th Cir. 2019).................................................... *passim*

*Lincoln v. Case*,
    340 F.3d 283 (5th Cir. 2003)............................................................. 34

*Miller v. Transamerican Press, Inc.*,
    621 F.2d 721 (5th Cir. 1980)...................................................... 48, 49

*Norris v. Causey*,
    869 F.3d 360 (5th Cir. 2017)............................................................. 46

*Pacific Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991).................................................................... 26, 34

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
    2020 WL 2950799 (S.D.N.Y. 2020) ................................................. 57

*Prideaux v. Tyson Foods, Inc.*,
    387 Fed. App'x 474, 479 (5th Cir. 2010) ........................................ 52

*Rollins v. Home Depot USA*,
    8 F.4th 393 (5th Cir. 2021) ............................................................... 46

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).................................................................. *passim*

*State Indus. Prods. Corp. v. Beta Tech., Inc.*,
    575 F.3d 450 (5th Cir. 2009)............................................................. 50

*Stelly v. Duriso*,
    982 F.3d 403 (5th Cir. 2020)....................................................... 2, 37

*TXO Production Corp. v. Alliance Resources Corp.*,
   509 U.S. 443 (1993) ....................................................................... 26, 34

*U.S. for Use of M-Co Constr., Inc. v. Shipco Gen., Inc.*,
   814 F.2d 1011 (5th Cir. 1987) ................................................... 37

*Watson v. Johnson Mobile Homes*,
   284 F.3d 568 (5th Cir. 2002) ................................... 26, 27, 33

*X Corp. v. Media Matters for America*,
   120 F.4th 190 (5th Cir. 2025) ................................................. 45

**Statutes**

18 U.S.C. § 1964(c) .................................................. *passim*

Tex. Civ. Prac. & Rem. Code §§ 41.003, 41.011 ............ 35

Tex. Civ. Prac. & Rem. Code § 41.008(b) ....................... 36

Tex. Civ. Prac. & Rem. Code § 41.008(b) ....................... 35

**Rules**

Fed. R. App. P. 32(a)(5) ................................................... 1

Fed. R. App. P. 32(a)(6) ................................................... 1

Fed. R. App. P. 32(a)(7)(B) ............................................. 1

Fed. R. App. P. 32(f) ....................................................... 1

Fed. R. App. P. 32(g)(1) ................................................. 1

Fed. R. Civ. P. 26(b)(1) ................................................. 44

Fed. R. Civ. P. 37 ........................................................... 44

Fed. R. Civ. P. 37(b)(2)(A) ........................................... 38

Fed. R. Civ. P. 43 ........................................................... 24

Fed. R. Civ. P. 43(a) ...................................................... 52

Fed. R. Civ. P. 55(b) .................................................... 54

Fed. R. Civ. P. 55(b)(2) ........................................ *passim*

FED. R. CIV. P. 55(b)(2)(B) ........................................ 54

Fed. R. Evid. 702 .................................................... 55, 56

Fed. R. Evid. 1006 ............................................ 14, 16, 55

**Other Authorities**

Charles Johnson, *Looks Like We're Going to the Fifth Circuit!*
(Sep. 4, 2025) ....................................................... 19

U.S. Const. amend. I .............................................. 48

# INTRODUCTION

Charles Johnson appeals a jury's damages verdict based on live testimony and documentary evidence admitted without a single objection. That verdict followed the District Court's entry of default on liability—entered after Johnson repeatedly defied and publicly mocked the court's discovery orders. He seeks to undo both outcomes, urging reversal of the sanction his misconduct triggered and challenging the jury trial despite never once objecting to how it was conducted. The District Court did not act precipitously. It warned Johnson, held multiple hearings, imposed lesser measures, and applied Fifth Circuit law before concluding that striking his pleadings was the only remaining means to preserve the integrity of the proceedings. The record shows the District Court exercised restraint and fidelity to the law, and the jury's damages verdict was anything but excessive in light of Johnson's reprehensible conduct.

There is no basis for reversal.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Whether the jury's punitive damages award was so "grossly excessive" under *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), that it violated Johnson's Due Process rights.

2.  Whether the District Court abused its discretion by striking Johnson's pleadings as a discovery sanction where Johnson was personally responsible for willful, repeated violations of court orders, refused to participate in discovery, and admitted to destroying evidence, and no lesser sanction would have deterred similar misconduct.

3.  Whether the District Court was required to disqualify Plaintiffs-Appellees' counsel where Johnson never moved for disqualification and instead relied on speculative, conspiracy-laced insinuations of a conflict.

4.  Whether Johnson forfeited any challenge to Plaintiffs' discovery requests where he refused to respond and never properly sought relief from the District Court.

5.  Whether the District Court abused its discretion by requiring Johnson to appear in person—rather than by teleconference—at a

discovery hearing where Johnson cited health and travel concerns but failed to substantiate them and where his prior conduct showed he was willing and able to travel when it suited him.

6.  Whether the District Court was required to hold a Rule 55(b)(2) evidentiary hearing or a *Daubert* hearing on damages where a jury determined damages based on documents and fact testimony, not court-adopted expert methodology.

7.  Whether Johnson can defeat Article III standing based on an unpreserved "litigation funding" theory, framed as a broader conspiracy narrative (including claims about a "Mormon-Chinese" plot and Elon Musk), when Plaintiffs seek redress for their own concrete injuries caused by Johnson.

# STATEMENT OF THE CASE[1]

## A. Professional provocateur Charles Johnson runs an extortion racket.

Charles Johnson is a well-known internet "troll." ROA.452. He built a public persona as an online provocateur, spinning stories about foreign infiltration of American government and business and accusing public figures of being spies or foreign "assets." ROA.436, 455. His mainstream conservative journalism career collapsed after he published "unsubstantiated pieces," and he shifted to posting "almost exclusively" on his own sites and forums such as Substack and Twitter/X. ROA.438. From there, Johnson denied the Holocaust and accused "hundreds of prominent politicians, businessmen, and activists" of being spies or assets of foreign governments. *Id.*

Around 2020, Johnson became a low-level confidential informant for the FBI. *Id.* He then touted those FBI contacts to inflate his supposed status as an intelligence asset, insinuating—and later fabricating—

---

[1] Because the District Court entered a default judgment against Johnson, we recite the factual allegations contained in their operative Complaint. ROA.437-508. "Because this is an appeal of a default judgment, [this Court] take[s] all well-pleaded factual allegations in [the] complaint as true." *Stelly v. Duriso*, 982 F.3d 403, 405 (5th Cir. 2020).

relationships with senior U.S. officials and agencies. *Id.* Even after he was no longer serving as an FBI informant, Johnson continued to deceptively describe himself as a "federal operative," often implying or explicitly stating that he spoke on behalf of law enforcement and intelligence agencies. *Id.*

Johnson joined forces with a co-conspirator, who likewise deceptively described himself as a CIA affiliate. *Id.* Together, they leveraged the false aura of federal authority to demand equity or favorable investment terms from targets in the defense and intelligence sectors—pairing promises of help with threats of sabotage and government reprisal if targets refused to play ball. ROA.437-40. Johnson himself branded the playbook the "Carrot" and the "Stick," ROA.464, and proudly described himself as "the new [Jeffrey] Epstein" in his ability to influence "compromised billionaires." ROA.464-65.

Johnson later attempted to repackage his Holocaust denial as some sort of sting "operation," while admitting to the denial. ROA.455. Yet he continued to weaponize the government ties he claimed as a shakedown tool—threatening "Internal Revenue Service audits," "Securities and Exchange Commission investigations," and other sanctions, and warning

that he was the "good cop" before worse consequences followed. ROA.439, 465-67.

## B. Point Bridge and Lambert sue Johnson, who chooses to proceed pro se after he rendered his counsel's representation "unreasonably difficult."

Plaintiffs-Appellees Point Bridge Capital LLC and Hal Lambert, Point Bridge's founder and principal, are among the many victims of Johnson's extortionate schemes. *See* ROA.419. Around 2020, Johnson made a relatively small investment through a special-purpose vehicle that Point Bridge formed in connection with a defense-sector company. Following this initial investment, Johnson demanded that Lambert sign over 50% of Point Bridge's overall business—claiming, among other things, that he was "with the Defense Department" and could ensure the company received no government contracts. *See* ROA.478-85,1629, 1632. Johnson also invoked his government ties to threaten an SEC investigation into Lambert and Point Bridge—or even have Lambert arrested if he didn't comply. *See* ROA.485-86, 1633-34. When Lambert refused to give in to this scheme, Johnson defamed him as "a front for a lot of the Russian activity," associated with the "Russian mob world," and a sexual predator. ROA.487-89, 514, 2703-04, 2714.

Point Bridge and Lambert sued Johnson under the Racketeer Influenced and Corrupt Organizations Act, claiming that his repeated extortionate demands constituted a pattern of racketeering activity. ROA.498-508. Lambert also individually sued Johnson for defamation based on Johnson's false statements about him.

Within a few months, Johnson's counsel moved to withdraw in part because Johnson rendered representation "unreasonably difficult." ROA.546-47. The District Court set a hearing on the motion "[b]ecause the withdraw[al] w[ould] leave [Johnson] to proceed pro se." ROA.551. At the hearing, the District Court granted the withdrawal upon Johnson's consent, then—on five separate occasions—encouraged Johnson to get a lawyer, ROA.1485, 1499, 1502-05, 1512, including by directing Johnson to the Tarrant County Bar Association and various law schools to find pro bono representation, ROA.1505, 1512. Johnson declined.

## C. Johnson flouts basic discovery requests.

In late January 2025, Plaintiffs served Johnson with requests for production relating to their civil RICO and defamation claims. ROA.604-12. Johnson's response was blatantly deficient. Despite regularly using numerous email, messaging, and social media accounts

and platforms, Johnson produced only a single PDF—containing repetitive copies of the same few emails—exported from a single email account and stripped of metadata and attachments. ROA.562. Plaintiffs moved to compel adequate discovery responses. ROA.552-78.

The District Court held a hearing on Plaintiffs' motion to compel, and the court displayed commendable patience despite Johnson's interruptions and conspiracy-tinged rants. The District Court again encouraged Johnson to obtain counsel. ROA.1485, 1499, 1502-07, 1512. It noted that despite "what is possibly emerging as a pattern" of Johnson disobeying litigation rules, it would "give [Johnson] some time to respond" to discovery. ROA.1491-92. But the District Court ultimately reminded Johnson that—pro se or not—he has "an obligation to comply with the rules" and that failure to do so can lead to contempt sanctions. ROA.1491. Accordingly, the court ordered Johnson to respond to Plaintiffs' requests for production. ROA.811-12.

## D. Johnson defies the District Court's discovery order.

Johnson did not comply with that order. Instead of responding to counsel's correspondence, he took to social media where he told his audience that it would be "an honor to pay sanctions for expressing my

viewpoint" and that he "wanted" the district judge "to be adverse [*sic*] to me to create the impression that it was me against the system." ROA.908. Losing the case, Johnson said, would make him "an American legend." *Id.*

The District Court set a show-cause hearing to address Johnson's noncompliance with the discovery order. ROA.902, 711. At the hearing, Johnson's only excuse for withholding documents was that the requests were overbroad. *See* ROA.1527. The District Court reminded him that he could object to discovery, but he still had "an obligation under the rules, pro se or not, to produce documents that are responsive. You don't just get to say, No, these are too broad, I'm not giving anything." ROA.1533. The District Court admonished Johnson to "pick up the phone and call [Plaintiffs' counsel] if you have a problem with a [discovery] request," but "[g]oing on your Substack or live chat and complaining doesn't really advance the ball." ROA.1534-35.

The District Court found that Johnson had defied his order and warned that contempt—including jail—was a potential consequence. ROA.1543, 1545. But the court told Johnson that he was "trying to be very kind and patient" in light of Johnson's pro se status. ROA.1544. So, the court merely ordered Johnson to turn over his devices to a third-party

discovery vendor to conduct a search for and produce responsive, nonprivileged documents. ROA.1545-46. The District Court made clear that this would be Johnson's "last warning." ROA.1544.

**E. Johnson continues violating the District Court's discovery orders, so the District Court strikes his pleadings.**

Having been expressly told this was his "last warning" and ordered to submit his devices to a third-party vendor for collection and review, Johnson did not heed that warning. He not only failed to hand his devices over to the third-party vendor, but also refused even to disclose his whereabouts to Plaintiffs' counsel to facilitate the device and document collection. ROA.1091-93. Johnson did, however, continue to post about the litigation on social media. ROA.1093-96.

This led to yet another show-cause hearing—the second in just over a month. *See* ROA.1140, 1583-1599. The District Court began by *sua sponte* appointing two Federal Public Defenders to represent Johnson "for any criminal … aspects of this case." ROA.1562. Johnson then admitted that he had not complied with the court's discovery order. ROA.1563-64. Although Johnson complained that he could not afford e-discovery, the District Court reprimanded him for "taking it upon

[him]self to make that decision without coming and telling" the court. ROA.1563-64.

The District Court then noted that it had "given [Johnson] every opportunity to comply with [its] orders" but that Johnson "continue[d] wasting [the court's] time" and did "nothing but flaunt the Court's orders." ROA.1570-72. Due to Johnson's repeated failure to obey its directives, the court considered the "best way to get [his] compliance" using "the least severe sanction" available. ROA.1572.

One possibility was to "throw[] [Johnson] in jail." *Id.* The District Court rejected that option, however, because jailing Johnson for contempt would simply fulfill his wish "to be seen as a martyr." *Id.* The court also noted that jailing Johnson could "thwart[] [its] colleague in New York's ability to enforce her sanctions orders against" him. ROA.1573. [2] That left the court "with no other choice than to strike

---

[2] Johnson's abusive behavior was not unique to the Northern District of Texas. For several years, Johnson engaged in similar shenanigans in federal litigation in New York relating to claims that he co-founded Clearview AI, a company for which Lambert served on the board. *See Johnson v. Clearview AI, Inc.*, No. 23 Civ. 2441, 2025 WL 1865220 (S.D.N.Y. Jul. 2, 2025). Fed up with Johnson's misconduct, the court fined him $10,000 and directed entry of default judgment against him. *Id.* at *7. "Throughout these proceedings," the court explained, Johnson "has openly and repeatedly flouted this Court's orders, including orders

[Johnson's] pleadings." *Id.* The court understood the gravity of this decision, stating:

> It got so bad, the first time in all of these years that I've been a judge, I've had to strike somebody's defenses. That is an extreme sanction. I felt it was necessary here due to his actions. I was left with no other choice. And I take very seriously the Fifth Circuit's admonishment that I consider the least severe sanction to correct the problem.

ROA.1730-31.

Following that bench ruling, the District Court issued a written order striking Johnson's pleadings. *See* ROA.1218-24. The District Court recognized the "heightened standard for litigation-ending sanctions," such as striking pleadings, and considered the four elements necessary to issue such an order. ROA.1220 (applying *L. Funder L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019)). It concluded that Johnson's conduct satisfied each of the necessary elements.

First, the District Court found that Johnson "acted willfully in his contempt for the Court's orders," pointing to the court's multiple warnings and Johnson's brazen social media posts lambasting the

---

regarding discovery," and "the record in this case is littered with [Johnson's] false statements, half-truths, and misrepresentations—to say nothing of his overtly racist tirades against his adversaries and their counsel." *Id.* at *1.

District Court and welcoming jail time. *Id.* It also noted Johnson's in-court statements that "he had simply made the decision not to comply" with discovery. ROA.1222.

Second, the court found that Johnson—rather than his counsel—was at fault. Despite having "two sets of counsel" for brief periods during the litigation, Johnson was self-represented for most of the case and had only himself to blame for his conduct. *Id.*

Third, Johnson's discovery violations "substantially prejudiced Plaintiffs." *Id.* Due to Johnson's conduct, "no cognizable discovery []occurred" since plaintiffs filed the lawsuit ten months earlier. ROA.1223. Additionally, "Johnson's unwillingness to participate in discovery or comply with this Court's orders [was] worsened by the fact that Johnson has admitted to the destruction of potentially responsive evidence," including Signal chats. *Id.* Thus, the court concluded, "not only have Plaintiffs been deprived of the ability to prepare their case but there is likely a substantial amount of evidence that has been destroyed." ROA.1223.

Finally, the court concluded that no lesser sanction "would substantially achieve the desired deterrent effect." *Id.* Neither the court's

previously imposed sanction ordering Johnson to pay the costs of a third-party discovery vendor nor the threat of contempt had any effect on Johnson's conduct. *Id.* Indeed, "it became evident to the Court that not only did its threat to place Johnson in the custody of the Marshal not [a]ffect [him], but he wished the Court arrest him so that he could portray it as further evidence of his self-proclaimed martyrdom." *Id.*

The next day, Johnson took to social media to mock the District Court's refusal to jail him: "In my more romantic delusions I think that there's a long history of people who were jailed leaving jail and becoming prime minister. Why not someone leaving prison and becoming president? And why not me?" Charles Johnson, *Notes on the State of Israel and Reflections on My Texas Court Case and Juneteenth* [*sic*] (June 19, 2025), tinyurl.com/yw84sec4.

## F. Plaintiffs win a $72 million judgment against Johnson.

After the District Court struck Johnson's pleadings, the parties proceeded to a jury trial on damages.

At trial, Plaintiffs called Lambert to testify about the damages he suffered as a result of Johnson's extortion. Lambert broadly described four categories of damages: (1) lost earned media, (2) reduced fee income

associated with diminished capital formation, (3) costs to address reputational harm, and (4) general damages. The exhibits underlying these figures were admitted without objection.

First, Lambert testified that earned media—unpaid national television exposure—played a central role in establishing credibility for him and Point Bridge and ultimately generated substantial revenue. He explained that regular appearances on national programs such as CNBC and CNN build credibility because viewers and prospective investors perceive television guests as having been "vetted." ROA.1622. He testified that he circulated those appearances to "thousands of people" and they were "an integral part of [his] business." *Id.*

Lambert further testified that earned media supported investor confidence and helped maintain Point Bridge's visibility in a competitive marketplace. ROA.1622-23. In his experience, national exposure reinforced trust with existing clients and introduced Point Bridge to prospective investors who might not otherwise encounter the firm.

According to Lambert's testimony, that media presence declined sharply after Johnson began "broadcasting his attacks" in August 2024. ROA.1648. He testified that his invitations and appearances on "big,

nationwide prime time" programs "basically fell off a cliff." *Id.* Lambert estimated a "90%" reduction in earned media on these programs. *Id.* Lambert also stated that nothing about his business changed during this time.

To quantify these changes, Plaintiffs displayed documentary materials and multiple Rule 1006 summary charts compiling and comparing earned media value for Lambert and Point Bridge across comparable seven-month periods before and after Johnson's attacks. ROA.1649-51, 2742-63, 2761-63. Lambert identified the underlying materials and the Rule 1006 charts, and he testified—based on his role at Point Bridge and his familiarity with how the firm tracks earned media—what the comparisons reflected. ROA.1650. Lambert explained that the summaries presented side-by-side figures for Lambert and Point Bridge and reflected a substantial decline in earned media value during the post-attack period. Over the seven-month period reflected in the summaries, the lost earned-media value totaled $6,794,706 for Lambert personally and $5,617,102 for Point Bridge. ROA.1651, 2761-63.

Johnson did not challenge Lambert's damages figures with contrary evidence, and he did not cross-examine Lambert on the specific figures.

Second, Lambert testified that he suffered economic harm through reduced fee income—specifically the asset-management fees Point Bridge earns in connection with special-purpose investment vehicles ("SPVs"). ROA.1648, 1652-53. He testified that Johnson's accusations harmed his and the firm's credibility with investors, reducing participation and the amount of capital raised, which in turn reduced the recurring fees Point Bridge earned. ROA.1652-54. He explained that these fees are calculated as a percentage of capital committed, so a decline in SPV fundraising directly reduced fee income.

In addition to Lambert's testimony, Plaintiffs presented expert testimony from former NSA General Counsel Stewart Baker (qualified and admitted without objection) addressing the business consequences of Johnson's statements accusing Lambert of ties to foreign money, mob influence, and other misconduct. ROA.1704-09. Baker testified that such allegations directly implicate national security concerns and can trigger scrutiny from government agencies and institutional investors. ROA.1704-08. He further testified that in the early-stage investment context—such as the SPV vehicles through which Plaintiffs raise capital—investment decisions depend heavily on trust and track record,

and that when reputational doubt is introduced through public accusations of foreign influence or wrongdoing, investors may choose to "take a pass." ROA.1707-08. Baker concluded that allegations of this nature predictably deter investment and reduce both the number and size of capital commitments. *Id.*

The jury heard testimony and saw documentary support comparing the capital Point Bridge's SPVs raised before and after Johnson's attacks. ROA.1652-53, 2840-43. Lambert described the comparison and testified that, before the attacks, Point Bridge had raised approximately $43.9 million. *Id.* After the attacks, however, the comparable amount was approximately $5.5 million, a decline of roughly $38 million, which was based on both Lambert's testimony and documents admitted into evidence. *Id.* Lambert testified that, in his view, the decline was not driven by broader economic or industry trends. ROA.1653.

Lambert also testified that he calculated the fee impact by applying a 1% management fee to the approximately $38 million decline, yielding about $385,000 per year and approximately $1.6 million over four years. ROA.1653-54. Documentary evidence reflecting those amounts was also introduced. ROA.2840-43.

Johnson presented no competing damages evidence to challenge the approximately $385,000 annual loss or the $1.6 million loss over four years.

Third, Lambert testified that he needed to incur significant costs to address the reputational harm Johnson caused. ROA.1657. He explained that the allegations remained readily accessible online and influenced how prospective contacts reacted when they searched his name. ROA.1655.

Lambert consulted a public relations firm about rehabilitating both his and Point Bridge's reputation. ROA.1655-57. He testified that the anticipated cost was $600,000 for him personally and $640,000 for Point Bridge, which the documentary evidence also supported. ROA.1657, 2593-94. Lambert further testified that although he intended to incur those rehabilitation costs, he deferred doing so while Johnson's defamatory campaign continued unabated. ROA.1656. Johnson did not cross-examine Lambert on these amounts or offer contrary evidence.

Fourth, Lambert testified that Johnson's online campaign took a toll that transcended mere financial loss for both himself and Point Bridge. He detailed the personal damage due to Johnson's accusations of

serious criminal conduct, including felonies, and publicly linking him to illicit money, including "Chinese and Russian money and mafia money." ROA.1658-59. Lambert testified that the attacks were "targeted" and "calculated," and he characterized the campaign as "a character assassination." ROA.1659.

The experience was "devastating," particularly after "30 years" spent building his reputation, and that it deeply affected his family, including because Lambert had discussed the uncomfortable nature of Johnson's false accusations with his wife and daughters. ROA.1658-59.

After the damages trial, the jury returned a verdict awarding substantial damages. ROA.1356-62, 1464-65. It awarded $7,500,000 in RICO damages to Lambert and $8,000,000 in RICO damages to Point Bridge Capital. ROA.1357, 1464. The judgment reflects that these RICO damages were trebled under 18 U.S.C. § 1964(c), resulting in $22,500,000 for Lambert and $24,000,000 for Point Bridge. ROA.1464. The jury also awarded $9,500,000 in damages to Lambert for Johnson's defamatory statements. ROA.1359. Finally, the jury awarded Lambert $15,000,000 in exemplary damages on the defamation claim. ROA.1361, 1465.

The Court entered final judgment awarding $47,000,000 to Lambert and $24,000,000 to Point Bridge, and it awarded Plaintiffs $1,033,130 in attorneys' fees and costs, bringing the total judgment to over $72 million. ROA.1464-65.

Johnson now appeals that judgment. After paying the docketing fee, Johnson bragged on his Substack that "[n]ot too many people get to go to the Fifth Circuit pro se," that he "took the LSAT and got a ridiculous high score," and that he was "representing [him]self because what's more American than taking on criminals by yourself? Call me John Wayne, why don't you?" Charles Johnson, *Looks Like We're Going to the Fifth Circuit!* (Sep. 4, 2025), tinyurl.com/3yadb9te.

## G. Johnson's continued refusal to provide post-judgment discovery results in a contempt order, an extended incarceration, and an unsuccessful mandamus petition.

Following Johnson's appeal, Plaintiffs initiated standard post-judgment discovery to identify Johnson's assets, which he ignored. ROA.3084-85, 3658. Plaintiffs also sought relief because Johnson attempted to sell over $1 million in stock holdings in plain violation of the District Court's asset-preservation order. ROA.2945-48. Upon learning of Johnson's continued discovery evasion and efforts to hide

assets, the District Court ordered Johnson's appearance at a deposition. ROA.3188, 3666.

Johnson physically appeared for a deposition at the courthouse but—in violation of the District Court's order—served no interrogatory responses, produced no documents, and announced at the outset that he would provide "not complete information." ROA.3221. Johnson stayed true to his word. Over the course of five hours, Johnson engaged in obvious evasions and outright refusals. The following excerpt is of a piece with the rest of the transcript:

> Q: Testifying here today under oath, will you identify all those accounts [that Johnson claimed were set up in his name]?
>
> A: No, I will not.
>
> Q: You refuse to?
>
> A: I refuse to because I've not been given permission to do so.
>
> Q: Will you identify who would be the person that would give you permission to identify that information?
>
> A: I will not.
>
> Q: You're aware that Judge Pittman previously disagreed that you can refuse to answer these type of questions?
>
> A: The judge can do whatever he sees fit. But I will not participate in that.
>
> Q: Will you go to jail rather than identify those people?

A: No, I won't end up going to jail. But that's funny.

Q: Would you rather?

A: It would be great if I went to jail because I would get the mug shot and that's what I want. But unfortunately, I will not end up going to jail. Regret—regrettably, I should say. More likely than not what will happen is Judge Pittman will push it into the future and then I'll have to come back to Fort Worth and eat a bunch of food I shouldn't and then fly back.

ROA.3223.

Due to Johnson's continued failure to engage in the discovery process (and after offering him one last chance to provide adequate responses), the District Court finally held Johnson in civil contempt on November 20, 2025, and ordered his incarceration. ROA.3528-30, 3716.

During his time in Johnson County Jail, Johnson filed two motions in the Fifth Circuit—a "Motion for Bail Pending Appeal," ECF 47, and a mandamus petition, *In re Charles Johnson*, No. 25-11393, Dkt. 2. This Court summarily denied both motions.

Although the District Court recognized that Johnson "ha[d] not purged himself of contempt," it released Johnson from custody on February 5, 2026. *Point Bridge v. Johnson*, 4:24-cv-0988, ECF 200 at 1.

## SUMMARY OF ARGUMENT

After months of defiance and delay, Johnson triggered the District Court's contempt and sanctions orders. He now seeks an appellate reset by asking this Court to excuse his noncompliance and reverse the District Court's measured efforts to vindicate its authority. Johnson refused to participate in discovery, disregarded court orders, and openly bragged to his online followers about treating this litigation as spectacle. Only after giving Johnson every conceivable opportunity to comply—deadlines, warnings, explanations, and multiple show-cause hearings—did the District Court finally impose the one sanction his conduct left available. Johnson cannot now turn his obstinance into reversible error, and nothing in this briefing otherwise undermines the jury's well-supported verdict.

*First*, the jury's exemplary damages award is well within constitutional bounds. Johnson's extortion campaign was not careless or impulsive. It was a calculated, strategic operation built on fabricated threats of arrest, national-security smears, and graphic accusations of sexual misconduct uniquely tailored to destroy Plaintiffs' business and reputation in sectors where trust is paramount. The Supreme Court has

long instructed that the reprehensibility of the defendant's actions is the "most important" indicator of constitutionally permissible damages, and Johnson's conduct sits at the far end of that scale. Moreover, the ratio of punitive damages to actual harm here—1.6-to-1—is exactly the sort of single-digit figure the Court has described as presumptively valid.

*Second*, Johnson's challenge to the District Court's order striking his pleadings fails under this Court's framework for litigation-ending sanctions. After Plaintiffs served targeted discovery, Johnson provided facially deficient responses. The District Court ordered compliance, warned that pro se status does not excuse adherence to the Rules, and convened a show-cause hearing. When Johnson *still* refused to obey, the court adopted a less severe mechanism—a neutral-vendor review of Johnson's devices—to identify and produce responsive, nonprivileged materials. Johnson refused again, this time openly admitting to both noncompliance and destruction of potentially responsive communications. Only after all this did the District Court make explicit findings of willfulness, personal responsibility, substantial prejudice, and the futility of lesser sanctions. Fifth Circuit precedent forecloses Johnson's claim that striking his pleadings was an abuse of discretion.

*Third*, Johnson contends that the District Court erred by requiring him to appear in person at a discovery hearing and invokes Rule 43 as if it entitled him to remote participation. Rule 43 governs testimony at trial, not attendance at pretrial discovery proceedings. The District Court required a physician-supported showing for remote participation. Johnson did not provide one and ultimately appeared in person. He identifies no prejudice resulting from that ruling. Case-management decisions of this sort fall well within the District Court's discretion.

*Fourth*, Johnson invokes Rule 55(b)(2) on the premise that the District Court entered damages by default and therefore had to apply those procedures. That characterization does not accurately describe how damages were determined. The District Court did not award damages on a paper default record. It conducted a jury trial, and the *jury* determined damages based on documentary evidence and fact testimony, including Lambert's testimony and other witnesses presented without objection. Rule 55(b)(2) therefore does not fit the posture of this case. Similarly, Johnson invokes *Daubert* for the first time on appeal. Even if this Court elects to review this forfeited argument, there is no basis for reversal because expert testimony was not necessary to the jury's verdict, which

Plaintiffs established through fact-witness testimony and documentary evidence (again, to which Johnson did not object).

*Finally*, Johnson asserts without any substantiated basis that Plaintiffs face standing issues due to purported "litigation funding" and "champerty" issues. He folds this claim into a broader conspiracy narrative, accusing this case of arising from a "Mormon-Chinese" plot involving Elon Musk. But this litigation has never involved any such issues. Even if it did, they have no bearing on a constitutional standing inquiry, which turns on injury, traceability, and redressability. Plaintiffs identified reputational and economic harm caused by Johnson, and the judgment at least partially redresses those harms. Plaintiffs therefore had (and continue to have) standing regardless of Johnson's conspiratorial framing.

At bottom, Johnson's appeal attempts to transform his calculated noncompliance into reversible error. The record tells a different story: the District Court acted with unusual patience, imposed a sanction only after every lesser option failed, and then presided over a fair jury trial on damages.

The judgment should be affirmed in full.

# ARGUMENT

## A. The jury's exemplary damages award did not violate Johnson's due process rights.

This Court reviews "de novo a challenge to the constitutionality of the size of a punitive damages award." *Watson v. Johnson Mobile Homes*, 284 F.3d 568, 572 (5th Cir. 2002).

Juries have wide latitude to issue punitive damages awards. They are constrained only by the "general concerns of reasonableness" imposed under the Supreme Court's Fourteenth (or, by logical extension, Fifth) Amendment jurisprudence. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991). To fail constitutional scrutiny, a punitive damages award must therefore be "so grossly excessive as to violate the substantive component of the Due Process Clause." *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458 (1993) (internal quotations omitted).

"In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575-86 [] (1996), the Supreme Court articulated three factors that courts should consider in determining whether an award of punitive damages is constitutionally excessive." *Watson*, 284 F.3d at 572. Those factors are: "[1] the defendant's reprehensibility or culpability; [2] the relationship between the penalty and the harm to the victim caused by the defendant's

actions; and [3] the sanctions imposed in other cases for comparable misconduct." *Id.* (internal quotation marks omitted).

The jury's punitive damages award fits easily within these constitutional bounds.

**1. Reprehensibility: Johnson's shakedown scheme attempted to cause maximum harm through threats of arrest, investor intimidation, and false accusations of corruption and sexual assault.**

Reprehensibility is the "most important indicium" in the constitutional analysis. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

Johnson asserts that his conduct ranks "low" on that scale because, in his view, Plaintiffs suffered only "economic" harm with no health-or-safety risk, were not financially vulnerable, and the District Court made no "merits findings" once his defenses were struck. Appellant's Brief ("Br.") at 10. That description does not match the record the jury heard.

While falsely posing as a federal operative, Johnson pursued what the record describes as a "carrot-and-stick approach"—one that Lambert likened to "a mob shakedown." ROA.439, 1630, 1751. Johnson demanded that Point Bridge Capital give him "50%" of its investment business going

forward. ROA.1629. He offered "nothing" in return. ROA.1630. When Lambert refused, Johnson escalated. Lambert testified that Johnson began contacting him relentlessly—calls and texts at all hours—until Lambert blocked Johnson's number. ROA.1630-31.

Johnson coupled this pressure with threats of prosecution and jail time, invoking "law enforcement" to convey that he could make Lambert's life—and family—collapse. ROA.1633-34. As Lambert put it, Johnson was "basically trying to say I'm going to have you arrested and your family is going to be destroyed if I don't—if you don't do what I want." ROA.1633-34. Johnson even put the threat in writing: "I've already been in touch with law enforcement about your behavior," and he was giving Lambert "a chance to do the right thing." ROA.1634. Lambert understood the message exactly as intended—"if I don't do what he wants, he's going to have me arrested and put in jail"—to force him to hand over "50% of my business." ROA.1633-34.

When Lambert refused to hand over half the business, Johnson escalated yet again. He emailed roughly forty of Point Bridge Capital's and Lambert's most important investors and limited partners, falsely alleging that Lambert had engaged in "disqualifying" misconduct

"including towards female founders," and adding: "I've spoken to law enforcement also" about Lambert. ROA.1636-38. Lambert testified the email was "devastating," professionally and personally. ROA.1636-38. An accusation that someone in Lambert's position engaged in "disqualifying" conduct and that "law enforcement" has been contacted throws up "red flags" and threatens Lambert's ability to raise money going forward—which indeed happened. ROA.1636-38. Lambert described the immediate impact in stark terms: he felt "sick to [his] stomach," and "literally . . . wanted to throw up." ROA.1639.

Undeterred, Johnson escalated again. After filing two lawsuits against Lambert that were summarily dismissed, he pivoted to a public defamation campaign aimed at inflicting maximum damage on Lambert's business reputation and personal life—accusing Lambert of sexual assault and criminal conduct tied to adversaries of the United States. In public broadcasts to his active social-media following, Johnson accused Lambert of being a "front for a lot of the Russian activity and a lot of the compromised cash" and "maybe a front for the cartels." ROA.487-89, 514, 2703-04, 2714. He paired those accusations with graphic, fabricated claims of sexual misconduct. ROA.487, 2702, 2714.

Plaintiffs' expert Stewart Baker—former General Counsel of the National Security Agency—explained why Johnson's accusations were tailor-made to inflict maximum harm in the national-security investing world. Baker testified that Johnson's public claims "of misconduct . . . would set off alarms in government agencies, and among institutional investors, and it would definitely hurt Mr. Lambert's business." ROA.1709. He added that accusations tying an investment fund to "dirty Russian money" are uniquely toxic in that ecosystem because they "point directly at national security concerns" and are meant to trigger scrutiny and investigation. ROA.1703-04. Baker likewise testified that, in the "Me-Too" era, sexual-assault allegations "guarantee a scandal" and "guarantee hostile press coverage." ROA.1706. And because Johnson made these charges "so loudly and on the record," Baker explained that listeners tend to assume there must be "some basis" for them. ROA.1704. The resulting harm is difficult to redress because the government "doesn't have time or an interest" in adjudicating private disputes or publicly clearing someone's name, leaving targets with little meaningful way to undo the reputational damage—making it "very hard to recover from" Johnson's defamatory statements. ROA.1708-09.

Johnson fails to explain why, based on this record, the reprehensibility component of the punitive damages award against him is in any way deficient. His brief on appeal consists of little more than conclusory statements to the effect that his "reprehensibility is low," and arithmetic errors about the damages ratio that the jury's award on Lambert's defamation claim represents. *See* Br. 10. To the extent that Johnson makes *any* comprehensible argument, it is that the absence of physical harm, indifference to physical health or safety, or financial vulnerability on the part of his victim are *per se* sufficient to take his behavior the guideposts laid down by the *Gore/State Farm* framework. *See id.*

But Johnson's argument fails even when framed in that charitable light. The *Gore/State Farm* framework explicitly lists "repeated actions" and "intentional malice, trickery, or deceit" as two independent components of reprehensibility for these purposes. *State Farm*, 538 U.S. at 419. And on this record, there is no doubt that Johnson's reprehensible conduct was repeated, deceitful, intentional, and targeted—designed to coerce Plaintiffs and then poison Point Bridge and Lambert with the very audiences that matter most, including investors and the national-

security contracting community. While the Supreme Court has hesitatingly cautioned that the "existence of any *one* of" the *Gore/State Farm* factors, standing alone, "*may* not be sufficient to sustain a punitive damages award," *id* (emphasis added), Johnson cites no authority for the proposition that even the flagrant and unambiguous presence of *two* will fail to do so.

If the Supreme Court had wanted to confine punitive damages to physical torts or actions that risk them, it could easily have created such a rule. It did not do so, however. And in the absence of any further substantive argument from Johnson as to why his relentless and malicious campaign of professional ruination falls outside the category of "reprehensible" behaviors that can allowably be deterred via punitive damages, this Court should affirm the award in this case as easily within the range of reasonable outcomes that the *Gore/State Farm* framework is designed to permit.

2. <u>Ratio</u>: **The ratio between the jury's punitive damages award and the harm suffered by Plaintiffs (1.6-to-1) is well within constitutional limits—Johnson never explains how he gets a ratio of 8.5-to-1.**

The second factor—"the relationship between the penalty and the harm to the victim caused by the defendant's actions"—strongly supports

upholding the jury's exemplary award. *Watson*, 284 F.3d at 572. Punitive damages awards are constitutionally sound when they bear "a reasonable relationship to compensatory damages." *Gore*, 517 U.S. at 580 (internal quotation marks omitted).

Johnson's ratio argument rests on numbers that do not appear anywhere in the verdict. He asserts that the award reflects an "8.5:1" punitive-to-compensatory ratio. Br. 10. But he never shows how he got there—no calculation, no record cite, no explanation.

The jury awarded $9.5 million in compensatory damages on Lambert's defamation claim (Question 3) and $15 million in exemplary damages (Question 4). ROA.1359-61, 1464-65. That produces a ratio of roughly 1.6:1—well within the "single-digit" range the Supreme Court has repeatedly described as likely to comport with due process. *State Farm*, 538 U.S. at 425.[3]

Johnson's fallback is to recast *State Farm* as imposing a near 1:1 "constitutional limit" whenever compensatory damages are "substantial."

---

[3] Even if one accepts Johnson's own assertion elsewhere in his brief that the total compensatory damages were "$21 million," the $15 million punitive award would result in a ratio of 0.7 to 1—an exemplary award *lower* than the compensatory award. Plaintiffs-Appellees cannot discern how Johnson arrives at an "8.5:1" ratio.

Br. 9. That is not the law. The Court has been "reluctant to identify concrete constitutional limits on the ratio," and it emphasized that the inquiry is contextual, not mechanical. *State Farm* 538 U.S. at 424-25. Indeed, the Supreme Court has blessed numerous punitive damages awards with ratios far greater than the present case. *See, e.g.*, *Haslip*, 499 U.S. at 23-24 (upholding a punitive damages award of more than four times the amount of compensatory damages); *TXO Production Corp.*, 509 U.S. at 471-72 (Scalia, J., concurring) (upholding a punitive damages award of approximately "10-to-1 between punitive damages and . . . *potential harm*"); *Gore*, 517 U.S. at 581 (favorably citing *Haslip*'s 4-to-1 ratio). The Fifth Circuit is in accord and has approved of ratios even higher than 10-to-1. *See Lincoln v. Case*, 340 F.3d 283, 294-95 (5th Cir. 2003) (approving a roughly 110-to-1 ratio).

Under any measure, therefore, the jury's punitive damages award falls easily within acceptable constitutional limits. *See State Farm*, 538 U.S. at 425 (contrasting "[s]ingle-digit multipliers" with "ratios in range of 500 to 1").

3.  **Comparable Penalties: The jury's verdict is consistent with all statutory benchmarks.**

The third guidepost looks to damages awards for comparable misconduct. *See Gore*, 517 U.S. at 574-75. In a passing reference with no analysis, Johnson cites Chapter 41 of the Texas Civil Practice and Remedies Code as a supposed "benchmark," apparently hinting at the statutory cap on exemplary damages under state law. Br. 10. But he never explains how the cap applies here, and the verdict numbers do not support his insinuation. Simple arithmetic shows that the verdict is wholly consistent with Texas law.

Texas Civil Practice and Remedies Code § 41.008(b) provides, in relevant part, that "[e]xemplary damages awarded against a defendant may not exceed . . . two times the amount of economic damages; plus [] an amount equal to any noneconomic damages found by the jury, not to exceed $750,000." *Id.* (b)(1)(A)-(B).

To start, the jury was instructed under Chapter 41 using the Texas Pattern Jury Charge and the statute's own language. The court told the jury it could award exemplary damages only on clear-and-convincing proof of "fraud, malice, or gross negligence." ROA.1359, 1710-11; TEX. CIV. PRAC. & REM. CODE §§ 41.003, 41.011. When the court asked whether he

had any objections to the proposed charge, he answered: "none whatsoever." ROA.1767-68. Having accepted the Chapter 41 instructions and submissions at trial, he cannot now cite Chapter 41 in the abstract without identifying any error in the charge, the questions submitted, or the jury's answers.

On the merits, the verdict also fits Chapter 41's cap without any reduction. The jury found $7.5 million in economic (special) damages under RICO in Question 1. ROA.1357, 1728. It then awarded $9.5 million on Lambert's defamation claim in Question 3—consistent with $7.5 million in special damages plus $2 million in general damages, as the evidence supported. ROA.1359, 1636-39. The jury awarded $15 million in exemplary damages. ROA.1361, 1728. That is exactly two times the $7.5 million economic finding, which is consistent with Chapter 41. TEX. CIV. PRAC. & REM. CODE § 41.008(b).

And if Johnson means to press a statutory-cap issue, he did not preserve it. He requested no cap-related predicate submissions, lodged no charge objection, and filed no post-judgment motion invoking § 41.008. ROA.1767-68. He cannot raise a new Chapter 41 theory for the first time

on appeal and ask this Court to redo the jury's exemplary-damages determination.

## 4. A default judgment does not preclude a punitive damages award.

Without any explanation, Johnson argues there were no "merits findings" of repeated or malicious conduct "because the court struck defenses and entered default." Br. 8. That argument would make punitive damages unavailable in any case where a defendant defaults or has defenses struck. That is not the law. In default posture, well-pleaded allegations are taken as true. *See Stelly*, 982 F.3d at 405; *U.S. for Use of M-Co Constr., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987). And courts have affirmed punitive awards in that setting. *See, e.g.*, *Matter of Caton*, 157 F.3d 1026 (5th Cir. 1998).

More fundamentally, the jury made the necessary predicate findings to award exemplary damages. Under Chapter 41—and consistent with the applicable Texas Pattern Jury Charge—the jury was instructed that it could award exemplary damages only if it found by clear and convincing evidence that the harm Johnson caused Lambert resulted from "fraud, malice, or gross negligence." ROA.1359-60. The jury

so found. ROA.1360. Johnson's "no findings" premise is therefore factually wrong.

Moreover, the record is replete with Johnson's malicious conduct. As explained in detail above, the jury heard testimony and evidence about his extortionate shakedown, the threats, the investor targeting, the escalating defamation, and the consequences that Point Bridge and Lambert faced as a result of Johnson's conduct. ROA.1629-34, 1641-45, 1704-09. Johnson cannot turn his litigation misconduct into an appellate advantage by (erroneously) claiming the record is thin because his defenses were struck.

**B.    The District Court did not abuse its discretion in striking Johnson's pleadings and directing entry of default on liability.**

This Court reviews discovery sanctions for abuse of discretion. *L. Funder LLC v. Munoz*, 924 F.3d 753, 758-59 (5th Cir. 2019). The District Court's factual findings are reviewed for clear error. *Crain v. City of Selma*, 952 F.3d 634, 638 (5th Cir. 2020).

Federal Rule of Civil Procedure 37(b)(2)(A) allows a district court to order "litigation-ending" sanctions, such as striking a party's pleadings. *Munoz*, 924 F.3d at 758-59. To impose litigation-ending sanctions, a

district court must make four findings beyond those that would justify a lesser sanction:

> (1) the discovery violation was committed willfully or in bad faith; (2) the client, rather than counsel, is responsible for the violation; (3) the violation substantially prejudiced the opposing party; and (4) a lesser sanction would not substantially achieve the desired deterrent effect.

*Munoz*, 924 F.3d at 759 (citation modified).

Johnson claims—without support—that the District Court struck his pleadings "without making the necessary findings" and "without first exhausting lesser sanctions." Br. 11, 14. The order striking Johnson's pleadings plainly refutes that argument on its face.

The District Court discussed each *Muñoz* factor and explained at length why lesser sanctions would not suffice. The court also acknowledged the seriousness of striking pleadings, stating

> It got so bad, the first time in all of these years that I've been a judge, I've had to strike somebody's defenses. That is an extreme sanction. I felt it was necessary here due to his actions. I was left with no other choice. And I take very seriously the Fifth Circuit's admonishment that I consider the least severe sanction to correct the problem.

ROA.1730.

Johnson does not engage the District Court's reasoning. He recites boilerplate standards, announces a conclusion, and never explains why

the District Court abused its discretion or why its analysis is inadequate. This Court does not treat such perfunctory, shotgun briefing as sufficient to put an issue in real dispute on appeal. *See Kelley v. Alpine Site Servs., Inc.*, 110 F.4th 812, 817 (5th Cir. 2024) ("Appellants are required to present an argument and citations to supporting authority for each contention in their brief . . . [and] must provide meaningful analyses for each issue and present more than conclusory allusions as to their arguments for the issues to be properly raised on appeal."). Johnson has thus forfeited his arguments on this score.

Even setting forfeiture aside, however, affirmance is warranted because the District Court's order squarely addressed all four *Muñoz* factors.

## 1. Johnson willfully violated the district court's orders.

Johnson attempts to recast his conduct as routine "discovery disputes," Br. 11, but the record reflects deliberate defiance—repeated warnings, unmistakable notice of potential imprisonment and/or default, and continued noncompliance.

The District Court did not infer willfulness from a single missed deadline. It relied on Johnson's repeated conduct and his own admissions,

in concluding that he had "no intention of complying" and had "simply made the decision not to comply." ROA.1222. Johnson defied the District Court's orders even after the court warned that further defiance would result in confinement for civil contempt. *See* ROA.1491-94.

Against that backdrop, Johnson's public conduct only confirmed that his defiance of the District Court orders was willful. The order specifically cites Johnson's June 11 and June 14, 2025, Substack postings as evidence of his purposeful noncompliance in the face of escalating warnings—opting instead to "mock[] them on social media" to his active following. ROA.1221.

The point is straightforward: Johnson was repeatedly informed— again and again—of what the court required. He was warned—again and again—what would happen if he refused, including arrest and confinement. He refused anyway. That is willfulness, not confusion.

## 2. Johnson had only himself to blame for his discovery violations.

The District Court expressly found the violations were Johnson's responsibility, not counsel's. Although he had cycled through multiple sets of counsel earlier in the case, Johnson was pro se during the operative period. The order therefore rightly concluded that "Johnson,

rather than counsel, is responsible." ROA.1222. That finding forecloses any argument that the court disregarded the client-versus-counsel distinction.

### 3. Johnson's repeated refusal to comply with discovery orders substantially prejudiced Plaintiffs.

The District Court expressly found Johnson's behavior caused substantial prejudice to Plaintiffs, emphasizing that "no cognizable discovery ha[d] occurred" because of Johnson's refusal to participate and comply. ROA.1223. Its prejudice finding was not limited to the costs of that substantial delay, however. The court also determined that Johnson's conduct had likely resulted in spoliation: Johnson admitted that Signal messages are automatically deleted after "a month or two months" and that he took "no steps" to preserve them, making it "likely [that] a substantial amount of evidence … ha[d] been destroyed." ROA.1034, 1223.

The court further noted that Plaintiffs were forced to pay for and attend court-ordered mediation without the benefit of discovery. ROA.1223. That is prejudice in its most concrete form: discovery stymied, evidence jeopardized (and likely lost), and the case pushed toward trial on an asymmetric record.

### 4. Lesser sanctions could not achieve the desired deterrent effect.

Finally, the District Court found that "no lesser sanction. . . would substantially achieve the desired deterrent effect." ROA.1223. It had previously warned that if Johnson failed to comply, he "w[ould] be arrested" by the U.S. Marshal and held until he complied and purged contempt. ROA.1086, 1219. Even then, Johnson did not comply. The hearing and trial transcripts reflect this progression of repeated admonitions, specific warnings about contempt, and the court's express effort to select the least severe sanction that could work. ROA.1491-94, 1543-44, 1569-73.

The District Court also explained why incarcerating Johnson for civil contempt was not a realistic "lesser" alternative on this record. It "became evident" to the District Court that Johnson wanted to be jailed to cast himself as a "martyr[]." ROA.1223. Faced with the prospect of confining Johnson for an extended period without compliance and that Johnson would in fact *benefit* from a contempt finding, the District Court concluded that no lesser sanction would work and struck the pleadings to stop the obstruction and move the case forward.

Subsequent events confirmed that no lesser sanction would have worked. After trial, Johnson was incarcerated for roughly three months—from November 20, 2025, to February 2026—for refusing to comply with the court's post-judgment discovery orders. Those docketed proceedings reinforce the District Court's point here: lesser measures—including contempt warnings and coercive orders—did not produce compliance in this litigation.

## 5. The sanction was proportionate and tailored.

After striking Johnson's pleadings and directing default on liability, the District Court set a full jury trial on damages, where Johnson could cross-examine Plaintiffs' witnesses and challenge their proof. Johnson did not call any witnesses or make any offer of proof. The trial transcript also reflects the court's continuing restraint in dealing with a pro se litigant, including efforts to guide Johnson toward questions that tested Plaintiffs' damages case—telling him it was "throw[ing] you a lifeline." ROA.1677, 1682. That sequence underscores the court's careful consideration of lesser measures and proportionality. In short, the District Court's sanction was measured because it gave Johnson repeated

opportunities to comply before striking his pleadings, and even after doing so it structured the case to ensure a fair, adversarial damages trial.

Johnson has forfeited his arguments on this score. But his appeal would fail even if he had not. Because the District Court properly applied the *Muñoz* framework and acted well within its broad discretion under Rule 37, there is no abuse of discretion and nothing for this Court to reverse.

**C.    Johnson forfeited any challenge to the District Court's discovery orders, including any "reporter's privilege."**

Under Rule 26(b)(1), a party may obtain "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). "Proportionality is determined by 'considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 936 F.3d 251, 259 (5th Cir. 2019) (quoting FED. R. CIV. P. 26(b)(1)).

District courts are "customarily accorded wide discretion in handling discovery matters," *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991), and this Court will "generally affirm unless a ruling on discovery is arbitrary or clearly unreasonable," *X Corp. v. Media Matters for America*, 120 F.4th 190, 197 (5th Cir. 2025) (internal quotation marks omitted).

Johnson claims that "the discovery process was used to harass and intimidate" him. Br. 13 (citation modified). He asserts the District Court erred by compelling production of documents that allegedly "swept in press-related communications and source materials without applying the qualified privilege, proportionality, or certification requirements." Br. 13-14. His objection is also difficult to pin down because he never clarifies whether he is invoking a reporter's privilege as a journalist resisting disclosure of a confidential source, or whether he is claiming protection as the alleged source and seeking to shield his own communications from routine discovery.

Johnson forfeited this argument by failing to identify, with any specificity, which discovery request or order he challenges. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an

argument by . . . failing to adequately brief the argument on appeal."). Johnson has thus forfeited this argument twice over. On appeal, he at most gestures broadly to Plaintiffs' first motion to compel, ROA.552-78; Br. 13.

But this does not adequately alert Plaintiffs or this Court to which discovery request Johnson finds overbroad or abusive. Nor does it explain what role he is claiming for privilege purposes, whether he was acting as a reporter, an alleged source, or something else. *See Norris v. Causey*, 869 F.3d 360, 373 n.10 (5th Cir. 2017) ("Because [appellant] neither advances an argument challenging the district court's [order] nor offers case law in support of it, we hold that he forfeited any such claim.").

And Johnson also forfeited any such claim by failing to raise it in the District Court. He did not identify any specific request to which the privilege applied, serve written objections, or seek a protective order or move to quash.

Indeed, when Johnson complained about being compelled to produce documents, the District Court told him, directly and on the record, exactly how to address any discovery he believed was overbroad or harassing:

> [Y]ou need to object to it, file the appropriate motion for protective order or motion to quash. But you continue to have an obligation under the rules, pro se or not, to produce documents that are responsive. You don't just get to say, No, these are too broad, I'm not giving anything. And then the Judge can decide whether the remaining requests violate the rules; but you have to have a motion— motion to quash, motion for protective order."

ROA.1534.

Johnson ignored the District Court's instructions. He never filed the motion, never produced the responsive discovery the Rules required, and now—for the first time in this case—attempts to rebrand his refusal as "harassment" on appeal. Instead of pursuing basic steps the Court laid out, he took his complaints to his Substack subscribers—the very approach the District Court warned against. ROA.1534 ("And that means you need to pick up the phone and call [Plaintiffs' counsel] if you have a problem with a request. Going on your Substack or live chat and complaining doesn't really advance the ball."). The forfeiture doctrine exists to prevent precisely this circumstance.

Even if this Court were to consider Johnson's argument that Plaintiffs' discovery requests implicated a "qualified reporter's privilege," that argument fails on the merits. The Fifth Circuit's doctrine—if it

applies at all—recognizes, at most, a qualified protection narrowly focused on compelled disclosure of confidential sources. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir. 1980). Johnson identifies no order requiring him to reveal any confidential source. And to the extent he is claiming protection as the alleged source, that is even further afield. The qualified reporter's privilege is premised on the idea that "forced disclosure of journalists' sources" in discovery "might deter informants from giving their stories to newsmen," thus chilling speech in a manner that implicates the First Amendment. *Id.*

If Johnson is affirmatively identifying himself as a source, then there is nothing left for the reporter's privilege to protect. Nor does the reporter's privilege create a blanket exemption from discovery into a defendant's conduct whenever he claims to have described that conduct to—among others—a journalist. Such a rule would destroy the viability of discovery altogether. In any event, Plaintiffs' discovery was aimed at Johnson's own communications and coordination with the individuals involved in his shakedown campaign against Plaintiffs—not at any source materials. Johnson has identified no request that would require

disclosure of confidential sources or other information protected by any qualified privilege.

Even assuming Johnson's premise that he was acting as a "reporter," Fifth Circuit precedent makes clear that the privilege is qualified, not a categorical shield—particularly on this record. This Court has held that the qualified reporter's privilege "must yield" "in a libel case" when the information is necessary to the claim. *Miller*, 621 F.2d at 725 (5th Cir. 1980). And while it has also required Plaintiffs to exhaust alternative means before compelling disclosure from a journalist directly, *see id.* at 726, Johnson has never even attempted to argue that Plaintiffs failed to do so. This is a defamation case, and Johnson offers no basis to treat any purported privilege as a bar to the discovery the District Court compelled. Once again, Johnson has forfeited his arguments. And once again, those arguments would fail on the merits even if he had not.

## D. Johnson's vague conflict-of-interest allegation is forfeited and unsupported on the merits.

Johnson's briefing offers only an undefined insinuation of a conflict of interest—tied vaguely to "opposing counsel maintaining an imputed conflict through the management of his family trust"—without stating who counsel allegedly represented, when, or in what substantially

related matter. Br. 12. Johnson forfeited any such claim because he never properly raised it below. *See State Indus. Prods. Corp. v. Beta Tech., Inc.*, 575 F.3d 450, 456 (5th Cir. 2009).

Johnson never filed a motion, never identified a governing standard, never requested any specific relief, and never asked the court to rule. He did no more than float a vague insinuation at a discovery hearing in June. The District Court immediately told him how to proceed: "file something to put that before the Court." ROA.1538. When Johnson continued referring to some vague conflict, the District Court again instructed: "You need to make a filing." *Id.* Johnson promised to do so, but he never followed through. Johnson cannot blame the District Court for failing to decide an issue he never presented.

Where a defendant seeks to disqualify opposing counsel over a conflict of interest, he ordinarily files a motion providing the court with some basic factual matter to substantiate that claim. That has been true in every case that Johnson's brief cites on this point. *See In re Dresser Indus., Inc.*, 972 F.2d 540, 542 (5th Cir. 1992); *In re Am. Airlines, Inc.*, 972 F.2d 605, 607-08 (5th Cir. 1992); *FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1308 (5th Cir. 1995); *see* Br. 12.

Johnson, by contrast, identifies no event, no affected decision, and no altered course of action. His argument lacks any evidence on the merits. He never explains the alleged conflict in any detail, and he never ties it to any concrete decision or litigation choice. He relies instead on rhetoric about the "potential use of confidential information." Br. 12. The nature of that information or how opposing counsel would have access to it are never explained.

The record confirms there was nothing for the court to decide. Plaintiffs' counsel rejected the insinuation of a conflict at the hearing and represented that conflict checks revealed that there was "nothing there." ROA.1538-39. On that record, the District Court had no obligation to launch a *sua sponte* disqualification inquiry into an allegation Johnson never presented for decision, and there is no basis to remand a jury verdict for an after-the-fact fishing expedition.

**E.    The District Court did not abuse its discretion by disallowing Johnson's teleconference appearance.**

In May 2025, the District Court held a hearing in response to Johnson's discovery misconduct. ROA.1480-1512. Johnson identifies no error in the court's handling of that hearing that would justify disturbing the verdict or judgment. He complains only that the court required him

to appear in person rather than by telephone. Br. 15. But Rule 43(a) (the sole authority Johnson cites for this argument) governs remote testimony at trial, not a party's preferred mode of attending a discovery hearing. In any event, review is for abuse of discretion, and Johnson cannot make that showing. *See Prideaux v. Tyson Foods, Inc.*, 387 Fed. App'x 474, 479 (5th Cir. 2010) (applying abuse of discretion standard to Rule 43(a) claim); *Eller v. Trans Union, LLC*, 739 F.3d 467, 477 (10th Cir. 2013) (same).

The request arose from Johnson's refusal to participate in discovery. In late January 2025, Plaintiffs served Johnson with requests for production relating to their civil RICO claims, and Johnson responded deficiently, prompting a motion to compel. ROA.604-612. The court set a hearing in May 2025. ROA.711.

Shortly before that hearing, Johnson emailed the District Court claiming a "debilitating medical condition" prevented him from appearing in person. ROA.717. Plaintiffs responded that Johnson had recently traveled and posted photos of those trips on social media. ROA.717-723. The District Court required Johnson either to appear in person or to support his claim with competent evidence, including

testimony under oath from his doctor. Johnson then appeared at the hearing without explanation. ROA.1480-1513. Nothing in that sequence supports reversal.

Johnson also notes that Plaintiffs' witness Stewart Baker testified remotely at trial due to a last-minute health issue requiring surgery, and he suggests that this created unfair "asymmetry." Br. 15. The situations are not remotely comparable. Baker underwent surgery and submitted a sworn declaration substantiating his condition. Johnson, by contrast, offered only an unsupported assertion—and when the District Court required competent proof, he appeared in person. The District Court did not abuse its discretion in ordering Johnson to appear live at the May 8 show-cause hearing, and Johnson can point to no unfair prejudice.

## F. The District Court was not required to hold a Rule 55(b)(2) hearing because the jury decided damages.

Johnson raised no contemporaneous objection to the procedures the District Court used for the jury damages trial. On appeal, he now asserts that the District Court "accepted Plaintiffs' [damages] without a Rule 55(b)(2) evidentiary hearing and without Daubert gatekeeping." Br. 15-16.

But Rule 55(b)(2)'s evidentiary-hearing requirement is inapplicable here because (1) default was entered on liability only, and (2) the court then held a jury trial on damages. Rule 55(b) addresses cases in which the court itself "determine[s] the amount of damages" in connection with a default judgment. FED. R. CIV. P. 55(b)(2)(B). That did not happen here. Rather, a jury determined damages after a full trial, and the court's post-verdict task was limited to applying statutory consequences of the verdict, including trebling the RICO award and awarding attorneys' fees.

The fact that a jury—not the court—determined damages after a full trial disposes of the Rule 55(b)(2) point, and it explains why Johnson's supporting assertions never connect to the record. He does not identify any exhibit that was inadmissible, any testimony that should have been excluded, or any gap in the proof the jury heard. Plaintiffs proved their damages with documentary evidence and fact testimony supplying concrete dollar figures for discrete harms. That evidence included underlying records and, where helpful, Rule 1006 summaries and graphical presentations of those records, along with Lambert's testimony explaining the figures and the resulting harm. The jury had a sound evidentiary basis to award damages for lost earned media value, reduced

investment following Johnson's attacks, and reputational repair costs incurred to mitigate and respond. Johnson did not object to that evidence at trial.

Johnson's passing reference to *Daubert* does not carry his burden on appeal either. He does not identify any witness, opinion, methodology, or exhibit that required scrutiny under Federal Rule of Evidence 702, and he points to no gatekeeping ruling the District Court made—over objection—that could justify vacating a jury verdict. The jury's damages figures did not depend on any particular "model" adopted by the court. Johnson writes as if the verdict turned on an "untested" expert model adopted by the District Court. Br. 7. It did not. And to the extent any expert testimony came in, there was no objection and nothing about it concerns an "untested damages model."[4] *Id.*

---

[4] Plaintiffs presented Stewart Baker, who previously served as General Counsel of the National Security Agency, to provide context for the character of Johnson's defamatory accusations and why allegations of foreign organized-crime ties and sexual misconduct were especially damaging and aimed to maximize reputational harm. Baker was examined at length on his background and was tendered without objection. *See* ROA.1707-09. Johnson raised no Rule 702 challenge, sought no *Daubert* ruling, and offered no competing expert testimony.

Nor did Johnson designate any expert for rebuttal or any other purpose. The scheduling order deadlines came and went without him naming anyone. *See* ROA.262-64. He did not attempt to call any witness at trial, expert or otherwise, and he made no offer of proof. Even now, his brief does not identify any rebuttal expert, describe any proposed opinions, or explain how any such testimony would have changed the jury's damages findings. That is no basis to vacate the verdict and order a do over.

## G. Johnson's conspiratorial allegations regarding litigation funding do not create a standing defect or any other basis for reversal.

Johnson's final argument is that Plaintiffs lacked standing because of what he calls a "litigation financing scheme." Br. 16-17. This litigation has never involved any such issues. Nor does his brief explain how that unfounded conjecture, even if accepted as true, would defeat standing for plaintiffs pursuing their own causes of action. Standing requires a concrete and particularized injury that is traceable to the defendant and redressable by the court. *Institute for Free Speech v. Johnson*, 148 F.4th 318, 327 (5th Cir. 2025). Point Bridge Capital and Hal Lambert meet that requirement because they sued Johnson for injuries he caused, including

economic harm to their business and reputation. *See El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("Economic injury is a quintessential injury upon which to base standing." (citation modified)).

Johnson also fails to point to any authority to support the proposition "litigation funding" creates any special Article III standing problems. *See Phoenix Light SF Ltd. v. Bank of New York Mellon*, 2020 WL 2950799, at *7 (S.D.N.Y. 2020) (distinguishing champerty claims from Article III standing and noting that "unlike standing, [champerty] is an affirmative defense that the party asserting has the burden to prove").

His lone citation, *Crabtree v. Allstate Prop. & Cas. Ins. Co.*, 140 F.4th 623, 625 (5th Cir. 2025), considered only whether the plaintiffs in that case were properly *assigned* a third-party's claim under Mississippi's champerty law. Because they possessed no independent injury, the plaintiffs in *Crabtree* lacked Article III standing. *Id.* at 626. This case has none of those features. There was no assignment, no third-party purchase of a cause of action, and no state-law defect preventing Plaintiffs from suing on their own claims.

Johnson's remaining discussion contains no Article III standing analysis. It reprises only the same conspiracy-driven insinuations about third-party backing and motives that he raised below, including claims that Elon Musk is funding the case and that the suit is part of a "Mormon-Chinese conspiracy." ROA.659, 1278. None of that bears on Plaintiffs' Article III standing.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Dated: February 25, 2026        Respectfully submitted,

/s/ *Will Thompson*

WILL THOMPSON
**DLA PIPER LLP (US)**
State Bar No. 24094981
1900 N. Pearl Street
Dallas, Texas 75201
will.thompson1@us.dlapiper.com
Telephone: (406) 546-5587

*/s/ Samuel Pollock-Bernard*

SAMUEL POLLOCK-BERNARD
**DLA PIPER LLP (US)**
500 8th St. NW
Washington, DC 20004
samuel.pollock-bernard@us.dlapiper.com

*Counsel for Plaintiffs-Appellees Point
Bridge Capital, LLC & Hal Lambert*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned counsel certifies that:

1. This document complies with the word limits of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,275 words; and

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Office Professional Plus 2010 in 14-point Century Schoolbook.

Dated: February 25, 2026      Respectfully submitted,

/s/ *Will Thompson*
WILL THOMPSON

*Counsel for Plaintiffs-Appellees Point Bridge Capital, LLC & Hal Lambert*

**CERTIFICATE OF SERVICE**

I certify that on February 25, 2026, I electronically filed this document with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users. A copy will be emailed and mailed to Johnson.

*/s/ Will Thompson*
*Counsel for Plaintiffs-Appellees*